IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, | * | |
| Plaintiff, | * | Case No. 89-218 |
| *v.* | * | Chief Judge Edward H. Damich |
| THE UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |

* * * * * * * * * * * * *

**CHEROKEE NATION'S OPPOSITION TO MOTION TO INTERVENE BY PATTON BOGGS LLP**

Arthur Lazarus, Jr.
Sonosky, Chambers, Sachse,
Endreson & Perry, LLP
1425 K Street, NW, Suite 600
Washington, D.C. 20005
202-682-0240
202-682-0249 (fax)
alazarus@sonosky.com

Special Counsel for Plaintiff

Of Counsel

Lloyd B. Miller
Donald J. Simon
Anne D. Noto
Sonosky, Chambers, Sachse,
Endreson & Perry, LLP
1425 K Street, NW, Suite 600
Washington, D.C. 20005
202-682-0240
202-682-0249 (fax)

Dated: November 17, 2005

# Table of Contents

*Page*

Introduction . . . . . 1

Argument . . . . . 3

I. Patton Boggs' attorney fee is subject to the approval of the Cherokee Nation as a matter of contract and under the applicable statute . . . . . 3

II. This Court lacks jurisdiction because the imputed complaint raises either a claim for injunctive relief against the Secretary of the Interior, or a claim for money damages against the Cherokee Nation, neither of which can be heard in this Court . . . . . 9

A. Patton Boggs seeks relief against the Secretary that can be awarded, if at all, only under the APA . . . . . 10

B. Patton Boggs seeks relief against the Cherokee Nation that is outside the jurisdiction of this Court . . . . . 16

III. Neither the Consent Decree, the Tucker Act, nor the All Writs Act, provides jurisdiction to this Court . . . . . 20

A. This Court's authority to enter the Consent Decree does not confer jurisdiction to adjudicate an attorney fee dispute . . . . . 21

B. This Court has no jurisdiction under the Tucker Act to consider Patton Boggs' claim for attorney fees, which is not a suit for money damages against the United States . . . . . 23

C. Absent jurisdiction under the Tucker Act, the All Writs Act is inapplicable . . . . . 26

IV. Patton Boggs does not meet the standards for intervention under RCFC 24 . . . . 28

Conclusion . . . . . 30

## Table of Authorities


***Cases:*** ***Page(s):***

*441 4th Street Ltd. P'ship v. United States*,
26 Ct. Cl. 1233 (1992) . . . . . . . . . . 27

*Am. Renovation and Constr. Co. v. United States*,
65 Fed. Cl. 254 (2005) . . . . . . . . . . 19, 25

*Bailey v. United States*,
3 Cl. Ct. 148 (1983) . . . . . . . . . . 12

*Berkeley v. United States*,
276 F.2d 9 (Ct. Cl. 1960) . . . . . . . . . . 17

*Bogart v. United States*,
531 F.2d 988 (Ct. Cl. 1976) . . . . . . . . . . 12

*Boyd v. United States*,
207 Ct. Cl. 1 (1975) . . . . . . . . . . 12

*Brookner v. United States*,
27 Fed. Cl. 423 (1992) . . . . . . . . . . 27

*Brown v. United States*,
105 F.3d 621 (Fed. Cir. 1997) . . . . . . . . . . 12

*Butler, Fitzgerald & Potter v. Sequa Corp.*,
258 F.3d 171 (2d Cir. 2001) . . . . . . . . . . 29-30

*Cherokee Nation v. United States*,
355 F.2d 945 (Ct. Cl. 1966) . . . . . . . . . . 12

*Chevron, U.S.A., Inc. v. N.R.D.C.*,
467 U.S. 873 (1984) . . . . . . . . . . 5

*Clinton v. Goldsmith*,
526 U.S. 529 (1999) . . . . . . . . . . 26

*County of Oneida v. Oneida Indian Nation*,
470 U.S. 226 (1985) . . . . . . . . . . 7

*Doyon, Ltd. v. United States*,
214 F.3d 1309 (Fed. Cir. 2000) . . . . . . . . . . 7

*Duncan v. Walker*,
533 U.S. 167 (2001) . . . . . . . . . . 5

*Dwen v. United States*,
62 Fed. Cl. 76 (2004) . . . . . . . . . . 24

*E.E.O.C. v. Cherokee Nation*,
871 F.2d 937 (10th Cir. 1989) . . . . . . . . . . 7

*Ellis v. United States*,
610 F.2d 760 (Ct. Cl. 1979) . . . . . . . . . . 24, 25

*Gaines v. Dixie Carriers, Inc.*,
434 F.2d 52 (5th Cir. 1970) . . . . . . . . . . 29, 30

*Godfroy v. United States*,
467 F.2d 909 (Ct. Cl. 1972) . . . . . . . . . . 12

*Hanlin v. United States*,
214 F.3d 1319 (Fed. Cir. 2000) . . . . . . . . . . 23

*Heller, Ehrman, White & MacAuliffe v. Babbitt*,
992 F.2d 360 (D.C. Cir. 1993) . . . . . . . . . . 14-15

*Int'l Mortgage & Inv. Corp. v. Von Clemm*,
301 F.2d 857 (2d Cir. 1962) . . . . . . . . . . 28-29

*Kennedy v. United States*,
19 Cl. Ct. 69 (1989) . . . . . . . . . . 17

*Keith v. St. George Packing Co., Inc.*,
806 F.2d 525 (5th Cir. 1986) . . . . . . . . . . 29

*Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*,
523 U.S. 751 (1998) . . . . . . . . . . 16

*Klamath Irrigation Dist. v. United States*,
64 Fed. Cl. 328 (2005) . . . . . . . . . . 27-29

*Kungys v. United States*,
485 U.S. 759 (1988) . . . . . . . . . . 5

*Littell v. Morton*,
369 F. Supp. 411 (D.Md. 1974) . . . . . . . . . . 12

*Massie v. United States*,
226 F.3d 1318 (Fed. Cir. 2000) . . . . . . . . . . 25

*McPherson v. United States*,
2 Cl. Ct. 670 (1983) . . . . . . . . . . 18

*Miller v. United States*,
67 Fed. Cl. 195 (2005) . . . . . . . . . . 20, 23

*Montana v. Blackfeet Tribe*,
471 U.S. 759 (1985) . . . . . . . . . . 7

*Nat'l Air Traffic Controller Ass'n v. United States*,
160 F.3d 714 (Fed. Cir. 1998) . . . . . . . . . . 23

*Nat'l City Bank of Evansville v. United States*,
163 F. Supp. 846 (Ct. Cl. 1958) . . . . . . . . . . 18

*N. Pac. Ry. Co. v. United States*,
227 U.S. 355 (1913) . . . . . . . . . . 7

*Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*,
498 U.S. 505 (1991) . . . . . . . . . . 16

*Pa. Bureau of Corr. v. U.S. Marshals Serv.*,
474 U.S. 34 (1985) . . . . . . . . . . 26

*Pueblo of Laguna v. United States*,
60 Fed. Cl. 133 (2004) . . . . . . . . . . 26

*Pueblo of Santo Domingo v. United States*,
54 Fed. Cl. 240 (Cl. Ct. 2002) . . . . . . . . . . 13

*Puyallup Tribe v. Dep't of Game*,
433 U.S. 165 (1977) . . . . . . . . . . 16

*Santa Clara Pueblo v. Martinez*,
436 U.S. 49 (1978) . . . . . . . . . . 16

*Sec. Savings and Loan Ass'n v. United States*,
26 Cl. Ct. 1000 (1992) . . . . . . . . . . 26

*Sisseton and Wahpeton Bands or Tribes v. United States*,
423 F.2d 1386 (Ct. Cl. 1970) . . . . . . . . . . 4

*Turner v. United States*,
248 U.S. 354 (1919) . . . . . . . . . . 16

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) . . . . . . . . . . 5

*Udall v. Tallman*,
380 U.S. 1 (1965) . . . . . . . . . . 5

*United Keetoowah Band of Cherokee Indians of Okla. v. United States*,
67 Fed. Cl. 695 (2005) . . . . . . . . . . 6

