**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**Consolidated Case No. 218 L**

| | | |
|---|---|---|
| **THE CHEROKEE NATION OF OKLAHOMA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | ) | **No. 89-218 L**<br>**Chief Judge Edward Damich** |
| **THE CHOCTAW NATION OF OKLAHOMA AND THE CHICKASAW NATION,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant,** | ) | **No. 89-630 L** |

**DEFENDANT'S OPPOSITION TO PATTON BOGGS' MOTION TO INTERVENE, MOTION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR ATTORNEYS' FEES**

SUE ELLEN WOOLRIDGE
Assistant Attorney General
Environment and Natural Resources Div.

JAMES M. UPTON
Trial Attorney
U.S. Department of Justice
Environmental and Natural Resources Div.
P.O. Box 663
Washington, D.C. 20044-0663

Attorneys for Defendant

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii
INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I. PATTON BOGGS' MOTION TO INTERVENE SHOULD BE DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A. The Patton Boggs Motion is Untimely . . . . . . . . . . . . . . . . . . . . . 6
B. Patton Boggs is not Asserting an "Interest Relating to the Property or Transaction Which is the Subject of the Action" . . . . . . . . . . . 9

II. THIS COURT LACKS JURISDICTION TO ISSUE THE REQUESTED TRO OR TO MAKE THE REQUESTED AWARD OF ATTORNEY FEES UNDER THE CIRCUMSTANCES PRESENT HERE . . . . . . . . . . . . . . . . . . . . . . . . . . 12

A. The Settlement Act Did not Confer Jurisdiction Upon the CFC to Adjudicate the Matter of Attorney Fees . . . . . . . . . . . . . . . . . . . . . . 12
B. This Court Does not Have Jurisdiction to Adjudicate Disputes Between Private Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III. NEITHER THE TUCKER ACT NOR THE ALL WRITS ACT AFFORDS THIS COURT JURISDICTION TO ISSUE A TRO, ADJUDICATE ATTORNEY FEES AND MAKE AN AWARD OF ATTORNEY FEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

A. The Tucker Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
B. The All Writs Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

IV. THE CONSENT DECREE LODGED WITH THE CFC PURSUANT TO THE SETTLEMENT ACT CANNOT SERVE AS THE REQUISITE JURISDICTIONAL "HOOK" TO GRANT THE RELIEF WHICH PATTON BOGGS SEEKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

V. THE COURT HAS NO EQUITABLE JURISDICTION TO ORDER THE DEFENDANT TO ACCOUNT FOR ALL FUNDS APPROPRIATED FOR THE CHEROKEE NATION UP TO THE PRESENT . . . . . . . . . . . . . . . . . . . . . . . 20

VI. THE ASSOCIATE DEPUTY SECRETARY'S OCTOBER 13, 2005

INTERPRETATION OF THE ATTORNEY FEES PROVISION OF THE SETTLEMENT ACT IS CORRECT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ATTACHMENT (Opinion in Carver Dan Peavy; et al. v. WFAA-TV, Inc. et al., No. 3-96-CV-2945-R, 2001 U.S. Dist. LEXIS 21405 (N.D. Tex., Dallas Div. Dec. 21, 2001) . . . . . . . . . . . . . 1

**TABLE OF AUTHORITIES**

FEDERAL CASES

American Renovation, and Constr. Co. v. United States, 65 Fed. Cl. 254 (2005) . . . . . . . . 8-9, 10, 14, 15

Badaracco v. Commissioner of Internal Revenue, 464 U.S. 386 (1984) . . . . . . . . 22

Bailey v. United States, 516 U.S. 137, 147 (1995) . . . . . . . . 23

Bobula v. United States, 970 F. 2d 854 (Fed. Cir.1992) . . . . . . . . 16

Brotherhood of Locomotive Eng'rs. v. Atcheson, Topeka & Santa Fe R.R. Co., 516 U.S. 152 (1996) . . . . . . . . 20

Brown v. United States, 42 Fed. Cl. 538 (1998) . . . . . . . . 23

Carver Dan Peavy; et al. v. WFAA-TV, Inc. et al., No. 3-96-CV-2945-R, 2001 U.S. Dist. LEXIS 21405 (N.D. Tex., Dallas Div. Dec. 21, 2001) . . . . . . . . 8

Cherokee Nation of Oklahoma v. United States, 54 Fed. Cl. 116 (2002) . . . . . . . . 7, 8, 9

Cheyenne-Arapaho Tribe of Indians of Oklahoma v. United States, 1 Cl. Ct. 293 (1983) . . . . . . . . 8

Clinton v. Goldsmith, 526 U.S. 529 (1999) . . . . . . . . 18

Chevron USA, Inc. v. Natural Resources Defense Council, 467 U. S. 837 . . . . . . . . 22

Doyon, Ltd. v. United States, 214 F.3d 1309 (Fed. Cir. 2000) . . . . . . . . 23

Dwen v. United States, 62 Fed. Cl. 76 (2004) . . . . . . . . 17

Gaines v. Dixie Carriers Inc., 434 F.2d 52 (5th Cir. 1970) . . . . . . . . 10-11

Gozlon-Peretz v. United States, 498 U.S. 395 (1991) . . . . . . . . 13

In re: Tennant, 359 F.3d 523, 527 (D.C. Cir. 2004) . . . . . . . . 17

Klamath Irrigation District v. United States 64 Fed. Cl. 328 (2005) . . . . . . . . 10

Klamath & Modoc Tribes and Yahooskin Band of Snake Indians v. United States, 174 Ct. Cl. 483 (1966) . . . . . . . . . . 20

Laker Airways Limited v. Pan American World Airways, et al., 109 F.R.D. 54 (D.D.C. 1985) . . . . . . . . . . 11

Montana v. Blackfeet Tribe of Indians, 471 U.S. 759 (1985) . . . . . . . . . . 22

Muskogee (Creek) Nation v. Hodel, 851 F.2d 1439 (D.C. Cir. 1988) . . . . . . . . . . 22

NAACP v. New York, 413 U.S. 345 (1973) . . . . . . . . . . 7

Northern Pipeline Constr. Co. v. United States, 458 U.S. 50 (1982) . . . . . . . . . . 14

Orion Scientific Systems v. United States, 28 Fed. Cl. 669 (1992) . . . . . . . . . . 14

Public Service Co. of Colorado v. United States, 2 Cl. Ct. 380 (1983) . . . . . . . . . . 20

Security Savings and Loan Ass'n v. United States, 26 Cl. Ct. 1000 (1992) . . . . . . . . . . 17

Smith v. Babcock, 19 F.3d 257 (6th Cir. 1994) . . . . . . . . . . 24

Sumitomo Metal Industries, Ltd. v. Babcock & Wilcox Co., 669 F.2d 703 (3rd Cir. 1982) . . . . . . . . . . 7

Syngenta Crop Protection, Inc. v. Henson, 537 U.S. 28 (2002) . . . . . . . . . . 18

Telecommunications and Action Center v. Federal Communications Commission, 750 F.2d 70 (D.C. Cir. 1984) . . . . . . . . . . 17

United States v. Eilberg, 89 F.R.D. 473 (E.D. Pa. . . . . . . . . . . 10-11

FEDERAL STATUTES

Indian Claims Commission Act, Pub. L. No. 79-926, ch. 959, Act of August 13, 1946, 60 Stat. 1049 . . . . . . . . . . 12,14

Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, 25 U.S.C. §§ 1779 et. seq. . . . . . . . . . . passim

Navajo-Hopi Settlement Act, 25 U.S.C. §§ 640d et. seq . . . . . . . . . . 13-14

All Writs Act, 28 U.S.C. § 1651 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Tucker Act, 28 U.S.C. § 1491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Little Tucker Act, 28 U.S.C. § 1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

FEDERAL RULES

FRCP 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

RCFC 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 10

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**Consolidated Case No. 218 L**

| | | |
|---|---|---|
| **THE CHEROKEE NATION OF OKLAHOMA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **No. 89-218 L**<br>**Chief Judge Edward Damich** |
| **THE CHOCTAW NATION OF OKLAHOMA AND THE CHICKASAW NATION,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant,** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **No. 89-630 L** |

**DEFENDANT'S OPPOSITION TO PATTON BOGGS' MOTION TO INTERVENE, MOTION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR ATTORNEYS' FEES**

**INTRODUCTION**

On October 19, 2005, the law firm of Patton Boggs filed three motions in this consolidated case: (1) a motion to intervene; (2) a motion for a Temporary Restraining Order (hereinafter "TRO"); and (3) a motion for an award of attorney fees to Patton Boggs in the net amount of $1,596,041. This amount does not reflect any deduction for the $151,000 it was paid on October 17, 2005. In its Supplemental Memorandum filed on November 3, 2005, Patton

Boggs acknowledged receipt of the $151,000 and lowered its claim amount to $1,445,041. On the October 19, 2005, the Court scheduled an oral argument on these motions for October 20, 2005. At the October 20th oral argument, the government first opposed the motion to intervene on the grounds of untimeliness. Defendant opposed the motion for a TRO and motion for an award of fees on the grounds that the Court of Federal Claims lacks jurisdiction to issue a TRO or to adjudicate the matter of attorney fees and award fees under the present circumstances. Finally, the government requested a chance to brief its position on all three motions.

