IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, | * | |
| Plaintiff, | * | Case No. 218-89 |
| v. | * | Chief Judge Edward J. Damich |
| THE UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |

* * * * * * * * * * * *

**REPLY BRIEF IN SUPPORT OF PATTON BOGGS' MOTIONS TO INTERVENE AND FOR ATTORNEYS FEES**

PATTON BOGGS LLP

David S. Panzer (DC Bar No. 470677)
David P. Callet (DC Bar No. 181990)
Greenberg Traurig LLP
800 Connecticut Ave, NW, Suite 500
Washington, DC 20006
202-331-3100
202-331-3101 (fax)
panzerd@gtlaw.com
calletd@gtlaw.com

November 28, 2005

## TABLE OF CONTENTS


**TABLE OF CONTENTS** ..... i

**TABLE OF AUTHORITIES** ..... iv

**REPLY BRIEF IN SUPPORT OF PATTON BOGGS' MOTIONS TO INTERVENE AND FOR ATTORNEYS FEES** ..... 1

**COUNTERSTATEMENT OF THE FACTS** ..... 2

PB's Contract At All Relevant Times Was "Approved." ..... 2

PB's "Approved Contract" Gave PB The Unilateral Right To Extend The Contract Term. ..... 3

PB's First Extension Modified The Litigation Contract Terms, And Was Therefore "Approved" By CN's Tribal Council and The BIA. ..... 3

PB's Second Extension Did Not Further Modify The Litigation Contract Terms; Therefore, No Further Approvals Were Necessary. ..... 4

PB Was Terminated Without Cause During Its Second Extension. ..... 4

**ARGUMENT: POINTS OF LAW** ..... 5

**I. PB DOES NOT SEEK CN FUNDS; THEREFORE, MOST OF THE OPPOSITION'S ARGUMENTS ARE INAPPOSITE** ..... 5

**A. PB Seeks Funds The Settlement Act Appropriated To Pay Fees To The "Indian Nations' Attorneys" First.** ..... 5

**B. The Fact That PB Does Not Seek CN's Money But, Rather, Money Expressly Appropriated For The Indian Nations' Attorneys, Moots Many Of The Opposition's Arguments.** ..... 6

**II. THE COURT HAS JURISDICTION TO ADJUDICATE PB'S CLAIM UNDER THE CONSENT DECREE AND UNDER THE TUCKER ACT** ..... 7

**A. The Settlement Act's Money-Mandating Attorneys Fees Provision Falls Well Within The Scope Of The Court's Power To Review The Consent Decree Because Attorneys Fees Must Be Paid Before The Indian Nations' Claims Are Extinguished.** ..... 7

**B. This Court Also Has Jurisdiction Under The Tucker Act To Adjudicate PB's Claim Against The Government For Money Damages Arising From The Secretary's Failure To Comply With The Money-Mandating Attorneys Fee Provision Of The Settlement Act.** ..... 8

1. **The Plain Language Of The Settlement Act Established It As A Money-Mandating Statute.** .......... 9

2. **That The Settlement Act Prescribes No Claims Procedures To Pay Attorneys Fees Confirms It Is Money-Mandating.** .......... 10

3. **This Court Is The Proper Forum To Adjudicate The Government's Failure To Follow The Settlement Act's Money-Mandating Provisions Because A Monetary Award Will Provide PB With Complete Relief.** .......... 11

**III. PB MOVED TO INTERVENE TO PROTECT ITS INTEREST IN RESOLVING ITS ATTORNEYS FEES CLAIM BY SUBMITTING A PROPER RULE 24(C) PLEADING SUBMITTED SIX DAYS AFTER THE GOVERNMENT BREACHED ITS STATUTORY DUTY.** .......... 12

**A. PB Has A Legally Protectable Interest In The Settlement Act Funds.** .......... 12

**B. Rule 24(c) Does Not Mandate A Motion To Intervene Be Accompanied By A Complaint Or An Answer.** .......... 13

**C. PB's Motion To Intervene, Filed Six Days After The Government's Breach Of Its Statutory Duty, Was Timely.** .......... 14

**IV. THE OPPOSITION'S ATTEMPT TO CREATE AN AMBIGUITY WHERE NONE EXISTS PROVIDES NO BASIS FOR THIS COURT TO IGNORE THE PLAIN LANGUAGE OF THE SETTLEMENT ACT'S ATTORNEYS FEES PROVISION.** .......... 15

**A. The Opposition Cannot Properly Contrive A "Tautology" Out Of The Plain Language Of The Settlement Act's Attorneys Fees Provision.** .......... 16

**B. The Opposition Cannot Properly Invoke A Presumption By Manufacturing Untenable Interpretations Of The Settlement Act.** .......... 17

**CONCLUSION** .......... 19

**APPENDIX** .......... 21

**EXHIBIT 16** — **MAY 20, 1989 CHEROKEE NATION RESOLUTION NO. 31-89** .......... A-100

**EXHIBIT 17** — **MARCH 13, 1991 PATTON BOGGS CONTRACT EXTENSION** .......... A-101

**EXHIBIT 18** — **JULY 13, 1991 CHEROKEE NATION RESOLUTION NO. 61-91** .......... A-102

**EXHIBIT 19** **AUGUST 12, 1991 LETTER FROM MERITT YOUNGDEER TO WILMA MANKILLER** ........ A-103

**EXHIBIT 20** **OCTOBER 3, 1991 LETTER FROM ACTING AREA DIRECTOR TO WILMA MANKILLER** ........ A-104

**EXHIBIT 21** **MAY 12, 1992 PATTON BOGGS CONTRACT EXTENSION** ........ A-105

**ADMINISTRATIVE PROCEDURES ACT, 5 U.S.C. § 702** ........ A-107

**SAINT ELIZABETH'S HOSPITAL AND DISTRICT OF COLUMBIA MENTAL HEALTH SERVICES ACT, 24 U.S.C. § 225g** ........ A-108

**NAVAJO-HOPI SETTLEMENT ACT, 25 U.S.C. § 640d-7** ........ A-111

**HOOPA-YUROK SETTLEMENT ACT, 25 U.S.C. § 1300i-11** ........ A-113

**ALASKA NATIVES CLAIMS SETTLEMENT ACT, 43 U.S.C. § 1619** ........ A-115

**25 C.F.R. § 89.30, *et seq.*** ........ A-118

## TABLE OF AUTHORITIES

**Federal Cases**

*AD Global Fund v. U.S.*,
67 Fed. Cl. 657 (2005) .......... 17, 19

*Am. Renovation and Constr. Co. v. U.S.*,
65 Fed. Cl. 254 (2005) .......... 13

*Beckman Indus., Inc. v. Int'l Ins. Co.*,
966 F.2d 470 (9th Cir.),
*cert. denied*, 506 U.S. 868 (1992) .......... 14

*Chevron USA, Inc. v. Natural Res. Def. Council*,
467 U. S. 837 (1984) .......... 18

