# In the United States Court of Federal Claims

Consolidated Case No. 89-218 L

(Filed: December 19, 2005)

| | | |
|---|---|---|
| **THE CHEROKEE NATION OF OKLAHOMA,** Plaintiff, v. **THE UNITED STATES,** Defendant. | * | Motion to intervene under RCFC 24(a)(2); Motion for attorney's fees; Jurisdiction under 25 U.S.C. § 1779e<br>Case No. 89-218L |
| **THE CHOCTAW NATION OF OKLAHOMA AND THE CHICKASAW NATION,** Plaintiffs, v. **THE UNITED STATES,** Defendant. | * | Case No. 89-630 L |

## OPINION AND ORDER

*Arthur Lazarus, Jr.*, Sonosky, Chambers, Sachse, Endreson & Perry, LLP, Washington, D.C., Special Counsel for Plaintiff.

*James M. Upton*, Trial Attorney, U.S. Department of Justice, Environment and Natural Resources Division, Washington, D.C., with whom was *Sue Ellen Woolridge*, Assistant Attorney General, Environment and Natural Resources Division.

*David S. Panzer*, Greenberg Traurig LLP, Washington, D.C., counsel of record for Applicant-Intervenor, with whom was *David P. Callet*.

**DAMICH,** Chief Judge.

## I. Introduction

This matter is before the court on Patton Boggs LLP's ("PB") Motion to Intervene pursuant to Rule 24(a)(2) of the Rules of the United States Court of Federal Claims ("RCFC") and PB's Motion for Attorney's Fees.[1] Both Plaintiff Cherokee Nation of Oklahoma ("Cherokee Nation") and Defendant United States government ("government") oppose PB's motions. For the reasons discussed herein, PB's Motion to Intervene is GRANTED. PB's Motion for Attorney's Fees is DENIED as moot, because PB has withdrawn its claim for equitable remedies upon which the motion was largely based. However, as PB has indicated that it wishes to pursue a claim for money damages against the government, and as the court has found that it has jurisdiction over such a claim, PB has leave to file a complaint. PB shall file its complaint by January 19, 2006.

## II. Background

In 1989, Plaintiffs filed suit in this court seeking damages for the government's use and mismanagement of tribal trust resources along the Arkansas River.[2] The case was reassigned to this judge on January 27, 1999. Shortly thereafter, the parties requested that the court stay the case pending settlement negotiations. Settlement negotiations were fruitful and resulted in the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act of 2002 ("Settlement Act"). *See* Pub. L. No. 107-331, 116 Stat. 2834 (codified at 25 U.S.C. §§ 1779a-1779g (2005)). The Settlement Act conferred certain benefits on the Plaintiffs, and in return for those benefits, Section 1779c(a) required them to "enter into a consent decree with the United States that waives, releases, and dismisses all the claims they have asserted or could have asserted in their cases . . ." before the court. 25 U.S.C. § 1779c(a). This section further required the parties to "lodge" the consent decree with the court and then "move for [its] entry . . . at such time as all appropriations by Congress . . . have been made and deposited into the appropriate tribal trust

---

[1]PB filed these two motions as a single memorandum and entitled it PB's supplemental memorandum. However, for the purposes of this opinion, each motion will be ruled on separately. In addition, all citations to PB's memorandum will be referred to as "PB's Mot."

[2]PB represented the Cherokee Nation at the time the suit was filed. However, PB alleges that the Cherokee Nation terminated it in 1995 without cause. PB's Mot. at 7.

fund account. . . ." *Id.* Finally, section 1779c(a) provides that "[u]pon entry of the consent decree," the Plaintiffs' claims against the government "shall be deemed extinguished." *Id.*

On January 8, 2003, the parties' lodged the consent decree with the court. The parties' representatives signed and dated the consent decree. It has not, as of yet, been signed by this court nor have the parties moved for its entry.

The Settlement Act contains a specific provision regarding the payment of attorney's fees. Section 1779e(a) provides:

> At the time the funds are paid to the Indian Nations, from funds authorized to be appropriated [by the Act], the Secretary [of the Interior] shall pay to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations.

*Id.* § 1779e(a).

This provision, however, is limited by section 1779e(b), which provides that "the total fees payable to attorneys under such contracts with an Indian Nation shall not exceed 10 percent of that Indian Nation's allocation of funds appropriated under . . . ." the Act. *Id.* § 1779e(b). Since the Cherokee Nation will receive a total of $20 million in appropriations under the Settlement Act, $2 million is available for the payment of attorney's fees.

As envisioned by the Settlement Act, Congress has appropriated each fiscal year, from the date of passage of the Act, partial appropriations, such that by sometime in 2007, the entire $20 million will have been appropriated.

