IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, Plaintiff, and PATTON BOGGS LLP, Intervenor-Plaintiff v. THE UNITED STATES, Defendant. | * | Case No. 89-218L |
| THE CHOCTAW NATION OF OKLAHOMA AND THE CHICKASAW NATION, Plaintiffs, v. THE UNITED STATES, Defendant. | * | Case No. 89-630L |

**CHEROKEE NATION'S MOTION TO DISMISS COMPLAINT-IN-INTERVENTION OF PATTON BOGGS, LLP**

The Cherokee Nation hereby moves, pursuant to Rules 12(b)(1) & (6) respectively of the Rules of the Court of Federal Claims, for dismissal of Patton Boggs' complaint-in-intervention because (1) this Court lacks jurisdiction over the subject matter of the complaint, and (2) the

complaint fails to state a claim upon which relief can be granted. In support of this motion, the Cherokee Nation respectfully refers this Court to the accompanying memorandum of law.

Respectfully submitted,

February 17, 2006

Arthur Lazarus, Jr.
By Anne D Noto
Sonosky, Chambers, Sachse, Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240
(202) 682-0249 (fax)
alazarus@sonosky.com

Special Counsel for Plaintiff Cherokee Nation

Of Counsel:

Lloyd Benton Miller
Donald J. Simon
Anne D. Noto
Sonosky, Chambers, Sachse, Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240
(202) 682-0249 (fax)
lloyd@sonosky.net
dsimon@sonosky.com
anoto@sonosky.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| THE CHEROKEE NATION OF OKLAHOMA,<br>Plaintiff,<br>and<br>PATTON BOGGS LLP,<br>Intervenor-Plaintiff<br>v.<br>THE UNITED STATES,<br>Defendant. | Case No. 89-218L |
| THE CHOCTAW NATION OF OKLAHOMA AND THE CHICKASAW NATION,<br>Plaintiffs,<br>v.<br>THE UNITED STATES,<br>Defendant. | Case No. 89-630L |

**MEMORANDUM IN SUPPORT OF CHEROKEE NATION'S MOTION TO DISMISS COMPLAINT-IN-INTERVENTION OF PATTON BOGGS, LLP**

Arthur Lazarus, Jr.
Sonosky, Chambers, Sachse, Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240
(202) 682-0249 (fax)
alazarus@sonosky.com

Special Counsel for Plaintiff Cherokee Nation

Of Counsel:

Lloyd Benton Miller
Donald J. Simon
Anne D. Noto
Sonosky, Chambers, Sachse, Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240
(202) 682-0249 (fax)
lloyd@sonosky.net
dsimon@sonosky.com
anoto@sonosky.com

## TABLE OF CONTENTS


Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I. Procedural Posture of This Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. The Court Should Dismiss the Complaint for Lack of Jurisdiction . . . . . . . . . . . . . . . . . . 6

A. The Settlement Act is Not a Money-Mandating Statute That Gives Rise to This Court's Tucker Act Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B. Apart from the Tucker Act, This Court Has No Jurisdiction under the Settlement Act to Adjudicate an Award of Attorneys Fees to Patton Boggs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

C. Patton Boggs' Cause of Action Is Really a Private Dispute with the Cherokee Nation over which This Court Has No Jurisdiction . . . . . . . . . . . . . . 14

III. The Court Should Dismiss the Complaint for Failure to State a Claim upon which Relief Can Be Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A. The Secretary Correctly Construed the Settlement Act As a Matter of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B. Patton Boggs' Sole and Exclusive Rationale for Claiming a $2 Million Attorneys Fee, the Single Ground for its Cause of Action, is Erroneous As a Matter of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

IV. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## TABLE OF AUTHORITIES

***Cases:***

*Am. Renovation and Constr. Co. v. United States*,
65 Fed. Cl. 254 (2005) . . . . . . . . . . 17

*Angle v. United States*,
709 F.2d 570 (9th Cir. 1983) . . . . . . . . . . 9

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
960 F.2d 1020 (Fed. Cir. 1992) . . . . . . . . . . 5

*Baker v. United States*,
50 Fed. Cl. 483 (2001) . . . . . . . . . . 10

*Berkeley v. United States*,
276 F.2d 9 (Ct. Cl. 1960) . . . . . . . . . . 15

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) . . . . . . . . . . 10

*Cherokee Nation v. United States*,
355 F.2d 945 (1966) . . . . . . . . . . 11

*Cherokee Nation v. United States*,
21 Cl. Ct. 565 (1990) . . . . . . . . . . 26

*Cherokee Nation v. United States*,
23 Cl. Ct. 117 (1991) . . . . . . . . . . 26

*Cherokee Nation v. United States*,
24 Cl. Ct. 695 (1992) . . . . . . . . . . 26

*Cherokee Nation v. United States*,
25 Cl. Ct. 361 (1992) . . . . . . . . . . 26

*Cherokee Nation v. United States*,
No. 95-5055 (Jan. 28, 1994) . . . . . . . . . . 26

*Chevron, U.S.A., Inc. v. N.R.D.C.*,
467 U.S. 837 (1984) . . . . . . . . . . 20

*Cheyenne-Arapaho Tribes of Indians v. United States*,
512 F.2d 1390 (Ct. Cl. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States*,
No. 92-675, 2006 WL 181365 (Fed. Cl. Jan. 26, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cobell v. Norton*,
240 F.3d 1081 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*C.W. Over & Sons, Inc. v. United States*,
48 Fed. Cl. 342 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*District of Columbia v. United States*,
67 Fed. Cl. 292 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Duncan v. Walker*,
533 U.S. 167 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Eastport S.S. Corp. v. United States*,
372 F.2d 1002 (Ct. Cl. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Erikson Air Crane Co. v. United States*,
731 F.2d 810 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Glick v. Barclay's De Zoete Wedd, Inc.*,
692 A.2d 1004 (N.J. Super. Ct. App. Div. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Godfrey v. United States*,
467 F.2d 909 (Ct. Cl. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Gould, Inc. v. United States*,
67 F.3d 925 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Heinzman v. Fine, Fine, Legum & Fine*,
234 S.E. 282 (Va. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Heller, Ehrman, White & MacAuliffe v. Babbit*,
922 F. 2d 360 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hopi Tribe v. United States*,
55 Fed. Cl. 81 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Sanborn*,
148 U.S. 222 (1893) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Waller*,
524 A.2d 748 (D.C. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Jamesbury Corp. v. Litton Indust. Prods., Inc.*,
839 F.2d 1544 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Katz v. Cisneros*,
16 F.3d 1204 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Kennedy v. United States*,
19 Cl. Ct. 69 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*,
523 U.S. 751 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Kungys v. United States*,
485 U.S. 759 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Littell v. Morton*,
445 F.2d 1207 (4th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Loudner v. United States*,
108 F.3d 896 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*McGowen v. Sec'y of the Dep't of Health and Human Servs.*,
31 Fed. Cl. 734 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*McPherson v. United States*,
2 Cl. Ct. 670 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Miller v. United States*,
67 Fed. Cl. 195 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Musser v. Musser*,
909 P.2d 37 (Okla. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Nat'l City Bank of Evansville v. United States*,
163 F. Supp. 846 (Ct. Cl. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Okla. Tax Comm'n. v. Citizen Band Potawatomi Indian Tribe of Okla.*,
498 U.S. 505 (1991) . . . . . . . . . . 14, 15

*Perri v. United States*,
53 Fed. Cl. 381 (2002) . . . . . . . . . . 27

*Pueblo of Santo Domingo v. United States*,
54 Fed. Cl. 240 (Cl. Ct. 2002) . . . . . . . . . . 11

Puyallup Tribe v. Washington Dep't of Game,
433 U.S. 165 (1977) . . . . . . . . . . 14

*Rhoades v. Norfolk and W. Ry. Co.*,
399 N.E.2d 969 (Ill. 1979) . . . . . . . . . . 27

*Rogers v. United States*,
697 F.2d 886 (9th Cir. 1983) . . . . . . . . . . 9, 22

*Sachs v. Klein*,
154 A.2d (D.C. App. 1959) . . . . . . . . . . 26

*Santa Clara Pueblo v. Martinez*,
436 U.S. 49 (1978) . . . . . . . . . . 14

*San Xavier Dev. Auth. v. Charles*,
237 F.3d 1149 (9th Cir. 2001) . . . . . . . . . . 21

