IN THE UNITED STATES COURT OF FEDERAL CLAIMS

THE CHEROKEE NATION OF OKLAHOMA,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

PATTON BOGGS LLP

Intervenor Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

Case No. 218-89

Chief Judge Edward J. Damich

# PATTON BOGGS' MEMORANDUM OPPOSING THE CHEROKEE NATION'S MOTION TO DISMISS

PATTON BOGGS LLP

David P. Callet (DC Bar No. 181990)
David S. Panzer (DC Bar No. 470677)
Greenberg Traurig LLP
800 Connecticut Ave, NW, Suite 500
Washington, DC 20006
202-331-3100
202-331-3101 (fax)
calletd@gtlaw.com
panzerd@gtlaw.com

March 20, 2006

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ........................................................................................ i

**TABLE OF AUTHORITIES** ................................................................................ iii

**PATTON BOGGS' MEMORANDUM OPPOSING THE CHEROKEE NATION'S MOTION TO DISMISS** ........................................................................................1

**I. THE CHEROKEE NATION PROFFERS NO BASIS TO RECONSIDER THIS COURT'S PRIOR DECISION ON JURISDICTION.** ...........................2

**A. This Court Should Not Reconsider Its Opinion Because The Cherokee Nation's Arguments Are No Different Than Previously Argued And Rejected By This Court.** ...............................................................2

1. **The Law Of The Case Doctrine Underscores Why The Court *Could* But *Should Not* Reconsider Its December 19, 2005 Opinion.** ..........................................................................2

2. **Every Jurisdictional Argument Presented In The Cherokee Nation's New Motion To Dismiss Was Specifically Considered And Explicitly Rejected By This Court.** ...................................3

**(a) The Cherokee Nation's First Jurisdictional Argument Was Presented At Oral Argument in December 2005, Rejected In This Court's Opinion, And Is Now Repeated In The Instant Motion.** ...................................4

**(b) The Cherokee Nation's Second and Third Jurisdictional Arguments Were *Copied Verbatim* From The Cherokee Nation's Opposition To Patton Boggs' Motion To Intervene, And Were Also Rejected In This Court's Opinion.** ...................................................................5

**B. The Only Nuance To The Cherokee Nation's Renewed Argument Is Immaterial To The Just Resolution Of The Dispute, And Otherwise Unsupported In Law And Fact.** ...........................................................6

**II. PATTON BOGGS HAS STATED A CLAIM AGAINST THE UNITED STATES, UNDER THE MONEY-MANDATING SETTLEMENT ACT, SEEKING ONLY A NAKED MONEY JUDGMENT.** ..................................10

**A. The Cherokee Nation Fails To Meet (Or Even Address) The Standard For A Motion To Dismiss.** ...........................................................11

**B. This Court Implicitly Has Rejected The Cherokee Nation's Argument That The Secretary, As A Matter Of Law, Correctly Construed The Settlement Act.** ....................................................................13

C. The Cherokee Nation Confuses Its Assertion That Patton Boggs Failed To State A Claim, With The Government's Potential (But Invalid) Defenses That Seek To Reduce That Claim. ..........14

CONCLUSION ..........16

APPENDIX TO PATTON BOGGS' MEMORANDUM OPPOSING THE CHEROKEE NATION'S MOTION TO DISMISS..........18

EXHIBIT A 5 U.S.C. § 5349.......... A-1

EXHIBIT B 5 U.S.C. § 5942.......... A-2

EXHIBIT C 7 U.S.C. § 1446.......... A-3

EXHIBIT D 19 U.S.C. § 1619.......... A-9

EXHIBIT E 24 U.S.C. § 225g.......... A-11

EXHIBIT F CHEROKEE, CHOCTAW, AND CHICASAW NATIONS CLAIMS SETTLEMENT ACT, 25 U.S.C. §§ 1779, *ET SEQ.*.......... A-14

EXHIBIT G 28 U.S.C. § 463.......... A-32

EXHIBIT H 42 U.S.C. § 254.......... A-33

EXHIBIT 1 A RED-LINE COMPARISON BETWEEN (1) ARGUMENTS II A & B FROM THE CHEROKEE NATIONS' OPPOSITION TO MOTION TO INTERVENE BY PATTON BOGGS LLP (ORIGINAL DOCUMENT) AND (2) ARGUMENTS II B & C FROM THE CHEROKEE NATION'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT IN INTERVENTION OF PATTON BOGGS LLP (NEW DOCUMENT) .......... A-35

## TABLE OF AUTHORITIES

**Federal Cases**

***Agwiak v. United States*,**
**347 F.3d 1375 (Fed. Cir. 2003)....10**

***Bradley v. United States*,**
**870 F.2d 1578 (Fed. Cir. 1989)....10**

***C.H. Robinson Int'l v. United States*,**
**64 Fed. Cl. 651 (2005)....11, 12**

***Cherokee Nation v. United States*,**
**937 F.2d 1539 (10th Cir.), *reh'g denied*, 948 F.2d 635 (10th Cir. 1991)....15**

***District of Columbia v. United States*,**
**67 Fed. Cl. 292 (2005)....10**

***Doe v. United States*,**
**100 F.3d 1576 (Fed. Cir. 1996)....10**

***Exxon Corp. v. United States*,**
**931 F.2d 874 (Fed Cir. 1991)....2**

***Florida Power & Light Co. v. United States*,**
**66 Fed. Cl. 93 (2005)....2**

***Grav v. United States*,**
**886 F.2d 1305 (Fed. Cir. 1989)....10**

***Hopi Tribe v. United States*,**
**55 Fed. Cl. 81 (2002)....10**

***Mangual v. United States*,**
**27 Fed. Cl. 480 (1993)....10**

***McBryde v. United States*,**
**299 F.3d 1357 (Fed. Cir. 2002)....10**

***McGowan v. Sec'y, Dep't of Health & Human Svcs.*,**
**31 Fed. Cl. 734 (1994)....2**

***Moore v. United States*,**
**63 Fed. Cl. 781 (2005)....15**

***Ontario Power Generation, Inc. v. United States,***
**369 F.3d 1298 (Fed. Cir. 2004) ........................................................................10**

***Sioux Nation of Indians v. United States,***
**650 F.2d 244 (Ct. Cl. 1981) ..............................................................................12**

***Sisseton & Wahpeton Bands or Tribes v. United States,***
**423 F.2d 1386 (Ct. Cl. 1970) ..........................................................................6, 12**

***United States v. Cherokee Nation,***
**480 U.S. 700 (1987), ......................................................................................15**

***United States v. Mitchell,***
**463 U.S. 206 (1983) ...................................................................................4, 10**

***United States v. Testan,***
**424 U.S. 392 (1976) .....................................................................................4, 5**

***W. Shoshone Identifiable Group v. United States,***
**652 F.2d 41 (1981) .........................................................................................12**

***White Mountain Apache Tribe of Arizona v. United States,***
**30 Fed. Cl. 8 (1993), *aff'd*, 31 F.3d 1176 (Fed. Cir. 1994) .........................................12**

***Wolfchild v. United States,***
**68 Fed. Cl. 779 (2005) ......................................................................................3**

**Federal Statutes**

**5 U.S.C. § 5349 ..........................................................................................10**

**5 U.S.C. § 5942 ..........................................................................................10**

**7 U.S.C. § 1446 ..........................................................................................10**

**19 U.S.C. § 1619 ........................................................................................10**

**24 U.S.C. § 225g ........................................................................................10**

**Cherokee, Choctaw, and Chicasaw Nations Claims Settlement Act,**
**25 U.S.C. §§ 1779, *et seq.* ...........................................................................passim**

**28 U.S.C. § 463 ..........................................................................................10**

**42 U.S.C. § 254 ..........................................................................................10**

**Federal Rules**

**RCFC 12** ....................................................................................................................11

**RCFC 24** ......................................................................................................................4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, | * | |
| Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES OF AMERICA, | * | Case No. 218-89 |
| Defendant. | * | |
| * * * * * * | * | |
| PATTON BOGGS LLP | * | Chief Judge Edward J. Damich |
| Intervenor Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |
| * * * * * * | * | * * * * * |

**PATTON BOGGS' MEMORANDUM OPPOSING THE CHEROKEE NATION'S MOTION TO DISMISS**

Similar to its previously filed Opposition to Patton Boggs' Motion to Intervene (Docket No. 118, "CN Opp"), the Cherokee Nation's Motion to Dismiss contends that this Court lacks jurisdiction to consider Patton Boggs' claim, and, in the alternative, that the Secretary's interpretation of the Settlement Act's attorney fee provision, 25 U.S.C. § 1779e(a) (the "Payment Provision"), is correct as a matter of law. The arguments advanced in support of this Motion have been previously considered and properly denied. *See* Docket No. 125, December 19, 2005 Opinion and Order ("Opinion"). The Cherokee Nation presents no valid basis to dismiss Patton Boggs' Complaint. Its Motion to Dismiss, therefore, should be denied.

# I. THE CHEROKEE NATION PROFFERS NO BASIS TO RECONSIDER THIS COURT'S PRIOR DECISION ON JURISDICTION.

## A. This Court Should Not Reconsider Its Opinion Because The Cherokee Nation's Arguments Are No Different Than Previously Argued And Rejected By This Court.

### 1. The Law Of The Case Doctrine Underscores Why The Court *Could* But *Should Not* Reconsider Its December 19, 2005 Opinion.

The Cherokee Nation's Motion seeks reconsideration of the Opinion. The Cherokee Nation correctly argues that the law of the case doctrine does not preclude this Court from reconsidering its Opinion.[1] Nonetheless, "[o]rderly and efficient case administration suggests that questions once decided not be subject to continued argument …." *Florida Power & Light Co. v. United States*, 66 Fed. Cl. 93, 95 (2005) (*quoting Exxon Corp. v. United States*, 931 F.2d 874, 877 (Fed Cir. 1991) (quotation omitted)). Even were the Court of Federal Claims to review its own interlocutory order, "the practice is to treat each decision as law of the case, departing from it only for certain reasons, such as new evidence, supervening law, or a clearly erroneous decision." *McGowan v. Sec'y, Dep't of Health and Human Svcs.*, 31 Fed. Cl. 734, 737 (1994) (citation omitted). As this Court recently explained in reconsidering an interlocutory order:

> The law of the case doctrine protects the settled expectations of the parties and promotes orderly development of the case. Reasons that may warrant departure from the law of the case include the discovery of new and different material evidence that was not presented in the prior action, or an intervening change of controlling legal authority, or when the prior decision is clearly incorrect and its preservation would work a manifest injustice.

[1] The Cherokee Nation's Memorandum in Support of Its Motion to Dismiss (Docket No. 135, "CN Memo") at 5 n.4.

*Wolfchild v. United States*, 68 Fed. Cl. 779, 785 (2005) (citations, internal quotations, and other markings omitted).

The Court has ruled that Patton Boggs states a Tucker Act claim over which the Court has jurisdiction. Opinion at 13-15. As explained below, the Cherokee Nation has proffered no new reasons for this Court to reverse itself.

### 2. Every Jurisdictional Argument Presented In The Cherokee Nation's New Motion To Dismiss Was Specifically Considered And Explicitly Rejected By This Court.

The Cherokee Nation disingenuously asserts that the Court's Opinion was rendered without the Cherokee Nation having had a real opportunity to oppose Patton Boggs' Motion to Intervene. The Cherokee Nation goes so far as to say: "While we recognize that the Court has found the Settlement Act to be a money-mandating statute, the unorthodox manner in which Patton Boggs advanced and then restyled its claims – raising this central argument for the first time only in a Reply Brief – ***deprived the Nation and the United States of an opportunity to brief that issue at all***." CN Memo at 5 (emphasis added). This assertion is simply untrue because the Cherokee Nation briefed this central point in its CN Opp.[2] In fact, the very arguments now advanced by the Cherokee Nation not only were argued to the Court in December 2005, but, most of those purportedly "new" argument were merely *copied* from its previously filed CN Opp.

---

[2] *See, e.g.*, CN Opp at 23-26 (Argument III.B. "This Court has no jurisdiction under the Tucker Act to consider Patton Boggs' claim for attorneys fees, which is not a suit for money damages against the United States."); *see also id.* at 12 (In support of its argument that Patton Boggs' relief could be found only in the District Court, the Cherokee Nation urged: "The proposition that the Settlement Act – and in particular the language of section 1779e – does not provide this Court with jurisdiction to review and fix attorney fee payments is best illustrated by contrast with a statute that does do so.").

**(a)** The Cherokee Nation's First Jurisdictional Argument Was Presented At Oral Argument in December 2005, Rejected In This Court's Opinion, And Is Now Repeated In The Instant Motion.

The first jurisdictional argument in the Cherokee Nation's instant Motion reads "the Settlement Act is not a money-mandating statute that gives rise to this Court's Tucker Act jurisdiction." CN Memo at 6. On December 13, 2005, the Cherokee Nation argued:

> MR. LAZARUS: Yes, Your Honor. Thank you. To be a money-mandating statute, the Supreme Court has determined in United States v. Mitchell, quoting United States v. [Testan], a case which is cited in the recent District of Columbia litigation in this Court, Patton Boggs must demonstrate that the Settlement Act "can fairly be interpreted as mandating compensation by the federal government for the damages sustained."
>
> Now, a money-mandating statute leads up to judgments against the United States payable out of a judgment fund in the Treasury. There is not a word in the Settlement Act that indicates or gives the slightest hint that the United States was going to be responsible for paying attorney's fees if Cherokee Nation did not. The statute reads exactly the opposite way. The [S]ecretary is to pay the attorneys with the Cherokee Nation's money. Patton Boggs knows that, and that's why it's not even seeking a judgment against the United States, but, rather, relief against the [S]ecretary. It's seeking equitable relief; it's not seeking a money judgment.
>
> Now, I'm sure counsel will say, "Oh, that's not right. We are seeking a money judgment." But they are not seeking money judgment out of the Treasury; they are seeking Cherokee Nation money. And if they are seeking a money judgment, and they are seeking money out of the Treasury, then they are not seeking the fund that the [S]ecretary is administering, and there goes their interest in the fund, and they strike out under Rule 24(a) because they now are no longer asserting an interest in anything that's involved in this lawsuit; they are seeking money from Uncle Sam. That's why I think this is not – there is no commitment here for the United States with paying U.S. money.

Docket No. 124, Transcript of the December 13, 2005 Motions Hearing ("Tr.") at 27:17-29:1.

After considering the Cherokee Nation's argument, the Court concluded that "the Settlement Act is money-mandating." Opinion at 13-15. In its Opinion, the Court twice

references the Cherokee Nation's argument at the December 13 motions hearing quoted above. Opinion at 13 (citing Tr. at 27-28); *id.* at 14 n.9 (same). In fact, the very same quote from *United States v. Testan*, 424 U.S. 392, 400 (1976), was read by counsel for the Cherokee Nation at oral argument, and was quoted in the Court's Opinion, and now is repeated in the Cherokee Nation's Motion. Tr. at 27-28; Opinion at 13; CN Memo at 6. After carefully considering that argument, and the contentions of the United States on the same issue, the Court determined that the Settlement Act is money-mandating. In doing so, this Court previously applied the correct standard: whether the Settlement Act "can fairly be interpreted as mandating compensation by the Federal Government for damages sustained." *Testan*, 424 U.S. at 400 (citations and internal quotation marks omitted). In its first opportunity to brief this "new" issue, the Cherokee Nation offers nothing new; rather, it simply recites again the standard found in the Court's Opinion, as previously urged by the Cherokee Nation at oral argument.

**(b)** The Cherokee Nation's Second and Third Jurisdictional Arguments Were *Copied Verbatim* From The Cherokee Nation's Opposition To Patton Boggs' Motion To Intervene, And Were Also Rejected In This Court's Opinion.

The entirety of the Cherokee Nation's second jurisdictional argument, under the heading "Apart from the Tucker Act, This Court Has No Jurisdiction under the Settlement Act to Adjudicate an Award of Attorneys Fees to Patton Boggs," is a three and a half page section ***copied verbatim*** from the CN Opp.[3] In addition to having been

[3] *Compare* CN Opp at 12-15 with CN Memo at 11-14 (omitting only a reference to Patton Boggs' Supplemental Memorandum and adding only footnote 8); *see also* Exhibit 1 (a redline comparison between these argument sections demonstrating that Cherokee Nation copied its second jurisdictional argument from the CN Opp).

previously rejected, this argument is entirely irrelevant because Patton Boggs *has* made a Tucker Act claim.

