107TH CONGRESS 2d Session } HOUSE OF REPRESENTATIVES { REPORT 107–632

# CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT ACT

SEPTEMBER 4, 2002.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. HANSEN, from the Committee on Resources, submitted the following

# REPORT

[To accompany H.R. 3534]

[Including cost estimate of the Congressional Budget Office]

The Committee on Resources, to whom was referred the bill (H.R. 3534) to provide for the settlement of certain land claims of Cherokee, Choctaw, and Chickasaw Nations to the Arkansas Riverbed in Oklahoma, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike all after the enacting clause and insert the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act".

**SEC. 2. FINDINGS.**

The Congress finds the following:

(1) It is the policy of the United States to promote tribal self-determination and economic self-sufficiency and to encourage the resolution of disputes over historical claims through mutually agreed-to settlements between Indian Nations and the United States.

(2) There are pending before the United States Court of Federal Claims certain lawsuits against the United States brought by the Cherokee, Choctaw, and Chickasaw Nations seeking monetary damages for the alleged use and mismanagement of tribal resources along the Arkansas River in eastern Oklahoma.

(3) The Cherokee Nation, a federally recognized Indian tribe with its present tribal headquarters near Tahlequah, Oklahoma, having adopted its most recent constitution on June 26, 1976, and having entered into various treaties with the United States, including but not limited to the Treaty at Hopewell, executed on November 28, 1785 (7 Stat. 18), and the Treaty at Washington, D.C., executed on July 19, 1866 (14 Stat. 799), has maintained a continuous government-to-

99–006

government relationship with the United States since the earliest years of the Union.

(4) The Choctaw Nation, a federally recognized Indian tribe with its present tribal headquarters in Durant, Oklahoma, having adopted its most recent constitution on July 9, 1983, and having entered into various treaties with the United States of America, including but not limited to the Treaty at Hopewell, executed on January 3, 1786 (7 Stat. 21), and the Treaty at Washington, D.C., executed on April 28, 1866 (7 Stat. 21), has maintained a continuous government-to-government relationship with the United States since the earliest years of the Union.

(5) The Chickasaw Nation, a federally recognized Indian tribe with its present tribal headquarters in Ada, Oklahoma, having adopted its most recent constitution on August 27, 1983, and having entered into various treaties with the United States of America, including but not limited to the Treaty at Hopewell, executed on January 10, 1786 (7 Stat. 24), and the Treaty at Washington, D.C., executed on April 28, 1866 (7 Stat. 21), has maintained a continuous government-to-government relationship with the United States since the earliest years of the Union.

(6) In the first half of the 19th century, the Cherokee, Choctaw, and Chickasaw Nations were forcibly removed from their homelands in the southeastern United States to lands west of the Mississippi in the Indian Territory which that were ceded to them by the United States. From the "Three Forks" area near present day Muskogee, Oklahoma, downstream to the point of confluence with the Canadian River, the Arkansas River flowed entirely within the territory of the Cherokee Nation. From that point of confluence downstream to the Arkansas territorial line, the Arkansas River formed the boundary between the Cherokee Nation on the left side of the thread of the river and the Choctaw and Chickasaw Nations on the right.

(7) Pursuant to the Act of April 30, 1906 (34 Stat. 137), title to the bed and banks of the Arkansas River passed to the United States in trust for the respective Indian Nations in accordance with their respective interests therein.

(8) For more than 60 years after Oklahoma statehood, the Bureau of Indian Affairs incorrectly assumed that Oklahoma owned the Riverbed from the Arkansas State line to Three Forks, and therefore took no action to protect the Indian Nations' Riverbed resources such as oil, gas, sand, and gravel and Drybed Lands suitable for grazing and agriculture.

(9) The United States Government constructed powerheads and other improvements in the channel of the Arkansas River on tribal lands, using sand and gravel belonging to the three Indian Nations. Due to the Bureau's inaction, individuals with property near the Arkansas River began to occupy the three Indian Nations' Drybed Lands—lands that were under water at the time of statehood but that are now dry due to changes in the course of the river.

(10) In 1966, the three Indian Nations sued the State of Oklahoma to recover their lands. In 1970, the Supreme Court of the United States decided in the case of Choctaw Nation vs. Oklahoma (396 U.S. 620 (1970)), that the Indian Nations retained title to their respective portions of the Riverbed along the navigable reach of the river.

