IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, | * | |
| Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES OF AMERICA, | * | Case No. 218-89 |
| Defendant. | * | |
| * * * * * * | * | |
| PATTON BOGGS LLP | * | Chief Judge Edward J. Damich |
| Intervenor Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |
| * * * * * * | * | * * * * * |

**MEMORANDUM SUPPORTING PATTON BOGGS' CROSS-MOTION FOR SUMMARY JUDGMENT FOR $1,247,501.80**

PATTON BOGGS LLP

David P. Callet (DC Bar No. 181990)
David S. Panzer (DC Bar No. 470677)
Greenberg Traurig LLP
800 Connecticut Ave, NW, Suite 500
Washington, DC 20006
202-331-3100
202-331-3101 (fax)
calletd@gtlaw.com
panzerd@gtlaw.com

March 20, 2006

# TABLE OF CONTENTS


**TABLE OF CONTENTS** ..... i

**TABLE OF AUTHORITIES** ..... iii

**MEMORANDUM SUPPORTING PATTON BOGGS' CROSS-MOTION FOR SUMMARY JUDGMENT FOR $1,247,501.80** ..... 1

**STATEMENT OF THE QUESTIONS PRESENTED** ..... 2

**STATEMENT OF THE CASE** ..... 2

**UNDISPUTED FACTS** ..... 9

**Undisputed Facts As To The Payment Provision** ..... 9

**Undisputed Facts As To The Fee Cap** ..... 10

**ARGUMENT** ..... 11

**I. THE SETTLEMENT ACT MANDATES PAYMENT TO THE CHEROKEE NATION'S ATTORNEYS OF THOSE FEES PROVIDED FOR IN THEIR APPROVED ATTORNEY FEE CONTRACTS.** ..... 11

**A. Under The Plain Language Of The Settlement Act, "As Approved" Modifies The Word "Contracts," Not The Word "Fees."** ..... 11

**B. The Settlement Act's Payment Provision Is Not Ambiguous Because It Has Only One Reasonable Reading And, Therefore, No Judicial Presumptions Can Save The Secretary's Interpretation Advanced By The Government And The Cherokee Nation** ..... 13

**C. Even If A Hypothecated Alternative Interpretation Makes The Settlement Act's Payment Provision Otherwise Ambiguous, The Unambiguous Legislative History Resolves That Potential Ambiguity.** ..... 14

**D. When The Legislative History Is Clear, There Is No Presumption In Favor Of Indians.** ..... 15

**II. PATTON BOGGS IS ENTITLED TO SUMMARY JUDGMENT ON THAT PORTION OF ITS TEN PERCENT CONTINGENCY FEE WITHIN THE FEE CAP.** ..... 16

**A. Patton Boggs Is Entitled To Summary Judgment In An Amount Equal To The Current And Future Balance Of The Attorney Escrow Account** ..... 17

B. Patton Boggs Also Is Entitled To Summary Judgment In An Amount Equal To The Sums Improperly Paid To The Hall Estill Law Firm. .....18

C. Patton Boggs Also Is Entitled To Summary Judgment In An Amount Equal To The Sums Improperly Paid To The Estate Of Paul Niebell. .....19

CONCLUSION .....20

APPENDIX TO PATTON BOGGS' CROSS-MOTION FOR SUMMARY JUDGMENT FOR $1,247,501.80 (SEPARATE VOLUME)

TABLE OF CONTENTS ..... i

EXHIBIT A — CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT ACT, 25 U.S.C. §§ 1779, *ET SEQ.* ..... A-1

EXHIBIT B — 25 U.S.C. § 81 ..... A-19

EXHIBIT C — H.R. Rep. No. 107-632 ..... A-22

EXHIBIT D — S.J. Res. 177, 74th Cong. (1936) ..... A-33

EXHIBIT 1 — SEPTEMBER 8, 1988 WILCOXEN-NIEBELL ATTORNEY'S CONTRACT ..... A-34

EXHIBIT 2 — APRIL 17, 1989 PATTON BOGGS ATTORNEYS' CONTRACT ..... A-39

EXHIBIT 3 — OCTOBER 30, 1995 LETTER FROM JOE BYRD TO KATE BOYCE ..... A-43

EXHIBIT 4 — OCTOBER 6, 2003 MEMORANDUM FROM JULIAN FITE TO CHAD SMITH, JIM WILCOXEN, AND JOE REEDER REGARDING ATTORNEY FEES FOR WORK ON ARKANSAS RIVERBED ISSUES ..... A-44

EXHIBIT 5 — MARCH 31, 2005 LETTER FROM JAMES WILCOXEN AND MARGARET SWIMMER TO CHAD SMITH AND COUNCIL OF THE CHEROKEE NATION ..... A-50

EXHIBIT 6 — OCTOBER 13, 2005 LETTER FROM JAMES CASON TO CHAD SMITH ..... A-53

EXHIBIT 7 — DECLARATION OF DAVID S. PANZER, ESQ. ..... A-56

# TABLE OF AUTHORITIES

**Federal Cases**

***AD Global Fund v. United States*,**
**67 Fed. Cl. 657 (2005) ............ 11, 12, 13, 14, 15**

***Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*,**
**467 U.S. 837 (1984) ............ 13**

***Cherokee Nation v. United States*,**
**937 F.2d 1539 (10th Cir.), *reh'g denied*, 948 F.2d 635 (10th Cir. 1991) ......... 10, 19, 22**

***Chickasaw Nation v. United States*,**
**534 U.S. 84 (2001) ............ 15**

***DeCoteau v. District County Court for the Tenth Judicial Dist.*,**
**420 U.S. 425 (1975) ............ 15**

***Demko v. United States*,**
**44 Fed. Cl. 83 (1999) ............ 12**

***Elliot Coal Mining Co. v. Dir., Office of Workers' Comp. Programs*,**
**17 F.3d 616 (3rd Cir. 1994) ............ 12**

***Hopi Tribe v. United States*,**
**55 Fed. Cl. 81 (2002) ............ 19**

***N.L.R.B. v. Pueblo of San Juan*,**
**276 F.3d 1186 (10th Cir. 2002) ............ 15**

***Red Lake Band v. United States*,**
**17 Cl. Ct. 362 (1989) ............ 15**

***Red Lake & Pembina Bands v. Turtle Mountain Band of Chippewa Indians*,**
**355 F.2d 936 (Ct. Cl. 1965) ............ 19, 22**

