IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, | * | |
| Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES OF AMERICA, | * | Case No. 218-89 |
| Defendant. | * | |
| * * * * * * | * | |
| PATTON BOGGS, LLP | * | Chief Judge Edward J. Damich |
| Intervenor Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |
| * * * * * * | * | * * * * * |

**APPENDIX TO PATTON BOGGS' CROSS-MOTION FOR SUMMARY JUDGMENT FOR $1,247,501.80**

**TABLE OF CONTENTS**


| | | |
|---|---|---|
| **EXHIBIT A** | **CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT ACT, 25 U.S.C. §§ 1779, *ET SEQ.*** | **A-1** |
| **EXHIBIT B** | **25 U.S.C. § 81** | **A-19** |
| **EXHIBIT C** | **H.R. Rep. No. 107-632** | **A-22** |
| **EXHIBIT D** | **S.J. Res. 177, 74th Cong. (1936)** | **A-33** |
| **EXHIBIT 1** | **SEPTEMBER 8, 1988 WILCOXEN-NIEBELL ATTORNEY'S CONTRACT** | **A-34** |
| **EXHIBIT 2** | **APRIL 17, 1989 PATTON BOGGS ATTORNEYS' CONTRACT** | **A-39** |
| **EXHIBIT 3** | **OCTOBER 30, 1995 LETTER FROM JOE BYRD TO KATE BOYCE** | **A-43** |
| **EXHIBIT 4** | **OCTOBER 6, 2003 MEMORANDUM FROM JULIAN FITE TO CHAD SMITH, JIM WILCOXEN, AND JOE REEDER REGARDING ATTORNEY FEES FOR WORK ON ARKANSAS RIVERBED ISSUES** | **A-44** |
| **EXHIBIT 5** | **MARCH 31, 2005 LETTER FROM JAMES WILCOXEN AND MARGARET SWIMMER TO CHAD SMITH AND COUNCIL OF THE CHEROKEE NATION** | **A-50** |
| **EXHIBIT 6** | **OCTOBER 13, 2005 LETTER FROM JAMES CASON TO CHAD SMITH** | **A-53** |
| **EXHIBIT 7** | **DECLARATION OF DAVID S. PANZER** | **A-56** |

C

**Effective: December 13, 2002**

UNITED STATES CODE ANNOTATED
TITLE 25. INDIANS
**CHAPTER 19--INDIAN LAND CLAIMS SETTLEMENTS**
SUBCHAPTER XIII--CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT

**§ 1779. Findings**

The Congress finds the following:

**(1)** It is the policy of the United States to promote tribal self-determination and economic self-sufficiency and to encourage the resolution of disputes over historical claims through mutually agreed-to settlements between Indian Nations and the United States.

**(2)** There are pending before the United States Court of Federal Claims certain lawsuits against the United States brought by the Cherokee, Choctaw, and Chickasaw Nations seeking monetary damages for the alleged use and mismanagement of tribal resources along the Arkansas River in eastern Oklahoma.

**(3)** The Cherokee Nation, a federally recognized Indian tribe with its present tribal headquarters south of Tahlequah, Oklahoma, having adopted its most recent constitution on June 26, 1976, and having entered into various treaties with the United States, including but not limited to the Treaty at Hopewell, executed on November 28, 1785 (7 Stat. 18), and the Treaty at Washington, D.C., executed on July 19, 1866 (14 Stat. 799), has maintained a continuous government-to-government relationship with the United States since the earliest years of the Union.

**(4)** The Choctaw Nation, a federally recognized Indian tribe with its present tribal headquarters in Durant, Oklahoma, having adopted its most recent constitution on July 9, 1983, and having entered into various treaties with the United States of America, including but not limited to the Treaty at Hopewell, executed on January 3, 1786 (7 Stat. 21), and the Treaty at Washington, D.C., executed on April 28, 1866 (7 Stat. 21), [FN1] has maintained a continuous government-to-government relationship with the United States since the earliest years of the Union.

**(5)** The Chickasaw Nation, a federally recognized Indian tribe with its present tribal headquarters in Ada, Oklahoma, having adopted its most recent constitution on August 27, 1983, and having entered into various treaties with the United States of America, including but not limited to the Treaty at Hopewell, executed on January 10, 1786 (7 Stat. 24), and the Treaty at Washington, D.C., executed on April 28, 1866 (7 Stat. 21), has maintained a continuous government-to-government relationship with the United States since the earliest years of the Union.

**(6)** In the first half of the 19th century, the Cherokee, Choctaw, and Chickasaw Nations were forcibly removed from their homelands in the southeastern United States to lands west of the Mississippi in the Indian Territory that were ceded to them by the United States. From the "Three Forks" area near present day Muskogee, Oklahoma, downstream to the point of confluence with the Canadian River, the Arkansas River flowed entirely within the territory of the Cherokee Nation. From that point of confluence downstream to the Arkansas territorial line, the Arkansas River formed the boundary between the Cherokee Nation on the left side of the thread of the river and the Choctaw and Chickasaw Nations on the right.

**(7)** Pursuant to the Act of April 30, 1906 (34 Stat. 137), tribal property not allotted to individuals or otherwise disposed of, including the bed and banks of the Arkansas River, passed to the United States in trust for the use and benefit of the respective Indian Nations in accordance with their respective interests therein.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(8)** For more than 60 years after Oklahoma statehood, the Bureau of Indian Affairs believed that Oklahoma owned the Riverbed from the Arkansas State line to Three Forks, and therefore took no action to protect the Indian Nations' Riverbed resources such as oil, gas, and Drybed Lands suitable for grazing and agriculture.

(9) Third parties with property near the Arkansas River began to occupy the Indian Nations' Drybed Lands--lands that were under water at the time of statehood but that are now dry due to changes in the course of the river.

**(10)** In 1966, the Indian Nations sued the State of Oklahoma to recover their lands. In 1970, the Supreme Court of the United States decided in the case of Choctaw Nation vs. Oklahoma (396 U.S. 620), [FN2] that the Indian Nations retained title to their respective portions of the Riverbed along the navigable reach of the river.

**(11)** In 1987, the Supreme Court of the United States in the case of United States vs. Cherokee Nation (480 U.S. 700) decided that the riverbed lands did not gain an exemption from the Federal Government's navigational servitude and that the Cherokee Nation had no right to compensation for damage to its interest by exercise of the Government's servitude.

**(12)** In 1989, the Indian Nations filed lawsuits against the United States in the United States Court of Federal Claims (Case Nos. 218-89L and 630- 89L), seeking damages for the United States' use and mismanagement of tribal trust resources along the Arkansas River. Those actions are still pending.

**(13)** In 1997, the United States filed quiet title litigation against individuals occupying some of the Indian Nations' Drybed Lands. That action, filed in the United States District Court for the Eastern District of Oklahoma, was dismissed without prejudice on technical grounds.

**(14)** Much of the Indian Nations' Drybed Lands have been occupied by a large number of adjacent landowners in Oklahoma. Without Federal legislation, further litigation against thousands of such landowners would be likely and any final resolution of disputes would take many years and entail great expense to the United States, the Indian Nations, and the individuals and entities occupying the Drybed Lands and would seriously impair long-term economic planning and development for all parties.

**(15)** The Councils of the Cherokee and Choctaw Nations and the Legislature of the Chickasaw Nation have each enacted tribal resolutions which would, contingent upon the passage of this subchapter and the satisfaction of its terms and in exchange for the moneys appropriated hereunder--

**(A)** settle and forever release their respective claims against the United States asserted by them in United States Court of Federal Claims Case Nos. 218-89L and 630-89L; and

**(B)** forever disclaim any and all right, title, and interest in and to the Disclaimed Drybed Lands, as set forth in those enactments of the respective councils of the Indian Nations.

**(16)** The resolutions adopted by the respective Councils of the Cherokee, Choctaw, and Chickasaw Nations each provide that, contingent upon the passage of the settlement legislation and satisfaction of its terms, each Indian Nation agrees to dismiss, release, and forever discharge its claims asserted against the United States in the United States Court of Federal Claims, Case Nos. 218-89L and 630-89L, and to forever disclaim any right, title, or interest of the Indian Nation in the Disclaimed Drybed Lands, in exchange for the funds appropriated and allocated to the Indian Nation under the provisions of the settlement legislation, which funds the Indian Nation agrees to accept in full satisfaction and settlement of all claims against the United States for the damages sought in the aforementioned claims asserted in the United States Court of Federal Claims, and as full and fair compensation for disclaiming its right, title, and interest in the Disclaimed Drybed Lands.

**(17)** In those resolutions, each Indian Nation expressly reserved all of its beneficial interest and title to all other Riverbed lands, including minerals, as determined by the Supreme Court in Choctaw Nation v. Oklahoma, 397 U.S. 620 (1970), and further reserved any and all right, title, or interest that each Nation may have in and to the water flowing in the Arkansas River and its tributaries.

CREDIT(S)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Pub.L. 107-331, Title VI, § 602, Dec. 13, 2002, 116 Stat. 2845.)

[FN1] So in original. Probably should be "(14 Stat. 769),".

[FN2] So in original. Probably should be "(397 U.S. 620),".

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

2002 Acts. Senate Report No. 107-249, see 2002 U.S. Code Cong. and Adm. News, p. 1817.

References in Text

The Act of April 30, 1906 (34 Stat. 137), referred to in par. (7), probably means the Act of April 26, 1906, c. 1876, 34 Stat. 137, which was classified in part as a note under 25 U.S.C.A. § 355.

This subchapter, referred to in par (15), originally read "this title", meaning Title VI of the Indian Financing Amendments Act of 2002, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 12, 2002, 116 Stat. 2845, known as the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, which enacted this subchapter.

Short Title

2002 Acts. Pub.L. 107-331, Title VI, § 601, Dec. 13, 2002, 116 Stat. 2845, provided that: "This title [enacting this subchapter] may be cited as the 'Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act'."

25 U.S.C.A. § 1779, 25 USCA § 1779

Current through P.L. 109-90 approved 10-18-05

Copr. © 2005 Thomson/West. No. Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

**Effective: December 13, 2002**

UNITED STATES CODE ANNOTATED
TITLE 25. INDIANS
**CHAPTER 19--INDIAN LAND CLAIMS SETTLEMENTS**
SUBCHAPTER XIII--CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT

**§ 1779a. Purposes**

The purposes of this subchapter are to resolve all claims that have been or could have been brought by the Cherokee, Choctaw, and Chickasaw Nations against the United States, and to confirm that the Indian Nations are forever disclaiming any right, title, or interest in the Disclaimed Drybed Lands, which are contiguous to the channel of the Arkansas River as of the date of the enactment of this subchapter in certain townships in eastern Oklahoma.

CREDIT(S)

(Pub.L. 107-331, Title VI, § 603, Dec. 13, 2002, 116 Stat. 2847.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

2002 Acts. Senate Report No. 107-249, see 2002 U.S. Code Cong. and Adm. News, p. 1817.

References in Text

This subchapter, referred to in text, originally read "this title", meaning Title VI of the Indian Financing Amendments Act of 2002, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 12, 2002, 116 Stat. 2845, known as the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, which enacted this subchapter.

The date of the enactment of this subchapter, referred to in text, originally read "the date of the enactment of this title", which probably means Dec. 13, 2002, the approval date of the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 13, 2002, 116 Stat. 2845, which enacted this subchapter.

25 U.S.C.A. § 1779a, 25 USCA § 1779a

Current through P.L. 109-90 approved 10-18-05

Copr. © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

**Effective: December 13, 2002**

UNITED STATES CODE ANNOTATED
TITLE 25. INDIANS
**CHAPTER 19--INDIAN LAND CLAIMS SETTLEMENTS**
SUBCHAPTER XIII--CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT

**§ 1779b. Definitions**

For the purposes of this subchapter, the following definitions apply:

(1) Disclaimed Drybed Lands

The term "Disclaimed Drybed Lands" means all Drybed Lands along the Arkansas River that are located in Township 10 North in Range 24 East, Townships 9 and 10 North in Range 25 East, Township 10 North in Range 26 East, and Townships 10 and 11 North in Range 27 East, in the State of Oklahoma.

(2) Drybed Lands

The term "Drybed Lands" means those lands which, on the date of enactment of this subchapter, lie above and contiguous to the mean high water mark of the Arkansas River in the State of Oklahoma. The term "Drybed Lands" is intended to have the same meaning as the term "Upland Claim Area" as used by the Bureau of Land Management Cadastral Survey Geographic Team in its preliminary survey of the Arkansas River. The term "Drybed Lands" includes any lands so identified in the "Holway study."

(3) Indian Nation; Indian Nations

The term "Indian Nation" means the Cherokee Nation, Choctaw Nation, or Chickasaw Nation, and the term "Indian Nations" means all 3 tribes collectively.

(4) Riverbed

The term "Riverbed" means the Drybed Lands and the Wetbed Lands and includes all minerals therein.

(5) Secretary

The term "Secretary" means the Secretary of the Interior.

(6) Wetbed lands

The term "Wetbed Lands" means those Riverbed lands which lie below the mean high water mark of the Arkansas River in the State of Oklahoma as of the date of the enactment of this subchapter, exclusive of the Drybed Lands. The term "Wetbed Lands" is intended to have the same meaning as the term "Present Channel Claim Areas" as utilized by the Bureau of Land Management Cadastral Survey Geographic Team in its preliminary survey of the Arkansas River.

CREDIT(S)

(Pub.L. 107-331, Title VI, § 604, Dec. 13, 2002, 116 Stat. 2847.)

HISTORICAL AND STATUTORY NOTES

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Revision Notes and Legislative Reports

2002 Acts. Senate Report No. 107-249, see 2002 U.S. Code Cong. and Adm. News, p. 1817.

References in Text

This subchapter, referred to in text, originally read "this title", meaning Title VI of the Indian Financing Amendments Act of 2002, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 12, 2002, 116 Stat. 2845, known as the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, which enacted this subchapter.

