**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**Consolidated Case No. 89-218 L**

| | | |
|---|---|---|
| **THE CHEROKEE NATION OF OKLAHOMA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **PATTON BOGGS,** | ) | |
| | ) | **No. 89-218 L** |
| **Plaintiff-Intervenor,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | | **Chief Judge Edward Damich** |
| **THE CHOCTAW NATION OF OKLAHOMA AND THE CHICKASAW NATION,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 89-630 L** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT'S REPLY TO PATTON BOGGS' MEMORANDUM OPPOSING THE GOVERNMENT'S MOTION TO DISMISS, OR , IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**Introduction**

On February 28, 2006, the Defendant filed a motion to dismiss Patton Boggs' Complaint-in-Intervention , or, in the alternative, for summary judgment. On March 20, 2006,

Patton Boggs filed its opposition to the government's motion. The government sought an enlargement of time until April 24, 2006 to file its reply to PB's opposition which the Court granted.

**SUMMARY OF ARGUMENT**

Only the government's interpretation of Section 1779e(a) of the Settlement Act (the attorney fees provision) resolves the ambiguous language thereof in favor of the Cherokee Nation, in accordance with one of the fundamental canons of construction of Indian legislation. PB's contention that the payments made to three other law firms/attorneys were improper is premised upon its erroneous construction of Section 1779e(a). Finally, the "attorney fees" provision of the Settlement Act, even if money mandating, is not money mandating with respect to Patton Boggs.

**ARGUMENT**

**I. THE CRUCIAL DISTINCTION BETWEEN THE GOVERNMENT'S INTERPRETATION OF SECTION 1779e(a) AND THAT OF PATTON BOGGS IS THAT THE GOVERNMENT'S INTERPRETATION RESOLVES THE STATUTORY AMBIGUITY IN FAVOR OF THE CHEROKEE NATION.**

The essence of the government's argument on the conflicting interpretations of Section 1779e of the Settlement Act (25 U.S.C. 1779e(a)) - - the attorneys' fee provision of the Act - - is that both its interpretation of Section 1779e and that of Patton Boggs result in making certain words in Section 1779e(a) surplusage, in violation of the general rule of statutory construction that a statute should be construed in such a way as to render no word(s) superfluous, **"if it can be prevented."** [Emphasis supplied] (Gov.'s Mot. to Dismiss at 10). Here, it does not appear

possible to prevent/avoid a construction which does not render some words in Section 1779(a) redundant or surplusage. Accordingly, the crucial distinction between the conflicting interpretations is that only the government's interpretation resolves the ambiguity in Section 1779e(a) in favor of the Cherokee Nation. In other words, only the government's interpretation takes into account a most fundamental Indian canon of construction of federal Indian statutes - - namely, that ambiguities in federal Indian legislation must be resolved in favor of the affected Indian tribe or Indians.

Patton Boggs argues that the Settlement Act's attorneys' fee provision is "unambiguous." Patton Boggs also contends, in effect, that "ambiguity" only arises when there are "two or more reasonable, alternative readings" of a statutory provision and that the "Secretary's untenable interpretation of the Settlement Act does not create an 'ambiguity' . . . " [Citation omitted] PB Opp. at 6. But, the Court should give this argument short shrift, since Patton Boggs effectively conceded that the language of Section 1779e(a) is ambiguous in its Supplemental Memorandum, filed November 3, 2005, at 22-23.

Patton Boggs makes much of the fact that the government concedes that both PB's interpretation of Section 1779e(a), and the Defendant's interpretation have the effect of rendering certain words of subsection (a) superfluous. See Defendant's Motion to Dismiss at 10. However, the Secretary's construction rendering the words "provided for in the individual tribal attorney fee contracts" is far less superfluous than Patton Boggs' construction which renders the phrase "as approved by the respective Indian nations" totally superfluous. This is because under the Secretary's construction it is implicit that the Secretary would not order the distribution of monies from the attorney fees escrow account to pay attorneys' fees whose services were not

encompassed (directly, or, indirectly) by a tribal attorney fee contract (or contracts) executed with the CNO, or which were premised solely upon a quantum meruit basis, even if the CNO had approved these fees.[1/] Indeed, the October 13, 2005 letter from Associate Deputy Secretary James E. Cason to the CNO specifically references the "contract between James G. Wilcoxen and Paul Niebell and the Cherokee Nation." This letter also cites a memorandum prepared by the General Counsel for the CNO, Julian Fite. The 2003 Fite memorandum, in turn, references the Wilcoxen-Niebell contract and states that the Hall Estill law firm was "operating under Wilcoxen's contract." See Attachment hereto (a copy of this memorandum) at 4. In sum, the CNO's General Counsel concluded that the services performed by Wilcoxen & Wilcoxen, Paul Niebell and Hall Estill were encompassed by the Wilcoxen & Wilcoxen (or Wilcoxen-Niebell) contract - - a tribal attorney fee contract which had been executed with the CNO and approved by the Secretary, according to PB.

