IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, | * | |
| Plaintiff, | * | |
| | * | Case No. 89-218(L) |
| and | * | |
| | * | Chief Judge Edward H. Damich |
| PATTON BOGGS LLP, | * | |
| Intervenor-Plaintiff | * | |
| v. | * | |
| THE UNITED STATES OF AMERICA, Defendant. | * | |

* * * * * * * * * * * * *

**THE CHEROKEE NATION'S MEMORANDUM IN OPPOSITION TO PATTON BOGGS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Arthur Lazarus, Jr.
Sonosky, Chambers, Sachse, Endreson
& Perry, LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240, (202) 682-0249 (fax)
alazarus@sonosky.com

Special Counsel for Plaintiff Cherokee Nation

Of Counsel:
Lloyd Benton Miller
Donald J. Simon
Anne D. Noto
Sonosky, Chambers, Sachse, Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240, (202) 682-0249 (fax)
lloyd@sonosky.net; dsimon@sonosky.com;
anoto@sonosky.com

May 12, 2006

## TABLE OF CONTENTS

*Page(s)*

Table of Authorities . . . . . . . . . . vi

I. Introduction . . . . . . . . . . 1

II. Issues Presented . . . . . . . . . . 4

III. Statement of the Case and Counter-Statement of Fact . . . . . . . . . . 5

A. History of the litigation . . . . . . . . . . 5

1. Origin of the claims . . . . . . . . . . 5

2. The Oklahoma litigation . . . . . . . . . . 6

3. The Claims Court litigation . . . . . . . . . . 7

4. The 2002 Settlement Act . . . . . . . . . . 11

B. Cherokee Nation consideration of the attorney fees claims . . . . . . . . . . 12

1. The Wilcoxen/Niebell contract . . . . . . . . . . 14

2. The Patton Boggs contract . . . . . . . . . . 15

3. Swidler Berlin law firm . . . . . . . . . . 16

IV. Argument . . . . . . . . . . 21

A. Summary Judgment Should Be Denied Because the Patton Boggs Contract Was Terminated And It Has No Claim Under That Contract . . . . . . . . . . 21

1. The law provides only a quantum merit recovery when a contingent fee contract is terminated . . . . . . . . . . 21

2. The Nation's decisions on fees were reasonable and consistent with applicable legal standards . . . . . . . . . . 27

B. The Patton Boggs Contract Entitles It Only to Fees Approved Under Tribal Law, Which Requires Tribal Approval of Fees . . . . . . . . . . . . . . . . 30

C. The Settlement Act Mandates that Attorneys' Fees Be First Approved by the Nation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

1. The better reading of the plain language of section 1779e requires the Nation's approval of the fee payments to its attorneys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

2. The legislative history does not resolve the matter . . . . . . . . . . . . . . . . . . 36

3. Applicable presumptions strongly support the Secretary's and the Nation's interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

a. The court should defer to the Secretary's reasonable interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

b. Canons of Indian law instruct that the court uphold the Nation's and the Secretary's interpretation . . . . . . . . . . . . . . . . . . 39

V. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**Appendix**

Ex. 1 Docket entries, *Cherokee Nation v. United States*, No 83-306-C (ED Okla) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Ex. 2 Complaint dated May 23, 1983, *Cherokee Nation v. United States*, No 83-306-C (ED Okla.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-6

Ex. 3 Opinion and Order dated January 28, 1994 in *Cherokee Nation v. United States*, No. 218-89L (Cl. Ct.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-16

Ex. 4 Notice of Appeal dated February 17, 1995 in *Cherokee Nation v. United States*, No. 218-89L (Cl. Ct.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-25

Ex. 5 Opinion and Order dated April 12, 1996, in *Cherokee Nation v. United States*, No. 95-5055 (Fed. Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . A-30

Ex. 6 *Hearings on H.R. 103, H.R. 3476 and H.R. 3534 Before the H. Comm. on Resources,* 107th Cong. cover -1, 30-34, 78-100 (April 17, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-37

| | | |
|---|---|---|
| Ex. 7 | Contract dated September 8, 1988 between the Cherokee Nation and J. Wilcoxen and P. Niebell | A-69 |
| Ex. 8 | Contract dated November 13, 1989 between the Cherokee Nation and Patton, Boggs & Blow | A-74 |
| Ex. 9 | Letter agreement dated September 18, 1991 between Patton Boggs & Blow and the Cherokee Nation | A-78 |
| Ex. 10 | Letter dated October 30, 1995 from Principal Chief Cherokee Nation Joe Byrd, to Kate Boyce, Patton Boggs | A-80 |
| Ex. 11 | Letter dated April 23, 1996 from L. Susan Work, General Counsel, Cherokee Nation to C. Allen Foster and Katharine R. Boyce, Patton Boggs | A-81 |
| Ex. 12 | Memorandum dated November 5, 2002 from James Wilcoxen to Julian Fite, General Counsel for the Cherokee Nation | A-82 |
| Ex. 13 | Memorandum dated November 7, 2002 from Patton Boggs to Chad Smith, Principal Chief Cherokee Nation, and Julian Fite, General Counsel for the Cherokee Nation | A-87 |
| Ex. 14 | Letter dated May 2, 2003 from James Wilcoxen to Julian Fite, General Counsel for the Cherokee Nation | A-103 |
| Ex. 15 | Cherokee Nation Spreadsheet of total sums paid by the Cherokee Nation to Patton Boggs & Blow, 1989 – 1997 | A-105 |
| Ex. 16 | Memorandum dated October 6, 2003, from Julian Fite, General Counsel, Cherokee Nation to Chad Smith, Principal Chief Cherokee Nation, James Wilcoxen, Wilcoxen & Wilcoxen, and Joe Reeder, Patton Boggs, with letter dated October 24, 2003 from Mr. Fite transmitting that memorandum to Jim Wilcoxen, Joe Reeder, Katherine Boyce at Patton Boggs, and Margaret Swimmer at Hall Estill | A-108 |
| Ex. 17 | Letter dated November 8, 2003 from Eleanor Niebell to Julian Fite, General Counsel, Cherokee Nation | A-116 |
| Ex. 18 | Letter dated November 14, 2003 from Joe Reeder to Julian Fite, General Counsel, Cherokee Nation | A-117 |

Ex. 19 Letter dated December 5, 2003, from Hall Estill to Julian Fite, General Counsel, Cherokee Nation A-123

Ex. 20 Letter dated December 17, 2003, from Joe Reeder to Chad Smith, Principal Chief, Cherokee Nation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-126

Ex. 21 Cherokee Nation Legislative Act 5-04: Act Relating to Establishing Policy and Procedures for the Management and Use of Cherokee Nation Trust Funds and Trust Assets, enacted February 17, 2004 . . . . . . . . . A-129

Ex. 22 Letter dated July 9, 2004, from David Riggs, Esq. Riggs, Abney, et al. to Julian Fite, General Counsel, Cherokee Nation . . . . . . . . . . A-131

Ex. 23 Cherokee Nation Rules Committee, Meeting Minutes, September 16, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-141

Ex. 24 Cherokee Nation Rules Committee, Meeting Minutes, October 20, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-147

Ex. 25 Cherokee Nation Rules Committee, Meeting Minutes, November 18, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-154

Ex. 26 Memorandum dated December 15, 2004, from Todd Hembree to Cherokee Nation Tribal Council . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-165

Ex. 27 Cherokee Nation Rules Committee, Meeting Minutes December 16, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-167

Ex. 28 Cherokee Nation Rules Committee, Meeting Minutes, January 17, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-175

Ex. 29 Minutes of Tribal Council Meeting – Regular Session, February 14, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-182

Ex. 30 Cherokee Nation Rules Committee, Meeting Minutes, February 17, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-192

Ex. 31 Minutes of Tribal Council Meeting – Regular Session, March 14, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-202

Ex. 32 Resolution No. 18-05: Council of the Cherokee Nation – Approving Payment of Attorney Fees for Hall & Estill, adopted February 14, 2005 . . . A-215

Ex. 33 Resolution 19-05: Council of the Cherokee Nation – Approving Payment of Attorney Fees for Paul Niebell, adopted February 14, 2005 .... A-217

Ex. 34 Resolution 20-05: Council of the Cherokee Nation – Payment of Attorney Fees for Jim Wilcoxen, adopted February 14, 2005 .. A-219

Ex. 35 Resolution 29-05: Council of the Cherokee Nation – Approving Payment of Attorney Fees for Patton & Boggs, adopted March 14, 2005 ... A-221

Ex. 36 Letter dated February 18, 2005, from Chad Smith, Principal Chief, Cherokee Nation, to Jeannette Hanna, Bureau of Indian Affairs .......... A-223

Ex. 37 Letter dated March 30, 2005, from Chad Smith, Principal Chief, Cherokee Nation, to Jeannette Hanna, Bureau of Indian Affairs .......... A-225

Ex. 38 Declaration of Diane Hammons .................................. A-227

**TABLE OF AUTHORITIES**

***Cases:*** ***Page(s)***

*AD Global Fund, LLC v. United States*,
67 Fed. Cl. 657 (2005), appeal docketed, No. 06-5046
(Fed. Cir. Jan. 13, 2006) . . . . . . . . . . 32, 33, 37, 38

*Adkin Plumbing & Heating Supply Co. v. Harwell*,
606 A.2d 802 (N.H. 1992) . . . . . . . . . . 22

*Ashford v. Interstate Trucking Corp. of Am., Inc.*,
524 N.W.2d 500 (Minn. Ct. App. 1994) . . . . . . . . . . 22

*Bailey v. United States*,
516 U.S. 137 (1995) . . . . . . . . . . 33

*Baker v. Humphrey*,
101 U.S. 494 (1979) . . . . . . . . . . 21

*Barrett v. Van Pelt*,
268 U.S. 85 (1925) . . . . . . . . . . 35

*Butler & Vale v. United States*,
43 Ct. Cl. 497 (1907) . . . . . . . . . . 26

*Calderon v. Navarette*,
800 P.2d 1058 (N.M. 1990) . . . . . . . . . . 22

*Campbell v. Bozeman Investors of Duluth*,
964 P.2d 41 (Mont. 1998) . . . . . . . . . . 22, 27

*Chemical Mfrs. Ass'n v. N.R.D.C.*,
470 U.S. 116 (1985) . . . . . . . . . . 38

*Cherokee Nation v. United States*,
355 F.2d 945 (Ct. Cl. 1966) . . . . . . . . . . 28, 30

*Cherokee Nation of Okla. v. United States*,
54 Fed. Cl. 116 (2002) . . . . . . . . . . 28

*Cherokee Nation of Okla. v. United States*,
124 F.3d 1413 (Fed. Cir. 1997) . . . . . . . . . . 10

*Cherokee Nation of Okla. v. United States*,
782 F.2d 871 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Cherokee Nation of Okla. v. United States*,
937 F.2d 1539 (10th Cir.), *reh'g denied*, 948 F.2d 635 (10th Cir. 1991) . . . . . . . . . . . 7

*Cherokee Nation of Okla. v. United States*,
504 U.S. 910 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Cherokee Nation of Okla. v. United States*,
21 Cl. Ct. 565 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

*Cherokee Nation of Okla. v. United States*,
23 Cl. Ct. 117 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cherokee Nation of Okla. v. United States*,
23 Cl. Ct. 735 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cherokee Nation of Okla. v. United States*,
24 Cl. Ct. 695 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cherokee Nation of Okla. v. United States*,
25 Cl. Ct. 361 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cherokee Nation of Okla. v. United States*,
26 Cl. Ct. 215 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cherokee Nation of Okla. v. United States*,
26 Cl. Ct. 794 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cherokee Nation of Okla. v. United States*,
No. 95-5055, slip op. (April 12, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Chevron, U.S.A., Inc. v. N.R.D.C., Inc.*,
467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Chickasaw Nation v. United States*,
534 U.S. 84 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Choctaw Nation v. Okla.*,
397 U.S. 620 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 28

*City of Burbank v. United States*,
273 F.3d 1370 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Cooper Indus., Inc. v. Aviall Servs, Inc.*,
543 U.S. 157 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Covington v. Rhodes*,
247 S.E.2d 305 (N.C. Ct. App. 1978),
rev. denied, 251 S.E.2d 468 (N.C. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*DeCoteau v. Dist. County Ct. for the Tenth Judicial Dist.*,
420 U.S. 425 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*DeGorter v. Fed. Trade Comm'n*,
244 F.2d 270 (9th Cir. 1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Demko v. United States*,
44 Fed. Cl. 83 (1999), *aff'd* 216 F.3d 1049 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . 36