*United States v. Eilberg*,
89 F.R.D. 473 (E.D. Pa. 1980) . . . . . . . . . . 30

*United States v. King*,
395 U.S. 1 (1969) . . . . . . . . . . 9, 20, 23

*United States v. Sherwood*,
312 U.S. 584 (1941) . . . . . . . . . . 17-20, 27

*United States v. Testan*,
424 U.S. 392 (1976) . . . . . . . . . . 20

*United States v. U.S. Fid. & Guar. Co.*,
309 U.S. 506 (1940) . . . . . . . . . . 16

*Washington v. Wash. Commercial Passenger Fishing Vessel Ass'n*,
443 U.S. 658 (1979) . . . . . . . . . . 7

*W. Shoshone Identifiable Group v. United States*,
652 F.2d 41 (Ct. Cl. 1981) . . . . . . . . . . 12-13

***Statutes:***


Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*
§ 702 . . . . . . . . . . 11
§ 706 . . . . . . . . . . 11

All Writs Act, 28 U.S.C. § 1651 . . . . . . . . . . 26

Cherokee, Choctaw, and Chickasaw Claims Settlement Act, 25 U.S.C. §§ 1779-1779g
§ 1779c . . . . . . . . . . 10, 15, 21, 22, 30
§ 1779d . . . . . . . . . . 10, 21
§ 1779e . . . . . . . . . . 3, 4, 10, 12-14, 22

Hoopa-Yurok Settlement Act, 25 U.S.C. § 1300i *et seq.* . . . . . . . . . . 14-15

Indian Claims Commission Act, 25 U.S.C. §§ 70-70n-2
§ 70n (Act of Aug. 13, 1946, ch. 959, § 15, 60 Stat. 1053) . . . . . . . . . . 13, 14

Tucker Act, 28 U.S.C. § 1491 . . . . . . . . . . 9, 23-25

25 U.S.C. § 81 . . . . . . . . . . 4, 5

Pub. L. No. 106-179 (2000) . . . . . . . . . . 4

Act of February 11, 1920, ch. 68, § 3, 41 Stat. 404 . . . . . . . . . . 14

Act of February 23, 1929, ch. 300, § 6, 45 Stat. 1257-58 . . . . . . . . . . 14

Act of February 23, 1929, ch. 302, § 5, 45 Stat. 1258 . . . . . . . . . . 14

Act of April 25, 1932, ch. 136, § 4, 47 Stat. 138 . . . . . . . . . . 14

Act of August 26, 1935, ch. 686, §§ 3 & 4, 49 Stat. 802 . . . . . . . . . . 14


***Miscellaneous:***


Rules of the Court of Federal Claims ("RCFC")
RCFC 5.2 . . . . . . . . . . 2
RCFC 7 . . . . . . . . . . 1
RCFC 14 . . . . . . . . . . 1
RCFC 24 . . . . . . . . . . 1-3, 9, 28, 30

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, | * | |
| Plaintiff, | * | Case No. 89-218 |
| *v.* | * | Chief Judge Edward H. Damich |
| THE UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |

* * * * * * * * * * * * *

**CHEROKEE NATION'S OPPOSITION TO MOTION TO INTERVENE BY PATTON BOGGS LLP**

## INTRODUCTION

Patton Boggs LLP ("PB"), a law firm, seeks through intervention to obtain, out of tribal funds in an account administered by the Secretary of the Interior ("Secretary"), additional compensation of approximately $1.5 million allegedly due under a 1989 attorneys' contract with the Cherokee Nation.[1] The key issue here presented is whether this Court has jurisdiction to consider and decide Patton Boggs' claim to Cherokee Nation funds. *See* Order of October 24, 2005, Docket No. 113. For the reasons set forth in this Opposition, the Court does not.

One significant procedural question, however, needs first to be addressed. RCFC 24(c) provides that a motion to intervene "shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought."[2] The intervenor-applicant here has failed to file such a

[1] Patton Boggs has long since been paid $403,959 for its legal services under the contract (PB Mot. to Intervene at 1), and, as authorized by the Cherokee Nation, the Secretary has recently paid the firm an additional $151,000. *See, e.g.,* Transcript of 10/20/05 Proceedings ("Tr."), Docket No. 112, at 5, 31.

[2] A "pleading" is a complaint or an answer. RCFC 7(a), 14(c).

"pleading" and, therefore, its motion is seriously defective.[3] Moreover, Patton Boggs also has advised the Court that its "Supplemental Memorandum replaces PB's earlier motions to intervene and for attorney fees, thereby constituting an initial memorandum under RCFC 5.2(a)(1)." PB Supp. Mem. at 1 n. 1 (emphasis added). Since a memorandum under RCFC 5.2 is neither a pleading nor a motion, and since Patton Boggs' initial motions for intervention and attorneys' fees have now been "replaced" by it, neither a pleading nor a motion is now on file, and the threshold question arises as to what matter, if any, remains before the Court for a decision.

Be that as it may, for purposes of this Opposition the Cherokee Nation will treat Patton Boggs' Motion to Intervene as if it were filed in the form required by Rule 24 (even though it lacks the necessary pleading) and, notwithstanding the law firm's representation to the contrary, as if that motion had not been withdrawn. Patton Boggs' Motion for Attorneys' Fees, on the other hand, is a far different story. Since Patton Boggs, as intervenor-applicant, is not yet a party to this case, its Motion for Attorneys' Fees – drafted as if it were a motion for summary judgment – has never been, and still is not, properly before the Court. Moreover, the Court's Order of October 24, 2005 calls for the filing of supplemental briefing on only two issues: (1) whether Patton Boggs may intervene (*i.e.,* the Court's jurisdiction), and (2) if so, "what relief, if any, the Court is empowered to grant" – and not whether Patton Boggs should be declared a

---

[3] In order to determine its jurisdiction the Court (as well as the parties) need to know whether Patton Boggs is seeking to intervene as a plaintiff, which would raise the problem that the Secretary against whom it seeks relief is not a defendant, or as a defendant with a counterclaim, which raises the problem of the Cherokee Nation's sovereign immunity as well as the question of why and how the law firm came for relief to this Court. Patton Boggs' filing of the required "pleading" might help solve this conundrum.

complete victor in this case *ab initio*. Accordingly, the Cherokee Nation will not address the merits of Patton Boggs' claim for additional compensation in this Opposition, except to the extent, as, for example, in Point I below, the merits bear upon the issue of this Court's jurisdiction.

For reasons discussed below, this Court has no jurisdiction over the claim Patton Boggs here asserts. Intervention in this case by Patton Boggs is thus unwarranted, and there is no relief responsive to the claim that the Court is empowered to grant. In addition, Patton Boggs fails to satisfy the standards for intervention under RCFC 24.[4]

## ARGUMENT

### I. Patton Boggs' attorney fee is subject to the approval of the Cherokee Nation as a matter of contract and under the applicable statute.

The jurisdictional flaws in Patton Boggs' Motion to Intervene (hereinafter "PB Mot.") are probably best analyzed against the background of the attorneys' contract, PB Mot., Ex. 2, and the particular provision – § 1779e – of the Cherokee, Choctaw, and Chickasaw Claims Settlement Act ("Settlement Act"), 25 U.S.C. §§ 1779-1779g, upon which the law firm relies. Specifically, Patton Boggs asserts that under its 1989 attorneys' contract it is "entitled to compensation in the amount of ten percent (10%) of all sums recovered for the Cherokee Nation, . . . less any sums

---

[4] In limiting this Opposition to addressing the threshold jurisdictional issues, in accordance with the limited scope of briefing provided by the Court's October 24 Order, the Cherokee Nation expressly reserves its multiple objections on the merits to Patton Boggs' Motion for Attorneys' Fees, should this proceeding survive the manifold jurisdictional defects in the form and substance of the claim Patton Boggs asserts, and should such a motion be properly filed, or re-filed, with the Court. The Nation further expressly reserves the right to dispute the allegations of fact set forth in that Motion, most of which the Nation vigorously contests.

[previously] paid to PB." PB Mot. at 1.[5] A mere reading of the contract, however, shows this unqualified assertion to be inaccurate. The contract actually provides, in language never mentioned by Patton Boggs, that its contingent fee is subject to the condition "that approvals required by law, if any, are obtained." PB Mot., Ex. 2 at 3 (emphasis added). Morever, the term "required approvals" is elsewhere defined in the contract to include approvals by "the Cherokee Nation Tribal Council and the Bureau of Indian Affairs, if required by regulation or statute."[6] *Id.* at 1. Accordingly, by the express terms of its contract, Patton Boggs' contingent fee is subject to any approvals of the Cherokee Nation Tribal Council required by law.