On October 24, 2005, the court ordered briefing on two matters: "(1) whether Patton Boggs may intervene in the above-referenced matter, and (2) what relief, if any, the Court is empowered to grant." Order at 2. The government's brief is devoted primarily to the second issue - - namely, whether the Court has jurisdiction to issue the requested TRO and to adjudicate the matter of attorney fees, including the authority to make an award of attorney fees to Patton Boggs.

## STATEMENT OF THE CASE

In December of 2002, over two years' worth of settlement negotiations between the United States and the Cherokee, Choctaw and Chickasaw Nations concerning claims that the Defendant allegedly mismanaged their respective Arkansas Riverbed lands (then pending in two separate cases and now pending in this consolidated case) and months of collaborative drafting efforts culminated in the passage of the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act (Pub. L. No. 107-331, Title VI, Sec. 601, Act of December 13, 2002, 116 Stat. 2847, 25 U.S.C. §§ 1779-1779g)(hereinafter "Settlement Act"). Section 607 of the Act ( Section

1779e) - - the provision on attorney fees - - provides in subsection (a), as follows:

> (a) PAYMENT.— At the time the funds are paid to the Indian Nations, from funds authorized to be appropriated pursuant to section 1779(c), the Secretary shall pay to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations.

> (b) LIMITATIONS.— Notwithstanding subsection (a), the total fees payable to attorneys under such contracts with an Indian Nation shall not exceed 10 percent of that Indian Nation's allocation of funds appropriated under section 1779(c).

Pursuant to 25 U.S.C. § 1779e, the Office of Special Trustee established an escrow account to hold 10 percent of the total amount authorized for appropriation for the Cherokee Nation, or, 10 percent of $20,000,000 - - that is, $2 million. The Tribal Council of the Cherokee Nation of Oklahoma (hereinafter"CNO") allowed Patton Boggs (and each of the interested law firms/attorneys) to make an oral presentation to the Council (and submit documentation) in support of the amount of attorney fees each claimed. By means of four tribal resolutions (see Cherokee Nation's brief for copies thereof), the Nation requested the Secretary to make the following distributions:

| Law firm/attorney | Amount |
|---|---|
| Patton Boggs | $151,000 |
| Wilcoxen & Wilcoxen | $550,000 |
| Hall Estill | $280,524.57 |

| | |
|---|---|
| Estate of Paul Niebell | $100,000 |

See letter, dated October 13, 2005, from Associate Deputy Secretary of the Department of the Interior to the Principal Chief of the Cherokee Nation, Chad Smith. Only Patton Boggs protested the amount which the Nation authorized for payment to it. (Copy of Oct. 13th letter attached to PB Supp. Memorandum filed on November 3, 2005).

The October 13th letter states that between May of 2004 and April, 2005, Patton Boggs sent two letters and a legal memorandum to the Department of the Interior, in which the firm argued for its entitlement to the entire $2 million reserved for the payment of attorney fees to the Cherokee Nation's claims attorneys, less the $403,959 the firm had received from 1989 to 1997 in the form of monthly payments pursuant to its attorney fee contract. The justification offered for its position was that its contract provided that the firm was entitled to receive "ten percent of any legislative settlement of the Cherokee Nation's mismanagement claims [asserted] against the United States" in pending Case No. 89-218 L. October 13th letter at 1. (Copy designated as Attachment A hereto). The October 13th letter also notes that the Department had received communications from Wilcoxen & Wilcoxen and Hall Estill to the effect that these firms would accept, rather than contest, the respective payment amounts which the Cherokee Nation's Tribal Council had authorized to be made to them.[1/]

The key portion of the October 13th letter states as follows:

> Section 607(b) of the Settlement Act, codified at 25 U.S.C. § 1779e(b), specifies

[1/] The letter noted the existence of a 1988 contract between Wilcoxen & Wilcoxen and Paul M. Niebell and the Cherokee Nation which also provided for a "payment of ten percent of any settlement of the Nation's claims against the United States." [Emphasis added] Ltr. at 2.

> that the total compensation paid for attorney fees on behalf of an Indian nation cannot exceed ten percent of that nation's share of the settlement funds. It is clear that the sum of potential claims for attorneys fees exceeds the ten percent cap imposed by the Settlement Act. It is also clear that the Cherokee Nation has considered this issue carefully and has decided upon a payment schedule that does not violate the statutory limitation, but has not been accepted by Patton Boggs.
>
> I have determined that <u>the Secretary is required to pay only those fees approved by tribal resolutions after the Settlement Act became effective</u>, and that the Settlement Act <u>requires the Secretary to execute a purely ministerial act</u> in carrying out the instructions of the Cherokee Nation as expressed in the post settlement resolutions of the Council.
>
> * * * *
>
> By this letter, I am informing you that I intend to make disbursements from the Cherokee Nation's attorney fee escrow account, which was created pursuant to the Settlement Act, within two weeks in accordance with your request. Upon payments of these attorney fees, the balance remaining in the Cherokee attorney escrow account will be disbursed to the Nation and the account will be closed. The Department respects the sovereignty of the Cherokee Nation and its right to manage its relationship with third party counsel.

[Emphasis added.] October 13th letter at 2.

On October 17, 2005, the Department paid (by electronic transfer) the fees authorized by the Cherokee Nation to Patton Boggs, Wilcoxen & Wilcoxen and Hall Estill. On October 19th, at her request, paper check was sent to Mrs. Paul Niebell. At the conclusion of the October 20th argument, Chief Judge Damich had requested the Solicitor's Office attorney who was present at the argument to determine whether the Department's officials would stop, if possible, any further payments from the attorney fees escrow account. On October 20, 2005, before the end of the oral argument, the Department had made an electronic transfer of the balance remaining in the escrow account to the Cherokee Nation. However, because of the Chief Judge's request, the Associate Deputy Secretary, James Cason, directed that this transfer be reversed, and his instruction was carried out within a few hours after the end of the oral argument.

## SUMMARY OF ARGUMENT

Patton Boggs' Motion to Intervene should be denied because it is untimely and does not meet the requirements of RCFC 24. The Court lacks jurisdiction to issue the requested TRO or to make the requested award of attorney fees in the circumstances present here. Neither the Tucker Act nor the All Writs Act confers the jurisdiction to issue a TRO or to adjudicate attorney fees or to award attorney fees to Patton Boggs. The Consent Decree cannot serve as the requisite jurisdictional hook, contrary to Patton Boggs' argument. The Court has no equitable jurisdiction to order the defendant to account now for all funds appropriated for the Cherokee Nation up to date under the Settlement Act. Interior's interpretation of the Act is correct. All three of Patton Boggs' motions should be denied.

## ARGUMENT

### I. PATTON BOGGS' MOTION TO INTERVENE SHOULD BE DENIED FOR UNTIMELINESS AND FOR AN ADDITIONAL REASON.

#### A. The Patton Boggs Motion is Untimely.

Patton Boggs insists its motion to intervene is timely because it was not until issuance of the October 13, 2005 letter from the Associate Deputy Secretary of the Department of the Interior, James Cason, to Chad Smith, the Principal Chief of the Cherokee Nation of Oklahoma, that Patton Boggs first discovered how Interior planned to distribute the $2 million set aside by the Settlement Act. We disagree. Both . . . 'intervention as of right and permissive intervention rely on timely application." Cherokee Nation of Oklahoma v. United States, 54 Fed. Cl. 116, 118 (2002). (Chief Judge Damich denied the motion to intervene filed by the United Keetoowah

Band of Cherokee Indians of Oklahoma (asserting loss of possession and full benefit of certain Arkansas Riverbed lands to which the Cherokee Nation of Oklahoma claimed exclusive title) as untimely, citing the United States Supreme Court's decision in NAACP v. New York, 413 U.S. 345, 365 (1973) in support. "If such an application is untimely, intervention must be denied." Id.