*Chickasaw Nation v. U.S.*,
534 U.S. 84 (2001) .......... 18

*DeCoteau v. District Court*,
420 U.S. 425 (1975) .......... 19

*District of Columbia v. U.S.*,
67 Fed. Cl. 292 (2005) .......... 11

*Doyon, Ltd. v. U.S.*,
214 F.2d 1309 (Fed. Cir. 2000) .......... 18, 19

*Gaines v. Dixie Carriers, Inc.*,
434 F.2d 52 (5th Cir. 1992) .......... 8, 13

*Hart v. U.S.*,
585 F.2d 1025 (1978) .......... 17

*Heller, Ehrman, White & MacAuliffe v. Babbitt*,
992 F.2d 360 (D.C. Cir. 1993) .......... 10

*Hopi Tribe v. U.S.*,
55 Fed. Cl. 81 (2002) .......... 9

*In re Discovery Zone Sec. Litig.*,
181 F.R.D. 582 (N.D. Ill. 1998) .......... 13

*Klamath Irrigation District v. U.S.*,
64 Fed. Cl. 328 (2005) .......... 12, 13

*Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*,
72 F.3d 361 (3rd Cir. 1995) .......... 13

*N.L.R.B. v. Pueblo of San Juan*,
276 F.3d 1186 (10th Cir. 2002) .......... 19

*Ohio & Miss. Ry. Co. v. McCarthy*,
96 U.S. 258 (1877) .......... 2

*Pueblo of Santo Domingo v. U.S.*,
54 Fed. Cl. 240 (2002) .......... 10

*Red Lake Band v. U.S.*,
17 Cl. Ct. 362 (1989) .......... 19

*Sisseton and Wahpeton Bands or Tribes v. U.S.*,
423 F.2d 1386 (Ct. Cl. 1970) .......... 2, 7, 10

*South Carolina v. Catawba Indian Tribe, Inc.*,
476 U.S. 498 (1986) .......... 18

*Spring Constr. Co., Inc. v. Harris*,
614 F.2d 374 (4th Cir. 1980) .......... 14

*U.S. v. Eilberg*,
89 F.R.D. 473 (E.D. Pa. 1980) .......... 13

*U.S. v. Thompson*,
941 F.2d 1074 (10th Cir. 1991) .......... 19

*United Keetoowah Band of Cherokee Indians of Oklahoma v. U.S.*,
67 Fed. Cl. 695 (2005) .......... 13

**Federal Statutes**

Administrative Procedures Act,
5 U.S.C. §§ 701, *et seq.* .......... 7, 8, 11, 12

Saint Elizabeth's Hospital and District of Columbia Mental Health Services Act,
24 U.S.C. §§ 225-225h .......... 11

25 U.S.C. § 70n .......... 10

25 U.S.C. § 81 .......... 2, 4, 16

Navajo-Hopi Settlement Act,
25 U.S.C. §§ 640d, *et seq.* .......... 9

Hoopa-Yurok Settlement Act,
25 U.S.C. § 1300i-11 .......... 10

Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act,
25 U.S.C. §§ 1779, *et seq.* .......... passim

Tucker Act,
28 U.S.C. § 1491 .......... passim

Alaska Natives Claims Settlement Act,
43 U.S.C. § 1619 .......... 10

Pub. L. 106-179 .......... 16

**Federal Regulations**

25 C.F.R. § 89.30 .......... 3

**Legislative Materials**

H.R. Rep. No. 107-632 .......... 19

**Federal Rules**

RCFC 5.2 .......... 1

RCFC Appendix G .......... 10

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, | * | |
| Plaintiff, | * | Case No. 218-89 |
| v. | * | Chief Judge Edward J. Damich |
| THE UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |

* * * * * * * * * * * *

**REPLY BRIEF IN SUPPORT OF PATTON BOGGS' MOTIONS TO INTERVENE AND FOR ATTORNEYS FEES**

Proposed intervenor Patton Boggs LLP ("PB") files this Reply Brief pursuant to this Court's October 24, 2005 Scheduling Order.

The Government and Cherokee Nation ("CN") (collectively, the "Opposition") contend that this Court lacks power to adjudicate PB's $1.4 million claim based on the attorneys fees provision of the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, Pub. Law 107-331 (the "Settlement Act"), codified as 25 U.S.C. § 1779e.[1] In fact, PB's claim for money damages "against the United States founded ... upon" a money-mandating "Act of Congress," – the Settlement Act – falls squarely within the Court's Tucker Act jurisdiction. *See* 28 U.S.C. § 1491(a)(1).

No one disputes this Court's power to review the proposed Consent Decree. The Opposition contends, however, that the Government's duty to pay statutorily-mandated attorneys fees is not a "condition precedent" to entry of the Consent Decree and, further,

[1] The full text of the Settlement Act is set forth in the Appendix (the "Appendix") to PB's Supplemental Memorandum ("Supp. Mem.") at A-4 to A-21. References to Exhibit 1 to 15 are included in the Appendix. Exhibits 16 to 21 are attached hereto. The citations to PB's Supp. Mem. herein are not incorporations by reference under RCFC 5.2 (b)(3).

that the Court's ability to "approve or disapprove some aspect of [the Consent Decree]"[2] excludes the power to ensure compliance with the Settlement Act's attorneys fees provision. The Settlement Act in fact requires proper payment of attorneys fees **before** the conditions precedent to the Consent Decree can be met and, thereby, mandates this Court's review as to whether attorneys fees have been paid in accordance with 25 U.S.C. § 1779e. Among other reasons, PB has the right to intervene to present its Tucker Act claim and to protect the integrity of the Consent Decree because entry of that consent judgment may be used at a later time in an attempt to bar PB's claim.

## COUNTERSTATEMENT OF THE FACTS

PB's "approved" Litigation Contract never expired[3] – CN terminated it without cause.[4]

PB's Contract At All Relevant Times Was "Approved."

PB's 1989 Litigation Contract (Ex. 2, A-43-46) is an "approved" contract and, as such, fully satisfies the requirements of the Settlement Act. Title 25 U.S.C. § 81 required "approval" by both CN's Tribal Council and the Secretary of the Department of the Interior (the "Secretary"). CN Opp. at 4 n.6. CN Tribal Council approved PB's April 17, 1989 Litigation Contract on May 20, 1989, in Resolution 31-89. Ex. 16 at A-100; *accord*

[2] Docket No. 112, 10/20/05 Hearing Tr. at 23:25-24:2 (Chief Judge Damich).

[3] To avoid the undisputed fact that CN terminated PB's Litigation Contract without cause, CN now argues that PB's Contract "expired." CN Opp. at 7-9. The Opposition knows its new found arguments are groundless, and has conspicuously refrained from even mentioning, much less contrasting absence or extension of other subordinated law firm contracts. Had CN actually believed that PB's Contract had expired it would not have recommended that the Secretary pay any of PB's fees. (When it recommended that only 1/9 of PB's fees be paid, CN contended that PB's contract had been "terminated in April 1997." Ex. 4 at A-51.) Apart from the fallacy of CN's newly-minted argument (*see supra* Counterstatement of the Facts), CN cannot properly be permitted to "mend its hold" and attempt to alter its rationale for the sake of litigation expedience. *Ohio & Miss. Ry. Co. v. McCarthy*, 96 U.S. 258, 267-68 (1877) ("Where a party gives a reason for his conduct and decision touching any thing involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold.").