On March 30, 2005, the Cherokee Nation provided the Secretary of the Interior with resolutions indicating how it believed the attorney's fees should be distributed to the attorneys. PB's Mot. at 11. The fee schedule set forth in the tribal resolutions allocated $151,000 to PB and various amounts to the other attorneys who had worked for the tribe. PB's App. at A-65. The total amount determined by the resolutions, however, did not exhaust the $2 million available for the payment of attorney's fees under the Settlement Act.

In response to the resolutions, PB submitted corrections to the Cherokee Nation's General Counsel, wherein PB claimed entitlement to the entire $2 million of available attorney's fees. PB's Mot. at 12. As a result, the Secretary became involved in this dispute. Finally, after PB and the Cherokee Nation submitted several letters to the Secretary regarding their contrasting views on the matter, on October 13, 2005, the Associate Deputy Secretary informed PB and the other attorneys that he "determined that the Secretary is required to pay only those fees approved by the tribal resolutions after the Settlement Act became effective . . . ." *Id.* at 13-14; PB's App. at A-86. In the same letter, Mr.Cason indicated that the attorney's fees would be dispersed according to the Cherokee Nation's resolution "within two weeks." PB's App. at A-86. Mr. Cason also

stated that, "[u]pon payments of these attorney fees, the balance remaining in the Cherokee attorney escrow account will be disbursed to the Nation and the account will be closed." *Id.* On October 18, 2005, the Secretary disbursed the attorney's fees in the amounts determined by the Cherokee Nation. PB's Mot. at 14.

Disappointed by Mr. Cason's decision, on October 19, 2005, PB filed three motions including a Motion to Intervene, a Motion for a Temporary Restraining Order, and a Motion for Attorney's Fees. The goal of these motions was to prevent the Secretary from disbursing the balance of the attorney fee escrow account to the Cherokee Nation until the court determined whether PB was entitled to additional attorney's fees.

The court held oral argument on these motions on October 20, 2005. One of the issues raised during oral argument was the ability of the court to issue a temporary restraining order prohibiting the Secretary from disbursing the balance of the escrow account. Shortly after the hearing, and at the request of the court, the Secretary, in the interests of justice, agreed not to transfer the balance of the account to the Cherokee Nation, so as to afford the court adequate time to consider the issues raised by the motions. The Secretary agreed to stay the transfer of funds until December 19, 2005, the date set by the court as a reasonable time within which it could hear further argument and rule on the motions.

On October 24, 2005, the court ordered PB to file supplemental briefing addressing two issues including: (1) whether PB may intervene; and (2) what relief, if any, is the court empowered to grant. On November 3, 2005, PB filed a supplemental memorandum wherein it indicated that the supplemental memorandum replaced its previous motions. Due to the Secretary's decision to stay the transfer of funds, PB also stated that it was withdrawing its Motion for a Temporary Restraining Order. Although styled as a "supplemental memorandum," PB essentially filed a motion to intervene and a motion for attorney's fees alleging entitlement to additional fees under its retainer agreement with the Cherokee Nation. The court will treat it as two separate motions. *Id.* at 1.

PB argues that its retainer agreement provides that it will receive 10 percent of the "amount recovered" "through the litigation or legislative process," that is, the entire $2 million. PB's App. at A-45. As PB has already been paid $403,959, and as the Cherokee Nation determined that PB was owed only $151,000 more, PB claims that it is still owed $1,445,041. PB's Mot. at 1, 8. PB acknowledges that three other attorneys claim to be owed money for work done on behalf of the Cherokee Nation and that the Settlement Act between the Defendant and the Cherokee Nation places a statutory cap of 10 percent on "the total fees payable to attorneys." PB's Mot. at 9; 25 U.S.C. § 1779e(b). Nevertheless, PB asserts that only one of the three other attorneys are legally entitled to attorney's fees, and, in any event, it has priority to payment. PB's Mot. at 9. Accordingly, PB requests the court to order the Secretary to provide an accounting and to declare that it is entitled to $1,445,041. *Id.* at 32-33. If the Secretary cannot pay this amount from the funds currently being held, PB further requests the court to disgorge any

remaining amount from the funds paid to Mr. Wilcoxin, another Cherokee Nation attorney. *Id.* at 32.

On December 13, 2005, the court held oral argument on PB's motions. At oral argument, PB withdrew its claim for equitable remedies, which was the focus of its motion for attorney's fees. Tr. at 49. Alternatively, PB seeks to pursue a claim for monetary damages against Defendant. *Id*. Accordingly, the scope of this opinion is limited to PB's Motion to Intervene and to whether the court has jurisdiction over PB's claim against Defendant.