*Seminole Nation v. United States*,
316 U.S. 286 (1942) . . . . . . . . . . 22

*Short v. United States*,
661 F.2d 150 (Ct. Cl. 1981) . . . . . . . . . . 5

*Sisseton and Wahpeton Bands or Tribes v. United States*,
423 F.2d 1386 (Ct. Cl. 1970) . . . . . . . . . . 23

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) . . . . . . . . . . 20

*Turner v. United States*,
248 U.S. 354 (1919) . . . . . . . . . . 14

*Udall v. Tallman*,
380 U.S. 1 (1965) . . . . . . . . . . 20

*United Keetoowah Band of Cherokee Indians v. United States*,
67 Fed. Cl. 695 (2005) . . . . . . . . . . 22

*United States v. Dann*,
470 U.S. 39 (1985) . . . . . . . . . . 9

*United States v. Johnson Controls, Inc.*,
713 F.2d 1541 (Fed. Cir. 1983) . . . . . . . . . . 18

*United States v. King*,
395 U.S. 1 (1969) . . . . . . . . . . 11

*United States v. Mitchell*,
463 U.S. 206 (1983) . . . . . . . . . . 6, 27

*United States v. Navajo Nation*,
537 U.S. 488 (2003) . . . . . . . . . . 6

*United States v. Sherwood*,
312 U.S. 584 (1941) . . . . . . . . . . 15, 16, 17

*United States v. Testan*,
424 U.S. 392 (1976) . . . . . . . . . . 6

*United States v. Turtle Mountain Band of Chippewa Indians*,
612 F.2d 517 (Ct. Cl. 1979) . . . . . . . . . . 5

*United States v. U.S. Fid. & Guar. Co.*,
309 U.S. 506 (1940) . . . . . . . . . . 14

*United States v. United States Smelting Ref. & Mining Co.*,
339 U.S.186 (1950) . . . . . . . . . . 5

*United States ex rel. Shakopee Mdweakanton Sioux Cmty. v. Pan Am. Mgmt. Co.*,
616 F. Supp. 1200 (D. Minn. 1985) . . . . . . . . . . 21

*W. Shoshone Bus. Council v. Babbitt*,
1 F.3d 1052 (10th Cir. 1993) . . . . . . . . . . 21

*W. Shoshone Identifiable Group v. United States*,
652 F.2d 41 (Ct. Cl. 1981) . . . . . . . . . . 11

*White v. Am. Law Book Co.*,
233 P. 426 (Okla. 1924) . . . . . . . . . . 25

*White Mountain Apache Tribe v. United States*,
30 Fed. Cl. 8 (1993) . . . . . . . . . . 26

*Wright v. Arnold*,
877 P.2d 616 (Okla. App. 1994) . . . . . . . . . . 25

***Statutes and Rules:***

Act of Feb. 11, 1920, ch. 68, § 3,
41 Stat. 404 . . . . . . . . . . 12

Act of Feb. 23, 1929, ch. 300, § 6,
45 Stat. 1257 . . . . . . . . . . 12

Act of Feb. 23, 1929, ch. 302, § 5,
45 Stat. 1258 . . . . . . . . . . 12

Act of Apr. 25, 1932, ch. 136, § 4,
47 Stat. 137 . . . . . . . . . . 12

Administrative Procedure Act, Pub. L. No. 89-554, 80 Stat. 393 (1966),
25 U.S.C. §§ 701-06 . . . . . . . . . . 13

Cherokee Nation Claims Settlement Act, Pub. L. No. 107-331, 116 Stat. 2845 (2002),
25 U.S.C. §§ 1779-1779g . . . . . . . . . . *passim*
25 U.S.C. § 1779 . . . . . . . . . . 8, 24, 27
25 U.S.C. § 1779a . . . . . . . . . . 8, 24, 28
25 U.S.C. § 1779c(a) . . . . . . . . . . 14, 24
25 U.S.C. § 1779c(b) . . . . . . . . . . 24,28
25 U.S.C. § 1779c(c) . . . . . . . . . . 7, 23
25 U.S.C. § 1779c(d) . . . . . . . . . . 7
25 U.S.C. § 1779e . . . . . . . . . . 12, 19, 20
25 U.S.C. § 1779e(a) . . . . . . . . . . 7, 10, 19

Distribution of Judgment Funds Act, Pub. L. No. 93-134, 87 Stat. 466 (1973),
25 U.S.C. § 1407 . . . . . . . . . . 9

Hoopa-Yurok Settlement Act, Pub. L. No. 100-580, 102 Stat. 2924 (1988),
25 U.S.C. §§ 1300i-1300i-11 . . . . . . . . . . 13

Indian Claims Commission Act, ch. 959, § 15, 60 Stat. 1053 (1946),
25 U.S.C. § 70n . . . . . . . . . . 11, 12, 13

Pub. L. No. 106-179, 114 Stat. 46 (2000),
25 U.S.C. § 81 . . . . . . . . . . 21

25 U.S.C. § 177 . . . . . . . . . . 21

25 U.S.C. § 640d-7(e) . . . . . . . . . . 8

RCFC 12(b) . . . . . . . . . . 1

RCFC 24(c) . . . . . . . . . . 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, Plaintiff, | * | |
| and | * | |
| PATTON BOGGS LLP, Intervenor-Plaintiff | * | Case No. 89-218L |
| v. | * | |
| THE UNITED STATES, Defendant. | * | |

| | | |
|---|---|---|
| THE CHOCTAW NATION OF OKLAHOMA AND THE CHICKASAW NATION, Plaintiffs, | * | |
| v. | * | Case No. 89-630L |
| THE UNITED STATES, Defendant. | * | |

**MEMORANDUM IN SUPPORT OF CHEROKEE NATION'S MOTION TO DISMISS PATTON BOGGS' COMPLAINT IN INTERVENTION**

Pursuant to RCFC 12(b), the Cherokee Nation moves for dismissal of Patton Boggs' complaint-in-intervention because (1) this Court lacks jurisdiction over the subject matter of the complaint, and (2) the complaint fails to state a claim upon which relief can be granted.

The Court has no jurisdiction over the complaint for three related reasons: First, neither the Cherokee Nation Claims Settlement Act, Pub. L. No. 107-331, 116 Stat. 2845 (2002), 25

U.S.C. §§ 1779 - 1779g ("Settlement Act"), the statute upon which Intervenor's claim is based, nor the Tucker Act, nor any other statute gives the Court jurisdiction to do what Patton Boggs asks it to do – adjudicate what are contested claims to attorneys fees in the underlying riverbed case and then make an award of fees. Second, this case involves a private controversy, a dispute between Patton Boggs and the Cherokee Nation, over the meaning and effect of a terminated attorneys' contract, which the Court has no authority to resolve. Third, for reasons the Cherokee Nation has not previously had an opportunity to brief (*see infra* at 3-5), the Settlement Act is not a "money mandating" statute within the meaning of the Tucker Act, and thus the Court lacks jurisdiction under that Act.

Alternatively, even assuming jurisdiction exists, the Patton Boggs complaint fails as a matter of law to state a claim upon which relief can be granted because the Secretary of the Interior's construction of the Settlement Act, and her payments of attorneys' fees pursuant to that construction, are correct as a matter of law.

For all, or any, of these reasons, the Court should dismiss the complaint-in-intervention.

## I. Procedural Posture of This Motion.

The Patton Boggs complaint is before the Court in an unusual procedural posture. When Patton Boggs moved to intervene, it failed to file a complaint-in-intervention, as required by RCFC 24(c). The firm did file, with its Motion to Intervene, a Motion for a Temporary Restraining Order, a Motion for Attorneys Fees, and an Emergency Motion for a Stay of Disbursement of Funds Contrary to Statute. These pleadings all sought equitable relief against the Secretary of the Interior, and not the payment of money damages by the United States.

On October 20, 2005, before either the Cherokee Nation or the United States filed

responses to these motions, the Court held a preliminary hearing and raised questions about its jurisdiction. Patton Boggs argued that the All Writs Act and the pending consent decree to be entered in the underlying riverbed case provide the Court with jurisdiction to order the equitable relief it sought. Tr. of Oct. 20, 2005 Hr'g at 21. Following the hearing, by Order of October 24, the Court directed the parties to file briefs addressing two issues: (1) whether Patton Boggs may intervene, and (2) what relief, if any, the Court is empowered to grant.