The Cherokee Nation's third jurisdictional argument, under the heading "Patton Boggs' Cause of Action Is Really a Private Dispute with the Cherokee Nation over which This Court Has No Jurisdiction," is another three-page section ***copied verbatim*** from the CN Opp, with only a few additional lines sprinkled in and replacing the words "Supplemental Memorandum" with the words "complaint in intervention."[4] As this Court has ruled, competing attorney fee claims among counsel of record in this Court are not a private dispute.[5]

**B. The Only Nuance To The Cherokee Nation's Renewed Argument Is Immaterial To The Just Resolution Of The Dispute, And Otherwise Unsupported In Law And Fact.**

The Cherokee Nation now argues: "The jurisdictional question for this Court, however, is not whether the Secretary has a duty to pay the [attorneys] fees, but rather whose money is used by the Secretary to discharge that duty." CN Memo at 6.[6] The Cherokee Nation states:

> In its December 19, 2005 opinion, the Court sought to satisfy the test for a money-mandating statute by assuming, without discussion, that the money which the statute requires the Secretary to pay the attorneys is "still U.S. government money" or, in other words, that the Settlement Act mandates "that the Secretary pay attorneys government funds…." Op. at 14. With all due respect, the Court's assumption is not correct: the language of the

---

[4] *Compare* CN Opp at 16-20 ("B. Patton Boggs seeks relief against the Cherokee Nation that is outside the jurisdiction of this Court.") with CN Memo at 14-18 ("C. Patton Boggs' Cause of Action Is Really a Private Dispute with the Cherokee Nation over which This Court Has No Jurisdiction."); *see also* Exhibit 1 (a redline comparison between these argument sections demonstrating that Cherokee Nation copied its third jurisdictional argument from the CN Opp).

[5] *Sissteton & Wahpeton Bands or Tribes v. United States*, 423 F.2d 1386, 1391 (Ct. Cl. 1970) ("in a case like this, where several attorneys have, at different times, appeared for claimants – generally under separate contracts – the dispute becomes more than a private contractual squabble") (citations and internal quotation marks omitted).

[6] Although this argument was not previously briefed, it is hardly "new." *See* Tr. 27:17-29:1, quoted *supra*.

> Settlement Act leads to the contrary conclusion that the Secretary is directed to pay the attorneys with tribal trust funds.

CN Memo at 7 (emphasis in original). This argument is irrelevant and just plain wrong.

The Cherokee Nation has misquoted the Court's Opinion in order to set up a false comparison. The Court concluded:

> The court is not persuaded by the Cherokee Nation's argument that section 1779e is not money-mandating because it does not authorize payment out of the general judgment fund, but rather from a fund set aside for the Cherokee Nation's payment of attorney's fees. Whether the money comes from the attorney escrow account or the judgment fund, it is still U.S. government money.

Opinion at 14 (footnote omitted). Thus, this Court never ruled that the Cherokee Nation's separate tribal trust fund was "*U.S. government money.*" Nor does Patton Boggs' Complaint seek money payable from the Cherokee Nation's tribal trust fund.[7] So, the numerous cases cited by the Cherokee Nation for the proposition that monies in the tribal trust fund are not U.S. funds are irrelevant.

Furthermore, the Cherokee Nation's argument is not premised on any recognized principle in law. It is simply baseless to contend: "Tucker Act jurisdiction thus arises from a statute that involves not only a mandate to pay money, but a mandate to pay Federal money." CN Memo at 7 (emphasis in original). A mandate that the government must pay ***is*** a mandate that the government must pay with government funds. This Court has never concluded that a statute mandated the government to pay a party money, but,

[7] Patton Boggs seeks a naked money judgment paid by the government. It does not matter to Patton Boggs whether that judgment is paid from the attorney escrow account or the judgment fund. If, however, the government improperly placed monies into the Cherokee Nation's tribal trust fund, or, if the government improperly paid monies out of the attorney escrow fund, surely that can be corrected by the Secretary or this Court (in overseeing the implementation of the Consent Decree). In any event, Patton Boggs does not seek any monies that were properly deposited into the Cherokee Nation tribal trust fund because the Settlement Act requires fees to be paid first *before* money is allocated to the tribal trust fund. 25 U.S.C. §§ 1779c(d), 1779e(b).

nonetheless, that it lacked jurisdiction because the government was statutorily required to pay with a third party's money. Congress obviously cannot require the government to pay with someone else's money. Nor do the cases cited by the Cherokee Nation on page 6 of its memorandum suggest otherwise.

Nor can the Cherokee Nation prevail on the facts. What is relevant is that (a) Patton Boggs seeks money from the United States, (b) the Settlement Act provides for money to be paid to the attorneys *before* monies are deposited into any tribal trust fund, and (c) the Cherokee Nation has admitted that such moneys are not Cherokee Nation funds by purposefully working with the government to set up the attorney escrow fund – something which the Settlement Act did not require.

Patton Boggs here has sued the United States – not the Cherokee Nation. *See generally*, Docket No. 127, Complaint in Intervention. The money that Patton Boggs seeks could have been paid with funds specifically set aside by the Settlement Act to pay the Cherokee Nations' attorneys.[8] As the Court concluded, regardless of whether Patton Boggs is paid from this "attorney fee escrow account or the judgment fund, it is still U.S. government money." Opinion at 14 (footnote omitted).

Unlike the "Special Holding Account" for other Indian Tribes, however, the Settlement Act did ***not*** create a separate fund in which to place the attorneys' fees. *See*

[8] The Settlement Act authorizes appropriations totaling $40,000,000 (25 U.S.C. § 1779c(c)), up to ten percent of which was to be set aside to pay "Indian Nations' attorneys" with an "approved" contract. *Id.* § 1779e. The Act directs "Indian Nations' attorneys" to be paid first, ***before any*** "remaining funds" are to be paid into the Indian Nations' Trust funds. *Id.* §§ 1779c(d), 1779e(b). The moneys appropriated to pay the attorneys fees were placed in a "special holding account" by the Secretary of the Department of the Interior (the "Secretary"). *See* Docket No. 109, Joint Status Report; *see also* Docket No. 138, Attachment, Declaration of Douglas A. Lords ("Lords Decl.") at ¶¶ 6-7. Patton Boggs is one of two "[Cherokee] Nations' attorneys," with an "approved" contract, entitled to have its fees paid out of this set aside under the Settlement Act (the other contract being expressly subordinate to the Patton Boggs contract). Only "after" payment of attorneys fees is the Cherokee Nation entitled to have 50% of the "remaining" amount deposited into its "Tribal trust fund," *i.e.*, at least $18 million. 25 U.S.C. §§ 1779c(d), 1779d.

25 U.S.C. § 1779f(b)(2) (describing the "special holding account for the benefit of the Indian Nations" to hold funds available for payment of "Claims of other Indian Tribes."). Such an account was not necessary because the Indian Nations' attorneys were required to be paid "***before***" the remaining funds were distributed to the Indian Nations. *Id.* § 1779c(d). But, having failed to comply with the Settlement Act, and not paying the Indian Nations' attorneys first, the Secretary established a separate account for the payment of attorneys' fees ***following*** the Cherokee Nation's instructions to the Secretary as to whom to pay, and how much.[9] The Secretary took funds ***out of*** the Cherokee Nation tribal trust fund (where they did not belong) and placed them ***into*** the account set up for attorneys' fees. Lords Decl. at ¶ 6. The record does not suggest any objection by the Cherokee Nation; to the contrary, the Cherokee Nation has acquiesced in this fact in joint status reports. *See* Docket No. 109, Joint Status Report; Docket No. 137, Joint Status Report. Thus, by participating in, and acquiescing in, the creation of a separate fund for the payment of Congressionally-mandated attorneys' fees, the Cherokee Nation has admitted that the funds with which the attorneys were to be paid are ***not*** Cherokee Nation funds.

For all of these reasons, it does not matter that the Cherokee Nation's tribal trust fund is not government money because the attorney escrow account set aside for the payment of attorneys fees most certainly is government money, and so is the judgment fund. *Accord* Opinion at 14.

---

[9] *Compare* Lords Decl. at ¶ 6 (account established on March 14, 2005) *with* Patton Boggs' Complaint Exhibit 3, Assistant Secretary Cason's October 13, 2005 letter (referencing the Cherokee Nation's instructions to the Secretary on February 18, 2005, and March 30, 2005); *see also* Docket No. 137, Joint Status Report.

## II. PATTON BOGGS HAS STATED A CLAIM AGAINST THE UNITED STATES, UNDER THE MONEY-MANDATING SETTLEMENT ACT, SEEKING ONLY A NAKED MONEY JUDGMENT.

The Court has ruled that 25 U.S.C. § 1779e is a money-mandating statute. Opinion at 15. The Court further allowed Patton Boggs to file a Complaint in Intervention against the United States based on 25 U.S.C. § 1779e. *Id.* Patton Boggs filed that Complaint on January 11, 2006. Docket No. 127. In it, Patton Boggs asserts a claim against the United States for money damages based on the money-mandating[10] Settlement Act. Docket No. 127; *accord* Opinion at 11, 15. No more is required to state a claim under the Tucker Act. *See United States v. Mitchell,* 463 U.S. 206, 218 (1983) (stating that "there is simply no question that the Tucker Act provides the United States' consent to suit for claims founded upon statutes or regulations that create substantive rights to money damages.").

---

[10] The Payment Provision requires that the Secretary "shall pay," thereby demonstrating that the Settlement Act is money-mandating. Opinion at 13 (*citing Hopi Tribe v. United States*, 55 Fed. Cl. 81, 87 (2002)). In addition, the Payment Provision of the Settlement Act sets forth a "certain sum" that Patton Boggs was to be paid. *See Ontario Power Generation, Inc. v. United States*, 369 F.3d 1298, 1301 (Fed. Cir. 2004).

Money-mandating statutes often define the "certain sum" to be paid by looking to another source. *See Agwiak v. United States*, 347 F.3d 1375, 1380 (Fed. Cir. 2003) (5 U.S.C. § 5942(a) mandates an allowance which "shall be paid under regulations prescribed by the President."); *McBryde v. United States*, 299 F.3d 1357, 1361 (Fed. Cir. 2002) (28 U.S.C. § 463 mandates "The Director of the Administrative Office of the United States Courts may pay the costs of his defense. The Director shall prescribe regulations for such payments subject to the approval of the Judicial Conference of the United States."); *Doe v. United States*, 100 F.3d 1576, 1580 (Fed. Cir. 2000) (19 U.S.C. § 1619(a) mandates "The Secretary may award and pay such person an amount that does not exceed 25 percent of the net amount so recovered."); *Grav v. United States*, 886 F.2d 1305, 1307-08 (Fed. Cir. 1989) (7 U.S.C. § 1446(d)(3) mandates that the Secretary of Agriculture enter contracts, even though the Secretary was given discretion over the terms and conditions of the contracts that the Secretary was obligated to offer); *Bradley v. United States*, 870 F.2d 1578, 1579 (Fed. Cir. 1989) (5 U.S.C. § 5349 mandates "pay ... shall be fixed and adjusted ... in accordance with prevailing rates"); *District of Columbia v. United States*, 67 Fed. Cl. 292, 305 (2005) (24 U.S.C. § 225g(b)(1) mandates "the appropriate Federal agency is directed to pay the District of Columbia the full costs for the provision of mental health diagnostic and treatments services for the following types of patients"); *Mangual v. United States*, 27 Fed. Cl. 480, 488 (1993) (42 U.S.C. § 254d(d)(3) mandates payment of "the income that the member would receive if the member was a [civilian member of the NHSC].").

In this case, that "certain sum" to be paid is "those fees provided for in the individual attorney fee contracts." 25 U.S.C. § 1779e(a).

Patton Boggs is *not* pursuing a contract claim against the Cherokee Nation.[11]

### A. The Cherokee Nation Fails To Meet (Or Even Address) The Standard For A Motion To Dismiss.

Under RCFC 12, this Court should "'treat all of the well-pleaded allegations of the complaint as true,'" and then dismiss only where it "'appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *C.H. Robinson Int'l v. United States*, 64 Fed. Cl. 651, 657-58 (2005) (citations omitted). Here, Patton Boggs has satisfied each element of its Tucker Act claim. The only pleading "failure" the Cherokee Nation cites is its disagreement with this Court that the Settlement Act's attorneys fee provision is money-mandating.[12] Therefore, the Cherokee Nation's contention that Patton Boggs has failed to state a claim is merely a repeat of its jurisdictional argument.

Moreover, as shown below, much of the Cherokee Nation's argument is predicated on disputed facts (which the Cherokee Nation incorrectly alleges are material). *See* CN Memo at 23 ("Patton Boggs' statement of its claim omits a number of material facts..."). For example:

---

[11] Nonetheless, the Cherokee Nation disingenuously continues to advance arguments in its attempt to defeat a contract claim *not* asserted against it. *See* CN Memo at 23 ("Patton Boggs' statement of its claim ...ignores a number of relevant principles of law – all of which negate its ***contract right*** theory of recovery.") (emphasis added). Thus, the Cherokee Nation's reliance on common law principles generally applicable to breach of contract cases involving contingency fees (*id.* at 26) is misplaced.

[12] As an initial matter, it is not clear that the Cherokee Nation has standing to make an argument under Rule 12 because Patton Boggs has not stated a claim against it. Even if the Court waived that standing requirement in its Opinion by directing the Cherokee Nation to "file an answer or appropriate motion by February 20, 2006," (Opinion at 15), it is also not clear that the Cherokee Nation's Motion to Dismiss is an "appropriate" motion in that it essentially re-hashes, with only minor embellishments, that which has been decided.

- The Cherokee Nation contends that Patton Boggs' Contract expired (*id.*), even though Patton Boggs has alleged that it was terminated without cause (Docket No. 127, Complaint In Intervention at ¶ 15);[13] and

- The Cherokee Nation contends that "Patton Boggs tries to zero out any fees to be paid to the other lawyers, with valid contracts, who also provided legal services" (CN Memo at 23 n.16 (emphasis in original)), ignoring Patton Boggs' allegation that the only other attorney fee contract with the Cherokee Nation is the Wilcoxen-Niebell Contract. That contract is specifically "subject to" Patton Boggs' Contract, which means that Patton Boggs' fees were to be paid before any fees were paid under the Wilcoxen-Niebell Contract. Docket No. 127, Complaint In Intervention at ¶ 21.[14]

These factual arguments have no place in a motion to dismiss. *C.H. Robinson Int'l*, 64 Fed. Cl. at 657-58.

---

[13] This factual dispute also is immaterial because, contrary to the Cherokee Nation's suggestion, this Court does not reject attorney fee claims based on an expired contract or one terminated without cause. In several of this Court's key Indian claims cases involving attorneys fees, one or more of the attorneys seeking payment had a contract that had expired, was withdrawn, or otherwise terminated, but that was never a basis upon which this Court denied a fee for work performed under an "approved" contract. *See White Mountain Apache Tribe of Arizona v. United States*, 30 Fed. Cl. 8, 13, 23 (1993) ("attorneys who were not involved in the litigation resulting in the final award and whose last contract with the plaintiff Tribe ended 10 years before the final award was made" was, nonetheless, awarded a fee by the Court), *aff'd*, 31 F.3d 1176 (Fed. Cir. 1994); *W. Shoshone Identifiable Group v. United States*, 652 F.2d 41 (1981) (counsel awarded full 10% contingency fee even though he was fired before judgment was entered); *Sioux Nation of Indians v. United States*, 650 F.2d 244 (Ct. Cl. 1981) (special counsel in this case, Mr. Lazarus, was awarded a full 10% fee on an award exceeding $100 million, even though one of his contracts with one of the tribes he represented had expired); *Sisseton, supra* (where attorney had withdrawn and assigned approved contract to new counsel of record who obtained a judgment, new counsel of record was not entitled to entire 10% fee stipulated in his contract, and part of the award was given to the counsel that had withdrawn).

[14] Moreover, if Patton Boggs is paid in full, that leaves hundreds of thousands of dollars to pay the other attorneys with subordinate claims.

### B. This Court Implicitly Has Rejected The Cherokee Nation's Argument That The Secretary, As A Matter Of Law, Correctly Construed The Settlement Act.