(11) In 1989, the Indian Nations filed lawsuits against the United States in the United States Court of Federal Claims (Case Nos. 218–89L and 630–89L), seeking damages for the United States use and mismanagement of tribal trust resources along the Arkansas River. Those actions are still pending.

(12) In 1997, the United States filed quiet title litigation against individuals occupying some of the Indian Nations' Drybed Lands. That action, filed in the United States District Court for the Eastern District of Oklahoma, was dismissed without prejudice on technical grounds.

(13) From time to time over the years following the Indian Nations' Court of Federal Claims litigation, the Indian Nations, the Department of Justice, the Bureau of Indian Affairs, and the Indian Nations have engaged in settlement negotiations.

(14) Nearly 7,750 acres of the Indian Nations' Drybed Lands have been occupied by a large number of adjacent landowners in Oklahoma. Without Federal legislation, further litigation against thousands of such landowners would be likely and any final resolution of pending disputes through a process of litigation would take many years and entail great expense to the United States, the Indian Nations, and the individuals and entities occupying the Drybed Lands and would seriously impair long-term economic planning and development for all parties.

(15) The Councils of the Cherokee, Choctaw, and Chickasaw Nations have each enacted tribal legislation which would, contingent upon the passage of this Act and in exchange for the monies appropriated hereunder—

(A) settle and forever release their respective claims against the United States asserted by them in United States Court of Federal Claims Case Nos. 218–89L and 630–89L; and

(B) forever disclaim any and all right, title, and interest in and to the Disclaimed Drybed Lands, as set forth in those enactments of the respective councils of the Indian Nations.

(16) The resolutions adopted by the respective Councils of the Cherokee, Choctaw, and Chickasaw Nations each provide that, contingent upon the passage of the settlement legislation, each Indian Nation agrees to dismiss, release, and forever discharge its claims asserted against the United States in the United States Court of Federal Claims, Case No. 218–89L, and to disclaim any right, title, or interest of the Indian Nation in the Disclaimed Drybed Lands, in exchange for the funds appropriated and allocated to the Indian Nation under the provisions of the settlement legislation, which funds the Indian Nation agrees to accept in full satisfaction and settlement of all claims against the United States for its use of and damage to the bed of the Arkansas River arising out of the construction of the McClellan-Kerr Navigation Way and for the damages sought in the aforementioned claims asserted in the United States Court of Federal Claims, and as full and fair compensation for disclaiming its right, title, and interest in the Disclaimed Drybed Lands.

(17) In those resolutions, each Indian Nation expressly reserved all of its beneficial interest and title to all other Riverbed lands, including minerals, as determined by the Supreme Court in Choctaw Nation v. Oklahoma, 397 U.S. 620 (1970), and further reserved any and all right, title, or interest that each Nation may have in and to the water flowing in the Arkansas River and its tributaries.

**SEC. 3. PURPOSES.**

The purposes of this Act are as follows:

(1) To approve, ratify, and confirm an agreed-to resolution of claims brought by the Cherokee, Choctaw, and Chickasaw Nations against the United States, and the agreed-to disclaimers of the three Indian Nations to any right, title, or interest in approximately 7,750 acres of Drybed Lands contiguous to the channel of the Arkansas River as of the date of the enactment of this Act in certain townships in eastern Oklahoma.

(2) To reserve the three Indian Nations' beneficial interest in the Riverbed except for the Disclaimed Drybed Lands.

(3) To authorize and direct the Secretary to implement the terms of such settlement.

(4) To authorize the actions and appropriations necessary to implement the provisions of this Act.

(5) To maintain the trust relationship between the United States and each of the three Indian Nations.

**SEC. 4. DEFINITIONS.**

For the purposes of this Act, the following definitions apply:

(1) DISCLAIMED DRYBED LANDS.—The term "Disclaimed Drybed Lands" means all Drybed Lands along the Arkansas River that are located in Township 10 North in Range 24 East, Townships 9 and 10 North in Range 25 East, Township 10 North in Range 26 East, and Townships 10 and 11 North in Range 27 east, in the State of Oklahoma.

(2) DRYBED LANDS.—The term "Drybed Lands" means those Riverbed lands of the Indian Nations which lie above and contiguous to the high water mark of the Arkansas River in the State of Oklahoma as of the date of the enactment of this Act but which have become part of the Riverbed by operation of accretion and avulsion.