***Sisseton & Wahpeton Bands or Tribes v. United States*,**
**423 F.2d 1386 (Ct. Cl. 1970) ............ 6, 18**

***South Carolina v. Catawba Indian Tribe, Inc.*,**
**476 U.S. 498 (1986) ............ 14**

***Sioux Nation of Indians v. United States*,**
**650 F.2d 244 (Ct. Cl. 1981) ............ 6**

**_United States v. Cherokee Nation_,**
**480 U.S. 700 (1987),..........10, 19, 22**

**_United States v. Thompson_,**
**941 F.2d 1074 (10th Cir. 1991)..........15**

**_W. Shoshone Identifiable Group v. United States_,**
**652 F.2d 41 (Ct. Cl. 1981)..........6**

**_White Mountain Apache Tribe of Arizona v. United States_,**
**30 Fed. Cl. 8 (1993), _aff'd_, 31 F.3d 1176 (Fed. Cir. 1994)..........6**

**Federal Statutes**

**25 U.S.C. § 81..........5**

**Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act,**
**25 U.S.C. §§ 1779, _et seq._ ..........passim**

**Legislative Materials**

**H.R. Rep. No. 107-632 ..........14**

**S.J. Res. 177, 74th Cong. (1936)..........5**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, | * | |
| Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES OF AMERICA, | * | Case No. 218-89 |
| Defendant. | * | |
| * * * * * * | * | |
| PATTON BOGGS LLP | * | Chief Judge Edward J. Damich |
| Intervenor Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |
| * * * * * * | * | * * * * * |

**MEMORANDUM SUPPORTING PATTON BOGGS' CROSS-MOTION FOR SUMMARY JUDGMENT FOR $1,247,501.80**

Intervenor Plaintiff Patton Boggs LLP ("Patton Boggs") has a $1,393,542.80 Tucker Act claim against the government based upon failure of the Secretary of the Department of the Interior (the "Secretary") to comply with the money-mandating attorneys fees provision of the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, Pub. Law 107-331 (the "Settlement Act"), codified as 25 U.S.C. § 1779.[1] The Settlement Act's attorney fee payment provision requires: "the Secretary shall pay to the Indian Nation's attorneys those fees ***provided for in the individual tribal attorney fee contracts*** as approved by the respective Indian Nations." 25 U.S.C. § 1779e(a)

---

[1] *See* Docket No. 127, Complaint in Intervention ("PB Compl."). The full text of the Settlement Act is set forth in the Appendix (the "Appendix") to Patton Boggs' Cross-Motion for Summary Judgment at A-1 to A-18.

(emphasis added) (the "Payment Provision"). This Cross-Motion for Summary Judgment seeks $1,247,501.80 of Patton Boggs' claim – that portion of its claim under the Payment Provision that is unaffected by the limitations on attorneys fees paid under the Settlement Act, as set forth in 25 U.S.C. § 1779e(b) (the "Fee Cap").

## STATEMENT OF THE QUESTIONS PRESENTED

1. Whether Patton Boggs is entitled to judgment, as a matter of law, in the amount equal to balance of the Settlement Act's Fee Cap because (a) Patton Boggs' statutory right to the fee "provided for" in its attorney fee contract exceeds that amount, (b) no other attorney seeks or could seek that amount, and (3) that amount – by definition – could not exceed the Settlement Act's Fee Cap.

2. Whether the balance of funds available to pay Patton Boggs' statutory fee – without exceeding the Settlement Act's Fee Cap – comprises:

> (a) the current and future balances of the attorney fee escrow account set aside to pay the Cherokee Nation's attorneys;
>
> (b) the amounts improperly paid to Hall Estill which had no attorney contract with the Cherokee Nation because the Fee Cap applies only to "the total fees payable to attorneys under such contracts"; and
>
> (c) the amounts improperly paid to the Estate of Paul Niebell, who was not entitled to any payment under his attorney fee contract with the Cherokee Nation because his efforts resulted in no recovery for the Cherokee Nation.

## STATEMENT OF THE CASE

### <u>The Secretary Misinterpreted The Settlement Act</u>

Despite the money-mandating language of the Settlement Act's Payment Provision, on October 13, 2005, the Secretary determined that the Payment Provision only "requires the Secretary to execute a purely ministerial act in carrying out the instructions of the Cherokee Nation as expressed in the post settlement resolutions of the

Council."[2] On October 17 and 18, 2005, in derogation of her statutory duties, the Secretary carried out the Cherokee Nation's instructions as to whom to pay attorneys fees and in what amounts.[3]

**<u>This Court Allowed Patton Boggs To Intervene</u>**

Patton Boggs moved to intervene on October 19, 2005. Following two hearings and heavy briefing, the Court issued an Opinion and Order on December 19, 2005, Docket No. 125 (the "Opinion"), granting Patton Boggs' motion to intervene and allowing Patton Boggs to file a complaint in intervention against the government based on the Settlement Act's money-mandating attorneys fee provision. In its Opinion, the Court determined:

- "PB's claim for attorney's fees is based on the enactment of th[e Settlement Act]." Opinion at 11.
- "A plain reading of [the Settlement Act's Payment Provision] unequivocally demonstrates that the statute mandates that the Secretary pay the attorneys their fees." *Id.* at 15.
- "$2 million is available for the payment of attorney's fees." *Id.* at 3.
- "Whether the money [claimed by Patton Boggs] comes from the attorney fee escrow account or the judgment fund, it is still U.S. government money." *Id.* at 14 (footnote omitted).

**<u>Patton Boggs Stated A Statutory Tucker Act Claim</u>**

Patton Boggs' Complaint in Intervention asserts that a plain reading of the Settlement Act's Payment Provision requires the Secretary to pay the Cherokee Nation's attorneys in accordance with their "approved" attorney fee contracts, subject to the Fee Cap. PB Compl. The Payment Provision does not provide for post-hoc Indian Nation "approval." *Id.*

---

[2] Exhibit 6 at A-54.

[3] Attachment to Docket No. 138, Declaration of Douglas A. Lords ("Lords Decl.") at ¶¶ 8-9.