The date of enactment of this subchapter, referred to in par. (2) and the date of the enactment of this subchapter, referred to in par. (6), originally read "the date of enactment of this title" and "the date of the enactment of this title", respectively, which probably mean Dec. 13, 2002, the approval date of the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 13, 2002, 116 Stat. 2845, which enacted this subchapter.

25 U.S.C.A. § 1779b, 25 USCA § 1779b

Current through P.L. 109-90 approved 10-18-05

Copr. © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

**Effective: December 13, 2002**

UNITED STATES CODE ANNOTATED
TITLE 25. INDIANS
**CHAPTER 19--INDIAN LAND CLAIMS SETTLEMENTS**
SUBCHAPTER XIII--CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT
**§ 1779c. Settlement and claims; appropriations; allocation of funds**

(a) Extinguishment of claims

Pursuant to their respective tribal resolutions, and in exchange for the benefits conferred under this subchapter, the Indian Nations shall, on the date of enactment of this subchapter, enter into a consent decree with the United States that waives, releases, and dismisses all the claims they have asserted or could have asserted in their cases numbered 218-89L and 630-89L pending in the United States Court of Federal Claims against the United States, including but not limited to claims arising out of any and all of the Indian Nations' interests in the Disclaimed Drybed Lands and arising out of construction, maintenance and operation of the McClellan-Kerr Navigation Way. The Indian Nations and the United States shall lodge the consent decree with the Court of Federal Claims within 30 days of the enactment of this subchapter, and shall move for entry of the consent decree at such time as all appropriations by Congress pursuant to the authority of this subchapter have been made and deposited into the appropriate tribal trust fund account of the Indian Nations as described in section 1779d of this title. Upon entry of the consent decree, all the Indian Nations' claims and all their past, present, and future right, title, and interest to the Disclaimed Drybed Lands, shall be deemed extinguished. No claims may be asserted in the future against the United States pursuant to sections 1491, 1346(a)(2), or 1505 of Title 28 for actions taken or failed to have been taken by the United States for events occurring prior to the date of the extinguishment of claims with respect to the Riverbed.

(b) Release of tribal claims to certain Drybed Lands

(1) In general

Upon the deposit of all funds authorized for appropriation under subsection (c) of this section for an Indian Nation into the appropriate trust fund account described in section 1779d of this title--

**(A)** all claims now existing or which may arise in the future with respect to the Disclaimed Drybed Lands and all right, title, and interest that the Indian Nations and the United States as trustee on behalf of the Indian Nation may have to the Disclaimed Drybed Lands, shall be deemed extinguished;

**(B)** any interest of the Indian Nations or the United States as trustee on their behalf in the Disclaimed Drybed Lands shall further be extinguished pursuant to the Trade and Intercourse Act of 1790, Act of July 22, 1790 (ch. 33, 1 Stat. 137), and all subsequent amendments thereto (as codified at 25 U.S.C. 177);

**(C)** to the extent parties other than the Indian Nations have transferred interests in the Disclaimed Drybed Lands in violation of the Trade and Intercourse Act, Congress does hereby approve and ratify such transfers of interests in the Disclaimed Drybed Lands to the extent that such transfers otherwise are valid under law; and

**(D)** the Secretary is authorized to execute an appropriate document citing this subchapter, suitable for filing with the county clerks, or such other county official as appropriate, of those counties wherein the foregoing described lands are located, disclaiming any tribal or Federal interest on behalf of the Indian Nations in such Disclaimed Drybed Lands. The Secretary is authorized to file with the counties a plat or map of the disclaimed lands should the Secretary determine that such filing will clarify the extent of lands disclaimed. Such a plat or map may be filed regardless of whether the map or plat has been previously approved for filing, whether or not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the map or plat has been filed, and regardless of whether the map or plat constitutes a final determination by the Secretary of the extent of the Indian Nations' original claim to the Disclaimed Drybed Lands. The disclaimer filed by the United States shall constitute a disclaimer of the Disclaimed Drybed Lands for purposes of the Trade and Intercourse Act (25 U.S.C. 177).

(2) Special provisions

Notwithstanding any provision of this subchapter--

**(A)** the Indian Nations do not relinquish any right, title, or interest in any lands which constitute the Wetbed Lands subject to the navigational servitude exercised by the United States on the Wetbed Lands. By virtue of the exercise of the navigational servitude, the United States shall not be liable to the Indian Nations for any loss they may have related to the minerals in the Wetbed Lands;

**(B)** no provision of this subchapter shall be construed to extinguish or convey any water rights of the Indian Nations in the Arkansas River or any other stream or the beneficial interests or title of any of the Indian Nations in and to lands held in trust by the United States on the date of enactment of this subchapter which lie above or below the mean high water mark of the Arkansas River, except for the Disclaimed Drybed Lands; and

**(C)** the Indian Nations do not relinquish any right, title, or interest in any lands or minerals of certain unallotted tracts which are identified in the official records of the Eastern Oklahoma Regional Office, Bureau of Indian Affairs. The disclaimer to be filed by the Secretary of the Interior under subsection (b)(1) of this section shall reflect the legal description of the unallotted tracts retained by the Nations.

(3) Setoff

In the event the Court of Federal Claims does not enter the consent decree as set forth in subsection (a) of this section, the United States shall be entitled to setoff against any claims of the Indian Nations as set forth in subsection (a) of this section, any funds transferred to the Indian Nations pursuant to section 1779d of this title, and any interest accrued thereon up to the date of setoff.

(4) Quiet title actions

Notwithstanding any other provision of law, neither the United States nor any department of the United States nor the Indian Nations shall be made parties to any quiet title lawsuit or other lawsuit to determine ownership of or an interest in the Disclaimed Drybed Lands initiated by any private person or private entity after execution of the disclaimer set out in subsection (b)(1) of this section. The United States will have no obligation to undertake any future quiet title actions or actions for the recovery of lands or funds relating to any Drybed Lands retained by the Indian Nation or Indian Nations under this subchapter, including any lands which are Wetbed Lands on the date of enactment of this subchapter, but which subsequently lie above the mean high water mark of the Arkansas River and the failure or declination to initiate any quiet title action or to manage any such Drybed Lands shall not constitute a breach of trust by the United States or be compensable to the Indian Nation or Indian Nations in any manner.

(5) Land to be conveyed in fee

To the extent that the United States determines that it is able to effectively maintain the McClellan-Kerr Navigation Way without retaining title to lands above the high water mark of the Arkansas River as of the date of enactment of this subchapter, said lands, after being declared surplus, shall be conveyed in fee to the Indian Nation within whose boundary the land is located. The United States shall not be obligated to accept such property in trust.

(c) Authorization for settlement appropriations

There is authorized to be appropriated an aggregate sum of $40,000,000 as follows:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(1)** $10,000,000 for fiscal year 2004.

**(2)** $10,000,000 for fiscal year 2005.

**(3)** $10,000,000 for fiscal year 2006.

**(4)** $10,000,000 for fiscal year 2007.

(d) Allocation and deposit of funds

After payment pursuant to section 1779e of this title, the remaining funds authorized for appropriation under subsection (c) of this section shall be allocated among the Indian Nations as follows:

**(1)** 50 percent to be deposited into the trust fund account established under section 1779d of this title for the Cherokee Nation.

**(2)** 37.5 percent to be deposited into the trust fund account established under section 1779d of this title for the Choctaw Nation.

**(3)** 12.5 percent to be deposited into the trust fund account established under section 1779d of this title for the Chickasaw Nation.

CREDIT(S)

(Pub.L. 107-331, Title VI, § 605, Dec. 13, 2002, 116 Stat. 2848.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

2002 Acts. Senate Report No. 107-249, see 2002 U.S. Code Cong. and Adm. News, p. 1817.

References in Text

This subchapter, referred to in text, originally read "this title", meaning Title VI of the Indian Financing Amendments Act of 2002, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 12, 2002, 116 Stat. 2845, known as the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, which enacted this subchapter.

The date of enactment of this subchapter, referred to in text, originally read "the date of enactment of this title", which probably means Dec. 13, 2002, the approval date of the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 13, 2002, 116 Stat. 2845, which enacted this subchapter.

25 U.S.C.A. § 1779c, 25 USCA § 1779c

Current through P.L. 109-90 approved 10-18-05

Copr. © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

**Effective: December 13, 2002**

UNITED STATES CODE ANNOTATED
TITLE 25. INDIANS
**CHAPTER 19--INDIAN LAND CLAIMS SETTLEMENTS**
SUBCHAPTER XIII--CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT

**§ 1779d. Tribal trust funds**

(a) Establishment, purpose, and management of trust funds

(1) Establishment

There are hereby established in the United States Treasury 3 separate tribal trust fund accounts for the benefit of each of the Indian Nations, respectively, for the purpose of receiving all appropriations made pursuant to section 1779c(c) of this title, and allocated pursuant to section 1779c(d) of this title.

(2) Availability of amounts in trust fund accounts

Amounts in the tribal trust fund accounts established by this section shall be available to the Secretary for management and investment on behalf of the Indian Nations and distribution to the Indian Nations in accordance with this subchapter. Funds made available from the tribal trust funds under this section shall be available without fiscal year limitation.

(b) Management of funds

(1) Land acquisition

(A) Trust land status pursuant to regulations

The funds appropriated and allocated to the Indian Nations pursuant to section 1779c(c) and (d) of this title, and deposited into trust fund accounts pursuant to subsection (a) of this section, together with any interest earned thereon, may be used for the acquisition of land by the Indian Nations. The Secretary may accept such lands into trust for the beneficiary Indian Nation pursuant to the authority provided in section 465 of this title and in accordance with the Secretary's trust land acquisition regulations at part 151 of title 25, Code of Federal Regulations, in effect at the time of the acquisition, except for those acquisitions covered by paragraph (1)(B).

(B) Required trust land status

Any such trust land acquisitions on behalf of the Cherokee Nation shall be mandatory if the land proposed to be acquired is located within Township 12 North, Range 21 East, in Sequoyah County, Township 11 North, Range 18 East, in McIntosh County, Townships 11 and 12 North, Range 19 East, or Township 12 North, Range 20 East, in Muskogee County, Oklahoma, and not within the limits of any incorporated municipality as of January 1, 2002, if--

**(i)** the land proposed to be acquired meets the Department of the Interior's minimum environmental standards and requirements for real estate acquisitions set forth in 602 DM 2.6, or any similar successor standards or requirements for real estate acquisitions in effect on the date of acquisition; and

**(ii)** the title to such land meets applicable Federal title standards in effect on the date of the acquisition.

(C) Other expenditure of funds

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Indian Nations may elect to expend all or a portion of the funds deposited into its trust account for any other purposes authorized under paragraph (2).

(2) Investment of trust funds; no per capita payment

(A) No per capita payments

No money received by the Indian Nations hereunder may be used for any per capita payment.

(B) Investment by Secretary

Except as provided in this section and section 1779e of this title, the principal of such funds deposited into the accounts established hereunder and any interest earned thereon shall be invested by the Secretary in accordance with current laws and regulations for the investing of tribal trust funds.

(C) Use of principal funds

The principal amounts of said funds and any amounts earned thereon shall be made available to the Indian Nation for which the account was established for expenditure for purposes which may include construction or repair of health care facilities, law enforcement, cultural or other educational activities, economic development, social services, and land acquisition. Land acquisition using such funds shall be subject to the provisions of subsections (b) and (d) [FN1] of this section.

(3) Disbursement of funds

The Secretary shall disburse the funds from a trust account established under this section pursuant to a budget adopted by the Council or Legislature of the Indian Nation setting forth the amount and an intended use of such funds.

(4) Additional restriction on use of funds

None of the funds made available under this subchapter may be allocated or otherwise assigned to authorized purposes of the Arkansas River Multipurpose Project as authorized by the River and Harbor Act of 1946, as amended by the Flood Control Act of 1948 and the Flood Control Act of 1950.

CREDIT(S)

(Pub.L. 107-331, Title VI, § 606, Dec. 13, 2002, 116 Stat. 2851.)

[FN1] So in original. This section does not contain a subsection (d).

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

2002 Acts. Senate Report No. 107-249, see 2002 U.S. Code Cong. and Adm. News, p. 1817.

References in Text

This subchapter, referred to in subsecs. (a)(2) and (b)(4), originally read "this title", meaning Title VI of the Indian Financing Amendments Act of 2002, Pub.L. 117-331, Title VI, § 601 et seq., Dec. 12, 2002, 116 Stat. 2845, known as the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, which enacted this subchapter.

Section 1779c(c) and (d) of this title, referred to in subsec. (b)(1)(A), was in the original "sections 205 (c) and (d)"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and was translated as reading "section 605(c) and (d)", meaning section 605(c) and (d) of Pub.L. 107-331, to reflect the probable intent of Congress.

The River and Harbor Act of 1946, as amended by the Flood Control Act of 1948 and the Flood Control Act of 1950, referred to in subsec. (b(4), probably means Act July 24, 1946, c. 595, 60 Stat. 634, as amended by the Flood Control Act of 1948, June 30, 1948, c. 771, Title II, 62 Stat. 1175, and the Flood Control Act of 1950, May 17, 1950, c. 188, Title II, 64 Stat. 170.

25 U.S.C.A. § 1779d, 25 USCA § 1779d

Current through P.L. 109-90 approved 10-18-05

Copr. © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

C

**Effective: December 13, 2002**

UNITED STATES CODE ANNOTATED
TITLE 25. INDIANS
**CHAPTER 19--INDIAN LAND CLAIMS SETTLEMENTS**
SUBCHAPTER XIII--CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT

**§ 1779e. Attorney fees**

(a) Payment

At the time the funds are paid to the Indian Nations, from funds authorized to be appropriated pursuant to section 1779c(c) of this title, the Secretary shall pay to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations.

(b) Limitations

Notwithstanding subsection (a) of this section, the total fees payable to attorneys under such contracts with an Indian Nation shall not exceed 10 percent of that Indian Nation's allocation of funds appropriated under section 1779c(c) of this title.