As for the decision of South Carolina v. Catawba Indian Tribe, 476 U. S. 498 (1986), upon which Patton Boggs relies, this case can be factually distinguished because the language of the governing federal legislation in that case with respect to the issue of whether the real property law of the State of South Carolina applied to the Tribe was quite clear.

Finally, we do not agree with Patton Boggs' argument that the legislative history of Section 1779e should preclude the application of the Indian canon of construction referenced

---

[1/] PB argues that neither Hall Estill nor Paul Niebell had separate, individual tribal attorney fee contracts with the CNO. However, Paul Niebell's services were covered by the Wilcoxen-Niebell contract with the CNO and so were the services of Hall Estill which was "operating under the Wilcoxen contract" See Attachment at 4. PB states that Hall Estill was "'associated' by Mr. Wilcoxen under the Wilcoxen-Niebell Contract." PB's Proposed Findings of Uncontroverted Fact at 4.

above. With respect to "attorney fees," the legislative history states the following:

*Section 7. Attorney fees*

> This section authorizes the Secretary to pay the Nations' attorneys those sums owed them under their respective contracts, but imposes a cap of ten percent of the Nation's allocation of funds appropriated under section 5(c).

See H.R. Rep. No. 107-632, 107th Cong. 2nd Sess. (2002) at 8. [Copy attached to PB's Cross-Motion for Summary Judgment]. The legislative history is wholly consistent with the Secretary's interpretation, since the Secretary's interpretation implicitly assumes the existence of a tribal attorney fee contract (or contracts) encompassing the legal services performed by those particular law firms which are claiming attorneys' fees under Section 1779e. Furthermore, although the legislative history of Section 1779e states that this Section "authorizes the Secretary to pay the Nations'" attorneys' fees, the legislative history does not suggest anywhere that the Secretary is to pay, irrespective of whether the particular Nation has approved the specific fee amount claimed by a particular law firm - - a requirement set out in the text of Section 1779e(a). Finally, the legislative history does not anywhere suggest that the Secretary must, as a court would do, adjudicate between the fee claims of various competing law firms.

## II. PATTON BOGGS' ARGUMENT THAT THE PAYMENTS MADE BY THE SECRETARY TO LAW FIRMS OTHER THAN PATTON BOGGS, VIOLATED THE EXPRESS TERMS OF THE ACT PRESUMES THAT PATTON BOGGS CONSTRUCTION OF SECTION 1779e IS CORRECT.

Patton Boggs makes much of the fact that the government's Motion to Dismiss states that the Secretary complied with the Cherokee Nation's instructions on the payment of attorneys' fees, treating this as an "admission" that the Secretary did not comply with "the express terms of the Settlement Act." PB's Opp. at 8. This argument begs the central question yet to be resolved

by the Court - - namely, the proper interpretation of Section 1779e(a). Defendant stresses that the Secretary's reading of Section 1779e must be accorded great deference, since the Interior Department, which is charged with the implementation of federal Indian legislation, has over 150 years' worth of experience in interpreting Indian legislation. Interior's interpretation of a statute which it administers is entitled to Chevron deference. Amoco Production Co. v. Watson, 410 F. 3d 722, 726 (D.C. Cir. 2005). The Court need not conclude that the Secretary's interpretation is the only reasonable one. Udall v. Tallman, 380 U.S. 1, 16 (1965). The courts " . . . will sustain the Court's construction of [a statute] if it is reasonable, even though another construction appears equally plausible." [Citations omitted] See Blackfeet Indian Tribe v. Montana Power, 838 F. 2d 1055, 1057-1058 (9th Cir.), cert. denied, 488 U.S. 828 (1988).[2/] The reasonableness of the Secretary's interpretation of Section 1779e(a) is evidenced by the fact it fully respects the CNO's sovereign prerogatives in resolving contractual disputes in tribal forums.