*Demov, Morris, Levin & Shein v. Glanz*,
428 N.E.2d 397 (N.Y. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Dill v. Public Utility District No. 2 of Grant County*,
475 P.2d 309 (Wash. Ct. App. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Doyon Ltd. v. United States*,
214 F.3d 1309 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*Dudding v. Norton Frickey & Assoc.*,
11 P.3d 441 (Colo. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Duncan v. Walker*,
533 U.S. 167 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Elliot Coal Mining Co. v. Dir., Office of Workers' Comp. Programs*,
17 F.3d 616 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Erie R. Co. v. United States*,
240 F. 28 (6th Cir. 1917) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Estate of Forrester v. Dawalt*,
562 N.E.2d 1315 (Ind. Ct. App. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Exxon Mobil Corp. v. Allapattah Servs. Inc.*,
___ U.S. ____ 125 S. Ct. 2611 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Fox & Assoc. Co. v. Purdon*,
541 N.E.2d 448 (Ohio 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Fracasse v. Brent*,
494 P.2d 9 (Cal. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Gaines, Gaines & Gaines, P.C. v. Hare, Wynn, Newell & Newton*,
554 So.2d 445 (Ala. Civ. App. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Greer, Klosik and Daugherty v. Yetman*,
496 S.E.2d 693 (Ga. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Hardman v. Snyder*,
393 S.E.2d 672 (W. Va. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Hart v. United States*,
585 F.2d 1025 (Ct. Cl. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Heinzman v. Fine, Fine, Legum & Fine*,
234 S.E.2d 282 (Va. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Hubbard v. Goffinett*,
70 S.W.2d 671 (Ky. 1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Jama v. Immigration & Customs Enforcement*,
543 U.S. 335 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Jenkins & Mann v. United States*,
1860 WL 4920 (Ct. Cl. 1860) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Kehoe v. Fid. Fed. Bank & Trust*,
421 F.3d 1209 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Kopelman and Assoc., L.C. v. Collins*,
473 S.E.2d 910 (W. Va. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Kungys v. United States*,
485 U.S. 759 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Malonis v. Harrington*,
816 N.E.2d 115 (Mass. 2004) . . . . . . . . . . 22, 27

*Montana v. Blackfeet Tribe of Indians*,
471 U.S. 759 (1985) . . . . . . . . . . 39, 40

*Montana v. United States*,
450 U.S. 544 (1981) . . . . . . . . . . 31

*Musser v. Musser*,
909 P.2d 37 (Okla. 1995) . . . . . . . . . . 22

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
_____ U.S. _____, 125 S.Ct. 2688 (2005) . . . . . . . . . . 38

*Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*,
503 U.S. 407 (1992) . . . . . . . . . . 38

*N.L.R.B. v. Pueblo of San Juan*,
276 F.3d 1186(10th Cir. 2002) . . . . . . . . . . 40

*Nobelman v. Am. Sav. Bank*,
508 U.S. 324 (1993) . . . . . . . . . . 35

*NTN Bearing Corp. of Am. v. United States*,
368 F.3d 1369 (Fed. Cir. 2004) . . . . . . . . . . 34

*O'Kane v. Apfel*,
224 F.3d 686 (7th Cir. 2000) . . . . . . . . . . 35, 36

*Oneida County v. Oneida Indian Nation*,
470 U.S. 226 (1985) . . . . . . . . . . 39, 40

*Papadopoulos v. Goldstein, Goldstein & Rikon, P.C.*,
725 N.Y.S.2d 364 (N.Y. App. Div. 2001) . . . . . . . . . . 22

*Phil. Watson, P.C. v. Peterson*,
650 N.W.2d 562 (Iowa 2002) . . . . . . . . . . 22, 23

*Plaza Shoe Store, Inc. v. Hermel, Inc.*,
636 S.W.2d 53 (Mo. 1982) . . . . . . . . . . 22

*Pritchett & Burch, PLLC v. Boyd*,
609 S.E.2d 439 (N.C. Ct. App.), *rev. dismissed*,
616 S.E.2d 543 (N.C. 2005) . . . . . . . . . . 22

*Pueblo of Santo Domingo v. United States*,
54 Fed. Cl. 240 (2002) . . . . . . . . . . 28

*Ratzlaf v. United States*,
510 U.S. 135 (1994) . . . . . . . . . . 33

*Red Lake Band v. United States*,
17 Ct. Ct. 362 (1989) . . . . . . . . . . 40

*Reid, Johnson, Downs, Andrachik & Webster v. Lansberry*,
629 N.E.2d 431 (Ohio 1994) . . . . . . . . . . 22

*Reynolds v. Polen*,
564 N.W.2d 467 (Mich. Ct. App. 1997) . . . . . . . . . . 22

*Rhoades v. Norfolk and W. Ry. Co.*,
399 N.E.2d 969 (Ill. 1979) . . . . . . . . . . 22, 23

*Rosenberg v. Levin*,
409 So.2d 1016 (Fla. 1982) . . . . . . . . . . 22, 23

*Sachs v. Klein*,
154 A.2d 134 (D.C. 1959) . . . . . . . . . . 22

*Salopek v. Schoeman*,
124 P.2d 21 (Cal. 1942) . . . . . . . . . . 23

*Scates v. Principi*,
282 F.3d 1362 (Fed. Cir. 2002) . . . . . . . . . . 24, 25, 26, 28

*Shoshone Indian Tribe of The Wind River Reservation v. United States*,
207 U.S. 564 (1908) . . . . . . . . . . 39, 40

*Sisseton & Wahpeton Bands or Tribes v. United States*,
423 F.2d 1386 (Ct. Cl. 1970) . . . . . . . . . . 25, 26

*Skeens v. Miller*,
628 A.2d 185 (Md. 1993) . . . . . . . . . . 22

*Somuah v. Flachs*,
721 A.2d 680 (Md. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Splane v. West*,
216 F.3d 1058 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Tex. State Comm'n for the Blind v. United States*,
796 F.2d 400 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Timken Co. v. United States*,
354 F.3d 1334 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Trend Coin Co. v. Fuller, Feingold & Mallah, P.A.*,
538 So.2d 919 (Fla. Dist. Ct. App. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Barnes*,
295 F.3d 1354 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Cherokee Nation of Okla.*,
480 U.S. 700 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. One Sentinel Arms Striker-12 Shotgun Serial No. 001725*,
416 F.3d 977 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Sablan*,
92 F.3d 865 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*U.S. Nat'l of Or. v. Indep. Ins. Agents of Am., Inc.*,
508 U.S. 439 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*U.S. Steel Group v. United States*,
225 F.3d 1284 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Vaughn v. King*,
975 F. Supp. 1147 (N.D. Ind. 1997) *aff'd*, 167 F.3d 347 (7th Cir. 1999) . . . . . . . . 22

*Western Shoshone Identifiable Group v. United States*,
652 F.2d 41 (Ct. Cl. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*White Mountain Apache Tribe of Ariz. v. United States*,
30 Fed. Cl. 8 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 29

*Winters v. United States*,
202 U.S. 564 (1908) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

***Statutes***:

38 U.S.C. § 5904(d)(1), (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Act of December 23, 1982,
Pub. L. No. 97-385, 96 Stat. 1944 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Cherokee, Choctaw and Chickasaw Nations Claims Settlement Act of 2002,
Pub. L. No. 107-331, §§ 601-609, 116 Stat. 2845 (codified at
25 U.S.C. §§ 1779-1779g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
25 U.S.C. § 1779c(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
25 U.S.C. § 1779c(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
25 U.S.C. § 1779(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 33, 36, 37, 39
25 U.S.C. § 1779e(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 30, 32, 34

Cherokee Nation Arkansas Riverbed Trust Fund Management Act of 2004,
(Feb. 23, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Indian Claims Commission Act of 1946,
ch. 959, § 2, 60 Stat. 1049 (formerly codified as amended at 25 U.S.C. § 70a) . 7, 25

***Legislative History***:

138 Cong. Rec. H396-04 (daily ed. Feb. 7, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

138 Cong. Rec. H7321 (daily ed. Aug. 4, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

138 Cong. Rec. S. 7029-01 (daily ed. May 20, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

H.R. Rep. No. 107-632 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Hearings on H.R. 103, H.R. 3476, and H.R. 3534 Before the H. Comm. on Resources*, 107th Cong. (April 17, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

***Miscellaneous:***

2A SUTHERLAND STATUTORY CONSTRUCTION § 47:33 (6th ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

73 AM. JUR. 2D *Statutes* § 138 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

MODEL RULES OF PROFESSIONAL CONDUCT R. 1.16 CMT (2002) . . . . . . . . . . . . . . . . . . . . . . . 21

RESTATEMENT (Third) of Law Governing Lawyers § 32, cmt (b) (2000) . . . . . . . . . . . . . . . . . . 21

ROBERT L. ROSSI, 1 ATTORNEYS' FEES § 3:12 (3d ed. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## MEMORANDUM OF THE CHEROKEE NATION IN OPPOSITION TO PATTON BOGGS' CROSS-MOTION FOR SUMMARY JUDGMENT

### I. Introduction

To Patton Boggs, this case could not be simpler:

The law firm had a contract with the Cherokee Nation which provided for a fee of 10 percent of the Nation's recovery for the claims litigated in this case.[1] Through its allegedly heroic efforts,[2] Patton Boggs is *solely* responsible for the Nation's recovery of $20 million via a legislative settlement of the case,[3] and therefore is entitled to its contract fee of $2 million, the statutory maximum. None of the other attorneys involved in the case – either because their work was of no value,[4] or because they were so foolish as to work without a contract[5] – should receive any payment at all. And it is only because of avarice or bad faith that the Nation has determined to pay Patton Boggs an amount less than its full entitlement,[6] a decision in which the Secretary

---

[1] "Patton Boggs' approved contract 'provided for' 'compensation of ten percent (10%) of the amount recovered less the amounts previously paid by said Cherokee Nation." PB SJ Mem. at 15.

[2] "PB conceived of the 'breach of trust' theory that ultimately succeeded and led to the Settlement Act. . . . Against all odds PB placed the Cherokee Nation within striking distance of an immense recovery before it was unceremoniously terminated, without cause, in 1995 . . . ." PB Supp. Mem. on Intervention at 6-7.

[3] "While other lawyers late in the game took over the case, little happened to bring about the ultimate recovery." *Id.* at 7.

[4] "Mr. Niebell did not perform any services that resulted in a recovery for the Cherokee Nation." PB SJ Mem. at 18. "Mr. Wilcoxen should not have been paid anything for his unsuccessful work on dismissed matters resulting in no recovery for the Cherokee Nation." *Id.* at 20 n.32.

[5] "The payment to Hall Estill was improper because it had **no** contract with the Cherokee Nation." PB SJ Mem. at 9, n.12 (emphasis in original). *See also id.* at 14-15 n.19.

[6] "[T]he Cherokee Nation instruct[ed] the Secretary to pay a law firm which had no attorney fee contract, to pay the estate of an attorney who earned no fee, and then to pay the balance of appropriated attorneys fees to the Cherokee Nation itself." PB SJ Mem. at 14-15 n.19.

irrationally and illegally acquiesced.[7] Accordingly, the Court should direct the Secretary to pay $2 million to Patton Boggs, minus only the money it already has received.

The *facts*, however, tell a far different story:

As this Court has recognized, the efforts that ultimately led to the Settlement Act began in 1970 – almost *20 years prior* to Patton Boggs' retention – when the Supreme Court confirmed the Cherokee Nation's ownership in the Arkansas riverbed. *Choctaw Nation v. Okla.*, 397 U.S. 620 (1970). Multiple attorneys labored over decades to build on that signal victory and seek redress for the harms caused by the United States to the Nation's ownership interest. When Patton Boggs was retained in 1989, it developed and litigated one theory of recovery, for mismanagement, while other attorneys worked to pursue different but parallel claims.

In 1995, after six years, Patton Boggs' contract was terminated. The firm left behind a case in poor shape, many of the claims having been dismissed outright, and the rest stayed indefinitely. The Nation brought in other attorneys, who resuscitated the remaining claims in the case on an interlocutory appeal, and then carried it forward. Ultimately, legislative efforts which had been pursued for years – by a number of different attorneys for the Nation – began to bear fruit, culminating in the passage of the Cherokee, Choctaw and Chickasaw Nations Claims Settlement Act of 2002, Pub. L. No. 107-331, §§ 601-609, 116 Stat. 2845 (codified at 25 U.S.C. §§ 1779-1779g), and the eventual payment of $20 million to the Nation.

When the Nation subsequently undertook to allocate the statutory fee payments to the attorneys who contributed to the recovery, it structured a deliberative governmental process. Its general counsel invited submissions from the affected attorneys, and prepared a report and

---

[7] "Based on strong pressure by the Cherokee Nation, the Secretary breached a duty to decide PB's entitlement to its legal fees." PB Supp. Mem. on Intervention at 14.

recommendation. That report was then reviewed by independent outside counsel, who concurred in the recommendation. The report was submitted to the Rules Committee of the Tribal legislature, reviewed by legislative counsel, then extensively debated and finally approved by the Committee. The report was then considered by the Tribal Council, where it was again debated and ultimately approved. At each stage of this process, Patton Boggs availed itself of the opportunity to make its case, both in writing and in person.