The relevant statute, 25 U.S.C. § 1779e, provides in material part that "the Secretary shall pay to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations." (Emphasis added.) Patton Boggs would have the Court read the phrase "as approved by the respective Indian Nations" as modifying the word "contracts," basing its argument mainly on the lack of commas in the text of this Settlement Act provision. PB Supp. Mem. at 22-23; *see also* Tr. at 29. But that construction of the statute makes no sense. In other words, there can be no valid "contract" at all unless an agreement has

---

5 Patton Boggs makes the bold claim that it is entitled to a full ten percent fee – the statutory ceiling on all fees that can be paid in the case – even though other attorneys also provided services to the Cherokee Nation, and even though Patton Boggs' contract either was terminated or expired, *see infra* at 7-9, years before the conclusion of the case. Thus, Patton Boggs tries to zero out any fees to be paid to other lawyers, with valid contracts, who also provided legal services. This Court long ago disapproved of such harsh tactics: "If appellants can rightly insist on the entire 10% because they had the foresight to put that figure in their contract, nothing would be left for [other attorneys] no matter how meritorious their claim. Congress could not have intended such an inequity, or to allow one attorney to bar another's pay in that fashion." *Sisseton and Wahpeton Bands or Tribes v. United States,* 423 F.2d 1386, 1389 (Ct. Cl. 1970).

6 Until amended in 2000 by Pub. L. 106-179, 25 U.S.C. § 81 required Cherokee Nation attorney contracts to be approved not only by the Tribal Council, but also by the Secretary.

been approved by the "respective Indian Nation[ ]", *i.e.,* the Cherokee Nation, *see* 25 U.S.C. § 81, so saying that "approval" by the Nation modifies "contract" creates a tautology, an unacceptable redundancy in the law – requiring approval of what is already necessarily approved. Stated another way, Patton Boggs' reading of the Settlement Act would convert the phase "as approved by the respective Indian Nations" into complete surplusage – again, since these Nations must already have given their approval in order for there to be a contract at all. Patton Boggs' reading thus violates the very rule of construction which it cites: that meaning should be given to every word in the statute. PB Supp. Mem. at 23.[7] In context, the phrase "as approved by the respective Indian Nations" thus can refer logically only to the word "fees" and, as pointed out above, this is exactly the provision of law with respect to fee approvals by the Cherokee Nation Tribal Council that Patton Boggs' attorney contract anticipated.[8]

To rebut the foregoing plain and reasonable conclusion, which, as noted, is wholly consistent with the tribal approval requirement in its attorneys' contract, Patton Boggs cites several canons employed in ordinary statutory construction cases where a law is said to be "ambiguous." PB Supp. Mem. at 25-27. The law firm clearly overreaches in its analysis of these

---

[7] "[A] cardinal principle of statutory construction" is "that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001); *see also Kungys v. United States*, 485 U.S. 759, 778 (1988) (A "cardinal rule of statutory interpretation [is] that no provision should be construed to be entirely redundant.").

[8] The Associate Deputy Secretary clearly reached the same conclusion in determining that "the Secretary is required to pay only those fees approved by tribal resolutions." PB Mot., Ex. 3 at 2; *see also* Tr. at 6-7. The Secretary's determination is entitled to great deference. *See, e.g, Udall v. Tallman*, 380 U.S. 1, 16 (1965); *Chevron, U.S.A., Inc. v. N.R.D.C.*, 467 U.S. 837, 844 (1984).

canons. Patton Boggs, for example, builds one argument upon the premise that Congress intended in the Settlement Act "to provide a complete legislative solution to a case," *id.* at 23, impliedly including payment of its disputed fee – a premise that is flatly contradicted by another provision in the statute that leaves the settlement open by allowing so-called "claimant tribes" to file suit seeking a share in the award. *See* 25 U.S.C. § 1779f(b) (This provision led to *United Keetoowah Band of Cherokee Indians of Okla. v. United States,* 67 Fed. Cl. 695 (2005) (complaint dismissed 9/16/05 on indispensable party grounds)). Patton Boggs' further argument that the Secretary's view of his ministerial duty leads to the "absurd result" that the Cherokee Nation might approve "none of PB's legal fees," PB Supp. Mem. at 25, is belied by the fact that the Nation, after careful review by its General Counsel and further review by an outside, independent law firm, actually decided to pay Patton Boggs an additional fee.[9] *See, e.g.,* Tr. at 5, 31; PB Supp. Mem. at 11, Ex. 4. Lastly, Patton Boggs' contention that the legislative history of the Settlement Act shows that Congress intended the firm to be paid in accordance with its contract, PB Supp. Memo at 26-27, wholly fails to take into account the expiration of that contract, not to mention the express (but by Patton Boggs consistently ignored) condition in its attorneys' contract that its fees are subject to the approvals of the Cherokee Nation Tribal Council required by law.

The deciding consideration in this case, however, is not the canons in ordinary litigation

---

[9] Patton Boggs' argument that, within the statutory scheme, "the Secretary must know to whom she has an obligation to pay," PB Supp. Mem. at 24, does not operate in its favor. The Secretary has a far easier task paying attorney fees in accordance with the approvals of the respective Indian Nations than she would have examining the fee provisions in approved attorney contracts which might be measured by quantum meruit. *See, e.g.,* Wilcoxen-Niebell Attorneys' Contract, PB Supp. Mem., Ex. 1 at A-39.

cited by Patton Boggs, but rather the controlling rule that statutes affecting Indians "are to be construed liberally for the benefit of the Indians, with ambiguous provisions interpreted to their benefit." *Doyon, Ltd. v. United States,* 214 F.3d 1309, 1314 (Fed. Cir. 2000) (quoting *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766 (1985)); *E.E.O.C. v. Cherokee* Nation, 871 F.2d 937, 939 (10th Cir. 1989) ("[N]ormal rules of construction do not apply when Indian treaty rights, or even non-treaty matters involving Indians, are at issue."); *see also N. Pac. Ry. Co. v. United States,* 227 U.S. 355, 366-67 (1913). This canon of construction is "rooted in the unique trust relationship between the United States and the Indians." *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 247 (1985); *see also Washington v. Wash. Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 675-76 (1979). In any battle between canons, therefore, Patton Boggs' version necessarily must fall.

Finally, in an attempt to justify demanding a full contingent fee for substantially less than full legal services, Patton Boggs complains that its attorneys' contract was terminated on October 30, 1995 "without cause."[10] PB Mot. at 1. Even if true, however, this fact is irrelevant because the contract either expired by its own terms before October 30, 1995, or would have expired shortly thereafter. More specifically, the initial contract was effective for a period of 18 months ending July 1, 1990. PB Mot., Ex. 2 at 3. Patton Boggs claims that the contract was "renewed twice," PB Mot. for Attorneys' Fees at 2, which would have brought its expiration date to July 1, 1994 at the latest, since the contract could be extended only "for periods of two (2) years, each

---

[10] This representation is significant since the contract contains a provision for paying Patton Boggs an "equitable portion" of its contingent fee in the event of termination "for cause." PB Mot., Ex. 2 at 4. No comparable provision exists in the contract covering termination "without cause." Arguably, the contract thus provides Patton Boggs with no right to payment of attorney fees in such an event.

from the date of its expiration." PB Ex. 2 at 3. That expiration date is more than a year before the alleged termination without cause.

Although the law firm has not yet submitted documentation to such effect (and might never), Patton Boggs may claim that its second contract extension was for a five-year period.[11] Assuming, *arguendo,* that this assertion will be made, whether it might be correct is similarly irrelevant since, even if true, the contract would have expired by its own terms on July 2, 1997, or long before the Cherokee Nation ever obtained a "recovery." The contract does not contain <u>any</u> provision for the payment of attorney fees in the event of its expiration prior to a recovery by the Cherokee Nation. *See* PB Mot., Ex. 2. Nor did Patton Boggs, notwithstanding its reputed experience and expertise, provide that its contingent fee would survive expiration of the contract. Despite the omission of these ordinary boilerplate provisions, the fact that possible expiration of the contract was within the contemplation of the parties is shown by the contract provision reciting it was "expressly understood that . . . [Patton Boggs] shall have no contractual obligation to continue representation of the Cherokee Nation after *expiration* or termination of this Contract." *Id.* at 3 (emphasis added). In an attorneys' contract which it drafted, Patton Boggs simply forgot to protect its contingent fee against expiration of the contract.