In making a determination of timeliness, the court must weigh three considerations: (1) how long a period of time the would-be intervenor knew or should have known of his right to intervene: (2) whether prejudice to the parties outweighs the prejudice to the would-be intervenor; and (3) the presence of "unusual circumstances" weighing for or against granting intervention. Cherokee Nation, supra, citing Sumitomo Metal Industries, Ltd. v. Babcock & Wilcox Co., 669 F.2d 703, 707 (3rd Cir. 1982). The first consideration strongly militates against granting the motion. This case has been pending before this Court for 16 years. Clearly, Patton Boggs had an ample opportunity to intervene once the settlement negotiations between the Cherokee, Choctaw and Chickasaw Nations, on the one hand, and the United States, on the other hand, began in 2000. Patton Boggs knew that the parties to the negotiations would eventually have to address the matter of attorney fees. If Patton Boggs had wanted to influence the formulation of any attorney fees provision which might be offered for insertion in the draft Settlement Act, then Patton Boggs should have moved to intervene in 2000. Finally, once the Act was passed on December 13, 2002, Patton Boggs knew: (1) 25 U.S.C. § 1779e provided for a ten percent cap on attorney fees; (2) it was asserting entitlement to the entire 10% (or $2 million which Congress authorized for payment to the CNO's attorneys); (3) that the other attorneys for the CNO would be asserting claims to part of the $2 million; and (4) that the Wilcoxen & Wilcoxen firm also had a contract with the Cherokee Nation which provided for a

ten percent fee. In short, Patton Boggs should have moved to intervene in 2000, or, at a minimum, when the Settlement Act became law on December 13, 2002. This three to five-year delay is sufficiently long to weigh heavily against granting Patton Boggs' motion. See Cheyenne-Arapaho Tribe of Indians of Oklahoma v. United States, 1 Cl. Ct. 293, 296 (1983). By waiting until October 19, 2005 to move to intervene, Patton Boggs "slept on its rights." Cherokee Nation, supra, at 116. See also Carver Dan Peavy; et al. v. WFAA-TV, Inc. et al., No. 3-96-CV-2945-R, 2001 U.S. Dist. LEXIS 21405 (N.D. Tex., Dallas Div. Dec. 21, 2001) at 6-7. (Attached hereto).

The three Indian Nations and the Defendant United States will be prejudiced if Patton Boggs is allowed to intervene because to allow intervention may well delay entry of the Consent Decree beyond the time that Congress makes the final appropriation in Fiscal Year 2007 to carry out the Settlement Act. It is in the interest of the present parties to implement the terms of the Act in a timely fashion. On the other hand, denying intervention might deny Patton Boggs the chance to recover the $1,445,041 it claims, because tribal sovereign immunity would bar any Patton Boggs suit against the CNO. Of course, the tribal sovereign immunity bar is a problem caused by the failure of Patton Boggs to put obtain a waiver of sovereign immunity clause in its tribal attorney fees contract. We submit that the prejudice to the four present parties to this consolidated case outweighs the potential prejudice to Patton Boggs. [2/]

---

[2/] In its brief, Patton Boggs notes that in American Renovation, and Constr. Co. v. United States,
65 Fed. Cl. 254 (2005) the Court took into account that the would-be intervenor could recover on its claim against the other contracting party only if intervention were granted. PB Br. at 19 n. 27. While that may be true that Patton Boggs cannot recover against the contractor (the CNO) except by intervention, this case differs from American Renovation because here Patton Boggs' mistake put it in this situation. The would-be intervenor in American Renovation faced a situation in

Finally, Patton Boggs does not identify any specific "unusual circumstances" which favor granting its motion to intervene. One "unusual circumstance" which weighs against it is that Patton Boggs claims the entire $2 million, minus the fees already received. As Patton Boggs explicitly acknowledged in its memorandum of April 22, 2005, to the Associate Solicitor, Division of Indian Affairs, Christopher Chaney, this amount, together with the attorney fees approved by the CNO, is far in excess of the $2 million statutory limit. Patton Boggs Br. Attachment at A-71.

In short, utilizing the same criteria for determining timeliness applied by this court in its 2002 Cherokee Nation opinion to the intervention motion of the United Keetoowah Band of Cherokee Indians (UKB) leads to the conclusion that Patton Boggs' motion for intervention must be denied because it, too, is untimely.

### B. Patton Boggs is not Asserting an "Interest Relating to the Property or Transaction Which is the Subject of the Action."

Patton Boggs asserts it is entitled to intervene as of right under RCFC 24(a)(2) because its attorney fees claim is an "interest relating to the property or transaction which is the subject of the action." Patton Boggs Br. at 19. The subject of the lawsuit in **No. 89-218 L** is the claim for the "mismanagement of the tribal resources of the Arkansas Riverbed owned by the Cherokee, Choctaw and Chickasaw Nations." Patton Boggs Br. at A-68. Unlike the the prior

---

which the plaintiff there (the other contracting party) had ceased operations and its only remaining asset was the claim which it had filed against the United States - - not a situation where the would-be intervenor had failed to include a crucial provision in the Instrument of Assignment entered into with plaintiff which operated to bar the would-be intervenor's claim against the plaintiff.

would-be intervenor, the UKB, Patton Boggs does not assert an interest in the subject of the CNO's lawsuit - - namely, the claim that the government allegedly mismanaged the natural resources on the Arkansas Riverbed lands owned by the CNO. By contrast, see American Renovation, and Constr. Co. v. United States, 65 Fed. Cl. at 259-260 (held that because the intervenor-applicant had an "interest" (within the meaning of RCFC 24) in the contract between the plaintiff and the federal government which was at issue in plaintiff's breach of contract action because would-be intervenor alleged an ownership interest in the same contract as did the plaintiff). The CFC case, Klamath Irrigation District v. United States 64 Fed. Cl. 328 (2005), cited by Patton Boggs, does not, in our opinion, compel a different conclusion. In Klamath Irrigation District, multiple water districts and individuals filed suit for a Fifth Amendment taking because of restrictions on the use of Klamath Basin water for irrigation purposes. A federation of fishermen (whose members derived substantial income from catching salmon which used the Klamath Basin for spawning) were allowed to intervene primarily because the "potential of additional litigation involving the same [natural] resources looms large." Klamath Irrigation District at 336. Unlike the federation of fishermen's motion to intervene, the Patton Boggs' motion cannot pose a threat of additional litigation concerning the government's alleged mismanagement of the Cherokee Nation's Arkansas River "Disclaimed Drybed Lands."[3/]

---

[3/]Nor do United States v. Eilberg, 89 F.R.D. 473 (E.D. Pa. 1980) and Gaines v. Dixie Carriers Inc., 434 F.2d 52 (5th Cir. 1970) (cases occurring outside the Federal Circuit) compel a different result. In Eilberg, the U.S. Environmental Protection Agency and a pipeline company entered into a proposed consent decree which they filed in federal district court together with a complaint concerning an alleged violation of the Toxic Substances Control Act. The state of Pennsylvania moved to intervene as of right under FRCP 24(a). The State attempted to support its motion, in part, by contending that if it filed suit against the pipeline company in the future it would have the heavy burden of refuting the preemptive effect of the consent decree on Pennsylvania's environmental laws. The district court held that this "burden" in a future lawsuit

Finally, Patton Boggs argues it should be allowed to intervene because "PB may never be able to recover [the full amount of attorney fees that it seeks] directly from the Cherokee Nation in another forum . . . " PB Br. at 19 n. 27. It adds: "Moreover, if the Cherokee Nation is correct in its assertions of sovereign immunity, . . . , PB may have no recourse to recover its fees from the Cherokee Nation whatsoever." Br. at 21 n. 29. This obstacle is one of Patton Boggs' own making. Patton Boggs consciously undertook this risk in its private contractual undertakings with the Cherokee Nation by not including a provision in its attorney fees contract waiving the Cherokee Nation's sovereign immunity to suit with respect to claims or issues which might arise under this attorney fee contract. By proceeding to enter into a contract to represent the Cherokee

---

against the pipeline company did not support intervention. Here, PB notes that it could also sue the government directly in the CFC seeking money damages, but, unlike Eilberg, makes no mention of a particular obstacle (such as preemption) to filing such a suit. PB's mention of this potential lawsuit should not be construed as support for its intervention.