[4] In *Sisseton and Wahpeton Bands v. U.S.*, 423 F.2d 1386, 1389-90 (Ct. Cl. 1970), cited by CN, the Court made clear that even a voluntary termination by counsel preserved counsel's right to its fees under an "approved" contract.

Ex. 2 at A-43. On November 13, 1989, the Secretary's designee at the Bureau of Indian Affairs ("BIA") approved the same Contract. Ex. 2 at A-46.

PB's "Approved Contract" Gave PB The Unilateral Right To Extend The Contract Term.

As approved, PB's April 17, 1989 Litigation Contract was "effective" from January 1, 1989, to July 1, 1990. Moreover, the Litigation Contract gave PB the "option" to extend its "approved" contract's duration by making a "written request … with all approvals required by law."[5] Ex. 2 at A-45. No "law" requires further approval of an "approved" contract.[6] PB's option to extend its Litigation Contract gave PB the right to continue or discontinue its representation of CN at the contractually-agreed upon significantly-reduced compensation. By contrast, the Litigation Contract did not give to CN the right to "approve" or disapprove an extension of the Litigation Contract.

If the BIA had disputed PB's unilateral right to extend the Litigation Contract, the BIA could have conditioned its approval of the Litigation Contract on requiring additional approval for further extensions, even though requested at PB's "option."[7] Instead, the BIA approved the existing contract language, which granted PB the unilateral right to extend the "approved" contract, assigning the contract number TAC-012-89.

PB's First Extension Modified The Litigation Contract Terms,
And Was Therefore "Approved" By CN's Tribal Council and The BIA.

The first contract extension, dated March 13, 1991, "incorporat[ed] by reference the [Litigation] Contract entered into with [PB]." Ex. 17 at A-101. By operation of this extension, the Litigation Contract was "effective" from July 2, 1990, through July 2, 1992. *Id.* The extension also modified the Litigation Contract terms to allow PB to

[5] CN nonetheless argues, with no basis in law or fact, that, at the time PB was terminated without cause in 1995, PB was operating under a contract "extension" that was neither "authorized [n]or approved." CN Opp. at 8 n.11.
[6] The BIA regulations make no mention of extensions. *See* 25 C.F.R. 89.30, *et seq.*
[7] While the BIA raised certain questions about the Contract, it never questioned PB's unilateral "option" to extend the Litigation Contract.

obtain future contract extensions for five years, instead of the two-year extensions permitted under the original contract as "approved" under 25 U.S.C. § 81. CN's Tribal Council approved this Litigation Contract modification on July 13, 1991, in Resolution 61-91. Ex. 18 at A-102 (CN Opp. withdrawn Ex. A-2). This modification also was "approved" by the Area Director of the BIA on October 2, 1991. CN Opp. Ex. A-1. In two letters to CN, the BIA's Area Director and the Acting Area Director made clear that the modified contract "may be extended for periods of five (5) years each from the date of its expiration, at the option and written request of the attorneys, with all approvals required by United States law and [CN] tribal law." Ex. 19, 20. The BIA did not assert that any such approvals were required for PB to exercise its "option" to extend the Contract. Nor did the BIA assign a new contract number.

<u>PB's Second Extension Did Not Further Modify The Litigation Contract Terms; Therefore, No Further Approvals Were Necessary.</u>

The second extension of PB's Litigation Contract, dated May 12, 1992, modified no other Contract term, and PB exercised its option to extend the Litigation Contract five years, to July 2, 1997. Ex. 21. No requirement existed for anyone to approve PB's exercise of its "option" to extend. To extend its already approved Contract, PB simply had to inform CN it was exercising its unilateral option, without the need for a new CN Tribal Resolution, nor an additional signature from the BIA, to approve the extension.[8]

<u>PB Was Terminated Without Cause During Its Second Extension.</u>

During the term of its Litigation Contract's second extension, PB was terminated without cause, even though the Contract permitted termination by CN only "for cause," with the consent of the Tribal Council and upon sixty days notice – neither of which ever

---

[8] *Compare* Ex. 1 (Wilcoxen-Niebell Contract) at A-40 ("...with the approval of the Principal Chief of the Cherokee Nation of Oklahoma and the Commissioner of Indian Affairs.")

occurred. *See* Ex. 3 at A-47.[9] No one has ever suggested that PB should have sought to extend its Litigation Contract once that Contract was improperly terminated by CN.[10]

## ARGUMENT: POINTS OF LAW

### I. PB DOES NOT SEEK CN FUNDS; THEREFORE, MOST OF THE OPPOSITION'S ARGUMENTS ARE INAPPOSITE.

Many Opposition arguments flow from a single inaccurate premise – that the "key issue" is "Patton Boggs' claim to **Cherokee Nation funds**." CN Opp. at 1 (emphasis added).[11] Indeed, the Settlement Act could not more plainly state that the money due PB was appropriated for and to be paid to the "Indian Nations' attorneys" to satisfy certain "attorney fee contracts." 25 U.S.C. § 1779e(a). PB's pending motions concern PB's statutorily-created right to payment per the terms of its approved "fee contract[]" with CN – not a private contract dispute. This money-mandating Act places PB's claim squarely within the Tucker Act, 28 U.S.C. § 1491(a)(1), for the Government's failure to comply.

#### A. PB Seeks Funds The Settlement Act Appropriated To Pay Fees To The "Indian Nations' Attorneys" First.

The Settlement Act authorizes appropriations totaling $40,000,000 (25 U.S.C. § 1779c(c)), up to ten percent of which was to be set aside to pay "Indian Nations' attorneys" with an "approved" contract. *Id.* § 1779e. The Act directs "Indian Nations'

---

[9] The fact that CN's termination of PB's Litigation Contract was without cause is underscored by the written statements of gratitude at the time (Ex. 3 at A-47) and, again, after the passage of the Settlement Act. Ex. 4 at A-53, Ex. 6 at A-58.

[10] CN makes the nonsensical argument that, while PB would have been entitled to "an equitable portion" of its ten percent contingency if it was terminated "for cause," PB "arguably [has] no right to payment of attorney fees" because CN terminated PB "without cause." CN Opp. at 7 n.10. If PB would have been due "an equitable portion" of its fees had it been terminated "for cause," then, the amount of "fees provided for in" PB's Litigation Contract would have been an "equitable portion" of its ten percent contingency. The amount of "fees provided for" in PB's Litigation Contract cannot logically be less had PB allowed its Contract to expire (which did not happen), let alone in the circumstances here, where PB was terminated "without cause."