For the reasons set forth below, PB's Motion to Intervene is GRANTED. PB's Motion for Attorney's Fees is DENIED as moot, because PB has withdrawn its claim for equitable remedies upon which the motion was largely based. However, as PB has indicated that it wishes to pursue a claim for money damages against the government, and as the court finds that it has jurisdiction over such a claim, PB has leave to file a complaint. PB shall file its complaint by January 19, 2006.

______Before considering whether jurisdiction exists, the court will first determine whether intervention is proper.

## III. Discussion

### A. Intervention Generally

PB has moved for intervention as of right under RCFC 24(a)(2) asserting that it has a right to intervene in this case so that it can protect its contractual right to attorney's fees.[3] PB's Mot. at 19. In relevant part, RCFC 24(a) states:

> Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

---

[3]Permissive intervention is also applicable here. As recognized by the Federal Circuit, the court's decision regarding permissive intervention is discretionary, and in the absence of an abuse of discretion, the trial court's ruling will be upheld. *Chapman v. Manbeck*, 931 F.2d 46, 48 (Fed. Cir. 1991) (analyzing the RCFC counterpart under the FRCP). Permissive intervention applies here because PB's claim has common questions of law and fact with the main action. Specifically, PB's claim involves the payment of attorney's fees as required by the Settlement Act – the subject of this action. Moreover, the issue of attorney's fees may arise again at the time the parties to the underlying litigation move for entry of the consent decree. However, because PB is entitled to intervention as of right, the court will dispense with a more detailed discussion.

RCFC 24(a).

In applying the requirements of the rule, the court is mindful that the Federal Circuit has recognized that "the requirements for intervention are to be construed *in favor of intervention*." *Am. Mar. Transp., Inc., v. United States*, 870 F.2d 1559, 1561 (Fed. Cir. 1989) (emphasis added). As this court has previously noted, a number of other circuits have held that RCFC 24 is to be construed liberally. *Am. Renovation and Constr. Co. v. United States*, 65 Fed. Cl. 254, 257 (2005) (collecting cases from several circuits that recognized this principle). This court has also recognized that, generally, courts will accept as true all well-pleaded, non-conclusory allegations in the motion to intervene, absent sham, frivolity, or other objections. *See id.* at 258; *see also Mendenhall v. M/V Toyota Maru No. 11*, 551 F.2d 55, 56 n.2 (5th Cir. 1977); *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995); *Southwest Center for Biological Diversity v. Berg*, 268 F.3d 810, 819-820 (9th Cir. 2001); *see also* 6 JAMES WM. MOORE ET AL, MOORE'S FEDERAL PRACTICE § 24.03 [5][a], at 24-51 (3d ed. 2002).

### B. PB Has a Right To Intervene

#### 1. PB Filed its Motion in a Timely Manner

Before ascertaining whether PB has satisfied the substantive requirements for intervention, the court "must first be satisfied as to [the] timeliness" of the motion. *See NAACP v. New York*, 413 U.S. 345, 366 (1973) (analyzing the RCFC counterpart intervention rule under the FRCP); *see Am. Mar. Transp., Inc.,* 870 F.2d at 1560 n.4 (recognizing that cases analyzing the RCFC counterpart are persuasive authority). The Federal Circuit has recognized three factors that may be helpful in assessing whether a motion to intervene is timely: (1) the length of time during which the would-be intervenor actually knew or reasonably should have known of its right to intervene; (2) whether the prejudice to the rights of the existing parties by allowing intervention outweighs the prejudice to the would-be intervenor by denying intervention; and (3) the existence of unusual circumstances militating either for or against a determination that the application is timely. *See Belton Indus., Inc. v. United States*, 6 F.3d 756, 762 (Fed. Cir.1993).[4] The court's assessment of "[t]imeliness is to be determined from all the circumstances. And it is to be determined by the court in the exercise of its sound discretion." *NAACP*, 413 U.S. at 366. Upon review, the court's determination "will not be disturbed" "unless that discretion is abused." *Id.*

##### a. PB Recently Learned of Its Right to Intervene

[4] The Court of International Trade ("CIT") used these factors in assessing the timeliness of a motion to intervene under its rules, which are similar to RCFC 24. *See Belton*, 6 F.3d at 762.