On November 3, 2005, Patton Boggs filed a Supplemental Memorandum in Support of its Motion to Intervene and Motion for Attorneys Fees. Still, no complaint was filed. The Supplemental Memorandum confirmed that Patton Boggs did not seek money damages from the United States, but rather judicial review of the Secretary's decision to pay attorneys fees as directed by the Cherokee Nation, and injunctive relief against the Secretary.[1] Patton Boggs reiterated its prior argument that this Court has jurisdiction to award equitable relief "incident of and collateral to" its entry of a consent decree pursuant to the Settlement Act, and under the All Writs Act. PB Supp. Mem. at 15-19. Nowhere in its Supplemental Memorandum did Patton Boggs argue that this Court has jurisdiction under the Tucker Act on the theory that the Settlement Act is a money-mandating statute.

The Cherokee Nation and the United States responded to the claims and arguments framed by Patton Boggs, and both contested the jurisdictional basis to its claims for equitable

[1] For example, Patton Boggs argued (1) that the Settlement Act "Requires the Secretary to Pay, " PB Supp. Mem. at 27; (2) that Patton Boggs was entitled to be paid a sum of money which "Is, or Will Be, Available for the Secretary to Disburse," *id.* at 28; (3) that "the Court Should Require the Secretary to Account for the Monies That Are, Were, And Will Be, In The 'Special Holding Account' For Attorneys Fees," *id.* at 30; and (4) that the "Court Should Declare That PB Is Entitled to $1,454, 041, Payable from Various Sources." *Id.* at 32.

relief. Because Patton Boggs had advanced no argument that the Settlement Act was "money-mandating," neither the Cherokee Nation nor the United States briefed that issue.[2]

Not until it filed its Reply Brief did Patton Boggs assert – for the first time – that the Court has jurisdiction because the Settlement Act is "money-mandating." PB Reply Brief at 9, 11-12. At the oral argument on December 13, 2005, Patton Boggs initially persisted in its claim for equitable relief against the Secretary, but then abandoned that position and agreed to proceed only on the basis of a claim for money damages against the United States. *See* Tr. of Dec. 13, 2005 H'rg at 11, 35, 38-39, 49.

The Court, in its opinion and order of December 19, 2005, granted Patton Boggs' Motion to Intervene but denied its Motion for Attorneys Fees as moot because Patton Boggs had "withdrawn its claim for equitable remedies upon which the motion was largely based." Op. at 15. Based on Patton Boggs' representations that it wished "to pursue a claim for money damages against the government," the Court granted Patton Boggs leave to file such a complaint. *Id.* In so ruling, the Court made clear that both the United States and the Cherokee Nation would be permitted "to file an answer or appropriate motion" in response to the complaint.[3] *Id.* (emphasis added).

Patton Boggs has now filed its complaint. The Cherokee Nation respectfully submits that

---

[2] *See* Cherokee Nation's Opposition to Mot. to Intervene by Patton Boggs, LLP, filed Nov. 17, 2005, and Defendant's Opposition to Patton Boggs' Mot. to Intervene, Mot. for a Temporary Restraining Order and Mot. for Attorneys Fees, filed Nov. 17, 2005.

[3] Since no complaint had yet been filed, the Court properly declined to address the other issues that had been raised by the briefs – including, for example, Patton Boggs' arguments on the merits of its claims, as well as the other defenses to those claims argued by the United States and the Cherokee Nation.

the filing of this complaint warrants further examination of the Court's jurisdiction to adjudicate the claim now being made. While we recognize that the Court has found the Settlement Act to be a money-mandating statute, the unorthodox manner in which Patton Boggs advanced and then restyled its claims – raising this central argument for the first time only in a Reply Brief – deprived the Nation and the United States of an opportunity to brief that issue at all. Although the money-mandating issue was discussed during the December 13 hearing, oral argument is not an adequate substitute for a thorough written analysis. The issue of the Court's jurisdiction is far too important to be decided without any opportunity for the parties contesting jurisdiction to brief the issue. Now that Patton Boggs has finally settled on a claim for relief (money damages) and a theory of jurisdiction (the Settlement Act is a money-mandating statute), the Court should consider its jurisdiction in light of the actual complaint filed in the case and – for the first time – full briefing by the parties challenging the claim of jurisdiction asserted in that complaint.[4]

---

[4] Although the Court found in its December 19 Opinion that the Settlement Act is "money mandating" and thus confers jurisdiction over Patton Boggs' reformulated claim, further consideration of this issue on full briefing is not precluded by the law of the case doctrine. That doctrine is a rule of practice, *United States v. United States Smelting Ref. & Mining Co.*, 339 U.S. 186, 198 (1950), that applies primarily where a case has been in extended litigation and there have already been previous appeals. *E.g.*, *Gould, Inc. v. United States*, 67 F.3d 925, 930 (Fed. Cir. 1995); *Short v. United States*, 661 F.2d 150, 154 (Ct. Cl. 1981) (superseded by statute on other grounds) (ruling that its decision in a previous appeal in the same case that individual Indians were entitled to proceeds from logging sales was law of the case); *United States v. Turtle Mountain Band of Chippewa Indians*, 612 F.2d 517 (Ct. Cl. 1979) (ruling that the court's previous decision on appeal from the trial judge's interlocutory order was law of the case). But in contrast with judgments that have been reviewed on appeal, interlocutory decisions are not law of the case. "The law of the case doctrine does not affect the power of a court to reconsider its interlocutory decisions. The court may change any interlocutory decision up until the entry of final judgment." *McGowan v. Sec'y of the Dep't of Health and Human Servs.,* 31 Fed. Cl. 734, 737 (1994). *See also Jamesbury Corp. v. Litton Indust. Prods., Inc.*, 839 F.2d 1544, 1550 (Fed. Cir. 1988) ("the court has the power to reconsider its decisions until a judgment is entered") (overruled on other grounds in *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1038 (Fed. Cir. 1992); *Turtle Mountain*, 612 F.2d at 520-21; *C.W. Over & Sons, Inc. v. United*

## II. The Court Should Dismiss the Complaint for Lack of Jurisdiction.

### A. The Settlement Act Is Not a Money-Mandating Statute That Gives Rise to This Court's Tucker Act Jurisdiction.

Section 607 of the Settlement Act provides in material part:

> At the time the funds are paid to the Indian Nations, from funds authorized to be appropriated pursuant to section 1779c(c) of this title, the Secretary shall pay to the Indian Nations' attorneys those fees provided for in the individual attorney fee contracts as approved by the respective Indian Nations.

25 U.S. C. § 1779e (emphasis added).

In passing upon Patton Boggs' motion for leave to intervene, this Court focused its analysis on the Settlement Act's use of the term "shall pay," and correctly determined that "use of the term 'shall pay' . . . demonstrates that the statute mandates that the Secretary pay the attorneys their fees." Op. at 15. There is no doubt that the Secretary "shall pay" attorneys fees. The jurisdictional question for this Court, however, is not whether the Secretary has a duty to pay the fees, but rather whose money is used by the Secretary to discharge that duty. As the Supreme Court declared in *United States v. Mitchell,* 463 U.S. 206 (1983), to invoke Tucker Act jurisdiction, a claimant must demonstrate that the source of substantive law relied upon (in this case, the Settlement Act) " ' "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." ' " *Id.* at 216-17 (quoting *United States v. Testan*, 424 U.S. 392, 400 (1976) (quoting *Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 1009 (Ct. Cl. 1967))) (emphasis added). *See also United States v. Navajo Nation,* 537 U.S. 488, 503, 506 (2003) (twice quoting *Mitchell,* 463 U.S. at 217, to the same effect.)

---

*States*, 48 Fed. Cl. 342, 347 (2000) (observing that the law of the case doctrine "does not restrict a court's ability to review its own decisions").

Tucker Act jurisdiction thus arises from a statute that involves not only a mandate to pay money, but a mandate to pay Federal money. The unexplored question in this case is whether the Secretary's mandatory duty to pay attorney fees is a duty to pay "compensation by the Federal Government," or compensation by, and from the funds of, the Cherokee Nation. Actually, the answer is the latter.

In its December 19, 2005 opinion, the Court sought to satisfy the test for a money-mandating statute by assuming, without discussion, that the money which the statute requires the Secretary to pay the attorneys is "still U.S. government money" or, in other words, that the Settlement Act mandates "that the Secretary pay attorneys government funds . . . ." Op. at 14. With all due respect, the Court's assumption is not correct: the language of the Settlement Act leads to the contrary conclusion that the Secretary is directed to pay the attorneys with tribal trust funds. Indeed, no payment of attorney fees by the Federal government and from Federal funds is anywhere contemplated by the Act. This is a crucial point, for it defeats Patton Boggs' claim of Tucker Act jurisdiction. The Tucker Act simply does not provide this Court with jurisdiction over a claim that the Secretary has failed to comply with a statute than mandates the payment of an Indian tribe's trust funds to a third party.