The Cherokee Nation contends that the Secretary interpreted the Settlement Act correctly as a matter of law. CN Memo at 18-22. Yet, the Court has recognized that PB has a cognizable "claim against the government for money damages." Opinion at 15. The Court agrees, at least in part, with Patton Boggs' interpretation of the Settlement Act that "[a] plain reading of this provision unequivocally demonstrates that the statute mandates that the Secretary pay the attorneys their fees." *Id.*

Moreover, the Court already has expressed skepticism of the Secretary's interpretation of the Settlement Act that would give "the Indian Nations ... absolute carte blanche with regard to who they pay and what they pay [because] that seems to me odd that the legislature would have used the phrase 'in the individual tribal attorney fee contracts,' and then say, 'as approved.'" Tr. at 55:2-7. The Secretary's interpretation (which the Cherokee Nation argues is correct as a matter of law) is not one of the two possible interpretations that the Court appears to be considering. *Id.* at 55:12-56:17, 60:15-61:14.

Knowing Patton Boggs' interpretation of the Settlement Act, the Court allowed Patton Boggs to file its Complaint. Implicitly, the Court either has determined that (a) Patton Boggs' interpretation is correct, or (b) the Secretary's interpretation is incorrect and, even if, under certain circumstances, the Cherokee Nation were permitted some approval of Patton Boggs' attorneys fees, Patton Boggs still would be entitled to some fees under the money-mandating Settlement Act. In either event, Patton Boggs has stated a Tucker Act claim. To the extent the Cherokee Nation's argument is based on its belief

that the Settlement Act is not money-mandating, that argument should be denied based on the law of the case doctrine and on its merits.

### C. The Cherokee Nation Confuses Its Assertion That Patton Boggs Failed To State A Claim, With The Government's Potential (But Invalid) Defenses That Seek To Reduce That Claim.

*Without citation to any authority*, the Cherokee Nation argues that, if it can show that Patton Boggs might be entitled to less than the full amount claimed, then Patton Boggs has failed to state a claim because Patton Boggs "has not pleaded [any] alternative theory of recovery, so such a cause of action is not before the Court." CN Memo at 24. Taken to its logical extreme, the Cherokee Nation argues that, if Patton Boggs is entitled to one dollar less than it claims, it has failed to state a claim. There is no support for this argument, because it defies common sense.

Nonetheless, in support of its Motion to Dismiss for ***failure to state a claim***, the Cherokee Nation focuses on some specific (but legally incorrect) reductions to the total amount of the Cherokee Nation's recovery from which Patton Boggs' ten percent fee would be calculated. At best, such reductions would state some sort of set-off defense which could be asserted by the government. But those proposed reductions fail on their merits as well; indeed, they are frivolous.

First, the Cherokee Nation contends that even under Patton Boggs' theory, it is not entitled to $2 million; instead, Patton Boggs is entitled to only $1.8 million[15] because any money set aside for the attorneys is not part of the Cherokee Nation's "recovery." *Id.*

[15] The Cherokee Nation further argues that its recovery is only $16 million and, therefore, Patton Boggs' ten percent fee is no more than $1.6 million. But the Cherokee Nation cannot seriously attempt to carve out from its "recovery" money that has been temporarily set aside for other Indian Claims which the Cherokee Nation knows it will receive.

at 22-23, n.15. To the contrary, this Court has calculated attorneys' contingency fees based on a total "recovery."[16]

The Cherokee Nation also attempts to limit the "recovery" upon which Patton Boggs' contingency fee will be based, to "the part [of the Cherokee Nation's recovery] arising from settlement of the Nation's mismanagement claims." CN Memo at 24 (footnote omitted).[17] Nonetheless, the "recovery" from which Patton Boggs' ten-percent fee is calculated – by definition – is not based on the particular claims brought by Patton Boggs; the Cherokee Nation's "recovery," instead, is based on what the Cherokee Nation received. Even if the Cherokee Nation's argument were correct in principle, every dispute that was resolved by the Settlement Act was included within the scope of the claims brought by Patton Boggs in the Cherokee Nation's Complaint. *See generally*, Docket No. 1, Complaint. Hence, not one cent of the Cherokee Nation's "recovery" is unrelated to Patton Boggs' efforts. And, but for Patton Boggs' efforts, the Cherokee Nation would not have recovered one cent because the matters brought by other counsel all were dismissed, with prejudice, without achieving ***any*** recovery! *See United States v. Cherokee Nation*, 480 U.S. 700 (1987) (disposing of "takings" claim); *Cherokee Nation v. United States*, 937 F.2d 1539 (10th Cir.) (disposing of "fair and honorable dealings" claims), *reh'g denied*, 948 F.2d 635 (10th Cir. 1991).

Again, Patton Boggs' Tucker Act claim is for that amount that the Secretary was required to pay Patton Boggs under the Settlement Act's Payment Provision. Docket No.

---

[16] *See Moore v. United States*, 63 Fed. Cl. 781, 785-86 (2005) (calculating attorneys' contingency fee based on the total settlement amount even though the settlement specifically identified allocations for principal, interest and attorneys' fees).

[17] While the Cherokee Nation claims to have "evidence" that "the various different components of claims that constitute the recovery [were based upon] the services provided (and results achieved) by <u>all</u> counsel for the Cherokee Nation," (CN Memo at 24 n.17 (emphasis in original)), no such evidence has ever been even described, much less proffered to this Court.

127, Complaint In Intervention at ¶¶ 20, 23. Here, the Secretary "shall pay ... those fees provided for in [Patton Boggs' approved] individual tribal attorney fee contract[]." 25 U.S.C. § 1779e(a). The amount "provided for" in Patton Boggs' Contract is ten percent of the amount "recovered," *i.e.*, "monetary or other quantifiable recovery for the Cherokee Nation, through the litigation or legislative process." Docket No. 127, Exhibit 1 at 3. The Settlement Act provided the Cherokee Nation with a "monetary or other quantifiable recovery" equal to 50% of the $40 million appropriated, and thereby it required the Secretary to pay Patton Boggs ten percent of that recovery, subject only to amounts previously paid and the fee cap in 25 U.S.C. § 1779e(b).

**CONCLUSION**

Stripping away (a) arguments which the Court has denied, (b) arguments aimed at claims Patton Boggs does not make, and (c) arguments based on immaterial facts, nothing remains to be considered. The Cherokee Nation tries in vain to create new legal principles from whole cloth: (1) that a money-mandating statute must also mandate the payment of Federal money; and (2) that a Tucker Act plaintiff fails to state a claim if, based on disputed facts, it is entitled to less than 100 cents on the dollar. These strained arguments, unsupported by any applicable law, reinforce this Court's earlier rulings that Patton Boggs ***has*** stated a Tucker Act claim upon which relief can be granted when it concluded that "[a] plain reading of [the Settlement Act's Payment Provision] unequivocally demonstrates that the statute mandates that the Secretary pay the attorneys their fees." Opinion at 15. In short, no legitimate defenses have been advanced against Patton Boggs' Tucker Act claim arising under the money-mandating Settlement Act.

For these reasons, the Cherokee Nation's Motion to Dismiss should be denied.

Respectfully submitted,

David P. Callet (DC Bar No. 181990)
David S. Panzer (DC Bar No. 470677)
GREENBERG TRAURIG LLP
800 Connecticut Ave, NW, Suite 500
Washington, DC 20006
202-331-3100
202-331-3101 (fax)
calletd@gtlaw.com
panzerd@gtlaw.com

March 20, 2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, | * | |
| Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES OF AMERICA, | * | Case No. 218-89 |
| Defendant. | * | |
| * * * * * * | * | |
| PATTON BOGGS LLP | * | Chief Judge Edward J. Damich |
| Intervenor Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |
| * * * * * * | * | * * * * * |

**APPENDIX TO PATTON BOGGS' MEMORANDUM OPPOSING TO THE CHEROKEE NATION'S MOTION TO DISMISS**

PATTON BOGGS LLP

David P. Callet (DC Bar No. 181990)
David S. Panzer (DC Bar No. 470677)
Greenberg Traurig LLP
800 Connecticut Ave, NW, Suite 500
Washington, DC 20006
202-331-3100
202-331-3101 (fax)
calletd@gtlaw.com
panzerd@gtlaw.com

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5 USCA S 5349
5 U.S.C.A. § 5349
<KeyCite Citations>

Effective: July 07, 2004

UNITED STATES CODE ANNOTATED
TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES
PART III--EMPLOYEES
SUBPART D--PAY AND ALLOWANCES
CHAPTER 53--PAY RATES AND SYSTEMS
SUBCHAPTER IV--PREVAILING RATE SYSTEM
§ 5349. Prevailing rate employees; legislative, judicial, Bureau of Engraving and Printing, and government of the District of Columbia

(a) The pay of employees, described under section 5102(c)(7) of this title, in the Library of Congress, the Botanic Garden, the Government Printing Office, the Government Accountability Office, the Office of the Architect of the Capitol, the Bureau of Engraving and Printing, and the government of the District of Columbia, shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and in accordance with such provisions of this subchapter, including the provisions of section 5344, relating to retroactive pay, and subchapter VI of this chapter, relating to grade and pay retention, as the pay-fixing authority of each such agency may determine. Subject to section 213(f) of title 29, the rates may not be less than the appropriate rates provided for by section 206(a)(1) of title 29. If the pay-fixing authority concerned determines that the provisions of subchapter VI of this chapter should apply to any employee under his jurisdiction, then the employee concerned shall be deemed to have satisfied the requirements of section 5361(1) of this title if the tenure of his appointment is substantially equivalent to the tenure of any appointment referred to in such paragraph.

(b) Subsection (a) of this section does not modify or otherwise affect section 5102(d) of this title, section 305 of title 44, and section 5141 of title 31.

CREDIT(S)

(Added Pub.L. 92-392, § 1(a), Aug. 19, 1972, 86 Stat. 572, and amended Pub.L. 95-454, Title VIII, § 801(a)(3)(H), Oct. 13, 1978, 92 Stat. 1222; Pub.L. 97-258, § 3(a)(11), Sept. 13, 1982, 96 Stat. 1063; Pub.L. 100- 426, Title III, § 301, Sept. 9, 1988, 102 Stat. 1602; Pub.L. 101-474, § 5(j), Oct. 30, 1990, 104 Stat. 1100; Pub.L. 108-271, § 8(b), July 7, 2004, 118 Stat. 814.)

<General Materials (GM) - References, Annotations, or Tables>

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1972 Acts. Senate Report No. 92-791 and Conference Report No. 92-1275, see 1972 U.S. Code Cong. and Adm. News, p. 2980.

1978 Acts. Senate Report No. 95-969 and House Conference Report No. 95- 1717, see 1978 U.S. Code Cong. and Adm. News, p. 2723.

1982 Acts. House Report No. 97-651, see 1982 U.S. Code Cong. and Adm. News, p. 1895.

1988 Acts. Senate Report No. 100-463, see 1988 U.S. Code Cong. and Adm. News, p. 2167.

1990 Acts. House Report No. 101-770, see 1990 U.S. Code Cong. and Adm. News, p. 1709.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5 USCA S 5942
5 U.S.C.A. § 5942
<KeyCite Citations>

Effective: [See Text Amendments]

UNITED STATES CODE ANNOTATED
TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES
PART III--EMPLOYEES
SUBPART D--PAY AND ALLOWANCES
CHAPTER 59--ALLOWANCES
SUBCHAPTER IV--MISCELLANEOUS ALLOWANCES
§ 5942. Allowance based on duty at remote worksites

(a) Notwithstanding section 5536 of this title, an employee of an Executive department or an independent establishment who is assigned to duty, except temporary duty, at a site so remote from the nearest established communities or suitable places of residence as to require an appreciable degree of expense, hardship, and inconvenience, beyond that normally encountered in metropolitan commuting, on the part of the employee in commuting to and from his residence and such worksite, is entitled, in addition to pay otherwise due him, to an allowance of not to exceed $10 a day. The allowance shall be paid under regulations prescribed by the President establishing the rates at which the allowance will be paid and defining and designating those sites, areas, and groups of positions to which the rates apply.

(b) Under procedures prescribed by the President, the maximum allowance specified in subsection (a) may be adjusted from time to time in the interest of recruiting and retaining employees for performance of duty at remote worksites.

CREDIT(S)

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 513; Pub.L. 90-83, § 1(41), Sept. 11, 1967, 81 Stat. 207; Pub.L. 91-656, § 6(a), Jan. 8, 1971, 84 Stat. 1953; Pub.L. 101-510, Div. A, Title XII, § 1206(g), Nov. 5, 1990, 104 Stat. 1662.)

<General Materials (GM) - References, Annotations, or Tables>

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1966 Acts.

| Derivation: | United States Code | Revised Statutes and Statutes at Large |
|---|---|---|
| | 5 U.S.C. 70c | Aug. 31, 1964, ¢YPub.L. 88-538¢Y¢R;00030;;EL;;1077005;¢R, § 1, 78 Stat. 745. |

The words "of the United States" are omitted as unnecessary because of the definition of "employee" in section

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7 USCA S 1446
7 U.S.C.A. § 1446
<YELLOW FLAG>

Effective: [See Text Amendments]

UNITED STATES CODE ANNOTATED
TITLE 7. AGRICULTURE
CHAPTER 35A--PRICE SUPPORT OF AGRICULTURAL COMMODITIES
SUBCHAPTER III--NONBASIC AGRICULTURAL COMMODITIES
§ 1446. Price support levels for designated nonbasic agricultural commodities

(a) The Secretary is authorized and directed to make available (without regard to the provisions of sections 1447 to 1449 of this title) price support to producers for oilseeds (including soybeans, sunflower seed, canola, rapeseed, safflower, flaxseed, mustard seed, and such other oilseeds as the Secretary may determine), sunflower seeds, honey, milk, sugar beets, and sugarcane in accordance with this subchapter.

(b) The price of honey shall be supported through loans, purchases, or other operations at a level not in excess of 90 per centum nor less than 60 per centum of the parity price thereof; and the price of tung nuts for each crop of tung nuts through the 1976 crop shall be supported through loans, purchases, or other operations at a level not in excess of 90 per centum nor less than 60 per centum of the parity price therefor: *Provided*, That in any crop year through the 1976 crop year in which the Secretary determines that the domestic production of tung oil will be less than the anticipated domestic demand for such oil, the price of tung nuts shall be supported at not less than 65 per centum of the parity price therefor.

(c) Except as provided in section 1446e of this title, the price of milk shall be supported at such level not in excess of 90 per centum nor less than 75 per centum of the parity price therefor as the Secretary determines necessary in order to assure an adequate supply of pure and wholesome milk to meet current needs, reflect changes in the cost of production, and assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs. Such price support shall be provided through the purchase of milk and the products of milk.

(d) Notwithstanding any other provision of law--

(1)(A) During the period beginning on January 1, 1986, and ending on December 31, 1990, the price of milk shall be supported as provided in this subsection.

(B) During the period beginning on January 1, 1986, and ending on December 31, 1986, the price of milk shall be supported at a rate equal to $11.60 per hundredweight for milk containing 3.67 percent milkfat.

(C)(i) During the period beginning on January 1, 1987, and ending on September 30, 1987, the price of milk shall be supported at a rate equal to $11.35 per hundredweight for milk containing 3.67 percent milkfat.

(ii) Except as provided in subparagraph (D), during the period beginning on October 1, 1987, and ending on December 31, 1990, the price of milk shall be supported at a rate equal to $11.10 per hundredweight for milk containing 3.67 percent milkfat.

(D)(i) Subject to clause (ii), if for each of the calendar years 1988 and 1990, the level of purchases of milk and the products of milk under this subsection (less sales under section 1427 of this title for unrestricted use), as estimated by the Secretary on January 1 of such calendar year, will exceed 5,000,000,000 pounds (milk equivalent), on January 1 of such calendar year, the Secretary shall reduce by 50 cents the rate of price support for milk as in effect on such date.

(ii) The rate of price support for milk may not be reduced under clause (i) unless--

(I) the milk production termination program under paragraph (3) achieved a reduction in the production of milk by participants in the program of at least 12,000,000,000 pounds during the 18 months of the program; or

(II) the Secretary submits to Congress a certification, including a statement of facts in support of the certification of the Secretary, that reasonable contract offers were extended by the Secretary under such program but such offers were not accepted by a sufficient number of producers making reasonable bids for contracts to achieve such a reduction in production.