(3) INDIAN NATION; INDIAN NATIONS.—The term "Indian Nation" means the Cherokee Nation, Choctaw Nation, or Chickasaw Nation, and the term "Indian Nations" means all three tribes collectively.

(4) RIVERBED.—The term "Riverbed" means the Drybed Lands and the Wetbed Lands and includes all minerals therein.

(5) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(6) WETBED LANDS.—The term "Wetbed Lands" means those Riverbed lands which lie below the high water mark of the Arkansas River in the State of Oklahoma as of the date of the enactment of this Act, exclusive of the Drybed Lands.

**SEC. 5. SETTLEMENT AND CLAIMS; APPROPRIATIONS; ALLOCATION OF FUNDS.**

(a) EXTINGUISHMENT OF CLAIMS.—Upon payment of the funds appropriated under this section, all claims for use of and damage to the Riverbed arising out of the construction and maintenance of the McClellan-Kerr Navigation Way and the claims asserted by the Cherokee, Choctaw, and Chickasaw Nations in the United States Court of Federal Claims against the United States shall be deemed extinguished.

(b) RELEASE OF TRIBAL CLAIMS TO CERTAIN DRYBED LANDS.—

(1) IN GENERAL.—Upon the deposit of all funds authorized for appropriation under subsection (c) for an Indian Nation into the appropriate trust fund account described in section 6, all claims and all right, title, and interest that the Indian Nations may have to the Disclaimed Drybed Lands, shall be deemed extinguished. The Secretary shall execute an appropriate document citing this Act, suitable for filing with the county clerks, or such other county official as appropriate, of those counties wherein the foregoing described lands are located, disclaiming tribal interests in such Disclaimed Drybed Lands.

(2) EXCEPTION.—Notwithstanding any provision of this Act, the Indian Nations do not relinquish any right, title, or interest in any lands or minerals to which the United States claims title which are contiguous to the Riverbed, and no provision of this Act shall be construed to extinguish or convey any water rights of the Indian Nations in the Arkansas River or any other stream or the beneficial interests or title of any of the Indian Nations in and to trust lands lying above or below the high water mark of the Arkansas River as of the date of the enactment of this Act, except for the Disclaimed Drybed Lands.

(3) LAND TO BE TAKEN INTO TRUST.—To the extent that the United States determines that it is able to effectively maintain the McClellan-Kerr Navigation Way without retaining title to lands above the high water mark of the Arkansas River as of the date of the enactment of this Act, said lands, after being declared surplus, shall be taken into trust for the Indian Nation within whose boundary the land is located. All Wetbed Lands, including minerals, from the Arkansas State line upstream to the historic point of navigability near the confluence of the Arkansas, Verdigris, and Grand Rivers, and all Drybed Lands located outside the foregoing described Townships, shall continue to be held by the United States in trust for the beneficiary Indian Nation and shall be protected in accordance with applicable law governing tribal trust lands.

(c) AUTHORIZATION FOR SETTLEMENT APPROPRIATIONS.—

(1) SETTLEMENT OF CLAIMS.—There is authorized to be appropriated the aggregate sum of $41,293,245. After payment pursuant to section 7, the remaining funds appropriated under this subsection shall be paid and allocated among the three Indian Nations in accordance with subsection (d) and deposited into the trust fund accounts established pursuant to section 6. Such payment shall be in full satisfaction and settlement of the Indian Nations' claims for the use of and damage to the Arkansas Riverbed arising out of the construction and maintenance of the McClellan-Kerr Navigation Way and asserted against the United States in the United States Court of Federal Claims, Case Nos. 218–89L and 630–89L, and in full satisfaction of, and as compensation for, the three Indian Nations' respective right, title, and interest in and to the Disclaimed Drybed Lands.

(2) RENTALS.—In addition to funds authorized to be appropriated in paragraph (1), there is authorized for appropriation and allocated in accordance with subsection (d) $8,000,000, representing the present value of the fair market rentals for the location and future operation in perpetuity of the two hydropower generation and related facilities at the Webbers Falls Lock and Dam and the Kerr Lock and Dam on the Arkansas River.

(d) ALLOCATION AND DEPOSIT OF FUNDS.—After payment pursuant to section 7, the remaining funds authorized for appropriation under subsection (c) shall be allocated among the Indian Nations as follows:

(1) 50 percent to be deposited into the trust fund account established under section 6 for the Cherokee Nation.