In this case, the Payment Provision requires the Secretary to pay to Patton Boggs "those fees provided for in [Patton Boggs'] individual tribal attorney fee contract[] as approved by the [Cherokee] Nation[]." 25 U.S.C. § 1779e(a). Patton Boggs' contract with the Cherokee Nation (the "Contract") "provided for" a ten percent contingency fee.[4] The Cherokee Nation's total recovery, including sums allocated to its counsel, will be $19,485,018, making Patton Boggs' total fee $1,948,501.80.[5] Subtracting the money that Patton Boggs has already been paid by the Cherokee Nation, and by the Secretary, Patton Boggs' Tucker Act claim is $1,393,542.80, as summarized below:

| | |
|---|---|
| **Appropriations To Cherokee Nation and Its Counsel Under The Settlement Act** | **$19,485,018.00** |
| Patton Boggs' Ten Percent Attorney Fee Claim Provided By The Settlement Act | $1,948,501.80 |
| Less Pre-Settlement Act Amounts Paid To Patton Boggs | ($403,959.00) |
| **Subtotal – Patton Boggs' Total Settlement Act Attorney Fee** | **$1,544,542.80** |
| Payment to Patton Boggs By The Secretary From Settlement Act Appropriated Funds on October 18, 2005 | ($151,000.00) |
| **Total of Patton Boggs' Tucker Act Claim** | **$1,393,542.80** |

At the same time, the Settlement Act's Fee Cap limits "the total fees payable to attorneys under such contracts with an Indian Nation [to] 10 percent of that Indian Nation's allocation of funds appropriated [by the Settlement Act]." 25 U.S.C. § 1779e(b).[6] The question remains as to how, if at all, the Fee Cap affects Patton Boggs'

[4] *See* Exhibit 2 at A-41.

[5] Docket No. 137, Joint Status Report; Lords Decl. at ¶¶ 8-9. This sum assumes that Congress will fully fund the FY 2007 appropriations.

[6] Contrary to the Cherokee Nation's arguments, Docket No. 124, December 13, 2005 Hearing Transcript ("Tr.") at 56:21-60:14, Patton Boggs does not seek all fees payable under the Payment Provision. Because Patton Boggs had been paid $403,959 by the Cherokee Nation, prior to October 18, 2005, Patton Boggs was owed a total of $1,544,542.80 (based on the sums now known to have been appropriated). Thus, had Patton Boggs been paid in full, $403,959 would have been remaining for the Cherokee Nation's other attorneys with "approved" contracts. Incidentally, this would have been enough to cover the amount of

statutory right to be paid its fees. Tr. at 54:21-56:7.

**The Cherokee Nation And The Government Fail To Consider This Court's Analysis In Their Responses To Patton Boggs' Tucker Act Complaint**

In response to Patton Boggs' Complaint, the Cherokee Nation filed a Motion to Dismiss which rehashes all of its jurisdictional arguments previously rejected by the Court when it granted Patton Boggs' motion to intervene. Docket No. 135. The Cherokee Nation incorrectly contends that Patton Boggs' "complaint mis-reads the Settlement Act in ascribing to the Secretary the authority to independently set the attorneys fees, instead of implementing the decision of the Indian Nations as to which attorneys should be paid and how much." *Id.* at 18.

Thereafter, the government filed a Motion to Dismiss Or, In The Alternative, For Summary Judgment (Docket 138), rearguing this Court's jurisdiction to consider Patton Boggs' claim. The government also repeats its interpretation of the Payment Provision – that the phrase "as approved by the Indian Nations" modifies the word "fees" – which it then concedes would render "superfluous" the Payment Provision's phrase "as provided for in the individual tribal attorney fee contracts." *Id.* at 10.

Given the government's concessions, only the Cherokee Nation fails to recognize the fatal flaw in its interpretation, which seeks to arrogate to itself carte blanche to direct a Unites States Cabinet-level official to execute an unequivocal statutory duty however the Cherokee Nation deems fit. The Court has ruled that the Settlement Act "mandates that the Secretary pay the attorneys their fees." Opinion at 15. "Under cardinal principles of statutory interpretation, the court must interpret the statute so that no clause, sentence or word shall be superfluous, void, or insignificant." Opinion at 14 (citation and internal

money that the Cherokee Nation approved for Mr. Wilcoxen under his contract before the Cherokee Nation gratuitously decided that Mr. Wilcoxen should received a $150,000 "bonus." *See* Ex. 4 at A-49.

quotation marks omitted). For that reason, the Court found it "hard ... to reconcile the Cherokee Nation and the U.S.'s position with the [presence of the] word 'contract' [in the Settlement Act's Payment Provision.]" Tr. at 54:22-24. The Court explained that the government's and the Cherokee Nation's position logically leads to "the Indian Nations hav[ing] absolute carte blanche with regard to who they pay and what they pay" which is "odd" given Congress's use of the phrase "in the individual tribal attorney fee contracts." *Id.* at 55:1-6. The Court thus recognized that "the final interpretation of the meaning [of the Payment Provision] has to take into account the use of the word 'contracts,' as well as the phrase, 'as approved by the respective Indian Nations.'" *Id.* at 55:7-11.

Concurrent with the filing of this Motion, Patton Boggs has filed oppositions to the dispositive motions filed by the Cherokee Nation and the government.

**<u>This Motion Seeks Only Those Fees Below The Fee Cap Which Cannot, Under Any Analysis, Involve Any Approval By The Cherokee Nation</u>**

Any interpretation of the Payment Provision that accounts for the word "contracts" in the Settlement Act must preserve Patton Boggs' ten percent contingency fee, absent a conflict with another attorney fee claim recognized under the Settlement Act. As the Court observed, a "possibility [that empowers the Cherokee Nation to approve fees] is to say that the contracts are binding, so that anybody, who has a binding contract with the tribes must be paid, but the amount, because of the fact that there is a cap here, is approved by the respective Indian Nations." Tr. at 55:19-23. In other words, the Secretary must pay the attorneys their fees under the Settlement Act's Payment Provision (Opinion at 15), but the Cherokee Nation has a limited role if payments would conflict with the Settlement Act's Fee Cap. Therefore, while the Court has yet to finally interpret the Payment Provision and decide whether it is "fees" that must be approved, or

if it is "contracts," in either event, Patton Boggs is entitled to be paid its "below the Fee Cap" fees.