CREDIT(S)

(Pub.L. 107-331, Title VI, § 607, Dec. 13, 2002, 116 Stat. 2852.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

2002 Acts. Senate Report No. 107-249, see 2002 U.S. Code Cong. and Adm. News, p. 1817.

25 U.S.C.A. § 1779e, 25 USCA § 1779e

Current through P.L. 109-90 approved 10-18-05

Copr. © 2005 Thomson/West. No. Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

**Effective: December 13, 2002**

UNITED STATES CODE ANNOTATED
TITLE 25. INDIANS
**CHAPTER 19--INDIAN LAND CLAIMS SETTLEMENTS**
SUBCHAPTER XIII--CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT

**§ 1779f. Release of other tribal claims and filing of claims**

(a) Extinguishment of other tribal claims

(1) In general

As of the date of enactment of this subchapter--

**(A)** all right, title, and interest of any Indian nation or tribe other than any Indian Nation defined in section 1779b of this title (referred to in this section and section 1779g of this title as a "claimant tribe") in or to the Disclaimed Drybed Lands, and any such right, title, or interest held by the United States on behalf of such a claimant tribe, shall be considered to be extinguished in accordance with section 177 of Title 25;

**(B)** if any party other than a claimant tribe holds transferred interests in or to the Disclaimed Drybed Lands in violation of section 177 of Title 25, Congress approves and ratifies those transfers of interests to the extent that the transfers are in accordance with other applicable law; and

**(C)** the documents described in section 1779c(b)(1)(D) of this title shall serve to identify the geographic scope of the interests extinguished by subparagraph (A).

(2) Quiet title actions

(A) In general

Notwithstanding any other provision of law, after the date of enactment of this subchapter, neither the United States (or any department or agency of the United States) nor any Indian Nation shall be included as a party to any civil action brought by any private person or private entity to quiet title to, or determine ownership of an interest in or to, the Disclaimed Drybed Lands.

(B) Future actions

As of the date of enactment of this subchapter, the United States shall have no obligation to bring any civil action to quiet title to, or to recover any land or funds relating to, the Drybed Lands (including any lands that are Wetbed Lands as of the date of enactment of this subchapter but that are located at any time after that date above the mean high water mark of the Arkansas River).

(C) No breach of trust

The failure or declination by the United States to initiate any civil action to quiet title to or manage any Drybed Lands under this paragraph shall not--

**(i)** constitute a breach of trust by the United States; or

**(ii)** be compensable to a claimant tribe in any manner.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(b) Claims of other Indian tribes

(1) Limited period for filing claims

(A) In general

Not later than 180 days after the date of enactment of this subchapter, any claimant tribe that claims that any title, interest, or entitlement held by the claimant tribe has been extinguished by operation of section 1779c(a) of this title or subsection (a) of this section may file a claim against the United States relating to the extinguishment in the United States Court of Federal Claims.

(B) Failure to file

After the date described in subparagraph (A), a claimant tribe described in that subparagraph shall be barred from filing any claim described in that subparagraph.

(2) Special holding account

(A) Establishment

There is established in the Treasury, in addition to the accounts established by section 1779d(a) of this title, an interest-bearing special holding account for the benefit of the Indian Nations.

(B) Deposits

Notwithstanding any other provision of this subchapter or any other law, of any funds that would otherwise be deposited in a tribal trust account established by section 1779d(a) of this title, 10 percent shall--

**(i)** be deposited in the special holding account established by subparagraph (A); and

**(ii)** be held in that account for distribution under paragraph (3).

(3) Distribution of funds

(A) In general

Funds deposited in the special holding account established by paragraph (2)(A) shall be distributed in accordance with subparagraphs (B) through (D).

(B) Claim filed

If a claim under paragraph (1)(A) is filed by the deadline specified in that paragraph, on final adjudication of that claim--

**(i)** if the final judgment awards to a claimant an amount that does not exceed the amount of funds in the special holding account under paragraph (2) attributable to the Indian Nation from the allocation of which under section 1779c(d) of this title the funds in the special holding account are derived--

**(I)** that amount shall be distributed from the special holding account to the claimant tribe that filed the claim; and

**(II)** any remaining amount in the special holding account attributable to the claim shall be transferred to the appropriate tribal trust account for the Indian Nation established by section 1779d(a) of this title; and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(ii)** if the final judgment awards to a claimant an amount that exceeds the amount of funds in the special holding account attributable to the Indian Nation from the allocation of which under section 1779c(d) of this title the funds in the special holding account are derived--

**(I)** the balance of funds in the special holding account attributable to the Indian Nation shall be distributed to the claimant tribe that filed the claim; and

**(II)** payment of the remainder of the judgment amount awarded to the claimant tribe shall be made from the permanent judgment appropriation established pursuant to section 1304 of Title 31.

(C) No claims filed

If no claims under paragraph (1)(A) are filed by the deadline specified in that paragraph--

**(i)** any funds held in the special holding account under paragraph (2) and attributed to that Indian Nation shall be deposited in the appropriate tribal trust account established by section 1779d(a); and

**(ii)** after the date that is 180 days after the date of enactment of this subchapter, paragraph (2)(B) shall not apply to appropriations attributed to that Indian Nation.

(c) Declaration with respect to scope of rights, title, and interests

Congress declares that--

**(1)** subsection (b) of this section is intended only to establish a process by which alleged claims may be resolved; and

**(2)** nothing in this section acknowledges, enhances, or establishes any prior right, title, or interest of any claimant tribe in or to the Arkansas Riverbed.

CREDIT(S)

(Pub.L. 107-331, Title VI, § 608, Dec. 13, 2002, 116 Stat. 2852.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

2002 Acts. Senate Report No. 107-249, see 2002 U.S. Code Cong. and Adm. News, p. 1817.

References in Text

This subchapter, referred to in text, originally read "this title", meaning Title VI of the Indian Financing Amendments Act of 2002, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 12, 2002, 116 Stat. 2845, known as the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, which enacted this subchapter.

The date of enactment of this subchapter, referred to in text, originally read "the date of enactment of this title" which probably means Dec. 13, 2002, the approval date of the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 13, 2002, 116 Stat. 2845, which enacted this subchapter.

180 days after the date of enactment of this subchapter, referred to in text, originally read "180 days after the date of enactment of this title", which probably means 180 days after Dec. 13, 2002, the approval date of the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 13, 2002, 116 Stat. 2845, which enacted this subchapter.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Section 1779d(a) of this title, referred to in subsec. (b)(3)(C)(i), was in the original "section 6(a)" and was translated as reading "section 606(a)", meaning section 606(a) of Pub.L. 107-331, to reflect the probable intent of Congress, because Pub.L. 107-133 does not contain a section 6, and section 1779d(a) establishes three tribal trust fund accounts.

25 U.S.C.A. § 1779f, 25 USCA § 1779f

Current through P.L. 109-90 approved 10-18-05

Copr. © 2005 Thomson/West. No. Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

**Effective: December 13, 2002**

UNITED STATES CODE ANNOTATED
TITLE 25. INDIANS
**CHAPTER 19--INDIAN LAND CLAIMS SETTLEMENTS**
SUBCHAPTER XIII--CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT

**§ 1779g. Effect on claims**

This subchapter shall not be construed to resolve any right, title, or interest of any Indian nation or of any claimant tribe, except their past, present, or future claims relating to right, title, or interest in or to the Riverbed and the obligations and liabilities of the United States thereto.

CREDIT(S)

(Pub.L. 107-331, Title VI, § 609, Dec. 13, 2002, 116 Stat. 2855.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

2002 Acts. Senate Report No. 107-249, see 2002 U.S. Code Cong. and Adm. News, p. 1817.

References in Text

This subchapter, referred to in text, originally read "this title", meaning Title VI of the Indian Financing Amendments Act of 2002, Pub.L. 107-331, Title VI, § 601 et seq., Dec. 12, 2002, 116 Stat. 2845, known as the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, which enacted this subchapter.

25 U.S.C.A. § 1779g, 25 USCA § 1779g

Current through P.L. 109-90 approved 10-18-05

Copr. © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

C

**Effective: March 14, 2000**

United States Code Annotated Currentness
Title 25. Indians
Chapter 3. Agreements with Indians
Subchapter II. Contracts with Indians

### → § 81. Contracts and agreements with Indian tribes

(a) Definitions

In this section:

**(1)** The term "Indian lands" means lands the title to which is held by the United States in trust for an Indian tribe or lands the title to which is held by an Indian tribe subject to a restriction by the United States against alienation.

**(2)** The term "Indian tribe" has the meaning given that term in section 450b(e) of this title.

**(3)** The term "Secretary" means the Secretary of the Interior.

(b) Approval

No agreement or contract with an Indian tribe that encumbers Indian lands for a period of 7 or more years shall be valid unless that agreement or contract bears the approval of the Secretary of the Interior or a designee of the Secretary.

(c) Exception

Subsection (b) of this section shall not apply to any agreement or contract that the Secretary (or a designee of the Secretary) determines is not covered under that subsection.

(d) Unapproved agreements

The Secretary (or a designee of the Secretary) shall refuse to approve an agreement or contract that is covered under subsection (b) of this section if the Secretary (or a designee of the Secretary) determines that the agreement or contract--

**(1)** violates Federal law; or

**(2)** does not include a provision that--

**(A)** provides for remedies in the case of a breach of the agreement or contract;

**(B)** references a tribal code, ordinance, or ruling of a court of competent jurisdiction that discloses the right of the Indian tribe to assert sovereign immunity as a defense in an action brought against the Indian tribe; or

**(C)** includes an express waiver of the right of the Indian tribe to assert sovereign immunity as a defense in an action brought against the Indian tribe (including a waiver that limits the nature of relief that may be provided or the jurisdiction of a court with respect to such an action).

(e) Regulations

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not later than 180 days after March 14, 2000, the Secretary shall issue regulations for identifying types of agreements or contracts that are not covered under subsection (b) of this section.

(f) Construction

Nothing in this section shall be construed to--

**(1)** require the Secretary to approve a contract for legal services by an attorney;

**(2)** amend or repeal the authority of the National Indian Gaming Commission under the Indian Gaming Regulatory Act (25 U.S.C. 2701 et seq.); or

**(3)** alter or amend any ordinance, resolution, or charter of an Indian tribe that requires approval by the Secretary of any action by that Indian tribe.

CREDIT(S)

(R.S. § 2103; Pub.L. 85-770, Aug. 27, 1958, 72 Stat. 927; Pub.L. 106- 179, § 2, Mar. 14, 2000, 114 Stat. 46.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1958 Acts. House Report No. 2449, see 1958 U.S. Code Cong. and Adm. News, p. 3961.

2000 Acts. House Report No. 106-501, see 2000 U.S. Code Cong. and Adm. News, p. 69.

Codifications

R.S. § 2103 was from Acts Mar. 3, 1871, c. 120, § 3, 16 Stat. 570; May 21, 1872, c. 177, § § 1, 2, 17 Stat. 136.

Amendments

2000 Amendments. Pub.L. 106-179, § 2, rewrote the section, which read:

"No agreement shall be made by any person with any tribe of Indians, or individual Indians not citizens of the United States, for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him, or any other person in consideration of services for said Indians relative to their lands, or to any claims growing out of, or in reference to, annuities, installments, or other moneys, claims, demands, or thing, under laws or treaties with the United States, or official acts of any officers thereof, or in any way connected with or due from the United States, unless such contract or agreement be executed and approved as follows:

"**First.** Such agreement shall be in writing, and a duplicate of it delivered to each party.

"**Second.** It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it.

"**Third.** It shall contain the names of all parties in interest, their residence and occupation; and if made with a tribe, by their tribal authorities, the scope of authority and the reason for exercising that authority, shall be given specifically.

"**Fourth.** It shall state the time when and place where made, the particular purpose for which made, the special thing or things to be done under it, and, if for the collection of money, the basis of the claim, the source from which it is to be collected, the disposition to be made of it when collected, the amount or rate per centum of the fee in all cases;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and if any contingent matter or condition constitutes a part of the contract or agreement, it shall be specifically set forth.

"**Fifth.** It shall have a fixed limited time to run, which shall be distinctly stated.

"All contracts or agreements made in violation of this section shall be null and void, and all money or other thing of value paid to any person by any Indian or tribe, or any one else, for or on his or their behalf, on account of such services, in excess of the amount approved by the Commissioner and Secretary for such services, may be recovered by suit in the name of the United States in any court of the United States, regardless of the amount in controversy; and one-half thereof shall be paid to the person suing for the same, and the other half shall be paid into the Treasury for the use of the Indian or tribe by or for whom it was so paid."

1958 Amendments. Par. Second. Pub.L. 85-770 deleted requirement that contracts with Indian tribes be executed before a judge of a court of record.

Par. Sixth. Pub.L. 85-770 deleted par. Sixth enumerating contractual elements to be certified to by the judge.

Transfer of Functions

For transfer of functions of other officers, employees, and agencies of the Department of the Interior, with certain exceptions, to the Secretary of the Interior, with power to delegate, see Reorg.Plan No. 3 of 1950, § § 1, 2, eff. May 24, 1950, 15 F.R. 3174, 64 Stat. 1262, set out in the Appendix to Title 5, Government Organization and Employees.

CROSS REFERENCES

Forfeiture of money received contrary to this section and punishment by fine or imprisonment, see 18 USCA § 438.

Necessity of previous consent of United States to validate contracts regarding tribal funds or property in hands of United States, see 25 USCA § 85.

Tribal self-governance funding agreements and civil actions, see 25 USCA § 458cc.

CODE OF FEDERAL REGULATIONS

Attorney contracts with Indian tribes not organized under Indian Reorganization Act, see 25 CFR § § 89.7 to 89.26.

LAW REVIEW COMMENTARIES

Cooperative agreements: Government-to-government relations to foster reservation business development. Joel H. Mack and Gwyn Goodson Timms, 20 Pepp.L.Rev. 1295 (1993).

Doing business with Indians and the three "S"es: Secretarial approval, sovereign immunity, and subject matter jurisdiction. William V. Vetter, 36 Ariz.L.Rev. 169 (1994).