In addition, the Secretary's construction does not place an adjudicatory role upon the Secretary who is in the Executive branch of the government. Such roles in the past have been judicial roles placed upon the Indian Claims Commission (by Section 15 of the Indian Claims Commission Act) and upon the U.S. Court of Claims (to which the remaining ICCA cases were transferred in anticipation of the Commission's termination in 1978). PB, without citing any support in the legislative history of Section 1779e, would effectively ascribe to Congress the intent that the Secretary resolve attorneys' fee disputes, which are private contractual disputes.

---

[2/] This is not to suggest that the government believes the PB's interpretation is equally plausible.

## III. THE ATTORNEYS' FEE PROVISION OF THE SETTLEMENT ACT IS NOT MONEY-MANDATING WITH RESPECT TO PATTON BOGGS.

Defendant reiterates that the attorneys' fee provision is not money-mandating with respect to Patton Boggs because prior to the CNO's approval of the payments of specific fee amounts to certain law firms/attorneys, none of the law firms/attorneys which had furnished services to the Cherokee Nation had a right under Section 1779e to any fees because the CNO had not approved the payment of any attorney fees. [3] The CNO has not approved the fees which Patton Boggs now seeks to recover. Section 1779e imposes an obligation[4] on the government to pay only those attorneys' fees approved by the Cherokee Nation, and that obligation runs to the CNO only.

Dated this 24th day of April, 2006.

[3] The CNO approved the payment of $151,000 to Patton Boggs, but Patton Boggs seeks to recover an **additional $1,393,542.80.** See PB Memo in support of Cross-Motion for Summary Judgment.

[4] Again, the implicit underlying assumption is that the services in question must be encompassed by a tribal attorney fee contract (or contracts) which had been approved by the CNO.

Respectfully submitted,

s/James M. Upton
JAMES M. UPTON
Trial Attorney
U. S. Department of Justice
Environment & Natural Resources Section
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel. (202) 305-0482
Fax: (202) 305-0506

OF COUNSEL:

Steven Simpson, Associate Solicitor,
Trust Responsibility Branch
Division of Indian Affairs
Office of the Solicitor
U.S. Department of the Interior
Main Bldg. - - 1849 C Street, N.W.
Washington, D.C. 20420

Angela Kelsey, Esq.
Karen Lindquist, Esq.
Trust Responsibility Branch
Division of Indian Affairs
Office of the Solicitor

Attachment

**ATTACHMENT**

SEAL OF THE CHEROKEE NATION
SEPT. 6, 1839

# CHEROKEE NATION

P.O. Box 948
Tahlequah, OK 74465-0948
918-456-0671

Chad "Corntassel" Smith
Principal Chief

Joe Grayson, Jr.
Deputy Principal Chief

**To:** Principal Chief Chad Smith
Jim Wilcoxen, Wilcoxen and Wilcoxen
Joe Reeder, Patton Boggs
**From:** Julian K. Fite, General Counsel
**Date:** October 6, 2003
**Subject:** Attorney Fees for Work on Arkansas Riverbed Issues

**I.** Overview: There are several claims or potential claims for attorney fees in regard to legislation passed in the latter part of 2002, settling the claims of the Cherokee Nation pertaining to the Arkansas River:

**A. ORIGINAL FEE SETTLEMENT:**

1. The Cherokee Nation and the attorneys who had represented the Nation in the original suit quieting title to the riverbed in the Cherokee, Choctaw and Chickasaw Nations, Choctaw Nation v. Oklahoma (U.S. Supreme Court 1970) made a fee settlement in 1980 providing for up to $3.5 million to be paid at the rate of ½ the annual revenue for 25 years. $ 1,527,701.00 remains payable. The contract expires by its terms in 2005. Due to potential ambiguities, a claim might be made that this balance would be payable from Arkansas Riverbed settlement funds.

**B. WILCOXEN/NIEBELL CONTRACT:**

In 1988, Cherokee Nation entered a contract with Jim Wilcoxen and Paul Niebell to pursue litigation (essentially a takings or condemnation claim) and, or, settlement of the various claims of the Cherokee Nation. Fees were to be determined by the Commissioner of Indian Affairs on an equitable basis as determined by a court with a limitation of 10%.

Under this contract, possibly a prior contract, and extensions of the 1988 contract, Jim Wilcoxen has rendered services from 1985 to the present. Mr. Niebell is deceased but his widow has submitted a claim for the period he worked on these matters. Also under this contract, Wilcoxen associated the Hall, Estill law firm and they have presented billings.