This careful and searching review resulted in formal decisions of a sovereign Tribal government, which balanced competing interests in determining how to satisfy its private contractual obligations. These governmental judgments warranted, and received, deference from the Secretary.

In light of this history, Patton Boggs' motion for summary judgment must fail as a matter of law, for three reasons:

First, Patton Boggs cannot claim fees under its contract, because it has no contract. The overwhelming weight of precedent, in this Circuit and in virtually every other jurisdiction, is that when an attorney with a contingent fee contract is discharged, whether for cause or not, the attorney cannot thereafter recover his contract fee, but only an equitable fee in quantum meruit. That equitable fee will certainly not be its full contract contingent fee, when other attorneys contributed to the recovery, both before and after the discharged attorney. What Patton Boggs is entitled to here (because its contract was terminated) is what it already has received: a quantum meruit recovery.

Second, Patton Boggs' contract does not entitle it to the recovery it seeks, because the fee provided by its contract is expressly subject to the "approvals required by law," including tribal law. Here, tribal law enacted prior to the fee determination required approval by the Tribal

Council for any fee payment in this case. Thus, again, what Patton Boggs is entitled to here (under its contract) is what it has received: a payment of fees approved by the Tribal Council acting pursuant to tribal law.

Finally, the Settlement Act requires no more. Although section 1779e(a) is arguably ambiguous, the better reading of the language under applicable canons of construction is that the Secretary is to pay those fees approved by the respective Indian Nations, precisely what she has done here. The one sentence of legislative history which Patton Boggs so heavily leans on is not to the contrary. And if statutory ambiguity is left to be resolved, double doctrinal deference is due: first, under the Indian canon of construction, to the careful governmental decision-making process engaged in by the Nation, and then, under applicable *Chevron* principles, to the Secretary's administrative determination to act in accord with that decision.

**II. Issues presented**

Whether Patton Boggs' motion for summary judgment should be denied where there are multiple material facts in dispute, and where Patton Boggs is not entitled to judgment as a matter of law because:

(a) it is barred from recovering a contingent fee under a contract that was terminated years before the contingency occurred, and where other attorneys, retained before and after Patton Boggs, contributed to the ultimate recovery;

(b) it is barred from recovering any fee beyond that approved by the Cherokee Nation because its contract expressly provided for a fee subject to the "approvals required by law," including tribal law, and Cherokee Nation tribal law requires attorney fee payments to be approved by the Nation; and

(c) it is barred from recovering any fee beyond that approved by the Cherokee Nation because the Settlement Act requires that the Secretary pay those fees approved by the respective Indian Nations.

## III. Statement of the Case and Counter-Statement of Facts

### A. History of the litigation

1. *Origin of the claims.* The Cherokee Nation's claims against the United States, ultimately resolved in the 2002 Settlement Act, arose nearly a century ago, when the Department of the Interior, in 1908, took the erroneous position that title to the Arkansas riverbed had been conveyed to the State of Oklahoma, and not reserved by the Cherokee Nation under its treaties with the United States.

In December 1966, the Cherokee Nation, later joined by the Choctaw and Chickasaw Nations, filed suit against Oklahoma, challenging the State's title to the riverbed. In 1970, the Supreme Court held that these three tribes retained title to the riverbed. *Choctaw Nation*, 397 U.S. 620.

Following this ruling, the Nation sought compensation from the United States for the damages it had sustained as a result of the Government's failure to recognize and protect the Nation's title to the land. In particular, the Nation sought compensation for the value of land and mineral resources that were exploited by the Government in the construction and operation of the McClellan-Kerr Arkansas Riverbed Navigation Project, which was authorized by Congress in 1941 and built between 1957 and 1971. In response to the Nation's requests, the United States undertook a study which reported that the value of the Nation's interests in the riverbed were $177 million.[8] Notwithstanding these findings, efforts made in the late 1970s and early 1980s to

---

[8] *See Cherokee Nation of Okla. v. United States*, 782 F.2d 871, 873 n.2 (10th Cir. 1986) rev'd on

Footnote continued. . .

obtain legislation to compensate the Nation were not successful. Instead, in 1982, Congress enacted a special jurisdictional statute which waived statutes of limitation and allowed the Nation to file suit against the United States for any claims that the Nation might have ". . . arising from construction of the Arkansas River Navigation System, including, but not limited to, the value of sand, gravel, coal, and other resources taken . . . ." Act of December 23, 1982, Pub. L 97-385, 96 Stat. 1944.[9]

2. *The Oklahoma litigation.* On May 23, 1983, pursuant to the special jurisdictional act, the Nation, represented by attorneys Paul Niebell and Andrew Wilcoxen,[10] filed a claim in the United States District Court for the Eastern District of Oklahoma, seeking compensation from the United States under the Fifth Amendment for the damages caused by its construction and operation of the Arkansas Riverbed Navigation System.[11] Although the Nation prevailed in the District Court and the Tenth Circuit, the Supreme Court reversed, and held that when the United States exercises power under its navigational servitude, it is not liable for damages to a landowner caused by the exercise of the servitude. *Cherokee Nation*, 480 U.S. at 703-08. The Supreme Court did not rule on whether the Nation might be entitled to compensation pursuant to other legal grounds, *id.* at 702 n.1, and remanded the case for further proceedings.

---

other grounds *United States v. Cherokee Nation of Okla.*, 480 U.S. 700 (1987).

[9] *See also Cherokee Nation*, 480 U.S. at 701-02 (recounting part of this history).

[10] James Wilcoxen entered his appearance in this case in 1985 while the case was on appeal before the Tenth Circuit, following the death of Andrew Wilcoxen, his father. *See* Ex. 1.

[11] Ex. 2. The jurisdictional act permitted the claim for damages to be filed in the federal district court in Oklahoma. 96 Stat. 1944.

On remand, the Nation sought compensation based on the "fair and honorable dealings" clause of the Indian Claims Commission Act,[12] which had been made applicable to the Nation's claims by the 1982 special jurisdictional act. The United States opposed those claims, and by decisions issued in July and October 1991, the Court of Appeals affirmed the district court's decision denying compensation to the Nation. *Cherokee Nation of Okla. v. United States*, 937 F.2d 1539 (10th Cir.), *reh'g denied,* 948 F.2d 635 (10th Cir 1991). On May 18, 1992, the Supreme Court issued an order declining to review the Tenth Circuit's decision. *Cherokee Nation of Okla. v. United States*, 504 U.S. 910 (1992).

All of these litigation efforts were undertaken by Niebell and Wilcoxen with associated counsel, Hall Estill, all of whom were retained on a contingent basis and received no payment.[13]

3. *The Claims Court litigation.* On April 17, 1989, while the Navigation Project case was pending before the Tenth Circuit, the Nation retained Patton Boggs to bring claims "for damages or equitable relief arising from the violation of the duties of the United States to protect the tribal lands and to manage the tribal resources of the Cherokee Nation." Ex. 8 at 1, Patton Boggs Contract. Patton Boggs would "prosecute actions for an injunction and/or damages, which are directly interrelated with pending legislative efforts," but would not represent the Nation in the pending Tenth Circuit litigation. *Id.* at 1, 2. The contract contemplated that Patton

[12] The Indian Claims Commission Act of 1946, ch. 959, § 2, 60 Stat. 1049, 1050 (formerly codified as amended at 25 U.S.C. § 70a).

[13] *See* Exs. 1, 7, 12, 14, 19. Beginning in July 1991, while the appeal was pending in the Tenth Circuit, the Nation and its counsel explored possible legislation to resolve its damages claims. Ex. 12 at 3; Ex. 19. On February 7, 1992, Congressman Mike Synar introduced H.R. 4209, a bill to amend the 1982 special jurisdictional act to allow compensation to be awarded notwithstanding the Government's rights under its navigational servitude. 138 Cong. Rec. H396-04, 397 (daily ed. Feb. 7, 1992). The bill passed the House on August 4, 1992. 138 Cong. Rec. H7321-01, 7323-7324, (daily ed. Aug. 4, 1992). A parallel bill, S. 2750, had been introduced in the Senate on May 20, 1992, 138 Cong Rec. S. 7029-01, 7037-7038 (daily ed. May 20, 1992), but did not pass.

Boggs would provide both litigation and lobbying services related to the Riverbed matter. *Id.* at 2.

On April 21, 1989, Patton Boggs filed the complaint in this case, still pending, for damages against the United States. *See* Docket for No. 218-89 (Fed. Cl.). The litigation initially did not fare well, and the claims were substantially narrowed by a series of adverse decisions from this Court.[14] The Court further narrowed the case by finding it did not encompass claims related "to the construction of the [Arkansas River] Navigation System." *Cherokee Nation*, 21 Cl. Ct. at 580-81 & n.11.[15] Finally, the Court ruled that claims for trespass on the riverbed, and mismanagement of the Nation's mineral resources in the riverbed, would be barred by the statute of limitations, except for those accruing within six years of the filing of the suit (April 21, 1983), or which fell within the continuing claim doctrine. *Id.* at 570-72.[16] The Court stated that further factual development would be necessary to determine whether specific claims were timely.[17]

The Court narrowed the case even further in subsequent decisions issued in 1991 and 1992, after Patton Boggs, on behalf of the Nation, filed amended complaints at the Court's direction, to restate the surviving claims with greater specificity. The United States challenged

---

[14] In particular, by a decision entered on October 5, 1990, the Court dismissed, for failure to state a claim, the Nation's claims for: failure to evict casual (non-mineral) trespassers from the Nation's lands; failure to survey those lands; failure to remove trespassers from the Nation's farm and range lands; failure to issue farming and grazing leases for the Nation's lands; and failure to manage the Nation's timber lands. *Cherokee Nation of Okla. v. United States*, 21 Cl. Ct. 565, 574-76, 577-79 (1990).

[15] The Court ruled that any claims related to the Government's exercise of its navigational servitude would be barred by principles of res judicata arising from the decisions in the Oklahoma case. *Id.* at 581.

[16] The waiver of the statute of limitations contained in the 1982 jurisdictional act did not apply to claims brought in this case.

[17] The Court also deferred consideration of the Nation's claim for an accounting of the income generated by its trust land and resources, stating that the Court's jurisdiction to order an accounting depended on first finding liability in the United States. *Id.* at 582.

the adequacy of the amended complaints and the Court issued several decisions, accepting some claims, but striking others.[18] The Court also denied a motion filed by Patton Boggs for entry of a partial final judgment on the dismissed claims for purposes of an immediate appeal, 23 Cl. Ct. 735 (1991), and rejected motions requesting that the Judge recuse himself from the case. 26 Cl. Ct. 215 (1992); 26 Cl. Ct. 794 (1992).

On January 28, 1994, the Court issued an unpublished order in which it declined to rule on a motion for summary judgment that had been filed by the United States, and instead indefinitely stayed all proceedings in the case until quiet title actions could be litigated against the third parties who were alleged to be trespassing on the Nation's riverbed lands. Ex. 3. For the next year, the parties pursued legislative settlement of the case, but those efforts failed.[19]

In February, 1995, the Nation, still represented by Patton Boggs, filed a notice of appeal seeking review of 13 interlocutory decisions of this Court. Ex. 4. The Federal Circuit issued an order to show cause why the appeal should not be dismissed as premature, and in March, 1995, Patton Boggs responded on behalf of the Nation. *See* Ex. 5 at 1.

On October 30, 1995, the Principal Chief of the Cherokee Nation sent a letter to Patton Boggs terminating its contract. Ex. 10.[20] At this point, the litigation was almost completely stalled and, absent a reversal on appeal, would likely have been abandoned.

---

[18] *See Cherokee Nation of Okla. v. United States*, 23 Cl. Ct. 117 (1991); 24 Cl. Ct. 695 (1992); 25 Cl. Ct. 361 (1992).

[19] On February 15, 1994, the Claims Court stayed implementation of its January 28, 1994 order for a period of one year, so the parties could pursue a possible legislative settlement of the case. At the end of the year, when those efforts failed, the January 28, 1994 order was reinstated. *Cherokee Nation of Okla. v. United States*, No. 95-5055, slip. op. at 5 (April 12, 1996), Ex. 5.

[20] By letter dated April 23, 1996, the Nation confirmed that Patton Boggs' services for both legislative and litigation matters had been terminated, and requested that the firm transfer its files to the Nation. Ex. 11.

On April 12, 1996, the Federal Circuit accepted jurisdiction over one of the 13 issues raised in the notice of appeal – the lower court order imposing an indefinite stay – declined jurisdiction on all other matters, and set a briefing schedule. Ex. 5 at 7. The Nation retained other law firms to handle the appeal.[21]

The appeal was successful, and the Federal Circuit reversed the order imposing an indefinite stay. *Cherokee Nation of Okla. v. United States*, 124 F.3d 1413 (Fed. Cir. 1997).[22] On remand, the Nation was represented in this Court by James Wilcoxen.[23] The case, however, remained inactive, as the Nation once again turned the focus of its efforts from litigation to legislation in order to seek a global resolution of all issues arising from the Arkansas riverbed – the Nation's substantial claims arising from the construction of the McClellan-Kerr Navigation Project, the increasingly fractious disputes between the Nation and third parties over title to portions of the riverbed, and the remaining claims in this case for past federal mismanagement of the minerals in the Arkansas riverbed. The lobbying efforts to settle the Riverbed matters legislatively were conducted primarily by Cherokee Nation officials and staff, Wilcoxen and Hall Estill. *See* Exs. 12, 14, 16.