---

[11] The Cherokee Nation has located a document entitled "Attorneys' Contract," dated March 13, 1991, which seems to extend the Patton Boggs Attorneys' Contract for two years until July 2, 1992 [sic], and authorizes a five-year extension thereafter. *See* Cherokee Nation ("CN") Ex. A-1 (all CN exhibits are attached). The two-year extension was approved by resolution of the Cherokee Nation Tribal Council and the BIA Acting Area Director. *See* CN Ex. A-2. The Cherokee Nation also has located a document entitled "Attorneys' Contract," dated May 12, 1992, in which Cherokee Principal Chief Wilma Mankiller purported to approve a five-year extension of the Patton Boggs contract to July 2, 1997, *see* CN Ex. A-3, but there is no indication that this "extension" ever was authorized or approved. The burden of proving any required approvals, of course, lies with Patton Boggs. Thus far, it has been silent on the matter.

In short, as a matter of contract and as a matter of law, the underpinning of Patton Boggs' additional compensation claim is plainly not what the law firm here alleges it is.

**II. This Court lacks jurisdiction because the imputed complaint raises either a claim for injunctive relief against the Secretary of the Interior, or a claim for money damages against the Cherokee Nation, neither of which can be heard in this Court.**

As discussed above, *supra* at 1-2, the Court's assessment of whether it has jurisdiction over the claim presented by the Motion to Intervene is hindered by Patton Boggs' failure to comply with RCFC 24 requiring a pleading to be filed with such a motion. Had Patton Boggs filed such a pleading – presumably a complaint against the United States – it would be possible to assess what claims are actually being asserted on intervention and, more importantly, what relief actually is being sought. In the Court of Federal Claims in particular, the claims asserted and the relief sought are the keys to whether jurisdiction lies – for this Court's jurisdiction is strictly limited to deciding cases where there is a claim for money damages that is asserted against the United States. 28 U.S.C. § 1491; *United States v. King*, 395 U.S. 1, 2-3 (1969).

In the absence of a complaint (or any other pleading) by which to measure Patton Boggs' claims, the Court is instead forced to impute its complaint from the discussion in the Supplemental Memorandum. Doing so, it is apparent that Patton Boggs asserts not a claim for money damages, but rather for injunctive relief, and not a claim against the United States, but rather against the Secretary of the Interior. To be sure, a forum may exist for such an action, but it would be in the United States District Court and not the Court of Federal Claims – for the relief Patton Boggs seeks arises, if at all, under the Administrative Procedures Act ("APA"), not under the Tucker Act or the Settlement Act.

Alternatively, to the extent that its Supplemental Memorandum can be read to assert a

claim for money damages, Patton Boggs' cause of action is one against the Cherokee Nation, for breach of an attorney contract. That dispute, of course, is between two private parties, and cannot be heard in this Court.

### A. Patton Boggs seeks relief against the Secretary that can be awarded, if at all, only under the APA.

Although it has filed no complaint in intervention, and thus has presented no clear statement of exactly what relief it is seeking, Patton Boggs appears to be asking the Court to order the Secretary to make a disbursement to it from the funds authorized and appropriated to the Cherokee Nation under section 1779c(c) of the Settlement Act.

Under the Act's scheme, Congress has authorized a total of $40 million to be divided among the three settling tribes, with half allocated to the Cherokee Nation. 25 U.S.C. § 1779c(c). The funds are to be deposited into a "tribal trust fund account" established for each tribe, § 1779d(a)(1), and then managed, invested or distributed by the Secretary. § 1779d(a)(2). "At the time the funds are paid to the Indian Nations," the Act states that "the Secretary shall pay" attorney fees to the tribal attorneys. § 1779e(a).

Prior to its filings in this Court, Patton Boggs sought to persuade the Secretary to pay to it the fees it believes are due under its attorneys' contract. As it recounts, "Having previously submitted requests for payment to the Secretary's staff, on May 20, 2004, Patton Boggs wrote to the Secretary seeking the 10% it was owed . . . ." PB Supp. Mem. at 8. Patton Boggs then "provided the Secretary with a legal memorandum" outlining its preferred resolution of the dispute. *Id.* at 13. Contrary to Patton Boggs' wishes, however, "the Secretary breached a duty to decide PB's entitlement to its legal fees . . . [and t]his decision was wrong." *Id.* at 14. Patton

Boggs concludes that "it was improper for the Secretary to decide to carry out the extra-statutory instructions" of the Cherokee Nation, "instead of Congress." *Id.*

Patton Boggs thus is seeking judicial review of agency action: the Secretary's decision announced in Mr. Cason's letter of October 13, 2005 (PB Supp. Mem., Ex. 12), wherein he informed Patton Boggs "that the Secretary is required to pay only those fees approved by the tribal resolutions after the Settlement Act became effective." PB Supp. Mem., Ex. 12 at A-86. Patton Boggs contends this decision "clearly breached a statutory duty" to pay a greater amount of fees to it, PB Supp. Mem. at 14, and it seeks this Court's review of that decision.

Patton Boggs may possibly be entitled to seek judicial review of the Secretary's decision, which it characterizes as a "failure to comply with a statutory obligation," PB Supp. Mem. at 1; an "abdicati[on] [of] statutory obligations," *id.* at 2; "wrong," *id.* at 14; "improper," *id.*; and "contrary to obligations imposed by the Settlement Act," *id.* It is simply not entitled to seek that review in this Court.

Instead, assuming, without conceding, that the claims asserted here may be judicially cognizable, they would arise, if at all, under the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.*, which provides the contours for judicial review of an agency action – such as the decision of the Secretary here to make certain payments to attorneys from the settlement fund. The APA permits "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," to seek judicial review of that action. § 702. It vests the federal district and appellate courts – but not the Court of Federal Claims – with jurisdiction to "compel agency action unlawfully withheld," § 706(1), or to set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 706(2)(A).

That is what Patton Boggs is asking for here. It is not asserting a claim for money damages against the United States; instead, it is seeking a declaration that the Secretary's decision to make payments of attorney fees in accordance with the Cherokee Nation's approved fee schedule is "contrary to law," and an order directing the Secretary to make payments to it from the fund in the amount it believes it is due. That relief, if permissible, would fall within the ambit of the APA. *See, e.g., Littell v. Morton*, 369 F. Supp. 411 (D.Md. 1974) (APA review of Secretary's decision to deny contingent fee payment to tribal attorney in claims case).[12]

The proposition that the Settlement Act – and in particular the language of section 1779e – does not provide this Court with jurisdiction to review and fix attorney fee payments is best illustrated by contrast with a statute that does do so. This Court frequently has been in the position of making an award of attorney fees in contingent fee cases brought by Indian tribes under jurisdiction which this Court inherited from the Indian Claims Commission. *See, e.g., Cherokee Nation v. United States,* 355 F.2d 945 (Ct. Cl. 1966); *Godfroy v. United States,* 467 F.2d 909 (Ct. Cl. 1972); *W. Shoshone Identifiable Group v. United States,* 652 F.2d 41 (Ct. Cl.

---

[12] This Court has no jurisdiction to issue injunctions against individual agencies or federal officials. *See Brown v. United States*, 105 F.3d 621, 622-24 (Fed. Cir. 1997) (affirming the dismissal by the Court of Federal Claims of an action in which the plaintiffs sought, *inter alia*, "an order that the IRS issue a letter" to the parties' employers "instructing the employers to disregard all federal liens and levies" because "[t]he Tucker Act does not provide independent jurisdiction over such claims for equitable relief"); *Bogart v. United States*, 531 F.2d 988, 991-92 (Ct. Cl. 1976) (dismissing the General Services Administrator as a defendant because where "the relief sought is against others than the United States, it is not within the jurisdiction of this court" and noting that it was beyond the authority of the court to issue an "order directing the defendants to vacate and cancel their request" to a private party to transfer property); *Boyd v. United States*, 207 Ct. Cl.1 n.1 (1975) (dismissing the Secretary of Defense and the Secretary of the Air Force as defendants because "[t]his court can enter judgments only against the United States"); *Bailey v. United States*, 3 Cl. Ct. 148, 150 (1983) (noting that the court was unaware of any authority that would permit the Claims Court to "order the Secretary of the Air Force to comply with plaintiff's view of what the judgment of another court required").