In Gaines, a law firm which had previously represented a plaintiff which had received an award of money damages (after terminating the firm's services) was allowed to intervene. However, in Gaines, the parties had acknowledged that a dispute over fees was pending before the court and had put some money into a court registry for possible payment of this particular firm's fees before the motion to intervene had been filed. Here, the Defendant has taken the position that the court has no jurisdiction to adjudicate/make an award of attorney fees and Congress, not the parties, has directed that $2 million of attorney fees be set aside to pay all attorney fees for the CNO, not just the fees of Patton Boggs or any other single firm. Furthermore, in Gaines, the intervention " . . . was allowed only after the case-in-chief was dismissed." Laker Airways Limited v. Pan American World Airways, et al., 109 F.R.D. 541, 544 n. 8 (D.D.C. 1985) (attorney moved to intervene to protect his interest in fees to be paid to two law firms under an agreement with the Liquidator of Laker Airways on the grounds of having been a partner in one of the firms at the time the plaintiff brought the lawsuit and for some period thereafter; the court denied the motion largely on the grounds that if the motion were granted it might cause the settlement of this complex litigation to "unravel" and because the "dispute [between the would-be intervenor and the law firm] is entirely separate and apart from the instant lawsuit."Id. at 544-545. The circumstances in Cherokee Nation are much closer to those in Laker Airways than to those in Gaines.

Nation without a waiver of sovereign immunity clause, Patton Boggs assumed the risk that it could not later sue the Cherokee Nation to recover its claimed attorney fees, if the Cherokee Nation refused to pay. Because Patton Boggs brought this problem upon itself, intervention should not be granted on this basis, especially when doing so would reshuffle the contractual rights of these private parties to the attorney fees contract.

## II. THIS COURT LACKS JURISDICTION TO ISSUE THE REQUESTED TRO OR TO MAKE THE REQUESTED AWARD OF ATTORNEY FEES UNDER THE CIRCUMSTANCES PRESENT HERE.

Even if the Court decides that Patton Boggs may intervene as of right, this Court has neither the jurisdiction to issue the TRO sought by Patton Boggs nor the jurisdiction to make the award of attorney fees sought by Patton Boggs because it is not empowered to adjudicate attorney fees to be paid out under the Settlement Act. This is true because: (1) the Settlement Act did not confer jurisdiction upon the CFC to adjudicate the matter of attorney fees between the interested law firms/attorneys (who litigated the CNO's claims in the CFC, or conducted the negotiation of the terms of the Settlement Act or lobbied for its passage) and (2) the CFC does not have authority to adjudicate disputes between private parties.

### A. The Settlement Act Did not Confer Jurisdiction Upon the CFC to Adjudicate the Matter of Attorney Fees.

There is no provision in the Settlement Act conferring jurisdiction upon the CFC to adjudicate the matter of attorney fees sought by the respective claims attorneys for the Cherokee,

Choctaw, and Chickasaw Nations. The sole section addressing attorney fees (25 U.S.C. § 1779e) effectively directs the Secretary of the Interior to pay out those attorney fees approved by the three Nations and establishes a 10% cap on fees. It does not confer any jurisdiction upon the

CFC to adjudicate attorney fees disputes and award attorney fees. Clearly, if Congress had desired to do so, it knew how to write legislation to unequivocally express such an intent. For example, Section 15 of the Indian Claims Commission Act (Pub. L. No. 79-926, ch. 959, Act of August 13, 1946, 60 Stat. 1049, 1053) expressly conferred jurisdiction on the Indian Claims Commission to adjudicate and award attorney fees. This argument is considerably more compelling here because Congress did confer jurisdiction on this Court over the claims of other tribes asserting title to, or an interest in, Arkansas Riverbed lands owned by the Cherokee, Choctaw, or Chickasaw Nations. This means that Congress made a deliberate choice to both grant the CFC jurisdiction over claims filed by "claimant" tribes and not to grant jurisdiction over attorney fees. In other words, when Congress granted jurisdiction to the CFC over claims filed by "claimant" tribes in Section 608 (25 U.S.C. § 1779f), but did not grant the CFC jurisdiction to adjudicate/award attorney fees in Section 607 (25 U.S.C. § 1779e), it should be presumed that Congress acted intentionally in its disparate treatment of the CFC –that is, granting jurisdiction to adjudicate the claims of "claimant" tribes versus not granting jurisdiction to adjudicate attorney fees. Gozlon-Peretz v. United States, 498 U.S. 395, 404 (1991).

A comparison of this Settlement Act with other Indian settlement legislation on the matter of attorney fees is also instructive. In the Navajo-Hopi Settlement Act (25 U.S.C. 640d, et seq.), Congress expressly granted authority to resolve all attorney fee issues to the Secretary of the Interior, rather than confer jurisdiction upon the federal district court to adjudicate attorney fees disputes and award attorney fees. 25 U.S.C. § 640d-7(f).

In short, the absence of any language in the Settlement Act conferring authority on the CFC to adjudicate attorney fees disputes arising under Section 607 of the Act (25 U.S.C. §

1779e) and award such fees should be deemed dispositive of the issue of whether the CFC has jurisdiction over the attorney fees claim of Patton Boggs.

**B. This Court Does not Have Jurisdiction to Adjudicate Disputes Between Private Parties.**

In the absence of an express conferral of authority to determine attorney fees as provided in Section 15 of the ICCA (cited supra), this matter is essentially an attempt to adjudicate the rights of Patton Boggs in a dispute between private parties over a private attorney fees contract. This Court does not have jurisdiction over disputes between private parties. E. g., See Northern Pipeline Constr. Co. v. United States, 458 U.S. 50, 67 n. 18, 69 (1982) (observes that Congress has the power to "create legislative courts [such as the CFC] to adjudicate public rights" and notes the distinction between public and private rights); American Renovation and Constr. Co. v. United States , 65 Fed. Cl. at 260-261 (acknowledged that the CFC may not adjudge disputes between private parties, but noted that case was not a situation which would " . . . require the Court to adjudicate private rights in the traditional sense."). But see Orion Scientific Systems v. United States, 28 Fed. Cl. 669, 670-671 (1993) (denied motion to intervene as of right because it lacked jurisdiction to hear disputes between private parties - - in that case a dispute between plaintiff and the would-be intervenor). Similarly, the real dispute here is a private dispute between Patton Boggs and the plaintiff Cherokee Nation which retained Patton Boggs.

At the present time, Patton Boggs is a only a private entity asserting its exclusive interest in the $2 million set aside by § 1779e of the Settlement Act for the payment of attorney fees - - a position diametrically at odds with Interior's recent (October 17 and 19, 2005) distribution of

about $930,000 of attorney fees to other interested attorneys and $151,000 to Patton Boggs. The factual situation here is diametrically opposed to the situation in American Renovation. The American Renovation opinion states, in pertinent part, as follows:

> . . . [I]n deciding who is entitled to the proceeds from the CK006 Contract [the contract between plaintiff and the government and the subject of this breach of contract lawsuit], the Court will be determining the ownership of the public right that is at stake in this case, the right to bring suit against the government under the CK006 Contract.

65 Fed. Cl. at 261 [Emphasis added]. As noted, Patton Boggs' asserted interest is not an interest in the subject

matter of the Cherokee suit in No. 218-89 L - - namely, the CNO's claim that the government mismanaged the natural resources on the CNO's Arkansas Riverbed lands. Patton Boggs is not asserting ownership of those Arkansas Riverbed lands to which the CNO asserts exclusive title. Thus, there is no claim presented by the three motions filed by Patton Boggs relating to the ownership of the public right of an Indian tribe to bring a breach of trust action against the United States for the mismanagement of the tribe's natural resources held in trust by the United States. Accordingly, it necessarily follows that Patton Boggs' motion to intervene (and the two accompanying motions) solely relate to a dispute between private parties "in the traditional sense" - - that is, at bottom a dispute between Patton Boggs and the CNO over the amount of attorney fees to which Patton Boggs claims to be entitled.

## III. NEITHER THE TUCKER ACT NOR THE ALL WRITS ACT AFFORDS THIS COURT JURISDICTION TO ISSUE A TRO, ADJUDICATE ATTORNEY FEES AND MAKE AN AWARD OF ATTORNEY FEES.