[11] In support of this framing of the "key issue," CN cites the Court's October 24, 2005 Scheduling Order; however, that Order makes no mention of "Cherokee Nation funds." Docket No. 113. In fact, the Order references the Secretary's reversal of its "transfer of funds to the Plaintiff, which came out of the attorney fee escrow account." *Id.* at 1.

attorneys" to be paid first, **before any** "remaining funds" are to be paid into the Indian Nations' Trust funds. *Id.* §§ 1779c(d), 1779e(b).[12] The moneys appropriated to pay the attorneys fees were placed in a "special holding account" by the Secretary of the Department of the Interior (the "Secretary"). *See* Docket No. 109 (10/3/05 Joint Status Report). PB is one of two "[Cherokee] Nations' attorneys," with an "approved" contract, entitled to have its fees paid out of this set aside under the Settlement Act.[13] Only "after" payment of attorneys fees is CN entitled to have 50% of the "remaining" amount deposited into its "Tribal trust fund," *i.e.*, at least $18 million. *Id.* §§ 1779c(d), 1779d.

### B. The Fact That PB Does Not Seek CN's Money But, Rather, Money Expressly Appropriated For The Indian Nations' Attorneys, Moots Many Of The Opposition's Arguments.

Money the Settlement Act expressly sets aside to pay attorneys does not belong to CN, which eliminates many of the Opposition's arguments:

---

[12] Paying the Indian Nations' attorneys first is necessary in order for the Secretary to know how much of the "funds authorized for appropriation" were "remaining" to place into the Tribal trust funds. *Id.* § 1779c(d). Paying these attorneys fees first is consistent with the Settlement Act's purpose as a legislative settlement of the then pending **litigation** in this case. *See* 25 U.S.C. §§ 1779 Findings (1) ("It is the policy of the United States ... to encourage the resolution of disputes over historical claims through mutually agreed-to settlements between Indian Nations and the United States"), (2) ("There are pending before the United States Court of Federal Claims certain lawsuits against the United States brought by the Cherokee, Choctaw, and Chicasaw Nations seeking monetary damages for the alleged use and mismanagement of tribal resources along the Arkansas River"), (12) ("In 1989, the Indian Nations filed lawsuits against the United States in the United States Court of Federal Claims (Case Nos. 218-89L and 630-89L), seeking damages for the United States' use and mismanagement of tribal trust resources along the Arkansas River"); 1779c(a) ("Extinguishment of [these] claims"). CN claims that the Settlement Act resolved issues "well beyond the specific claims for relief brought in the case pending before the Court," CN Opp. at 29, but no one has ever identified any viable claims that CN had against the Government relating to the Arkansas Riverbed beyond the mismanagement claims that PB formulated and filed in Case No. 218-89 (this case) after claims brought by other lawyers had been dismissed. *See* Supp. Memo. at 6 n.6. Indeed, in its brief the Government steers conspicuously clear of this issue.

[13] The Wilcoxen & Wilcoxen firm is the other. *See* Ex. 1. However, that firm's recovery was made specifically "subject to" PB's even before PB's contract was entered, (*id.* at A-38); that recovery was limited to a quantum meruit analysis not to "exceed ten percent," (*id.* at A-39; *see also* CN Opp. at 6 n.9 ("...measured by quantum meruit...")); all actions pursued under that contract were dismissed (*see* Supp. Mem. at 6 n.6; *see also* Ex. 4 at A-50); that contract did not include a unilateral right to extend (Ex. 1 at A-40 ("...with the approval of the Principal Chief ... and the Commissioner of Indian Affairs.")); in 56 pages, the Opposition does not suggest that this contract was ever extended; and even though Mr. James Wilcoxen did not enter his appearance in this case until September 14, 1999 (*see* Docket No. 42) – years after PB's termination without cause – he never entered into a contract for claims resolved in the Settlement Act. Thus, no one has a better claim to money, set aside under §§ 1779c(d) and 1779e, than PB.

- The argument that PB lacks a Rule 24 interest (U.S. Opp. at 9-10, CN Opp. at 28-29) erroneously assumes that PB claims a portion of CN's recovery and, for that reason, CN's related assertion of sovereign immunity is irrelevant;
- The "lacks jurisdiction over a private dispute" argument (U.S. Opp. at 14, CN Opp. at 17-20) erroneously assumes that PB's claim is against CN's funds;[14]
- The argument that neither the Tucker Act nor the dependent All Writs Act apply (U.S. Opp. at 15-16, CN Opp. at 23-26) erroneously ignores the Settlement Act's money-mandating provision that requires direct payment to the "Indian Nation's attorneys;"
- The argument that the Court cannot order an equitable accounting (U.S. Opp. at 20-21) erroneously assumes that the money to be accounted for belongs to an Indian Tribe; and
- The argument that this Court is the wrong forum to hear a claim under the Administrative Procedures Act ("APA") (CN Opp. at 10-15) erroneously assumes that PB lacks money damages claim against the Government.

In short, the Opposition's contentions largely ignore PB's Tucker Act claim against the Government, and its rights under the Settlement Act.

## II. THE COURT HAS JURISDICTION TO ADJUDICATE PB'S CLAIM UNDER THE CONSENT DECREE AND UNDER THE TUCKER ACT.

### A. The Settlement Act's Money-Mandating Attorneys Fees Provision Falls Well Within The Scope Of The Court's Power To Review The Consent Decree Because Attorneys Fees Must Be Paid Before The Indian Nations' Claims Are Extinguished.

Recognizing that the Court must be empowered to review its own Consent Decree, the Government contends that "proper payment" of attorneys fees, under § 1779e, is unnecessary before the Court's decree is entered, while CN suggests that the Indian Nations' attorneys need not be paid at all. U.S. Opp. at 19 (*citing* 25 U.S.C. § 1779c(d)); CN Opp. 22 (same). Yet, the process to satisfy Indian Nations' claims, outlined in § 1779c(a), legally cannot even begin until the Indian Nations' attorneys fees have been paid. "The Indian Nations and the United States ... shall move for entry of the

[14] Even if PB did seek CN tribal funds, matters involving the allocation of statutory attorney fees among lawyers operating under separate "approved" contracts are not "private contract" disputes. *Sisseton, supra,* 423 F.2d at 1391 ("On the other hand, in a case like this where several attorneys have, at different times, appeared for claimants – generally under separate contracts – the dispute becomes more than a private contractual squabble.") (internal citation and quotation omitted).

consent decree at such time as all appropriations … have been made and deposited into the appropriate tribal trust fund account of the Indian Nations as described in section 1779d of this title." 25 U.S.C. § 1779c(a). Further, the "[a]llocation and deposit of funds" into the Tribal trust funds "described in section 1779d of this title" is set forth in § 1779c(d), which the Opposition admits is a condition precedent to entry of the Consent Decree.[15] Section 1779c(d)'s allocation expressly comes "after" payment to the Indian Nations' attorneys those fees provided under § 1779e. Therefore, paying attorneys fees under § 1779e precedes the allocation and deposit of funds under § 1779c(d), which then defines the extent of funding of the Tribal trust funds in § 1779d. Only after all deposits are made into the § 1779d "Tribal trust funds" can any party move for entry of the Consent Decree. 25 U.S.C. § 1779c(a).