On October 19, 2005, PB filed its motion to intervene alleging that its decision to intervene was based on the Secretary's October 13, 2005, determination that it would not pay PB as stated in its retainer agreement. PB's Reply at 14-15. PB argues that it had no reason to intervene prior to that determination because it had an enforceable right to attorney's fees that it thought the Secretary would uphold. *Id.* at 15. Only after the Secretary's interpretation became clear, did PB find it necessary to intervene. *Id.* PB asserts that because it filed its motion within six days of the Secretary's determination, it is timely. *Id.*

The Cherokee Nation's opposition does not address the issue of timeliness. *See* Pl.'s Opp'n at 28-30. Defendant, however, argues that PB's motion is untimely because PB was aware of its interest in attorney's fees since 1989, and, thus, PB should have moved to intervene in 2000, when the parties were conducting settlement negotiations so that it could have influenced "the formulation of any attorney fee provision which might be offered for insertion in the draft Settlement Act . . . ." *Id.* at 7. Alternatively, Defendant argues that PB should have moved to intervene in 2002, when the Settlement Act became effective because the legislation imposed a 10 percent cap on attorney's fees, and PB knew that it would be asserting entitlement to the entire 10 percent, while other attorneys would be asserting claims to a portion of it. *Id.*

Defendant's arguments fail to recognize that at the time settlement negotiations were underway, PB believed it had an enforceable right that would not be affected by those negotiations.[5] Defendant also fails to recognize that even after the passage of the Settlement Act, PB believed that the Settlement Act reinforced its contractual right to attorney's fees. Both of these facts suggest that PB had no reason to seek intervention prior to the Secretary's decision.

In addition, and also weighing in favor of timeliness is the fact that once PB became aware that the Secretary was considering the payment of attorney's fees pursuant to the Settlement Act, it exercised due diligence to protect its interest. On May 20, 2004, PB sent the Secretary a detailed letter explaining its contractual right to attorney's fees and requesting payment. PB's Mot. at 8. Once again, on March 8, 2005, PB reminded the Secretary of its interest and informed the Secretary of its belief that it had priority to payment over the other attorneys. *Id.* at 10. On March 30, 2005, the Cherokee Nation, upon the recommendation of its General Counsel, provided the Secretary with resolutions detailing how it believed the attorneys should be paid. *Id.* Although PB submitted corrections to the Cherokee Nation, as requested, those corrections were never addressed. *Id.* at 12. Nonetheless, after receiving a request from the Secretary for additional comment, PB sent the Secretary a 15-page memorandum outlining, in detail, PB's position as to the attorney's fees and a recommendation on how to proceed. *Id.* at 13. Several months later, on July 20, 2005, the Cherokee Nation responded to PB's letter. *Id.* After approximately one-year of arguing its position, on October 13, 2005, the Associate Deputy Secretary James Cason informed PB and the parties that he "determined that the Secretary is required to pay only those fees approved by the tribal resolutions after the Settlement Act became effective . . . ." *Id.* at 13-14. As such, Mr. Cason indicated that the attorney's fees would be

[5] *See supra* note 2.

disbursed according to the Cherokee Nation's resolution "within two weeks." PB's App. at A-86. At this time, PB realized that Mr. Cason's determination rendered the fee provision in its retainer agreement meaningless, thereby necessitating its intervention. PB's Mot. at 14. Within six days from the date of Mr. Cason's letter, PB filed its motion. *Id.*

The court finds that PB acted expediently in moving to intervene only six days after it became aware of its right to intervene. Accordingly, and despite Defendant's statement that PB "slept on its rights," the court finds that PB's right to intervene only recently developed. Def.'s Opp'n at 8.

**b. The Potential Prejudice to PB Outweighs the Potential Prejudice That the Parties May Suffer**

Embodied within PB's motion is the belief that if the court denies intervention it may suffer prejudice because once the Secretary pays out the remaining funds, it may not be able to recover its attorney's fees. *See generally* PB's Mot. PB also argues that even if it could maintain an independent action against the government, "someone might later contend [that the entry of the consent decree] has a preclusive effect on its rights." PB's Reply at 13.

In opposition, Defendant recognizes the prejudice that PB may suffer, but states that it is PB's fault for not obtaining a waiver of sovereign immunity clause in its retainer agreement. Def.'s Opp'n at 8. Defendant further contends that the parties may suffer prejudice by PB's intervention because it may delay the entry of the consent decree, which Defendant asserts should occur sometime in 2007, after Congress makes the final appropriation. *Id.*

The court does not find Defendant's arguments persuasive. Although a waiver clause may have alleviated PB's need to intervene in this case because it could have pursued its claim against the Cherokee Nation in another tribunal for breach of contract, that does not alter the reality that, on the facts before the court, PB may suffer prejudice. In addition, PB's claim is likely to be resolved well-before the parties move to have the consent decree entered in 2007; thus, the potential prejudice to the parties is extremely remote. PB's Reply at 15 n.26.