More specifically, Section 1779 c(c) of the Settlement Act authorizes the appropriation of $40 million to three tribes over a four-year period, 50% of which is allocated to the Cherokee Nation. 25 U.S.C. § 1779 c(d). Section 1779 e(a), quoted above in its entirety, provides that, "[a]t the time the funds are paid to the Indian Nations, from funds authorized to be appropriated pursuant to section 1779 c(c)," the Secretary shall pay the attorneys. The statute thus is clear that the appropriated funds are "paid to the Indian Nations" and thereby become tribal trust funds, not

owned by the United States, but only administered by the Secretary.

This conclusion finds support in every other relevant provision of the Settlement Act, and, in fact, lies at the very heart of the settlement implemented by the Act. The very purposes of the statute, for example, as set forth in § 1779a, "are to resolve all claims that have been or could have been brought by [the Cherokee Nation] against the United States" and to extinguish title to certain Cherokee Nation lands. Not a word is there said or implied about payment by the United States of Cherokee Nation attorney fees with Federal funds. *Compare* statute at issue in *Hopi Tribe v. United States,* 55 Fed. Cl. 81 (2002), *i.e.,* 25 U.S.C. § 640d-7(e), where Congress expressly provided for payment of tribal attorneys' fees and expenses with Federal funds.

The Congressional findings in the Settlement Act are even more explicit about tribal entitlement to the appropriated settlement funds. *See* 25 U.S.C. § 1779. Thus finding (15) recites that the signatory Nations enter into the settlement "in exchange for the moneys appropriated hereunder." Finding (16) reiterates that the Cherokee Nation releases its claims and relinquishes its lands "in exchange for the funds appropriated and allocated to the Indian Nation under the provisions of the settlement legislation, which funds the Indian Nation agrees to accept . . . ." Again not a word appears to show any intent on the part of Congress to assume responsibility to pay Cherokee Nation attorney fees with Federal funds.

This construction of the Act also is consistent with well-settled law under which Federal funds appropriated to pay a judgment in favor of an Indian tribe are presumptively trust funds of that tribe, even if no express statement is made regarding the trust status of those funds.[5] The

[5] *See Cheyenne-Arapaho Tribes of Indians v. United States*, 512 F.2d 1390, 1392 (Ct. Cl. 1975) ("It is clear from past opinions of this Court and of the Supreme Court, and from the actions of both Congress and the Executive Branch, that funds appropriated to Indians to satisfy

Supreme Court has similarly recognized that when federal funds are appropriated to satisfy a judgment in favor of a tribe, those funds are held in trust by the Government for the benefit of the tribe. *United States v. Dann*, 470 U.S. 39, 49-50 (1985). This, in turn places the Government in a "dual role" with respect to the Tribe: "[T]he Government [i]s at once a judgment debtor" obligated to pay the judgment due to the Tribe, ". . . and a trustee for the Tribe responsible for ensuring that the money was put to productive use and ultimately distributed in a manner consistent with the best interests of the tribe." *Id.*

The same is true here. The funds appropriated under the Settlement Act are intended to satisfy the Government's obligation to compensate the Nation for the losses it sustained, but the Government also places those funds in the custody of the Secretary of the Interior who holds them in trust for the Nation. And those are the funds the Secretary is directed to pay, in part, to the attorneys.

Finally, the proposition that Congress intended to withhold as "government money" a portion of the funds appropriated to carry out the Cherokee Nation's settlement is simply illogical. Why would Congress plan to use "government money" to pay the Cherokee Nation's attorneys, especially since those attorneys had filed suit against the United States and the United States owed them nothing? Why would Congress voluntarily assume an obligation to

---

judgments of the Indian Claims Commission or of this Court, as well as funds produced by tribal activities, are, when kept in the Treasury, held in trust for the Indians."); *Rogers v. United States*, 697 F.2d 886, 890 (9th Cir. 1983) (same, and noting that the Distribution of Judgment Funds Act, 25 U.S.C.§ 1407, "indicates a congressional belief that all funds appropriated to satisfy Indian judgments are held in trust"); *Angle v. United States*, 709 F.2d 570, 575 (9th Cir. 1983) (same, citing *Rogers*); *Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States*, No. 92-675, 2006 WL 181365, at *21 (Fed. Cl. Jan. 26, 2006) (finding that funds appropriated to pay a judgment due to a tribe were trust funds when held in Treasury).

compensate the attorneys if their clients did not, especially since the United States received no benefit from their services? The answer is that Congress plainly did not do so, and nothing in the Settlement Act indicates otherwise. As the Court of Federal Claims observed in *District of Columbia v. United States,* 67 Fed. Cl. 290, 303 (2005) (citing *Bowen v. Massachusettes*, 487 U.S. 879, 905 n.42 (1988)), "not all statutes which provide an economic benefit are compensation mandating."

To summarize, Patton Boggs can show that the Secretary has a duty to pay attorney fees, and she did out of tribal trust funds. What Patton Boggs cannot show is that the Settlement Act provides for the required "compensation by the Federal Government." Accordingly, the Settlement Act is not a money-mandating statute, as that term has been defined by the Supreme Court, and this Court has no jurisdiction over this case under the Tucker Act. *See Baker v. United States,* 50 Fed. Cl. 483, 487 (Fed. Cl. 2001) (The party invoking this Court's jurisdiction has the burden of establishing that a statute is money-mandating.).

**B. Apart from the Tucker Act, This Court Has No Jurisdiction under the Settlement Act to Adjudicate an Award of Attorneys Fees to Patton Boggs.**

The Settlement Act vests authority to determine and pay attorneys' fees exclusively in the Secretary and not this Court. Section 607 of the Settlement Act provides in material part that "the Secretary shall pay to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations." 25 U.S.C. § 1779e(a) (emphasis added). The statute thus could hardly be more clear that the Secretary alone is authorized to implement the attorney fee provision of the Settlement Act. This

Court is given no such role, either directly or by implication.[6]

The proposition that the Settlement Act – and in particular the language of section 1779e – does not provide this Court with jurisdiction to review and fix attorney fee payments is best illustrated by contrast with a statute that does do so. This Court frequently has been in the position of making an award of attorney fees in contingent fee cases brought by Indian tribes under jurisdiction which this Court inherited from the Indian Claims Commission. *See, e.g., Cherokee Nation v. United States,* 355 F.2d 945 (Ct. Cl. 1966); *Godfroy v. United States,* 467 F.2d 909 (Ct. Cl. 1972); *W. Shoshone Identifiable Group v. United States,* 652 F.2d 41 (Ct. Cl. 1981). The Court's authority to set attorney fees in these cases was conferred by a specific provision of the Indian Claims Commission Act ("ICCA"), 25 U.S.C. § 70n, which provided (for cases brought before the Indian Claims Commission):

> The fees of such attorney or attorneys for all services rendered in prosecuting the claim in question, whether before the Commission or otherwise, shall, unless the amount of such fees is stipulated in the approved contract between the attorney or attorneys and the claimant, be fixed by the Commission at such amount as the Commission, in accordance with standards obtaining for prosecuting similar contingent claims in courts of law, finds to be adequate compensation for services rendered and results obtained, considering the contingent nature of the case, plus all reasonable expenses incurred in the prosecution of the claim; but the amount so fixed by the Commission, exclusive of reimbursements for actual expenses, shall not exceed 10 per centum of the amount recovered in any case.

Act of Aug. 13, 1946, ch. 959, § 15, 60 Stat. 1053. Although the Indian Claims Commission was disbanded in 1978, all powers of the Commission, including the right to award attorneys fees under section 70n, were transferred to the Court of Claims, and then to the Court of Federal Claims. *See Pueblo of Santo Domingo v. United States,* 54 Fed. Cl. 240, 244-45 (Cl. Ct. 2002).

[6] This Court, of course, has only such jurisdiction as Congress expressly confers. *United States v. King,* 395 U.S. 1, 3 (1969); *Miller v. United States*, 67 Fed. Cl. 195, 196-97 (2005).

Thus, this Court's jurisdiction to make awards of attorney fees in ICCA cases rests on the specific statutory authority in section 70n that the "fees of such attorney or attorneys . . . shall . . . be fixed by the Commission," an explicit authority that has subsequently been conferred on this Court to exercise in appropriate cases.