(E) If for any of the calendar years 1988, 1989, and 1990, the level of purchases of milk and the products of milk under this subsection (less sales under section 1427 of this title for unrestricted use), as estimated by the Secretary on January 1 of such calendar year, will not exceed 2,500,000,000 pounds (milk equivalent), the Secretary shall increase by 50 cents the rate of price support for milk in effect on such date.

(F) The price of milk shall be supported through the purchase of milk and the products of milk.

(2)(A) Beginning after March 31, 1986, the Secretary shall provide for a reduction to be made in the price received by producers for all milk produced in the United States and marketed by producers for commercial use.

(B) Except as provided in subparagraphs (E) and (F), the amount of the reduction under subparagraph (A) in the price received by producers shall be--

(i) the period beginning on April 1, 1986, and ending on December 31, 1986, 40 cents per hundredweight of milk marketed; and

(ii) during the first 9 months of 1987, 25 cents per hundredweight of milk marketed.

(C) The funds represented by the reduction in price, required under this paragraph to be applied to the marketings of milk by a producer, shall be collected and remitted to the Commodity Credit Corporation, as such time and in such manner as prescribed by the Secretary, by each person making payment to a producer for milk purchased from such producer, except that in the case of a producer who markets milk of the producer's own production directly to consumers, such funds shall be remitted directly to the Corporation by such producer.

(D) The funds remitted to the Corporation under this paragraph shall be considered as included in the payments to a producer of milk for purposes of the minimum price provisions of the Agricultural Adjustment Act (7 U.S.C. 601 et seq.), reenacted with amendments by the Agricultural Marketing Agreement Act of 1937.

(E)(i) In lieu of any reductions in payments made by the Secretary for the purchase of milk and the products of milk under this subsection during the period beginning March 1, 1986, and ending September 30, 1986, required under the order issued by the President on February 1, 1986, under section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985 (Public Law 99- 177) [2 U.S.C.A. § 902], the Secretary shall increase the amount of the reduction required under subparagraph (A) during the period beginning April 1, 1986, and ending September 30, 1986, as the sole means of meeting any reductions required under the order in payments made by the Secretary for the purchase of milk and the products of milk under this subsection.

(ii) The aggregate amount of any increased reduction under clause (i) shall be equal, to the extent practicable, to the aggregate amount of the reduction that would otherwise be required under the order referred to in clause (i) in payments made by the Secretary for the purchase of milk and the products of milk under this subsection during the period beginning March 1, 1986, and ending September 30, 1986, except that the amount of any increased reduction under clause (i) may not exceed 12 cents per hundredweight of milk marketed.

(F) [FN1](i) The Secretary--

(I) notwithstanding the Balanced Budget and Emergency Deficit Control Act of 1985 and any order issued by the President under section 252 of such Act [2 U.S.C.A. § 902] for a fiscal year; and

(II) in lieu of making any reduction in payments for the purchase of milk or the products of milk under this subsection during such fiscal year under any such order;

shall provide for the reduction (measured in cents per hundredweight of milk marketed) under subparagraph (A) during the period beginning on October 1 and ending on September 30 of such fiscal year as the sole means of achieving any reduction in budget outlays under the milk price-support program that otherwise would be required under either such order and only for the purpose of substituting for any reduction in payments made by the Secretary for the purchase of milk or the products of milk under either such order.

(ii) The aggregate amount of any reduction under subparagraph (A) resulting from the operation of clause (i) may not exceed the aggregate amount of the reduction in budget outlays under the milk price-support program, as estimated by the Secretary, that otherwise would have been achieved under either such order by reducing payments made by the Secretary for the purchase of milk or the products of milk under this subsection during such fiscal year.

(F) [FN1] During calendar year 1988, the Secretary shall provide for a reduction of 2 1/2 cents per hundredweight to be made in the price received by producers for all milk produced in the United States and marketed by producers for commercial use.

(3)(A)(i) The Secretary shall establish and carry out under this paragraph a milk production termination program for the 18-month period beginning April 1, 1986.

(ii) Under the milk production termination program required under this subparagraph, the Secretary, at the request of any producer of milk in the United States who submits to the Secretary a bid, may offer to enter into a contract with the producer for the purpose of terminating the production of milk by the producer in return for a payment to be made by the Secretary.

(iii) For the 18-month period for which the milk production termination program under this subparagraph is in effect, the Secretary shall--

(I) as soon as practicable, determine the total number of dairy cattle the Secretary estimates will be marketed for slaughter as a result of such program; and

(II) by regulation specify marketing procedures to ensure that greater numbers of dairy cattle slaughtered as a result of the production termination program provided for in this section shall be slaughtered in each of the periods of April through August 1986, and March through August 1987 than for the other months of the program. Such procedures also shall ensure that such sales of dairy cattle for slaughter shall occur on a basis estimated by the Secretary that maintains historical seasonal marketing patterns. During such 18-month period, the Secretary shall limit the total number of dairy cattle marketed for slaughter under the program in excess of the historical dairy herd culling rate to no more than 7 percent of the national dairy herd per calendar year.

(iv) Each contract made under this subparagraph shall provide that--

(I) the producer shall sell for slaughter or for export all the dairy cattle in which such producer owns an interest;

(II) during a period of 3, 4, or 5 years, as specified by the Secretary in each producer contract and beginning on the day the producer completes compliance with subclause (I), the producer neither shall acquire any interest in dairy cattle or in the production of milk nor acquire, or make available to any person, any milk production capacity of a facility that becomes available because of compliance by a producer with such subclause unless the Secretary shall by regulation otherwise permit; and

(III) if the producer fails to comply with such contract, the producer shall repay to the Secretary the entire payment received under the contract, including simple interest payable at a rate prescribed by the Secretary, which shall, to the extent practicable, reflect the cost to the Corporation of its borrowings from the Treasury of the United States, commencing on the date payment is first received under such contract.

(v) Any producer of milk who seeks to enter into a contract for payments under this paragraph shall provide the Secretary with (I) evidence of such producer's marketing history; (II) the size and composition of the producer's dairy herd during the period the marketing history is determined; and (III) the size and composition of the producer's dairy herd at the time the bid is submitted, as the Secretary deems necessary and appropriate.

(vi) Except as provided in subparagraph (D), no producer who commenced marketing of milk in the 15-month period ending March 31, 1986, shall be eligible to enter into a contract for payments under this subparagraph.

(vii) A contract entered into under this paragraph by a producer who by reason of death cannot perform or assign such contract may be performed or assigned by the estate of such producer.

(B) The Secretary may establish and carry out a milk diversion or milk production termination program for any of the calendar years 1988, 1989, and 1990 as necessary to avoid the creation of burdensome excess supplies of milk or milk products.

(C) In setting the terms and conditions of any milk diversion or milk production termination under this paragraph and of each contract made under this subparagraph, the Secretary shall take into account any adverse effect of such program or contracts on beef, pork, and poultry producers in the United States and shall take all feasible steps to minimize such effect.

(D) A producer who commenced marketing milk after December 31, 1984, shall be eligible to enter into a contract for payments under this subparagraph if such producer's entire milk production facility and entire dairy herd were transferred to the producer by reason of a gift from, or the death of, a member or members of the family of the producer. The term "member of the family of the producer" means (i) an ancestor of the producer, (ii) the spouse of the producer, (iii) a lineal descendant of the producer, or the producer's spouse, or a parent of the producer, or (iv) the spouse of any such lineal descendant.

(E) Application for payment shall be made by producers through the county committees established under section 590h(b) of Title 16.

(F) to (J) Repealed. Pub. L. 99-198, Title I, § 101(b)(1), (2), Dec. 23, 1985, 99 Stat. 1363, 1365

(K) Redesignated (E).

(L) Repealed. Pub. L. 99-198, Title I, § 101(b)(2), Dec. 23, 1985, 99 Stat. 1365

(M) A contract entered into under this paragraph by a producer who by reason of death cannot perform or assign such contract may be performed or assigned, in accordance with subparagraph (L), by the estate of such producer.

(N) If the provisions for reductions in the price received for milk marketed for commercial use as provided for in paragraph (2) are held to be invalid by any court, or the Secretary is restrained or enjoined by any court from implementing such provisions, the Secretary shall immediately suspend making any diversion payments under this paragraph for the period beginning with the date of such court action and shall resume making such payments only if such court action is overruled, stayed, or terminated.

(4) Each producer who markets milk and each person required to make payment to the Corporation under this subsection shall keep such records and make such reports, in such manner, as the Secretary determines necessary to carry out this subsection. The Secretary may make such investigations as the Secretary deems necessary for the effective administration of this subsection or to determine whether any person subject to the provisions of this subsection has engaged or is engaged or is about to engage in any act or practice that constitutes or will constitute a violation of any provision of this subsection or regulation issued under this subsection. For the purpose of such investigation, the Secretary may administer oaths and affirmations, subpena witnesses, compel their attendance, take evidence, and require the production of any records that are relevant to the inquiry. Such attendance of witnesses and the production of any such records may be required from any place in the United States. In case of contumacy by, or refusal to obey a subpena to, any person, the Secretary may invoke the aid of any court of the United States

within the jurisdiction of which such investigation or proceeding is carried on, or where such person resides or carries on business, in requiring the attendance and testimony of witnesses and the production of records. Such court may issue an order requiring such person to appear before the Secretary to produce records or to give testimony on the matter under investigation. Any failure to obey such order of the court may be punished by such court as a contempt thereof. All process in any such case may be served in the judicial district of which such person is an inhabitant or wherever such person may be found.

(5)(A) The district courts of the United States are vested with jurisdiction specifically to enforce, and to prevent and restrain any person from violating, any provision of this subsection or any regulation issued under this subsection. Any such civil action authorized to be brought under this subsection shall be referred to the Attorney General for appropriate action. The Secretary is not required, however, to refer to the Attorney General minor violations of this subsection whenever the Secretary believes that the administration and enforcement of this subsection would be adequately served by suitable written notice or warning to any person committing such violation.

(B)(i) Each person as to whom there is a failure to make a reduction in the price of milk received by such person as required by paragraph (2) or who fails to remit to the Corporation the funds required to be collected and remitted by paragraph (2)(B) shall be liable, in addition to any amount due, to a marketing penalty at a rate equal to the support price for milk in effect at the time the failure occurs on the quantity of milk as to which the failure applies. The Secretary may reduce any such marketing penalty in such amount as the Secretary determines equitable in any case in which the Secretary determines that the failure was unintentional or without knowledge on the part of the person concerned. Each person who knowingly violates any other provision of this subsection, or any regulation issued under this subsection, shall be liable for a civil penalty of not more than $1,000 for each such violation. Any penalty provided for under this subparagraph shall be assessed by the Secretary after notice and opportunity for a hearing.

(ii) Each person who buys, from a producer with respect to whom there is in effect at the time of such sale a contract entered into under paragraph (3), one or more dairy cattle sold for slaughter or export, who knows that such cattle are sold for slaughter or export, and who fails to cause the slaughter or export of such cattle within a reasonable time after receiving such cattle shall be liable for a civil penalty of not more than $5,000 with respect to each of such cattle.

(iii) Each person who retains or acquires an interest in dairy cattle or the production of milk in violation of a contract entered into under this paragraph shall be liable, in addition to any amount due under paragraph (3)(A)(iv), to a marketing penalty on the quantity of milk produced during the period in which such ownership is prohibited under the contract. Such penalty shall be computed at the rate or rates of the support price for milk in effect during the period in which the milk production occurred.

(iv) Each person who makes a false statement in a bid submitted under paragraph (3) as to (I) the marketings of milk for commercial use by the producer, or (II) the size or composition of the dairy herd that produced such marketings, or (III) the size or composition of the dairy herd at the time the bid is submitted shall be subject, in addition to any amount due under paragraph (3)(A)(iv) or clause (iii) of this subparagraph, to a civil penalty of $5,000 for each head of cattle to which such statement applied.

(v) Each person who makes a false statement as to the number of dairy cattle that was sold for slaughter or export under a contract under paragraph (3)(A) shall be subject, in addition to any amount due under paragraph (3)(A)(iv) or clause (iii) of this subparagraph, to a civil penalty of not more than $5,000 for each head of cattle to which such statement applied.

(C) Any person against whom a penalty is assessed under subparagraph (B) may obtain review of such penalty in an appropriate district court of the United States by filing a civil action in such court not later than thirty days after such penalty is imposed. The Secretary shall promptly file in such court a certified copy of the record upon which the penalty is based. The findings of the Secretary may be set aside only if found to be unsupported by substantial evidence.

(D) The district courts of the United States shall have jurisdiction to review and enforce any penalty imposed under subparagraph (B).

(E) The remedies provided in this paragraph shall be in addition to, and not exclusive of, other remedies that may be available.

(F) In carrying out this subsection, the Secretary may, as the Secretary deems appropriate--

(i) use the services of State and county committees established under section 590h(b) of Title 16; and

(ii) enter into agreements to use, on a reimbursable or nonreimbursable basis, the services of administrators of Federal milk marketing orders and State milk marketing programs.

(6) The term "United States" as used in paragraphs (2) and (3) of this subsection means the forty-eight contiguous States in the continental United States.

(7) The Secretary shall carry out this subsection through the Commodity Credit Corporation.

CREDIT(S)

(Oct. 31, 1949, c. 792, Title II, § 201, 63 Stat. 1052; Aug. 28, 1954, c. 1041, Title II, §§ 203(a), 204(b), Title VII, § 709, 68 Stat. 899, 912; Apr. 2, 1956, c. 159, § 1, 70 Stat. 87; July 20, 1956, c. 661, 70 Stat. 596; Aug. 28, 1958, Pub.L. 85-835, Title V, § 503, 72 Stat. 996; Sept. 16, 1960, Pub.L. 86-799, 74 Stat. 1054; Nov. 30, 1970, Pub.L. 91-524, Title II, § 202, 84 Stat. 1361; Aug. 10, 1973, Pub.L. 93-86, § 1(3), 87 Stat. 222; Dec. 29, 1973, Pub.L. 93-225, 87 Stat. 942; Sept. 29, 1977, Pub.L. 95- 113, Title II, § 203, Title IX, §§ 901, 902, 91 Stat. 920, 949; Nov. 28, 1979, Pub.L. 96-127, § 1, 93 Stat. 981; Dec. 3, 1980, Pub.L. 96-494, Title II, § 202(c), 94 Stat. 2570; Mar. 31, 1981, Pub.L. 97-6, 95 Stat. 8; Aug. 13, 1981, Pub.L. 97-35, Title I, § 150, 95 Stat. 369; Dec. 22, 1981, Pub.L. 97-98, Title I, § 103, Title VIII, § 801, Title IX, § 901, 95 Stat. 1219, 1256, 1257; Sept. 8, 1982, Pub.L. 97-253, Title I, § 101, 96 Stat. 763; Nov. 29, 1983, Pub.L. 98-180, Title I, § 102(a), 97 Stat. 1128; Oct. 1, 1985, Pub.L. 99-114, § 1, 99 Stat. 488; Nov. 15, 1985, Pub.L. 99-157, § 1, 99 Stat. 818; Dec. 13, 1985, Pub.L. 99-182, § 1, 99 Stat. 1173; Dec. 23, 1985, Pub.L. 99-198, Title I, § 101(a)-(e), Title VIII, § 801, Title IX, § 901, Title X, §§ 1008, 1041, 99 Stat. 1362, 1363, 1365, 1441, 1443, 1452, 1464; Mar. 20, 1986, Pub.L. 99- 260, § 10, 100 Stat. 52; May 27, 1987, Pub.L. 100-45, § 15(a), 101 Stat. 325; Dec. 22, 1987, Pub.L. 100-202, § 101(k) [Title VI, § 638], 101 Stat. 1329-357; Dec. 22, 1987, Pub.L. 100-203, Title I, §§ 1104(c)-(e), 101 Stat. 1330-4; Aug. 11, 1988, Pub.L. 100-387, Title I, § 102(a), 102 Stat. 932; Dec. 19, 1989, Pub.L. 101-239, Title I, § 1007, 103 Stat. 2110; Nov. 28, 1990, Pub.L. 101-624, Title VII, § 701(1), Title IX, § 901(1), Title XI, § 1161(b), Title XXII, § 2236(a), 104 Stat. 3457, 3478, 3520, 3961; Dec. 13, 1991, Pub.L. 102-237, Title I, § 113(8), 105 Stat. 1838; Nov. 1, 1993, Pub.L. 103-130, § 3(a), 107 Stat. 1369.)

[FN1] So in original. Two subpars. (F) of subsec. (d) have been enacted.