(2) 37.5 percent to be deposited into the trust fund account established under section 6 for the Choctaw Nation.

(3) 12.5 percent to be deposited into the trust fund account established under section 6 for the Chickasaw Nation.

**SEC. 6. TRIBAL TRUST FUNDS.**

(a) TRUST FUND ACCOUNTS AND USES OF TRUST FUNDS.—All funds appropriated and paid pursuant to section 5 shall be deposited into three separate tribal trust fund accounts to be established by the Secretary for the benefit of each of the three Indian Nations. All funds deposited into said accounts, and any income earned thereon, shall be expended only in accordance with the provisions of this section.

No funds deposited into the trust fund accounts established in section 6 shall be made available to the beneficiary Indian Nation until that Nation files the appropriate stipulation of dismissal with prejudice of all claims asserted in Case Nos. 218–89L or 630–89L, filed in the United States Court of Federal Claims.

(b) LAND ACQUISITION.—

(1) TRUST LAND STATUS PURSUANT TO REGULATIONS.—The funds appropriated and allocated to the Indian Nations pursuant to section 5(c) and deposited into trust fund accounts pursuant to section 6(a), together with any interest earned thereon, and allocated pursuant to section 5(d) may be used for the acquisition of land by the three Indian Nations for transfer to the United States in trust for the beneficiary Indian Nation in accordance with the Secretary's trust land acquisition regulations at part 151 of title 25, Code of Federal Regulations, as in effect on January 1, 2001.

(2) REQUIRED TRUST LAND STATUS.—Any such trust land acquisitions on behalf of the Cherokee Nation shall be mandatory if the land proposed to be acquired is located within Township 12 North, Range 21 East, in Sequoyah County, Township 11 North, Range 18 East, in McIntosh County, Townships 11 and 12 North, Range 19 East, or Township 12 North, Range 20 East, in Muskogee County, Oklahoma, and not within the limits of any incorporated municipality as of January 1, 2002, if—

(A) the land proposed to be acquired meets the Department of the Interior's minimum environmental standards and requirements for real estate acquisitions set forth in 602 DM 2.6, as in effect on January 1, 2001; and

(B) the title to such land must meet applicable Federal title standards as in effect on said date.

(3) OTHER EXPENDITURE OF FUNDS.—The Indian Nations may elect to expend all or a portion of the funds deposited into its trust account for any other purposes authorized under subsection (c).

(c) INVESTMENT OF TRUST FUNDS; NO PER CAPITA PAYMENT.—

(1) NO PER CAPITA PAYMENTS.—No money received by the Indian Nations hereunder may be used for any per capita payment.

(2) INVESTMENT BY SECRETARY.—Except as provided in this section and section 7, the principal of such funds deposited into the accounts established hereunder and any interest earned thereon shall be invested by the Secretary in accordance with current laws and regulations for the investing of tribal trust funds.

(3) USE OF PRINCIPAL FUNDS.—The principal amounts of said funds and any amounts earned thereon shall be made available to the Indian Nation for which the account was established for expenditure for purposes which may include construction or repair of health care facilities, law enforcement, cultural or other education activities, economic development, social services, and land acquisition. Land acquisition using such funds shall be subject to the provisions of subsections (b) and (d).

(d) DISBURSEMENT OF FUNDS.—The Secretary shall disburse the funds from a trust account established under this section pursuant to a budget adopted by the Council of the Indian Nation setting forth the amount and an intended use of such funds.

**SEC. 7. ATTORNEY FEES.**

(a) PAYMENT.—At the time the funds are paid to the Indian Nations, from funds authorized to be appropriated pursuant to section 5(c), the Secretary shall pay to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations.

(b) LIMITATIONS.—Notwithstanding subsection (a), the total fees payable to attorneys under such contracts with an Indian Nation shall not exceed 10 percent of that Indian Nation's allocation of funds appropriated under section 5(c).

## PURPOSE OF THE BILL

The purpose of H.R. 3534, as ordered reported, is to provide for the settlement of certain land claims of the Cherokee, Choctaw, and Chickasaw Nations to the Arkansas Riverbed in Oklahoma.