Here, Patton Boggs seeks a "naked money judgment" only as to those additional *amounts* within the Settlement Act's statutory Fee Cap, amounts that do not involve competing claims among the Cherokee Nations' attorneys, as set forth below:

| | |
|---|---|
| Balance Of The Attorney Fee Escrow Fund | $366,977.23 |
| Future Expected Allocation To The Attorney Fee Escrow Fund | $500,000.00 |
| Monies Improperly Paid Out Of The Attorney Fee Escrow Fund To The Hall Estill Law Firm – Which Had No Contract With The Cherokee Nation | $280,524.57 |
| Monies Improperly Paid Out Of The Attorney Fee Escrow Fund To The Estate Of Paul Niebell – A Fee "Wholly Contingent" On A Recovery He Did Not Achieve | $100,000.00 |
| **Total: Patton Boggs' Summary Judgment Claim** | **$1,247,501.80** |

None of this $1,247,501.80 that Patton Boggs now seeks in this summary judgment motion entails the need for any potential "approval" by the Cherokee Nation, even if the Settlement Act allowed or required such "approval." Patton Boggs seeks only those amounts under the Fee Cap. Absent application of the Fee Cap, there was nothing for the Cherokee Nation to approve or disapprove as to Patton Boggs' unambiguous ten percent contingency fee contract. Therefore, even if the Court rejects Patton Boggs' interpretation of the Payment Provision, any interpretation takes into account that the Payment Provision uses both the word "contracts," as well as the phrase "as approved by the respective Indian Nations," leads to summary judgment for Patton Boggs of $1,247,501.80 – the amount equal to the balance of the fees permitted under the Settlement Act.

**UNDISPUTED FACTS**

The following facts are not in dispute:[7]

**Undisputed Facts As To The Payment Provision**

First, "the [Settlement Act] mandates that the Secretary pay the attorneys their fees." Opinion at 15. Patton Boggs' approved Contract "provided for" "compensation of ten percent (10%) of the amount recovered less the amounts previously paid by said Cherokee Nation...." Ex. 2 at A-41. Of those funds appropriated pursuant to the Settlement Act, 50% are allocated to the Cherokee Nation, a portion of which was set aside for its counsel. Assuming the FY 2007 appropriations fully funds the last $10 million traunch of authorized funds, the Cherokee Nation and its attorneys will recover a total of $19,485,018.[8] The amount that the Secretary "shall pay" to Patton Boggs is "provided for" in Patton Boggs' ten percent contingency fee Contract. Therefore, Patton Boggs is entitled to $1,948,501.80, less the $554,959 previously received (of which only $151,000 was paid with funds appropriated under the Settlement Act), *i.e.*, $1,393,542.80.

**Undisputed Facts As To The Fee Cap**

Under the Fee Cap, however, the Settlement Act limits payment to the Cherokee Nation's attorneys from funds appropriated pursuant to the Settlement Act to ten percent of the Cherokee Nation recovery – again, $1,948,501.80.

From appropriated funds, the Secretary disbursed payments as follows:

- $151,000 to Patton Boggs;

[7] *See* Tr. at 80:11-12; *see also* Patton Boggs' Proposed Findings of Uncontroverted Facts, filed concurrently herewith.

[8] Opinion at 3 ("Since the Cherokee Nation will receive a total of $20 million in appropriations under the Settlement Act, $2 million is available for payment of attorney's fees."); Docket No. 137, Joint Status Report.

- $550,000 to Mr. Wilcoxen's law firm;
- $280.524.57 to the Hall Estill law firm; and
- $100,000 to the Estate of Mr. Niebell.

Lords Decl. at ¶¶ 8-9. Of these attorneys, only Patton Boggs seeks additional payments.[9] Hall Estill was paid $280,524.57, even though it had no attorney fee contract with the Cherokee Nation. Mr. Niebell was paid $100,000.00, even though none of his efforts resulted in any recovery for the Cherokee Nation.[10]

To date, the Secretary has paid the Cherokee Nation's attorneys a total of $1,081,524.57 from Settlement Act appropriated funds,[11] allowing for further payments from appropriated funds of ***at least*** $866,977.23 without running afoul of the Fee Cap, or even questioning whether the attorney fee payments made by the Secretary were appropriate![12]

---

[9] Ex. 5 at A-51 (March 31, 2005 letter from Mr. Wilcoxen, and Margaret A. Swimmer of the Hall Estill firm, to the Cherokee Nation, stating "having accepted the Nation's fee determination, we have no dispute with the Nation....").

[10] Mr. Niebell's contract provided that he be paid nothing for his unsuccessful litigation. Ex. 1 at A-35. Mr. Niebell (along with Mr. Wilcoxen) pursued two claims on behalf of the Cherokee Nation, both of which were finally dismissed long before the Settlement Act and, therefore, were not resolved by the Settlement Act. *See United States v. Cherokee Nation*, 480 U.S. 700 (1987) (disposing of "takings" claim); *Cherokee Nation v. United States*, 937 F.2d 1539 (10th Cir.) (disposing of "fair and honorable dealings" claims), *reh'g denied*, 948 F.2d 635 (10th Cir. 1991). Mr. Niebell died in 1994 (Ex. 4 at A-46), before Patton Boggs was terminated. Ex. 3 at A-43. He never worked on this case. *See* Ex. 4 at A-46 (describing Mr. Niebell's work as "Mr. Niebell was one of the original six attorneys who entered into the 1980 fee settlement.").

[11] Lords Decl. at ¶¶ 8-9.

[12] The payment to Hall Estill was improper because it had ***no*** contract with the Cherokee Nation. The payment to the Estate of Paul Niebell was improper because Mr. Niebell's contract provided that he would be paid only if the litigation he pursued was successful (Ex. 1 at A-35), but it was not. *See supra*, note 13. Mr. Niebell's contract was "wholly contingent" on his obtaining a recovery for the Cherokee Nation, but, because the cases he pursued led to zero recovery for the Cherokee Nation, his approved contract "provided for" him to receive zero attorneys fees. But for Mr. Wilcoxen's appearance and (limited) participation *in this case brought by Patton Boggs*, Mr. Wilcoxen would not be entitled to any fees either.