Your place or mine? Commercial transactions between Indian tribes and non-Indians in Oklahoma--New rules for tribal sovereign immunity. Mike McBride III, 67 Okla.B.J. 3183 (1996).

LIBRARY REFERENCES

Corpus Juris Secundum

CJS Indians § 31, Contracts.

CJS Indians § 38, General Considerations.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107TH CONGRESS 2d Session } HOUSE OF REPRESENTATIVES { REPORT 107–632

# CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS CLAIMS SETTLEMENT ACT

SEPTEMBER 4, 2002.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. HANSEN, from the Committee on Resources, submitted the following

## R E P O R T

[To accompany H.R. 3534]

[Including cost estimate of the Congressional Budget Office]

The Committee on Resources, to whom was referred the bill (H.R. 3534) to provide for the settlement of certain land claims of Cherokee, Choctaw, and Chickasaw Nations to the Arkansas Riverbed in Oklahoma, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike all after the enacting clause and insert the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act".

**SEC. 2. FINDINGS.**

The Congress finds the following:

(1) It is the policy of the United States to promote tribal self-determination and economic self-sufficiency and to encourage the resolution of disputes over historical claims through mutually agreed-to settlements between Indian Nations and the United States.

(2) There are pending before the United States Court of Federal Claims certain lawsuits against the United States brought by the Cherokee, Choctaw, and Chickasaw Nations seeking monetary damages for the alleged use and mismanagement of tribal resources along the Arkansas River in eastern Oklahoma.

(3) The Cherokee Nation, a federally recognized Indian tribe with its present tribal headquarters near Tahlequah, Oklahoma, having adopted its most recent constitution on June 26, 1976, and having entered into various treaties with the United States, including but not limited to the Treaty at Hopewell, executed on November 28, 1785 (7 Stat. 18), and the Treaty at Washington, D.C., executed on July 19, 1866 (14 Stat. 799), has maintained a continuous government-to-

99–006

government relationship with the United States since the earliest years of the Union.

(4) The Choctaw Nation, a federally recognized Indian tribe with its present tribal headquarters in Durant, Oklahoma, having adopted its most recent constitution on July 9, 1983, and having entered into various treaties with the United States of America, including but not limited to the Treaty at Hopewell, executed on January 3, 1786 (7 Stat. 21), and the Treaty at Washington, D.C., executed on April 28, 1866 (7 Stat. 21), has maintained a continuous government-to-government relationship with the United States since the earliest years of the Union.

(5) The Chickasaw Nation, a federally recognized Indian tribe with its present tribal headquarters in Ada, Oklahoma, having adopted its most recent constitution on August 27, 1983, and having entered into various treaties with the United States of America, including but not limited to the Treaty at Hopewell, executed on January 10, 1786 (7 Stat. 24), and the Treaty at Washington, D.C., executed on April 28, 1866 (7 Stat. 21), has maintained a continuous government-to-government relationship with the United States since the earliest years of the Union.

(6) In the first half of the 19th century, the Cherokee, Choctaw, and Chickasaw Nations were forcibly removed from their homelands in the southeastern United States to lands west of the Mississippi in the Indian Territory which that were ceded to them by the United States. From the "Three Forks" area near present day Muskogee, Oklahoma, downstream to the point of confluence with the Canadian River, the Arkansas River flowed entirely within the territory of the Cherokee Nation. From that point of confluence downstream to the Arkansas territorial line, the Arkansas River formed the boundary between the Cherokee Nation on the left side of the thread of the river and the Choctaw and Chickasaw Nations on the right.

(7) Pursuant to the Act of April 30, 1906 (34 Stat. 137), title to the bed and banks of the Arkansas River passed to the United States in trust for the respective Indian Nations in accordance with their respective interests therein.

(8) For more than 60 years after Oklahoma statehood, the Bureau of Indian Affairs incorrectly assumed that Oklahoma owned the Riverbed from the Arkansas State line to Three Forks, and therefore took no action to protect the Indian Nations' Riverbed resources such as oil, gas, sand, and gravel and Drybed Lands suitable for grazing and agriculture.

(9) The United States Government constructed powerheads and other improvements in the channel of the Arkansas River on tribal lands, using sand and gravel belonging to the three Indian Nations. Due to the Bureau's inaction, individuals with property near the Arkansas River began to occupy the three Indian Nations' Drybed Lands—lands that were under water at the time of statehood but that are now dry due to changes in the course of the river.

(10) In 1966, the three Indian Nations sued the State of Oklahoma to recover their lands. In 1970, the Supreme Court of the United States decided in the case of Choctaw Nation vs. Oklahoma (396 U.S. 620 (1970)), that the Indian Nations retained title to their respective portions of the Riverbed along the navigable reach of the river.

(11) In 1989, the Indian Nations filed lawsuits against the United States in the United States Court of Federal Claims (Case Nos. 218–89L and 630–89L), seeking damages for the United States use and mismanagement of tribal trust resources along the Arkansas River. Those actions are still pending.

(12) In 1997, the United States filed quiet title litigation against individuals occupying some of the Indian Nations' Drybed Lands. That action, filed in the United States District Court for the Eastern District of Oklahoma, was dismissed without prejudice on technical grounds.

(13) From time to time over the years following the Indian Nations' Court of Federal Claims litigation, the Indian Nations, the Department of Justice, the Bureau of Indian Affairs, and the Indian Nations have engaged in settlement negotiations.

(14) Nearly 7,750 acres of the Indian Nations' Drybed Lands have been occupied by a large number of adjacent landowners in Oklahoma. Without Federal legislation, further litigation against thousands of such landowners would be likely and any final resolution of pending disputes through a process of litigation would take many years and entail great expense to the United States, the Indian Nations, and the individuals and entities occupying the Drybed Lands and would seriously impair long-term economic planning and development for all parties.

(15) The Councils of the Cherokee, Choctaw, and Chickasaw Nations have each enacted tribal legislation which would, contingent upon the passage of this Act and in exchange for the monies appropriated hereunder—

(A) settle and forever release their respective claims against the United States asserted by them in United States Court of Federal Claims Case Nos. 218–89L and 630–89L; and

(B) forever disclaim any and all right, title, and interest in and to the Disclaimed Drybed Lands, as set forth in those enactments of the respective councils of the Indian Nations.

(16) The resolutions adopted by the respective Councils of the Cherokee, Choctaw, and Chickasaw Nations each provide that, contingent upon the passage of the settlement legislation, each Indian Nation agrees to dismiss, release, and forever discharge its claims asserted against the United States in the United States Court of Federal Claims, Case No. 218–89L, and to disclaim any right, title, or interest of the Indian Nation in the Disclaimed Drybed Lands, in exchange for the funds appropriated and allocated to the Indian Nation under the provisions of the settlement legislation, which funds the Indian Nation agrees to accept in full satisfaction and settlement of all claims against the United States for its use of and damage to the bed of the Arkansas River arising out of the construction of the McClellan-Kerr Navigation Way and for the damages sought in the aforementioned claims asserted in the United States Court of Federal Claims, and as full and fair compensation for disclaiming its right, title, and interest in the Disclaimed Drybed Lands.

(17) In those resolutions, each Indian Nation expressly reserved all of its beneficial interest and title to all other Riverbed lands, including minerals, as determined by the Supreme Court in Choctaw Nation v. Oklahoma, 397 U.S. 620 (1970), and further reserved any and all right, title, or interest that each Nation may have in and to the water flowing in the Arkansas River and its tributaries.

**SEC. 3. PURPOSES.**

The purposes of this Act are as follows:

(1) To approve, ratify, and confirm an agreed-to resolution of claims brought by the Cherokee, Choctaw, and Chickasaw Nations against the United States, and the agreed-to disclaimers of the three Indian Nations to any right, title, or interest in approximately 7,750 acres of Drybed Lands contiguous to the channel of the Arkansas River as of the date of the enactment of this Act in certain townships in eastern Oklahoma.

(2) To reserve the three Indian Nations' beneficial interest in the Riverbed except for the Disclaimed Drybed Lands.

(3) To authorize and direct the Secretary to implement the terms of such settlement.

(4) To authorize the actions and appropriations necessary to implement the provisions of this Act.

(5) To maintain the trust relationship between the United States and each of the three Indian Nations.

**SEC. 4. DEFINITIONS.**

For the purposes of this Act, the following definitions apply:

(1) DISCLAIMED DRYBED LANDS.—The term "Disclaimed Drybed Lands" means all Drybed Lands along the Arkansas River that are located in Township 10 North in Range 24 East, Townships 9 and 10 North in Range 25 East, Township 10 North in Range 26 East, and Townships 10 and 11 North in Range 27 east, in the State of Oklahoma.

(2) DRYBED LANDS.—The term "Drybed Lands" means those Riverbed lands of the Indian Nations which lie above and contiguous to the high water mark of the Arkansas River in the State of Oklahoma as of the date of the enactment of this Act but which have become part of the Riverbed by operation of accretion and avulsion.

(3) INDIAN NATION; INDIAN NATIONS.—The term "Indian Nation" means the Cherokee Nation, Choctaw Nation, or Chickasaw Nation, and the term "Indian Nations" means all three tribes collectively.

(4) RIVERBED.—The term "Riverbed" means the Drybed Lands and the Wetbed Lands and includes all minerals therein.

(5) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(6) WETBED LANDS.—The term "Wetbed Lands" means those Riverbed lands which lie below the high water mark of the Arkansas River in the State of Oklahoma as of the date of the enactment of this Act, exclusive of the Drybed Lands.

**SEC. 5. SETTLEMENT AND CLAIMS; APPROPRIATIONS; ALLOCATION OF FUNDS.**

(a) EXTINGUISHMENT OF CLAIMS.—Upon payment of the funds appropriated under this section, all claims for use of and damage to the Riverbed arising out of the construction and maintenance of the McClellan-Kerr Navigation Way and the claims asserted by the Cherokee, Choctaw, and Chickasaw Nations in the United States Court of Federal Claims against the United States shall be deemed extinguished.

(b) RELEASE OF TRIBAL CLAIMS TO CERTAIN DRYBED LANDS.—

(1) IN GENERAL.—Upon the deposit of all funds authorized for appropriation under subsection (c) for an Indian Nation into the appropriate trust fund account described in section 6, all claims and all right, title, and interest that the Indian Nations may have to the Disclaimed Drybed Lands, shall be deemed extinguished. The Secretary shall execute an appropriate document citing this Act, suitable for filing with the county clerks, or such other county official as appropriate, of those counties wherein the foregoing described lands are located, disclaiming tribal interests in such Disclaimed Drybed Lands.

(2) EXCEPTION.—Notwithstanding any provision of this Act, the Indian Nations do not relinquish any right, title, or interest in any lands or minerals to which the United States claims title which are contiguous to the Riverbed, and no provision of this Act shall be construed to extinguish or convey any water rights of the Indian Nations in the Arkansas River or any other stream or the beneficial interests or title of any of the Indian Nations in and to trust lands lying above or below the high water mark of the Arkansas River as of the date of the enactment of this Act, except for the Disclaimed Drybed Lands.

(3) LAND TO BE TAKEN INTO TRUST.—To the extent that the United States determines that it is able to effectively maintain the McClellan-Kerr Navigation Way without retaining title to lands above the high water mark of the Arkansas River as of the date of the enactment of this Act, said lands, after being declared surplus, shall be taken into trust for the Indian Nation within whose boundary the land is located. All Wetbed Lands, including minerals, from the Arkansas State line upstream to the historic point of navigability near the confluence of the Arkansas, Verdigris, and Grand Rivers, and all Drybed Lands located outside the foregoing described Townships, shall continue to be held by the United States in trust for the beneficiary Indian Nation and shall be protected in accordance with applicable law governing tribal trust lands.

(c) AUTHORIZATION FOR SETTLEMENT APPROPRIATIONS.—

(1) SETTLEMENT OF CLAIMS.—There is authorized to be appropriated the aggregate sum of $41,293,245. After payment pursuant to section 7, the remaining funds appropriated under this subsection shall be paid and allocated among the three Indian Nations in accordance with subsection (d) and deposited into the trust fund accounts established pursuant to section 6. Such payment shall be in full satisfaction and settlement of the Indian Nations' claims for the use of and damage to the Arkansas Riverbed arising out of the construction and maintenance of the McClellan-Kerr Navigation Way and asserted against the United States in the United States Court of Federal Claims, Case Nos. 218–89L and 630–89L, and in full satisfaction of, and as compensation for, the three Indian Nations' respective right, title, and interest in and to the Disclaimed Drybed Lands.

(2) RENTALS.—In addition to funds authorized to be appropriated in paragraph (1), there is authorized for appropriation and allocated in accordance with subsection (d) $8,000,000, representing the present value of the fair market rentals for the location and future operation in perpetuity of the two hydropower generation and related facilities at the Webbers Falls Lock and Dam and the Kerr Lock and Dam on the Arkansas River.

(d) ALLOCATION AND DEPOSIT OF FUNDS.—After payment pursuant to section 7, the remaining funds authorized for appropriation under subsection (c) shall be allocated among the Indian Nations as follows:

(1) 50 percent to be deposited into the trust fund account established under section 6 for the Cherokee Nation.

(2) 37.5 percent to be deposited into the trust fund account established under section 6 for the Choctaw Nation.

(3) 12.5 percent to be deposited into the trust fund account established under section 6 for the Chickasaw Nation.

**SEC. 6. TRIBAL TRUST FUNDS.**

(a) TRUST FUND ACCOUNTS AND USES OF TRUST FUNDS.—All funds appropriated and paid pursuant to section 5 shall be deposited into three separate tribal trust fund accounts to be established by the Secretary for the benefit of each of the three Indian Nations. All funds deposited into said accounts, and any income earned thereon, shall be expended only in accordance with the provisions of this section.

No funds deposited into the trust fund accounts established in section 6 shall be made available to the beneficiary Indian Nation until that Nation files the appropriate stipulation of dismissal with prejudice of all claims asserted in Case Nos. 218–89L or 630–89L, filed in the United States Court of Federal Claims.