## C. PATTON BOGGS CONTRACT:

In 1989, Cherokee Nation entered a contract with the Patton Boggs law firm for pursuit of a separate lawsuit against the U.S. for mismanagement of the resources of Cherokee Nation regarding the Arkansas Riverbed. This contract provided for monthly fees of up to $5,000 and 10% of any recovery (less monthly fees already paid). This contract was terminated in April 1997, during the Byrd administration.

## D. SWIDLER BERLIN LAW FIRM:

During the Byrd administration of Cherokee Nation, the contract of Patton Boggs was terminated and the firm of Swidler Berlin was retained to pursue the claims. Swidler Berlin services were terminated in 1999.

## E. CHEROKEE NATION STAFF ATTORNEYS AND PERSONNEL

During the long years of trying to resolve Cherokee Nation claims, staff attorneys and other personnel have contributed to this effort. David A. Mullon Jr. was directly involved during the Mankiller administration and again during the final three years under Principal Chief Smith. Arkansas Riverbed Commission Director Troy Wayne Poteete played a major role in the negotiations. Key administrative personnel of Cherokee Nation and the Cherokee Nation's Washington, D.C. staff were key players in Congressional efforts that resulted in the settlement legislation.

## F. FEE LIMITATIONS AND OTHER ISSUES

The legislation makes specific provisions for attorney fees as follow:

*SEC. 607.ATTORNEY FEES*

*(B) PAYMENT - At the time the funds are paid to the Indian Nations, from funds authorized to be appropriated pursuant to section 605(c), the Secretary shall pay to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations.*

*(b) LIMITATIONS - Notwithstanding subsection (a), the total fees payable to attorneys under such contracts with an Indian Nation shall not exceed 10 percent of that Indian Nation's allocation of funds appropriated under section 605(c).*

The Cherokee Nation portion of settlement payments will total $20 million payable at $5 million per year for 4 years. These payments are conditioned on yearly appropriations from Congress. Thus there would be up to $2 million available for attorney fees payable at $500,000 per year for 4 years (if funded).

In addition, the United Keetoowah Band has filed an action claiming an interest in the Arkansas Riverbed and demanding these funds. The legislation reserves up to 10% of the funds payable to satisfy any such claims. Should UKB be successful, $2 million could be taken from the Cherokee payments which would reduce available funds for attorney fees to $1.8 million.

## II. ANALYSIS OF CLAIMS:

Each of the claims, or potential claims, should be examined in its individual context:

### A. ORIGINAL FEE SETTLEMENT:

This fee agreement has been administered by BIA and has paid out around $2 million to date, leaving a balance due of approximately $1.5 million. The contract states that it is payable "solely from monies realized by the Nation from the sale of resources, or from earnings or income arising from the ownership of assets in the River; actual balance is $1,577,701.00

This settlement would probably not be construed as sale or as earnings or income from the resource. Since the legislation is restrictive in regard to what these funds can be used for, and sets a 10% limit on attorney fees overall, I would consider this potential claim likely to be denied if asserted.

### B. WILCOXEN/NIEBELL CONTRACT:

This contract bridges the entire litigation/settlement saga of over 30 years. Mr. Niebell was one of the original six attorneys who entered into the 1980 fee settlement above. The father of Jim Wilcoxen was also one of those six. Mr. Niebell died and his involvement ended in 1994 (his claim is asserted by his widow). Jim Wilcoxen apparently started working on these issues in 1985, although we have no record of a written contract until 1988.

Wilcoxen has submitted billings for 1985 to present. I have divided these into 1985-87 (1750 hours at $150 per hour = $262,500), and 1988 to present (2219 hours at $150 per hour - $332,850 plus expenses of $2638.83 for a total of $335,488.83). It should be noted that Wilcoxen has estimated time from 1985 up to a portion of 1992. Since then, the claim is based on contemporaneous records.

Mr. Niebell's widow has assembled records and submitted claims for 1980-1984 (482 hours); 1985-1988 (1101 hours); and 1988-1994 (1127 hours). There is no hourly rate requested in the documents submitted.

The Hall, Estill firm, operating under Wilcoxen's contract has submitted billings for 1989-94 ($264,938.22), and for additional work in

2002-2003 ($15,586.35). These records appear to be detailed and contemporaneous.

In regard to these claims, I have requested Cherokee Nation records regarding payments to these attorneys and the matters and cases involved for 1980 to present (to the extent such records are available).