---

[21] *See* Opening and Reply Briefs of the Cherokee Nation in *Cherokee Nation of Okla. v. United States*, No. 95-5055 (Fed. Cir.) reprinted at 1995 WL 17043907 (1995) and 1997 WL 33545042 (1997). The Nation's Opening Brief was filed by the firm of Andrews & Kurth in Washington, and Pezold, Richey, Caruso & Barker, of Tulsa, Oklahoma. The reply brief was filed by Swidler & Berlin, of Washington, D.C., which also argued the appeal. James Wilcoxen appeared as of-counsel on both briefs.

[22] The Federal Circuit reasoned that the litigation of claims for past breaches of trust by the United States did not depend on the outcome of any future actions that might be brought against third party trespassers. The Court explained that the United States' failure to survey the land in order to then protect it from trespass could be adjudicated even if the United States never brought quiet title actions against third parties. *Id.* at 1416-17.

[23] The Swidler Berlin firm, which principally handled the appeal, was discharged in 1999, after having been paid for its efforts in the case. *See* Ex. 16 at A111, A113.

4. *The 2002 Settlement Act.* The text of the 2002 Settlement Act makes clear that it compensates the settling tribes not only for resolution of the mismanagement claims then pending in this Court, but also for the losses that had been sustained as a result of the McClellan-Kerr Project, 25 U.S.C. § 1779c(a),[24] and for the Nations' agreement to convey title to approximately 7,750 acres of land, known as the "Disclaimed Drybed Lands."[25] The compensation received under the Settlement Act, in other words, extended well beyond settlement of just the claims litigated in this case.

The legislative history of the Act confirms this, and reiterates the longstanding nature of the dispute resolved by the legislation. Before the House Committee on Resources, Cherokee Nation Principal Chief Chad Smith testified:

> [T]his legislation is the culmination of many years of work by the succession of tribal administrations to resolve the complex controversies surrounding the Nations' ownership of the bed and banks of the Arkansas River in Oklahoma. Our earliest efforts to reach a settlement for lost riverbed resources began in the late 1970s. . .
>
> The current bill, H.R. 3534, would settle the three Nations' damage claims against the United States now pending in the Court of Federal Claims, *and it would give them, in a single lump sum, the past and future fair rental value of the lands being used for the two powerheads that were constructed on tribal lands on the bed of the Arkansas. The bill would also compensate the Nations for the lands being occupied by adjacent landowners and other potential claimants in the lower segments of the River.* In exchange for the appropriated sums, the three Nations would dismiss their lawsuits against the Government and disclaim any right, title or interest in the 7,750 acres of lands being occupied by non-tribal interests. Those disclaimers will serve to eliminate the cloud of tribal claims in the title to lands being occupied by these people and relieve the Government of the very

[24] This Court had found the claims relating to the McClellan-Kerr Navigation Project were not part of the mismanagement case. *Cherokee Nation,* 21 Cl. Ct. at 580-581 & n.11.

[25] The Act recites that the settling tribes would consent to the extinguishment of "all claims now existing or which may arise in the future with respect to the Disclaimed Drybed Lands and all right, title, and interest that the Indian Nations and the United States as trustee on behalf of the Indian Nation may have to the Disclaimed Drybed Lands . . . ." § 1779c(b)(1)(A).

> expensive burden of having to bring ejectment litigation against a very large number of Oklahoma citizens. . .[26]

The United States, represented by Deputy Assistant Secretary for Indian Affairs Wayne Smith, explained that the amount of the settlement was based on reaching agreement on specific categories of losses, set out in a chart which he offered to the Committee. *Id.* at 32.[27] Oklahoma Congressman Brad Carson, the principal House sponsor of the bill, reflecting data from the Smith chart, reiterated the number of issues for which compensation was being paid:

> Enactment of this legislation, H.R. 3534, will bring about clear, tangible benefits. First it will eliminate the need for the Department of Justice to bring hundreds of defendants into court due to their occupancy of parts of the 7,750 acres of drybed lands. Second, the settlement will pay the three tribes for the actual present value of the loss of past and future assets they would have had if not for the construction of the McClelland-Kerr navigation system. Third, positive movement of the legislation will result in the dismissal of the mismanagement case against the Bureau of Indian Affairs. And, finally, the settlement will provide the tribes with resources that will, in turn, be used to further economic development in the region, benefitting Indian and non-Indian members of these communities alike. . .

*Id.* at 92- 93. Of the four bases for compensation outlined by Rep. Carson, the claims litigated in this case involve only the third category.

### B. Cherokee Nation consideration of the attorney fees claims

In late 2002, as the Settlement Act was proceeding through Congress, the various attorneys who had represented the Nation over the years began to raise questions regarding

---

[26] Ex. 6, *Hearings on H.R. 103, H.R. 3476, and H.R. 3534 Before the H. Comm. on Resources*, 107th Cong. 90 (April 17, 2002) ("House Hearings") (emphasis added).

[27] The chart was not included in the final published version of the House Hearings. Discovery of the chart would be required if this case proceeds further.

payment of their fees.[28] To address those questions, the Cherokee Nation undertook an examination of the claims being made by those attorneys.

The process began in the fall of 2002. At the request of the Nation, both James Wilcoxen and Patton Boggs submitted reports setting out the justifications for their fee claims. Wilcoxen, the widow of Paul Niebell, and the Hall Estill firm (which had been associated as counsel under the Wilcoxen-Niebell contract) thereafter supplemented their initial submission with additional information and billing records.[29]

The submissions made by the attorneys, as well as Tribal records, were reviewed by the Nation's general counsel, Julian Fite, who prepared a memorandum, dated October 6, 2003, setting out his preliminary views on allocation of fees under the Settlement Act. That memorandum, Ex. 16, was provided to the Principal Chief, and by letter dated October 24, 2003, to James Wilcoxen, Joe Reeder (formerly a partner with Patton Boggs, but at that time outside counsel to Patton Boggs), Katherine Boyce at Patton Boggs, and Margaret Swimmer at Hall Estill. Mr. Fite's analysis considered the attorneys fee claims in light of the decades-long effort to secure compensation for damage to the Nation's interests in the Arkansas riverbed:

> Except for the original litigation confirming the title to this property [the 1970 Supreme Court decision], *none of the several lawsuits and appeals ever resulted in favorable disposition of any issues.* However, the long term and continued litigation efforts helped to keep these issues alive so that the eventual legislative solution could be reached.

---

[28] *See* Ex. 12, Letter dated November 5, 2002 from James Wilcoxen to Cherokee Nation General Counsel, Julian Fite; Ex. 13, Memorandum dated November 7, 2002 from Patton Boggs to Cherokee Nation Principal Chief Chad Smith and General Counsel Julian Fite.

[29] *See* Ex 14, letter of May 2, 2003 from James Wilcoxen to Julian Fite; *see also* Ex. 16, at A110-A115, Memorandum dated October 6, 2003 from Julian Fite. To protect attorney client privilege, the Cherokee Nation maintains attorney billing records as confidential and, accordingly, those records are not submitted with this Response.

> Likewise, the long and many efforts to reach a legislative settlement of these matters went down many dead end roads until they reached fruition last year.

Ex. 16 at A114 (emphasis added). Mr. Fite also explained that "on these many efforts, the Cherokee Nation has expended well over $3 million to outside attorneys. In addition, the time of staff attorneys and administrative personnel on these matters would run into the hundreds of thousands or possibly over $1 million." Ex. 16 at A114. In that context, Mr. Fite considered the pending fee claims being made by each outside counsel:

1. *The Wilcoxen/Niebell contract.* Mr. Fite stated that the first identified written contract with James Wilcoxen and Paul Niebell was in 1988, for services in prosecuting claims which the Cherokee Nation may have had against the United States in any court or other tribunal, that it provided for the payment of fees not to exceed 10% of the recovery, and that each of the attorneys had submitted records regarding their time and expenses in providing services. Ex. 16 at A110.

As to Wilcoxen, Mr. Fite noted that he provided services to the Nation since 1985, Ex. 16 at A110, and had submitted a statement of his time on the matters from 1985 to 2003 (showing 1750 hours from 1985-1987, and 2219 hours from 1988 to 2003, for a total of $595,350 at $150 per hour), plus $2,638.83 in expenses. *Id.* at A112. He noted that Mr. Wilcoxen estimated his time from 1985 to 1992, thereafter had contemporaneous time records, and had not been paid for any of the work done on these matters. *Id.*

Mr. Fite recommended *not* paying Wilcoxen for time spent before the first executed contract was made in 1988. *Id.* at A114. For the period 1988 through 2003, Mr. Fite noted that "Wilcoxen and the attorneys working with him are the only ones with payments deferred to this final resolution," and "that Wilcoxen was involved from the beginning until final resolution." *Id.*

at A114. Mr. Fite recommended a payment of $400,000, with a "performance premium for long term unpaid service and results of $150,000, for a total of $550,000." *Id.* [30]

As to Niebell, Mr. Fite reviewed the time records submitted by his widow, which showed 482 hours from 1980-1984, 1101 hours from 1985-1988 and 1127 hours from 1988 to 1994. Mr. Fite recommended a payment of $100,000 to Mr. Niebell's estate. Ex. 16 at A110, A112, A114.

As to the Hall Estill firm, Mr. Fite found that the firm worked on these matters for the Nation under the terms of the Wilcoxen/Niebell contract. Ex. 16 at A110, A112. Although the time spent by Hall Estill could have been submitted as part of Mr. Wilcoxen's statement for compensation, Mr. Fite reviewed that firm's billings separately. He found its records to be detailed and contemporaneous, and recommended payment in the amounts shown ($264,938.22 for the period 1989-1994, and $15,586.35 for the period 2002-2003), with a performance bonus of $100,000. Ex. 16 at A112-A113, A115.

*2. The Patton Boggs contract.* Mr. Fite said that the 1989 Patton Boggs Riverbed contract provided for monthly fees up to $5,000 and 10% of any recovery (less monthly fees already paid). Ex. 16 at A111. He noted that the firm had a second contract with the Nation for which it had separately received payments for lobbying services, "much of which had to do with Arkansas Riverbed matters." *Id.* at A113; *see also* Ex. 9. Mr. Fite found that Patton Boggs had been paid $403,959 under the Riverbed contract from 1989 through 1997, Exh. 16 at A113, [31] but

---

[30] Patton Boggs makes much of the "subject to" language in the Wilcoxen-Niebell contract, and argues that fee payments under that contract are essentially pre-empted by the payments which Patton Boggs claims under its contract. But the Patton Boggs contract was terminated in 1995, so the surviving Wilcoxen contract is "subject to" no legally effective condition. Moreover, the proviso in the Wilcoxen contract that it would be "subject to . . . the future retention of Patton, Boggs and Blow, Washington, D.C. as co-counsel in matters hereinafter mentioned" clearly refers to a contemplated division of labor and not to the payment of fees.

[31] *See* Ex. 15, Table, listing payments made by the Cherokee Nation to Patton Boggs from

Footnote continued. . .

that under both contracts, the Nation had paid Patton Boggs a total of $1,053,908.48. *Id.*;[32] *see also* Ex. 15. He also noted that "[i]n a letter dated August 11, 1995, Kate Boyce, Patton Boggs partner, indicated that Patton Boggs had accumulated $126,000 in unbilled fees for Riverbed legal work." Ex. 16 at A113. Based on this information, Mr. Fite recommended that Patton Boggs be paid the additional $126,000 that it claimed was due, plus a performance premium of $25,000 for the firm's supplemental assistance in the passage of the Settlement Act in 2002. Ex. 16 at A115.

3. *Swidler Berlin law firm*. Following the termination of the Patton Boggs contract, the Nation retained the services of Swidler Berlin to represent it in the Federal Circuit appeal in the mismanagement case. Mr. Fite noted that the firm's services were terminated in 1999 and that the Nation had paid the firm $202,120. He stated that the firm was making no claim for additional payment, and he recommended none. Ex. 16 at A111, A113, A115.

Mr. Fite invited the interested attorneys to comment on the recommendations contained in his memorandum. Ex. 16 at A108-A109.[33] Patton Boggs responded vigorously, by telephone calls in early November, and a letter dated November 14, 2003. Ex. 18. Patton Boggs' counsel Reeder stated that the firm's claim was "based squarely on the Litigation Contract," questioned

---

November 9, 1988 through September 30, 1997.

[32] As the Fite Memo notes, some of the money paid to Patton Boggs under the lobbying contract was paid for services related to the Arkansas Riverbed matter, and should be considered payments under the Arkansas Riverbed contract. Ex. 16 at A113.