1981). The Court's authority to set attorney fees in these cases was conferred by a specific provision of the Indian Claims Commission Act ("ICCA"), 25 U.S.C. § 70n, which provided (for cases brought before the Indian Claims Commission):

> The fees of such attorney or attorneys for all services rendered in prosecuting the claim in question whether before the Commission or otherwise, shall, unless the amount of such fees is stipulated in the approved contract between the attorney or attorneys and the claimant, be fixed by the Commission at such amount as the Commission, in accordance with standards obtaining for prosecuting similar contingent claims in courts of law, finds to be adequate compensation for services rendered and results obtained, considering the contingent nature of the case, plus all reasonable expenses incurred in the prosecution of the claim; but the amount so fixed by the Commission, exclusive of reimbursements for actual expenses, shall not exceed 10 per centum of the amount recovered in any case.

Act of Aug. 13, 1946, ch. 959, § 15, 60 Stat. 1053. Although the Indian Claims Commission was disbanded in 1978, all powers of the Commission, including the right to award attorneys fees under section 70n, were transferred to the Court of Claims, and then to the Court of Federal Claims. *See Pueblo of Santo Domingo v. United States,* 54 Fed. Cl. 240, 244-45 (Cl. Ct. 2002). Thus, this Court's jurisdiction to make awards of attorney fees in ICCA cases rests on the *specific statutory authority* in section 70n that the "fees of such attorney or attorneys . . . shall . . . be fixed by the Commission," an explicit authority that has subsequently been conferred on this Court to exercise in appropriate cases.

But this is not one such case and the Court derives no authority from section 70n here. By contrast to the power expressly conferred by the ICCA, no comparable authority to determine or award fees can be found in the Settlement Act, which – contrary to Patton Boggs' contention (PB Supp. Mem. at 15) – is simply silent as to the *Court's* role in the payment of attorney fees under section 1779e. That provision does not direct the court to "fix" the fee, nor to review a

contract fixing such fees, nor to enforce a contract fixing such fees, nor to second-guess a tribe's determination as to the amount of fees to pay under such a private contract, nor to make an "equitable" determination of the payment of such fees, nor to review the Secretary's administrative decisions in carrying out a tribe's instructions on the disbursement of tribal funds to pay such fees. The contrast between section 70n – which explicitly provides the Court with the authority that Patton Boggs wishes it had here – and section 1779e, which governs this case, could not be more stark.[13]

Finally, the same point is illustrated by *Heller, Ehrman, White & MacAuliffe v. Babbitt,* 992 F.2d 360 (D.C. Cir. 1993), where a law firm brought a suit in district court under the APA against the Secretary for failing to pay attorney fees from a settlement fund created by Congress pursuant to the Hoopa-Yurok Settlement Act ("HYSA"), 25 U.S.C. § 1300i *et seq*. The court rejected the effort, and said that exclusive jurisdiction over the claim lay in the Claims Court, <u>but only because the HYSA expressly gave exclusive jurisdiction to this Court</u>. 992 F.2d at 361,

---

[13] To the same effect as the ICCA – and in stark contrast to the Settlement Act at issue in this case – multiple tribal jurisdictional acts have *expressly* conferred jurisdiction on this Court to "fix" and award attorneys fees. *See, e.g.,* Act of February 23, 1929, ch. 300, § 6, 45 Stat. 1257-58 (Coos Bay, Lower Umpqua, and Suislaw Tribes) ("Upon final determination of such suit or suits the Court of Claims shall have jurisdiction to fix and determine a reasonable fee, not to exceed 10 per centum of the recovery, together with all necessary and proper expenses incurred in the preparation and prosecution of such suit or suits, to be paid to the attorney or attorneys employed . . . ."); Act of April 25, 1932, ch. 136, § 4, 47 Stat. 138 (Eastern and Western Cherokees) (same); Act of February 23, 1929, ch. 302, § 5, 45 Stat. 1258 (Kansas and Kaw Tribes) ("That upon the final determination of any suit instituted under this Act, the Court of Claims shall decree such amount or amounts as it may find reasonable to be paid to the said attorneys of the Kansas or Kaw Tribe of Indians for their services and expenses as said attorneys . . . ."); Act of February 11, 1920, ch. 68, § 3, 41 Stat. 404 (Fort Berthold Indians) ("[U]pon the final determination of such suit, cause, or action the Court of Claims shall decree such fees as it shall find reasonable to be paid the attorney or attorneys employed therein by said tribe or bands of Indians, under contracts negotiated and approved as provided by existing law . . . ."); Act of August 26, 1935, ch. 686, §§ 3 & 4, 49 Stat. 802 (Siletz) (same).

363. The statute in *Heller, Ehrman* specified that "any claim" challenging the distribution of money and property under HYSA "shall be brought" in the Claims Court. *Id.* at 363. The D.C. Circuit concluded that "HYSA specifies that the law firm's only remedy is to sue the United States in the Claims Court for damages." *Id.* The plaintiffs cannot "circumvent" a "clear and explicit" statutory grant of exclusive jurisdiction "by creatively framing their complaint." *Id.* at 363-4.

As with the ICCA, the "clear and explicit" grant of jurisdiction to this Court in the HYSA to resolve disputes about distribution of the settlement funds, including attorney fees, stands in sharp contrast to the silence of the Settlement Act as to the same matters. This Court's role under the Settlement Act is simply to receive and lodge a consent decree, ensuring that all appropriations have been made to the settling tribes. 25 U.S.C. § 1779c(a). Nowhere is there a provision comparable to that in the HYSA that gives the Court an omnibus and exclusive jurisdiction to resolve "any claim" arising out of the distribution of money under the Act. Where Congress intended to confer such jurisdiction on this Court, it knew how to do so, and has done so expressly. It did not do so here.

Absent an express grant of jurisdiction to this Court to resolve the issue, Patton Boggs must look elsewhere for the remedy it seeks – review of agency action by the Secretary and potential injunctive relief. No amount of "creatively framing their complaint," 992 F.2d at 363, (if only it had filed one) should permit Patton Boggs to "circumvent" the jurisdictional rules set by Congress.

**B. Patton Boggs seeks relief against the Cherokee Nation that is outside the jurisdiction of this Court.**

In substance and at core, the Supplemental Memorandum before the Court presents a garden variety contract dispute between two private parties: Patton Boggs claims that it has a contract with the Cherokee Nation that commits the Nation to pay a certain fee to it, and it further claims that the Nation is now in breach of that contract.

In the normal course, such a claim for breach of an attorney contract would be resolved by the law firm suing its client over the fees it asserts are due. But as Patton Boggs recognizes, PB Supp. Mem. at 19 n.27, that option is not available here because the Nation is protected from suit by its sovereign immunity.[14] As sophisticated counsel, Patton Boggs could have negotiated in its contract for a waiver of the Nation's immunity in the event of a fee dispute, but it did not do so. That failure is a problem of its own making.

Nor is the Nation's immunity waived by the fact of its presence before the Court as plaintiff in the underlying riverbed case against the United States. When a tribal sovereign sues, it remains immune from counterclaims or cross-claims except for recoupment arising out of the same transaction or occurrence as the tribal claim. *See, e.g., Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991) ("[A] tribe does not waive its sovereign immunity from actions that could not otherwise be brought against it merely because those actions were pleaded in a counterclaim to an action filed by the tribe."). Even if Patton

[14] *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978); *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991); *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998); *Puyallup Tribe v. Dep't of Game*, 433 U.S. 165, 172-73 (1977); *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 512 (1940); *Turner v. United States*, 248 U.S. 354, 357-58 (1919).

Boggs were granted intervention, and even if it were to file a counterclaim (or cross-claim) against the Cherokee Nation, its claim for attorney fees arises from its alleged services under a separate agreement, not from the transaction or occurrence that gave rise to this case – the historic claims by the Cherokee Nation against the United States regarding the Nation's riverbed lands. Thus, the purported claim that Patton Boggs seeks to assert against the Cherokee Nation is barred by the Nation's immunity.