Patton Boggs contends that the Court has jurisdiction to issue the TRO which Patton

Boggs seeks, as well as adjudicate attorney fees and award attorney fees to Patton Boggs, under the Tucker Act (28 U.S.C. § 1491) and/or the All Writs Act (28 U.S.C. § 1651). Under the circumstances here, neither the Tucker Act nor the All Writs Act confers the requisite subject matter jurisdiction.

**A. The Tucker Act.**

In the aid of its jurisdiction to award money judgments under the Tucker Act, and to "'provide an entire remedy and to complete the relief afforded by the judgment'", the CFC may afford equitable relief " 'incident of and collateral to any such judgment'" under 28 U.S.C. § 1491(a)(2). Patton Boggs' Br. at 17-18. Such equitable relief under Section 1491(a)(2) "must be incidental and collateral to a claim for money damages." Bobula v. United States, 970 F. 2d 854, 859 (Fed. Cir.1992). In other words, this equitable relief is limited to a party which has sued the United States seeking the award of money damages. Since Patton Boggs is not a party to this case, the equitable relief authorized by Section 1491(a)(2) is not available to Patton Boggs. Indeed, a complaint seeking only equitable relief for an asserted breach of contract, together with costs and attorney fees, but not seeking money damages, has been held to be beyond the jurisdiction of the "Little Tucker Act"- - 28 U.S.C. §1346(a)(2) because without a claim for money damages there was no basis for federal district court jurisdiction. Bobula, supra, at 859. Even if Patton Boggs were allowed to intervene, it would still be obligated to proffer a claim within the CFC's jurisdiction. Dwen v. United States, 62 Fed. Cl. 76, 81 (2004). It cannot do so, as demonstrated in Argument II, above.

In short, the limited equitable relief available under the Tucker Act (28 U.S.C. § 1491(a)(2)) does not provide the CFC with jurisdiction to issue the TRO requested by Patton

Boggs or to adjudicate attorney fees or award attorney fees to Patton Boggs.

**2. The All Writs Act.**

Patton Boggs relies heavily upon the All Writs Act, 28 U.S.C. § 1651, to support its jurisdictional argument. This Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdiction and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Contrary to Patton Boggs' implicit assumption, the All Writs Act does not provide an independent source of jurisdiction; instead, it only "permits courts to issue writs in aid of jurisdiction acquired to grant some other form of relief." Telecommunications and Action Center v. Federal Communications Commission, 750 F.2d 70, 77 (D.C. Cir. 1984). The Tucker Act provides the CFC with jurisdiction to enter judgments awarding money damages against the government. In 2004, citing the language of the All Writs Act quoted above, the Court of Appeals for the District of Columbia Circuit held: "As this statutory language makes clear, the Act is not itself a grant of jurisdiction." In re: Tennant, 359 F.3d 523, 527 (D.C. Cir. 2004). See also Security Savings and Loan Ass'n. v. United States, 26 Cl. Ct. 1000, 1003-1004 (1992) (held that All Writs Act did not confer jurisdiction on this Court to grant plaintiff's motion for a temporary restraining order or a motion for a preliminary injunction.) Finally, the United States Supreme Court has held: 'While the All Writs Act authorizes employment of extraordinary writs, it confines the authority to the issuance of process 'in aid of' the issuing court's jurisdiction . . . . [T]he Act does not enlarge that jurisdiction." Clinton v. Goldsmith, 526 U.S. 529, 534-535 (1999). See also Syngenta Crop Protection, Inc. v. Henson, 537 U.S. 28 (2002).

Patton Boggs' reliance upon the All Writs Act is misplaced. The equitable relief which

Patton Boggs seeks - - issuance of a TRO to prevent the distribution of attorney fees from the Cherokee attorney fees escrow account - - is not "in aid of" the CFC's existing jurisdiction to award money damages. Indeed, it has nothing to do with such jurisdiction.

## IV. THE CONSENT DECREE LODGED WITH THE CFC PURSUANT TO THE SETTLEMENT ACT CANNOT SERVE AS THE REQUISITE JURISDICTIONAL "HOOK" TO GRANT THE RELIEF WHICH PATTON BOGGS SEEKS.

Patton Boggs argues that the Court's power to "decide" Patton Boggs' attorney fees' claim flows from " its duty to ensure compliance with the consent decree mandated by the Settlement Act." PB's Br. at 15. In support of this contention, Patton Boggs asserts:

> Through the Settlement Act, Congress vested this Court with jurisdiction over 'those fees provided for in the individual attorney fee contracts as approved by the respective Indian Nations.' 25 U.S.C. 1779(e)(a). The Settlement Act provides a 'comprehensive legislative settlement' of all claims which were bought, or could have been bought, in this action, effectuated through the Consent Decree . . . .

Id. Another key assertion is the following: "The Court is necessarily empowered to carry out Congress' mandate by ensuring that the Consent Decree is consonant with the Statute and the parties' conduct comports with the Consent Decree, including ensuring that the Indian Nation's attorneys have been paid in accordance with the Statute." Id. 15-16. Defendant has conclusively demonstrated in the preceding arguments that the Settlement Act did not confer jurisdiction on this Court to adjudicate/award attorney fees.

The second facet of the "Consent Decree" argument is that before the Court can enter the consent decree "it first must determine that [the] conditions precedent" to the extinguishment of the three Nation's claims have been met.. PB Br. at 16.[4] "One such condition is proper payment

---

[4] The "conditions precedent" reference is taken from the provision of the Consent Decree which states that the parties shall move for entry of the Decree "'attesting to the satisfaction of all

of attorneys fees." [Emphasis added.] Id. Again, the plain language of the Settlement Act refutes this second branch of the Consent Decree argument. Section 605(a) of the Act (25 U.S.C. § 1779c(a)) contains the "Extinguishment of Claims" provision. It states, in pertinent part, that the three Nations and the United States

> " . . . shall move for entry of the consent decree at such time as all appropriations by Congress pursuant to the authority of this subchapter have been made and deposited into the appropriate tribal trust fund account of the Indian Nations as described in section 1779d [entitled "Tribal Trust Funds"]. Upon entry of the consent as decree, all the Indian Nations' claims and all their past, present, and future right, title, and interest to the Disclaimed Drybed Lands, shall be deemed extinguished. * * *

Section 1779c(a) makes no reference to the provision on attorney fees (25 U.S.C. § 1779e) with respect to extinguishment of claims and title to the "Disclaimed Drybed Lands." The only connection between § 1779c and § 1779e is found in § 1779c(d) which provides that "[a]fter payment [of attorney fees] pursuant to section 1779e of this title, the remaining funds authorized for appropriation under subsection (c) of this section shall be allocated among the Indian Nations as follows . . . ." Section 1779c(d) does not say "proper payment" of attorney fees. Section 1779e refers neither to "proper payment" of attorney fees nor to " total fees properly payable to attorneys." In short, nothing in the Settlement Act makes "proper payment of attorneys fees" a condition precedent to the extinguishment of the Cherokee Nation's claims which were asserted, or which could have been asserted, in Case No. 89-218 L and its title to/interest in its "Disclaimed Drybed Lands." In sum, the plain text and design of the Settlement Act should be deemed dispositive of Patton Boggs' "Consent Decree" argument. Brotherhood of Locomotive

---

conditions precedent to the extinguishment of the plaintiffs' claims pursuant to' the Settlement Act."

Eng'rs v. Atchison, Topeka & Santa Fe R.R. Co., 516 U.S. 152, 155-156 (1996). [5]

Finally, we stress that where this court does not have the jurisdiction to award a would-be intervenor the relief it requests then this fact, by itself, is a sufficient grounds for denying the motion to intervene. Public Service Co. of Colorado v. United States, 2 Cl. Ct. 380, 382-383 (1983).

## V. THE COURT HAS NO EQUITABLE JURISDICTION TO ORDER THE DEFENDANT TO ACCOUNT FOR ALL FUNDS APPROPRIATED FOR THE CHEROKEE NATION UP TO THE PRESENT.