This Court's power to meet all conditions precedent to its entering its Consent Decree necessarily empowers it to review the payment of attorneys fees, which precedes the conditions precedent.[16]

**B. This Court Also Has Jurisdiction Under The Tucker Act To Adjudicate PB's Claim Against The Government For Money Damages Arising From The Secretary's Failure To Comply With The Money-Mandating Attorneys Fee Provision Of The Settlement Act.**

CN argues that, because PB alleges a failure by the Secretary, PB's claim "would arise, if at all, under the Administrative Procedures Act." CN Opp. at 11. The APA, 5 U.S.C. §§ 701, *et. seq.*, however, applies only to "non-monetary" relief, whereas the Tucker Act offers monetary relief, 28 U.S.C. § 1491. That the Secretary failed to satisfy a legal duty under § 1779e of the Settlement Act hardly distinguishes PB's claim from

[15] U.S. Opp. at 19 (*citing* 25 U.S.C. § 1779c(d)); CN Opp. 22 (same).

[16] Thus, the Opposition cannot distinguish *Gaines v. Dixie Carriers, Inc.*, 434 F.2d 52 (5th Cir. 1970) on the ground that the funds at issue are not "under the court's direction jurisdiction and control." CN Opp. at 29; *see also* U.S. Opp. at 11 n.3.

any other Tucker Act claim based on an Act of Congress, which invariably involves some official's failure to pay money when mandated by Congress to do so.

### 1. The Plain Language Of The Settlement Act Established It As A Money-Mandating Statute.

A Tucker Act claimant may show that it has suffered money damages by stating a claim under a money-mandating statute, such as the Settlement Act. *See Hopi Tribe v. U.S.*, 55 Fed. Cl. 81 (2002). In *Hopi Tribe*, the Tribe sued the Government under the Tucker Act, 28 U.S.C. § 1491(a)(1), for the Secretary's failure to reimburse legal expenses arising out of the Navajo-Hopi Settlement Act of 1974, 25 U.S.C. §§ 640d, *et. seq.* ("Hopi Settlement Act"). The Tribe argued that § 640d-7(e)'s statement that the "Secretary of the Interior is authorized to pay any or all appropriate legal fees," was a money-mandating statute. 55 Fed. Cl. at 83-84, 87. The Court disagreed, finding that only statutes containing a "plainly prescribed duty," manifested most commonly in the "mandatory term 'shall,'" were money mandating. *Id.* at 87.

Here, the mandatory term in § 1779e ("the Secretary shall pay") unequivocally mandates the Secretary to pay PB "those fees provided for" in its "approved" contract with CN.[17] PB's approved Litigation Contract "provided for" "compensation of ten percent (10%) of the amount recovered less the amounts previously paid...." Ex. 2 at A-45. Of the appropriated funds, 50% or $20 million are allocated to CN and its counsel. Based on its 10% contingency contract, PB is, thus, entitled to $2 million, less the

[17] A money-mandating statute "restricts the Secretary's discretion" only to refuse excessive or unrelated fee claims. *Id.* at 97-98. Barring that, the Secretary must pay the full amount of attorneys fees. *Id.* at 98. CN does not (nor could it credibly) contend that the fees claimed by PB are excessive or unrelated. Therefore, the Secretary's limited discretion to refuse excessive or unrelated attorneys fees is not at issue. Although it does not bear on PB's entitlement to its fees under the Settlement Act, *Hopi Tribe* makes clear that the Secretary lacked the discretion to pay attorneys who have **no** contract with CN.

$554,959 previously paid. Thus, "the Secretary shall pay" PB $1,445,041.[18]

### 2. That The Settlement Act Prescribes No Claims Procedures To Pay Attorneys Fees Confirms It Is Money-Mandating.

The Settlement Act first segregated funds for the payment of fees to the "Indian Nations' attorneys." This language stands in stark contrast to other Indian payment statutes, like the Hopi Settlement Act, discussed *supra*, where all settlement moneys were paid to the respective Indian Nations and their attorneys were required to make a claim against those Tribal funds.[19] *See* CN Opp. at 12-14 (citing examples). These examples underscore PB's right to have the Secretary pay its fees "provided for" in its "approved" contract, without any need for PB to submit a claim to the Secretary, CN, or even to the Court, because Congress has already determined the amount to pay the "Indian Nations' attorneys" in 25 U.S.C. § 1779e.

The Government also argues that the Settlement Act's specific jurisdictional

---

[18] Contrary to CN's claim that "Patton Boggs tries to zero out <u>any</u> fees to be paid to other lawyers, with valid contracts, who also provided legal services," CN Opp. at 4 n.5 (emphasis in original), honoring PB's statutory right leaves remaining $403,959 to be paid to other CN attorneys out of funds appropriated under the Settlement Act for attorneys fees. *See* Supp. Mem. at 33 (requiring James Wilcoxen to give back no more than $96,041 of the $550,000 he received in attorneys fees, netting him $403,959 plus a gratuity). CN's citation to *Sisseton*, *supra*, is, therefore, inapplicable because that case involved two irreconcilable claims where one set of lawyers sought all of the attorneys fees. Here, Wilcoxen & Wilcoxen's recovery is made "subject to" PB's, (*see* Ex. 1 at A-38), leaving hundreds of thousands of dollars remaining. *Sisseton* does confirm, however, that the Hall-Estill firm, associated by Wilcoxen & Wilcoxen, must look to Wilcoxen & Wilcoxen for payment. Hall-Estill has no independent claim to statutory attorneys fees. *Id.* at 1391 ("[O]nly such attorneys as have actually appeared for claimants can be recognized as entitled to allowance of fees. Associate counsel and assignees, and persons otherwise employed, must look for their pay to those with whom they have contracts.") (internal citation and quotation omitted).

The Government seriously misrepresents the nature of the two "approved" contracts, emphasizing that "**each provide for a fee of 10 percent of the amount recovered**." U.S. Opp. at 23 (bold in original). To the contrary, the Wilcoxen-Niebell Contract provides only "such compensation as the Commissioner of Indian Affairs may find equitably to be due as may be determined by a court or tribunal, for services theretofore rendered under this Contract, but in no event shall the aggregate fee exceed ten percent (10%) of any and all sums recovered or procured through the efforts of the said attorneys." Ex. 1 at A-39.

[19] Other examples include: (1) the Hoopa-Yurok Settlement Act, 25 U.S.C. §§ 1300i-11(a). (no mechanism to pay attorneys fees, but vesting this Court with exclusive jurisdiction to hear disputes as to the settlement fund distribution) (*see Heller, Ehrman, White & MacAuliffe v. Babbitt*, 992 F.2d 360 (D.C. Cir. 1993)); (2) the Alaska Natives Claims Settlement Act, 43 U.S.C. § 1619 (providing for attorneys to file claims for their own fees in this Court); and (3) the now-repealed 25 U.S.C. § 70n (still empowering this Court to award attorneys fees in cases transferred from the Indian Claims Commission). *See Pueblo of Santo Domingo v. U.S.*, 54 Fed. Cl. 240 (2002); *see also* RCFC Appendix G.

grant to this Court over "claims" brought by other Indian Nations (*e.g.*, United Keetoowah Band) in § 1779f(b)(1)(A), demonstrates the Court's lack of jurisdiction over attorneys fees disputes under the Settlement Act. U.S. Opp. at 13. To the contrary, the lack of any claims procedures regarding attorneys fees underscores the Secretary's duty to ensure that "approved" contracts are honored without the need to file a "claim."