To the contrary, PB contends that once the Secretary pays the remaining funds out, it may have no other recourse but to pursue a separate cause of action against the government. PB further asserts that as the payment of attorney's fees may be a "condition precedent" to the entry of the consent decree, if the court enters the judgment before PB has a chance to raise its claim, it may be precluded from doing so. PB's Mot. at 16. Although it is unclear whether or not the payment of attorney's fees is a condition precedent, the argument is plausible in light of the fact that the Settlement Act requires that the parties move the court to enter the consent decree. Although Cherokee Nation and the Defendant believe that entering the consent decree is merely ministerial, since the consent decree avers that the Settlement Act has been complied with, it is arguable that the court may be required to ascertain this fact before signing and filing the consent decree. Finally, the court is reminded by the principle that it is to accept all well-pleaded

allegations as true for purposes of this motion. All of these considerations lead to the conclusion that the potential prejudice to PB far outweighs that raised by Defendant. Therefore, this factor also weighs in favor of timeliness.

**c. The Unusual Circumstances Weigh in Favor of Timeliness**

The unusual circumstances presented here weigh in favor of timeliness. In this regard, at oral argument PB withdrew its request for equitable relief in favor of a claim for money damages against the government based on section 1779e of the Settlement Act. As explained infra, the court holds that it has jurisdiction over PB's claim since the Settlement Act is money-mandating.[6] As a result of this determination, the question then arises whether this claim should be adjudicated in this action or in a separate action that PB may file. There are at least two reasons weighing in favor of allowing PB to intervene in this case. First, if PB's motion to intervene is denied, the Secretary may feel more justified in disbursing the funds to the Cherokee Nation out of the attorney fee escrow account. This may pose a significant problem for PB if the reviewing court in its separate action determines that any additional fees owed to PB may only come out of the attorney fee escrow account. Under these circumstances, PB would not have a fund from which to recover.[7] Second, the possibility exists that the Cherokee Nation may want to contest PB's claim for additional fees if the Secretary does not pay out the balance of the attorney fee escrow account upon this court's denial of PB's motion. As a result of the Cherokee Nation's interest, it would then have to move to intervene in PB's separate action against the government. These unusual circumstances persuade the court that now is the time to deal with the issue of PB's entitlement to attorney's fees.

Finally, and regardless of the possibility of a separate action, it is at least arguable that in determining whether to grant the parties' motion for entry of the consent decree, the court may need to ascertain whether all the preceding conditions have been satisfied. As the proper payment of attorney's fees may be a condition precedent to entry of the consent decree, the possibility exists that the court will need to consider this same issue at that time. Logic suggests that the court consider it sooner rather than later, so as not to delay ultimately the entry of the consent decree.

---

[6] *See infra* Section. C.

[7] The Secretary may disburse these monies even if intervention is granted, but she may find it unattractive to do so because of the likelihood that PB's claim will be promptly adjudicated within the framework of this case. *See infra* note 7.

In considering all the circumstances and the general presumption in favor of intervention, the court finds that PB filed its motion in a timely fashion.[8]

**2. PB's Claim for Attorney's fees Relates to the Subject of the Action**

In addition to timeliness, RCFC 24(a)(2) states that the applicant for intervention must claim "an interest relating to the property or transaction which is the subject of the action." The Federal Circuit has shed some light on the nature of the related "interest," indicating that it must be a "legally protectible interest," and be "of such a *direct* and *immediate* character that the intervenor will either gain or lose by the direct legal operation and effect of the judgment." *Am. Mar. Transp., Inc.,* 870 F.2d at 1561 (emphasis in original). Although these explanatory phrases suggest a rigid or strict view on intervention, in the context of the case, this court agrees with the conclusion of Judge Allegra in *Klamath Irrigation Dist. v. United States,* wherein he found that these phrases are meant solely to "emphasize that qualifying interests under RCFC 24(a)(2) must not be indirect or contingent, and not to preclude a finding of practical impairment . . . ." 64 Fed. Cl. 328, 333 (2005). Judge Allegra persuasively argues, after reviewing the history of current RCFC 24, that to find otherwise, the court "would have to conclude that the Federal Circuit intended to emasculate the changes wrought by the 1966 amendments, and did so indirectly, in the guise of defining what is an 'interest' within the meaning of the new rule." *Id.* In addition, Judge Allegra notes that "no Federal law of which this court is aware has ever imposed certainty as a requirement of proof, particularly at the outset of litigation – and RCFC 24(a) is no exception, as it only requires that the disposition of the case 'may' impede or impair an applicant's interests." *Id.* Moreover, this court is mindful of the overarching principle that the "the requirements for intervention are to be construed *in favor of intervention*." *Am. Mar. Transp., Inc.,* 870 F.2d at 1561 (emphasis added).