But this is not one such case and the Court derives no authority from section 70n here. By contrast to the power expressly conferred by the ICCA, no comparable authority to determine or award fees can be found in the Settlement Act, which is simply silent as to the *Court's* role in the payment of attorney fees under section 1779e. That provision does not direct the court to "fix" the fee, nor to review a contract fixing such fees, nor to enforce a contract fixing such fees, nor to second-guess a tribe's determination as to the amount of fees to pay under such a private contract, nor to make an "equitable" determination of the payment of such fees, nor to review the Secretary's administrative decisions in carrying out a tribe's instructions on the disbursement of tribal funds to pay such fees. The contrast between section 70n – which explicitly provides the Court with the authority that Patton Boggs wishes it had here – and section 1779e, which governs this case, could not be more stark.[7]

[7] To the same effect as the ICCA – and in contrast to the Settlement Act at issue in this case – multiple tribal jurisdictional acts have *expressly* conferred jurisdiction on this Court to "fix" and award attorneys fees. *See, e.g.,* Act of Feb. 23, 1929, ch. 300, § 6, 45 Stat. 1257-58 (Coos Bay, Lower Umpqua, and Suislaw Tribes) ("Upon final determination of such suit or suits the Court of Claims shall have jurisdiction to fix and determine a reasonable fee, not to exceed 10 per centum of the recovery, together with all necessary and proper expenses incurred in the preparation and prosecution of such suit or suits, to be paid to the attorney or attorneys employed . . . ."); Act of Apr. 25, 1932, ch. 136, § 4, 47 Stat. 137 (Eastern and Western Cherokees) (same); Act of Feb. 23, 1929, ch. 302, § 5, 45 Stat. 1258 (Kansas and Kaw Tribes) ("That upon the final determination of any suit instituted under this Act, the Court of Claims shall decree such amount or amounts as it may find reasonable to be paid to the said attorneys of the Kansas or Kaw Tribe of Indians for their services and expenses as said attorneys . . . ."); Act of Feb. 11, 1920, ch. 68, § 3, 41 Stat. 404 (Fort Berthold Indians) ("[U]pon the final determination of such suit, cause, or

Finally, the same point is illustrated by *Heller, Ehrman, White & MacAuliffe v. Babbitt,* 992 F.2d 360 (D.C. Cir. 1993), where a law firm brought a suit in district court under the APA against the Secretary for failing to pay attorney fees from a settlement fund created by Congress pursuant to the Hoopa-Yurok Settlement Act ("HYSA"), Pub. L. No. 100-580, 102 Stat. 2924 (1988), 25 U.S.C. §§ 1300i-1300i-11. The court rejected the effort, and said that exclusive jurisdiction over the claim lay in the Claims Court, but only because the HYSA expressly gave exclusive jurisdiction to this Court. 992 F.2d at 361, 363. The statute in *Heller, Ehrman* specified that "any claim" challenging the distribution of money and property under HYSA "shall be brought" in the Claims Court. *Id.* at 363. The D.C. Circuit concluded that "HYSA specifies that the law firm's only remedy is to sue the United States in the Claims Court for damages." *Id.* The plaintiffs cannot "circumvent" a "clear and explicit" statutory grant of exclusive jurisdiction "by creatively framing their complaint." *Id.* at 363-64.[8]

As with the ICCA, the "clear and explicit" grant of jurisdiction to this Court in the HYSA to resolve disputes about distribution of the settlement funds, including attorney fees, stands in sharp contrast to the silence of the Settlement Act as to the same matters. This Court's role

---

action the Court of Claims shall decree such fees as it shall find reasonable to be paid the attorney or attorneys employed therein by said tribe or bands of Indians, under contracts negotiated and approved as provided by existing law . . . .").

[8] In this case, significantly, the exact reverse of the *Heller, Ehrman* situation is presented. As the Cherokee Nation previously has suggested (without conceding), Patton Boggs may have a cause of action in a United States District Court under the Administ. Procedure Act, Pub. L. No. 89-554, 80 Stat. 393 (1966), 5 U.S.C. §§ 701-706. *See* Cherokee Nation's Opp'n to PB's Mot. to Intervene at 10-11; *see also Littell v. Morton,* 445 F.2d 1207 (4th Cir. 1971). Here Intervenor has attempted to "circumvent" potential APA jurisdiction in the district court "by creatively framing [its] complaint" to assert purported jurisdiction under the Tucker Act in this Court.

under the Settlement Act is simply to receive and lodge a consent decree, ensuring that all appropriations have been made to the settling tribes. 25 U.S.C. § 1779c(a). Nowhere is there a provision comparable to that in the HYSA that gives the Court an omnibus and exclusive jurisdiction to resolve "any claim" arising out of the distribution of money under the Act. Where Congress intended to confer such jurisdiction on this Court, it knew how to do so, and has done so expressly. It did not do so here.

### C. Patton Boggs' Cause of Action Is Really a Private Dispute with the Cherokee Nation over which This Court Has No Jurisdiction.

In substance and at core, the complaint in intervention really presents not a claim for damages owed by the United States, but instead a garden variety contract dispute between two private parties: Patton Boggs claims that it has a contract with the Cherokee Nation that commits the Nation to pay a certain fee to it, and it further claims that the Nation is now in breach of that contract. The Nation asserts it has established a fair and appropriate fee. Under the Settlement Act, the Secretary's duty is merely to pay what is owed.

In the normal course, a claim for breach of an attorney contract would be resolved by the law firm suing its client over the fees it asserts are due. But as Patton Boggs recognizes, PB Supp. Mem. at 19 n.27, that option is not available here because the Nation is protected from suit by its sovereign immunity.[9] As sophisticated counsel, Patton Boggs could have negotiated in its contract for a waiver of the Nation's immunity in the event of a fee dispute, but it did not do

---

[9] *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978); *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991); *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998); *Puyallup Tribe v. Dep't of Game*, 433 U.S. 165, 172-73 (1977); *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 512 (1940); *Turner v. United States*, 248 U.S. 354, 357-58 (1919).

so. That failure is a problem of its own making.

Nor is the Nation's immunity waived by the fact of its presence before the Court as plaintiff in the underlying riverbed case against the United States. When a tribal sovereign sues, it remains immune from counterclaims or cross-claims except for recoupment arising out of the same transaction or occurrence as the tribal claim. *See, e.g., Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991) ("[A] tribe does not waive its sovereign immunity from actions that could not otherwise be brought against it merely because those actions were pleaded in a counterclaim to an action filed by the tribe."). Patton Boggs' cause of action does not stem from the transaction or occurrence that gave rise to this case – the historic claims by the Cherokee Nation against the United States regarding the Nation's riverbed lands – but from a separate agreement. Thus, the purported claim that Patton Boggs seeks to assert against the Cherokee Nation is barred by the Nation's immunity.

Even apart from the immunity issue, this Court cannot resolve the fee dispute between Patton Boggs and the Nation because the Court plainly lacks jurisdiction to adjudicate claims such as this between private parties:

> [I]t has been uniformly held, upon a review of the statutes creating the court [of claims] and defining its authority, that its jurisdiction is confined to the rendition of money judgments in suits brought for that relief against the United States <u>and if the relief sought is against others than the United States the suit as to them must be ignored as beyond the jurisdiction of the court</u>[,] or if its maintenance against private parties is prerequisite to prosecution of the suit against the United States the suit must be dismissed.

*United States v. Sherwood*, 312 U.S. 584, 588 (1941) (citations omitted) (emphasis added).[10]

---

[10] *See also Berkeley v. United States*, 276 F.2d 9, 12-13 (Ct. Cl. 1960) (to extent plaintiff's claim challenges actions of private party, the claim lies outside the jurisdiction of the

Applying this settled rule, the Supreme Court in *Sherwood* held that where the plaintiff asserted a right to bring an action based on its status as a judgment creditor of another party pursuant to certain provisions of New York state law, the Court of Claims was without jurisdiction to adjudicate the claim because it would require the Court to adjudicate the validity of the state court order vesting the judgment creditor with the capacity to make the claim:

> We think it plain that the present suit could not have been maintained in the Court of Claims because that court is without jurisdiction of any suit brought against private parties and because adjudication of the right or capacity of respondent [the plaintiff in the Court of Claims] to proceed with the suit upon the contract of the judgment debtor with the United States is prerequisite to any recovery upon the Government contract. Adjudication of that issue is not within the jurisdiction of the Court of Claims whose authority, as we have seen, is narrowly restricted to the adjudication of suits brought against the Government alone.