<General Materials (GM) - References, Annotations, or Tables>

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1949 Acts. Senate Report No. 1130, see 1949 U.S.Code Cong. Service, p. 2407.

1954 Acts. Conference Report No. 2664 and House Report No. 1927, see 1954 U.S.Code Cong. and Adm.News, p. 3399.

1956 Acts. Senate Report No. 1471, see 1956 U.S.Code Cong. and Adm.News, p. 2321.

Senate Report No. 2576, see 1956 U.S.Code Cong. and Adm.News, p. 3411.

1958 Acts. House Report No. 2356, see 1958 U.S.Code Cong. and Adm.News, p. 4132.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

19 USCA S 1619
19 U.S.C.A. § 1619
<KeyCite Citations>

Effective: [See Text Amendments]

UNITED STATES CODE ANNOTATED
TITLE 19. CUSTOMS DUTIES
CHAPTER 4--TARIFF ACT OF 1930
SUBTITLE III--ADMINISTRATIVE PROVISIONS
PART V--ENFORCEMENT PROVISIONS
§ 1619. Award of compensation to informers

(a) In general

If--

(1) any person who is not an employee or officer of the United States--

(A) detects and seizes any vessel, vehicle, aircraft, merchandise, or baggage subject to seizure and forfeiture under the customs laws or the navigation laws and reports such detection and seizure to a customs officer, or

(B) furnishes to a United States attorney, the Secretary of the Treasury, or any customs officer original information concerning--

(i) any fraud upon the customs revenue, or

(ii) any violation of the customs laws or the navigation laws which is being, or has been, perpetrated or contemplated by any other person; and

(2) such detection and seizure or such information leads to a recovery of--

(A) any duties withheld, or

(B) any fine, penalty, or forfeiture of property incurred;

the Secretary may award and pay such person an amount that does not exceed 25 percent of the net amount so recovered.

(b) Forfeited property not sold

If--

(1) any vessel, vehicle, aircraft, merchandise, or baggage is forfeited to the United States and is thereafter, in lieu of sale--

(A) destroyed under the customs or navigation laws, or

(B) delivered to any governmental agency for official use, and

(2) any person would be eligible to receive an award under subsection (a) of this section but for the lack of sale of such forfeited property,

the Secretary may award and pay such person an amount that does not exceed 25 percent of the appraised value of

such forfeited property.

(c) Dollar limitation

The amount awarded and paid to any person under this section may not exceed $250,000 for any case.

(d) Source of payment

Unless otherwise provided by law, any amount paid under this section shall be paid out of appropriations available for the collection of the customs revenue.

(e) Recovery of bail bond

For purposes of this section, an amount recovered under a bail bond shall be deemed a recovery of a fine incurred.

CREDIT(S)

(June 17, 1930, c. 497, Title IV, § 619, 46 Stat. 758; Aug. 5, 1935, c. 438, Title III, § 305, 49 Stat. 527; June 25, 1948, c. 646, § 1, 62 Stat. 869; Oct. 12, 1984, Pub. L. 98-473, Title II, §§ 319, 321, 98 Stat. 2056; Oct. 30, 1984, Pub.L. 98-573, Title II, § 213(a)(15), 98 Stat. 2988; Oct. 27, 1986, Pub.L. 99-570, Title III, § 3125, 100 Stat. 3207-88.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1984 Acts. House Report No. 98-1030 and House Conference Report No. 98- 1159, see 1984 U.S. Code Cong. and Adm. News, p. 3182.

Senate Report No. 98-308, Related Reports, and House Conference Report No. 98-1156, see 1984 U.S. Code Cong. and Adm. News, p. 4910.

1986 Acts. Statement by President, see 1986 U.S. Code Cong. and Adm. News, p. 5393.

References in Text

The customs laws, referred to in subsecs. (a)(1)(A), (B)(ii), and (b)(1)(A), are classified generally to this title.

The navigation laws, referred to in subsecs. (a)(1)(A), (B)(ii), and (b)(1)(A), are classified generally to Title 33, Navigation and Navigable Waters.

Amendments

1986 Amendments. Pub.L. 99-570, § 3125, designated existing provisions as subsecs. (a) to (e), with corresponding catchlines, in subsec. (a), as so designated, added reference to employees of the United States, in subsec. (b), as so designated, added provision authorizing the Secretary to make an award to any person if such person would be eligible to receive an award under subsec. (a) of this section but for the lack of sale of such forfeited property, in subsec. (d), as so designated, added qualification that the source of payment shall be as stated therein unless otherwise provided by law, and struck out provision that in no event could the Secretary delegate the authority to pay an award under this section in excess of $10,000 to an official below the level of the Commissioner of Customs.

1984 Amendments. Pub. L. 98-573, § 213(a)(15)(A), inserted references to aircraft following references to vehicles wherever appearing.

Pub. L. 98-573, § 213(a)(15)(B), substituted "$250,000" for "$50,000" wherever appearing.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

24 USCA S 225g
24 U.S.C.A. § 225g
<KeyCite Citations>

Effective: [See Text Amendments]

UNITED STATES CODE ANNOTATED
TITLE 24. HOSPITALS AND ASYLUMS
CHAPTER 4--SAINT ELIZABETHS HOSPITAL
SUBCHAPTER III--MENTAL HEALTH SERVICE FOR DISTRICT OF COLUMBIA
§ 225g. Financing provisions

(a) Authorization of appropriations

There are authorized to be appropriated for grants by the Secretary of Health and Human Services to the District of Columbia comprehensive mental health system, $30,000,000 for fiscal year 1988, $24,000,000 for fiscal year 1989, $18,000,000 for fiscal year 1990, and $12,000, 000 for fiscal year 1991.

(b) Federal agencies; payments to District of costs for treatment of certain patients; responsibility of U.S. for service costs

(1) Beginning on October 1, 1987, and in each subsequent fiscal year, the appropriate Federal agency is directed to pay the District of Columbia the full costs for the provision of mental health diagnostic and treatment services for the following types of patients:

(A) Any individual referred to the system pursuant to a Federal statute or by a responsible Federal agency.

(B) Any individual referred to the system for emergency detention or involuntary commitment after being taken into custody (i) as a direct result of the individual's action or threat of action against a Federal official, (ii) as a direct result of the individual's action or threat of action on the grounds of the White House or of the Capitol, or (iii) under chapter 9 of Title 21 of the District of Columbia Code.

(C) Any individual referred to the system as a result of a criminal proceeding in a Federal court (including an individual admitted for treatment, observation, and diagnosis and an individual found incompetent to stand trial or found not guilty by reason of insanity). The preceding provisions of this paragraph apply to any individual referred to the system (or to Saint Elizabeths Hospital) before or after November 8, 1984.

(2) The responsibility of the United States for the cost of services for individuals described in paragraph (1) shall not affect the treatment responsibilities to the District of Columbia under the Interstate Compact on Mental Health.

(c) Financial responsibility during coordination period

(1) During the service coordination and the financial transition periods, the District of Columbia shall gradually assume a greater share of the financial responsibility for the provision of mental health services provided by the system to individuals not described in subsection (b) of this section.

(2) Omitted

(d) Shared responsibility for capital improvements

Subject to section 225b(f)(2) of this title, capital improvements to facilities at Saint Elizabeths Hospital authorized during the service coordination period shall be the shared responsibility of the District and the Federal Government in accordance with Public Law 83-472.

(e) Unassigned liabilities; sole responsibility of Federal Government

Pursuant to the financial audit under section 225b(f) of this title, any unassigned liabilities of the Hospital shall be assumed by and shall be the sole responsibility of the Federal Government.

(f) Audit to determine liability of Federal Government for accrued annual leave balances; authorization of appropriations

(1) After the service coordination period, the Secretary shall conduct an audit, under generally accepted accounting procedures, to identify the liability of the Federal Government for accrued annual leave balances for those employees assumed by the District under the system implementation plan.

(2) There is authorized to be appropriated for payment by the Federal Government to the District an amount equal to the liability identified by such audit.

(g) Authority; District; collection of costs for mental health services

Nothing in this subchapter shall affect the authority of the District of Columbia under any other statute to collect costs billed by the District of Columbia for mental health services, except that payment for the same costs may not be collected from more than one party.

(h) Responsibility of United States for certain claims

The Government of the United States shall be solely responsible for--

(1) all claims and causes of action against Saint Elizabeths Hospital that accrue before October 1, 1987, regardless of the date on which legal proceedings asserting such claims were or may be filed, except that the United States shall, in the case of any tort claim, only be responsible for any such claim against the United States that accrues before October 1, 1987, and the United States shall not compromise or settle any claim resulting in District liability without the consent of the District, which consent shall not be unreasonably withheld; and

(2) all claims that result in a judgment or award against Saint Elizabeths Hospital before October 1, 1987.

CREDIT(S)

(Pub. L. 98-621, § 9, Nov. 8, 1984, 98 Stat. 3377.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1984 Acts. House Report No. 98-1024, see 1984 U.S. Code Cong. and Adm. News, p. 5810.

References in Text

Public Law 83-472, referred to in subsec. (d), is Act July 2, 1954, c. 457, 68 Stat. 434, as amended, known as the Departments of Labor, and Health, Education, and Welfare Appropriation Act, 1955. Certain provisions of this Act relating to Saint Elizabeths Hospital and appearing at 68 Stat. 443, were repealed by section 10(d)(2) of Pub.L. 98-621 effective Oct. 1, 1987. For complete classification of this Act to the Code, see Tables.

Codifications

Subsec. (c)(2) of this section amended section 502 of the District of Columbia Self-Government and Governmental Reorganization Act (Pub.L. 93-198, Title V, Dec. 24, 1973, 87 Stat. 813), which appears as section 47-3406 of Title 47, Taxation and Fiscal Affairs, of the District of Columbia Code.

Effective and Applicability Provisions

1984 Acts. Section effective Oct. 1, 1985, see section 12(a) of Pub.L. 98-621, set out as a note under section 225 of this title.

LIBRARY REFERENCES

American Digest System

District of Columbia k10, 11, 24, 31.

Health k267, 563.

Mental Health k78.

United States k78, 96.

Key Number System Topic Nos. 132, 198H, 257A, 393.

24 U.S.C.A. § 225g, **24 USCA** § **225g**

Current through P.L. 109-169, P.L. 109-173 approved 02-15-06

Copr. © 2005 Thomson/West. No. Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

Westlaw.



C

**Effective: December 13, 2002**

UNITED STATES CODE ANNOTATED
TITLE 25. INDIANS
**CHAPTER 19--INDIAN LAND CLAIMS SETTLEMENTS**
SUBCHAPTER XIII--CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT

**§ 1779. Findings**

The Congress finds the following:

**(1)** It is the policy of the United States to promote tribal self-determination and economic self-sufficiency and to encourage the resolution of disputes over historical claims through mutually agreed-to settlements between Indian Nations and the United States.

**(2)** There are pending before the United States Court of Federal Claims certain lawsuits against the United States brought by the Cherokee, Choctaw, and Chickasaw Nations seeking monetary damages for the alleged use and mismanagement of tribal resources along the Arkansas River in eastern Oklahoma.

**(3)** The Cherokee Nation, a federally recognized Indian tribe with its present tribal headquarters south of Tahlequah, Oklahoma, having adopted its most recent constitution on June 26, 1976, and having entered into various treaties with the United States, including but not limited to the Treaty at Hopewell, executed on November 28, 1785 (7 Stat. 18), and the Treaty at Washington, D.C., executed on July 19, 1866 (14 Stat. 799), has maintained a continuous government-to-government relationship with the United States since the earliest years of the Union.

**(4)** The Choctaw Nation, a federally recognized Indian tribe with its present tribal headquarters in Durant, Oklahoma, having adopted its most recent constitution on July 9, 1983, and having entered into various treaties with the United States of America, including but not limited to the Treaty at Hopewell, executed on January 3, 1786 (7 Stat. 21), and the Treaty at Washington, D.C., executed on April 28, 1866 (7 Stat. 21), [FN1] has maintained a continuous government-to-government relationship with the United States since the earliest years of the Union.

**(5)** The Chickasaw Nation, a federally recognized Indian tribe with its present tribal headquarters in Ada, Oklahoma, having adopted its most recent constitution on August 27, 1983, and having entered into various treaties with the United States of America, including but not limited to the Treaty at Hopewell, executed on January 10, 1786 (7 Stat. 24), and the Treaty at Washington, D.C., executed on April 28, 1866 (7 Stat. 21), has maintained a continuous government-to-government relationship with the United States since the earliest years of the Union.

**(6)** In the first half of the 19th century, the Cherokee, Choctaw, and Chickasaw Nations were forcibly removed from their homelands in the southeastern United States to lands west of the Mississippi in the Indian Territory that were ceded to them by the United States. From the "Three Forks" area near present day Muskogee, Oklahoma, downstream to the point of confluence with the Canadian River, the Arkansas River flowed entirely within the territory of the Cherokee Nation. From that point of confluence downstream to the Arkansas territorial line, the Arkansas River formed the boundary between the Cherokee Nation on the left side of the thread of the river and the Choctaw and Chickasaw Nations on the right.

**(7)** Pursuant to the Act of April 30, 1906 (34 Stat. 137), tribal property not allotted to individuals or otherwise disposed of, including the bed and banks of the Arkansas River, passed to the United States in trust for the use and benefit of the respective Indian Nations in accordance with their respective interests therein.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(8)** For more than 60 years after Oklahoma statehood, the Bureau of Indian Affairs believed that Oklahoma owned the Riverbed from the Arkansas State line to Three Forks, and therefore took no action to protect the Indian Nations' Riverbed resources such as oil, gas, and Drybed Lands suitable for grazing and agriculture.

(9) Third parties with property near the Arkansas River began to occupy the Indian Nations' Drybed Lands--lands that were under water at the time of statehood but that are now dry due to changes in the course of the river.

**(10)** In 1966, the Indian Nations sued the State of Oklahoma to recover their lands. In 1970, the Supreme Court of the United States decided in the case of Choctaw Nation vs. Oklahoma (396 U.S. 620), [FN2] that the Indian Nations retained title to their respective portions of the Riverbed along the navigable reach of the river.

**(11)** In 1987, the Supreme Court of the United States in the case of United States vs. Cherokee Nation (480 U.S. 700) decided that the riverbed lands did not gain an exemption from the Federal Government's navigational servitude and that the Cherokee Nation had no right to compensation for damage to its interest by exercise of the Government's servitude.

**(12)** In 1989, the Indian Nations filed lawsuits against the United States in the United States Court of Federal Claims (Case Nos. 218-89L and 630- 89L), seeking damages for the United States' use and mismanagement of tribal trust resources along the Arkansas River. Those actions are still pending.

**(13)** In 1997, the United States filed quiet title litigation against individuals occupying some of the Indian Nations' Drybed Lands. That action, filed in the United States District Court for the Eastern District of Oklahoma, was dismissed without prejudice on technical grounds.

**(14)** Much of the Indian Nations' Drybed Lands have been occupied by a large number of adjacent landowners in Oklahoma. Without Federal legislation, further litigation against thousands of such landowners would be likely and any final resolution of disputes would take many years and entail great expense to the United States, the Indian Nations, and the individuals and entities occupying the Drybed Lands and would seriously impair long-term economic planning and development for all parties.

**(15)** The Councils of the Cherokee and Choctaw Nations and the Legislature of the Chickasaw Nation have each enacted tribal resolutions which would, contingent upon the passage of this subchapter and the satisfaction of its terms and in exchange for the moneys appropriated hereunder--

**(A)** settle and forever release their respective claims against the United States asserted by them in United States Court of Federal Claims Case Nos. 218-89L and 630-89L; and

**(B)** forever disclaim any and all right, title, and interest in and to the Disclaimed Drybed Lands, as set forth in those enactments of the respective councils of the Indian Nations.

**(16)** The resolutions adopted by the respective Councils of the Cherokee, Choctaw, and Chickasaw Nations each provide that, contingent upon the passage of the settlement legislation and satisfaction of its terms, each Indian Nation agrees to dismiss, release, and forever discharge its claims asserted against the United States in the United States Court of Federal Claims, Case Nos. 218-89L and 630-89L, and to forever disclaim any right, title, or interest of the Indian Nation in the Disclaimed Drybed Lands, in exchange for the funds appropriated and allocated to the Indian Nation under the provisions of the settlement legislation, which funds the Indian Nation agrees to accept in full satisfaction and settlement of all claims against the United States for the damages sought in the aforementioned claims asserted in the United States Court of Federal Claims, and as full and fair compensation for disclaiming its right, title, and interest in the Disclaimed Drybed Lands.