## BACKGROUND AND NEED FOR LEGISLATION

H.R. 3534 is a comprehensive legislative settlement of all claims asserted by the Cherokee, Choctaw, and Chickasaw Nations for the use and mismanagement of tribal resources along the Arkansas

River. The legislation extinguishes all of the Nations' claims to the so-called Disclaimed Drybed Lands and authorizes a total $49,293,245 in appropriated claim settlement funds to be allocated in specified trust fund accounts among the Cherokee, Choctaw, and Chickasaw Nations. Of the settlement amount, 50 percent would be held for the Cherokee Nation, 37.5 percent for the Choctaw Nation, and 12.5 percent for the Chickasaw Nation.

For more than 60 years following Oklahoma's statehood, the Bureau of Indian Affairs erroneously assumed that the State retained ownership of the Arkansas Riverbed from the Arkansas State line to Three Forks. The Cherokee, Choctaw, and Chickasaw Nations asserted that their Treaties superseded the Equal Footing Doctrine regarding navigable rivers and that ownership of the Arkansas Riverbed should remain with the tribes.

Due to the Bureau's inaction, the federal government constructed power heads and made other improvements in the channel of the riverbed on tribal land, using sand and gravel belonging to the three Nations. In addition, individuals with property near the river began to occupy the Drybed Lands lands that were under water at the time of Oklahoma Statehood but that are now dry. In 1966, the three Indian Nations sued the State of Oklahoma to recover their lands and in 1970, the U.S. Supreme Court ruled that ownership of the riverbed remained with the tribes. The decision gave the northern half of the riverbed to the Cherokee Nation from the Arkansas line west to the confluence with the Canadian River and the southern half of the riverbed jointly to the Choctaws and Chickasaws.

In 1989, the three Indian Nations filed lawsuits against the United States seeking damages for the use and mismanagement of tribal trust resources along the Arkansas River. To date, negotiations on the settlement of the three Nations' claim against the United States have continued without resolve. The Councils of the Cherokee, Choctaw, and Chickasaw Nations have enacted tribal legislation releasing their respective claims against the United States and extinguishing any and all right, title, and interest in the Drybed Lands. H.R. 3534 codifies the three Nations' settlement.

## COMMITTEE ACTION

H.R. 3534 was introduced on December 19, 2001, by Congressman Brad Carson (D–OK), and was subsequently referred to the Committee on Resources. On April 17, 2002, the Committee held a hearing on the bill, and on June 26, 2002, the Committee met to mark up the legislation. Congressman Carson offered an amendment in the nature of a substitute to make certain technical and clarifying revisions. The legislation, as amended, was ordered favorably reported to the House of Representatives by unanimous consent.

## SECTION-BY-SECTION ANALYSIS OF BILL AS ORDERED REPORTED

### *Section 1. Short title*

This section sets out the short title of the bill, the "Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act."

*Section 2. Findings*

This section sets forth the findings prompting the need for the legislation.

*Section 3. Purposes*

This section sets forth the purpose of the bill: to approve the settlement (described above); to reserve the three Nations' beneficial interest in the riverbed except for the "disclaimed drybed lands;" to authorize the Secretary of the Interior to implement the settlement; to authorize the appropriations necessary to implement the bill; and to preserve the trust relationship between the U.S. and each of the three Nations.

*Section 4. Definitions*

This section sets forth the definitions for the bill.

*Section 5. Settlement and claims; Appropriations; Allocation of funds*

Subsection (a) states that the three Nations' claims against the United States will be extinguished upon payment of the funds authorized to be appropriated under the bill.

Subsection (b) states that on deposit of the appropriated funds into the trust accounts pursuant to section 6 of the bill, the three Nations' interests in the Disclaimed Drybed Lands shall be deemed extinguished. The Secretary of the Interior is authorized to file the appropriate documents with the county clerks for the counties where the Disclaimed Drybed Lands are located. The other Riverbed resources are expressly reserved, as are any water rights the three Nations may have. Other federal lands above the highwater mark, to the extent unnecessary for maintaining the navigation way and upon being declared surplus, are to be taken into trust for the Nations.

Subsection (c) authorizes for appropriation the aggregate sum of $41,293,245 for allocation among the three Nations in accordance with subsection (d)—50 percent to the Cherokee Nation, 37.5 percent to the Choctaw Nation, and 12.5 percent to the Chickasaw Nation—after making the payment authorized by section 7 (attorneys fees according to their contracts, not to exceed ten percent of the settlement), as full settlement and satisfaction for claims pending against the U.S. and for their disclaimed interests in the Disclaimed Drybed Lands. This subsection further authorizes an appropriation of $8 million as fair present value of past and future use of tribal lands for the two hydropower facilities on the river.