## ARGUMENT

### I. THE SETTLEMENT ACT MANDATES PAYMENT TO THE CHEROKEE NATION'S ATTORNEYS OF THOSE FEES PROVIDED FOR IN THEIR APPROVED ATTORNEY FEE CONTRACTS.

As explained more fully below, the myriad canons of construction used by this Court,[13] confirm a simple, common-sense reading of the Settlement Act: the phrase "as approved by the respective Indian Nations" modifies the word "contracts," not the word "fees."

#### A. Under The Plain Language Of The Settlement Act, "As Approved" Modifies The Word "Contracts," Not The Word "Fees."

Statutory interpretation begins with plain meaning.[14] If every word in the Settlement Act is to be given meaning, "as approved by the" Cherokee Nation cannot refer to "fees" because that would negate and make insignificant the phrase "provided for in the individual tribal attorney fee contracts."[15]

Grammatically, if Congress intended the phrase "as approved" to refer to the remote word "fees," instead of the immediately preceding word "contracts," then the clause "provided for in the individual tribal attorney fee contracts" should have been set off by commas both before the word "provided" and after the word "contracts."[16]

---

[13] *See, e.g., AD Global Fund v. United States*, 67 Fed. Cl. 657 (2005).

[14] *See id.*, 67 Fed. Cl. at 671.

[15] *See id.* at 672 (interpretations should ensure that "provisions do not negate each other and words or other elements are not excessive or insignificant.").

[16] *See Demko v. United States*, 44 Fed. Cl. 83, 87 (1999) (discussing at length "the doctrine of the last antecedent"). "Under that principle, qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to and including others more remote." *Elliot Coal Mining Co. v. Dir., Office of Workers' Comp. Programs*, 17 F.3d 616, 629 (3rd Cir. 1994) (citations and internal quotation marks omitted).

Structurally,[17] the phrase "as approved by the respective Indian Nations" was placed within the statutory provision that (a) grants to the Indian Nations' attorneys rights to fees, as well as (b) mandates that the Secretary pay the Indian Nations' attorneys such fees. *See* Opinion at 15. Therefore, "as approved" describes those contracts the Secretary must pay because the Secretary must know what and to whom she "shall pay." In addition, the Settlement Act limits the total amount that the Secretary shall pay "to attorneys ***under such contracts***." 25 U.S.C. § 1779e(b) (emphasis added) (discussed further *infra*).

Logically, if Congress intended to vest the Cherokee Nation with complete discretion over the payment of its attorneys' fees, there was no reason for Congress to mandate that ***the Secretary*** pay the Indian Nations' attorneys with U.S. government money.[18] Congress would simply have given all funds appropriated directly to the Indian Nations. The Settlement Act's plain meaning neither requires nor even allows any additional approval or disapproval of attorneys fees by the Cherokee Nation.

---

[17] *See AD Global Fund*, 67 Fed. Cl. at 671-72 (interpretations should be based upon a reading of the statute as a whole, and placed within its "contemporary legal context").

[18] *See* Opinion at 14 ("Whether the money comes from the attorney fee escrow account or the judgment fund, it is still U.S. government money. By mandating that the Secretary pay attorneys government funds, Congress provided the attorneys with a cause of action if the Secretary failed to do so.") (footnote omitted). The funds paid to the attorneys from the attorney escrow funds established in March 2005. Docket 137, Joint Status Report. *See also* 25 U.S.C. § 1779c(d) ("***After*** payment pursuant to ***section 1779e*** of this title, the ***remaining funds*** authorized for appropriation under subsection (c) of this section shall be allocated among the Indian Nations....") (emphasis added).

**B. The Settlement Act's Payment Provision Is Not Ambiguous Because It Has Only One Reasonable Reading And, Therefore, No Judicial Presumptions Can Save The Secretary's Interpretation Advanced By The Government And The Cherokee Nation.**

The Secretary's untenable interpretation of the Settlement Act, advanced by the government and the Cherokees Nation, but which the government now *admits* contravenes multiple canons of statutory construction, still does not create an "ambiguity," which requires two or more reasonable, alternative readings. *AD Global Fund*, 67 Fed. Cl. at 672 ("Ambiguity in a statute ... normally means two or more alternative readings, all having some claim to respect and none leading to absurd results.") (citation and internal quotation marks omitted). Consequently, there are no presumptions in favor of these untenable interpretations advanced by the government or the Cherokee Nation.

First, the Court need only defer to the Secretary's interpretation of the Settlement Act "if the statute is silent or ambiguous with respect to the specific issue[.] [T]he question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (footnote omitted). In this case, the Secretary has not advanced a permissible construction of the Settlement Act, and wholly ignores the significance of the attorneys' contracts.

Second, the Supreme Court is very clear about the reasonable outer bounds of any presumption in favor of Indians: "[t]he canon of construction regarding the resolution of ambiguities in favor of Indians, however, does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress." *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986) (footnote omitted).

### C. Even If A Hypothesized Alternative Interpretation Makes The Settlement Act's Payment Provision Otherwise Ambiguous, The Unambiguous Legislative History Resolves That Potential Ambiguity.

Notwithstanding the untenable interpretations advanced by the government and the Cherokee Nation, the Court hypothesized its own alternative interpretation:

> I'm sort of moving in the direction of that middle way, that they have to pay any attorney for whom they have a valid contact [sic], but because of the cap, the Indians can determine, as long as its reasonable, the amount of money that the people should be paid.

Tr. at 56:2-7. "However, if a statute has two or more plausible alternative readings and thus is deemed ambiguous, the next step is for the court to look to the legislative history." *See AD Global Fund*, 67 Fed. Cl. at 672 (citations omitted). Committee reports are the most persuasive of all forms of legislative history and deemed to be "highly persuasive" with this Court. *Id.* at 677 (citation omitted).