(b) LAND ACQUISITION.—

(1) TRUST LAND STATUS PURSUANT TO REGULATIONS.—The funds appropriated and allocated to the Indian Nations pursuant to section 5(c) and deposited into trust fund accounts pursuant to section 6(a), together with any interest earned thereon, and allocated pursuant to section 5(d) may be used for the acquisition of land by the three Indian Nations for transfer to the United States in trust for the beneficiary Indian Nation in accordance with the Secretary's trust land acquisition regulations at part 151 of title 25, Code of Federal Regulations, as in effect on January 1, 2001.

(2) REQUIRED TRUST LAND STATUS.—Any such trust land acquisitions on behalf of the Cherokee Nation shall be mandatory if the land proposed to be acquired is located within Township 12 North, Range 21 East, in Sequoyah County, Township 11 North, Range 18 East, in McIntosh County, Townships 11 and 12 North, Range 19 East, or Township 12 North, Range 20 East, in Muskogee County, Oklahoma, and not within the limits of any incorporated municipality as of January 1, 2002, if—

(A) the land proposed to be acquired meets the Department of the Interior's minimum environmental standards and requirements for real estate acquisitions set forth in 602 DM 2.6, as in effect on January 1, 2001; and

(B) the title to such land must meet applicable Federal title standards as in effect on said date.

(3) OTHER EXPENDITURE OF FUNDS.—The Indian Nations may elect to expend all or a portion of the funds deposited into its trust account for any other purposes authorized under subsection (c).

(c) INVESTMENT OF TRUST FUNDS; NO PER CAPITA PAYMENT.—

(1) NO PER CAPITA PAYMENTS.—No money received by the Indian Nations hereunder may be used for any per capita payment.

(2) INVESTMENT BY SECRETARY.—Except as provided in this section and section 7, the principal of such funds deposited into the accounts established hereunder and any interest earned thereon shall be invested by the Secretary in accordance with current laws and regulations for the investing of tribal trust funds.

(3) USE OF PRINCIPAL FUNDS.—The principal amounts of said funds and any amounts earned thereon shall be made available to the Indian Nation for which the account was established for expenditure for purposes which may include construction or repair of health care facilities, law enforcement, cultural or other education activities, economic development, social services, and land acquisition. Land acquisition using such funds shall be subject to the provisions of subsections (b) and (d).

(d) DISBURSEMENT OF FUNDS.—The Secretary shall disburse the funds from a trust account established under this section pursuant to a budget adopted by the Council of the Indian Nation setting forth the amount and an intended use of such funds.

**SEC. 7. ATTORNEY FEES.**

(a) PAYMENT.—At the time the funds are paid to the Indian Nations, from funds authorized to be appropriated pursuant to section 5(c), the Secretary shall pay to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations.

(b) LIMITATIONS.—Notwithstanding subsection (a), the total fees payable to attorneys under such contracts with an Indian Nation shall not exceed 10 percent of that Indian Nation's allocation of funds appropriated under section 5(c).

## PURPOSE OF THE BILL

The purpose of H.R. 3534, as ordered reported, is to provide for the settlement of certain land claims of the Cherokee, Choctaw, and Chickasaw Nations to the Arkansas Riverbed in Oklahoma.

## BACKGROUND AND NEED FOR LEGISLATION

H.R. 3534 is a comprehensive legislative settlement of all claims asserted by the Cherokee, Choctaw, and Chickasaw Nations for the use and mismanagement of tribal resources along the Arkansas

River. The legislation extinguishes all of the Nations' claims to the so-called Disclaimed Drybed Lands and authorizes a total $49,293,245 in appropriated claim settlement funds to be allocated in specified trust fund accounts among the Cherokee, Choctaw, and Chickasaw Nations. Of the settlement amount, 50 percent would be held for the Cherokee Nation, 37.5 percent for the Choctaw Nation, and 12.5 percent for the Chickasaw Nation.

For more than 60 years following Oklahoma's statehood, the Bureau of Indian Affairs erroneously assumed that the State retained ownership of the Arkansas Riverbed from the Arkansas State line to Three Forks. The Cherokee, Choctaw, and Chickasaw Nations asserted that their Treaties superseded the Equal Footing Doctrine regarding navigable rivers and that ownership of the Arkansas Riverbed should remain with the tribes.

Due to the Bureau's inaction, the federal government constructed power heads and made other improvements in the channel of the riverbed on tribal land, using sand and gravel belonging to the three Nations. In addition, individuals with property near the river began to occupy the Drybed Lands lands that were under water at the time of Oklahoma Statehood but that are now dry. In 1966, the three Indian Nations sued the State of Oklahoma to recover their lands and in 1970, the U.S. Supreme Court ruled that ownership of the riverbed remained with the tribes. The decision gave the northern half of the riverbed to the Cherokee Nation from the Arkansas line west to the confluence with the Canadian River and the southern half of the riverbed jointly to the Choctaws and Chickasaws.

In 1989, the three Indian Nations filed lawsuits against the United States seeking damages for the use and mismanagement of tribal trust resources along the Arkansas River. To date, negotiations on the settlement of the three Nations' claim against the United States have continued without resolve. The Councils of the Cherokee, Choctaw, and Chickasaw Nations have enacted tribal legislation releasing their respective claims against the United States and extinguishing any and all right, title, and interest in the Drybed Lands. H.R. 3534 codifies the three Nations' settlement.

COMMITTEE ACTION

H.R. 3534 was introduced on December 19, 2001, by Congressman Brad Carson (D–OK), and was subsequently referred to the Committee on Resources. On April 17, 2002, the Committee held a hearing on the bill, and on June 26, 2002, the Committee met to mark up the legislation. Congressman Carson offered an amendment in the nature of a substitute to make certain technical and clarifying revisions. The legislation, as amended, was ordered favorably reported to the House of Representatives by unanimous consent.

SECTION-BY-SECTION ANALYSIS OF BILL AS ORDERED REPORTED

*Section 1. Short title*

This section sets out the short title of the bill, the "Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act."

*Section 2. Findings*

This section sets forth the findings prompting the need for the legislation.

*Section 3. Purposes*

This section sets forth the purpose of the bill: to approve the settlement (described above); to reserve the three Nations' beneficial interest in the riverbed except for the "disclaimed drybed lands;" to authorize the Secretary of the Interior to implement the settlement; to authorize the appropriations necessary to implement the bill; and to preserve the trust relationship between the U.S. and each of the three Nations.

*Section 4. Definitions*

This section sets forth the definitions for the bill.

*Section 5. Settlement and claims; Appropriations; Allocation of funds*

Subsection (a) states that the three Nations' claims against the United States will be extinguished upon payment of the funds authorized to be appropriated under the bill.

Subsection (b) states that on deposit of the appropriated funds into the trust accounts pursuant to section 6 of the bill, the three Nations' interests in the Disclaimed Drybed Lands shall be deemed extinguished. The Secretary of the Interior is authorized to file the appropriate documents with the county clerks for the counties where the Disclaimed Drybed Lands are located. The other Riverbed resources are expressly reserved, as are any water rights the three Nations may have. Other federal lands above the highwater mark, to the extent unnecessary for maintaining the navigation way and upon being declared surplus, are to be taken into trust for the Nations.

Subsection (c) authorizes for appropriation the aggregate sum of $41,293,245 for allocation among the three Nations in accordance with subsection (d)—50 percent to the Cherokee Nation, 37.5 percent to the Choctaw Nation, and 12.5 percent to the Chickasaw Nation—after making the payment authorized by section 7 (attorneys fees according to their contracts, not to exceed ten percent of the settlement), as full settlement and satisfaction for claims pending against the U.S. and for their disclaimed interests in the Disclaimed Drybed Lands. This subsection further authorizes an appropriation of $8 million as fair present value of past and future use of tribal lands for the two hydropower facilities on the river.

Subsection (d) sets out the percentages for allocating settlement funds among the three Nations.

*Section 6. Tribal Trust Funds*

Subsection (a) states that all appropriated funds will be deposited into separate tribal trust fund accounts for the benefit of the three Indian Nations, that the funds may only be expended in accordance with the provisions this section, and that none of the funds will be made available to a Nation until it has executed and filed a stipulation of dismissal in the Court of Federal Claims cases.

Subsection (b) states that the appropriated funds deposited into in the Tribal trust accounts and any interest earned thereon may be used for land acquisitions pursuant to the Secretary's regulations, except that trust acquisitions on behalf of the Cherokees are mandatory if the land proposed to be acquired is located in certain sections in Sequoyah, McIntosh, or Muskogee Counties, provided that the land is not located within the boundaries of any municipality and it meets the Secretary's minimum environmental and title standards.

Subsection (c) prohibits use of the settlement funds for per capita payments, and requires the Secretary to invest the funds in accordance with applicable laws and regulations. It also allows the funds to be used for construction or repair of health care facilities, law enforcement, cultural or other education activities, economic development, social services, and land acquisition, provided that the acquisition of land complies with to the requirements of subsections (b) and (d).

Subsection (d) requires disbursement of the funds from a trust account established under section 6 pursuant to budgets adopted by the council of the Nation setting forth the amount and intended use of the funds.

*Section 7. Attorney fees*

This section authorizes the Secretary to pay the Nations' attorneys those sums owed them under their respective contracts, but imposes a cap of ten percent of the Nation's allocation of funds appropriated under section 5(c).

COMMITTEE OVERSIGHT FINDINGS AND RECOMMENDATIONS

Regarding clause 2(b)(1) of rule X and clause 3(c)(1) of rule XIII of the Rules of the House of Representatives, the Committee on Resources' oversight findings and recommendations are reflected in the body of this report.

CONSTITUTIONAL AUTHORITY STATEMENT

Article I, section 8 of the Constitution of the United States grants Congress the authority to enact this bill.

COMPLIANCE WITH HOUSE RULE XIII

1. Cost of Legislation. Clause 3(d)(2) of rule XIII of the Rules of the House of Representatives requires an estimate and a comparison by the Committee of the costs which would be incurred in carrying out this bill. However, clause 3(d)(3)(B) of that rule provides that this requirement does not apply when the Committee has included in its report a timely submitted cost estimate of the bill prepared by the Director of the Congressional Budget Office under section 402 of the Congressional Budget Act of 1974.

2. Congressional Budget Act. As required by clause 3(c)(2) of rule XIII of the Rules of the House of Representatives and section 308(a) of the Congressional Budget Act of 1974, this bill does not contain any new budget authority, spending authority, credit authority, or an increase or decrease in revenues or tax expenditures.

3. General Performance Goals and Objectives. As required by clause 3(c)(4) of rule XIII, the general performance goal or objective

of this bill is to provide for the settlement of certain land claims of the Cherokee, Choctaw, and Chickasaw Nations to the Arkansas Riverbed in Oklahoma.

4. Congressional Budget Office Cost Estimate. Under clause 3(c)(3) of rule XIII of the Rules of the House of Representatives and section 403 of the Congressional Budget Act of 1974, the Committee has received the following cost estimate for this bill from the Director of the Congressional Budget Office:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, August 28, 2002.*

Hon. JAMES V. HANSEN,
*Chairman, Committee on Resources,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the enclosed cost estimate for H.R. 3534, the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act.

If you wish further details of this estimate, we will be pleased to provide them. The CBO staff contacts are Lanette J. Walker (for federal costs), Marjorie Miller (for the state, local, and tribal impact), and Cecil McPherson (for the private-sector impact).

Sincerely,

BARRY B. ANDERSON
(For Dan L. Crippen, Director).

Enclosure.

*H.R. 3534—Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act*

Summary: H.R. 3534 would ratify a settlement of the Cherokee, Choctaw, and Chickasaw Nations' claims to certain lands along the Arkansas River. Under the bill, the tribes would extinguish their claims upon payment by the federal government of $49 million to compensate them for the mismanagement of tribal resources along the Arkansas River. CBO estimates that implementing the bill would cost $49 million in fiscal year 2003, assuming appropriation of the authorized amount. H.R. 3534 would not affect direct spending or receipts; therefore, pay-as-you-go procedures would not apply.

H.R. 3534 contains an intergovernmental mandate as defined in the Unfunded Mandates Reform Act (UMRA), but this mandate would impose no net costs on state, local, or tribal governments. The mandate would fall on the Cherokee, Choctaw, and Chickasaw Indian Tribes.

H.R. 3534 contains a private-sector mandate, as defined in UMRA, on the attorneys representing the Cherokee, Choctaw, and Chickasaw Nations in the settlement matter described in the bill. CBO estimates that the direct cost of the mandate would be well below the annual threshold established by UMRA ($115 million in 2002, adjusted annually for inflation).

Estimated cost to the Federal Government: The estimated budgetary impact of H.R. 3534 is shown in the following table. This estimate assumes that the bill will be enacted near the end of fiscal year 2002 and amounts authorized will be appropriated in fiscal

year 2003. The costs of this legislation fall within budget function 450 (community and regional development).

| | By fiscal year, in millions of dollars— | | | | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 |
| CHANGES IN SPENDING SUBJECT TO APPROPRIATION | | | | | |
| Authorization level [1] | 49 | 0 | 0 | 0 | 0 |
| Estimated outlays | 49 | 0 | 0 | 0 | 0 |

[1] This amount could be partly or fully offset by a reduction in future payments from the Judgment Fund if the tribes prevail in a pending case against the government, however, CBO cannot estimate the likelihood or magnitude of such an offset.

Basis of estimate: H.R. 3534 would authorize the Department of the Interior (DOI) to make payments to the tribes' attorneys and to three new tribal trust funds to compensate the Cherokee, Choctaw, and Chickasaw Nations' for the mismanagement of tribal resources along the Arkansas River. The bill would authorize the appropriation of $49 million for such payments. Of this total, $41 million would be used to settle the tribes' claims, and $8 million would be a rental payment for the use of tribal land where two federal hydropower facilities are located.

The trust funds would become the tribes' property after each tribe files for dismissal of all relevant claims filed in the United States Court of Federal Claims. Therefore, assuming that the $49 million authorized by the bill is appropriated in 2003 and that the tribes file for dismissal in 2003, outlays of that amount would be recorded in that year.