C. PATTON, BOGGS CONTRACT:

Under this contract, Patton Boggs was paid $403,959 from 1989 through the termination of the contract in April 1997. In addition, the firm was paid additional sums under a companion lobbying contract, much of which had to do with Arkansas Riverbed matters. In a letter dated August 11, 1995, Kate Boyce, Patton Boggs partner, indicated that Patton Boggs had accumulated $126,000 in unbilled fees for Riverbed legal work. The total amount paid this firm during the contracts was $1,053,908.48.

Patton Boggs has raised an issue that their contract was improperly terminated in 1997 during the Byrd administration; however, no apparent complaint was made at the time.

The Patton Boggs contract states that, in the event of the contract being terminated, "said attorneys shall receive an equitable portion of such recovery, prorated consistent with the terms hereof regarding additional compensation."

It should also be noted that Joe Reeder, formerly with Patton Boggs, and Kate Boyce provided valuable assistance in the passage of the 2002 legislation, at the request of Wilma Mankiller and with the consent of Principal Chief Smith.

D. SWIDLER BERLIN LAW FIRM:

This after the fact contract was entered into in 1997 and terminated in 1999. It included legal work on Arkansas River matters. Under this contract, the firm was paid $632,699.39, $202,120 of which was billing for Riverbed projects. When the contract was terminated, the Tribal Council voted specifically not to pay an outstanding balance, part of which was billing for Riverbed projects. This was due to the debt being incurred without budget authority.

III. GENERAL COMMENT:

The many and long efforts to claim the Arkansas Riverbed and the eventual legislative resolution of remaining issues has involved a long succession of Principal Chiefs, Tribal Councils, administrators, law firms and BIA and Interior Department personnel.

Except for the original litigation confirming the title to this property, none of the several lawsuits and appeals ever resulted in favorable disposition of any issues. However, the long term and continued litigation efforts helped to keep these issues alive so that the eventual legislative solution could be reached.

Likewise, the long and many efforts to reach a legislative settlement of these matters went down many dead end roads until they reached fruition last year.

On these many efforts, the Cherokee Nation has expended well over $3 million to outside attorneys. In addition, the time of staff attorneys and administrative personnel on these matters would run into hundreds of thousands, or possibly over $1 million.

Of the various lawyers and law firms who have been employed by the Cherokee Nation, most have received substantial payments. The necessity now is that Cherokee Nation must determine amounts to be approved for payment under various contracts, bearing in mind the legislative limitation on total amount.

## IV. TENTATIVE RECOMMENDATION FOR APPROVAL OF ATTORNEY FEES:

### A. ORIGINAL ATTORNEY FEE SETTLEMENT:

The amount still owed is actually for different work than the matters resolved by this legislation, and I would recommend that any lump sum payment come from funds other than the Riverbed Settlement Funds.

### B. WILCOXEN/NIEBELL CONTRACT:

Without any available contract or fee agreement, and without records to determine the status of payment for work done prior to the 1988 contract, I would not recommend full payment based on this work.

As to Wilcoxen's stated hours up until contemporaneous records begin in 1992, the claim appears a bit ambitious, though I would not doubt the honest effort to reconstruct matters from over ten years ago. I also take into account the fact that Wilcoxen and the attorneys working with him are the only ones with payments deferred to this final resolution. My recommendations also reflect the fact that Wilcoxen was involved from the beginning until final resolution.

With the foregoing, I would recommend payment to Jim Wilcoxen in the amount of $400,000, plus a performance premium for long term unpaid service and results of $150,000, for a total of $550,000.

I would further recommend a payment to the estate of Paul Niebell in the amount of $100,000.

I would further recommend payment to the Hall, Estill law firm on their two invoices of $264,938.22, and $15,586.35, for a total of $280,524.57, plus a performance premium of $100,000.00 regarding critical executive and legislative issues.

C. PATTON, BOGGS CONTRACT:

The Patton, Boggs firm was paid for the bulk of their work from 1989-1997. After that time, they were no longer involved in litigation or legislative efforts until late in 2002, discussed above.

As such I would recommend payment for the uncompensated time accrued on the Arkansas Riverbed contract in the amount of $126,000, plus a performance premium for the final assistance in the legislation in the amount of $25,000 for a total of $151,000.

D. SWIDLER, BERLIN LAW FIRM:

This firm has made no claim, and, under the facts of their involvement I would not recommend any payment.

E. CONCLUSION:

My recommendation would be, as set forth above, that the Cherokee Nation approve those amounts for payment from the Arkansas Riverbed settlement. The total payments would be $1,206,524.57.