[33] By letter dated November 8, 2003, the widow of Paul Niebell objected to Mr. Fite's proposal to pay her husband's estate only $100,000, stating that the payment would amount to only $37 per hour for his time. She asked that he reconsider the matter, as her husband regularly charged his time at $100 per hour. Ex. 17. Hall Estill also commented. By letter dated December 5, 2003, the firm further described its services and requested additional compensation for time that had not been billed and for the delay in receiving payment. Ex. 19. Ultimately, the Council of the Cherokee Nation did not make either of these requested changes. *See* Exs. 32, 33.

the Nation's decision to terminate that contract, and described the services that the firm had provided to the Nation prior to the contract termination. Ex. 18 at 2-3. Patton Boggs also took the position that the lawsuit it filed in the Claims Court was "the only basis, and, indeed, the statutorily stated basis, for the resulting legislative settlement . . . ." Ex. 18 at 2 (emphasis in original).

In response to a request by the Nation for more specific information about the actual number of hours that Patton Boggs had billed on this matter, its counsel submitted a letter dated December 17, 2003, Ex. 20, in which he explained that this was not available:

> . . . because our Attorney Contract neither required or contemplated that we would charge by the hour and submit and maintain precise, detailed data in that manner. Further complicating this arduous task, as explained in our November 2002 submission, Patton Boggs installed a new computerized billing system in December 1990. While we do not have all the time that was devoted to this cause, we have attempted to recapture from the billing system the total professional hours devoted to the Arkansas Riverbed litigation matters.

The firm submitted a one-page chart which reported a total of 6,528 hours of time by 53 individuals, Ex. 20 at A-128, but without differentiating among partners, associate attorneys, paralegals or law clerks, much less describing the substance of the work done.

On February 23, 2004, to implement the Settlement Act restrictions on the $20 million appropriation made to the Nation, the Council of the Cherokee Nation adopted an Act, as a matter of tribal law, to govern its use of those funds. Cherokee Nation Legislative Act 5-04, the Arkansas Riverbed Trust Fund Management Act of 2004, Ex. 21. That tribal law requires, *inter alia*, the approval of the Chief and the Council for the payment of attorneys fees made with the appropriated funds. *Id.* at § 5.

In 2004, Mr. Fite retained outside legal counsel to provide an independent analysis of his preliminary recommendations on the attorney fee claims. By letter dated July 9, 2004, outside

counsel concurred in large part with the recommendations made by Mr. Fite, but raised some additional questions for his consideration. Ex. 22. Among these was the extent to which Patton Boggs was obligated under its 1989 Riverbed contract with the Nation also to provide legislative and lobbying services related to the Arkansas riverbed, but for which the firm was separately paid under its other contract with the Nation.[34] Outside counsel also questioned the basis for Patton Boggs' assertion that the firm had over 6000 hours time in the matter.[35] He concurred in Mr. Fite's view that "[a]ny determination of the amount of this 'equitable contingency fee' should take into account the primary fact that recovery under the Act arose from the efforts and contributions of several attorneys and law firms (including employees of the Nation) in addition to Patton Boggs." *Id.* at 7.

Mr. Fite's recommendations, along with the outside counsel's review, were provided to the Principal Chief who, in turn, formally submitted the matter to the Council of the Cherokee Nation. In accord with Nation law and practice, the Council referred the matter to the legislative Rules Committee, which is a standing Committee comprised, at that time, of all 15 members of the Council. *See* Ex. 23 at A141, A143. The Rules Committee considered the issue of attorneys fees at *six* Committee meetings, held on September 16, 2004, October 20, 2004, November 18,

[34] "In my opinion, the 1989 Patton Boggs Contract establishes the duty of Patton Boggs to provide both litigation services and lobbying/legislative services in return for the compensation specified in the contract . . . . [T]he Nation and Patton Boggs entered into a separate contract, apparently providing that Patton Boggs would be paid $100,000 per year for lobbying. A considerable sum of money evidently has been paid by the Nation pursuant to this separate contract, but it remains uncertain as to what extent the lobbying services purportedly rendered under the separate contract are in fact lobbying services that are required under the 1989 Patton Boggs Contract." *Id.* at 5.

[35] "[T]here are also unanswered questions about the nature and extent of the services they did perform and the amounts paid for those services. The litigation they were involved in on behalf of the Nation consisted almost entirely, if not entirely, of drafting pleadings, research and brief writing. Apparently not one deposition was taken in the case. I know of no way to verify the 6,000-plus hours of work they now claim to have spent on the litigation . . . . The total amount of claimed time doesn't seem reasonable to us." Ex. 22 at 7.

2004, December 16, 2004, January 17, 2005, and February 17, 2005. Exs. 23 at A143-45; 24 at A147-53; 25 at A158; 27 at A169-70; 28 at A175-80; 30 at A195-96. [36]

At each Committee meeting, the interested attorneys were provided with the opportunity to present their position in support of their claims for fees. Patton Boggs appeared at five of those meetings, through either partners of the firm or local counsel, presented its position to the Committee and responded to questions. *See* Exs. 23, 24, 27, 28, 30, Minutes of September 16, 2004; October 20, 2004; December 16, 2004, January 17, 2005, and February 17, 2005.

The debate on the issue was thoughtful and considered. Committee members had the benefit of recommendations from not only the Nation's General Counsel and outside legal counsel, but also the Nation's legislative counsel. Ex. 26. The Council sought to deal fairly with the attorneys who had represented the Nation throughout these proceedings and to honor the Nation's obligations. Council members discussed the work done by each of the attorneys, the extent to which each had, or had not, been paid, and the results achieved. *See* Ex. 27 at A169-70; Ex. 28 at A175-80.

During the Rules Committee meeting on January 17, 2005, a motion to pay Patton Boggs the sum of $151,000 failed, following a 5-5 vote. Ex. 28 at A177. The Committee then approved fee payments for attorneys Wilcoxen and Niebell in the amounts recommended by Mr. Fite, and approved a fee payment to Hall Estill, but without the $100,000 bonus that Mr. Fite had recommended. *Id.* at A177-78. The Committee then resumed discussion of the fee payment for Patton Boggs. A motion was made to pay Patton Boggs $900,000. The motion was subject to

[36] In addition, the underlying records relating to the attorney fee claims were made available for review by Council members. *See* Ex. 25, at A158, November 18, 2004 Meeting Minutes.

further debate, including argument from Patton Boggs' counsel, but the motion failed by a vote of 4-8. *Id.* at A178-80.

On February 14, 2005, the full Tribal Council adopted resolutions approving the Committee recommendations regarding fees for Wilcoxen (by a vote of 13 to 1), for Niebell and for Hall Estill (by votes of 11 to 3 each).[37]

On February 17, 2005, the Rules Committee resumed consideration of the Patton Boggs fees, and adopted (by a vote of 8-7) a resolution approving Mr. Fite's recommendation that the firm be paid $151,000. Ex. 30 at A195-96. The recommendation was then considered by the full Council during its regular session on March 14, 2005. Ex. 31 at A209-212. Following debate, the Council (by a vote of 8-5)[38] enacted Resolution No. 29-05, Ex. 35, approving the Rules Committee recommendation. Taking into account payments already made (exclusive of additional payments made under the lobbying contract), this brought the total paid to Patton Boggs under its litigation contract to over $550,000.

By letters dated February 18, 2005 and March 30, 2005, the Principal Chief forwarded the Council resolutions to the Bureau of Indian Affairs for processing and payment from the Nation's share of the funds appropriated under the Settlement Act. Exs. 36, 37.

---

[37] *See*, Ex. 32, Resolution No. 18-05 (for payment of $280,524.57 to Hall Estill); Ex. 33, Resolution No. 19-05 (for payment of $100,000 to the estate of Paul Niebell); and Ex. 34, Resolution No. 20-05 (for payment of $550,000 to James Wilcoxen). *See also* Ex. 29 at A188-89, Tribal Council Meeting Minutes. The Council meetings are also available in audio and video form at http://www.cherokee.org/home.aspx? section=councilminutes&year=2005.

[38] *See* Ex. 31 at A209-212, Council Meeting Minutes. The Council proceedings are also available in audio and video form at http://www.cherokee.org/home.aspx?section=councilminutes&year=2005.

## IV. Argument

This case is not appropriate for summary disposition in favor of Patton Boggs because there are disputes as to material facts relating to, *inter alia,* the scope of its work, the efforts it expended *vis a vis* other attorneys, the portion of the recovery for which it is entitled to take credit, and the adequacy of the substantiation of its claim for fees. In addition, Patton Boggs is not entitled to summary judgment as a matter of law.

### A. Summary Judgment Should Be Denied Because the Patton Boggs Contract Was Terminated And It Has No Claim Under That Contract

#### *1. The law provides only a quantum meruit recovery when a contingent fee contract is terminated.*

Patton Boggs' claim for attorneys fees is based on the contingent fee provision of its 1989 Riverbed contract with the Cherokee Nation. But as Patton Boggs asserts, that contract was terminated by the Nation in 1995, years prior to the Settlement Act.[39] Accordingly, the claim for a contingent fee based on that contract must fail.

The universal rule in the United States is that a client may discharge its legal counsel at any time, with or without cause.[40] Further, when the attorney has a contingent fee contract, the virtually universal rule is that the discharged attorney cannot claim a right to his contingent fee

[39] "On April 30, 1995, PB was terminated without cause . . . ." Patton Boggs Complaint-in-Intervention at ¶ 15. The actual date of termination was October 30, 1995. *See* Ex. 10, Letter dated October 30, 1995 from the Cherokee Nation to Patton Boggs.

[40] *E.g., Baker v. Humphrey*, 101 U.S. 494, 500 (1879); RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 32, cmt (b) (2000) ("A client may always discharge a lawyer, regardless of cause and regardless of any agreement between them. A client is not forced to entrust matters to an unwanted lawyer."); *see also* MODEL RULES OF PROFESSIONAL CONDUCT R. 1.16 cmt (2002) ("A client has a right to discharge a lawyer at any time, with or without cause, subject to liability for payment for the lawyer's services.").

under that contract – whether the contract was terminated with or without cause.[41] Instead, the only basis on which the discharged attorney may recover a fee is quantum meruit – the reasonable value of the services actually provided. As one treatise author states, "[i]t is now fair to say that the overwhelming tendency on the part of the courts is to hold that an attorney employed on a contingent fee contract, who is discharged without fault on his part before the happening of the contingency, is not entitled to recover on the contract, but may recover merely on a quantum meruit basis the reasonable value of the services rendered." ROBERT L. ROSSI, 1 ATTORNEYS' FEES § 3:12 (3d ed. 2005) (collecting cases at note 4).

The rule is based on recognition that the attorney-client relationship is not like other contractual relationships, but is a "unique, fiduciary relationship," *Fox*, 541 N.E.2d at 450, which is "founded upon trust and confidence." *Heinzman*, 234 S.E.2d at 285. Because a successful attorney-client relationship depends on the client's full confidence in the attorney, the courts

[41] *See, e.g.*, *Gaines, Gaines & Gaines, P.C. v. Hare, Wynn, Newell & Newton*, 554 So.2d 445, 447 (Ala. Civ. App. 1989); *Fracasse v. Brent*, 494 P.2d 9 (Cal. 1972); *Dudding v. Norton Frickey & Assoc.*, 11 P.3d 441, 447-48 (Colo. 2000); *Sachs v. Klein*, 154 A.2d 134, 137 (D.C. 1959); *Rosenberg v. Levin*, 409 So.2d 1016, 1021-22 (Fla. 1982); *Trend Coin Co. v. Fuller, Feingold & Mallah, P.A.*, 538 So.2d 919, 921 (Fla. Dist. Ct. App. 1989); *Greer, Klosik and Daugherty v. Yetman*, 496 S.E.2d 693 (Ga. 1998); *Rhoades v. Norfolk and W. Ry. Co.*, 399 N.E.2d 969, 974-75 (Ill. 1979); *Estate of Forrester v. Dawalt*, 562 N.E.2d 1315, 1317-8 (Ind. Ct. App. 1990); *Vaughn v. King*, 975 F. Supp. 1147, 1151 (N.D. Ind. 1997) (applying Indiana law), *aff'd*, 167 F.3d 347 (7th Cir. 1999); *Phil. Watson, P.C. v. Peterson*, 650 N.W.2d 562, 567 (Iowa 2002); *Hubbard v. Goffinett*, 70 S.W.2d 671 (Ky. 1934); *Skeens v. Miller*, 628 A.2d 185, 188-90 (Md. 1993); *Somuah v. Flachs*, 721 A.2d 680, 684-85 (Md. 1998); *Malonis v. Harrington*, 816 N.E.2d 115, 122-123 (Mass. 2004); *Reynolds v. Polen*, 564 N.W.2d 467 (Mich. Ct. App. 1997); *Ashford v. Interstate Trucking Corp. of Am., Inc.*, 524 N.W.2d 500, 503 (Minn. Ct. App. 1994); *Plaza Shoe Store, Inc. v. Hermel, Inc.*, 636 S.W.2d 53, 60 (Mo. 1982); *Campbell v. Bozeman Investors of Duluth*, 964 P.2d 41 (Mont. 1998); *Covington v. Rhodes*, 247 S.E.2d 305, 308-09 (N.C. Ct. App. 1978), *rev. denied*, 251 S.E.2d 468 (N.C. 1979); *Pritchett & Burch, PLLC v. Boyd*, 609 S.E.2d 439 (N.C. Ct. App.), *rev. dismissed*, 616 S.E.2d 543 (N.C. 2005); *Adkin Plumbing & Heating Supply Co. v. Harwell*, 606 A.2d 802, 804 (N.H. 1992); *Demov, Morris, Levin & Shein v. Glanz*, 428 N.E.2d 387, 389 (N.Y. 1981); *Papadopoulos v. Goldstein, Goldstein & Rikon, P.C.*, 725 N.Y.S.2d 364 (N.Y. App. Div. 2001); *Reid, Johnson, Downs, Andrachik & Webster v. Lansberry*, 629 N.E.2d 431 (Ohio 1994); *Fox & Assoc. Co. v. Purdon*, 541 N.E.2d 448, 450 (Ohio 1989); *Musser v. Musser*, 909 P.2d 37, 40 (Okla. 1995); *Hardman v. Snyder*, 393 S.E.2d 672 (W. Va. 1990); *Heinzman v. Fine, Fine, Legum & Fine*, 234 S.E.2d 282, 285-6 (Va. 1977); *Dill v. Public Utility District No. 2 of Grant County*, 475 P.2d 309, 316 (Wash. Ct. App. 1970). *See also Calderon v. Navarette*, 800 P.2d 1058 (N.M. 1990).