Even apart from the immunity issue, this Court cannot resolve the fee dispute between Patton Boggs and the Nation because the Court plainly lacks jurisdiction to adjudicate claims such as this between private parties:

> [I]t has been uniformly held, upon a review of the statutes creating the court [of claims] and defining its authority, that its jurisdiction is confined to the rendition of money judgments in suits brought for that relief against the United States *and if the relief sought is against others than the United States the suit as to them must be ignored as beyond the jurisdiction of the court*[,] or if its maintenance against private parties is prerequisite to prosecution of the suit against the United States the suit must be dismissed.

*United States v. Sherwood*, 312 U.S. 584, 588 (1941) (citations omitted) (emphasis added).[15]

Applying this settled rule, the Supreme Court in *Sherwood* held that where the plaintiff asserted a right to bring an action based on its status as a judgment creditor of another party pursuant to certain provisions of New York state law, the Court of Claims was without

---

15 *See also Berkeley v. United States*, 276 F.2d 9, 12-13 (Ct. Cl. 1960) (to extent plaintiff's claim challenges actions of private party, the claim lies outside the jurisdiction of the Court of Claims); *Kennedy v. United States*, 19 Cl. Ct. 69, 76 (1989) ("[I]f the maintenance of a suit against private parties is a prerequisite to the prosecution of the suit against the United States, the suit must be dismissed.").

jurisdiction to adjudicate the claim because it would require the Court to adjudicate the validity of the state court order vesting the judgment creditor with the capacity to make the claim:

> We think it plain that the present suit could not have been maintained in the Court of Claims because *that court is without jurisdiction of any suit brought against private parties* and because adjudication of the right or capacity of respondent [the plaintiff in the Court of Claims] to proceed with the suit upon the contract of the judgment debtor with the United States is prerequisite to any recovery upon the Government contract. . . . Adjudication of that issue is not within the jurisdiction of the Court of Claims whose authority, as we have seen, is narrowly restricted to the adjudication of suits brought against the Government alone.

*Sherwood*, 312 U.S. at 588-589.[16]

The rule set out in *Sherwood* controls here. The claim made by Patton Boggs is in the nature of a contract dispute with the Cherokee Nation – asserting the terms of its contract, it contests the right of the Nation to pay it anything less than 10 percent of the Nation's recovery in the underlying riverbed case. But the Cherokee Nation's reading of the contract differs. Even though Patton Boggs labors to frame its claim as one against the United States (or, more specifically, against the Secretary), the predicate for the claim of what the Secretary must do, or must pay, still depends on resolution of the dispute between two private parties as to what their

---

16 *See also McPherson v. United States*, 2 Cl. Ct. 670, 673 (1983) (court lacked jurisdiction over plaintiff's damages claim against the United States, where the claim against the Government was dependent upon showing a breach of duty by a third party); *Nat'l City Bank of Evansville v. United States*, 163 F. Supp. 846, 852 (Ct. Cl. 1958) (to the extent plaintiff's losses resulted from improper action of the surety on a contract with the United States, plaintiff's claim was against the surety and not the United States, and accordingly lay outside the jurisdiction of the court of claims).

private contract provides. As such, the claim lies outside the jurisdiction of this Court, just as in *Sherwood.*[17]

Patton Boggs attempts to finesse this problem by claiming, in essence, that the Settlement Act somehow federalizes the attorney contract, making it a direct obligation of the United States, and seeking to hold the United States liable for performance of the contract. But the Act does no such thing. All it does do is provide a mechanism for the Cherokee Nation to pay fees it owes under its contracts out of the settlement sums it is receiving under the statute – by directing the Secretary to perform the ministerial function of making disbursements to the attorneys from funds appropriated for the benefit of the Nation. In so doing, the statute does not make any such contract an obligation of the United States, or make the proper meaning of contract terms a dispute between Patton Boggs and the United States. The dispute over its contract is, and

[17] This Court's decision in *American Renovation and Constr. Co. v. United States,* 65 Fed. Cl. 254 (2005) is not to the contrary. In *American Renovation*, an assignee of a government contract sought to intervene in an action against the United States for breach of that contract brought by the original contractor. The Court granted intervention because the question presented was which company – the plaintiff or the intervenor – "was entitled to recover a contract balance allegedly due from the government," *id.* at 261, *i.e.,* which company was the proper plaintiff. In agreeing to decide which of the two possible plaintiffs was entitled to the recovery against the United States under the contract, the Court emphasized that "it cannot enforce the legal rights of Intervenor-Applicant specifically against Plaintiff, as such a determination falls outside of the jurisdiction conferred under the Tucker Act." *Id.* at 262.

That precisely states the difference here: Patton Boggs is not attempting to claim it is the proper plaintiff to recover from the United States for federal mismanagement of the Arkansas riverbed; rather, Patton Boggs is asserting a legal right, based on its contract, against the Cherokee Nation. As the Court said in *American Renovation*, that determination "falls outside of the jurisdiction conferred by the Tucker Act." *Id.*

remains, between Patton Boggs and the Nation. And that is a dispute that lies outside the jurisdiction of this Court to resolve.[18]

## III. Neither the Consent Decree, the Tucker Act, nor the All Writs Act, provides jurisdiction to this Court.

As previously noted, *supra* at 16-19, this Court, as a court of limited jurisdiction, may hear only claims that fall within its statutory authority. *United States v. King*, 395 U.S. 1, 3 (1969); *Miller v. United States*, 67 Fed. Cl. 195, 196-97 (2005). This stricture, which applies to all courts of limited jurisdiction, applies with special force to the Court of Federal Claims. Because this Court was created to hear suits against the United States, jurisdiction is measured against the background principle that waivers of federal sovereign immunity must be expressly stated and are to be strictly construed. *United States v. Testan*, 424 U.S. 392, 399 (1976); *Sherwood*, 312 U.S. at 590. Consequently, as a necessary predicate to intervention, Patton Boggs has to identify an act of Congress that expressly gives the Court jurisdiction to hear the sort of claim that the law firm here presses.

As alleged bases for this Court's jurisdiction, Patton Boggs cites, alternately, the Consent Decree, PB Supp. Mem. at 15; the Tucker Act, *id.* at 17-18; and the All Writs Act, *id.* As the following discussion will show, none of these sources vests this Court with jurisdiction over the attorney fee dispute here.

---

[18] The cases cited by Patton Boggs to the effect that "a former counsel with a terminated contingency fee contract is 'so situated' as to permit intervention as to the fees owed pursuant to their contracts," PB Supp. Mem. at 20-21, are not on point. None of those cases was brought in this Court. The federal courts there involved had jurisdiction to resolve fee disputes between private parties. This Court does not.

### A. This Court's authority to enter the Consent Decree does not confer jurisdiction to adjudicate an attorney fee dispute.

Patton Boggs argues with singular tunnel vision that payment of its claimed attorney fee is a "condition[ ] precedent" to entry by the Court of the Consent Decree. PB Supp. Mem. at 16. Not a word in the Settlement Act or the Consent Decree supports that self-aggrandizing assertion. What Patton Boggs overlooks is that the Settlement Act involves, *inter alia,* the payment for, and extinguishment of, certain Cherokee Nation claims against the United States. The Consent Decree is designed to implement that settlement and, much as Patton Boggs would have it otherwise, has nothing to do with the payment of attorney fees.

With respect to the Consent Decree, the Settlement Act provides:

> [T]he Indian Nations shall, on the date of enactment of this subchapter, enter into a *consent decree* with the United States *that waives, releases, and dismisses all the claims they have asserted or could have asserted in their cases numbered 218-89L and 630-89L* pending in the United States Court of Federal Claims against the United States, including but not limited to claims arising out of any and all of the Indian Nations' interests in the Disclaimed Drybed Lands and arising out of construction, maintenance and operation of the McClellan-Kerr Navigation Way. *The Indian Nations and the United States* shall lodge the consent decree with the Court of Federal Claims within 30 days of the enactment of this subchapter, and *shall move for entry of the consent decree at such time as all appropriations by Congress pursuant to the authority of this subchapter have been made and deposited into the appropriate tribal trust fund account* of the Indian Nations as described in section 1779d of this title. Upon entry of the consent decree, all the Indian Nations' claims and all their past, present, and future right, title, and interest to the Disclaimed Drybed Lands, shall be deemed extinguished.