Patton Boggs seeks to have the Court order an accounting of all funds appropriated thus far for the Cherokee Nation pursuant to the terms of the Settlement Act. Given the present procedural posture of the Patton Boggs motions, the Court has no equitable jurisdiction to order the requested accounting. Klamath & Modoc Tribes and Yahooskin Band of Snake Indians v. United States, 174 Ct. Cl. 483, 490 (1966). In Klamath, the Court of Claims held that it had no jurisdiction to order the government to do a general accounting of tribal trust funds belonging to the plaintiff tribes. Rather, the Court held that it had the equitable power to order an accounting only after it had found the government liable on the plaintiffs' claims and then only for the purpose of aiding the Court in calculating the amount of damages owing to the plaintiffs.

The two issues now before this Court are whether Patton Boggs should be allowed to

[5] The only conceivable responsibility of the Court with respect to attorney fees is to make sure that the attorney fees paid out did not exceed 10 percent of each Nation's allocation of funds authorized to be appropriated; the three respective allocations are set out in 25. U.S.C. § 1779c(d). The Office of Special Trustee, which has responsibility for setting up the various accounts for handling the funds appropriated according to the allocation specified by the Act in Section 1779c(d), could certify to the Court that the total attorneys fees paid out for each Nation did not exceed the cap of 10 percent of each allocation.

intervene in this case and whether the Court has jurisdiction to issue the requested TRO and jurisdiction under the Settlement Act to adjudicate the matter of attorney fees and award Patton Boggs attorney fees. Unless and until the Court: (1) allows intervention; (2) finds it has jurisdiction to adjudicate attorney fees; and (3) finds the United States liable on the Patton Boggs' claim for attorney fees, it can have no equitable jurisdiction to order the government to render an up to date accounting of the funds appropriated thus far by Congress for the Cherokee Nation.

## VI. THE ASSOCIATE DEPUTY SECRETARY'S OCTOBER 13, 2005 INTERPRETATION OF THE ATTORNEY FEES PROVISION OF THE SETTLEMENT ACT IS CORRECT.[6]

Section 1779e(a) of the Settlement Act provides as follows:

> At the time the funds are paid to the Indian Nations, from funds authorized to be appropriated pursuant to section 1779c(c) of this title, the Secretary shall pay to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations.

[Emphasis added.] The Associate Deputy Secretary of the Department of the Interior, James Cason, interpreted the above underscored language as follows:

> the Secretary is required to pay only those fees approved by tribal resolutions after the Settlement Act became effective, and that the Settlement Act requires the Secretary to execute a purely ministerial act in carrying out the instructions of the Cherokee Nation as expressed in the past settlement resolutions of the Council.

[Emphasis added.]

The starting point for this statutory construction issue is that the Interior Department has

[6] The propriety of Interior's October 13th interpretation of Section 1779e of the Act is a merits - - not jurisdictional -- issue, in our opinion, but Patton Boggs discusses the issue at length in its brief. Indeed, much of its brief addresses the merits of the Patton Boggs claim, notwithstanding the fact that the Court's October 24th Order limited briefing to intervention and jurisdiction. But, despite the fact the Patton Boggs brief goes beyond the scope of the Order, we will address Interior's interpretation of Section 1779e of the Act to assist the Court in dealing with the Patton Boggs claim.

special expertise in interpreting and administering Indian statutes and its interpretation of arguably ambiguous language should be afforded considerable deference by the Court. E.g., Chevron USA, Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984). At a minimum, the Court must give "careful consideration" to Interior's interpretation. Muskogee (Creek) Nation v. Hodel, 851 F.2d 1439, 1445 n. 8. (D.C. Cir. 1988). More importantly, the Associate Deputy Secretary's interpretation of § 1779e of the Act is consistent with the longstanding canon of construction that ambiguities in federal Indian statutes must be resolved in favor of the Indians. E.g., Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985). This is because his interpretation leaves the decision as to what attorney fees are to be paid out solely in the hands of the Cherokee Nation's tribal government in deference to tribal sovereignty. By contrast, Patton Boggs' interpretation resolves the ambiguity in favor of the attorneys, rather than the Cherokee Nation. Yet, the language of Section 1779e evidences no Congressional intent to protect the attorneys for the three Nations. For this reason alone, Interior's interpretation of Section 1779e of the Settlement Act must be upheld.

Patton Boggs argues that in order for the Associate Deputy Secretary's interpretation to be correct, Congress should have inserted commas between "fees" and "provided" and between "contracts" and "as." Patton Boggs Br. at 22-23. Yet, the Court is bound by the language as written and not as Patton Boggs contends it should have been written. Cf. Badaracco v. Commissioner of Internal Revenue, 464 U.S. 386, 398 (1984). Patton Boggs also argues that its interpretation, unlike Interior's, renders certain words in Section 1779e(a) "insignificant"- - namely, "provided for in the individual tribal attorney fee contracts." PB Br.at 23. However, Patton Boggs' reading of Section 1779e(a) also renders part of subsection (a) superfluous - - a result contrary to the

canons of statutory construction. Bailey v. United States, 516 U.S. 137, 147 (1995). Patton Boggs' construction would render the words "as approved by the respective Indian Nations" redundant because no individual tribal attorney fee contract can come into effect without first having received tribal approval. Even if both interpretations arguably render different words in subsection (a) of Section 1779e ambiguous, Interior's interpretation would prevail because it resolves the ambiguous language therein in favor of Indian interests, given Chevron deference, and in a statute that was intended to benefit the Indian Nations. See Doyon, Ltd. V. United States, 214 F.3d 1309, 1314 (Fed. Cir. 2000); Brown v. United States, 42 Fed. Cl. 538, 539 (1998).

Patton Boggs contends that the Cherokee Nation's interpretation of Section 1779e "rubber stamped by the Secretary" leads to an "absurd result" and that PB's interpretation is the only reasonable one. PB Br. at 25. While Patton Boggs states there are two tribal attorney fee contracts with the Cherokee Nation approved by the Bureau of Indian Affairs (the PB contract and the Wilcoxen & Wilcoxen contract), it conspicuously fails to mention that **each provides for a fee of 10 percent of the amount recovered**. If Patton Boggs' interpretation of Section 1779e(a) is correct - - that is, that the fees approved in its contract must be paid it, then it logically follows that Wilcoxen & Wilcoxen, in theory,[7] could have an equally meritorious claim for entitlement to 10 percent of the $20 million authorized to be appropriated for the Cherokee Nation, or $2 million. Thus, under the Patton Boggs construction of Section 1779e(a), **the fees which could properly be paid under these two contracts would total $4 million in direct contradiction of the statutory cap of 10 percent/$2 million on the total attorney fees** payable to the attorneys for the Cherokee

[7] As noted, Wilcoxen & Wilcoxen has agreed to accept the $550,000 paid to them as full payment for the legal services rendered to the CNO. But, that fact does not detract from the soundness of the government's argument.

Nation provided for in Section 1779e(b). The canons of statutory construction do not allow for an acceptable interpretation of subsection (a) of Section 1779e which is totally inconsistent with subsection (b) of Section 1779e. Smith v. Babcock, 19 F.3d 257, 263 (6th Cir. 1994) (held that statutory interpretations which "yield internal inconsistencies" are to be avoided). [8/]

In sum, given the existence of the two tribal attorney fee contracts with the Cherokee Nation, it is the Patton Boggs' interpretation of Section 1779e(a) which unavoidably leads to an absurd result and must be rejected.

## CONCLUSION

For the foregoing reasons, Defendant respectfully submits that all three motions filed by Patton Boggs should be denied.

Dated this 17th day of November, 2005.

[8/] The fact that PB seeks entitlement to the entire $2 million does not avoid this problem because its interpretation of Section 607 is faulty and logically leads to the absurd outcome noted.

Respectfully submitted,

SUE ELLEN WOOLRIDGE
Assistant Attorney General
Environment and Natural
Resources Division

s/James M. Upton________
JAMES M. UPTON
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources
Division
P.O. Box 663
Washington, D.C. 20044-0663
(202) 305-0482 (Phone)
(202) 305-0506 (Fax)

Of Counsel:

Steven Simpson
Assistant Solicitor,
Energy, Minerals and Trust Branch
Angela Kelsey, Esq.
Indian Affairs Division
Office of the Solicitor
Department of the Interior
Washington, D.C. 20240

**ATTACHMENT**

*2001 U.S. Dist. LEXIS 21405, **

CARVER DAN PEAVY, ET AL., Plaintiffs, VS. WFAA-TV, INC., ET AL., Defendants.