**3. <u>This Court Is The Proper Forum To Adjudicate The Government's Failure To Follow The Settlement Act's Money-Mandating Provisions Because A Monetary Award Will Provide PB With Complete Relief.</u>**

Tucker Act jurisdiction lies squarely with this Court to decide PB's attorneys fees under money-mandating § 1779e. This year, in *District of Columbia v. U.S.*, 67 Fed. Cl. 292 (2005), this Court considered whether jurisdiction for a money-mandating statute lay with this Court (under the Tucker Act) or the District Court (under the APA). The Court ruled that the Tucker Act provides appropriate jurisdiction if "this court can provide … an adequate remedy" in the form of a retrospective "naked money judgment." *Id.* at 315-16. On the other hand, the APA provides no jurisdiction for such simple money judgments under 5 U.S.C. § 702, but offers exclusive jurisdiction for "prospective relief" where parties expect "future financial and legal relationships." *Id.* at 316. The District of Columbia (the "District") had sought payment from the Government for past mental health expenses as provided under the Saint Elizabeth's Hospital and District of Columbia Mental Health Services Act, 24 U.S.C. §§ 225-225h. The Court found that the statute, stating that the appropriate Federal Agency "shall" pay the District, was presumptively money-mandating. *Id.* at 305 (*citing* 24 U.S.C. § 225g(b)(1)). The Court then found that the District's claims for mental health treatment expenses, already incurred, as well as those for repair and renovation of mental health facilities, could be

remedied by a naked money judgment. *Id.* at 318, 320-21.

Here, again, § 1779e of the Settlement Act clearly states that the Secretary "shall pay to the Indian Nations' attorneys those fees provided for in" "approved" "contracts." The attorney fees "provided for" in PB's "approved" contract is all PB seeks, for having successfully researched, filed, and prosecuted, and secured legislated settlement for the only claim that enabled CN to recover. Fulfilling the statutory mandate to pay PB's fees before any money is allocated to CN's Tribal Trust fund will end the financial and legal relationship; there is no ongoing or prospective relief triggering APA jurisdiction. Thus, the Tucker Act provides the complete and adequate relief sought - money damages - and jurisdiction rests exclusively with this Court.[20]

## III. PB MOVED TO INTERVENE TO PROTECT ITS INTEREST IN RESOLVING ITS ATTORNEYS FEES CLAIM BY SUBMITTING A PROPER RULE 24(C) PLEADING SUBMITTED SIX DAYS AFTER THE GOVERNMENT BREACHED ITS STATUTORY DUTY.

### A. PB Has A Legally Protectable Interest In The Settlement Act Funds.

The Opposition contends that PB lacks an "interest relating to the property or transaction which is the subject of the action" because it does not have a stake in CN's claim for mismanaging the "Arkansas Riverbed." U.S. Opp. at 10; CN Opp. at 28. To the contrary, PB's interest is in the only matter still being litigated in this Court – distribution of Settlement funds that must precede entry of the Consent Decree. The Government mistakenly asserts that, consequently, there is no potential of additional litigation involving the same resources. U.S. Opp. at 10 (*citing Klamath Irrigation District v. U.S.*, 64 Fed. Cl. 328 (2005)). But *Klamath* explains:

> Where, as here, the potential of additional litigation involving the same resources looms large, a putative intervenor should be allowed to prevent

[20] None of the Court's various interim equitable powers (*see* Supp. Mem. at 17-18) diminish the fact that an award of money damages against the Government provides PB with complete relief.

> the development of adverse precedents that undoubtedly will be wielded against it in the future.

*Id.* at 336. The "development of adverse precedents" is exactly what PB seeks to avoid by intervening. Denying intervention now would force PB to make its claim in this Court in new litigation involving payment of the same attorneys fees for which Congress authorized Settlement Act appropriations.[21]

Thus, while PB does have independent grounds to pursue its claim in this Court, PB seeks to intervene here because the Consent Decree inaccurately represents that PB's attorneys fees have been fully paid, which is untrue. PB certainly has an interest to preclude entry of any proposed judgment which is inaccurate, and which someone might later contend has a preclusive effect on PB's rights.[22]

### B. Rule 24(c) Does Not Mandate A Motion To Intervene Be Accompanied By A Complaint Or An Answer.

Contrary to CN's contention, a third party may intervene to file a motion.[23] *See*

---

[21] CN cites *Klamath* to point out that a proposed intervenor-plaintiff must show that the Court could exercise jurisdiction over an independent claim. CN Opp. at 27. For reasons as discussed above in Section II (B), such independent jurisdiction exists.

[22] CN further claims that the "settlement fund" is not the "subject of [this] action." CN Opp. at 29. But even apart from PB's 10% interest in CN's underlying claim, PB's direct interest in the settlement fund alone justifies intervention. *See Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 366 (3rd Cir. 1995) ("[W]hile a mere economic interest may be insufficient to support the right to intervene, an intervener's interest in a specific fund is sufficient to entitle intervention in a case affecting that fund."); *In re Discovery Zone Sec. Litig.*, 181 F.R.D. 582, 594 (N.D. Ill. 1998) (same); *accord Gaines, supra* note 16. As the Government points out, *Am. Renovation and Constr. Co. v. U.S.*, 65 Fed. Cl. 254, 260 (2005), involved an intervenor who "alleged an ownership interest in the same contract as did the plaintiff." U.S. Opp. at 10. Here, PB's interest lies in the same Settlement Act monies claimed by CN.
The Government attempts to distinguish *U.S. v. Eilberg*, 89 F.R.D. 473 (E.D. Pa. 1980), however, the facts it recites (U.S. Opp. at 10 n.5) appear to be from a different case entirely. In the *Eilberg* decision, the Government's argument here was decided against the Government in that case:

> But [the Government's lack of interest] argument elevates form over substance. ... Rule 24(a)(2) ... does not require that the petitioner claim an interest in the property that is the subject of the suit, but only an interest "relating to" that property. [Intervenors] claim as theirs the very distributive share for which the United States sues, they are claiming an interest not only "relating to," but in, the property that is the subject of the suit ....

*Id.* at 474 (internal citation and quotation omitted). CN attempts to distinguish this case solely because the intervenor's did not seek to enter "in a former client's case." CN Opp. at 30 n.25.