The essence of PB's argument on this prong is that the Settlement Act is the subject of the action at this stage of the litigation. PB's Reply at 12. PB asserts that although its claimed interest is the attorney's fees owed to it by the Cherokee Nation, the payment of these fees is an *express requirement* under the Settlement Act, thereby demonstrating that its interest relates to the subject of the action. PB's Reply at 12; 25 U.S.C. § 1779e(a). In opposition, both the Cherokee Nation and Defendant argue that the subject of the action *is not* the Settlement Act, but

---

[8]Defendant references this court's earlier decision wherein it denied the United Keetoowah Band of Cherokee Indians' ("UKB") motion to intervene in 2002. Def.'s Opp'n at 6 (citing *Cherokee Nation of Oklahoma v. United States*, 54 Fed. Cl. 116, 118 (2002). Unlike the circumstances here, however, the UKB was unable to satisfy any of the three elements for timeliness. In this regard, the UKB was aware of its right to intervene from the very beginning of the lawsuit, but only chose to intervene after it became apparent that the Settlement Act may be enacted. Second, allowing UKB to intervene would have disrupted the legislative progress with regard to passage of the Act – a result that would have greatly prejudiced the existing parties. Finally, UKB's motion was denied because no unusual circumstances warranted its intervention.

the "claims brought by the Cherokee Nation against the United States related to the Arkansas riverbed," and PB has no interest in those claims. Pl.'s Opp'n at 28; Def.'s Opp'n at 9.

The court is persuaded that PB has satisfied the second requirement of RCFC 24(a)(2).

First, PB's contractual right to attorney's fees is certainly a "legally protectible interest," as the law recognizes the value of contract formation and provides a remedy for breach. *See Am. Mar. Transp., Inc.,* 870 F.2d at 1561. Second, PB's interest seems to be of a "direct and immediate" character in that PB's pursuit of its interest may be precluded by the entry of the consent decree. *Id.* Since the court finds that PB's interest is "legally protectible" and not "indirect or contingent," the inquiry now turns to whether PB's interest relates to the subject of the action.

The subject of the Cherokee Nation's action *was* its claim that Defendant mismanaged the riverbed property. However, as the Settlement Act ultimately resolves this claim, it follows that this legislation *now represents* the subject of the action at this stage of the case. As PB's claim for attorney's fees is based on the enactment of this legislation, there is no question that these fees relate to the Settlement Act, i.e., the *transaction* between the Defendant and the Cherokee Nation wherein the claim was resolved. Accordingly, the court finds that PB's interest relates to the Settlement Act – the subject of the underlying action. This finding is also supported by the fact that the Settlement Act expressly discusses the payment of attorney's fees demonstrating their direct relation to the subject of the action.

**3. PB is So Situated that its Ability to Protect its Interest May Be Impaired**

To comply with the third requirement of RCFC 24(a), PB must demonstrate that it is "so situated that the disposition of the action may as a practical matter *impair or impede* [its] ability to protect that interest." RCFC 24(a)(2) (emphasis added). As this court has previously recognized, this inquiry is "fact specific and flexible, and primarily guided by pragmatic considerations" rather than rigid criteria. *See Am. Renovation*, 65 Fed. Cl. at 263.

PB contends that its ability to protect its interest may be impaired in one of three ways. First, after the Secretary transfers the remaining balance of the fund to the Cherokee Nation it will not be able to recover its fees as the Cherokee Nation has sovereign immunity. PB's Mot. at 21 n. 29. Second, and even if PB can pursue a claim against the government, it may be argued at a later time that PB cannot recover its fees out of the government's general judgment fund because the payment of attorney's fees may only come out of a certain fund set aside for this purpose. *See* PB's Reply at 13. Third, the entry of the consent decree equates with a judgment and, thus, may act to preclude PB from bringing its claim. *Id.* In opposition, Defendant and the Cherokee Nation contend that PB's ability to protect its interest will not be impaired by the entry of the consent decree because the payment of attorney's fees is not a "condition precedent to the

entry of the consent decree," and, thus, its entry will not affect PB's claim. Pl.'s Opp'n at 30; *see* Def.'s Opp'n at 11.