*Sherwood*, 312 U.S. at 588-89 (citation omitted).[11]

The rule set out in *Sherwood* controls here. The claim made by Patton Boggs is in the nature of a contract dispute with the Cherokee Nation – asserting the terms of its contract, it contests the right of the Nation to pay it anything less than 10 percent of the Nation's recovery in the underlying riverbed case. But the Cherokee Nation's reading of the contract differs. Even

---

Court of Claims); *Kennedy v. United States*, 19 Cl. Ct. 69, 76 (1989) ("[I]f the maintenance of a suit against private parties is a prerequisite to the prosecution of the suit against the United States, the suit must be dismissed.").

[11] *See also McPherson v. United States*, 2 Cl. Ct. 670, 673 (1983) (court lacked jurisdiction over plaintiff's damages claim against the United States, where the claim against the Government was dependent upon showing a breach of duty by a third party); *Nat'l City Bank of Evansville v. United States*, 163 F. Supp. 846, 852 (Ct. Cl. 1958) (to the extent plaintiff's losses resulted from improper action of the surety on a contract with the United States, plaintiff's claim was against the surety and not the United States, and accordingly lay outside the jurisdiction of the Court of claims).

though Patton Boggs labors to frame its claim as one against the United States, the predicate for the claim of what the Secretary must do, or must pay, still depends on resolution of the dispute between two private parties as to what their private contract provides. As such, the claim lies outside the jurisdiction of this Court, just as in *Sherwood.*[12]

Patton Boggs attempts to finesse this problem by claiming, in essence, that the Settlement Act somehow federalizes the attorney contract, making it a direct obligation of the United States, and seeking to hold the United States liable for performance of the contract. But the Act does no such thing. All it does do is provide a mechanism for the Cherokee Nation to pay fees it owes under its contracts out of the settlement sums it is receiving under the statute – by directing the Secretary to perform the ministerial function of making disbursements to the attorneys from funds appropriated for the benefit of the Nation. In so doing, the statute does not make any such contract an obligation of the United States, or make the proper meaning of contract terms a

---

[12] This Court's decision in *American Renovation and Constr. Co. v. United States,* 65 Fed. Cl. 254 (2005) is not to the contrary. In *American Renovation*, an assignee of a government contract sought to intervene in an action against the United States for breach of that contract brought by the original contractor. The Court granted intervention because the question presented was which company – the plaintiff or the intervenor – "was entitled to recover a contract balance allegedly due from the government," *id.* at 261, *i.e.,* which company was the proper plaintiff. In agreeing to decide which of the two possible plaintiffs was entitled to the recovery against the United States under the contract, the Court emphasized that "it cannot enforce the legal rights of Intervenor-Applicant specifically against Plaintiff, as such a determination falls outside of the jurisdiction conferred under the Tucker Act." *Id.* at 262.

That precisely states the difference here: Patton Boggs is not attempting to claim it is the proper plaintiff to recover from the United States for federal mismanagement of the Arkansas riverbed; rather, Patton Boggs is asserting a legal right, based on its contract, against the Cherokee Nation, and is treating the United States basically as the guarantor. As the Court said in *American Renovation*, that determination "falls outside of the jurisdiction conferred by the Tucker Act." *Id.*

dispute between Patton Boggs and the United States. The dispute over its contract is, and remains, between Patton Boggs and the Nation. And that is a dispute that lies outside the jurisdiction of this Court to resolve. *See Katz v. Cisneros,* 16 F.3d 1204, 1210 (Fed. Cir. 1994) ("Any express contract that might be invocable is between Hollywood Associates and Housing Allowance, not between Hollywood Associates and the United States, which is, of course, the sine qua non of jurisdiction in the Court of Federal Claims. Absent privity. . . there is no case." (citing *Erikson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed. Cir. 1984), and *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1550 (Fed. Cir. 1983)).

## III. The Court Should Dismiss the Complaint for Failure to State a Claim upon which Relief Can Be Granted.

Even if the Court finds it has jurisdiction over the complaint in intervention, the complaint fails as a matter of law to state a claim upon which relief can be granted. First, the complaint mis-reads the Settlement Act in ascribing to the Secretary the authority to independently set the attorneys fees, instead of implementing the decision of the Indian Nations as to which attorneys should be paid and how much. And second, the complaint is deficient as a matter of law because Patton Boggs is not entitled to the flat 10% recovery it seeks: at most, it is entitled to a *quantum meruit* recovery, given that it was terminated well before the case was finished (and even if it had not been terminated, its contract would have expired by its own terms), and further because the services provided by Patton Boggs related to only a portion of the recovery received by the Cherokee Nation under the Settlement Act, and the law firm is not entitled to any percentage of the Nation's recovery outside the scope of its contract. But since the Patton Boggs complaint does not seek a *quantum meruit* recovery, and since applicable legal

principles bar the flat 10% recovery it does seek, the complaint should be dismissed for failure to state a claim.

**A. The Secretary Correctly Construed the Settlement Act As a Matter of Law.**

Inquiry into whether Intervenor's complaint states a justiciable cause of action begins appropriately with examination of its contract within the statutory context (25 U.S.C. § 1779e). Specifically, Patton Boggs asserts that under its 1989 attorneys' contract it is entitled to compensation in the amount of "ten percent (10%) of all sums recovered for [the] Cherokee Nation, . . . less any sums [previously] paid to PB . . . ." Compl. ¶ 10. A mere reading of the contract, however, shows this unqualified assertion to be inaccurate. The contract actually provides, in language never mentioned by Patton Boggs, that its contingent fee is subject to the condition "that approvals required by law, if any, are obtained." Compl., Ex. 1 at 3 (emphasis added). Moreover, the term "required approvals" is elsewhere defined in the contract to include approvals by "the Cherokee Nation Tribal Council and the Bureau of Indian Affairs, if required by regulation or statute." *Id.* at 1. Accordingly, by the express terms of its contract, Patton Boggs' contingent fee is subject to any approvals of the Cherokee Nation Tribal Council required by law.

The relevant provision of the Settlement Act, section 1779e(a), provides in material part that "the Secretary shall pay to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations." (emphasis added). Patton Boggs would have the Court read the phrase "as approved by the respective Indian Nations" as modifying the word "contracts," basing its argument mainly on the lack of commas in the text of this Settlement Act provision. PB Supp. Mem. at 22-23; *see also* Tr. of

Oct. 20, 2005 H'rg at 29. But that construction of the statute makes no sense. In other words, there can be no valid "contract" at all unless an agreement has been approved by the "respective Indian Nation[]", *i.e.,* the Cherokee Nation, so saying that "approval" by the Nation modifies "contract" creates a tautology, an unacceptable redundancy in the law – requiring approval of what is already necessarily approved. Stated another way, Patton Boggs' reading of the Settlement Act would convert the phase "as approved by the respective Indian Nations" into complete surplusage – again, since these Nations must already have given their approval in order for there to be a contract at all. Patton Boggs' reading thus violates the "cardinal" rule of construction that meaning should be given to every word in the statute.[13] In context, the phrase "as approved by the respective Indian Nations" can refer logically only to the word "fees" and, as pointed out above, this is exactly the provision of law with respect to fee approvals by the Cherokee Nation Tribal Council that Patton Boggs' attorney contract anticipated.

In construing section 1779e, the Secretary reached precisely this same conclusion, stating: "I have determined that the Secretary is required to pay only those fees approved by tribal resolution after the Settlement Act became effective . . . ." Compl., Ex. 3 at 2. The Secretary's determination is entitled to great deference. *See, e.g., Udall v. Tallman,* 380 U.S. 1, 16 (1965); *Chevron, U.S.A., Inc. v. N.R.D.C.,* 467 U.S. 837, 844 (1984). Given the language of Patton Boggs' contract, it is plainly correct as a matter of law.

---

[13] "[A] cardinal principle of statutory construction" is "that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001), *quoting Duncan v. Walker*, 533 U.S. 167, 174 (2001); *see also Kungys v. United States*, 485 U.S. 759, 778 (1988) (A "cardinal rule of statutory interpretation [is] that no provision should be construed to be entirely redundant.").