**(17)** In those resolutions, each Indian Nation expressly reserved all of its beneficial interest and title to all other Riverbed lands, including minerals, as determined by the Supreme Court in Choctaw Nation v. Oklahoma, 397 U.S. 620 (1970), and further reserved any and all right, title, or interest that each Nation may have in and to the water flowing in the Arkansas River and its tributaries.

CREDIT(S)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Pub.L. 107-331, Title VI, § 602, Dec. 13, 2002, 116 Stat. 2845.)

[FN1] So in original. Probably should be "(14 Stat. 769),".

[FN2] So in original. Probably should be "(397 U.S. 620),".

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

2002 Acts. Senate Report No. 107-249, see 2002 U.S. Code Cong. and Adm. News, p. 1817.

References in Text

The Act of April 30, 1906 (34 Stat. 137), referred to in par. (7), probably means the Act of April 26, 1906, c. 1876, 34 Stat. 137, which was classified in part as a note under 25 U.S.C.A. § 355.

This subchapter, referred to in par (15), originally read "this title", meaning Title VI of the Indian Financing Amendments Act of 2002, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 12, 2002, 116 Stat. 2845, known as the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, which enacted this subchapter.

Short Title

2002 Acts. Pub.L. 107-331, Title VI, § 601, Dec. 13, 2002, 116 Stat. 2845, provided that: "This title [enacting this subchapter] may be cited as the 'Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act'."

25 U.S.C.A. § 1779, 25 USCA § 1779

Current through P.L. 109-90 approved 10-18-05

Copr. © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

**Effective: December 13, 2002**

UNITED STATES CODE ANNOTATED
TITLE 25. INDIANS
**CHAPTER 19--INDIAN LAND CLAIMS SETTLEMENTS**
SUBCHAPTER XIII--CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT

**§ 1779a. Purposes**

The purposes of this subchapter are to resolve all claims that have been or could have been brought by the Cherokee, Choctaw, and Chickasaw Nations against the United States, and to confirm that the Indian Nations are forever disclaiming any right, title, or interest in the Disclaimed Drybed Lands, which are contiguous to the channel of the Arkansas River as of the date of the enactment of this subchapter in certain townships in eastern Oklahoma.

CREDIT(S)

(Pub.L. 107-331, Title VI, § 603, Dec. 13, 2002, 116 Stat. 2847.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

2002 Acts. Senate Report No. 107-249, see 2002 U.S. Code Cong. and Adm. News, p. 1817.

References in Text

This subchapter, referred to in text, originally read "this title", meaning Title VI of the Indian Financing Amendments Act of 2002, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 12, 2002, 116 Stat. 2845, known as the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, which enacted this subchapter.

The date of the enactment of this subchapter, referred to in text, originally read "the date of the enactment of this title", which probably means Dec. 13, 2002, the approval date of the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 13, 2002, 116 Stat. 2845, which enacted this subchapter.

25 U.S.C.A. § 1779a, 25 USCA § 1779a

Current through P.L. 109-90 approved 10-18-05

Copr. © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

C

**Effective: December 13, 2002**

UNITED STATES CODE ANNOTATED
TITLE 25. INDIANS
**CHAPTER 19--INDIAN LAND CLAIMS SETTLEMENTS**
SUBCHAPTER XIII--CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT

**§ 1779b. Definitions**

For the purposes of this subchapter, the following definitions apply:

(1) Disclaimed Drybed Lands

The term "Disclaimed Drybed Lands" means all Drybed Lands along the Arkansas River that are located in Township 10 North in Range 24 East, Townships 9 and 10 North in Range 25 East, Township 10 North in Range 26 East, and Townships 10 and 11 North in Range 27 East, in the State of Oklahoma.

(2) Drybed Lands

The term "Drybed Lands" means those lands which, on the date of enactment of this subchapter, lie above and contiguous to the mean high water mark of the Arkansas River in the State of Oklahoma. The term "Drybed Lands" is intended to have the same meaning as the term "Upland Claim Area" as used by the Bureau of Land Management Cadastral Survey Geographic Team in its preliminary survey of the Arkansas River. The term "Drybed Lands" includes any lands so identified in the "Holway study."

(3) Indian Nation; Indian Nations

The term "Indian Nation" means the Cherokee Nation, Choctaw Nation, or Chickasaw Nation, and the term "Indian Nations" means all 3 tribes collectively.

(4) Riverbed

The term "Riverbed" means the Drybed Lands and the Wetbed Lands and includes all minerals therein.

(5) Secretary

The term "Secretary" means the Secretary of the Interior.

(6) Wetbed lands

The term "Wetbed Lands" means those Riverbed lands which lie below the mean high water mark of the Arkansas River in the State of Oklahoma as of the date of the enactment of this subchapter, exclusive of the Drybed Lands. The term "Wetbed Lands" is intended to have the same meaning as the term "Present Channel Claim Areas" as utilized by the Bureau of Land Management Cadastral Survey Geographic Team in its preliminary survey of the Arkansas River.

CREDIT(S)

(Pub.L. 107-331, Title VI, § 604, Dec. 13, 2002, 116 Stat. 2847.)

HISTORICAL AND STATUTORY NOTES

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Revision Notes and Legislative Reports

2002 Acts. Senate Report No. 107-249, see 2002 U.S. Code Cong. and Adm. News, p. 1817.

References in Text

This subchapter, referred to in text, originally read "this title", meaning Title VI of the Indian Financing Amendments Act of 2002, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 12, 2002, 116 Stat. 2845, known as the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, which enacted this subchapter.

The date of enactment of this subchapter, referred to in par. (2) and the date of the enactment of this subchapter, referred to in par. (6), originally read "the date of enactment of this title" and "the date of the enactment of this title", respectively, which probably mean Dec. 13, 2002, the approval date of the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 13, 2002, 116 Stat. 2845, which enacted this subchapter.

25 U.S.C.A. § 1779b, 25 USCA § 1779b

Current through P.L. 109-90 approved 10-18-05

Copr. © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

**Effective: December 13, 2002**

UNITED STATES CODE ANNOTATED
TITLE 25. INDIANS
**CHAPTER 19--INDIAN LAND CLAIMS SETTLEMENTS**
SUBCHAPTER XIII--CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT

**§ 1779c. Settlement and claims; appropriations; allocation of funds**

(a) Extinguishment of claims

Pursuant to their respective tribal resolutions, and in exchange for the benefits conferred under this subchapter, the Indian Nations shall, on the date of enactment of this subchapter, enter into a consent decree with the United States that waives, releases, and dismisses all the claims they have asserted or could have asserted in their cases numbered 218-89L and 630-89L pending in the United States Court of Federal Claims against the United States, including but not limited to claims arising out of any and all of the Indian Nations' interests in the Disclaimed Drybed Lands and arising out of construction, maintenance and operation of the McClellan-Kerr Navigation Way. The Indian Nations and the United States shall lodge the consent decree with the Court of Federal Claims within 30 days of the enactment of this subchapter, and shall move for entry of the consent decree at such time as all appropriations by Congress pursuant to the authority of this subchapter have been made and deposited into the appropriate tribal trust fund account of the Indian Nations as described in section 1779d of this title. Upon entry of the consent decree, all the Indian Nations' claims and all their past, present, and future right, title, and interest to the Disclaimed Drybed Lands, shall be deemed extinguished. No claims may be asserted in the future against the United States pursuant to sections 1491, 1346(a)(2), or 1505 of Title 28 for actions taken or failed to have been taken by the United States for events occurring prior to the date of the extinguishment of claims with respect to the Riverbed.

(b) Release of tribal claims to certain Drybed Lands

(1) In general

Upon the deposit of all funds authorized for appropriation under subsection (c) of this section for an Indian Nation into the appropriate trust fund account described in section 1779d of this title--

**(A)** all claims now existing or which may arise in the future with respect to the Disclaimed Drybed Lands and all right, title, and interest that the Indian Nations and the United States as trustee on behalf of the Indian Nation may have to the Disclaimed Drybed Lands, shall be deemed extinguished;

**(B)** any interest of the Indian Nations or the United States as trustee on their behalf in the Disclaimed Drybed Lands shall further be extinguished pursuant to the Trade and Intercourse Act of 1790, Act of July 22, 1790 (ch. 33, 1 Stat. 137), and all subsequent amendments thereto (as codified at 25 U.S.C. 177);

**(C)** to the extent parties other than the Indian Nations have transferred interests in the Disclaimed Drybed Lands in violation of the Trade and Intercourse Act, Congress does hereby approve and ratify such transfers of interests in the Disclaimed Drybed Lands to the extent that such transfers otherwise are valid under law; and

**(D)** the Secretary is authorized to execute an appropriate document citing this subchapter, suitable for filing with the county clerks, or such other county official as appropriate, of those counties wherein the foregoing described lands are located, disclaiming any tribal or Federal interest on behalf of the Indian Nations in such Disclaimed Drybed Lands. The Secretary is authorized to file with the counties a plat or map of the disclaimed lands should the Secretary determine that such filing will clarify the extent of lands disclaimed. Such a plat or map may be filed regardless of whether the map or plat has been previously approved for filing, whether or not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the map or plat has been filed, and regardless of whether the map or plat constitutes a final determination by the Secretary of the extent of the Indian Nations' original claim to the Disclaimed Drybed Lands. The disclaimer filed by the United States shall constitute a disclaimer of the Disclaimed Drybed Lands for purposes of the Trade and Intercourse Act (25 U.S.C. 177).

(2) Special provisions

Notwithstanding any provision of this subchapter--

**(A)** the Indian Nations do not relinquish any right, title, or interest in any lands which constitute the Wetbed Lands subject to the navigational servitude exercised by the United States on the Wetbed Lands. By virtue of the exercise of the navigational servitude, the United States shall not be liable to the Indian Nations for any loss they may have related to the minerals in the Wetbed Lands;

**(B)** no provision of this subchapter shall be construed to extinguish or convey any water rights of the Indian Nations in the Arkansas River or any other stream or the beneficial interests or title of any of the Indian Nations in and to lands held in trust by the United States on the date of enactment of this subchapter which lie above or below the mean high water mark of the Arkansas River, except for the Disclaimed Drybed Lands; and

**(C)** the Indian Nations do not relinquish any right, title, or interest in any lands or minerals of certain unallotted tracts which are identified in the official records of the Eastern Oklahoma Regional Office, Bureau of Indian Affairs. The disclaimer to be filed by the Secretary of the Interior under subsection (b)(1) of this section shall reflect the legal description of the unallotted tracts retained by the Nations.

(3) Setoff

In the event the Court of Federal Claims does not enter the consent decree as set forth in subsection (a) of this section, the United States shall be entitled to setoff against any claims of the Indian Nations as set forth in subsection (a) of this section, any funds transferred to the Indian Nations pursuant to section 1779d of this title, and any interest accrued thereon up to the date of setoff.

(4) Quiet title actions

Notwithstanding any other provision of law, neither the United States nor any department of the United States nor the Indian Nations shall be made parties to any quiet title lawsuit or other lawsuit to determine ownership of or an interest in the Disclaimed Drybed Lands initiated by any private person or private entity after execution of the disclaimer set out in subsection (b)(1) of this section. The United States will have no obligation to undertake any future quiet title actions or actions for the recovery of lands or funds relating to any Drybed Lands retained by the Indian Nation or Indian Nations under this subchapter, including any lands which are Wetbed Lands on the date of enactment of this subchapter, but which subsequently lie above the mean high water mark of the Arkansas River and the failure or declination to initiate any quiet title action or to manage any such Drybed Lands shall not constitute a breach of trust by the United States or be compensable to the Indian Nation or Indian Nations in any manner.

(5) Land to be conveyed in fee

To the extent that the United States determines that it is able to effectively maintain the McClellan-Kerr Navigation Way without retaining title to lands above the high water mark of the Arkansas River as of the date of enactment of this subchapter, said lands, after being declared surplus, shall be conveyed in fee to the Indian Nation within whose boundary the land is located. The United States shall not be obligated to accept such property in trust.

(c) Authorization for settlement appropriations

There is authorized to be appropriated an aggregate sum of $40,000,000 as follows:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(1)** $10,000,000 for fiscal year 2004.

**(2)** $10,000,000 for fiscal year 2005.

**(3)** $10,000,000 for fiscal year 2006.

**(4)** $10,000,000 for fiscal year 2007.

(d) Allocation and deposit of funds

After payment pursuant to section 1779e of this title, the remaining funds authorized for appropriation under subsection (c) of this section shall be allocated among the Indian Nations as follows:

**(1)** 50 percent to be deposited into the trust fund account established under section 1779d of this title for the Cherokee Nation.

**(2)** 37.5 percent to be deposited into the trust fund account established under section 1779d of this title for the Choctaw Nation.

**(3)** 12.5 percent to be deposited into the trust fund account established under section 1779d of this title for the Chickasaw Nation.

CREDIT(S)

(Pub.L. 107-331, Title VI, § 605, Dec. 13, 2002, 116 Stat. 2848.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

2002 Acts. Senate Report No. 107-249, see 2002 U.S. Code Cong. and Adm. News, p. 1817.

References in Text

This subchapter, referred to in text, originally read "this title", meaning Title VI of the Indian Financing Amendments Act of 2002, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 12, 2002, 116 Stat. 2845, known as the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, which enacted this subchapter.

The date of enactment of this subchapter, referred to in text, originally read "the date of enactment of this title", which probably means Dec. 13, 2002, the approval date of the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 13, 2002, 116 Stat. 2845, which enacted this subchapter.

25 U.S.C.A. § 1779c, 25 USCA § 1779c

Current through P.L. 109-90 approved 10-18-05

Copr. © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

C

**Effective: December 13, 2002**

UNITED STATES CODE ANNOTATED
TITLE 25. INDIANS
**CHAPTER 19--INDIAN LAND CLAIMS SETTLEMENTS**
SUBCHAPTER XIII--CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT

**§ 1779d. Tribal trust funds**

(a) Establishment, purpose, and management of trust funds

(1) Establishment

There are hereby established in the United States Treasury 3 separate tribal trust fund accounts for the benefit of each of the Indian Nations, respectively, for the purpose of receiving all appropriations made pursuant to section 1779c(c) of this title, and allocated pursuant to section 1779c(d) of this title.

(2) Availability of amounts in trust fund accounts

Amounts in the tribal trust fund accounts established by this section shall be available to the Secretary for management and investment on behalf of the Indian Nations and distribution to the Indian Nations in accordance with this subchapter. Funds made available from the tribal trust funds under this section shall be available without fiscal year limitation.

(b) Management of funds

(1) Land acquisition

(A) Trust land status pursuant to regulations

The funds appropriated and allocated to the Indian Nations pursuant to section 1779c(c) and (d) of this title, and deposited into trust fund accounts pursuant to subsection (a) of this section, together with any interest earned thereon, may be used for the acquisition of land by the Indian Nations. The Secretary may accept such lands into trust for the beneficiary Indian Nation pursuant to the authority provided in section 465 of this title and in accordance with the Secretary's trust land acquisition regulations at part 151 of title 25, Code of Federal Regulations, in effect at the time of the acquisition, except for those acquisitions covered by paragraph (1)(B).

(B) Required trust land status

Any such trust land acquisitions on behalf of the Cherokee Nation shall be mandatory if the land proposed to be acquired is located within Township 12 North, Range 21 East, in Sequoyah County, Township 11 North, Range 18 East, in McIntosh County, Townships 11 and 12 North, Range 19 East, or Township 12 North, Range 20 East, in Muskogee County, Oklahoma, and not within the limits of any incorporated municipality as of January 1, 2002, if--

**(i)** the land proposed to be acquired meets the Department of the Interior's minimum environmental standards and requirements for real estate acquisitions set forth in 602 DM 2.6, or any similar successor standards or requirements for real estate acquisitions in effect on the date of acquisition; and

**(ii)** the title to such land meets applicable Federal title standards in effect on the date of the acquisition.

(C) Other expenditure of funds

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Indian Nations may elect to expend all or a portion of the funds deposited into its trust account for any other purposes authorized under paragraph (2).

(2) Investment of trust funds; no per capita payment

(A) No per capita payments

No money received by the Indian Nations hereunder may be used for any per capita payment.