Subsection (d) sets out the percentages for allocating settlement funds among the three Nations.

*Section 6. Tribal Trust Funds*

Subsection (a) states that all appropriated funds will be deposited into separate tribal trust fund accounts for the benefit of the three Indian Nations, that the funds may only be expended in accordance with the provisions this section, and that none of the funds will be made available to a Nation until it has executed and filed a stipulation of dismissal in the Court of Federal Claims cases.

Subsection (b) states that the appropriated funds deposited into in the Tribal trust accounts and any interest earned thereon may be used for land acquisitions pursuant to the Secretary's regulations, except that trust acquisitions on behalf of the Cherokees are mandatory if the land proposed to be acquired is located in certain sections in Sequoyah, McIntosh, or Muskogee Counties, provided that the land is not located within the boundaries of any municipality and it meets the Secretary's minimum environmental and title standards.

Subsection (c) prohibits use of the settlement funds for per capita payments, and requires the Secretary to invest the funds in accordance with applicable laws and regulations. It also allows the funds to be used for construction or repair of health care facilities, law enforcement, cultural or other education activities, economic development, social services, and land acquisition, provided that the acquisition of land complies with to the requirements of subsections (b) and (d).

Subsection (d) requires disbursement of the funds from a trust account established under section 6 pursuant to budgets adopted by the council of the Nation setting forth the amount and intended use of the funds.

*Section 7. Attorney fees*

This section authorizes the Secretary to pay the Nations' attorneys those sums owed them under their respective contracts, but imposes a cap of ten percent of the Nation's allocation of funds appropriated under section 5(c).

COMMITTEE OVERSIGHT FINDINGS AND RECOMMENDATIONS

Regarding clause 2(b)(1) of rule X and clause 3(c)(1) of rule XIII of the Rules of the House of Representatives, the Committee on Resources' oversight findings and recommendations are reflected in the body of this report.

CONSTITUTIONAL AUTHORITY STATEMENT

Article I, section 8 of the Constitution of the United States grants Congress the authority to enact this bill.

COMPLIANCE WITH HOUSE RULE XIII

1. Cost of Legislation. Clause 3(d)(2) of rule XIII of the Rules of the House of Representatives requires an estimate and a comparison by the Committee of the costs which would be incurred in carrying out this bill. However, clause 3(d)(3)(B) of that rule provides that this requirement does not apply when the Committee has included in its report a timely submitted cost estimate of the bill prepared by the Director of the Congressional Budget Office under section 402 of the Congressional Budget Act of 1974.

2. Congressional Budget Act. As required by clause 3(c)(2) of rule XIII of the Rules of the House of Representatives and section 308(a) of the Congressional Budget Act of 1974, this bill does not contain any new budget authority, spending authority, credit authority, or an increase or decrease in revenues or tax expenditures.

3. General Performance Goals and Objectives. As required by clause 3(c)(4) of rule XIII, the general performance goal or objective

of this bill is to provide for the settlement of certain land claims of the Cherokee, Choctaw, and Chickasaw Nations to the Arkansas Riverbed in Oklahoma.

4. Congressional Budget Office Cost Estimate. Under clause 3(c)(3) of rule XIII of the Rules of the House of Representatives and section 403 of the Congressional Budget Act of 1974, the Committee has received the following cost estimate for this bill from the Director of the Congressional Budget Office:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, August 28, 2002.*

Hon. JAMES V. HANSEN,
*Chairman, Committee on Resources,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the enclosed cost estimate for H.R. 3534, the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act.

If you wish further details of this estimate, we will be pleased to provide them. The CBO staff contacts are Lanette J. Walker (for federal costs), Marjorie Miller (for the state, local, and tribal impact), and Cecil McPherson (for the private-sector impact).

Sincerely,

BARRY B. ANDERSON
(For Dan L. Crippen, Director).

Enclosure.

*H.R. 3534—Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act*

Summary: H.R. 3534 would ratify a settlement of the Cherokee, Choctaw, and Chickasaw Nations' claims to certain lands along the Arkansas River. Under the bill, the tribes would extinguish their claims upon payment by the federal government of $49 million to compensate them for the mismanagement of tribal resources along the Arkansas River. CBO estimates that implementing the bill would cost $49 million in fiscal year 2003, assuming appropriation of the authorized amount. H.R. 3534 would not affect direct spending or receipts; therefore, pay-as-you-go procedures would not apply.