In this case, the House of Representatives' Committee on Resources explains how § 1779e is to operate: "This section authorizes the Secretary to pay the Nations' attorneys those sums owed them under their respective contracts, but imposes a cap of ten percent of the Nation's allocation of funds appropriated under [§ 1779c(c)]." H.R. REP. NO. 107-632 at A-29 (discussing Section 1779e of the Statute). The legislative history states nothing as to any subsequent "approval" of attorneys fees by the Indian Nations; instead, it expresses the plain meaning of the statutory provision: the Indian Nations' attorneys are to be paid in accordance with the terms of their contracts. This legislative history is unequivocal, and thereby precludes any need to look to any judicial presumption. *See AD Global Fund*, 67 Fed. Cl. at 672.

**D. When The Legislative History Is Clear, There Is No Presumption In Favor Of Indians.**

The Settlement Act's clear legislative history further rejects any presumption in favor of the Cherokee Nation, even if it had proffered a reasonable interpretation. *See Chickasaw Nation v. United States*, 534 U.S. 84, 85 (2001) (relying on legislative history to determine Congress's intent and ruling that the presumption does not apply if it "would produce an interpretation that we conclude would conflict with the intent embodied in the statute Congress wrote"). As this Court has made clear, "legislative history should be examined before a presumption is applied." *See AD Global Fund*, 67 Fed. Cl. at 672 (citation omitted); *see also Red Lake Band v. U.S.*, 17 Cl. Ct. 362, 381 (1989) ("This rule [construing statutes to benefit Indians] does not permit a construction that contradicts express statutory language or legislative history, however.") (*citing DeCoteau v. District County Court for the Tenth Judicial Dist.,* 420 U.S. 425, 445 (1975)). Other federal courts also look to legislative history *before* they apply any judicial presumption in favor of Indians because clear congressional intent may be found in legislative history. *See N.L.R.B. v. Pueblo of San Juan*, 276 F.3d 1186, 1194 (10th Cir. 2002); *United States v. Thompson*, 941 F.2d 1074, 1077-78 (10th Cir. 1991) (compiling cases).

Thus, the plain meaning of the Settlement Act, applicable rules of statutory construction, and the Settlement Act's unambiguous legislative history, all required the Secretary to pay "those [attorneys] fees provided for" in the "approved" "attorney fee contracts."[19] As the government and the Cherokee Nation could not overcome the

[19] Even assuming the Settlement Act could be interpreted to permit the Cherokee Nation to approve fees (which it cannot), the Settlement Act cannot be read to give the Cherokee Nation any "approval" of fees below the Fee Cap because the Settlement Act does not give the Cherokee Nation carte blanche with regard to whom the Secretary pays and what the Secretary pays. Tr. at 54-55. Such carte blanche "approval" has resulted in the Cherokee Nation instructing the Secretary to pay a law firm which had no attorney fee

controlling potency of the Settlement Act's legislative history, they have avoided it at all costs.

## II. PATTON BOGGS IS ENTITLED TO SUMMARY JUDGMENT ON THAT PORTION OF ITS TEN PERCENT CONTINGENCY FEE WITHIN THE FEE CAP.

Patton Boggs is entitled to be paid a ten percent contingency fee, absent any statutory limitation on that fee. *See supra*. Patton Boggs' approved Contract "provided for" "compensation of ten percent (10%) of the amount recovered less the amounts previously paid by said Cherokee Nation…." Ex. 2 at A-41.[20] Because Patton Boggs' $1.4 million Tucker Act claim exceeds the Fee Cap, and no other attorneys claim any additional fees, Patton Boggs is entitled to summary judgment in an amount equal to the balance of the Fee Cap, comprised of (a) the current and future balance of the attorney escrow account, (b) the amount improperly paid to the Hall Estill law firm, and (c) the amount improperly paid to the Estate of Paul Niebell.

---

contract, to pay the estate of an attorney who earned no fee, and then to pay the balance of appropriated attorneys fees to the Cherokee Nation itself.

[20] The Cherokee Nation has previously chastised Patton Boggs for failing to address that its Contract includes language subjecting Patton Boggs' ten percent contingency fee to "any approval from the Cherokee Nation tribal [council] required by law." Tr. at 58:21-24. While this language is in Patton Boggs' Contract, the Cherokee Nation's argument begs the question, "were any approvals required by law?" That, of course, is the ultimate question for the Court: whether the "approval" provided by the Settlement Act is the prior approval of an attorney fee contract or a subsequent approval of fees that would otherwise be subject to the fee cap. The Court noted, however, that any such "approval" by the Cherokee Nation would have to be subject to an objective assessment of reasonableness. *Id.* at 60:15-61:14.

*With respect to Patton Boggs' Contract*, however, that reasonableness is not at issue here because the Cherokee Nation's right of approval, assuming it had one, never arose. Given the unambiguous language of Patton Boggs' Contract, it simply is not objectively reasonable to suggest that Patton Boggs' Contract provides for something other than a ten percent contingency. Because this Motion applies only to fees under the Fee Cap, there are no required approvals to consider under any reasonable interpretation of the Settlement Act.

### A. Patton Boggs Is Entitled To Summary Judgment In An Amount Equal To The Current And Future Balance Of The Attorney Escrow Account.

The Settlement Act limits the amounts payable *from appropriated funds* to 10% of the total amounts appropriated for the Cherokee Nation and its lawyers with approved contracts.[21] Here, "[t]he total amount determined by the [Cherokee Nation] resolutions ... did not exhaust the $2 million available for the payment of attorney's fees under the Settlement Act."[22] Rather, the Cherokee Nation resolutions (and the amounts actually paid out by the Secretary) totaled $1,081,524.57, leaving $866,977.23 within the statutory Fee Cap to satisfy Patton Boggs' claim.[23]

Because Patton Boggs' ten percent fee exceeds this remaining balance, the Secretary was mandated to pay Patton Boggs *at least* an additional $866,977.23,[24] even assuming that Patton Boggs' fee is limited by the amounts that the Secretary paid to the Cherokee Nation's other counsel with individual tribal attorney fee contracts. Thus, Patton Boggs seeks summary judgment in an ***amount*** equal to the unpaid balance in the attorney escrow account ($366,977.23), plus the expected allocation from FY 2007 appropriations ($500,000.00), totaling $866,977.23.

### B. Patton Boggs Also Is Entitled To Summary Judgment In An Amount Equal To The Sums Improperly Paid To The Hall Estill Law Firm.