The amounts deposited into the trust funds could be used by the tribes to pay for the acquisition of additional land or for certain other purposes. The bill would authorize DOI to take land acquired by the tribes into trust. CBO estimates that any administrative costs to the federal government resulting from taking those lands into trust would not be significant.

Pay-as-you-go considerations: None.

Estimated impact on state, local, and tribal governments: H.R. 3534 contains an intergovernmental mandate as defined in UMRA because it would extinguish outstanding legal claims of the Cherokee, Choctaw, and Chickasaw Nations. The bill provides, however, that these claims would be extinguished only after funds are appropriated to compensate the tribes, so they would incur no net costs as a result of this mandate.

Estimated impact on the private sector: H.R. 3534 contains a private-sector mandate as defined by UMRA. The bill would limit the fees payable to the attorneys under contract with the Cherokee, Choctaw, and Chicawaw Nations. Section 7 would limit attorneys' fees to 10 percent of the funds allocated by the government to each of the Indian Nations. Such a limitation on attorney fees would be a private-sector mandate as defined by UMRA. The total amount of the settlement is less than $50 million. Thus, the direct cost of the mandate, measured as a loss in net income for the attorneys, would be well below the annual threshold established by UMRA ($115 million in 2002, adjusted annually for inflation). According to government sources, however, attorney fees would likely not exceed 10 percent of the settlement. Thus, the mandate may have no cost to the private sector.

Estimate prepared by: Federal Costs: Lanette J. Walker; impact on state, local and tribal governments: Marjorie Miller; impact on the private sector: Cecil McPherson.

Estimate approved by: Peter H. Fontaine, Deputy Assistant Director for Budget Analysis.

COMPLIANCE WITH PUBLIC LAW 104–4

This bill contains no unfunded mandates as defined by Public Law 104–4.

PREEMPTION OF STATE, LOCAL OR TRIBAL LAW

This bill is not intended to preempt any State, local or tribal law.

CHANGES IN EXISTING LAW

If enacted, this bill would make no changes in existing law.

○

[CHAPTER 851.]

June 26, 1936.
[S. J. Res. 177.]
[Pub. Res., No. 135.]

## JOINT RESOLUTION

To define the term of certain contracts with Indian tribes.

Indians.
Certain contracts with attorneys, of indefinite term, etc., validated.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled*, That any contracts or agreements heretofore approved by the Secretary of the Interior between the authorities of any tribe, band, or group of Indians and their attorneys for the prosecution of claims against the United States, which provide that such contracts or agreements shall run for a period of years therein specified, and as long thereafter as may be required to complete the business therein provided for, or words of like import, or which provide that compensation for services rendered shall be on a quantum-meruit basis not to exceed a specified percentage, shall be deemed a sufficient compliance with section 2103 of the Revised Statutes (or section 81, title 25, United States Code): *Provided, however*, That nothing herein contained shall limit the power of the Secretary of the Interior, after due notice and hearing and for proper cause shown, to cancel any such contract or agreement: *Provided further*, That the provisions of this Act shall not be construed to revive any contract which has been terminated heretofore by lapse of time, operation of law, or by acts of the parties thereto.

R. S., sec. 2103, p. 367.
U. S. C., p. 999.
*Provisos.*
Authority to cancel contracts.
Terminated contracts not revived.

Existing valid contracts with time limitation for completion of services not affected.

SEC. 2. Any existing valid contract heretofore made and approved pursuant to any Act of Congress by any tribe, band, or group of Indians with an attorney or attorneys for the rendition of services in the prosecution of claims against the United States under authority of which suit or suits have been filed, and which contains a limitation of time for the completion of the services to be performed may be continued in full force unless a subsequent contract dealing with the same subject matter has been made and approved.

Approved, June 26, 1936.

---

[CHAPTER 852.]

June 26, 1936.
[H. J. Res. 608.]
[Pub. Res., No. 136.]

## JOINT RESOLUTION

Extending for two years the time within which American claimants may make application for payment, under the Settlement of War Claims Act of 1928, of awards of the Mixed Claims Commission and the Tripartite Claims Commission, and extending until March 10, 1938, the time within which Hungarian claimants may make application for payment, under the Settlement of War Claims Act of 1928, of awards of the War Claims Arbiter.

Settlement of War Claims Act.
Vol. 45, p. 254; Vol. 47, p. 318; Vol. 48, pp. 125, 1019.
Time for making application for payment by American claimants.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled*, That subsection (g) of section 2 and subsection (f) of section 5 of the Settlement of War Claims Act of 1928, as amended by Public Resolution Numbered 38, Seventy-third Congress, approved June 18, 1934, are further amended, respectively, by striking out the words "eight years" wherever such words appear therein and inserting in lieu thereof the words "ten years".

Vol. 45, p. 254.

SEC. 2. The first sentence of subsection (h) of section 6 of the Settlement of War Claims Act of 1928, as amended by Public Resolution Numbered 38, Seventy-third Congress, approved June 18, 1934, is further amended to read as follows:

Application for payments; time limitation.

"No payment shall be made under this section unless application therefor is made by March 10, 1938, in accordance with such regulations as the Secretary of the Treasury may prescribe."

Approved, June 26, 1936.

SEP 1988
TAHLEQUAH AGENCY

ATTORNEY'S CONTRACT

THIS AGREEMENT, made and entered into this 13th day of September, 1988, by and between Wilma P. Mankiller, Principal Chief of the Cherokee Nation of Oklahoma, acting for and on behalf of said Cherokee Nation ("Party of the First Part"), and James G. Wilcoxen of Muskogee, Oklahoma, and Paul M. Niebell, Washington, D.C. ("Parties of the Second Part").

WITNESSETH: That the Party of the First Part, on behalf of the said Cherokee Nation of Oklahoma, under authority of a Resolution of the Council of said Cherokee Nation, adopted at Tahlequah, Oklahoma on the 13th day of August, 1988, a copy of which is hereto attached and made a part hereof, hereby contracts with, retains and employs the Parties of the Second Part as attorneys in matters hereinafter mentioned, subject to the approval of the Commissioner of Indian Affairs and to the future retention of Patton, Boggs and Blow, Washington, D.C. as co-counsel in matters hereinafter mentioned.

It shall be the duty of said attorneys to advise and to represent the said Cherokee Nation in connection with properly prosecuting to final conclusion any and all claims which said Cherokee Nation may have against the United States, which it may be authorized to present by Act of Congress in the United States courts, or any other court or tribunal.

Said attorneys shall advise the said Cherokee Nation in any matters relating to said claims, and to represent it or them before the United States Court of Appeals for the Tenth Circuit and the Supreme Court of the United States, and before any other courts or tribunals, or any officers having any duty to perform in connection with the investigation, consideration or final settlement relative to any or all suits so authorized to be filed and prosecuted for and on behalf of said Cherokee Nation,

Said attorneys, in the performance of the duties required of them under this Contract, shall be subject to the supervision and direction of the Commissioner of Indian Affairs, and the said Cherokee Nation, and shall not make any compromise, settlement or other adjustment of the matters in controversy unless with the approval of the Commissioner of Indian Affairs and the Principal Chief of the said Cherokee Nation.

It is agreed that the said attorneys, subject to the approval of the Commissioner of Indian Affairs, may associate with them in said work hereunder other attorneys of their own choice and selection; provided, that neither the United States nor the Cherokee Nation of Oklahoma, Party of the First Part, is to be at any expense by reason of the employment of any such associate attorneys, all expenses thereof to be paid by the Parties of the Second Part, out of any compensation which they may receive for services to be rendered hereunder.

It is agreed that the compensation of the Parties of the Second Part, for the services rendered under the terms of this Contract, is to be wholly contingent upon a recovery for said Cherokee Nation. The Parties of the Second Part shall receive such compensation as the Commissioner of Indian Affairs may find equitably to be due as may be determined by a court or tribunal, for services theretofore rendered under this Contract, but in no event shall the aggregate fee exceed ten percent (10%) of any and all sums recovered or procured through the efforts of the said attorneys, in whole or in part for the said Cherokee Nation.

The attorneys, Parties of the Second Part, shall also be allowed and disbursed from the amount of any judgment received such actual expenses incurred by them, except such amounts as may be authorized by resolution of the Council

of said Cherokee Nation, approved by the Commissioner [illegible] be expended out of tribal funds to reimburse said attorneys [illegible] expenses during the progress of the litigation.

It is agreed that the effective date of this Contract shall be [illegible] August 11, 1988, the date of expiration of the prior Attorneys' Contract in order to cover the services of the Parties of the Second Part in prosecuting any and all claims herein mentioned, and that the terms of this Contract shall continue for a period of two (2) years from said effective date or to August 11, 1990, and that this Contract may be extended for periods of five (5) years, each from the date of its expiration, at the option and written request of said Parties of the Second Part, with the approval of the Principal Chief of the Cherokee Nation of Oklahoma and the Commissioner of Indian Affairs.

It is agreed also that no assignment of the obligations of this Contract, in whole or in part, shall be made without the consent of the Commissioner of Indian Affairs.

It is further agreed that no assignment or encumbrance of any interest of said attorneys in the compensation agreed to be paid by this Contract shall be made without the approval of the Commissioner of Indian Affairs. Any assignment of the obligations of this Contract, and/or any assignmnet or encumbrance of any interest in the compensation agreed to be paid, made in violation of the provisions of this paragraph, shall operate to terminate this Contract, and in such event no attorney having any interest in the Contract or in the fee provided for therein shall be entitled to any compensation whatever for any service rendered to the date of the termination of the Contract.

It is agreed that in the event of the death of either one or more of the

Parties of the Second Part the estate of the deceased attorney, or the estates of the deceased attorneys as the case may be, shall be allowed compensation in such sum as the Commissioner of Indian Affairs may find equitable to be due for the services theretofore rendered under the Contract, or as may be determined by a court or tribunal equitably to be due for the services theretofore rendered under this Contract.

It is agreed that the death of one of the Parties of the Second Part, leaving the others surviving, shall not terminate the Contract, but the death of all of the Parties of the Second Part shall terminate this Contract, unless they leave surviving associate counsel holding an interest in the Contract under an assignment duly approved by the Commissioner of Indian Affairs, in which event such associate counsel shall be entitled to proceed in all claims pending before the United States Court of Appeals for the Tenth Circuit, United States Supreme Court, or in any other court or tribunal, until their final determination under the terms and conditions of the Contract, and to prosecute such proceedings in compliance with the terms and provisions of this Contract.

This Contract may be terminated by the Commissioner of Indian Affairs with the consent of the Council of the Cherokee Nation of Oklahoma for cause deemed by the Commissioner of Indian Affairs to be reasonable and satisfactory upon sixty (60) days notice to the parties in interest, and if the Contract shall be so terminated, the Parties of the Second Part shall be credited with such interest should any sum or sums be recovered by a judgment of a court or tribunal as the court or tribunal may determine to be equitable in the fee found due upon the final determination of the said suit and the controverted matters therein included.

IN WITNESS WHEREOF, we have hereunto set our hands and seals this 9th day of September, 1988.

Principal Chief of the Cherokee Nation of Oklahoma

Party of the First Part

James G. Wilcoxen

Paul M. Niebell

Parties of the Second Part

Approved pursuant to authority delegated by the Commissioner of Indian Affairs in 10 BIAM 3.

1-23-89
Date

Area Director
Muskogee Area Office

ATTORNEYS' CONTRACT

THIS AGREEMENT (the "Contract") is made and entered into this 17th day of April, 1989, by and between The Cherokee Nation of Indians of the State of Oklahoma ("Cherokee Nation") and Patton, Boggs & Blow, Washington, D.C. (the "Attorneys").

WITNESSETH: That the Cherokee Nation or Tribe of Indians in Oklahoma, under authority of a Resolution of the Council of said Cherokee Nation, adopted at Tahlequah, Oklahoma on the 20th day of May, 1989, copies of which are hereto attached and made a part hereof, hereby contracts with, retains and employs Patton, Boggs & Blow as attorneys in matters hereinafter mentioned, subject to all required approvals. (All references hereinafter to "required approvals" shall be construed to include the Cherokee Nation Tribal Council and the Bureau of Indian Affairs, if required by regulation or statute.)

It shall be the duty of said Attorneys to advise and to represent the Cherokee Nation in connection with claims which said Cherokee Nation may have under any treaty, Act of Congress, other laws, or regulations for damages or equitable relief arising from the violation of the duties of the United States to protect the tribal lands and to manage the tribal resources of said Cherokee Nation. The terms and conditions of this Contract do not authorize said Attorneys to provide any representation in Cherokee Nation v. United States, Case No. 88-112, now pending before the United States Court of Appeals for the Tenth Circuit, nor does the representation authorized by this Contract in any way interfere with said pending litigation.

Said Attorneys shall advise and represent the Cherokee Nation in the aforementioned matters before the United States Claims Court, federal district courts, Courts of Appeal, and the Supreme Court, and before any other courts or tribunals, or any officers having any duty to perform in connection with the investigation, consideration or final settlement of such matters.

The said Attorneys will pursue as their top priority, either through the litigation processes or complementary legislative efforts, a resolution by way of settlement to recompense the Cherokee Nation for its long-outstanding entitlement since 1970 to the full benefits of its rights in its tribal lands held in trust by the United States, which rights to this date have not been honored in any respect.

Said Attorneys, in performing their duties under this Contract, are subject to the supervision and direction of the Cherokee Nation, and shall not make any compromise, settlement or other adjustment of the matters in controversy without advance approval of the Principal Chief of the Cherokee Nation.

It is agreed that said Attorneys shall prosecute actions for an injunction and/or damages, which are directly interrelated with pending legislative efforts, and shall be compensated an amount not to exceed $5,000 per month for fees for the period January 1989 through June 1990, and for actual out-of-pocket costs expended in direct prosecution of said litigation, including, but not limited to, deposition transcripts, travel and subsistence expenses.