have held that a client always has a right to discharge his attorney, and that right cannot be impaired either by allowing an action for breach where the termination is without cause, or by requiring the client to pay the full contract fees: "To require the client to pay the discharged attorney the full contract fees would make the right to discharge largely meaningless . . . ." *Rhoades*, 399 N.E.2d at 974.[42] As another court said:

> "*The right to discharge is of little value if the client must risk paying the full contract price for services not rendered upon a determination by a court that the discharge was without legal cause. The client may frequently be forced to choose between continuing the employment of an attorney in whom he has lost faith, or risking the payment of double contingent fees equal to the greater portion of any amount eventually recovered.*"
>
> * * *
>
> We have concluded that a client should have both the power and the right at any time to discharge his attorney with or without cause. Such a discharge does not constitute a breach of contract for the reason that it is a basic term of the contract, implied by law into it by reason of the special relationship between the contracting parties, that the client may terminate that contract at will. It would be anomalous and unjust to hold the client liable in damages for exercising that basic implied right.

*Fracasse*, 494 P.2d at 12 (quoting *Salopek v. Schoeman*, 124 P.2d 21, 24 (Cal. 1942) (Gibson, J. and Traynor, J. concurring (emphasis added)).[43]

---

[42] *See also Plaza Shoe Store,* 636 S.W.2d at 58; *Demov*, 428 N.E.2d at 389; *Heinzman*, 234 S.E.2d at 285-6; *Fracasse*, 494 P.2d at 13.

[43] *Accord, Somuah*, 721 A.2d at 684 ("Because the power of the client to discharge his or her attorney is an 'implied term of the retainer contract,' the client does not breach the contract when he or she terminates the attorney-client relationship based on a reasonable subjective dissatisfaction with the attorney's services, even if the client does not have 'good cause.'"); *Rosenberg*, 409 So.2d at 1021 ("The attorney-client relationship is one of special trust and confidence. The client must rely entirely on the good faith efforts of the attorney in representing his interests. This reliance requires that the client have complete confidence in the integrity and ability of the attorney and that absolute fairness and candor characterize all dealings between them. These considerations dictate that clients be given greater freedom to change legal representatives than might be tolerated in other employment relationships. We approve the philosophy that there is an overriding need to allow clients freedom to substitute attorneys without economic penalty as a means of accomplishing the broad objective of fostering public confidence in the legal profession.").

These principles have been applied in claims cases since the early years of the Court of Claims. In *Jenkins & Mann v. United States*, 1860 WL 4920 (Ct. Cl. 1860), for example, the Court of Claims refused to enforce payment based on a contingent fee contract that had been made by the Secretary of the Treasury, but was then effectively eliminated by an Act of Congress. The court reasoned:

> We are not prepared to admit that, as between attorney and client, where there is a contract for a contingent fee, the client becomes liable for the full amount of such fee when he revokes the authority of his attorney . . . . The better opinion would seem to be, that an attorney accepting an employment for a part of the sum to be recovered, takes his engagement subject of the right of his employer to revoke his authority, compromise the suit, or discharge the debtor; and that, upon the termination of his contract by such means, he would be entitled to recover the reasonable value for his services up to the time of discharge, and no more. In other words, the measure of damages would be ascertained under a quantum meruit, and not by the terms of the contract.

*Id.* at 3.

The Federal Circuit applied these common law principles more recently in *Scates v. Principi*, 282 F.3d 1362 (Fed. Cir. 2002). The court held there that when a veteran discharged his attorney during the proceedings on his claim for veterans' benefits, the attorney was no longer entitled to be paid the full 20% contingent fee provided for in his contract (and authorized by statute), but could be paid only fees that were "based upon and fairly reflect that lawyer's contribution to the case." *Id.* at 1365.

To uphold the claim of the discharged attorney for his full contingent fee would leave the client only with the options of either finding an attorney to handle the case without charge, continuing the case *pro se*, or paying another lawyer to complete the case out of the client's personal funds – all of which the court found unacceptable. *Id.* at 1366. The court further found that payment of the contingent fee to discharged counsel would be contrary to a 20 percent statutory cap on contingent fees in veterans' benefits cases. *Id.* at 1365 (quoting 38 U.S.C. §

5904(d)(1), (2)). The court pointed out that the purpose of the statutory cap was to assist veterans in retaining legal counsel by allowing the use of a contingent fee, while also protecting veterans from improper diminution of their benefits through payment of excessive legal fees. *Id.* at 1366. That purpose, the court found, would be undermined if an attorney who was discharged without concluding the case was nevertheless allowed to recover a full contingent fee. *Id.*

These principles also have been applied to contingent fee contracts in cases brought on behalf of Indian tribes.[44] For example, in *White Mountain Apache Tribe of Ariz. v. United States*, 30 Fed. Cl. 8 (1993), the court refused to award a 10% contingent fee to counsel based on the fee provisions of its contract, after the tribe had terminated the contract and retained other counsel to conclude the case.[45] Pursuant to the jurisdiction granted under the Indian Claims Commission Act of 1946, ch. 959, § 15, 60 Stat. 1053 (formerly codified as amended at 25 U.S.C. § 70n), the court did determine what fee was due – by applying quantum meruit principles. In doing so, the court considered the substantive work done by the attorneys, their billing records,[46] and their contribution to the results in the case relative to other counsel representing the tribes.

Similarly, in *Sisseton & Wahpeton Bands or Tribes v. United States*, 423 F.2d 1386, 1389 (Ct. Cl. 1970), the court rejected an argument that a contract held by two attorneys for a 10 percent contingent fee precluded any recovery by predecessor counsel who had voluntarily

---

[44] Each of the cases involving Indian tribes was brought under a statute that, unlike the Settlement Act here, expressly granted the Court jurisdiction to adjudicate attorney fee payments.

[45] The court also noted that it was "not the proper forum to determine whether or not the discharge of the associated attorneys by the Tribe was justified." *Id.* at 22.

[46] The court expressed concern about the lack of detail in the attorneys' billing records and discounted the hours claimed as a result. "Uncertainty arising from imprecise recordkeeping are to be resolved against claimant attorneys." *Id.* at 21.

withdrawn from the case. The court applied principles of quantum meruit to apportion the fee between the two sets of attorneys. In so doing, the Court stated that if the successor attorneys could "rightly insist on the entire 10% because they had the foresight to put that figure in their contract," then "nothing would be left for [the prior attorneys] no matter how meritorious their claim." *Id.* at 1389. "Congress could not have intended such an inequity, or to allow one attorney to bar another's pay in that fashion." *Id.* [47]

These rules control here and compel denial of Patton Boggs' motion for summary judgment. Patton Boggs states both that its contract was terminated, Complt.¶ 15, and that it withdrew from representing the Nation after the termination. *See* Ex. 18 at 3. While the firm may dispute whether its contract was terminated for good cause, that is irrelevant. The Nation, like any other client, had the absolute right to terminate a contract with its attorney. That having occurred here, Patton Boggs could (although it does not) claim a fee for equitable compensation under principles of quantum meruit, but it cannot claim a fee based on the terms of the attorney contract.[48]

---

[47] *See also Butler & Vale v. United States*, 43 Ct. Cl. 497 (1907) (construing jurisdictional act under which the court was to determine attorney fee claims arising out of a recovery for a tribe; the court concluded that where a contingent fee attorney contact had expired, the proper basis for determining the fee was quantum meruit and not the terms of any contract.).

[48] The Settlement Act provision on fees, section 1779(e), does not alter this conclusion. As illustrated by the Federal Circuit decision in *Scates*, 282 F.3d 1362, the purpose of a federal statute which authorizes the payment of a contingent fee, subject to a statutory cap, is to facilitate the hiring of an attorney but preserve the claimant's recovery by guarding against its diminution through the payment of excessive legal fees. The statute at issue in *Scates* did not displace the common law right of a client to terminate an attorney contract without liability for the contingent fee; indeed, the case is entirely consistent with that right. The same is true of the fees provision in the Settlement Act. It authorizes the use of the funds appropriated to the Nation under the Act to pay attorneys fees, but caps those fees at 10% for the protection of the Nation. Like the statute in *Scates*, nothing in section 1779e alters the common law right of a tribe to discharge its attorney without liability for paying the full contingent fee.

2. *The Nation's decisions on fees were reasonable and consistent with applicable legal standards.*

Patton Boggs' repeated attacks on the Nation's decisions regarding the payment of attorneys fees, *see* n. 6 *supra,* warrant some response. These decisions were reasonable, and consistent with well-settled law.

The deliberative process undertaken by the Nation shows that it took into consideration the factors that the courts typically have applied in providing equitable compensation to an attorney whose contingent fee contract has been terminated prior to the occurrence of the contingency. For instance, the record shows that the Cherokee Nation considered, *inter alia,* the time worked by each attorney, the results obtained, the risk assumed, and the contribution of each attorney relative to the other attorneys handling the matter.[49]

The Nation reasonably concluded that *none* of the several lawsuits, appeals and efforts at Congressional action regarding the riverbed was, alone, decisive, *see supra* at 13-14, Ex. 16, but rather that the 2002 Settlement Act was the culmination of three decades of efforts, by a number of different lawyers in a number of different forums, to secure compensation for the damages that the Nation had sustained.

This was, in fact, a view of the Settlement Act shared by Congressman Carson, its principal House sponsor, who characterized the compensation paid to the Nation as based on four grounds, of which the mismanagement litigation was only one. *See* p.12 *supra*. And it is a view shared by this Court as well, which in another context in this case recognized that the

[49] *See e.g., Malonis,* 816 N.E.2d at 121 n.9 (ruling that when determining the appropriate fee for a terminated contingent-fee attorney, a court should consider "not only time spent, but the amount of the recovery, and the attorney's impact on the actual outcome"); *Campbell*, 964 P.2d at 46; *Kopelman and Assoc., L.C. v. Collins*, 473 S.E.2d 910, 920-21 (W. Va. 1996).

Settlement Act was the product not simply of this litigation, but of the broader effort pursued by the Nation since the 1970 Supreme Court decision affirming its ownership of the riverbed:

> In essence, however, this matter has been ongoing since the 1970 Supreme Court decision confirming title to the bed and banks of the Arkansas River in the Cherokee, Choctaw and Chickasaw Nations. *Choctaw Nation v. Oklahoma*, 397 U.S. 620 (1970). Plaintiffs have been involved in multiple ongoing negotiations and lawsuits with the United States in the past 32 years seeking compensation to resolve the dispute.

*Cherokee Nation of Okla. v. United States*, 54 Fed. Cl. 116, 118 (2002).[50]

In this light, Patton Boggs' oft-stated claim that it – and it alone – is responsible for the results obtained in the Settlement Act, *see* n. 2, n. 3 *supra*, is belied by the fact that it did not start to work on these matters until 1989 – 19 years *after* the Supreme Court decision – and then stopped working on these matters in 1995 – seven years *prior* to passage of the Act. Both before Patton Boggs arrived on the scene, and after it departed, other counsel made important contributions to the effort over many years – in Congress, in the Oklahoma cases, and in this

[50] While the Nation found that none of the lawsuits that had been brought during the three decades following the Supreme Court decision had resulted in compensation to the Nation, it nevertheless reasonably took into account the effect that all prior litigation had on obtaining the ultimate legislative settlement. As the Court of Claims found in *Cherokee Nation v. United States*, 355 F.2d 945, 954-956 (Ct. Ct. 1966), work done and results achieved in prior proceedings (before both the courts and the Congress) may be considered in an award of attorneys fees, even though the prior proceedings did not independently result in a monetary award, where those proceedings still had an impact in achieving the final result.