25 U.S.C. § 1779c(a) (emphasis added).

On its face, the Settlement Act does not require the Court, before entering the Consent Decree, to ensure that tribal funds are properly invested, 25 U.S.C. § 1779d(b)(2)(B), or that no per capita payments are being made, § 1779d(b)(2)(A), or that disbursements by the Secretary are made only pursuant to a budget adopted by the tribe, § 1779d(b)(3) – or that any of the many

other provisions of the Act are being properly implemented. Nor does the Act require the Court to ensure that the attorneys are satisfied with the payment of their fees. § 1779e. Indeed, the Settlement Act does not vest in this Court any authority or supervision over the settlement funds, which have their genesis in action by Congress and not through an award or other decision by the Court. All the Court need determine before entering the Consent Decree is that "all appropriations by Congress pursuant to the authority of this [Act] have been made and deposited into the appropriate tribal trust fund account." 25 U.S.C. § 1779c(a). The notion that payment to Patton Boggs of its claimed fee is a "condition precedent" to approval of the Consent Decree is, in the law firm's word, "absurd." PB Supp. Mem. at 25.

Nothing in the text of the proposed Consent Decree itself is inconsistent with this conclusion. Patton Boggs' abbreviated quotation from that document to the effect that the parties, upon moving for entry of the Decree, will be "attesting to the satisfaction of all conditions precedent to the extinguishment of the plaintiffs' claims," PB Supp. Mem. at 16, quoting from Docket No. 101, is obviously taken out of context. Those "conditions precedent" are elsewhere described in the Consent Decree as when "all appropriations required by Sections 605 and 606, as modified by Sections 608 and 609, of the Act have been made and deposited into the appropriate tribal trust fund accounts." Consent Decree, Docket No. 101 at Attachment 1. Ironically, in view of Patton Boggs' reliance upon the Consent Decree, Section 607 of the Settlement Act, 25 U.S.C. § 1779e – the section dealing with attorney fees – is one of the few sections of the Act that is not incorporated by reference into the Decree.

To summarize, the Court's responsibilities with respect to entry of the Consent Decree do not include any decision or findings about Patton Boggs' fee claims. The Consent Decree itself

cannot, and does not, vest this Court with jurisdiction over an attorney fee dispute that it otherwise does not have.

**B. This Court has no jurisdiction under the Tucker Act to consider Patton Boggs' claim for attorney fees, which is not a suit for money damages against the United States.**

The Tucker Act creates jurisdiction in this Court over a limited set of causes of action against the United States for money damages.[19] *Miller*, 67 Fed. Cl. at 196-97; *see also*, *e.g.*, *King*, 395 U.S. at 3; *Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1998). The fatal flaw in Patton Bogg's assertion of Tucker Act jurisdiction is that, as we explained above, *supra* at 10-16, its demands for relief are directed against the Secretary and are not claims for money damages against the United States.[20]

In recognition of this fatal jurisdictional flaw in its cause of action, Patton Boggs seeks to piggyback its claim for fees upon the Tucker Act jurisdiction that clearly does exist for the Cherokee Nation's claims against the United States, by invoking for itself the ancillary equitable

---

[19] The Tucker Act provides in relevant part:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).

[20] Patton Boggs contends that "this Court would also have jurisdiction over a separate action brought by PB against the United States to recover PB's attorneys' fees wrongfully disbursed," PB Supp. Mem. at 18 n.20 (citing *Hanlin v. United States*, 214 F.3d 1319 (Fed. Cir. 2000)). *Hanlin*, however, is not on point. In that case, the plaintiff attorney had a contingent fee contract (1) that provided for a direct payment to him by the Government of a percentage of the award, and (2) where a statute (38 U.S.C. § 5904(d)) expressly authorized such direct payment. Patton Boggs has no such contract or statute.

powers the Court possesses to implement the Nation's monetary award. How or why equitable remedies available to a successful plaintiff may be relied upon by a non-party to the underlying lawsuit seeking relief against the parties, Patton Boggs fails to explain.

Moreover, even assuming, *arguendo,* that Patton Boggs' logical leap made sense, there still would be no statutory authority for the equitable relief that it seeks. As Patton Boggs has observed, PB Supp. Mem. at 18, this Court, in the exercise of its authority to award money damages, has authority to make factual findings and to interpret statutes. *Dwen v. United States,* 62 Fed. Cl. 76, 81 (2004) ("[T]he court has jurisdiction to make independent factual determinations of a claimant's specific property interest as a matter of course in adjudicating taking claims."). The Court also has authority to issue declaratory judgments where Congress has expressly authorized it to do so, *see Dwen*, 62 Fed. Cl. at 80, or where such judgments are "tied and subordinate to a monetary award," *Ellis v. United States*, 610 F.2d 760, 762 (Ct. Cl. 1979). Neither of the latter circumstances pertains in the present case.

Specifically, and relying on a truncated quotation of the Tucker Act, Patton Boggs maintains that the Act expressly authorizes this Court to issue declaratory and injunctive relief in all cases within its jurisdiction where such relief is necessary "to provide an entire remedy and to complete the relief afforded by the judgment." PB Supp. Mem. at 17-18 (quoting 28 U.S.C. § 1491(a)(2)). Not so. The sentence from which Patton Boggs quotes actually says:

> To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, *issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States.*

28 U.S.C. 1491(a)(2) (emphasis added). When read in its entirety, the Tucker Act is clear that

the provision upon which Patton Boggs relies only grants the Court the authority to issue particular kinds of orders, namely orders affecting the job placement and retirement status of federal employees. Since Patton Boggs does not seek any of the specified orders, it cannot rely on this provision as authority for the injunctive relief that it does seek.[21]

Similarly, Patton Boggs may not rely upon this Court's authority to issue equitable relief where such relief is "tied and subordinate to a monetary award," *Ellis*, 610 F.2d at 762. *Compare Am. Renovation and Constr. Co. v. United States,* 65 Fed. Cl. at 260, discussed *supra* note 17, at 18. The core relief Patton Boggs seeks – an injunction ordering the Secretary to disburse money to it from the Cherokee Nation's settlement funds – is neither incidental to the underlying damage award to the Cherokee Nation on its riverbed claims, nor itself an award of damages. The Court's ancillary jurisdiction thus does not support jurisdiction over the law firm's fee dispute, since Patton Boggs itself has no claim over which the Court has general jurisdiction and thus to which its requested injunctive relief could be ancillary.

Although it is true that Patton Boggs ultimately desires that federal officials turn over money to it, the firm is not seeking *money damages from the United States*. The fund to which Patton Boggs claims a right is no longer money that belongs to the United States, and the fact that the Secretary exercises control over the fund does not change its ownership. For the same

---

[21] The principle that the Court of Federal Claims may award only money damages and may not, unless statutorily authorized to do so, issue orders to government officials – even where those orders concern the payment of money – was recently reaffirmed by the Federal Circuit. In *Massie v. United States,* 226 F.3d 1318 (Fed. Cir. 2000), the Federal Circuit considered whether the trial court had jurisdiction in a breach of contract claim against the United States to order equitable relief against the government by requiring future annuity payments to a plaintiff. The Court ruled it did not: "Except in strictly limited circumstances, *see* 28 U.S.C. 1491(b)(2), there is no provision in the Tucker Act authorizing the Court of Federal Claims to order equitable relief." 226 F.3d at 1321. *See also* cases cited *supra* note 16 at 18.

reason, the remedy that Patton Boggs seeks – payment from the fund by the Secretary to Patton Boggs of ten percent of the Cherokee Nation's share of the judgment – is not "damages," but is, rather, an injunction ordering the Secretary to disburse the funds according to Patton Boggs' interpretation of its attorney contract. As discussed above, Patton Boggs' objection to the Secretary's intended disbursement of that fund thus possibly may state a claim under the APA as agency action "contrary to law," but it does not state a claim that is adjudicable in this Court under the Tucker Act.

**C. Absent jurisdiction under the Tucker Act, the All Writs Act is inapplicable.**

The All Writs Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651.

The All Writs Act thus authorizes the federal courts to issue writs as necessary to protect their ongoing jurisdiction. *See Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 141 (2004) (ordering the Department of the Interior to preserve, index, and report any destruction or loss of records reasonably anticipated to be subject to discovery in the case before it). It is well established that the All Writs Act may be relied upon only in support of a court's independent jurisdiction. It does not create jurisdiction over a claim or action where none would otherwise exist. *Clinton v. Goldsmith*, 526 U.S. 529, 534-35 (1999) (observing that the All Writs Act allows the employment of extraordinary writs "'in aid of' [the issuing court's] existing statutory jurisdiction; the Act does not enlarge that jurisdiction"). *See also Pa. Bureau of Corr. v. United States Marshals Serv.*, 474 U.S. 34, 40-43 (1985); *Sec. Sav. and Loan Ass'n v. United States*, 26 Cl. Ct. 1000, 1003 (1992). Thus, unless the Court otherwise has jurisdiction, the All Writs Act is

of no use to Patton Boggs.