NO. 3-96-CV-2945-R

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

2001 U.S. Dist. LEXIS 21405

December 21, 2001, Decided
December 21, 2001, Filed; December 26, 2001, Entered

**DISPOSITION: [*1]** Recommended that this FNNA's motion to intervene should be denied as untimely.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff individuals sued defendant company alleging violations of federal wiretap statutes and related state law claims. After five years of litigation the parties negotiated a settlement. Pursuant to Fed. R. Civ. P. 24, intervenor creditor moved to intervene in the underlying civil action.

**OVERVIEW:** Previous to the settlement in the underlying action, the individuals entered into a separate agreement by which a percentage of the settlement proceeds would be paid to a third party and the individuals would also pay off, on behalf of a third party, a line of credit held by the creditor. The creditor subsequently filed suit in state court to foreclose on the loan. While the state court litigation was still pending, the third party executed a collateral assignment for the benefit of the creditor by which he assigned a security interest in the agreement between the third party and the individuals. The magistrate judge found that the creditor as an assignee was in no better position than the third party and the creditor's intervention at this late date would embroil the parties and the court in collateral matters that were irrelevant to the substantive issues in the present case and unduly protract the imminent resolution of the present litigation. The creditor had presented no argument or evidence that the various remedies available under state law to secure payment of a judgment debt were either not available or inadequate.

**OUTCOME:** The magistrate judge recommended that the motion to intervene should be denied as untimely.

**CORE TERMS:** settlement, lawsuit, intervene, motion to intervene, recommendation, leave to intervene, intervenor, assignee, untimely, unusual circumstances, failure to file, length of time, timeliness, assignor, state law

2

**LexisNexis(R) Headnotes** ◆ Hide Headnotes

Civil Procedure > Joinder of Claims & Parties > Intervention

*HN1* A party may intervene in an ongoing lawsuit if four conditions are met: (1) the intervention must be timely; (2) the party must have an interest in the subject matter of the action; (3) the disposition of the case may impair or impede the party's ability to protect that interest; and (4) the party is not adequately represented by the existing parties. Fed. R. Civ. P. 24(a)(2). A party who fails to meet any one of these requirements is not entitled to intervene as a matter of

1

right. More Like This Headnote

Civil Procedure > Joinder of Claims & Parties > Intervention

*HN2* The timeliness of a motion to intervene must be determined from all the facts and circumstances of the particular case. Four factors are relevant to this inquiry: (1) the length of time during which the intervenor knew or should have known of its interest before it sought leave to intervene; (2) the extent of prejudice that existing parties to the litigation may suffer as a result of the delay; (3) the extent of prejudice to the intervenor if leave to intervene is denied; and (4) any unusual circumstances militating for or against a determination that the application is timely. More Like This Headnote

Contracts Law > Third Parties > Assignment of Rights

*HN3* An assignee stands in the shoes of his assignor, deriving the same but no greater rights and remedies than the assignor then possessed. More Like This Headnote

Civil Procedure > Joinder of Claims & Parties > Intervention

*HN4* With regard to a motion to intervene, being required to enforce a right through ordinary legal channels does not constitute prejudice. More Like This Headnote

Civil Procedure > Joinder of Claims & Parties > Intervention

*HN5* Fed. R. Civ. P. 24 is not intended to allow the creation of whole new lawsuits by the intervenors. More Like This Headnote

**COUNSEL:** For CARVER DAN PEAVY, plaintiff: S Stewart Frazer, Attorney at Law, Law Office of S Stewart Frazer, Arthur F Selander, Michael J Quilling, Keith B Cummiskey, Kenneth A Hill, Attorneys at Law, Quilling Selander Cummiskey & Lownds, Dallas, TX USA.

For SALLY PEAVY, consolidated plaintiff: Arthur F Selander, Keith B Cummiskey, Kenneth A Hill, Attorneys at Law, Quilling Selander Cummiskey & Lownds, Dallas, TX USA.

For SALLY PEAVY, EUGENE M OLIVER, ANNA OLIVER, consolidated plaintiffs: Michael J Quilling, Quilling Selander Cummiskey & Lownds, Dallas, TX USA.

For EUGENE M OLIVER, consolidated plaintiff: S Stewart Frazer, Attorney at Law, Law Office of S Stewart Frazer, Dallas, TX USA.

For WFAA-TV INC, ROBERT RIGGS, defendants: Thomas S Leatherbury, William 'Bill' D Sims, Jr, Stacy Deanne Siegel Simon, Michael L Raiff, Attorneys at Law, Vinson & Elkins, Dallas, TX USA.

For USA, movant: Lynn Hastings, Myrna B Silen, Attorneys at Law, US Attorney's Office, Department of Justice, Dallas, TX USA.

For BUCK CONSULTANTS INC, movant: D Ronald Reneker, Attorney at Law, Bush Craddock & Reneker, **[*2]** Dallas, TX USA.

For MATTHEW HARDEN, JR, movant: Scott S Hershman, Attorney at Law, Lackey Hershman, Dallas, TX USA.

For FIRST NATIONAL OF NORTH AMERICA LLC, movant: George F Nicholas, James S Robertson, III, Attorneys at Law, Nicholas & Robertson, Dallas, TX USA.

**JUDGES:** JEFF KAPLAN, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** JEFF KAPLAN

**OPINION: FINDINGS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE**

First National of North America, LLP ("FNNA") has filed a motion to intervene in this lawsuit pursuant to Rule 24 of the Federal Rules of Civil Procedure. For the reasons stated herein, the motion should be denied as untimely.

I.

This is a consolidated civil action brought by Carver Dan Peavy, Eugene M. Oliver, and their respective spouses against WFAA-TV, Inc. for violations of the federal wiretap statutes and related state law claims. After five years of litigation, the parties finally negotiated a settlement on October 15, 2001.

On September 22, 1999, Peavy and Oliver entered into an agreement with John H. Meyer and Ron Wilson whereby they agreed to pay Meyer and Wilson 5% of all settlement proceeds recovered in the *WFAA* litigation and four other cases. The **[*3]** agreement provides, in relevant part:

> The undersigned Carver D. Peavy & Gene Oliver ("the Promisor(s)") promises to pay to pay [sic] to the order of John H. Meyer & Ron Wilson ("the Payee(s)") a 5% (five percent) of the total Gross (before Tax and attorney fee deduction) settlement moneys and AOVC of each of the 5 current cases they have filed upon full and final settlement. The moneys and AOVC shall be paid by the Promisor(s) in funds as directed by the Payee(s). The total of payment paid to the Payees shall not exceed a dollar value of 5 million dollars for the 5 total cases.

(FNNA Mot., Exh. 2). In addition, the agreement obligates Peavy and Oliver to pay off a FNNA line of credit loan to Money Power, LLC, which Meyer had guaranteed. (*See id.*, Exhs. 2 & 1 (A)).

FNNA subsequently filed suit in Texas state court against Money Power, Meyer, Wilson, Peavy, Oliver, and others to foreclose on the loan. (*Id.*, Exh. 1). On November 1, 2001, while the state court litigation was still pending, Meyer executed a "Collateral Assignment" for the benefit of FNNA. That document provides, in relevant part:

> Meyer hereby collaterally assigns to FNNA, and grants to **[*4]** FNNA a security interest in, all of Meyer's rights in and to, but not any of his obligations under, the Agreement [of September 22, 1999]. This Assignment is made to secure Meyer's obligations under the Loan including, without limitation, his liability for payment of amounts due under the Loan Agreement, the Note and the Guaranty.

(*Id.*, Meyer Aff., Exh. C).

By this motion, FNNA "wishes to intervene in the WFAA lawsuit to protect its interest, as assignee, in the settlement proceeds [and] . . . seeks an order from the Court directing disbursement of the settlement proceeds to FNNA in accordance with its rights under the agreement described above." (*Id.* P 7). The motion has been fully briefed by the parties and

is ripe for determination. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 FNNA objects to the affidavits submitted by Peavy and Oliver in support of their response to the motion to intervene. As none of the statements contained in these affidavits are necessary to the disposition of the pending motion, the objections are overruled as moot.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*5]**

II.

*HN1*A party may intervene in an ongoing lawsuit if four conditions are met: (1) the intervention must be timely; (2) the party must have an interest in the subject matter of the action; (3) the disposition of the case may impair or impede the party's ability to protect that interest; and (4) the party is not adequately represented by the existing parties. FED. R. CIV. P. 24(a)(2); *Sierra Club v. Espy*, 18 F.3d 1202, 1204-05 (5th Cir. 1994). A party who fails to meet any one of these requirements is not entitled to intervene as a matter of right. *See Bush v. Viterna*, 740 F.2d 350, 354 (5th Cir. 1984).