[23] For CN counsel even to make this argument at all, especially to this Court, is ironic. In *United Keetoowah*, decided in September 2005, Lloyd Miller, CN counsel here, argued on behalf of CN to

*Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 475 (9th Cir.) ("where, as here, the movant describes the basis for intervention with sufficient specificity to allow the district court to rule, its failure to submit a pleading [a complaint or an answer] is not grounds for reversal."), *cert. denied*, 506 U.S. 868 (1992); *see also United Keetoowah Band of Cherokee Indians of Oklahoma v. U.S.*, 67 Fed. Cl. 695 (2005) (granting proposed intervenor's motion to dismiss). The key is whether the PB's filing provides the Court with enough information about PB's claim to rule on its intervention motion. *Beckman*, 966 F.2d at 475. The purpose of a complaint or an answer is to explain a party's position, which PB has done in its prior filings and again here: the Court knows that PB's claim is against the Government for money damages arising under the money-mandating provisions of the Settlement Act's attorneys fees provision.[24]

That information is sufficient to allow the Court to render its decision on PB's Motion to Intervene. Thus, no additional "pleading" is required because PB here has made clear both the nature of its monetary claim against the Government and its jurisdictional basis to proceed in this Court.[25]

### C. PB's Motion To Intervene, Filed Six Days After The Government's Breach Of Its Statutory Duty, Was Timely.

The Government contends that PB's Motion is untimely by as much as five years

---

intervene in this Court, in order to a file a Motion to Dismiss (neither a complaint nor an answer, as CN now says is required (*see* CN Opp. at 1, n.2.)). The relief requested by CN was granted. Whether or not this pettifogging argument was even raised in that case, the Court discarded it without ceremony.

[24] This Court's jurisdiction under the Consent Decree and under the Tucker Act is clear (Supp. Mem. at 15-18); PB has a claim for money damages here because the Settlement Act entitles it to receive "those fees provided for" in its "approved" contract with CN and those are fees that the Secretary "shall pay" (*id.* at 22-27). PB's claim for money damages is against the Government, not CN. *Id.* at 32-34 (stating a claim against the Government if PB were not fully paid).

[25] Even if a formal complaint were necessary, it is hardly too late for PB to cure any such alleged technical procedural defect. *See Spring Constr. Co. v. Harris*, 614 F.2d 374, 376-77 (4th Cir. 1980) (affirming District Court's decision to grant a motion to intervene that was not accompanied by a Rule 24(c) pleading, where such a pleading was subsequently filed). For this reason, even if PB unintentionally withdrew its pending motions, *see* CN Opp.at 2, that can be corrected. Should the Court deem it necessary, PB will file a formal complaint against the Government.

because "[i]f Patton Boggs had wanted to influence the formulation of any attorney fees provision which might be offered in the draft Settlement Act, then Patton Boggs should have moved to intervene in 2000." U.S. Opp. at 7. PB, however, seeks only to enforce its rights under 25 U.S.C. § 1779e. As of October 3, 2005, a full 10% of the appropriated funds under the Settlement Act was "held in a separate special holding account for the payment of attorney fees," and "[n]one of the [appropriated] funds ha[d] been disbursed to the Cherokee Nation to date." Docket No. 109 (10/3/05 Joint Status Report) at 2. Thus, as of last month, the Government had not yet failed to pay PB fees owed, so no reason to intervene had occurred. The Secretary's decision (improperly) to disburse the funds set-aside for CN's attorneys was not announced until October 13, 2005. Ex. 12. Until then, PB had no reason to doubt that the Government would honor the mandatory attorneys fees payment provision in the Settlement Act. PB moved to intervene six days after the Secretary's improper decision.[26]

## IV. THE OPPOSITION'S ATTEMPT TO CREATE AN AMBIGUITY WHERE NONE EXISTS PROVIDES NO BASIS FOR THIS COURT TO IGNORE THE PLAIN LANGUAGE OF THE SETTLEMENT ACT'S ATTORNEYS FEES PROVISION.

The Government concedes that "the Court is bound by the language [of the Statute] **as written**." U.S. Opp. at 22 (emphasis added). As written, Section 607 of the Settlement Act provides that "the Secretary shall pay to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations." 25 U.S.C. § 1779e(a). Arguing that the phrase "as approved" does not modify the immediately preceding word "contracts," the Opposition insists that "as approved" modifies the words "those fees" found nine words earlier in the

[26] PB's claim can be litigated in short order; thus, it is baffling why the Government urges anguish that PB's "intervention may well delay entry of the Consent Decree beyond the time that Congress makes the final appropriation in Fiscal Year 2007 to carry out the Settlement Act." U.S. Opp. at 8.

subsection.[27] The Opposition studiously ignores the previously briefed rules of grammar,[28] or the various canons of construction and most notably the authoritative legislative history,[29] because none of this would allow the tortured twisting necessary to rearrange the language that was employed by Congress.[30]

### A. The Opposition Cannot Properly Contrive A "Tautology" Out Of The Plain Language Of The Settlement Act's Attorneys Fees Provision.

Completely ignoring most of PB's analysis, the Opposition strenuously argues that a contract cannot be a contract unless it is Indian-Nation approved.[31] CN makes this assertion so it can argue that "as approved by the respective Indian Nations" cannot modify the immediately preceding word "contract" without being a tautology. So, according to CN, the phrase must modify something else, because tautologies lead to impermissible statutory constructions. The sophistry of this tortured argument could hardly be more transparent. The fact that Congress in the Settlement Act limits payment to those contracts that are Indian-Nation approved hardly means that, to qualify as a contract, the agreement must be Indian-Nation approved. In order to concoct its tautology, the Opposition is confusing the difference between all contracts generally and those contracts Congress qualified for payment under the Settlement Act.

The Litigation Contract defines itself an "Attorneys' Contract." Ex. 2 at A-43. It recites that "THIS AGREEMENT (the "Contract") is made and entered into this 17th day

---

[27] CN Opp. at 5; U.S. Opp. at 21 (relying on the Secretary's interpretation without explanation).

[28] Supp. Mem. at 22-23 (discussing the doctrine of the last antecedent).

[29] *Id.* at 23-24.

[30] For the same reasons, the Opposition's interpretation is impermissible. *Id.* at 25-27. It makes no sense to require the Secretary to carry out a mandatory duty to pay CN's attorneys, in any amounts CN dictates, out of funds set aside for the attorneys. Were this the intent, Congress easily could have authorized immediate transfer of all Settlement Act appropriations directly to the Indian Nations so they could then pay whomever, in whatever manner and whatever amounts they choose.

[31] CN, noting that, "Until amended in 2000 by Pub. L. 106-179, 25 U.S.C. § 81 required [CN] attorney contracts to be approved not only by the Tribal Council, but also by the Secretary," (CN Opp. at 4 n.6), clearly knows the difference between the elements of a contract and the differing levels of "approval."

of April, 1989," *id.* – a month before it was authorized by the a Tribal Council Resolution (31-89). Ex. 16 (also referring to the pre-authorized document as a "contract."). Again, the first extension of PB's Litigation Contract defines itself an "Attorneys' Contract," Ex. 17, four months before it was "authorized" by the Tribal Council. Ex. 18. In short, CN referred repeatedly to PB's April 17, 1989 Litigation Contract as a "contract" well before its various stages of "approval."