The court finds that PB has sufficiently demonstrated that its ability may be impaired. PB raises a plausible argument that the payment of attorney's fees is a condition precedent, and this question involves statutory interpretation which the court need not resolve at this time. As the court is to accept as true PB's well-pleaded allegations, the court finds that the possibility exists that PB's interest may be impaired by the entry of the consent decree and by the Secretary's payment of the remaining funds to the Cherokee Nation. *See Am. Renovation*, 65 Fed. Cl. at 258. PB also raises a plausible argument that a court may find that any recovery PB is entitled to from the government may be limited to monies available in the attorney fee escrow account. Finally, and although PB may not have demonstrated the requirements for *res judicata* and collateral estoppel, the court accepts the reasoning in *Klamath* that even the potential for "adverse precedents" warrants intervention. *See Klamath*, 64 Fed. Cl. at 336 (stating that where "the potential of additional litigation involving the same resources looms large, a putative intervenor should be allowed to prevent the development of adverse precedents . . . "). For these reasons, the third requirement of RCFC 24(a) is satisfied.

**4. The Parties Do No Adequately Represent PB's Interests**

For the fourth requirement of RCFC 24(a) to be satisfied, PB must demonstrate that its interest is not "adequately represented by the existing parties." RCFC 24(a)(2). "The burden of demonstrating inadequacy of representation is not heavy" and is satisfied where the applicant shows that representation of its interest may be inadequate. *Klamath*, 64 Fed. Cl. at 336 (citing *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). Neither the Cherokee Nation or the Defendant even assert that they adequately represent PB's interest. To the contrary, the interests of the existing parties are at direct odds with PB, as the Cherokee Nation has already indicated that it does not believe PB is entitled to any additional attorney's fees, and the Defendant has supported this determination. Clearly, this requirement is satisfied.

Based on the foregoing, the court finds that PB has a right to intervene. In addition, both logic and justice dictate that PB should be permitted to pursue its claims against the government now rather than having to file a separate cause of action where it may suffer prejudice. Additionally, there is the possibility that PB's claims may not only affect the government, but also the Cherokee Nation. Hence, as both parties are already involved in this suit, intervention makes sense. Moreover, the payment of attorney's fees is required under the Settlement Act, and as this court may ultimately have to determine whether the requirements have been met, the court finds it appropriate to resolve PB's claim at this time.

For all these reasons, the court GRANTS PB's Motion to Intervene.

### C. The Court Has Jurisdiction Over PB's Claim Against the Government

#### 1. The Settlement Act is Money-Mandating

The Tucker Act grants the Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution, or *any Act of Congress* or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a) (emphasis added). The Tucker Act, however, is not an "Act of Congress" upon which a claim may be based. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) (citing 28 U.S.C. § 1491). Rather, for the Court to have jurisdiction, PB must identify an independent money-mandating statute. *Id.* (stating that "jurisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act itself"). A statute is money-mandating if it "can be fairly interpreted as mandating compensation by the Federal Government for damage sustained." *United States v. Testan*, 424 U.S. 392, 400 (1976) (quoting *Eastport Steamship Corp. v. United States*, 372 F.2d 1002, 1009 (1967)). From the Supreme Court's statement in *Testan*, it is evident that "[i]f the language and effect of the statute is mandatory, then the court possesses jurisdiction . . . . If, on the other hand, the language of the statute is permissive in scope and effect, the statute does not grant jurisdiction to hear the case." *Hopi Tribe v. United States*, 55 Fed. Cl. 81, 86 (2002) (quoting *Lewis v. United States*, 32 Fed. Cl. 59, 64 (1994)).

Here, PB asserts that the attorney fee provision of the Settlement Act provides the court with jurisdiction due to its money-mandating nature. PB's Reply at 9 (citing 25 U.S.C. § 1779e(a)). Particularly, the Settlement Act provides, "the Secretary *shall pay* to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations." 25 U.S.C. § 1779e(a) (emphasis added). PB asserts that due to the mandatory nature of this statute, which is evidenced by the use of the term "shall," the court has jurisdiction over its claim against the government. PB's Reply at 9. In support of this proposition, PB argues that the court's finding in *Hopi Tribe* demonstrates that the use of the term "shall" equates with a mandatory duty. *Id.* (citing 55 Fed. Cl. at 87) (stating that nothing in the statute, at issue, creates a "plainly prescribed duty that the Secretary authorize payment" because the statute does *not* use the "mandatory term *shall* in describing the Secretary's duty," but instead uses the term "is authorized").

In opposition, the Defendant and the Cherokee Nation both argue that the Settlement Act is not money-mandating. Defendant argues that although the Settlement Act "directs the Secretary to pay out those attorney fees" "it does not confer any jurisdiction upon the CFC to adjudicate attorney fee disputes and award attorney fees." Def.'s Opp'n at 12-13; Tr. at 29-30. Defendant also argues that the Secretary's duty to pay attorney's fees under the Settlement Act is ministerial and, thus, the statute is not money-mandating. Tr. at 29-30.