This construction of the Act is also consistent with the federal government's trust responsibility, under which the Secretary of the Interior's role under statutes of this kind is to protect the interests of the tribes, not to protect parties contracting with those tribes. *See, e.g., In re Sanborn*, 148 U.S. 222, 227 (1893) (noting that statutes that require the approval of contracts between a tribe and its attorney are "intended to protect the Indians from improvident and unconscionable contracts [and] by no means create a legal obligation on the part of the United States to see that the Indians perform their part of such contracts."); *San Xavier Dev. Auth. v. Charles*, 237 F.3d 1149, 1153 (9th Cir. 2001) ("[A] non-Indian party to a contract does not have the right to employ statutory remedies [authorized by 25 U.S.C. § 177] enacted to protect Indian tribes and their members."); *W. Shoshone Bus. Council v. Babbitt*, 1 F.3d 1052, 1056 (10th Cir. 1993) (observing that "the undisputed purpose of [25 U.S.C. § 81] is to protect tribal lands, not to regulate lawyers specifically, or to create either an administrative right of review or a contract cause of action for non-Indian contractors."); *United States ex rel. Shakopee Mdweakanton Sioux Cmty. v. Pan Am. Mgmt. Co.*, 616 F. Supp. 1200, 1217 (D. Minn. 1985) ("There is no dispute that the main impetus behind the enactment of [25 U.S.C.] § 81 was the fraud and abuse being inflicted upon Indian tribes by attorneys and claim agents allegedly representing their interests before the federal government.").

The section of the Settlement Act under which Patton Boggs brings its claim was similarly enacted to protect the rights and interests of the settling tribes and not to create rights or remedies for non-Indian contractors. Indeed, an interpretation of the Settlement Act to protect tribal interests and to defer to tribal determinations of the appropriate amount to be paid to the tribe's attorneys is also fully consistent with the longstanding rule regarding the Secretary's

responsibilities to manage tribal funds for the benefit of the tribe. *See, e.g., Seminole Nation v. United States*, 316 U.S. 286, 297 (1942) (when managing tribal funds, the government's conduct should "be judged by the most exacting fiduciary standards."); *Loudner v. United States*, 108 F.3d 896, 900 (8th Cir. 1997) ("[t]here is a presumption that absent explicit language to the contrary, all funds held by the United States for Indian tribes are held in trust.") (quoting *Rogers v. United States*, 697 F.2d 886, 890 (9th Cir. 1983)); *see also Cobell v. Norton*, 240 F.3d 1081, 1099, 1107 (D.C. Cir. 2001).[14] For all the foregoing reasons, the Secretary's interpretation of this Section of the Settlement Act is correct as a matter of law.

### B. Patton Boggs' Sole and Exclusive Rationale for Claiming a $2 Million Attorneys Fee, the Single Ground for its Cause of Action, is Erroneous As a Matter of Law.

Patton Boggs treats its claim against the United States as the proverbial "slam dunk." According to Intervenor: Patton Boggs had a contract with the Cherokee Nation calling for a contingent attorneys fee of 10% of any "recovery" (Compl. ¶ 20); the Cherokee Nation recovered $20 million[15] as a result of the Settlement Act (*id.* ¶ 18); Patton Boggs thus was entitled to a fee

---

[14] Any other construction of the Act would, in effect, call upon this Court to review a determination made by a sovereign Indian tribe which, as set out in the Secretary's decision of October 13, 2005, *see* Ex. 3 to Complaint in Intervention, undertook a careful analysis of the various attorney fee claims, including an analysis by outside independent counsel, and reached a decision on an appropriate payment schedule for attorneys fees.

[15] According to Intervenor's "money-mandating statute" argument (*see* pp. 6-10, *supra*), the Cherokee Nation really recovered only $18 million, since Congress, *sub silentio*, set aside $2 million of the total appropriation as "government funds" to pay the attorneys as a Federal obligation. Indeed, under Intervenor's construction of the statute, the Nation's net recovery could be as low as $16 million, since a "claimant tribe" is asserting a right to an additional 10% of the $20 million pursuant to Section 608 of the Settlement Act, 25 U.S.C. § 1779f, and $2 million of the funds appropriated have been set aside for that purpose. *See United Keetoowah Band of Cherokee Indians v. United States*, 67 Fed. Cl. 695 (2005), appeal pending, No. 06-5003 (Fed. Cir.). Thus, under its own theory, Patton Boggs has no right to claim 10% of a $20

of $2 million, less amounts previously paid ($403,959), or a net of $1,596,941 (*id.* ¶¶ 20, 23 (no. 2)); the Secretary paid Patton Boggs only $151,000 (*id.* ¶¶ 22 (no. 2), 23 (no. 2)); and the United States thus owes Patton Boggs $1,445,041. *Id.* at 7; *see also id.* at 1-2 ("Nature of the Action"). For purposes of the complaint in intervention, that is the whole story.

Not quite. Patton Boggs' statement of its claim omits a number of material facts and ignores a number of relevant principles of law – all of which negate its contract right theory of recovery. Briefly stated, even under Patton Boggs' concept of the facts, its attorneys' contract with the Cherokee Nation expired no later than July 2, 1997 (Compl. ¶ 14), or, in other words, long before the Settlement Act was approved or the Nation received any recovery, and thus before substantial performance by the law firm. Under such circumstances, even assuming, *arguendo,* that its claim is valid, Patton Boggs would be entitled only to a fee based upon *quantum meruit* or otherwise apportioned among counsel, and not to the contract amount.[16] But

million recovery since – according to Patton Boggs – at least $2 million and arguably $4 million of those funds do not in fact belong to the Cherokee Nation, but are simply federal funds. Patton Boggs cannot have it both ways: either the entire $20 million recovery constitutes tribal funds (in which case the attorney fees are to be paid by the Secretary from tribal, not federal, money), or the recovery to the Nation under the Act is only $18 million, or perhaps $16 million (in which case Patton Boggs is not entitled under its contract to have its 10 percent fee calculated on the basis of a $20 million recovery). The final installment of the settlement ($5 million), of course, has not yet been appropriated. *See* § 1779c(c)).

[16] Patton Boggs makes the bold claim that it is entitled to a full ten percent fee – the statutory ceiling on all fees that can be paid in the case – even though other attorneys also provided services to the Cherokee Nation, and even though Patton Boggs' contract either was terminated or expired years before the conclusion of the case. Compl. ¶¶ 15, 21-22. Thus, Patton Boggs tries to zero out any fees to be paid to other lawyers, with valid contracts, who also provided legal services. This Court long ago disapproved of such harsh tactics: "If appellants can rightly insist on the entire 10% because they had the foresight to put that figure in their contract, nothing would be left for [other attorneys] no matter how meritorious their claim. Congress could not have intended such an inequity, or to allow one attorney to bar another's pay in that fashion." *Sisseton and Wahpeton Bands or Tribes v. United States,* 423 F.2d 1386, 1389 (Ct. Cl. 1970).

Intervenor has not pleaded this alternative theory of recovery, so such a cause of action is not before the Court.

Similarly, Patton Boggs emphasizes that its attorneys contract covered "claims for mismanagement of [the Cherokee Nation's] Arkansas Riverbed trust resources" (Compl. ¶ 19); and that these "mismanagement" claims were set forth in this Court's Case Nos. 218-89L and 630-89L "seeking damages for the United States' use and mismanagement of tribal trust resources . . . ." *Id.* ¶ 8; *see also id.* ¶¶ 9, 19. The Settlement Act, however, provides on its face that a substantial (though unspecified) portion of the Nation's $20 million recovery is based not upon the release of mismanagement claims, but rather upon the extinguishment of Cherokee Nation title to certain lands (*see* §§ 1779, Findings (14)-(16), 1779a, 1779c(a) and (b)) – elements of the settlement not covered by Patton Boggs' contract. Even if it were applicable, therefore, which it is not, Patton Boggs' 10% contingent fee would apply only to part of the $20 million settlement fund – the part arising from settlement of the Nation's mismanagement claims.[17] This alternative view of Intervenor's fee claim, however, also is not pleaded, so no such cause of action is before the Court.

1. Patton Boggs is not entitled to a 10% contract fee. Intervenor alleges that its attorneys contract "was terminated without cause" on April 30, 1995. Compl. ¶ 15. Even assuming for purposes of this motion that this allegation is true, it also is immaterial because a

---

[17] If this case is not dismissed on the grounds stated in this motion, the evidence to be presented at trial in this matter likely would include the various different components of claims that constitute the recovery provided to the Nation by the Settlement Act, and the relationship between those various elements of the settlement and the services provided (and results achieved) by all counsel for the Cherokee Nation.

client at any time may discharge its legal counsel with or without cause.[18] The allegation of unauthorized termination also is irrelevant (a) because Patton Boggs does not claim to have objected, and (b) because the contract would have in any event expired by its own terms on July 2, 1997 (Compl. ¶ 14), or, in other words, long before the Cherokee Nation ever obtained a "recovery" and long before the effort to obtain a settlement was substantially complete.