(B) Investment by Secretary

Except as provided in this section and section 1779e of this title, the principal of such funds deposited into the accounts established hereunder and any interest earned thereon shall be invested by the Secretary in accordance with current laws and regulations for the investing of tribal trust funds.

(C) Use of principal funds

The principal amounts of said funds and any amounts earned thereon shall be made available to the Indian Nation for which the account was established for expenditure for purposes which may include construction or repair of health care facilities, law enforcement, cultural or other educational activities, economic development, social services, and land acquisition. Land acquisition using such funds shall be subject to the provisions of subsections (b) and (d) [FN1] of this section.

(3) Disbursement of funds

The Secretary shall disburse the funds from a trust account established under this section pursuant to a budget adopted by the Council or Legislature of the Indian Nation setting forth the amount and an intended use of such funds.

(4) Additional restriction on use of funds

None of the funds made available under this subchapter may be allocated or otherwise assigned to authorized purposes of the Arkansas River Multipurpose Project as authorized by the River and Harbor Act of 1946, as amended by the Flood Control Act of 1948 and the Flood Control Act of 1950.

CREDIT(S)

(Pub.L. 107-331, Title VI, § 606, Dec. 13, 2002, 116 Stat. 2851.)

[FN1] So in original. This section does not contain a subsection (d).

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

2002 Acts. Senate Report No. 107-249, see 2002 U.S. Code Cong. and Adm. News, p. 1817.

References in Text

This subchapter, referred to in subsecs. (a)(2) and (b)(4), originally read "this title", meaning Title VI of the Indian Financing Amendments Act of 2002, Pub.L. 117-331, Title VI, § 601 et seq., Dec. 12, 2002, 116 Stat. 2845, known as the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, which enacted this subchapter.

Section 1779c(c) and (d) of this title, referred to in subsec. (b)(1)(A), was in the original "sections 205 (c) and (d)"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and was translated as reading "section 605(c) and (d)", meaning section 605(c) and (d) of Pub.L. 107-331, to reflect the probable intent of Congress.

The River and Harbor Act of 1946, as amended by the Flood Control Act of 1948 and the Flood Control Act of 1950, referred to in subsec. (b(4), probably means Act July 24, 1946, c. 595, 60 Stat. 634, as amended by the Flood Control Act of 1948, June 30, 1948, c. 771, Title II, 62 Stat. 1175, and the Flood Control Act of 1950, May 17, 1950, c. 188, Title II, 64 Stat. 170.

25 U.S.C.A. § 1779d, 25 USCA § 1779d

Current through P.L. 109-90 approved 10-18-05

Copr. © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

**Effective: December 13, 2002**

UNITED STATES CODE ANNOTATED
TITLE 25. INDIANS
**CHAPTER 19--INDIAN LAND CLAIMS SETTLEMENTS**
SUBCHAPTER XIII--CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT

**§ 1779e. Attorney fees**

(a) Payment

At the time the funds are paid to the Indian Nations, from funds authorized to be appropriated pursuant to section 1779c(c) of this title, the Secretary shall pay to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations.

(b) Limitations

Notwithstanding subsection (a) of this section, the total fees payable to attorneys under such contracts with an Indian Nation shall not exceed 10 percent of that Indian Nation's allocation of funds appropriated under section 1779c(c) of this title.

CREDIT(S)

(Pub.L. 107-331, Title VI, § 607, Dec. 13, 2002, 116 Stat. 2852.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

2002 Acts. Senate Report No. 107-249, see 2002 U.S. Code Cong. and Adm. News, p. 1817.

25 U.S.C.A. § 1779e, 25 USCA § 1779e

Current through P.L. 109-90 approved 10-18-05

Copr. © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

**Effective: December 13, 2002**

UNITED STATES CODE ANNOTATED
TITLE 25. INDIANS
**CHAPTER 19--INDIAN LAND CLAIMS SETTLEMENTS**
SUBCHAPTER XIII--CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT

**§ 1779f. Release of other tribal claims and filing of claims**

(a) Extinguishment of other tribal claims

(1) In general

As of the date of enactment of this subchapter--

**(A)** all right, title, and interest of any Indian nation or tribe other than any Indian Nation defined in section 1779b of this title (referred to in this section and section 1779g of this title as a "claimant tribe") in or to the Disclaimed Drybed Lands, and any such right, title, or interest held by the United States on behalf of such a claimant tribe, shall be considered to be extinguished in accordance with section 177 of Title 25;

**(B)** if any party other than a claimant tribe holds transferred interests in or to the Disclaimed Drybed Lands in violation of section 177 of Title 25, Congress approves and ratifies those transfers of interests to the extent that the transfers are in accordance with other applicable law; and

**(C)** the documents described in section 1779c(b)(1)(D) of this title shall serve to identify the geographic scope of the interests extinguished by subparagraph (A).

(2) Quiet title actions

(A) In general

Notwithstanding any other provision of law, after the date of enactment of this subchapter, neither the United States (or any department or agency of the United States) nor any Indian Nation shall be included as a party to any civil action brought by any private person or private entity to quiet title to, or determine ownership of an interest in or to, the Disclaimed Drybed Lands.

(B) Future actions

As of the date of enactment of this subchapter, the United States shall have no obligation to bring any civil action to quiet title to, or to recover any land or funds relating to, the Drybed Lands (including any lands that are Wetbed Lands as of the date of enactment of this subchapter but that are located at any time after that date above the mean high water mark of the Arkansas River).

(C) No breach of trust

The failure or declination by the United States to initiate any civil action to quiet title to or manage any Drybed Lands under this paragraph shall not--

**(i)** constitute a breach of trust by the United States; or

**(ii)** be compensable to a claimant tribe in any manner.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(b) Claims of other Indian tribes

(1) Limited period for filing claims

(A) In general

Not later than 180 days after the date of enactment of this subchapter, any claimant tribe that claims that any title, interest, or entitlement held by the claimant tribe has been extinguished by operation of section 1779c(a) of this title or subsection (a) of this section may file a claim against the United States relating to the extinguishment in the United States Court of Federal Claims.

(B) Failure to file

After the date described in subparagraph (A), a claimant tribe described in that subparagraph shall be barred from filing any claim described in that subparagraph.

(2) Special holding account

(A) Establishment

There is established in the Treasury, in addition to the accounts established by section 1779d(a) of this title, an interest-bearing special holding account for the benefit of the Indian Nations.

(B) Deposits

Notwithstanding any other provision of this subchapter or any other law, of any funds that would otherwise be deposited in a tribal trust account established by section 1779d(a) of this title, 10 percent shall--

**(i)** be deposited in the special holding account established by subparagraph (A); and

**(ii)** be held in that account for distribution under paragraph (3).

(3) Distribution of funds

(A) In general

Funds deposited in the special holding account established by paragraph (2)(A) shall be distributed in accordance with subparagraphs (B) through (D).

(B) Claim filed

If a claim under paragraph (1)(A) is filed by the deadline specified in that paragraph, on final adjudication of that claim--

**(i)** if the final judgment awards to a claimant an amount that does not exceed the amount of funds in the special holding account under paragraph (2) attributable to the Indian Nation from the allocation of which under section 1779c(d) of this title the funds in the special holding account are derived--

**(I)** that amount shall be distributed from the special holding account to the claimant tribe that filed the claim; and

**(II)** any remaining amount in the special holding account attributable to the claim shall be transferred to the appropriate tribal trust account for the Indian Nation established by section 1779d(a) of this title; and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(ii)** if the final judgment awards to a claimant an amount that exceeds the amount of funds in the special holding account attributable to the Indian Nation from the allocation of which under section 1779c(d) of this title the funds in the special holding account are derived--

**(I)** the balance of funds in the special holding account attributable to the Indian Nation shall be distributed to the claimant tribe that filed the claim; and

**(II)** payment of the remainder of the judgment amount awarded to the claimant tribe shall be made from the permanent judgment appropriation established pursuant to section 1304 of Title 31.

(C) No claims filed

If no claims under paragraph (1)(A) are filed by the deadline specified in that paragraph--

**(i)** any funds held in the special holding account under paragraph (2) and attributed to that Indian Nation shall be deposited in the appropriate tribal trust account established by section 1779d(a); and

**(ii)** after the date that is 180 days after the date of enactment of this subchapter, paragraph (2)(B) shall not apply to appropriations attributed to that Indian Nation.

(c) Declaration with respect to scope of rights, title, and interests

Congress declares that--

**(1)** subsection (b) of this section is intended only to establish a process by which alleged claims may be resolved; and

**(2)** nothing in this section acknowledges, enhances, or establishes any prior right, title, or interest of any claimant tribe in or to the Arkansas Riverbed.

CREDIT(S)

(Pub.L. 107-331, Title VI, § 608, Dec. 13, 2002, 116 Stat. 2852.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

2002 Acts. Senate Report No. 107-249, see 2002 U.S. Code Cong. and Adm. News, p. 1817.

References in Text

This subchapter, referred to in text, originally read "this title", meaning Title VI of the Indian Financing Amendments Act of 2002, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 12, 2002, 116 Stat. 2845, known as the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, which enacted this subchapter.

The date of enactment of this subchapter, referred to in text, originally read "the date of enactment of this title" which probably means Dec. 13, 2002, the approval date of the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 13, 2002, 116 Stat. 2845, which enacted this subchapter.

180 days after the date of enactment of this subchapter, referred to in text, originally read "180 days after the date of enactment of this title", which probably means 180 days after Dec. 13, 2002, the approval date of the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 13, 2002, 116 Stat. 2845, which enacted this subchapter.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Section 1779d(a) of this title, referred to in subsec. (b)(3)(C)(i), was in the original "section 6(a)" and was translated as reading "section 606(a)", meaning section 606(a) of Pub.L. 107-331, to reflect the probable intent of Congress, because Pub.L. 107-133 does not contain a section 6, and section 1779d(a) establishes three tribal trust fund accounts.

25 U.S.C.A. § 1779f, 25 USCA § 1779f

Current through P.L. 109-90 approved 10-18-05

Copr. © 2005 Thomson/West. No. Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

C

**Effective: December 13, 2002**

UNITED STATES CODE ANNOTATED
TITLE 25. INDIANS
**CHAPTER 19--INDIAN LAND CLAIMS SETTLEMENTS**
SUBCHAPTER XIII--CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT
**§ 1779g. Effect on claims**

This subchapter shall not be construed to resolve any right, title, or interest of any Indian nation or of any claimant tribe, except their past, present, or future claims relating to right, title, or interest in or to the Riverbed and the obligations and liabilities of the United States thereto.

CREDIT(S)

(Pub.L. 107-331, Title VI, § 609, Dec. 13, 2002, 116 Stat. 2855.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

2002 Acts. Senate Report No. 107-249, see 2002 U.S. Code Cong. and Adm. News, p. 1817.

References in Text

This subchapter, referred to in text, originally read "this title", meaning Title VI of the Indian Financing Amendments Act of 2002, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 12, 2002, 116 Stat. 2845, known as the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, which enacted this subchapter.

25 U.S.C.A. § 1779g, 25 USCA § 1779g

Current through P.L. 109-90 approved 10-18-05

Copr. © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

28 USCA S 463
28 U.S.C.A. § 463
<KeyCite Citations>

Effective: [See Text Amendments]

UNITED STATES CODE ANNOTATED
TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE
PART I--ORGANIZATION OF COURTS
CHAPTER 21--GENERAL PROVISIONS APPLICABLE TO COURTS AND JUDGES
§ 463. Expenses of litigation

Whenever a Chief Justice, justice, judge, officer, or employee of any United States court is sued in his official capacity, or is otherwise required to defend acts taken or omissions made in his official capacity, and the services of an attorney for the Government are not reasonably available pursuant to chapter 31 of this title, the Director of the Administrative Office of the United States Courts may pay the costs of his defense. The Director shall prescribe regulations for such payments subject to the approval of the Judicial Conference of the United States.

CREDIT(S)

(Added Pub.L. 97-164, Title I, § 116(a), Apr. 2, 1982, 96 Stat. 32.)

<General Materials (GM) - References, Annotations, or Tables>

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1982 Acts. Senate Report No. 97-275, see 1982 U.S.Code Cong. and Adm.News, p. 11.

Effective and Applicability Provisions

1982 Acts. Section effective Oct. 1, 1982, see section 402 of Pub.L. 97-164, set out as a note under section 171 of this title.

LIBRARY REFERENCES

American Digest System

Judges k30.

Key Number System Topic No. 227.

Corpus Juris Secundum

CJS Judges § 198, Allowance for Expenses.

CJS United States § 152, Statutory Charges and Liabilities.

RESEARCH REFERENCES

ALR Library

143 ALR 1354, Supersedeas, Stay, or Bail, Upon Appeal in Habeas Corpus.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

42 USCA S 254
42 U.S.C.A. § 254
<KeyCite Citations>

Effective: [See Text Amendments]

UNITED STATES CODE ANNOTATED
TITLE 42. THE PUBLIC HEALTH AND WELFARE
CHAPTER 6A--PUBLIC HEALTH SERVICE
SUBCHAPTER II--GENERAL POWERS AND DUTIES
PART C--HOSPITALS, MEDICAL EXAMINATIONS, AND MEDICAL CARE
§ 254. Interdepartmental work

Nothing contained in this part shall affect the authority of the Service to furnish any materials, supplies, or equipment, or perform any work or services, requested in accordance with sections 1535 and 1536 of Title 31, or the authority of any other executive department to furnish any materials, supplies, or equipment, or perform any work or services, requested by the Department of Health and Human Services for the Service in accordance with that section.

CREDIT(S) (July 1, 1944, c. 373, Title III, § 327, 58 Stat. 697; 1953 Reorg. Plan No. 1, §§ 5, 8, eff. Apr. 11, 1953, 18 F.R. 2053, 67 Stat. 631; Oct. 17, 1979, Pub.L. 96-88, Title V, § 509(b), 93 Stat. 695.)

<General Materials (GM) - References, Annotations, or Tables>

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1944 Acts. House Report No. 1364, see 1944 U.S.Code Cong.Service, p. 1211.

1979 Acts. Senate Report No. 96-49 and House Conference Report No. 96- 459, see 1979 U.S.Code Cong. and Adm.News, p. 1514.

Codifications

"Sections 1535 and 1536 of Title 31" was substituted in text for "section 7 of the Act of May 21, 1920, as amended (U.S.C., 1940 edition, title 31, sec. 686)" on authority of Pub.L. 97-258, § 4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

Transfer of Functions

All functions of Public Health Service, of the Surgeon General of the Public Health Service, and of all other officers and employees of the Public Health Service, and all functions of all agencies of or in the Public Health Service transferred to Secretary of Health, Education, and Welfare [now Secretary of Health and Human Services] by 1966 Reorg. Plan No. 3, 31 F.R. 8855, 80 Stat. 1610, effective June 25, 1966, set out under section 202 of this title. The Secretary of Health, Education, and Welfare was redesignated the Secretary of Health and Human Services by section 509(b) of Pub.L. 96-88 which is classified to section 3508(b) of Title 20, Education.

All functions of the Federal Security Administrator were transferred to the Secretary of Health, Education, and Welfare [now Secretary of Health and Human Services] and all agencies of the Federal Security Agency were transferred to the Department of Health, Education, and Welfare [now Department of Health and Human Services] by section 5 of Reorg. Plan No. 1 of 1953, set out as a note under section 3501 of this title. The Federal Security Agency and the office of Administrator were abolished by section 8 of Reorg. Plan No. 1 of 1953. The Secretary of Health, Education, and Welfare was redesignated the Secretary of Health and Human Services by section 509(b) of Pub.L. 96-88 which is classified to section 3508(b) of Title 20, Education.

LAW REVIEW COMMENTARIES

"Official English": Federal limits on efforts to curtail bilingual services in the states. 100 Harv.L.Rev. 1345 (1987).

LIBRARY REFERENCES

American Digest System

United States k40, 41.

Key Number System Topic No. 393.

RESEARCH REFERENCES

Encyclopedias

Am. Jur. 2d Health § 15, Public Health Functions.

Treatises and Practice Aids

Bankruptcy Service Lawyers Edition § 27:1906, Contingent Obligation Loans; HEAL Loans, PSAP Grants, and the Like.

Norton Bankruptcy Law and Practice 2d § 47:53, Non-Title 11 Exceptions.