H.R. 3534 contains an intergovernmental mandate as defined in the Unfunded Mandates Reform Act (UMRA), but this mandate would impose no net costs on state, local, or tribal governments. The mandate would fall on the Cherokee, Choctaw, and Chickasaw Indian Tribes.

H.R. 3534 contains a private-sector mandate, as defined in UMRA, on the attorneys representing the Cherokee, Choctaw, and Chickasaw Nations in the settlement matter described in the bill. CBO estimates that the direct cost of the mandate would be well below the annual threshold established by UMRA ($115 million in 2002, adjusted annually for inflation).

Estimated cost to the Federal Government: The estimated budgetary impact of H.R. 3534 is shown in the following table. This estimate assumes that the bill will be enacted near the end of fiscal year 2002 and amounts authorized will be appropriated in fiscal

year 2003. The costs of this legislation fall within budget function 450 (community and regional development).

| | By fiscal year, in millions of dollars— | | | | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 |
| CHANGES IN SPENDING SUBJECT TO APPROPRIATION | | | | | |
| Authorization level [1] | 49 | 0 | 0 | 0 | 0 |
| Estimated outlays | 49 | 0 | 0 | 0 | 0 |

[1] This amount could be partly or fully offset by a reduction in future payments from the Judgment Fund if the tribes prevail in a pending case against the government, however, CBO cannot estimate the likelihood or magnitude of such an offset.

Basis of estimate: H.R. 3534 would authorize the Department of the Interior (DOI) to make payments to the tribes' attorneys and to three new tribal trust funds to compensate the Cherokee, Choctaw, and Chickasaw Nations' for the mismanagement of tribal resources along the Arkansas River. The bill would authorize the appropriation of $49 million for such payments. Of this total, $41 million would be used to settle the tribes' claims, and $8 million would be a rental payment for the use of tribal land where two federal hydropower facilities are located.

The trust funds would become the tribes' property after each tribe files for dismissal of all relevant claims filed in the United States Court of Federal Claims. Therefore, assuming that the $49 million authorized by the bill is appropriated in 2003 and that the tribes file for dismissal in 2003, outlays of that amount would be recorded in that year.

The amounts deposited into the trust funds could be used by the tribes to pay for the acquisition of additional land or for certain other purposes. The bill would authorize DOI to take land acquired by the tribes into trust. CBO estimates that any administrative costs to the federal government resulting from taking those lands into trust would not be significant.

Pay-as-you-go considerations: None.

Estimated impact on state, local, and tribal governments: H.R. 3534 contains an intergovernmental mandate as defined in UMRA because it would extinguish outstanding legal claims of the Cherokee, Choctaw, and Chickasaw Nations. The bill provides, however, that these claims would be extinguished only after funds are appropriated to compensate the tribes, so they would incur no net costs as a result of this mandate.

Estimated impact on the private sector: H.R. 3534 contains a private-sector mandate as defined by UMRA. The bill would limit the fees payable to the attorneys under contract with the Cherokee, Choctaw, and Chicawaw Nations. Section 7 would limit attorneys' fees to 10 percent of the funds allocated by the government to each of the Indian Nations. Such a limitation on attorney fees would be a private-sector mandate as defined by UMRA. The total amount of the settlement is less than $50 million. Thus, the direct cost of the mandate, measured as a loss in net income for the attorneys, would be well below the annual threshold established by UMRA ($115 million in 2002, adjusted annually for inflation). According to government sources, however, attorney fees would likely not exceed 10 percent of the settlement. Thus, the mandate may have no cost to the private sector.

Estimate prepared by: Federal Costs: Lanette J. Walker; impact on state, local and tribal governments: Marjorie Miller; impact on the private sector: Cecil McPherson.

Estimate approved by: Peter H. Fontaine, Deputy Assistant Director for Budget Analysis.

COMPLIANCE WITH PUBLIC LAW 104–4

This bill contains no unfunded mandates as defined by Public Law 104–4.

PREEMPTION OF STATE, LOCAL OR TRIBAL LAW

This bill is not intended to preempt any State, local or tribal law.

CHANGES IN EXISTING LAW

If enacted, this bill would make no changes in existing law.

○