The Settlement Act limits payment to those attorneys with "individual tribal attorney fee contracts." 25 U.S.C. § 1779e(a). The limitation on the amount of fees that

---

[21] 25 U.S.C. § 1779e(a) ("...***from funds authorized to be appropriated*** ... the Secretary shall pay...") (emphasis added); *Id.* § 1779e(b) ("Notwithstanding subsection (a) of this section, the total fees payable to attorneys under such contracts with an Indian Nation shall not exceed 10 percent of that Indian Nation's allocation of ***funds appropriated*** under section 1779c(c) of this title.") (emphasis added).

[22] Opinion at 3; *see also* Docket No. 137, Joint Status Report (indicating that the Fee Cap will be $1,948,501.80).

[23] *See supra*, note 12 (all other attorneys have disclaimed any interest in this money).

[24] This sum is subject to Congress fully funding the Settlement Act appropriations.

the Secretary "shall pay" applies to "the total fees payable to attorneys under such contracts." *Id.* § 1779e(b). The Hall Estill law firm had no such individual tribal attorney fee contract with the Cherokee Nation. The Cherokee Nation has recognized that fact, in writing.[25] Despite the fact that the Hall Estill law firm was "associated" pursuant to the Wilcoxen-Niebell Contract, under which Messrs. Wilcoxen and Niebell were solely responsible to pay Hall Estill's fees,[26] the Secretary paid $280,524.57 to Hall Estill out of the attorney escrow account.[27]

For these reasons, the Secretary's improper payment to Hall Estill – which had no "individual tribal attorney fee contract" – did not affect "the total fees payable to attorneys ***under such contracts***." 25 U.S.C. § 1779e(b) (emphasis added). Hall-Estill, having no individual tribal attorney fee contract, had no statutory right to attorneys fees.[28] More basic, the Secretary lacked the discretion to pay anything to Hall-Estill.[29] Hence, the $280,525 that the Secretary improperly paid to the Hall Estill law firm as a matter of law cannot apply against the statutory Fee Cap, and, therefore, cannot properly apply against amounts available to honor Patton Boggs' statutory right.[30] Thus, Patton Boggs

---

[25] Exhibit 4 at A-47.

[26] Exhibit 1 at A-35.

[27] Docket No. 137, Joint Status Report at 3; Lords Decl. at ¶ 8. The Secretary made the decision to pay Hall Estill knowing that: (a) the Cherokee Nation acknowledged, in writing, that Hall Estill had no contract, but was "associated" by Mr. Wilcoxen; and (b) the individual tribal attorney fee contract with Mr. Wilcoxen expressly provided that Messrs. Wilcoxen and Niebell were be responsible for any payment to "associate" law firms. Exhibit 6 at A-54 (citing Exhibit 4 at A-47); Exhibit 6 at A-54 (citing Exhibit 1 at A-35).

[28] *Sisseton*, 423 F.2d at 1391 ("[O]nly such attorneys as have actually appeared for claimants can be recognized as entitled to allowance of fees. Associate counsel and assignees, and persons otherwise employed, must look for their pay to those with whom they have contracts.") (citation and internal quotation marks omitted).

[29] *See Hopi Tribe v. United States*, 55 Fed. Cl. 81, 87 (2002) (where payments are mandated, the Secretary's discretion is limited to determining what fees are to properly chargeable under the contract).

[30] It does not withstand scrutiny that the Secretary would pay such unauthorized sums to a third-party, whose shareholder, Margaret A. Swimmer, is married to Ross Swimmer, Special Trustee, Office of Special

also seeks summary judgment in the *amount* improperly paid to Hall Estill – $280,524.57 – again, an amount that cannot properly count against the Fee Cap.

**C. Patton Boggs Also Is Entitled To Summary Judgment In An Amount Equal To The Sums Improperly Paid To The Estate Of Paul Niebell.**

Mr. Niebell was employed under an "individual tribal attorney fee contract[]," (25 U.S.C. § 1779e(a)), including him within the class of persons who could be paid fees. In his case, however, his contract "provided for" fees that were "wholly contingent upon a recovery for [the] Cherokee Nation." Ex. 1 at A-35. In calculating Mr. Niebell's fee, the only relevant consideration is the recovery achieved by the Cherokee Nation in the matters on which Mr. Niebell worked because "performance of services [is] a sine qua non for compensation." *Red Lake & Pembina Bands v. Turtle Mountain Band of Chippewa Indians*, 355 F.2d 936, 938 (Ct. Cl. 1965). But Mr. Niebell did not perform any services that resulted in a recovery for the Cherokee Nation. The actions brought by Messrs. Wilcoxen and Niebell were dismissed, resulting in no recovery. *See United States v. Cherokee Nation, supra*, (disposing of "takings" claim); *Cherokee Nation v. United States, supra*, (disposing of "fair and honorable dealings" claims). Thereafter, Mr. Niebell died in 1994, without ever having performed any services on this matter – the only case that led to the Cherokee Nation's recovery under the Settlement Act.

For all of those reasons, the Secretary's improper $100,000.00 payment to the Estate of Paul Niebell – who was not entitled to any attorneys fees appropriated pursuant to the Settlement Act – did not affect "***the total fees payable*** to attorneys under such contracts." 25 U.S.C. § 1779e(b) (emphasis added). Hence, the $100,000.00 that the

---

Trustee for American Indians, at the Department of the Interior – a former Cherokee Nation Principal Chief for ten years, and the person who founded the Indian Affair practice at the Hall Estill law firm. *See* http://www.hallestill.com/biographies_search_results.php?action=attorney_search;practice_area=11;mode=pa (last visited Monday, March 20, 2006).

Secretary improperly paid to the Estate of Paul Niebell is not a limit on the amounts available to Patton Boggs. Thus, Patton Boggs also seeks summary judgment in the *amount* improperly paid to the Estate of Paul Niebell – $100,000.00 – because that amount cannot count against the Fee Cap.[31]

## CONCLUSION

The Secretary, subject only to the limitations in the Fee Cap, was required to pay the Cherokee Nation's attorneys those fees provided by their respective contracts. The Court has considered an interpretation of the Settlement Act that recognizes Patton Boggs' Contract (which defines the amount of fees payable under the Settlement Act's Payment Provision) and, to the extent that the Fee Cap would be exceeded, gives reasonable approval of fees to the Cherokee Nation. Even under this interpretation, however, absent competing claims (as defined by the respective attorneys fee contracts) that in total exceed the $2 million appropriated for the Cherokee Nation's attorneys, the Cherokee Nation has nothing further to approve.