It is agreed that said Attorneys may associate with them in the aforementioned matters other attorneys of their own choice and selection; provided, that said Cherokee Nation agrees in advance to pay the expense that said Attorneys incur by reason of the employment of any such associate attorneys.

The Cherokee Nation and the Attorneys acknowledge that said Attorneys will provide considerably more legal services and incur more in fees than the amount herein provided for monthly compensation. Accordingly, it is agreed that, upon agreed monetary or other quantifiable recovery for the Cherokee Nation, through the litigation or legislative process, said Attorneys shall receive from the Cherokee Nation additional compensation of ten percent (10%) of the amount recovered less the amounts previously paid by said Cherokee Nation for attorney fees pursuant to this Contract for litigation; provided, that approvals required by law, if any, are obtained.

This Contract shall be effective for eighteen (18) months (January 1, 1989 to July 1, 1990), and may be extended for periods of two (2) years, each from the date of its expiration, at the option and written request of the Attorneys, with all approvals required by law. It is expressly understood that said Attorneys shall have no contractual obligation to continue representation of the Cherokee Nation after expiration or termination of this Contract, and the Cherokee Nation shall cooperate in said Attorneys' actions to terminate such representation, including consent to withdrawal from pending court actions.

This Contract may be terminated by the Cherokee Nation with the consent of the Tribal Council of the Cherokee Nation for cause deemed by the Bureau of Indian Affairs to be reasonable and satisfactory upon sixty (60) days notice to the parties in interest. If the Contract is so terminated, and any monetary or other quantifiable sum is recovered by judgment or settlement of a suit or related controverted matters for which Patton, Boggs & Blow has represented the Cherokee Nation, said Attorneys shall receive an equitable portion of such recovery, pro rated consistent with the terms hereof regarding additional compensation.

IN WITNESS WHEREOF, we have hereunto set our hands and seals this 13th day of November, 1989.

Wilma P. Mankiller
Principal Chief on behalf of
Cherokee Nation of Indians
of the State of Oklahoma

Joe R. Reeder, on behalf of
PATTON, BOGGS & BLOW
Washington, D.C.

Approved pursuant to authority delegated by the Commissioner of Indian Affairs in 10 BIAM 3.

NOV 13 1989
Date

Merritt Youngdeer
Area Director
Muskogee Area Office

# CHEROKEE NATION

P.O. Box 948
Tahlequah, OK 74465-0948
918-456-0671

Joe Byrd
ᏦᏫ ᏥᏍᏆ
Principal Chief

James "Garland" Eagle
ᏥᎻ ᎠᏬᎭᎵ
Deputy Principal Chief

October 30, 1995

Kate Boyce
PATTON BOGGS, L.L.P.
2550 M Street N.W.
Washington, D.C. 20037

Dear Ms. Boyce:

As you know, Cherokee Nation has recently changed Administrations. I made the commitment during the election to closely scrutinize all accounts and contracts. I have acted upon that promise.

Currently, we are reviewing our legislative needs and weighing those against our budgetary constraints. After consulting with members of the Administration and staff, I have decided that, at this time, Cherokee Nation no longer requires the services of Patton Boggs.

I would personally like to thank you for your years of service to Cherokee Nation. You recently guided our staff through the Budget Reconciliation and we are grateful for your insight. As a former Council Member, I am also aware of the role you played in obtaining funding for Sequoyah and of your involvement with the Arkansas River Bed. Our tribal members have certainly benefited from your expertise.

Please do not hesitate to contact Cherokee Nation if we can be of assistance. Again, thank you for your hard work.

Sincerely,

Joe Byrd
Principal Chief

JB/tg

Chad "Corntassel" Smith
ᎣᏥᏍᏗ
Principal Chief

# CHEROKEE NATION

P.O. Box 948
Tahlequah, OK 74465-0948
918-456-0671

Joe Grayson, Jr.
ᏦᏏᏩ ᏦᏏᏂᏩ
Deputy Principal Chief

**To:** Principal Chief Chad Smith
Jim Wilcoxen, Wilcoxen and Wilcoxen
Joe Reeder, Patton Boggs
**From:** Julian K. Fite, General Counsel
**Date:** October 6, 2003
**Subject:** Attorney Fees for Work on Arkansas Riverbed Issues

**I. Overview: There are several claims or potential claims for attorney fees in regard to legislation passed in the latter part of 2002, settling the claims of the Cherokee Nation pertaining to the Arkansas River:**

**A. ORIGINAL FEE SETTLEMENT:**

**1. The Cherokee Nation and the attorneys who had represented the Nation in the original suit quieting title to the riverbed in the Cherokee, Choctaw and Chickasaw Nations, Choctaw Nation v. Oklahoma (U.S. Supreme Court 1970) made a fee settlement in 1980 providing for up to $3.5 million to be paid at the rate of ½ the annual revenue for 25 years. $ 1,527,701.00 remains payable. The contract expires by its terms in 2005. Due to potential ambiguities, a claim might be made that this balance would be payable from Arkansas Riverbed settlement funds.**

**B. WILCOXEN/NIEBELL CONTRACT:**

**In 1988, Cherokee Nation entered a contract with Jim Wilcoxen and Paul Niebell to pursue litigation (essentially a takings or condemnation claim) and, or, settlement of the various claims of the Cherokee Nation. Fees were to be determined by the Commissioner of Indian Affairs on an equitable basis as determined by a court with a limitation of 10%.**

**Under this contract, possibly a prior contract, and extensions of the 1988 contract, Jim Wilcoxen has rendered services from 1985 to the present. Mr. Niebell is deceased but his widow has submitted a claim for the period he worked on these matters. Also under this contract, Wilcoxen associated the Hall, Estill law firm and they have presented billings.**

**C. PATTON BOGGS CONTRACT:**

**In 1989, Cherokee Nation entered a contract with the Patton Boggs law firm for pursuit of a separate lawsuit against the U.S. for mismanagement of the resources of Cherokee Nation regarding the Arkansas Riverbed. This contract provided for monthly fees of up to $5,000 and 10% of any recovery (less monthly fees already paid). This contract was terminated in April 1997, during the Byrd administration.**

**D. SWIDLER BERLIN LAW FIRM:**

**During the Byrd administration of Cherokee Nation, the contract of Patton Boggs was terminated and the firm of Swidler Berlin was retained to pursue the claims. Swidler Berlin services were terminated in 1999.**

**E. CHEROKEE NATION STAFF ATTORNEYS AND PERSONNEL**

**During the long years of trying to resolve Cherokee Nation claims, staff attorneys and other personnel have contributed to this effort. David A. Mullon Jr. was directly involved during the Mankiller administration and again during the final three years under Principal Chief Smith. Arkansas Riverbed Commission Director Troy Wayne Poteete played a major role in the negotiations. Key administrative personnel of Cherokee Nation and the Cherokee Nation's Washington, D.C. staff were key players in Congressional efforts that resulted in the settlement legislation.**

**F. FEE LIMITATIONS AND OTHER ISSUES**

**The legislation makes specific provisions for attorney fees as follow:**

***SEC. 607.ATTORNEY FEES***

***(B) PAYMENT - At the time the funds are paid to the Indian Nations, from funds authorized to be appropriated pursuant to section 605(c), the Secretary shall pay to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations.***

***(b) LIMITATIONS - Notwithstanding subsection (a), the total fees payable to attorneys under such contracts with an Indian Nation shall not exceed 10 percent of that Indian Nation's allocation of funds appropriated under section 605(c).***

**The Cherokee Nation portion of settlement payments will total $20 million payable at $5 million per year for 4 years. These payments are conditioned on yearly appropriations from Congress. Thus there would be**

up to $2 million available for attorney fees payable at $500,000 per year for 4 years (if funded).

In addition, the United Keetoowah Band has filed an action claiming an interest in the Arkansas Riverbed and demanding these funds. The legislation reserves up to 10% of the funds payable to satisfy any such claims. Should UKB be successful, $2 million could be taken from the Cherokee payments which would reduce available funds for attorney fees to $1.8 million.

## II. ANALYSIS OF CLAIMS:

Each of the claims, or potential claims, should be examined in its individual context:

### A. ORIGINAL FEE SETTLEMENT:

This fee agreement has been administered by BIA and has paid out around $2 million to date, leaving a balance due of approximately $1.5 million. The contract states that it is payable "solely from monies realized by the Nation from the sale of resources, or from earnings or income arising from the ownership of assets in the River; actual balance is $1,577,701.00

This settlement would probably not be construed as sale or as earnings or income from the resource. Since the legislation is restrictive in regard to what these funds can be used for, and sets a 10% limit on attorney fees overall, I would consider this potential claim likely to be denied if asserted.

### B. WILCOXEN/NIEBELL CONTRACT:

This contract bridges the entire litigation/settlement saga of over 30 years. Mr. Niebell was one of the original six attorneys who entered into the 1980 fee settlement above. The father of Jim Wilcoxen was also one of those six. Mr. Niebell died and his involvement ended in 1994 (his claim is asserted by his widow). Jim Wilcoxen apparently started working on these issues in 1985, although we have no record of a written contract until 1988.

Wilcoxen has submitted billings for 1985 to present. I have divided these into 1985-87 (1750 hours at $150 per hour = $262,500), and 1988 to present (2219 hours at $150 per hour - $332,850 plus expenses of $2638.83 for a total of $335,488.83). It should be noted that Wilcoxen has estimated time from 1985 up to a portion of 1992. Since then, the claim is based on contemporaneous records.

**Mr. Niebell's widow has assembled records and submitted claims for 1980-1984 (482 hours); 1985-1988 (1101 hours); and 1988-1994 (1127 hours). There is no hourly rate requested in the documents submitted.**

**The Hall, Estill firm, operating under Wilcoxen's contract has submitted billings for 1989-94 ($264,938.22), and for additional work in 2002-2003 ($15,586.35). These records appear to be detailed and contemporaneous.**

**In regard to these claims, I have requested Cherokee Nation records regarding payments to these attorneys and the matters and cases involved for 1980 to present (to the extent such records are available).**

**C. PATTON, BOGGS CONTRACT:**

**Under this contract, Patton Boggs was paid $403,959 from 1989 through the termination of the contract in 1997. In addition, the firm was paid additional sums under a companion lobbying contract, much of which had to do with Arkansas Riverbed matters. In a letter dated August 11, 1995, Kate Boyce, Patton Boggs partner, indicated that Patton Boggs had accumulated $126,000 in unbilled fees for Riverbed legal work. The total amount paid this firm during the contracts was $1,053,908.48.**

**Patton Boggs has raised an issue that their contract was improperly terminated in 1997 during the Byrd administration; however, no apparent complaint was made at the time.**

**The Patton Boggs contract states that, in the event of the contract being terminated, "said attorneys shall receive an equitable portion of such recovery, prorated consistent with the terms hereof regarding additional compensation."**

**It should also be noted that Joe Reeder, formerly with Patton Boggs, and Kate Boyce provided valuable assistance in the passage of the 2002 legislation, at the request of Wilma Mankiller and with the consent of Principal Chief Smith.**

**D. SWIDLER BERLIN LAW FIRM:**

**This after the fact contract was entered into in 1997 and terminated in 1999. It included legal work on Arkansas River matters. Under this contract, the firm was paid $632,699.39, $202,120 of which was billing for Riverbed projects. When the contract was terminated, the Tribal Council voted specifically not to pay an outstanding balance, part of which was billing for Riverbed projects. This was due to the debt being incurred without budget authority.**

## III. GENERAL COMMENT:

The many and long efforts to claim the Arkansas Riverbed and the eventual legislative resolution of remaining issues has involved a long succession of Principal Chiefs, Tribal Councils, administrators, law firms and BIA and Interior Department personnel.

Except for the original litigation confirming the title to this property, none of the several lawsuits and appeals ever resulted in favorable disposition of any issues. However, the long term and continued litigation efforts helped to keep these issues alive so that the eventual legislative solution could be reached.

Likewise, the long and many efforts to reach a legislative settlement of these matters went down many dead end roads until they reached fruition last year.

On these many efforts, the Cherokee Nation has expended well over $3 million to outside attorneys. In addition, the time of staff attorneys and administrative personnel on these matters would run into hundreds of thousands, or possibly over $1 million.

Of the various lawyers and law firms who have been employed by the Cherokee Nation, most have received substantial payments. The necessity now is that Cherokee Nation must determine amounts to be approved for payment under various contracts, bearing in mind the legislative limitation on total amount.

## IV. TENTATIVE RECOMMENDATION FOR APPROVAL OF ATTORNEY FEES:

### A. ORIGINAL ATTORNEY FEE SETTLEMENT:

The amount still owed is actually for different work than the matters resolved by this legislation, and I would recommend that any lump sum payment come from funds other than the Riverbed Settlement Funds.

### B. WILCOXEN/NIEBELL CONTRACT:

Without any available contract or fee agreement, and without records to determine the status of payment for work done prior to the 1988 contract, I would not recommend full payment based on this work.

As to Wilcoxen's stated hours up until contemporaneous records begin in 1992, the claim appears a bit ambitious, though I would not doubt the honest effort to reconstruct matters from over ten years ago. I also take into account the fact that Wilcoxen and the attorneys working with him are the only ones with payments deferred to this final resolution. My recommendations also reflect the fact that Wilcoxen was involved from the beginning until final resolution.