At the same time, the Nation was also correct in concluding that the Settlement Act established a ceiling, not a floor, on the amount of attorneys fees to be paid. While Patton Boggs assumes, throughout its motion, that the Act *requires* payment of $2 million – the full 10% of the Nation's allocated share of the funds – neither the language nor the purpose of the Settlement Act supports this view. The Act states that the fees "shall not exceed ten percent." This plainly does not require that the fees be ten percent. The purpose of this provision, like similar statutory caps on attorneys fees, is to ensure that the funds are used to the greatest extent to compensate the person who suffered the substantive loss, and not to pay legal fees. *Id.* at 955 (describing cases brought under the Indian Claims Commission Act and other special jurisdictional acts, which provided for an attorneys fee of "not to exceed 10%" of the recovery, in which the attorney fee award was less than 10%); *Pueblo of Santo Domingo v. United States*, 54 Fed. Cl. 240, 244 (2002) (noting that Indian Claims Commission Act "sets a maximum of 10 percent of the recovery"); *see also Scates*, 282 F.3d 1362 (declining to award full 20% contingent fee to discharged attorney in veterans' benefit case).

case. It cannot be gainsaid that the steady pressure applied through *all* of these efforts by *all* of these counsel ultimately resulted in the Settlement Act.

But even if the Act could be viewed as arising from this litigation alone, Patton Boggs can hardly claim sole credit here, either. As of 1995, when its contract was terminated, its work on the case had resulted in the dismissal of multiple claims raised in the original complaint, and an indefinite stay of those that remained. For this, it had been paid something over $400,000.[51] To the extent this litigation did ultimately contribute to the enactment of the Settlement Act, that was a result more of what happened after Patton Boggs was discharged, than what happened before. It was the success of the appeal to the Federal Circuit that reinvigorated this case, yet that victory was achieved by counsel other than Patton Boggs. But even after the successful appeal, the outcome of further proceedings in this Court on remand were far from certain. A motion for summary judgment filed by the United States was still pending, the result of which may have further narrowed the Nation's claims. In part for this reason, the Nation, through other

[51] Indeed, as noted above, Mr. Fite's report questioned whether Patton Boggs was paid even substantially more, because some part of the money paid by the Nation under Patton Boggs' other contract properly should be attributed to the 1989 Riverbed contract. Ex. 16 at A113; *see also* Ex. 22 at 5-6 (report of outside counsel). Patton Boggs responded to Mr. Fite's questions with only very general descriptions of the difference between the work done under each of the two contracts, without responding to the specific question raised. *See* Ex 20; *see also* Ex. 13 at 1-4, 6-8. Thus, it remains unclear whether Patton Boggs initially was paid only $403,959 for its services in connection with the 2002 Settlement Act, or some greater amount.

In addition, although the Nation raised questions about the number of hours that Patton Boggs asserted that it spent on this matter, Patton Boggs never provided the Nation with specific information explaining the hours it claimed, or even differentiating the time of partners from that of associates, law clerks or paralegals. To be sure, Patton Boggs described the problems it had in retrieving billing information as a result of a computer change in 1990, Ex. 20, but that internal accounting matter does not explain why the firm was able to produce summary totals of hours, but not any detailed information about the work done for the time claimed – at least for the period after the 1990 computer change (which covers five of the six years in question). Having failed to receive this more detailed information it requested, the Nation was correct in declining to accord full weight to the number of hours claimed. *See White Mountain Apache*, 30 Fed. Cl. at 21. *Cf. Western Shoshone Identifiable Group v. United States*, 652 F.2d 41, 49 (Ct. Cl. 1981).

counsel, made a renewed effort at seeking a legislative settlement. And that legislation encompassed more than settlement of just the claims in this case.

The Nation carefully considered all of these issues, provided multiple opportunities to the affected attorneys to present facts and arguments in support of their respective claims for fees, assessed those claims in light of the Nation's long history in seeking redress for its losses, and made a determination of an appropriate award to each attorney. The Nation's careful determination of the equitable award due to each attorney was reasonable, consistent with applicable law, and is entitled to considerable deference.[52]

### B. The Patton Boggs Contract Entitles It Only to Fees Approved Under Tribal Law, Which Requires Tribal Approval of Fees.

Although even Patton Boggs concedes that its contract was terminated, the Settlement Act and *the contract itself,* assuming, arguendo, it is effective, entitle Patton Boggs to no more than it has already received: a payment of fees approved by the Nation.

Section 1779e(a) requires the Secretary to pay those fees "provided for in the individual tribal attorney fee contract[]." 25 U.S.C. § 1779e(a). But Patton Boggs is wrong in asserting that its contract automatically entitles it to 10 percent of the Nation's recovery. Its contract provides no such thing. The fee provision of the contract, at page 3, states:

> [S]aid Attorneys shall receive from the Cherokee Nation additional compensation of ten percent (10%) of the amount recovered less the amounts previously paid by said Cherokee Nation for attorney fees pursuant to this Contract for litigation; *provided, that approvals required by law, if any, are obtained.*

Ex. 8 at 3, (emphasis added). Accordingly, Patton Boggs' entitlement to a contingent fee is conditional, not absolute, and is contractually dependent on receiving "approvals required by

[52] *See Cherokee Nation*, 355 F.2d at 952 (considering the position of the Cherokee Nation's governing body on the fee that should be paid to its attorneys from a judgment awarded under the Indian Claims Commission Act.).

law," including tribal law.[53]

After passage of the Settlement Act, the Nation enacted Legislative Act 5-04, the "Arkansas Riverbed Trust Fund Management Act of 2004" (Feb. 23, 2004), *see* Ex. 21, to govern the Nation's use of the funds to be received under the Settlement Act, and to ensure, in part, that the Nation's use of those funds would comply with the conditions set forth by Congress. The Act, as a matter of tribal law, specifically requires that the payment of attorneys fees in the case be approved by the Nation:

> After the payment of attorney fees, *which shall be approved by the Principal Chief and the Council of the Cherokee Nation*, and not exceed 10% according to the Settlement Act, the balance of the funds shall be used for the following purposes . . . .

*Id.* at § 5 (emphasis added). Thus tribal law establishes a legal requirement that the attorney fees paid under the Settlement Act first be approved by the Tribal Council and by the Principal Chief.

Because the Patton Boggs contract makes its 10 percent fee expressly conditional on obtaining "approvals required by law, if any," that fee is conditioned on the "approval" of the Cherokee Nation that is "required by law" under Legislative Act 5-04. Thus, Patton Boggs does not have an absolute contractual right to a 10 percent contingent fee. It has a contractual right only to such fee as approved by the Nation.

This is a condition to which Patton Boggs agreed in its contract. It did not limit the scope

[53] The preface to the contract makes clear that "approvals" include those required as a matter of *tribal* law. At page 1, the contract states that Patton Boggs is retained:

> . . . subject to all required approvals. (All references hereinafter to "required approvals" shall be construed to include the Cherokee National Tribal Council and the Bureau of Indian Affairs, if required by regulation or statute.)

This is consistent with federal law, which recognizes that tribal ordinances apply to non-Indians who enter into consensual contracts with a tribe. *E.g., Montana v. United States,* 450 U.S. 544, 565-66 (1981) ("A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.").

of this proviso, nor seek in any fashion to protect its contingent fee from the nature or source of such approvals as might be required by law. Having agreed to this provision, Patton Boggs has no contractual entitlement to the 10 percent contingent fee it claims. Its entitlement, under the contract and under tribal law, is only to those fees approved by the government of the Nation. That is what is "provided for in the individual tribal attorney fee contract[]," § 1779e(a), and that is what Patton Boggs has received.

### C. The Settlement Act Mandates that Attorneys' Fees Be First Approved by the Nation.

Tribal approval of fees is not only required by tribal law (and therefore by the Patton Boggs contract), it is also required by the Settlement Act.

In its summary judgment motion, Patton Boggs persists in its argument that the language of section 1779e(a) *unambiguously* provides that the Secretary must pay whatever fee Patton Boggs claims is established by its contract. The relevant statutory provision states that "the Secretary shall pay to the Indian Nations' attorneys *those fees* provided for in the individual tribal attorney fee contracts *as approved by the respective Indian Nations*." 25 U.S.C. § 1779e(a) (emphasis added). The dispute here, of course, is whether the "as approved" phrase modifies "fees" – as the Secretary and the Nation contend – or "contracts," as Patton Boggs contends.

In *AD Global Fund, LLC v. United States*, 67 Fed. Cl. 657 (2005), *appeal docketed*, No. 06-5046 (Fed. Cir. Jan. 13, 2006) – a case repeatedly cited by Patton Boggs – the Court thoughtfully marks the path to follow in resolving a question of statutory construction such as this:



80311.1

First, "[s]tatutory interpretation begins with the language, or plain meaning, of the statute." *Id.* at 671. "[C]ertain rules called canons of construction are useful in extracting the plain meaning from the statute." *Id.*

But "if a statute has two or more plausible alternative readings and thus is deemed ambiguous, the next step is for the court to look to the legislative history." *Id.* at 672.

"However, if the legislative history is equivocal . . . , any remaining ambiguities should be resolved by resort to any applicable presumption." *Id.*

1. *The better reading of the plain language of section 1779e requires the Nation's approval of the fee payments to its attorneys.*

"Whether or not the words of a statute are clear is itself not always clear." *Id.* at 671 (quoting *Tex. State Comm'n for the Blind v. United States,* 796 F.2d 400, 406 (Fed. Cir. 1986) (en banc)). "In such a situation, certain rules called canons of construction are useful in extracting the plain meaning from the statute." *Id.*

A "cardinal principle of statutory construction" is the avoidance of redundancy or surplusage in a statute, so that "if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.[54] This is a rule of statutory interpretation that has been invoked repeatedly by the Federal Circuit.[55]

---

[54] *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)); *see also Kungys v. United States*, 485 U.S. 759, 778 (1988) (holding that a "cardinal rule of statutory interpretation [is] that no provision should be construed to be entirely redundant"); *Bailey v. United States*, 516 U.S. 137, 145 (1995) (holding that "[j]udges should hesitate . . . to treat [as surplusage] statutory terms in any setting . . . ." (quoting *Ratzlaf v. United States*, 510 U.S. 135, 140-141 (1994))); *Cooper Indus., Inc. v. Aviall Servs, Inc.*, 543 U.S. 157, 166, 167 (2004) (stating that following a reading which would render part of a statute entirely superfluous is "something we are loath to do" and finding that the court "must, if possible, construe a statute to give every word some operative effect").

[55] In *Splane v. West*, 216 F.3d 1058, 1067-69 (Fed. Cir. 2000), for example, the Federal Circuit construed a statutory provision that covered veterans' multiple sclerosis "incurred in or aggravated by" service in the armed forces, and held that Congress intended to cover pre-existing medical conditions, or else the words "or aggravated by" in the statute would be rendered "meaningless or superfluous." *See*

Footnote continued. . .

Applied here, the necessary reading of section 1779e(a) is that the "as approved" phrase modifies "fees," not "contracts," and therefore that the Secretary "shall pay" only those fees "as approved" by the respective Indian Nation. Otherwise, if the phrase modifies "contracts," as Patton Boggs argues, *see* PB SJ Mem. at 10-11, an untenable redundancy is created. *Any* tribal attorney fee contract – if it is to be a valid contract in the first place – must *necessarily* already have been "approved by the respective Indian Nation[]" at the time the contract was formed. Absent such approval, there would be no contract at all. Therefore, the "approval" phrase, as construed by Patton Boggs, has no meaning in the statutory provision: it is a pure redundancy.[56]

Patton Boggs seeks to rebut this "cardinal" rule of construction mainly by relying on the lack of commas in the text of this provision. PB SJ Mem. at 10. But "a purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454, 455 (1993) (rejecting an interpretation based solely on the "deployment of quotation

*also, NTN Bearing Corp. of Am. v. United States*, 368 F.3d 1369, 1377 (Fed. Cir. 2004) (finding the court must construe a statute to give meaning to all its provisions); *City of Burbank v. United States*, 273 F.3d 1370, 1379 (Fed. Cir. 2001) (declining to render statutory language "superfluous").

[56] To illustrate, the statutory term "contracts" would have exactly the same meaning whether the "as approved" phrase modifies it or not. Under the Patton Boggs' reading, section 1779e(a) could simply require the Secretary to pay "those fees provided for in the individual tribal attorney fee contracts." The "as approved" qualifier that follows this language adds nothing whatsoever to the meaning of "contracts." Thus, to give meaning to that phrase within the context of the statute, it must instead be held to modify "those fees" – where it very much makes a difference.