Finally, to the extent that Patton Boggs suggests that the Settlement Act itself provides jurisdiction, it is mistaken. The Court, of course, retains jurisdiction over the case until the entry of final judgment, but the Court's jurisdiction over the case does not give it ancillary jurisdiction over any and all potential intervenors. Though the Court of Federal Claims recently observed that "it is well-accepted that *defendants* intervening as a matter of right need not have independent jurisdictional grounds, but instead are covered by the doctrine of ancillary jurisdiction," *Klamath Irrigation Dist. v. United States*, 64 Fed. Cl. 328, 334 (2005) (emphasis added), this Court has ruled that plaintiff-intervenors, by contrast, must be able to show that the Court would have independent jurisdiction over their claims. *Brookner v. United States*, 27 Fed. Cl. 423, 424 (1992). *See also 441 4th Street Ltd. P'ship v. United States*, 26 Cl. Ct. 1233, 1234 n.1 (1992). This is so because a court cannot use the rules of procedure to enlarge its jurisdiction, *Sherwood*, 312 U.S. at 589-90, and the jurisdiction of the Court of Federal Claims is limited by the doctrine of sovereign immunity. *441 4th Street*, 26 Cl. Ct. at 1234 n.1. Where a third party seeks to intervene as a plaintiff, the doctrine of sovereign immunity requires that the court have independent jurisdiction over the intervenor – a showing that Patton Boggs has not, and cannot, make here.[22]

---

[22] The fact that the federal district courts do not always insist that they be able to assert independent jurisdiction over the claims of intervening plaintiffs does not support intervention in this case. As this Court observed in *441 4th Street*, "[t]he jurisdiction granted this court in the Tucker Act, hedged as it is by the doctrine of sovereign immunity, cannot accommodate the same breadth of third-party interests that a district court would be entitled to consider under the concept of ancillary jurisdiction." 26 Cl. Ct. at 1234 n.1 (citation omitted).

## IV. Patton Boggs does not meet the standards for intervention under RCFC 24.

The Court's lack of jurisdiction over the claim for attorney fees that Patton Boggs seeks to assert is, in itself, fatal to the purported motion to intervene filed by Patton Boggs. Independently, however, the motion fails to satisfy the requirements for intervention under Rule 24(a).

An applicant for intervention must show "an interest relating to the property or transaction which is the subject of the action." RCFC 24(a)(2). The "subject of the action" here are the claims brought by the Cherokee Nation against the United States related to the Arkansas riverbed. Patton Boggs has no interest in those claims, or in the riverbed property relating to those claims.

The point is best illustrated by *Klamath,* the case Patton Boggs chiefly relies on. There, intervenor-applicants – groups representing fishermen – asserted an interest in the allocation of water administered by a federal irrigation project, where the project was being sued for money damages and where the suit threatened to impact the project's future decisions about water allocation in a way that could impair fishing. 64 Fed. Cl. at 328-29. "The interests that link the [intervenor-applicants] to this case thus are central, rather than collateral; they are not contingent." *Id.* at 332. Here, by contrast, Patton Boggs is not seeking to intervene for the purpose of protecting any interest it has in the adjudication of the riverbed claims that are the "subject of [this] action," but rather about the very collateral, and very indirectly derivative, issue of its attorney fees.[23]

---

[23] Further, as noted above, the standards for intervention in this Court as a defendant on the side of the United States, as in *Klamath*, are far more relaxed than intervention as a plaintiff seeking to assert a claim against the United States, and thus where the sovereign immunity of the United States is directly at issue: "while the 'United States must consent to be sued,' it need not

To the extent Patton Boggs is asserting an interest in the settlement fund, that fund is not the "property or transaction" which is the "subject of [this] action." That fund was created by Congress to effect a legislative, not judicial, settlement of a set of property-related issues between the Cherokee Nation and the United States that extends well beyond the specific claims for relief brought in the case pending before the Court. The fund was not created by the Court, or through a judgment of the Court, nor (for reasons discussed above) are disbursements from the fund within the jurisdiction of the Court. By statute, the fund is administered by the Secretary, not by the Court.[24]

The decision of the Fifth Circuit in *Gaines v. Dixie Carriers, Inc.,* 434 F.2d 52 (5th Cir. 1970), also cited by Patton Boggs, is readily distinguishable on these grounds. The fund in that case was "in the registry of the district court," and thus under the court's direct jurisdiction and control, unlike in this case. *Id.* at 54. Further, the money sought by the intervening law firm in *Gaines* was not the money of a sovereign Indian tribe, whose immunity from suit has not been waived and which has not consented to an adjudication of the fees to be paid from its funds under a private contract it entered. *Id.* at 53; *see also Keith v. St. George Packing Co., Inc.,* 806 F.2d 525, 526 (5th Cir. 1986) (observing that "*Gaines* may not represent the most persuasive use of Fed. R. Civ. P. 24"); *Butler, Fitzgerald & Potter v. Sequa Corp.,* 250 F.3d 171, 178 (2d Cir.

---

'consent to be defended.'" *Id.* at 334 (quoting *Int'l Mortgage & Inv. Corp. v. Von Clemm*, 301 F.2d 857, 863-64 (2d Cir. 1962)).

[24] Precisely for that reason, Patton Boggs sought an order from the Court to direct <u>the Secretary</u> not to make disbursements from the fund to the Nation. In response, the Court secured a voluntary agreement from the Secretary to temporarily defer additional disbursements.

2001) (declining to follow *Gaines*).[25]

Similarly, Patton Boggs does not qualify for intervention under the second prong of RCFC 24(a)(2) – that "the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect [its] interest." By operation of Section 1779c of the Settlement Act, this case will terminate upon entry of the Consent Decree. 25 U.S.C. § 1779c(a). Nothing in the Decree, which extinguishes various claims of the Cherokee Nation, will impair, impede or in any way adversely affect Patton Boggs' fee claim. Moreover, as has heretofore been demonstrated, *supra* at 21-22, the satisfaction of Patton Boggs' demands is not a "condition precedent" to the entry of the Consent Decree. Whatever court may have jurisdiction over the law firm's contract dispute, if any, will not have that jurisdiction divested by the final Consent Decree of this Court in unrelated litigation to which Patton Boggs is not entitled to be a party.

**CONCLUSION**

For the foregoing reasons, Cherokee Nation suggests that Patton Boggs' Motion to Intervene be stricken for failure to comply with RCFC 24(c). In the alternative, the Nation

---

[25] The other case Patton Boggs relies on, *United States v. Eilberg,* 89 F.R.D. 473 (E.D. Pa. 1980), is also distinguishable. There, the United States sued a former Congressman to recover money he made practicing law while serving in Congress. *Id.* at 473. Partners in his law firm were involved in a separate dispute with him in state court, and intervened in the federal action to protect their right to the same funds they were seeking in the state court action. *Id.* at 474. *Eilberg* thus did not involve attorneys intervening in a former client's case seeking to recover fees allegedly due to them, and accordingly has nothing to do with the circumstances at issue here, other than the entirely superficial similarity that it, and this case, both involve attorneys.

requests that the motion be denied on the ground that the Court lacks jurisdiction over Patton Boggs' claim and that the motion fails to satisfy the standards of Rule 24.

Respectfully submitted,

Dated: November 17, 2005

Arthur Lazarus, Jr. By Ann D Noto

Arthur Lazarus, Jr.
Sonosky, Chambers, Sachse,
Endreson & Perry, LLP
1425 K Street, NW, Suite 600
Washington, D.C. 20005
202-682-0240
202-682-0249 (fax)
alazarus@sonosky.com

By Anne D. Noto

Special Counsel for Plaintiff

Of Counsel

Lloyd B. Miller
Donald J. Simon
Anne D. Noto
Sonosky, Chambers, Sachse,
Endreson & Perry, LLP
1425 K Street, NW, Suite 600
Washington, D.C. 20005
202-682-0240
202-682-0249 (fax)