*HN2*The timeliness of a motion to intervene must be determined from all the facts and circumstances of the particular case. *Edwards v. City of Houston*, 78 F.3d 983, 1000 (5th Cir. 1996); *Corley v. Jackson Police Department*, 755 F.2d 1207, 1209 (5th Cir. 1985). Four factors are relevant to this inquiry: (1) the length of time during which the intervenor knew or should have known of its interest before it sought leave to intervene; (2) the extent of prejudice that existing parties to the litigation may suffer as a result of **[*6]** the delay; (3) the extent of prejudice to the intervenor if leave to intervene is denied; and (4) any unusual circumstances militating for or against a determination that the application is timely. *Edwards*, 78 F.3d at 1000, *quoting Stallworth v. Monsanto Co.*, 558 F.2d 257, 264-65 (5th Cir. 1977).

A.

The first factor focuses on the length of time during which the intervenor knew or should have known of its interest before it sought leave to intervene. FNNA maintains that it did not know of Meyer's entitlement to a portion of the settlement proceeds until October 25, 2001, when it learned that a settlement had been reached in the *WFAA* case. (FNNA Mot. P 6; FNNA Reply P 9). Shortly thereafter, Meyer assigned his interest in the agreement with Peavy and Oliver to FNNA. The instant motion was filed on November 13, 2001.

This argument all but ignores the fact that FNNA claims its right to a portion of the settlement proceeds as an assignee of Meyer. *HN3*"An assignee stands in the shoes of his assignor, deriving the same but no greater rights and remedies than the assignor then possessed." *FDIC v. Bledsoe*, 989 F.2d 805, 810 (5th Cir. 1993), **[*7]** *quoting Fox-Greenwald Sheet Metal Co. v. Markowitz Bros. Inc.*, 147 U.S. App. D.C. 14, 452 F.2d 1346, 1357 n. 69 (5th Cir. 1971). Meyer clearly knew of his interest in the outcome of this litigation when he entered into the agreement with Peavy and Oliver in September 1999. Had Meyer sought to intervene at this late date, the Court would have no difficulty in denying the motion as untimely. As an assignee, FNNA is in no better position than Meyer in this regard.

B.

The second consideration is whether the existing parties will suffer prejudice as a result of

4

the delay. This factor focuses only on prejudice caused by the delay itself--not prejudice that may result if the intervention is granted. Edwards, 78 F.3d at 1002.

Since September 1999, the parties have vigorously litigated their positions in the district court, Fifth Circuit, and United States Supreme Court. n2 Clearly, a considerable amount of time and resources have been invested in this lawsuit during the past two years. After the case was remanded, the parties spent three days in mediation and countless hours negotiating with one another before a settlement was reached in October 2001. The **[*8]** tenor and course of these settlement discussions might well have been altered had Meyer or FNNA been at the table. While FNNA ultimately may be entitled to a portion of the settlement proceeds, it should not hold the parties to this litigation hostage while its rights are being adjudicated.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 The *WFAA* case was on appeal to the Fifth Circuit when Peavy and Oliver entered into their agreement with Meyer in September 1999. On July 31, 2000, the court of appeals vacated a summary judgment order in favor of WFAA and remanded the case for a trial on the merits. *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158 (5th Cir. 2000). The United States Supreme Court denied a petition for writ of certiorari on May 29, 2001. *Peavy v. WFAA-TV, Inc.*, 532 U.S. 1051, 121 S. Ct. 2191, 149 L. Ed. 2d 1023 (2001). Thereafter, this Court held a scheduling conference with the parties and set the case for trial in March 2002.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

C.

The Court also must consider any prejudice to FNNA if the motion to intervene is not granted. FNNA argues that it "will **[*9]** have to resort to independent collection efforts against Peavy, Oliver, and perhaps others" if it is not allowed to intervene in this suit. (FNNA Mot. P 11). However, *HN4*being required to enforce a right through ordinary legal channels does not constitute prejudice. FNNA has presented no argument or evidence that the various remedies available under state law to secure payment of a judgment debt are either not available or inadequate in this case. *See, e.g.* TEX. CIV. PRAC. & REM. CODE ANN. § 61.001 (Vernon 1986) (pre-judgment writ of attachment); *id.* § 63.001 (writ of garnishment); *id.* § 31.002 (post-judgment turnover order). n3 The Court finds no prejudice to FNNA if leave to intervene is denied.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 At best, the evidence shows only that Peavy and Oliver have stated an intention not to honor the agreement. (FNNA Mot., Meyer Aff. P 9). This in itself does not demonstrate that FNNA cannot collect any amounts due from Peavy and Oliver once its claim is reduced to judgment.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

D.

Finally, the Court must **[*10]** consider any unusual circumstances that bear on the issue of timeliness. One such factor is an on-going dispute as to whether the original agreement between Peavy, Oliver, and Meyer was superseded by a later agreement. On January 1,

5

2000, these parties entered into a second contract whereby Peavy and Oliver promised "to richly reward Ron Wilson and John H. Meyer for all of the considerations and courtesies that Ron Wilson and John H. Meyer have bestowed on Dan Peavy and Gene Oliver." (Peavy Aff., Exh. E). The document goes on:

> This agreement supersedes all prior documents or understandings whether verbal or written between all parties, namely, Carver D. (Dan) Peavy, Eugene M. (Gene) Oliver, Ron Wilson, and John H. Meyer . . . All other agreements between and among the parties including but not limited to the joint venture agreement between Homemasters, Inc. and Money Power, L.L.C. are not considered a part of this document.

(*Id.*). The Court will not even attempt to decipher this cryptic paragraph. Suffice it to say that allowing FNNA to intervene would require the Court to determine both the validity and effect of this contract. Those matters have been joined in **[*11]** the state court lawsuit and can be fully resolved in that forum. *Deus v. Allstate Insurance Co.*, 15 F.3d 506, 525 (5th Cir.), *cert. denied*, 513 U.S. 1014, 115 S. Ct. 573, 130 L. Ed. 2d 490 (1994) (HN5 Rule 24 "is not intended to allow the creation of whole new lawsuits by the intervenors"). FNNA's intervention at this late date would embroil the parties and the Court in collateral matters that are irrelevant to the substantive issues in this case and unduly protract the imminent resolution of the *WFAA* litigation. Under these circumstances, intervention is not proper. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 FNNA cites two "analogous" cases in support of its motion where attorneys were allowed to intervene in pending lawsuits involving former clients to protect their interests under a contingent fee contract. *Keith v. St. George Packing Co., Inc.*, 806 F.2d 525 (5th Cir. 1986); *Gaines v. Dixie Carriers, Inc.*, 434 F.2d 52 (5th Cir. 1970). Significantly, the intervenors in both *Keith* and *Gaines* sought leave to intervene within months after the underlying lawsuits were filed. *See* *Keith*, 806 F.2d at 525-26 (intervention sought six months after suit was filed); *Gaines*, 434 F.2d at 53 (intervention sought less than 10 months after suit was filed).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*12]**

**RECOMMENDATION**

FNNA's motion to intervene should be denied as untimely.

DATED: December 21, 2001.

JEFF KAPLAN

UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO OBJECT**

On this date the United States magistrate judge made written findings and a recommended disposition of First National of North America, LLP's motion to intervene in the above styled and numbered cause. The United States district clerk shall serve a copy of these findings and recommendations on all parties by certified mail, return receipt requested. Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to these findings and recommendations

must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings and recommendations to which objections are being made. The district court need not consider frivolous, conclusory or general objections. The failure to file such written objections to these proposed findings and recommendations shall bar that party from obtaining a *de novo* determination by the district court. Nettles v. Wainwright, 677 F.2d 404, 410 (5th Cir. 1982). **[*13]** *See also* Thomas v. Arn, 474 U.S. 140, 150, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985). Additionally, the failure to file written objections to proposed findings and recommendations within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error or manifest injustice. Douglass v. United Services Automobile Ass'n, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: December 21, 2001.

JEFF KAPLAN

UNITED STATES MAGISTRATE JUDGE

Service: **Get by LEXSEE®**
Citation: **2001 us dist lexis 21405**
View: Full
Date/Time: Thursday, November 17, 2005 - 3:55 PM EST

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.