### B. The Opposition Cannot Properly Invoke A Presumption By Manufacturing Untenable Interpretations Of The Settlement Act.

The Opposition never argues, nor could it, that its interpretation tracks the plain meaning of the Settlement Act. Instead it argues that, because an ambiguity exists, that ambiguity should be resolved in its favor based on certain judicial presumptions. *See infra*. But "[a]mbiguity in a statute ... normally means two or more alternative readings, all having some claim to respect and none leading to absurd results." *See AD Global Fund v. U.S.*, 67 Fed. Cl. 657, 672 (2005) (*quoting Hart v. U.S.*, 218 Ct. Cl. 212, 585 F.2d 1025, 1029 (1978)). As discussed above, CN argues that PB's interpretation of the attorneys fee provision of the Settlement Act, 25 U.S.C. § 1779e, creates a tautology. Ignoring the plain language of the Settlement Act, the Opposition posits its own tortured construction and argues that this creates an ambiguity.[32]

First, the Opposition argues that "[t]he Secretary's decision is entitled to great deference." CN Opp. at 5 n.8; *see also* U.S Opp. at 22 ("arguably ambiguous language

---

[32] On top of its argument that the *Settlement Act* provides CN with an after-the-fact right to approve fees, CN also argues that the *Litigation Contract* itself provided CN with an after-the-fact contractual right to re-approve PB's 10% contingency fee. CN Opp. at 4. That reading of the contract, of course, would render it wholly illusory.

should be afforded considerable deference by the Court").[33] Yet, the Court need only defer to the Secretary's interpretation of the Settlement Act "if the statute is silent or ambiguous with respect to the specific issue[.] [T]he question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron USA, Inc. v. Natural Res. Def. Council*, 467 U. S. 837, 843 (1984). Here, the Settlement Act's attorneys fees provision is clear and unambiguous: the Secretary "shall pay to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations." 25 U.S.C. § 1779e(a).

The Opposition also argues that "ambiguities in federal Indian statutes must be resolved in favor of the Indians," U.S. Opp. at 22, and that such statutes "are to be construed liberally for the **benefit** of the Indians, with ambiguous provisions interpreted to their **benefit**." CN Opp. at 7 (*citing Doyon, Ltd. v. U.S.*, 214 F.2d 1309, 1314 (Fed. Cir. 2000)) (emphasis added). The Supreme Court, however, is very clear about the limitations of this presumption: "[t]he canon of construction regarding the resolution of ambiguities in favor of Indians, however, does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress." *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986).[34] The plain language of the Settlement Act simply is not conducive to any ambiguity, even if such an ambiguity would **benefit** CN.[35]

---

[33] The Government goes so far as to say, "[t]he starting point for this statutory construction is that the Interior Department has special expertise." U.S. Opp. at 21-22. Of course, the Court should **start** with the language of the Settlement Act "as written." *See* U.S. Opp. at 22.

[34] *See also Chickasaw Nation v. U.S.*, 534 U.S. 84, 85, 122 S. Ct. 528, 535 (2001) (relying on legislative history to determine Congress's intent and ruling that the presumption does not apply if it "would produce an interpretation that we conclude would conflict with the intent embodied in the statute Congress wrote").

[35] By essentially re-writing the Settlement Act, CN has sought to pay favored local attorneys gratuitously and to keep the balance of the money for itself. Based on CN Tribal Council Resolutions, the Secretary paid a $150,000 bonus to Wilcoxen & Wilcoxen, $280,525 to the Hall Estill firm that had no contract

The Opposition conspicuously avoids any mention of the unambiguous legislative history – all reinforcing PB's interpretation – where the House of Representatives' Committee on Resources clearly explains how § 1779e is to operate: "This section authorizes the Secretary to pay the Nations' attorneys those sums owed them under their respective contracts, but imposes a cap of ten percent of the Nation's allocation of funds appropriated under [§ 1779c(c)]." H.R. REP. NO. 107-632 at A-34 (discussing § 1779e).[36] As this Court has recognized, "legislative history should be examined before a presumption is applied." *See AD Global Fund*, 67 Fed. Cl. at 672; *see also Red Lake Band v. U.S.*, 17 Cl. Ct. 362, 381 (1989) ("This rule [construing statutes to benefit Indians] does not permit a construction that contradicts express statutory language or legislative history, however.") (*quoting DeCoteau v. District Court,* 420 U.S. 425, 445 (1975)).[37]

That "approved" modifies the preceding word "contracts," and not the word "fees," is fully supported by the plain language of the Settlement Act, basic grammar, all applicable canons of construction, as well as unambiguously clear legislative history.

**CONCLUSION**

Ultimately, CN contends that the Settlement Act means whatever CN says it means and that PB's Litigation Contract allows CN to pay PB whatever it decides to pay. The Opposition does not want the Court to consider those arguments on the merits, however, averring that the Court has no jurisdiction. With the Court's hands thus tied,

---

("approved" or otherwise), and began to transfer the balance of more than $900,000 to the CN's trust account. All of that would "benefit" CN, but that is not the sort of benefit discussed in *Doyon, supra*.

[36] The complete committee report is reproduced in the Appendix at pages A-27 to A-37.

[37] Other federal courts also look to legislative history *before* they apply any judicial presumption in favor of Indians because clear congressional intent may be found in legislative history. *See N.L.R.B. v. Pueblo of San Juan*, 276 F.3d 1186, 1194 (10th Cir. 2002); *U.S. v. Thompson*, 941 F.2d 1074, 1077-78 (10th Cir. 1991) (compiling cases).

the Opposition wishes to selectively implement parts of the Settlement Act, and then direct this Court to rubber-stamp those wishes in the Court's judgment.

PB seeks to intervene to protect its own interest in its rights under the Settlement Act, and to protect the integrity of the Court's judgment. Only two law firms – PB and the Wilcoxen firm – have contracts with CN. And, the Wilcoxen firm's contract not only covers claims already dismissed before the Settlement Act, but it was expressly "subject to" PB's Litigation Contract. The Court is fully empowered to decide these matters, and to grant PB complete relief for its monetary claim, based on the unambiguous Settlement Act which codified PB's right to be paid "those fees provided for in" its unambiguous "approved" Litigation Contract.

Respectfully submitted,

David S. Panzer (DC Bar No. 470677)
David P. Callet (DC Bar No. 181990)
GREENBERG TRAURIG LLP
800 Connecticut Ave, NW, Suite 500
Washington, DC 20006
202-331-3100
202-331-3101 (fax)
panzerd@gtlaw.com
calletd@gtlaw.com

November 28, 2005

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | Case No. 218-89 |
| v. | * | |
| | * | Chief Judge Edward J. Damich |
| THE UNITED STATES OF AMERICA, | * | |
| | * | |
| Defendant. | * | |

* * * * * * * * * * * *

**APPENDIX TO REPLY BRIEF IN SUPPORT OF PATTON BOGGS' MOTIONS TO INTERVENE AND FOR ATTORNEYS FEES**