The Cherokee Nation argues that the Settlement Act is not money-mandating because it does not authorize payment out of the general judgment fund, but rather from a fund set aside for the Cherokee Nation's payment of attorney's fees. *See* Tr. at 27-28; *see also* 25 U.S.C. § 1779e

(stating "[a]t the time the funds are paid to the Indian Nations, *from funds authorized to be appropriated pursuant to [the Settlement Act]* . . .") (emphasis added). The Cherokee Nation contends that the distinct nature of the payment fund demonstrates that the government did not waive sovereign immunity for this type of suit. *Id.*

The court finds that Defendant's and Plaintiff's arguments fail to recognize the simple fact that the court *has* jurisdiction when a statute "can be fairly interpreted as *mandating* compensation." *Testan*, 424 U.S. at 400.

In response to Defendant's arguments, there is no requirement that the statute expressly provide that the court has the power to adjudicate the dispute. To the contrary, the power or authority to adjudicate the dispute arises from the money-mandating nature of the statute. In addition, Defendant's argument that the Secretary's obligation to pay attorney's fees under section 1779e of the Settlement Act is ministerial is contrary to logic. Even if the Secretary's obligation is ministerial, it is a *duty*, i.e., something that is ordered to be performed, and here, it is a duty to pay money. Although the court does not necessarily agree that the duty is ministerial, even if it is, its ministerial nature does not alter the money-mandating nature of the statute. Ironically, Defendant's position *supports* the notion that the statute is money-mandating, because if the Secretary's duty is ministerial, the Secretary has no other option but to pay the fees as required by the statute. Furthermore, the fact that the act *may be* ministerial does not eliminate a role for the court. Even if the sole duty of the Secretary is to pay attorneys' fees as directed by the Cherokee Nation, the court may still be called upon to decide if the Secretary actually performed this duty.

The court is not persuaded by the Cherokee Nation's argument that section 1779e is not money-mandating because it does not authorize payment out of the general judgment fund, but rather from a fund set aside for the Cherokee Nation's payment of attorney's fees. Whether the money comes from the attorney fee escrow account or the judgment fund, it is still U.S. government money.[9] By mandating that the Secretary pay attorneys government funds, Congress provided the attorneys with a cause of action if the Secretary failed to do so.

Accordingly, in order to determine whether the Settlement Act provides the court with jurisdiction, the court must look to the language of the statute itself. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). Under cardinal principles of statutory interpretation, the court must interpret the statute so that "no clause, sentence or word shall be superfluous, void, or insignificant." *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citations omitted). Here, the statute expressly provides that the Secretary "*shall* pay" the attorneys. 25 U.S.C. § 1779e(a) (emphasis added). In employing these principles, it is evident that the

---

[9]At oral argument, the Cherokee Nation argued that, if PB has a cause of action that could be satisfied from the judgment fund, then it would not have an interest in the subject matter of the action under RCFC 24(a). Tr. at 27-28. However, the court has found that the Settlement Act is at least part of the subject matter of the action, and it is the Settlement Act that mandates the payment of attorney's fees. (It is still, of course, an open question whether a judgment in favor of PB would be paid out of the attorney fee escrow account or the judgment fund.)

Secretary's obligation to pay the attorneys is mandatory, *not* permissive, and thus, it "can be fairly interpreted as *mandating* compensation." *Testan*, 424 U.S. at 400 (emphasis added). The mandatory nature of the statute arises due to the use of the term "shall pay." A plain reading of this provision unequivocally demonstrates that the statute mandates that the Secretary pay the attorneys their fees.

The court finds that it has jurisdiction over PB's claim against the government for monetary damages.

**IV. Conclusion**

For all the aforementioned reasons, PB's Motion to Intervene is GRANTED. PB's Motion for Attorney's Fees is DENIED as moot, because PB has withdrawn its claim for equitable remedies upon which the motion was largely based. However, as PB has indicated that it wishes to pursue a claim for money damages against the government, and as the court has found that it has jurisdiction over such a claim, PB has leave to file a complaint.[10] PB shall file its complaint by January 19, 2006. Defendant and the Cherokee Nation shall file an answer or appropriate motion by February 20, 2006.

s/Edward J. Damich
EDWARD J. DAMICH
Chief Judge

[10] Although the court will not order the Secretary to continue to hold the funds in the attorney fee escrow account past December 19, 2005, it may be prudent for her to do so. In the event the court holds that the government is liable to PB for attorney's fees, and if there is no money left in the attorney fee escrow account, the award *may* be payable from the judgment fund. In this case, the government will have paid twice. Ultimately, however, the decision is within the Secretary's discretion.