The contract does not contain any provision for the payment of attorney fees in the event of its termination without cause or its expiration prior to a recovery by the Cherokee Nation. *See* Compl., Ex. 1. Nor did Patton Boggs, notwithstanding its reputed experience and expertise, provide that its contingent fee would survive an expiration of the contract.[19] Despite the omission of these ordinary boilerplate provisions, the fact that possible expiration or termination of the contract was within the contemplation of the parties is shown by the contract provision reciting it was "expressly understood that . . . [Patton Boggs] shall have no contractual obligation to continue representation of the Cherokee Nation after expiration or termination of this Contract . . . ." *Id.* at 3. In an attorneys' contract which it drafted, Patton Boggs simply forgot to protect its contingent fee. There is no provision in the contract that entitles Patton Boggs to a fee under the circumstances at issue here.

---

[18] "The relationship of attorney and client is one of reliance, trust, and confidence." *White v. Am. Law Book Co.,* 233 P. 426, 427 (Okla. 1924). As a result, "[w]hen any element of this relationship is destroyed, for whatever reason, the client has the absolute right, in the interest of his own welfare, to discharge the attorney." *Wright v. Arnold,* 877 P.2d 616, 618 (Okla. App. 1994.) (quoting *White*, 233 P. at 427). *See also In re Waller,* 524 A.2d 748, 752 (D.C. 1987) ("A client has an absolute right to discharge an attorney at any time. Moreover, a client need not demonstrate cause prior to discharging an attorney.").

[19] The contract does provide that, in the event it is terminated "for cause," the attorneys shall receive "an equitable portion" of any recovery. Compl., Ex. 1 at 4.

Assuming, *arguendo,* that Patton Boggs' right to compensation survives the termination or expiration of its contract, the law firm still is not entitled to a 10% contingent fee. Intervenor does not allege, nor could it, that it performed all, or substantially all, of the professional services which led up to the eventual settlement.[20] Under the circumstances, "when an attorney is discharged before the case results in a money judgment or settlement, the attorney does not recover under the contingent fee agreement, but rather, the attorney receives the reasonable value of his services." *Musser v. Musser,* 909 P.2d 37, 40 (Okla. 1995); *see White Mountain Apache Tribe of Ariz. v. United States,* 30 Fed. Cl. 8, 18 (1993) ("A contingency fee is meant to be a merit-based form of compensation. It is not the guaranteed windfall that the associated attorneys appear to think it is."); *Heinzman v. Fine, Fine, Legum and Fine,* 234 S.E.2d 282, 286 (Va. 1977) ("Having in mind the special nature of a contract for legal services, we hold that when, as here, an attorney employed under a contingent fee contract is discharged without just cause and the client employs another who effects a recovery, the discharged attorney is entitled to a fee based upon quantum meruit for services rendered prior to discharge . . . ."); *see also Sachs v. Klein,* 154

[20] While Patton Boggs filed the original complaint and served as counsel of record for the Cherokee Nation's trust and mismanagement claims from 1989 through 1995, its representation of the Nation before the Claims Court during this period was plagued with rulings adverse to the Nation. During that period, the Claims Court dismissed a number of the Nation's claims, and allowed others to proceed only after requiring repeated amendments of the complaint. *See Cherokee Nation v. United States*, 25 Cl. Ct. 361 (1992); *Cherokee Nation v. United States*, 24 Cl. Ct. 695 (1992); *Cherokee Nation v. United States*, 23 Cl. Ct. 117 (1991); *Cherokee Nation v. United States*, 21 Cl. Ct. 565, 567 (1990). The Claims Court's final act during Patton Boggs' representation of the Nation was to stay the case indefinitely, effectively killing the case. *Cherokee Nation v. United States*, No. 95-5055, slip. op. at 8 (Jan. 28, 1994). Although the Court of Appeals agreed to review the Claims Court's stay order on interlocutory appeal, Patton Boggs was terminated and the briefs and argument on the merits of the interlocutory appeal were presented by other counsel. And it was counsel other than Patton Boggs which represented the Cherokee Nation in the proceedings on remand and in the work necessary to actually settle the claims in the Nation's favor.

A.2d 134, 137 (D.C. App. 1959). This is so because, as the Illinois Supreme Court has observed, "[t]o require the client to pay the discharged attorney the full contract fees would make the right to discharge even without cause largely meaningless." *Rhoades v. Norfolk & W. Ry. Co.*, 399 N.E.2d 969, 974 (Ill. 1979).

In short, as a matter of law Patton Boggs is not entitled to the 10% contingent fee that it seeks. The question whether the law firm may deserve to be paid on the basis of *quantum meruit* is moot since Intervenor has not asserted such a claim in the complaint. It should be noted, however, that a contingent fee attorney's right to recover under a *quantum meruit* theory arises from a contract implied-in-law, not implied-in-fact. *See Glick v. Barclay's De Zoete Wedd, Inc.*, 692 A.2d 1004, 1009-1010 (N.J. Super. Ct. App. Div. 1997). It is well established that this Court lacks jurisdiction over contracts implied-in-law, even when those contracts are with the United States. *E.g. United States v. Mitchell,* 463 U.S. 206, 218 (1983); *Perri v. United States,* 53 Fed. Cl. 381, 408 (2002).

2. <u>Patton Boggs is not entitled to a $2 million fee.</u> The Patton Boggs attorneys contract defines the law firm's employment as representing "the Cherokee Nation in connection with claims . . . arising from the violation of the duties of the United States to protect the tribal lands and to manage the tribal resources of said Cherokee Nation." Compl., Ex. 1 at 1. In its complaint, Intervenor emphasizes that the attorneys contract covered "<u>claims for mismanagement</u> of [the Cherokee Nation's] Arkansas Riverbed trust resources" (*id.* ¶ 19); and that those "mismanagement" claims are set forth in this case "seeking damages for the United States' use and mismanagement of tribal trust resources . . . ." *Id.* ¶ 8; *see also id.* ¶¶ 9, 19. Neither the

Patton Boggs attorneys contract, nor the claims asserted in the underlying riverbed case, deal with the sale of interests in Cherokee Nation lands.

The Settlement Act, however, provides on its face that a substantial (though unspecified) portion of the Nation's $20 million recovery is attributable not to the release of mismanagement claims, but instead to the extinguishment of Cherokee Nation title to certain lands and interests in lands. Section 1779, Finding (15), for example, speaks not only of the release of the claims asserted in this case (Case No. 89-218L), but also states that the Cherokee Nation shall "forever disclaim any and all right, title, and interest in and to the Disclaimed Drybed Lands . . . ." Finding (15)(B); *see also* § 1779a to the same effect. Similarly, wholly apart from the mismanagement claims in this case, § 1779c(b)(1)(A) provides that, upon "the deposit of all funds authorized for appropriation under subsection (c) of this section . . ., all right, title and interest that the Indian Nations and the United States as trustee on behalf of the Indian Nation may have to the Disclaimed Drybed Lands, shall be deemed extinguished."

The statutory scheme makes clear that some portion of the $20 million recovery to the Cherokee Nation is in exchange for the extinguishment of its title to land, not to settlement of its claims for mismanagement. But even if Patton Boggs had litigated the mismanagement claims from conception to fruition (which it did not), Patton Boggs' contract entitles it – at best – to a 10% fee for whatever portion of the Settlement Act might be attributed to the Nation's recovery on its mismanagement claims. In short, by claiming a full 10% fee of $2 million, Patton Boggs is seeking a percentage of that portion of the $20 million settlement that was not created through its efforts and, more particularly, is outside the scope of its attorneys contract. The law firm has no such entitlement. Moreover, since Intervenor in its complaint has asserted a claim solely to a

gross fee of $2 million and not any pro-rated lesser sum, the Court cannot grant the relief it requests as a matter of law.

## IV. Conclusion

For the foregoing reasons, Patton Boggs' complaint in intervention should be dismissed for lack of jurisdiction or failure to state a cause of action upon which relief can be granted, or on both grounds.

February 17, 2006

Respectfully submitted,

Arthur Lazarus, Jr. by Anne D. Noto

Arthur Lazarus, Jr.
Sonosky, Chambers, Sachse, Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240
(202) 682-0249 (fax)
alazarus@sonosky.com

By Anne D. Noto

Special Counsel for Plaintiff Cherokee Nation

Of Counsel:

Lloyd Benton Miller
Donald J. Simon
Anne D. Noto
Sonosky, Chambers, Sachse, Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240
(202) 682-0249 (fax)
lloyd@sonosky.net
dsimon@sonosky.com
anoto@sonosky.com