42 U.S.C.A. § 254, **42 USCA** § **254**

Current through P.L. 109-169, P.L. 109-173 approved 02-15-06

Copr. © 2005 Thomson/West. No. Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

**<u>Patton Boggs' Memorandum Opposing The Cherokee Nation's Motion To Dismiss, Exhibit 1</u>:**

**A Red-Line Comparison Between**

**(1) Arguments II A & B from the Cherokee Nation's Opposition To Motion To Intervene By Patton Boggs LLP (Original Document)**

**And**

**(2) Arguments II B & C from the Cherokee Nation's Memorandum In Support Of Its Motion To Dismiss Complaint-In-Intervention Of Patton Boggs LLP (New Document)**

The proposition that the Settlement Act - and in particular the language of section 1779e - does not provide this Court with jurisdiction to review and fix attorney fee payments is best illustrated by contrast with a statute that <u>does</u> do so. This Court frequently has been in the position of making an award of attorney fees in contingent fee cases brought by Indian tribes under jurisdiction which this Court inherited from the Indian Claims Commission. *See, e.g., Cherokee Nation v. United States,* 355 F.2d 945 (Ct. Cl. 1966); *Godfroy v. United States,* 467 F.2d 909 (Ct. Cl. 1972); *W<u>.</u> Shoshone ~~Idenable~~ <u>Identifiable</u> Group v. United States,* 652 F.2d 41 (Ct. Cl. 1981). The Court's authority to set attorney fees in these cases was conferred by a specific provision of the Indian Claims Commission Act ("ICCA"), 25 U.S.C. § 70n, which provided (for cases brought before the Indian Claims Commission):

> The fees of such attorney or attorneys for all services rendered in prosecuting the claim in question<u>,</u> whether before the Commission or otherwise, shall, unless the amount of such fees is stipulated in the approved contract between the attorney or attorneys and the claimant, be fixed by the Commission at such amount as the Commission, in accordance with standards obtaining for prosecuting similar contingent claims in courts of law, finds to be adequate compensation for services rendered and results obtained, considering the contingent nature of the case, plus all reasonable expenses incurred in the prosecution of the claim; but the amount so fixed by the Commission, exclusive of reimbursements for actual expenses, shall not exceed 10 per centum of the amount recovered in any case.

Act of Aug. 13, 1946, ch. 959, § 15, 60 Stat. 1053. Although the Indian Claims Commission was disbanded in 1978, all powers of the Commission, including the right to award attorneys fees under section 70n, were transferred to the Court of Claims, and then to the Court of Federal Claims. *See Pueblo of Santo Domingo v. United States,* 54 Fed. Cl. 240,

244-45 (Cl. Ct. 2002). Thus, this Court's jurisdiction to make awards of attorney fees in ICCA cases rests on the *specific statutory authority* in section 70n that the "fees of such attorney or attorneys . . . shall . . . be fixed by the Commission," an explicit authority that has subsequently been conferred on this Court to exercise in appropriate cases.

But this is not one such case and the Court derives no authority from section 70n here. By contrast to the power expressly conferred by the ICCA, no comparable authority to determine or award fees can be found in the Settlement Act, which - contrary to Patton Boggs' contention (PB Supp. Mem. at 15) - is simply silent as to the *Court's* role in the payment of attorney fees under section 1779e. That provision does not direct the court to "fix" the fee, nor to review a contract fixing such fees, nor to enforce a contract fixing such fees, nor to second-guess a tribe's determination as to the amount of fees to pay under such a private contract, nor to make an "equitable" determination of the payment of such fees, nor to review the Secretary's administrative decisions in carrying out a tribe's instructions on the disbursement of tribal funds to pay such fees. The contrast between section 70n - which explicitly provides the Court with the authority that Patton Boggs wishes it had here - and section 1779e, which governs this case, could not be more stark. [12] [7]

---

[13] [7] To the same effect as the ICCA - and in stark contrast to the Settlement Act at issue in this case - multiple tribal jurisdictional acts have *expressly* conferred jurisdiction on this Court to "fix" and award attorneys fees. *See, e.g.*, Act of February Feb. 23, 1929, ch. 300, § 6, 45 Stat. 1257-58 (Coos Bay, Lower Umpqua, and Suislaw Tribes) ("Upon final determination of such suit or suits the Court of Claims shall have jurisdiction to fix and determine a reasonable fee, not to exceed 10 per centum of the recovery, together with all necessary and proper expenses incurred in the preparation and prosecution of such suit or suits, to be paid to the attorney or attorneys employed ...."); Act of April Apr. 25, 1932, ch. 136, § 4, 47 Stat. 138 137 (Eastern and Western Cherokees) (same); Act of February Feb. 23, 1929, ch. 302, § 5, 45 Stat. 1258 (Kansas and Kaw Tribes) ("That upon the final determination of any suit instituted under this Act, the Court of Claims shall decree such amount or amounts as it may find reasonable to be paid to the said attorneys of the Kansas or Kaw Tribe of Indians for their services and expenses as said attorneys . . . ."); Act of February Feb. 11, 1920, ch. 68, § 3, 41 Stat. 404 (Fort Berthold Indians) ("[U]pon the final determination of such suit, cause, or action the Court of Claims shall decree such fees as it shall find reasonable to be paid the attorney or attorneys employed therein by said tribe or bands of Indians, under contracts negotiated and approved as provided by existing law ...."); Act of August 26, 1935, ch. 686, §§ 3 & 4, 49 Stat. 802 (Siletz) (same).

Finally, the same point is illustrated by *Heller, Ehrman, White & MacAuliffe v. Babbitt,* 992 F.2d 360 (D.C. Cir. 1993), where a law firm brought a suit in district court under the APA against the Secretary for failing to pay attorney fees from a settlement fund created by Congress pursuant to the Hoopa-Yurok Settlement Act ("HYSA"), 25 U.S.C. § 1300i *et seq* Pub. L. No. 100-580, 102 Stat. 2924 (1988), 25 U.S.C. §§ 1300i-1300i-11. The court rejected the effort, and said that exclusive jurisdiction over the claim lay in the Claims Court, but only because the HYSA expressly gave exclusive jurisdiction to this Court. 992 F.2d at 361, 363. The statute in *Heller, Ehrman* specified that "any claim" challenging the distribution of money and property under HYSA "shall be brought" in the Claims Court. *Id.* at 363. The D.C. Circuit concluded that "HYSA specifies that the law firm's only remedy is to sue the United States in the Claims Court for damages." *Id.* The plaintiffs cannot "circumvent" a "clear and explicit" statutory grant of exclusive jurisdiction "by creatively framing their complaint." *Id.* at 363-4 64 [8].

As with the ICCA, the "clear and explicit" grant of jurisdiction to this Court in the HYSA to resolve disputes about distribution of the settlement funds, including attorney fees, stands in sharp contrast to the silence of the Settlement Act as to the same matters. This Court's role under the Settlement Act is simply to receive and lodge a consent decree, ensuring that all appropriations have been made to the settling tribes. 25 U.S.C. § 1779c(a). Nowhere is there a provision comparable to that in the HYSA that gives the Court an omnibus and exclusive jurisdiction to resolve "any claim" arising out of the distribution of money under the Act.

[8] In this case, significantly, the exact reverse of the *Heller, Ehrman* situation is presented. As the Cherokee Nation previously has suggested (without conceding), Patton Boggs may have a cause of action in a United States District Court under the Administ. Procedure Act, Pub. L. No. 89-554, 80 Stat. 393 (1966), 5 U.S.C. §§ 701-706. *See* Cherokee Nation's Opp'n to PB's Mot. to Intervene at 10-11; *see also Littell v. Morton*, 445 F.2d 1207 (4th Cir. 1971). Here Intervenor has attempted to "circumvent" potential APA jurisdiction in the district court "by creatively framing [its] complaint" to assert purported jurisdiction under the Tucker Act in this Court.

Where Congress intended to confer such jurisdiction on this Court, it knew how to do so, and has done so expressly. It did not do so here.

~~Absent an express grant of jurisdiction to this Court to resolve the issue, Patton Boggs must look elsewhere for the remedy it seeks - review of agency action by the Secretary and potential injunctive relief. No amount of "creatively framing their complaint," 992 F.2d at 363, (if only it had filed one) should permit Patton Boggs to "circumvent" the jurisdictional rules set by Congress.~~

**~~B~~C. Patton Boggs ~~seeks relief against~~' Cause of Action Is Really a Private Dispute with the Cherokee Nation ~~that is outside the jurisdiction of this Court~~ over which This Court Has No Jurisdiction.**

In substance and at core, the ~~Supplemental Memorandum before the Court presents~~ complaint in intervention really presents not a claim for damages owed by the United States, but instead a garden variety contract dispute between two private parties: Patton Boggs claims that it has a contract with the Cherokee Nation that commits the Nation to pay a certain fee to it, and it further claims that the Nation is now in breach of that contract. The Nation asserts it has established a fair and appropriate fee. Under the Settlement Act, the Secretary's duty is merely to pay what is owed.

In the normal course, ~~such~~ a claim for breach of an attorney contract would be resolved by the law firm suing its client over the fees it asserts are due. But as Patton Boggs recognizes, PB Supp. Mem. at 19 n.27, that option is not available here because the Nation is protected from suit by its sovereign immunity. ~~[14]~~ [9] As sophisticated counsel, Patton Boggs could have

~~[14]~~ [9] *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978); *Okla. Tax Comm 'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991); *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998); *Puyallup Tribe v. Dep't of Game*, 433 U.S. 165, 172-73 (1977); *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 512 (1940); *Turner v. United States*, 248 U.S. 354, 357-58 (1919).

negotiated in its contract for a waiver of the Nation's immunity in the event of a fee dispute, but it did not do so. That failure is a problem of its own making.

Nor is the Nation's immunity waived by the fact of its presence before the Court as plaintiff in the underlying riverbed case against the United States. When a tribal sovereign sues, it remains immune from counterclaims or cross-claims except for recoupment arising out of the same transaction or occurrence as the tribal claim. *See, e.g., Okla. Tax Comm 'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991) ("[A] tribe does not waive its sovereign immunity from actions that could not otherwise be brought against it merely because those actions were pleaded in a counterclaim to an action filed by the tribe."). ~~Even if~~ Patton ~~Boggs were granted intervention, and even if it were to file a counterclaim (or cross-claim) against the Cherokee Nation, its claim for attorney fees arises from its alleged services under a separate agreement, not~~ Boggs' cause of action does not stem from the transaction or occurrence that gave rise to this case - the historic claims by the Cherokee Nation against the United States regarding the Nation's riverbed lands - but from a separate agreement. Thus, the purported claim that Patton Boggs seeks to assert against the Cherokee Nation is barred by the Nation's immunity.

Even apart from the immunity issue, this Court cannot resolve the fee dispute between Patton Boggs and the Nation because the Court plainly lacks jurisdiction to adjudicate claims such as this between private parties:

> [I]t has been uniformly held, upon a review of the statutes creating the court [of claims] and defining its authority, that its jurisdiction is confined to the rendition of money judgments in suits brought for that relief against the United States and if the relief sought is against others than the United States the suit as to them must be ignored as beyond the jurisdiction of the court[,] or if its maintenance against private parties is prerequisite to prosecution of the suit against the United States the suit must be dismissed.

*United States v. Sherwood*, 312 U.S. 584, 588 (1941) (citations omitted) (emphasis added). [15] [10]

Applying this settled rule, the Supreme Court in *Sherwood* held that where the plaintiff asserted a right to bring an action based on its status as a judgment creditor of another party pursuant to certain provisions of New York state law, the Court of Claims was without jurisdiction to adjudicate the claim because it would require the Court to adjudicate the validity of the state court order vesting the judgment creditor with the capacity to make the claim:

> We think it plain that the present suit could not have been maintained in the Court of Claims because that court is without jurisdiction of any suit brought against private parties and because adjudication of the right or capacity of respondent [the plaintiff in the Court of Claims] to proceed with the suit upon the contract of the judgment debtor with the United States is prerequisite to any recovery upon the Government contract. ~~. . .~~ Adjudication of that issue is not within the jurisdiction of the Court of Claims whose authority, as we have seen, is narrowly restricted to the adjudication of suits brought against the Government alone.

*Sherwood*, 312 U.S. at 588-~~589.~~ [16] 89 (citation omitted). [11]

The rule set out in *Sherwood* controls here. The claim made by Patton Boggs is in the nature of a contract dispute with the Cherokee Nation - asserting the terms of its contract, it contests the right of the Nation to pay it anything less than 10 percent of the Nation's recovery in the underlying riverbed case. But the Cherokee Nation's reading of the contract

---

~~15~~ 10 *See also Berkeley v. United States*, 276 F.2d 9, 12-13 (Ct. Cl. 1960) (to extent plaintiff's claim challenges actions of private party, the claim lies outside the jurisdiction of the Court of Claims); *Kennedy v. United States*, 19 Cl. Ct. 69, 76 (1989) ("[I]f the maintenance of a suit against private parties is a prerequisite to the prosecution of the suit against the United States, the suit must be dismissed.").

~~16~~ 11 *See also McPherson v. United States*, 2 Cl. Ct. 670, 673 (1983) (court lacked jurisdiction over plaintiff's damages claim against the United States, where the claim against the Government was dependent upon showing a breach of duty by a third party); *Nat'l City Bank of Evansville v. United States*, 163 F. Supp. 846, 852 (Ct. Cl. 1958) (to the extent plaintiff's losses resulted from improper action of the surety on a contract with the United States, plaintiff's claim was against the surety and not the United States, and accordingly lay outside the jurisdiction of the ~~court~~ Court of claims).

differs. Even though Patton Boggs labors to frame its claim as one against the United States ~~(or, more specifically, against the Secretary)~~, the predicate for the claim of what the Secretary must do, or must pay, still depends on resolution of the dispute between two private parties as to what their private contract provides. As such, the claim lies outside the jurisdiction of this Court, just as in *Sherwood*. [~~17~~ 12]

Patton Boggs attempts to finesse this problem by claiming, in essence, that the Settlement Act somehow federalizes the attorney contract, making it a direct obligation of the United States, and seeking to hold the United States liable for performance of the contract. But the Act does no such thing. All it does do is provide a mechanism for the Cherokee Nation to pay fees it owes under its contracts out of the settlement sums it is receiving under the statute - by directing the Secretary to perform the ministerial function of making disbursements to the attorneys from funds appropriated for the benefit of the Nation. In so doing, the statute does not make any such contract an obligation of the United States, or make the proper meaning of contract terms a dispute between Patton Boggs and the United States. The dispute over its contract is, and remains, between Patton Boggs and the Nation. And that is a dispute that lies

---

[~~17~~ 12] This Court's decision in *American Renovation and Constr. Co. v. United States*, 65 Fed. Cl. 254 (2005) is not to the contrary. In *American Renovation*, an assignee of a government contract sought to intervene in an action against the United States for breach of that contract brought by the original contractor. The Court granted intervention because the question presented was which company - the plaintiff or the intervenor - "was entitled to recover a contract balance allegedly due from the government," *id.* at 261, *i.e.*, which company was the proper plaintiff. In agreeing to decide which of the two possible plaintiffs was entitled to the recovery against the United States under the contract, the Court emphasized that "it cannot enforce the legal rights of Intervenor-Applicant specifically against Plaintiff, as such a determination falls outside of the jurisdiction conferred under the Tucker Act." *Id.* at *262.*

That precisely states the difference here: Patton Boggs is not attempting to claim it is the proper plaintiff to recover from the United States for federal mismanagement of the Arkansas riverbed; rather, Patton Boggs is asserting a legal right, based on its contract, against the Cherokee Nation, and is treating the United States basically as the guarantor. As the Court said in *American Renovation*, that determination "falls outside of the jurisdiction conferred by the Tucker Act." *Id.*

outside the jurisdiction of this Court to resolve. [18] *See Katz v. Cisneros*, 16 F.3d 1204, 1210 (Fed. Cir. 1994) ("Any express contract that might be invocable is between Hollywood Associates and Housing Allowance, not between Hollywood Associates and the United States, which is, of course, the sine qua non of jurisdiction in the Court of Federal Claims. Absent privity... there is no case." (citing *Erikson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984), and *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550 (Fed. Cir. 1983)).

[18] The cases cited by Patton Boggs to the effect that "a former counsel with a terminated contingency fee contract is 'so situated' as to permit intervention as to the fees owed pursuant to their contracts," PB Supp. Mem. at 20-21, are not on point. None of those cases was brought in this Court. The federal courts there involved had jurisdiction to resolve fee disputes between private parties. This Court does not.