In this case, the balance of the attorney escrow account (including $500,000 which the parties expect to be allocated into that account) is $866,977.23. No attorneys

[31] It is irrelevant to Patton Boggs which government funds are used to pay Patton Boggs' claim. The government, however, has an interest in not having to pay a judgment to Patton Boggs from the Judgment Fund in addition to paying to the Cherokee Nation those sums appropriated under the Settlement Act. There is no reason why the government should not be able to use the current and future balance of the attorney escrow account to pay down this claim. Moreover, having improperly demanded that the government pay the Hall Estill firm and the Estate of Paul Niebell, invoking the spectre of its sovereignty, and having threatened to sue the government, the Cherokee Nation would be estopped from contesting the government's replenishment of the attorney fee escrow account from the funds in the Cherokee Nation tribal trust fund or from FY 2007 appropriations. If this Court concludes, as Patton Boggs urges, that Hall Estill and the Estate of Paul Niebell could not properly be paid from the attorney escrow account, the government should be free to reallocate the funds – at the very least out of FY 2007 appropriations (which cannot be characterized as Cherokee Nation funds, even under the Cherokee Nation's analysis). That sort of monitoring of the proper payment of fees falls squarely within the ambit of the Court's power over the Consent Decree. As the Cherokee Nation opted to afford these other attorneys some fee payments, equivalent deductions from amounts allocated to the Cherokee Nation tribal trust fund will not interfere with that intent.

other than Patton Boggs claim this money, which is less than Patton Boggs' statutory entitlement. And no attorneys other than Patton Boggs have a contract recognized by the Settlement Act that brings them within the class of persons entitled to any of that money. Therefore, no genuine dispute exists as to any material fact. As a matter of law, Patton Boggs is entitled to *at least* that $866,977.23 balance of the attorney escrow account.

In addition, and again as a matter of law, where the Secretary paid $280,524.57 to Hall Estill (which had no contract), that payment was not part of the limitation on "total fees payable to attorneys under such contracts with an Indian Nation" set forth in 25 U.S.C. § 1779e(b). Hence, no genuine disputes exist as to any material fact, and Patton Boggs is entitled to *an additional* $280,524.57.

Finally, and also as a matter of law, the Secretary's $100,000.00 payment to the Estate of Paul Niebell (who was entitled to zero attorneys fees) was also not part of the limitation on "total fees payable to attorneys under such contracts with an Indian Nation," either. Thus, again, no genuine dispute exists as to any material fact, and Patton Boggs is entitled to *an additional* $100,000.00.

WHEREFORE, Patton Boggs seeks summary judgment against the United States in an amount equal to the remaining balance of the attorney escrow account, the amount improperly disbursed to Hall Estill, and the amount improperly disbursed to the Estate of Mr. Niebell for a total of $1,247,501.80, summarized as follows:[32]

---

[32] Subtracting Patton Boggs' claim for summary judgment ($1,247,501.80) from its total Tucker Act claim ($1,393,542.80) yields $146,041.00 – that part of Patton Boggs' total claim on which it has not moved for summary judgment. The $146,040.20 balance of Patton Boggs' claim will require an application of the Fee Cap to the competing fee claims between Patton Boggs and Mr. Wilcoxen, assuming that he had a right to fees at all.

As with Mr. Niebell, "performance of services [is] a sine qua non for compensation." *Red Lake & Pembina Bands*, 355 F.2d at 938. Thus, Mr. Wilcoxen should not have been paid anything for his unsuccessful work on dismissed matters resulting in no recovery for the Cherokee Nation. Under the Wilcoxen-Niebell Contract, Mr. Wilcoxen was entitled only to "such compensation as the Commissioner of

| | |
|---|---|
| Balance Of The Attorney Fee Escrow Fund | $366,977.23 |
| Future Expected Allocation To The Attorney Fee Escrow Fund | $500,000.00 |
| Monies Improperly Paid Out Of The Attorney Fee Escrow Fund To The Hall Estill Law Firm – Which Had No Contract With The Cherokee Nation | $280,524.57 |
| Monies Improperly Paid Out Of The Attorney Fee Escrow Fund To The Estate Of Paul Niebell – A Fee "Wholly Contingent" On A Recovery He Did Not Achieve | $100,000.00 |
| **Total: Patton Boggs' Claim For Summary Judgment** | **$1,247,501.80** |

Respectfully submitted,

David P. Callet (DC Bar No. 181990)
David S. Panzer (DC Bar No. 470677)
GREENBERG TRAURIG LLP
800 Connecticut Ave, NW, Suite 500
Washington, DC 20006
202-331-3100
202-331-3101 (fax)
calletd@gtlaw.com
panzerd@gtlaw.com

March 20, 2006

Indian Affairs may find equitably to be due as may be determined by a court or tribunal, for services theretofore rendered under this Contract, but in no event shall the aggregate fee exceed ten percent (10%) of any and all sums recovered or procured through the efforts of the said attorneys." Ex. 1 at A-35. The actions brought by Messrs. Wilcoxen & Niebell were dismissed, resulting in no recovery. *See United States v. Cherokee Nation, supra*, (disposing of "takings" claim); *Cherokee Nation v. United States, supra.* While, unlike Mr. Niebell, Mr. Wilcoxen did do work in this case, since his entry of appearance in 1999, his role was of so little import that the Court could not recall having ever met him in person. Tr. at 4:8-14. The Cherokee Nation could not have reasonably concluded otherwise. Moreover, a significant portion of fees paid to Mr. Wilcoxen were for his efforts on the dismissed claims. Ex. 4 at A-48, A-46 (noting, *inter alia*, that Mr. Wilcoxen billed $262,500 for work from 1985-87). Even assuming that Mr. Wilcoxen had a statutory entitlement to fees, at a hearing on the merits Patton Boggs will demonstrate that the Wilcoxen-Niebell Contract was made expressly "subject-to" Patton Boggs' Contract, and, therefore, no fees could have been paid to Mr. Wilcoxen until Patton Boggs' attorney fee claim was paid-in-full. Ex. 1 at A-34.