**With the foregoing, I would recommend payment to Jim Wilcoxen in the amount of $400,000, plus a performance premium for long term unpaid service and results of $150,000, for a total of $550,000.**

**I would further recommend a payment to the estate of Paul Niebell in the amount of $100,000.**

**I would further recommend payment to the Hall, Estill law firm on their two invoices of $264,938.22, and $15,586.35, for a total of $280,524.57.**

## C. PATTON, BOGGS CONTRACT:

**The Patton, Boggs firm was paid for the bulk of their work from 1989-1997. After that time, they were no longer involved in litigation or legislative efforts until late in 2002, discussed above.**

**As such I would recommend payment for the uncompensated time accrued on the Arkansas Riverbed contract in the amount of $126,000, plus a performance premium for the final assistance in the legislation in the amount of $25,000 for a total of $151,000.**

## D. SWIDLER, BERLIN LAW FIRM:

**This firm has made no claim, and, under the facts of their involvement I would not recommend any payment.**

## E. CONCLUSION:

**My recommendation would be, as set forth above, that the Cherokee Nation approve those amounts for payment from the Arkansas Riverbed settlement. The total payments would be $1,106,524.57.**

*Wilcoxen & Wilcoxen*
*Attorneys at Law*
*112 North Fifth Street*
*P.O. Box 357*
*Muskogee, Oklahoma 74402-0357*

*Area Code 918*
*Telephone 683-6696*
*Fax 682-8605*

HALL ESTILL
ATTORNEYS AT LAW

320 South Boston Avenue
Suite 400
Tulsa, Oklahoma 74103-3708

Phone 918 594-0426
Fax 918 594-0505

March 31, 2005

The Honorable Chad Smith
Principal Chief of the Cherokee Nation
P.O. Box 948
Tahlequah, OK 74465-0948

Council of the Cherokee Nation
Attn: Gina Blackfox, Legislative Aide
P.O. Box 948
Tahlequah, OK 74465-0948

**Re: Arkansas Riverbed Settlement Attorney Fees**

Dear Chief Smith and Members of the Council:

We have received a March 29, 2005, letter (copy enclosed) (hereinafter, the "Letter") from Katherine R. Boyce of Patton Boggs, LLP. The Letter contains representations that purport to characterize the history of the settlement of the Cherokee Nation's claims to the Arkansas Riverbed and our role in it. It also states that we have a disagreement with Patton Boggs, and by implication attorneys at the law firm of Greenberg Traurig who formerly were with Patton Boggs and have represented Patton Boggs from time to time with regard to attorney fees claimed by Patton Boggs. The purpose of this letter is to state clearly and directly to the Nation our position on this matter.

First, contrary to the representation in the first paragraph of the Letter, we have "no difference of opinion" with Patton Boggs or Greenberg Traurig as to "the proper allocation of attorney fees" from the riverbed settlement. We have not discussed our fees with Patton Boggs or Greenberg Traurig. In fact, we have no relationship of any kind with those firms regarding attorney fees. Our work, under contract on the Nation's behalf in the riverbed settlement, is long-standing and well-documented. In response to requests by both the executive and legislative branches of the Cherokee Nation, we have made a number of detailed written submissions to explain the decades-long effort to obtain justice for the Nation. We will not undertake to restate that record here.

Second, we disagree with the statement in the second paragraph of the Letter that the settlement came about "only . . . as a result of litigation." The act of Congress that created the settlement resulted from the Bush Administration's and Congress' recognition that, as a matter of policy and fairness, the evidence compiled by the Nation and those who represented it under our contract required that justice be done on the riverbed claims

*in spite of* court rulings against the Nation. Decades of litigation in which we had participated thus gave way to years of negotiations in which we represented the Nation in conjunction with tribal staff and officials to persuade the federal government to honor its historic debt to the Nation.

The third paragraph of the Letter invites us to compromise and settle our attorney fee claim with Patton Boggs. Again, we have no dispute to settle with that firm, and, as discussed below, having accepted the Nation's fee determination, we have no dispute with the Nation either. Further, our contract is with the Cherokee Nation, not Patton Boggs or Greenberg Traurig. The Cherokee Nation is protected in its contractual relationship with us by the attorney-client privilege, which can only be waived by the Nation. We have no intention of discussing our contract with other law firms.

The Letter's characterization of our attorney fee claim is incorrect and should not be relied on by the Nation. Our submission for attorney fees was based on our contract that provided for up to ten percent of the amount recovered in the settlement to be paid as a contingent fee, approximately $2 million in this case. Our submission to the Nation included the value, without interest, of recorded time during approximately 15 years, during which we received no payment for our services. Because we were working under a contingent fee arrangement and not being currently paid on an hourly basis, there was substantial, additional unrecorded time that was expended in securing the settlement.

The Cherokee Nation's General Counsel reviewed our attorney fees submission, and prepared a proposed schedule of payments (amounting approximately to one half the authorized contingent fee) and an analysis to support it. The General Counsel's work in turn was reviewed by an independent law firm retained by the Nation for that purpose. Following that review, the executive office of the Cherokee Nation formally recommended payment of the fees to the Cherokee Nation Council. The recommendations were reviewed by the Rules Committee and were the subject of a hearing at which tribal executive officials and attorneys made presentations on the fee requests. Subsequently, all fee requests were evaluated and voted on by the Cherokee Nation Council and memorialized in tribal resolutions. The fee requests for Patton Boggs underwent the same review process. While Ms. Boyce states in the second to last paragraph of the Letter that the Cherokee Nation's actions on the attorney fees for the Patton Boggs and Greenberg Traurig attorneys "are not acceptable," that is <u>not</u> our view of the Nation's decision with regard to our fee award. We both accept and respect the Nation's decision.

Accordingly, other than by furnishing Ms. Boyce a copy of this letter, we will have no discussion with the attorneys at Patton Boggs or Greenberg Traurig about this matter. We expressly disassociate ourselves from the Letter's contention that attorneys at those firms have a right under the settlement act to prevent the settlement fund from being disbursed to the Nation until their claims for attorneys fees have been paid.

Finally, we understand that by letter of March 14, 2005, to Chief Smith, the BIA Regional Fiduciary Trust Administrator stated her impression that there is "an apparent dispute regarding payment of the fees." We would appreciate your advising the BIA that

that is not the case with respect to our attorney fees and requesting disbursement of the payment to us as determined by the Nation without further delay by the Department of the Interior.

If you wish to discuss this matter further we will be pleased to do so at your convenience.

Sincerely,

James G. Wilcoxen by MAS

James G. Wilcoxen
Wilcoxen & Wilcoxen

Margaret A. Swimmer

Margaret A. Swimmer
Hall Estill

Enclosure

cc: Katherine R. Boyce
Mrs. Eleanor Niebell

# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

In reply, please address to:
Main Interior, MS 6456

Honorable Chad Smith
Principal Chief
Cherokee Nation
P. O. Box 948
Tahlequah, Oklahoma 74465-0948

OCT 13 2005

Dear Chief Smith:

This letter is in response to your letters of February 18, 2005 and March 30, 2005 to Jeanette Hanna, Regional Director, Eastern Oklahoma Region of the Bureau of Indian Affairs, and an August 26, 2005 letter to me. In the referenced letters you requested that the Secretary of the Interior pay the attorney fees for your tribe in accordance with the fee schedule set forth in the tribal council resolutions and section 607(a) of the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act (the Settlement Act), which is codified at 25 U.S.C. § 1779e.

The Department has received two letters, which were dated May 20, 2004 and March 8, 2005, from Patton Boggs along with a legal memorandum dated April 22, 2005, which was prepared by the late Donald Pearlman, a senior partner of Patton Boggs. The memorandum put forth the argument that the Court of Federal Claims has jurisdiction over his firm's attorney fee dispute with the Cherokee Nation based upon the consent decree. It also asserted that the Court of Federal Claims is the proper forum for the Cherokee Nation's former and present attorneys to litigate their fee claims. Patton Boggs urged the Department to file two motions before the Court of Federal Claims; one to seek an interpretation of the Settlement Act which would permit the Court of Federal Claims to determine attorney fees claims as part of its authority to enter a consent decree, and the other to provide notice to the all of the law firms that represented the Cherokee Nation so that they would be afforded an opportunity to litigate the attorney fees claims by intervening in the Arkansas Riverbed mismanagement case, which is still pending.

Patton Boggs requested that the Department of the Interior not make any disbursements from any of the Settlement Act accounts of the Cherokee Nation until its claim for $1,596,041 had been paid. According to the correspondence submitted by Patton Boggs, its claim is based on a 1989 attorney client contract that contained a provision for the firm to receive ten percent of any legislative settlement of the Cherokee Nation's mismanagement claims against the United States minus any fees which were paid prior to settlement. Based upon the Cherokee Nation's $20 million share of the Settlement Act monies, Patton Boggs asserts that it is entitled to the entire ten percent of the Cherokee Nations attorney fees ($2 million) minus the $403,959 the firm received from 1989 to 1997, when it received monthly fee payments pursuant to its contract.

The Department has also received correspondence from two other law firms, Wilcoxen and

Wilcoxen and Hall Estill. Among the documents the Department has received is a copy of the 1988 contract between James G. Wilcoxen and Paul M. Niebell and the Cherokee Nation, which also contained a provision for a payment of ten percent of any settlement of the Nation's claims against the United States. The Department has also received copies of a October 6, 2003 memorandum prepared by the late Julian Fite, General Counsel for the Cherokee Nation, a July 9, 2004 memorandum prepared by an independent law firm, Riggs, Abney, Neal, Turpen, Orbison & Lewis for the General Counsel, and a December 14, 2004 memorandum prepared by Todd Hembry, the General Counsel for the Council of the Cherokee Nation, all of which analyzed the various attorney fee claims. In addition, Hall Estill, provided a fax dated April 4, 2005 with an attached copy of a March 31, 2005 letter from Wilcoxen and Wilcoxen and Hall Estill to your office and the Council of the Cherokee Nation. In that March 31, 2005 letter, representatives of both firms asserted that they accepted the payments authorized by the Council's resolutions and denied having any dispute with the Nation's payment decisions or any intention of attempting to assert a contractual claim for ten percent of the attorney fees authorized by the Settlement Act.

Section 607(b) of the Settlement Act, codified at 25 U.S.C. § 1779e(b), specifies that the total compensation paid for attorney fees on behalf of an Indian nation cannot exceed ten percent of that nation's share of the settlement funds. It is clear that the sum of potential claims for attorneys fees exceeds the ten percent cap imposed by the Settlement Act. It is also clear that the Cherokee Nation has considered this issue carefully and has decided upon a payment schedule that does not violate the statutory limitation, but has not been accepted by Patton Boggs.

I have determined that the Secretary is required to pay only those fees approved by tribal resolutions after the Settlement Act became effective, and that the Settlement Act requires the Secretary to execute a purely ministerial act in carrying out the instructions of the Cherokee Nation as expressed in the post settlement resolutions of the Council. As you are aware, the Cherokee Nation's Council authorized the payment of attorney fees as follows:

| | | |
|---|---|---|
| Resolution No. 29-05 | Patton Boggs | $ 151,000 |
| Resolution No. 20-05 | Wilcoxen & Wilcoxen | $ 550,000 |
| Resolution No. 18-05 | Hall Estill | $ 280,524.57 |
| Resolution No. 19-05 | Estate of Paul Niebell | $ 100,000 |

By this letter, I am informing you that I intend to make disbursements from the Cherokee Nation's attorney fee escrow account, which was created pursuant to the Settlement Act, within two weeks in accordance with your request. Upon payments of these attorney fees, the balance remaining in the Cherokee attorney escrow account will be disbursed to the Nation and the account will be closed. The Department respects the sovereignty of the Cherokee Nation and its right to manage its relationship with third party counsel.

In deciding to make these payments, I have not made any judgments as to the validity of any of the attorney contracts nor the amounts of the attorneys fees or any potential claims that the attorneys may have for fees. The validity and amount of the attorney fees is strictly a contractual matter between the Cherokee Nation and its current and former attorneys.

I hope that these arrangements meet with your approval. Please contact me at your earliest convenience if I may be of further assistance.

Sincerely,

James E. Cason

James E. Cason
Associate Deputy Secretary

cc:
Senator James M. Inhofe
James G. Wilcoxen
Margaret A. Swimmer
Joseph R. Membrino
Katharine R. Boyce
Estate of Paul Niebell

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, | * | |
| Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES OF AMERICA, | * | Case No. 218-89 |
| Defendant. | * | |
| * * * * * * | * | |
| PATTON BOGGS LLP | * | Chief Judge Edward J. Damich |
| Intervenor Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |
| * * * * * * | * | * * * * * |

**DECLARATION OF DAVID S. PANZER**

DAVID S. PANZER, ESQ., declares pursuant to 28 U.S.C. § 1746 and says:

1. I am an attorney associated with the law firm of Greenberg Traurig LLP at 800 Connecticut Avenue, N.W., Washington, DC 20006, and I am counsel for the Intervenor Plaintiff, Patton Boggs LLP. I submit this Declaration in support of Patton Boggs's Cross-Motion for Summary Judgment for $1,247,501.80 (the "Motion") in the above captioned case.

2. Exhibit 1 in the Appendix to the Motion is a true and accurate copy of the 1988 attorney fee contract between the Cherokee Nation on the one hand, and Mr. James Wilcoxen and Mr. Paul Niebell, on the other hand.

3. Exhibit 2 in the Appendix to the Motion is a true and accurate copy of the 1989 attorney fee contract between the Cherokee Nation and Patton Boggs.

4. Exhibit 3 in the Appendix to the Motion is a true and accurate copy of a letter from Cherokee Nation Principal Chief Joe Byrd to Ms. Katharine Boyce of Patton Boggs, dated October 30, 1995.

5. Exhibit 4 in the Appendix to the Motion is a true and accurate copy of a letter from Cherokee Nation General Counsel Julian Fite, dated October 6, 2003.

6. Exhibit 5 in the Appendix to the Motion is a true and accurate copy of a letter from Mr. James Wilcoxen and Ms. Margaret Swimmer to the Cherokee Nation, dated March 31, 2005.

7. Exhibit 6 in the Appendix to the Motion is a true and accurate copy of a letter from Assistant Secretary James Cason, of the Department of the Interior, to the Cherokee Nation's Principal Chief, Chad Smith, date-stamped October 13, 2005.

8. All of these above-mentioned exhibits were provided to Patton Boggs by the Cherokee Nation or the government during the course of Patton Boggs' representation of the Cherokee Nation, or during the course of the subsequent dispute involving Patton Boggs' attorneys fees at issue in this litigation. All of these exhibits are what they purport to be.

Dated: March 20, 2006

DAVID S. PANZER, ESQ.