For its part, Patton Boggs argues that the Nation's construction violates the same canon, by claiming that the phrase "provided for in the individual tribal attorney fee contracts" is surplusage under the Nation's reading. PB SJ Mem. at 10. But this is not right. Inclusion of the phrase requires that there be a contractual basis to the attorney fees to be paid by the Secretary, so that the Nation could not, for instance, "approve" fees for payment to an attorney who did not have a pre-existing contractual claim to such fees.

marks").[57] To be sure, while the inclusion of commas in section 1779e(a) might helpfully have further clarified the meaning of the statute in favor of the Secretary's interpretation, the absence of commas does not mean that the contrary reading is compelled.

Patton Boggs also relies, spuriously, on the so-called "rule of the last antecedent." PB Mem. at 10 n.16. Under this grammatical rule of construction, a limiting clause or phrase (*i.e.*, a qualifier) should ordinarily be read as modifying only the noun or phrase that immediately precedes it. *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 342-43 (2005). Typically, this rule applies in situations where a statutory provision lists two or more items in a series, followed by a qualifier, and where it is then unclear whether the qualifier applies only to the last item in the series or to all of the items. *Id.*

This case, however, is different. The question here is not whether the "as approved" qualifier phrase applies to one, or both, of two possible antecedents, but rather *which* of the two possible antecedents the qualifier modifies. The "rule of the last antecedent," as it has typically been employed by the courts, does not answer this question.

In any event, the rule, even if it were applicable, is no more than a guide to construction, and "is not inflexible and uniformly binding." 2A SUTHERLAND STATUTORY CONSTRUCTION § 47:33 (6th ed.).[58] Indeed, in both of the two cases cited by Patton Boggs to explain the rule, the

[57] *See also Barrett v. Van Pelt*, 268 U.S. 85, 91 (1925) (holding that "[p]unctuation is a minor, and not a controlling element in interpretation"); *United States v. Sablan*, 92 F.3d 865, 867 (9th Cir. 1996) (noting that "punctuation is not always decisive in construing statutes"); *DeGorter v. Fed. Trade Comm'n*, 244 F.2d 270, 278 (9th Cir. 1957) (finding that punctuation and syntax are not "decisive of the construction of a statute, if their strict observance would render ineffective any portion of it"); *Erie R. Co. v. United States*, 240 F. 28, 32 (6th Cir. 1917) (finding that "[t]he presence or absence of a comma . . . is so nearly fortuitous that it is a wholly unsafe aid to statutory interpretation").

[58] Courts often disregard the rule if it would distort the statute's true meaning or purpose, as evidenced by context and other guides. *See, e.g., Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 330-31(1993) (rejecting application of the "last antecedent rule," even though it is "quite sensible as a matter of grammar," in favor of a "plausible" alternative reading that "is the more reasonable one."); *O'Kane v.*

Footnote continued. . .

courts cited the rule – but then disregarded it – because to do so yielded the statutory reading that made best sense in context.[59] The same is true here.[60]

2. *The legislative history does not resolve the matter.*

If the Court rejects the view that the "cardinal" canon against statutory redundancy resolves the "plain meaning" question in favor of the Secretary and the Nation, then the most that can be said of section 1779e is that that there are two plausible readings of it (and indeed, the Court has suggested even a third view).[61] "Ambiguity in a statute . . . normally means two or

---

*Apfel*, 224 F.3d 686, 690 (7th Cir. 2000) (application of "last antecedent" rule would make statute "nonsensical"); *Kehoe v. Fid. Fed. Bank & Trust*, 421 F.3d 1209, 1215 (11th Cir. 2005); *United States v. One Sentinel Arms Striker-12 Shotgun Serial No. 001725*, 416 F.3d 977, 979 (9th Cir. 2005); *United States v. Barnes*, 295 F.3d 1354, 1360 (D.C. Cir. 2002); *see also* 73 AM. JUR. 2D *Statutes* §138 (rule "is not controlling or inflexible" and is "not applicable where a further extension or inclusion is clearly required by the intent and meaning of the context . . . .").

[59] *See Demko v. United States*, 44 Fed. Cl. 83, 87-90 (1999) (stating that the rules of grammar and syntax are not necessarily dispositive), *aff'd* 216 F.3d 1049, 1053 (Fed. Cir. 2000) (rejecting the "last antecedent rule" because "it would create an absurd result"); *Elliot Coal Mining Co. v. Dir., Office of Workers' Comp. Programs*, 17 F.3d 616, 629-31 (3d Cir. 1994).

[60] The construction of the statute offered by Patton Boggs – that any attorney with an "approved" contract gets whatever that contract provides for – could easily be inconsistent with the statutory cap. For instance, both the Patton Boggs and the Wilcoxen contracts provide for a contingent fee of 10 percent. If both contracts were "approved" by the Nation (as they were), then Patton Boggs' construction of the statute would mechanically require the Secretary to violate the statutory cap. The only reading that respects the cap is a requirement for the "approval" clause to apply to the determination of fees, which allows the tribe, in exercising its approval authority, to ensure that the aggregate of fees paid remains within the cap. And that is exactly what happened here.

[61] As Patton Boggs points out, PB SJ Mem. at 13, the Court offered a "middle way" of interpreting the provision:

> I'm sort of moving in the direction of that middle way, that they have to pay any attorney for whom they have a valid contact [*sic*], but because of the cap, *the Indians can determine, as long as it is reasonable, the amount of money that the people should be paid.*

Hearing Tr. (Dec. 13, 2005) at 56:2-7 (emphasis added). This reading is in accord with the facts here: all attorneys who have a "valid contract" are receiving payment, in an amount that has been determined by the Nation, and that is "reasonable." This construction of the provision would, for instance, prohibit the Nation from deciding that an attorney with a valid contract should receive nothing, or should receive only

Footnote continued. . .

more alternative readings, all having some claim to respect and none leading to absurd results." *AD Global Fund,* 67 Fed. Cl. at 672 (quoting *Hart v. United States,* 585 F.2d 1025, 1029 (Ct. Cl. 1978)). In such a case, "the next step is for the court to look to the legislative history." *Id.*

Here, Patton Boggs rests its case on the thin reed of a one-line snippet of legislative history, *see* PB SJ Mem. at 13, but one that provides little guidance on point and falls well short of the "clear and unambiguous" legislative history, *AD Global Fund*, 67 Fed. Cl. at 672, that is needed to "shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." *Id.* at 677 (quoting *Exxon Mobil Corp. v. Allapattah Servs. Inc.,* __ U.S. __ 125 S.Ct. 2611, 2626-7 (2005)).

*Only one sentence* in the House Report on the Settlement Act discusses Section 1779e directly: "This section authorizes the Secretary to pay the Nations' attorneys those sums owed them under their respective contracts, but imposes a cap of ten percent of the Nation's allocation of funds appropriated . . . ." H.R. REP. NO. 107-632, at 8 (2002).[62] This sentence says no more than that the Secretary is to pay the attorneys fees, subject to the payment cap. It does not purport to address, one way or the other, whether the fees paid to the attorneys are to be approved by the tribe, or by what process the Secretary is to determine "those sums owed them." In any event, this history is not inconsistent with the Secretary's and the Nation's interpretation of the provision, and tribal approval of the fees is not foreclosed by this lone sentence. It cannot be said to shine a "reliable light" on much of anything.

an amount that is not reasonable, as determined by the Secretary.

[62] The same report later states in the budget analysis that "Section 7 would limit attorneys' fees to 10 percent of the funds allocated by the government to each of the Indian Nations." *Id.* at 9.

3. *Applicable presumptions strongly support the Secretary's and the Nation's interpretation.*

If the legislative history is "equivocal and does [not] constitute a reliable indicator of the intentions of Congress, any remaining ambiguities should be resolved by resort to any applicable presumption." *A.D. Global,* 67 Fed. Cl. at 672. Here, the applicable presumptions strongly support the Nation's and the Secretary's position.

a. The court should defer to the Secretary's reasonable interpretation.

In administering the Settlement Act, including the provision regarding attorneys' fees, the Secretary's interpretation is to be accorded great deference by the court. *See, e.g., Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, ____ U.S. _____, 125 S.Ct. 2688, 2699 (2005) (holding that "if the implementing agency's construction is reasonable . . . a federal court [must] accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation" (citing *Chevron, U.S.A., Inc. v. N.R.D.C., Inc.*, 467 U.S. 837, 843-44, and n.11 (1984))); *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 417-418 (1992) (providing *Chevron* deference to agency's interpretation of the word "required" in approving a transaction between Amtrak and private parties); *Timken Co. v. United States*, 354 F.3d 1334, 1341-42 (Fed. Cir. 2004) (providing deference to agency's interpretation of the statutory term "exceeds").[63]

[63] The Secretary's construction need not be the only permissible construction, nor even the construction the Court would prefer. *See, e.g., Chemical Mfrs. Ass'n v. N.R.D.C.*, 470 U.S. 116, 125 (1985) (holding that the court need not find that the implementing agency's construction "is the only permissible" one but rather that the agency's understanding is "sufficiently rational" to preclude the court from substituting its own judgment as to the best reading); *U.S. Steel Group v. United States*, 225 F.3d 1284, 1287-1291 (Fed. Cir. 2000) (holding that the court must defer to the agency's interpretation even if the court would have preferred another, in ruling that the agency was due deference in its interpretation that "total expenses" included movement expenses).

The Secretary here is explicitly charged with implementing Section 1779e, in which Congress directs that "the Secretary shall pay" the attorneys fees. In construing this provision, the Secretary stated: "I have determined that the Secretary is required to pay only those fees approved by tribal resolution after the Settlement Act became effective . . . ." Compl., Ex.3 at 2. Thus, the Secretary acted on the basis of a determination made by a sovereign tribal government, after a careful and searching review, consistent with her reasonable construction of the statute. It cannot be argued that the Secretary's construction of the statute was wholly irrational. Thus, her implementation of Congress' direction to her should be respected by this Court.

b. Canons of Indian law instruct that the court uphold the Nation's and the Secretary's interpretation.

When statutes are ambiguous, it is a well-established canon of interpretation that ambiguities be construed to the benefit of the Indians. *See, e.g., Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) (statutes "are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit"); *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339, 1352 (Fed. Cir. 2004) (quoting *Montana,* 471 U.S. at 766, and citing *Winters v. United States*, 207 U.S. 564, 576 (1908) for the proposition that "ambiguities should be resolved 'from the standpoint of the Indians'"); *Doyon Ltd. v. United States*, 214 F.3d 1309, 1314 (Fed. Cir. 2000). The Indian canons of interpretation are particularly relevant here because "[t]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians." *Montana v. Blackfeet*, 471 U.S. at 766 (quoting *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985)).

To the extent the Court finds ambiguity in the statutory language of section 1779e, the statute should be read to protect not the attorneys seeking their fees, but the Indian tribes who



80311.1

have to pay the fees. In accord with this canon of construction, the Secretary properly interpreted the statute "in favor of the Indians." This is also the interpretation that gives respect to the judgments of a sovereign tribal government. In this light, the Secretary was correct in fulfilling her statutory and trust responsibility by accepting the Nation's judgment about the amount of fees to be paid.[64]

### V. Conclusion

The Court should deny Patton Boggs' motion for summary judgment.

Respectfully submitted,
*/s/ Arthur Lazarus, Jr.*

May 12, 2006

Arthur Lazarus, Jr.
Sonosky, Chambers, Sachse, Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240, (202) 682-0249 (fax)
alazarus@sonosky.com

Special Counsel for Plaintiff Cherokee Nation

Of Counsel:
Lloyd Benton Miller
Donald J. Simon
Anne D. Noto
Sonosky, Chambers, Sachse, Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240, (202) 682-0249 (fax)

---

[64] While the cases cited by Patton Boggs – *Chickasaw Nation v. United States*, 534 U.S. 84, 85 (2001); *Red Lake Band v. United States*, 17 Cl. Ct. 362, 381 (1989); and *DeCoteau v. Dist. County Ct. for the Tenth Judicial Dist.*, 420 U.S. 425, 445 (1975) – hold that the Indian canon of construction cannot be used to contort a clear statute or to contravene all other clear interpretive guides, the presumption in favor of Indians, along with other judicial tools, is always applicable in resolving ambiguities. *See, e.g., Chickasaw*, 534 U.S. at 85; *N.L.R.B. v. Pueblo of San Juan*, 276 F.3d 1186, 1194 (10th Cir. 2002) (holding that the court is to apply the special canons of construction to the benefit of Indian interests where there is no clear indication of congressional intent to abrogate Indian sovereignty rights); *see also Montana*, 471 U.S. at 766, *Shoshone*, 364 F.3d at 1352, *Doyon*, 214 F.3d at 1314, and *Oneida*, 470 U.S. at 247. Thus, the cases cited by Patton Boggs stand for no more than the proposition that the Indian canon of construction does not apply where the statutory language is clear on its face – which is not the case here.