IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, | * | |
| Plaintiff, | * | Case No. 89-218(L) |
| and | * | Chief Judge Edward H. Damich |
| PATTON BOGGS LLP, | * | |
| Intervenor-Plaintiff | * | |
| v. | * | |
| THE UNITED STATES OF AMERICA, Defendant. | * | |

* * * * * * * * * * * * *

## CHEROKEE NATION'S APPENDIX OF EXHIBITS IN RESPONSE TO PATTON BOGGS CROSS MOTION FOR SUMMARY JUDGMENT

Arthur Lazarus, Jr.
Sonosky, Chambers, Sachse, Endreson & PerryLLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240, (202) 682-0249 (fax)
alazarus@sonosky.com

Special Counsel for Plaintiff Cherokee Nation

Of Counsel:
Lloyd Benton Miller
Donald J. Simon
Anne D. Noto
Sonosky, Chambers, Sachse, Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240, (202) 682-0249 (fax)
lloyd@sonosky.net; dsimon@sonosky.com; anoto@sonosky.com

**Table of Contents**


| | | *Page* |
|---|---|---|
| Ex. 1 | Docket entries, *Cherokee Nation v. United States*, No 83-306-C (ED Okla) | A-1 |
| Ex. 2 | Complaint dated May 23, 1983, *Cherokee Nation v. United States*, No 83-306-C (ED Okla.) | A-6 |
| Ex. 3 | Opinion and Order dated January 28, 1994 in *Cherokee Nation v. United States*, No. 218-89L (Cl. Ct.) | A-16 |
| Ex. 4 | Notice of Appeal dated February 17, 1995 in *Cherokee Nation v. United States*, No. 218-89L (Cl. Ct.) | A-25 |
| Ex. 5 | Opinion and Order dated April 12, 1996, in *Cherokee Nation v. United States*, No. 95-5055 (Fed. Cir.) | A-30 |
| Ex. 6 | *Hearings on H.R. 103, H.R. 3476 and H.R. 3534 Before the H. Comm. on Resources,* 107th Cong. cover -1, 30-34, 78-100 (April 17, 2002) | A-37 |
| Ex. 7 | Contract dated September 8, 1988 between the Cherokee Nation and J. Wilcoxen and P. Niebell | A-69 |
| Ex. 8 | Contract dated November 13, 1989 between the Cherokee Nation and Patton, Boggs & Blow | A-74 |
| Ex. 9 | Letter agreement dated September 18, 1991 between Patton Boggs & Blow and the Cherokee Nation | A-78 |
| Ex. 10 | Letter dated October 30, 1995 from Principal Chief Cherokee Nation Joe Byrd, to Kate Boyce, Patton Boggs | A-80 |
| Ex. 11 | Letter dated April 23, 1996 from L. Susan Work, General Counsel, Cherokee Nation to C. Allen Foster and Katharine R. Boyce, Patton Boggs | A-81 |
| Ex. 12 | Memorandum dated November 5, 2002 from James Wilcoxen to Julian Fite, General Counsel for the Cherokee Nation | A-82 |

| | | |
|---|---|---|
| Ex. 13 | Memorandum dated November 7, 2002 from Patton Boggs to Chad Smith, Principal Chief Cherokee Nation, and Julian Fite, General Counsel for the Cherokee Nation | A-87 |
| Ex. 14 | Letter dated May 2, 2003 from James Wilcoxen to Julian Fite, General Counsel for the Cherokee Nation | A-103 |
| Ex. 15 | Cherokee Nation Spreadsheet of total sums paid by the Cherokee Nation to Patton Boggs & Blow, 1989 – 1997 | A-105 |
| Ex. 16 | Memorandum dated October 6, 2003, from Julian Fite, General Counsel, Cherokee Nation to Chad Smith, Principal Chief Cherokee Nation, James Wilcoxen, Wilcoxen & Wilcoxen, and Joe Reeder, Patton Boggs, with letter dated October 24, 2003 from Mr. Fite transmitting that memorandum to Jim Wilcoxen, Joe Reeder, Katherine Boyce at Patton Boggs, and Margaret Swimmer at Hall Estill | A-108 |
| Ex. 17 | Letter dated November 8, 2003 from Eleanor Niebell to Julian Fite, General Counsel, Cherokee Nation | A-116 |
| Ex. 18 | Letter dated November 14, 2003 from Joe Reeder to Julian Fite, General Counsel, Cherokee Nation | A-117 |
| Ex. 19 | Letter dated December 5, 2003, from Hall Estill to Julian Fite, General Counsel, Cherokee Nation | A-123 |
| Ex. 20 | Letter dated December 17, 2003, from Joe Reeder to Chad Smith, Principal Chief, Cherokee Nation | A-126 |
| Ex. 21 | Cherokee Nation Legislative Act 5-04: Act Relating to Establishing Policy and Procedures for the Management and Use of Cherokee Nation Trust Funds and Trust Assets, enacted February 17, 2004 | A-129 |
| Ex. 22 | Letter dated July 9, 2004, from David Riggs, Esq. Riggs, Abney, et al. to Julian Fite, General Counsel, Cherokee Nation | A-131 |
| Ex. 23 | Cherokee Nation Rules Committee, Meeting Minutes, September 16, 2004 | A-141 |
| Ex. 24 | Cherokee Nation Rules Committee, Meeting Minutes, October 20, 2004 | A-147 |

Ex. 25 Cherokee Nation Rules Committee, Meeting Minutes, November 18, 2004 ........ A-154

Ex. 26 Memorandum dated December 15, 2004, from Todd Hembree to Cherokee Nation Tribal Council ........ A-165

Ex. 27 Cherokee Nation Rules Committee, Meeting Minutes December 16, 2004 ........ A-167

Ex. 28 Cherokee Nation Rules Committee, Meeting Minutes, January 17, 2005 ........ A-175

Ex. 29 Minutes of Tribal Council Meeting – Regular Session, February 14, 2005 ........ A-182

Ex. 30 Cherokee Nation Rules Committee, Meeting Minutes, February 17, 2005 ........ A-192

Ex. 31 Minutes of Tribal Council Meeting – Regular Session, March 14, 2005 ........ A-202

Ex. 32 Resolution No. 18-05: Council of the Cherokee Nation – Approving Payment of Attorney Fees for Hall & Estill, adopted February 14, 2005 ........ A-215

Ex. 33 Resolution 19-05: Council of the Cherokee Nation – Approving Payment of Attorney Fees for Paul Niebell, adopted February 14, 2005 ........ A-217

Ex. 34 Resolution 20-05: Council of the Cherokee Nation – Payment of Attorney Fees for Jim Wilcoxen, adopted February 14, 2005 ........ A-219

Ex. 35 Resolution 29-05: Council of the Cherokee Nation – Approving Payment of Attorney Fees for Patton & Boggs, adopted March 14, 2005 ........ A-221

Ex. 36 Letter dated February 18, 2005, from Chad Smith, Principal Chief, Cherokee Nation, to Jeannette Hanna, Bureau of Indian Affairs ........ A-223

Ex. 37 Letter dated March 30, 2005, from Chad Smith, Principal Chief, Cherokee Nation, to Jeannette Hanna, Bureau of Indian Affairs ........ A-225

Ex. 38 Declaration of Diane Hammons ........ A-227

| | | | | | | | | | | | Nearest $1,000 | J 8605 M | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1086 | 06 | 83 | 306 | 05 | 23 | 83 | 2 | 290 | 1 | | | | 83 | 306 |

83-306-C

PLAINTIFFS

CHEROKEE NATION OF OKLAHOMA

DEFENDANTS

THE UNITED STATES,

CAUSE

(CITE THE U.S. CIVIL STATUTE UNDER WHICH THE CASE IS FILED AND WRITE A BRIEF STATEMENT OF CAUSE)

Act of Congress, approved 12/23/82 (P.L.97-385, 97th Cong., 96 Stat.1944) Wrongful taking of property for lock & dam construction, for compensation for loss of sand, gravel & coal.

(Index pb)

ATTORNEYS

Jim Wilcoxen

Andrew Wilcoxen
P.O.Box 357
Muskogee, OK 74402
918/683-6696

Of Counsel:

Paul M. Niebell
910 Seventeenth Street, N.W.
Suite 419
Washington, D.C. 20036
202/659-1516

Michael S. Yaroschuk (deceased) (March, 85)
P.O.Box 9
Montpelier, VT 05602
802/229-0062

Lynn Rubinstein
Attorney
Department of Justice
10th & Pennsylvania Ave., N.W
Rm. 21
Washington, D.C. 20530
(202) 633-5397

~~LOUIS STRIEGEL~~, Axsistant
U.S.Attorney
P. O. Box 1009
Muskogee, Oklahoma 74401

PAULINE H. MILIUS
Dept. of Justice, P.O. Box 663
Land and Natural Resources Div
Washington, D.C. ~~20530~~ 20044-0663
(202) 633-3797

CLOSED
FRANK H. SEAY

CHECK HERE IF CASE WAS FILED IN FORMA PAUPERIS

| FILING FEES PAID | | |
|---|---|---|
| DATE | RECEIPT NUMBER | C.D. |
| 5/23/83 #51937 $60 | CD#61 $60.00 | 5/25/ |
| 1-20-88 #058211 #105.00 | CD#90 #105.00 | 1-22-88 |

UNITED STATES DISTRICT COURT DOCKET

DC-111 (Rev. 5/8

Ex. 1
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

| DATE | NR. | PROCEEDINGS |
|---|---|---|
| 23/83 | | COMPLAINT. |
| 23/83 | | PRAECIPE For Summons. |
| 23/83 | | ISSUING Summons (2) 60-day.(Given.to atty.for service). |
| 7/83 | | Return on Summons: served U.S. Atty., Muskogee, Oklahoma on 5/23/83; served Atty. Gen. of U.S. by Certified Mail on 5/26/83. |
| 25/83 | | ANSWER of deft. |
| /13/83 | | DOCKET mailed setting pretrial at Muskogee, Oklahoma on December 15, 1983 at 11:30 A.M. |
| /29/83 | | MOTION of deft. to Strike date of Pre-Trial Conference. |
| " | | Entering Order denying Motion of deft. to strike date of Pre-Trial Conference. (FHS) (Copies to counsel.) |
| 1/21/83 | | JOINT PRETRIAL MEMO. |
| 2/15/83 | | Said cause comes on for Pretrial: Plaintiff present by counsel, Andrew Wilcoxen. Defendant present by counsel, Terry Smith, (Corp.of Eng.) and Lynn Rubinstein. Court directs this matter stricken from the Pretrial Docket. Parties to file Briefs on Liability issue with primary emphasis on the navigation servitude issue, by Feb. 15, 1984. Further Parties to file Joint Motions for Summary Judgment by Feb. 15, 1984. Responses due March 30, 1984., with Reply if parties desire due Apr. 18, 1984. (FHS) |
| /10/84 | | MOTION of Deft. for Judgment on the Pleadings. *Resp. due 3-30-84* |
| /10/84 | | BRIEF of Deft. in Support of Motion for Judgment on the Pleadings. |
| 15/84 | | MOTION of Pltf. for Partial Summary Judgment as to Liability. *Resp. due 3-30-84* |
| 15/84 | | BRIEF of Pltf. in Support of Motion for Partial Summary Judgment. |
| 3/30/84 | | RESPONSE of Pltf. to Defts. Motion for Judgment on the Pleadings. |
| 4/3/84 | | MOTION of defendant For Extension of time to file Response Brief, and Reply Briefs. *4-2-84 Called [illegible]* |
| 4/3/84 | | Entering Order granting defendant an extension of time until May 14, 1984, to file its response to plaintiff's motion for partial summary judgment, and further granting an extension of time until June 11, 1984, for the parties to file reply briefs. (FHS) (Copies to Counsel). |
| /14/84 | | MEMORANDUM by defendant in Opposition to Plaintiff's Motion for Summary Judgment and Reply Memorandum in Support of Defendant's Motion for Judgment on the Pleadings. |
| /6/84 | | ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT. (FHS) |

DC 111A
(Rev. 1/75)

CIVIL DOCKET CONTINUATION SHEET **83-306-C**

| PLAINTIFF | DEFENDANT | DOCKET NO. ____ |
|---|---|---|
| CHEROKEE NATION OF OKLA. | THE UNITED STATES OF AMERICA | PAGE ___ OF ___ PAGES |

| DATE | NR. | PROCEEDINGS |
|---|---|---|
| 6/13/84 | | ORDER (AMENDED) GRANTING Pltf's Motion for Partial Summary Judgment and denying deft's Motion for Partial Summary Judgment. (FHS) (Copies to counsel.) |
| 6/19/84 | | (copy) Petition for Interlocutory appeal filed w/10th C. Court of Appeals from order 6/6/84. - [illegible] |
| 10/9/84 | | Order of U. S. Court of Appeals granting petition for leave to appeal. 84-2355 |
| 10/10/84 | | Forwarding Interlocutory Appeal consisting of one volume. (copies) (Copy of index in file) to Tenth Circuit. |
| 3/13/86 | | MANDATE: JUDGMENT Affirming District Court Decision. OPINION. (Clerk, 10th circ.) |
| 3/13/86 | | NOTICE MAILED setting case for Pretrial Conference on 4/25/86 at 10:30 A.m. in the U.S. Cths., Musk. OK.(cc) |
| 4/4/86 | | MOTION (Deft. to continue PRETRIAL. |
| 4/4/86 | | ENTERING ORDER DENYING Motion of Defendant to Continue PRETRIAL. (FHS)(cc counsel) (EOD 4/4/86) |
| 4/10/86 | | SECOND JOINT PRETRIAL MEMORANDUM OF PLTF AND DEFT. |
| 4/28/86 | | PRETRIAL: Pltf. present by Jim Wilcoxen and Paul M. Niebell. Deft. present by Pauline H. Milius (Dept. Justice)<br>Theories of the case by the parties.<br>Deft. states to court she will probable file an application to stay case because a Petition for Writ of Cert will be filed in Supreme Court about May 23.<br>Court advises counsel that case will be reset for another pretrial in first part of November. (JHP) |
| 4/29/86 | | Receipt of Interlocutory Appeal consisting of one volume. (Copies - Broke down) |
| 4/29/86 | | NOTICE mailed setting case for Pretrial on July 2, 1986 at 5:00 P.M. in the U.S. Cths., Musk. OK. (cc)(Agreed P/T Stmt. due 6/17/86<br>Writ of Cert filed - #85-1940 - Keep record intact |
| 6/17/86 | | MOTION to Adopt Previously Submitted Second Joint Pretrial Memorandum of Plaintiff and Defendant. |
| 6/19/86 | | NOTICE mailed changing time only of PRETRIAL CONFERENCE from July 1986 at 5:00 p.m. to July 2, 1986 at 11:00 a.m. |
| 6/30/86 | | NOTICE mailed Striking Pretrial Conference from 7/2/86 Docket, and Resetting for November 18, 1986, 2 p.m., U.S.Cthse., Muskogee OK.<br>10-24-86 Pet. Writ Certiorari - Sup. Ct. #85-1940 |

111A
ev. 1/75)

83-306-C

Page 3

CIVIL DOCKET CONTINUATION SHEET

| PLAINTIFF | DEFENDANT | DOCKET NO. ______ PAGE ___ OF ___ PAGES |
|---|---|---|
| CHEROKEE NAT. | U.S.A. | |

| DATE | NR. | PROCEEDINGS |
|---|---|---|
| 1/5/86 | | NOTICE mailed CHANGING time for Pretrial Conference on 11/18/86 from 2:00 P.M. to 9:30 A.M.(cc) |
| 1/13/86 | | MOTION, of pltf., To Continue Pretrial. |
| 1/14/86 | | ENTERING ORDER: Granting Motion of the Plaintiff, Cherokee Nation of Oklahoma, To Continue the Pretrial Conference set November 18, 1986.(FHS)(cc) |
| 11/24/86 | | Letter 10th C. Court Appeals fwd. Certiorari Rcd. Supreme Ct., |
| 11/24/86 | | Fwd. Certiorari Rcd, Supreme Ct. (No. 85-1940) |
| 5/11/87 | | MANDATE: The Court Orders as follows:<br>1. The Mandate issued to the U.S. Court for the EDOK on March 11, 1986, is recalled.<br>2. The judgment of this Court filed 1/23/86 is vacated.<br>3. The Judgment of U.S. Cistrict Court for EDOK is reversed and the cause is remanded for entry of judgment in accordance with the opinion and judgment of the Supreme Court of the U.S.<br>4. Costs of $810.00 shall be taxed in favor of the U.S. Within 14 days the U.S. may file an additional bill of costs for costs expended on appeal to this Court. |
| 5/19/87 | | [redacted] STIPULATION as to Future Proceedings.(FHS) (cc) (EOD-5/19/87) |
| 5/19/87 | | ORDER Granting Partial Summary Judgment.(FHS) (cc) (EOD-5/19/87) |
| 7/1/87 | | MOTION for Summary Judgment, by deft. U.S.A. |
| 7/2/87 | | SECOND MOTION of plaintiffs For Partial Summary Judgment as to Liability. |
| 7/2/87 | | SUPPLEMENTAL BRIEF of plaintiff in Support of Motion for Partial Summary Judgment as to Liability. |
| 7/30/87 | | APPENDIX C, of Pltf. to supple. brief in support of Motion for partial Summary Judgment. |
| 8/3/87 | | REPLY BRIEF of Plt. to Deft.'s Motion for Summ. Judg. |
| 8/3/87 | | Deft.'s Memorandum in Opposition to Plt.'s Mot. for Summ Judg. and Reply Memorandum in Supp. of Deft.'s MOtion for Summ Judg. |
| /7/87 | | Record on Appeal (No. 85-1940) from Supreme Ct. returned. |
| 08/11/87 | | Correction Page to Plaintiff's Reply Brief. |
| 9/1/87 | | NOTICE setting pretrial for OCTOBER 23, 1987/ 11:00 a.m. Agreed Pretrial statement due October 16, 1987. |

DC 111A
(Rev. 1/75)

83-306-(

CIVIL DOCKET CONTINUATION SHEET

| PLAINTIFF | DEFENDANT | DOCKET NO. |
|---|---|---|
| CHEROKEE NATION | U.S.A. | PAGE ___OF___ PAGE |

| DATE | NR. | PROCEEDINGS |
|---|---|---|
| 10/16/87 | | THIRD JOINT PRETRIAL MEMORANDUM OF PLT. AND DEFT. |
| 10/23/87 | | Said cause comes on for Pretrial with Pltf. present by Jim Wilcoxen and Paul M. Niebell. Deft., present by Terry Smith, Pauline Mili Theories of the case by the parties. Court advised neither side has any additional evidence or authority to present to the Court, case will be submitted on briefs. (FHS) |
| 12/22/87 | | ORDER Granting Defendant's Motion for Summary Judgment and Denying Plaintiff's Motion for Summary Judgment. (FHS) (Copies to Counsel)(EOD 12/22/87) |
| 12/28/87 | | NOTICE of change of address of counsel for U.S.A., Pauline H. Mil |
| 1/20/88 | | NOTICE OF APPEAL by Plt. from Order of 12-22-87.(copies to counsel and circuit ct.) 88-1112 |
| 1/20/88 | | DOCKETING STATEMENT (orig. & all 3 mailed to circuit, per rules) |
| 1/29/88 | | Transcript Order Form. Transcript <u>not</u> necessary for this appeal. (Copy to Tenth Circuit) |
| 10/26/88 | | RECORD mailed to 10th Cir. (Due 11-3) |
| 11/6/91 | | MANDATE received from 10th Circuit affirming the decision of the trial court. |
| | | Letter from 10th Circuit stating that the Supreme Court has grant an extension of time to file a petition for writ of certiorari. |
| 3/9/92 | | Letter rec. from 10th stating Writ of Cert. was filed on 2/24/92 and assigned Supreme Court No. 91-1354. |
| | | Letter rec. from Tenth Circuit stating petition for writ of cert. filed in the captioned case was denied by an order of the supreme Court on May 18, 1992. |

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF OKLAHOMA
1983 MAY 23 PM 2:38
LEWIS L. VAUGHN, CLERK
BY ______ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

CHEROKEE NATION OF OKLAHOMA, )
Plaintiff, )
-vs- ) NO. 83-306-C
THE UNITED STATES, )
Defendant. )

# COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff, Cherokee Nation of Oklahoma, respectfully represents as follows:

## COUNT I

1. Pursuant to the Act of Congress, approved December 23, 1982 (Public Law 97-385, 97th Cong., 96 Stat. 1944), Congress conferred jurisdiction

> "[U]pon the United States District Court for the Eastern District of Oklahoma to hear, determine and render judgment, under the jurisdictional provisions of section 2 of the Indian Claims Commission Act of August 13, 1946, as amended (60 Stat. 1049, 1050; 25 U.S.C. 70a), on any claim which the Cherokee Nation of Oklahoma may have against the United States for any and all damages to Cherokee tribal assets related to and arising from construction of the Arkansas River Navigation System, including, but not limited to, the value of sand, gravel, coal, and other resources taken, the value of damsites and powerheads of dams constructed on that part of the Arkansas riverbed within Cherokee domain in Oklahoma, without the authority or consent of said Cherokee Nation; *** all of said lands or interests therein being held by said Cherokee Nation by virtue of treaties and by patent issued by the United States granting said lands to said Cherokee Nation in fee simple, or otherwise."

**Ex. 2**
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

2. Plaintiff, Cherokee Nation of Oklahoma, was originally located in the southeastern portion of the United States in what are now the States of Virginia, North and South Carolina, Georgia, Kentucky and Tennessee. Pursuant to a series of treaties with the United States, executed during the period 1817 and 1835, and under a patent issued by the United States thereunder in 1838, the Cherokee Nation was removed from its ancestral lands in the east and relocated on 13,594,135.14 acres of land in what was then known as Indian Territory, now a part of the State of Oklahoma.

3. During the period 1897-1906, the United States Congress enacted a series of Acts intended to establish a Cherokee tribal roll, to divide the tribal property among the enrolled members, to permit the formation and admission of the State of Oklahoma to the Union, which would include the people and lands patented to the Cherokee Nation. Under said Acts defendant, as trustee of plaintiff, assumed full administrative control over all of the property and affairs of the Cherokee Nation to carry out the purposes of said Acts. Cherokee Nation v. Hitchcock, 187 U. S. 294, 306 (1902).

4. At all times mentioned herein plaintiff, the Cherokee Nation of Oklahoma, has maintained its existence as an identifiable nation of North American Indians, and presently has enrolled tribal members and a Constitution with a representative form of government, approved by the United States Secretary of the Interior. Plaintiff maintains its tribal office and headquarters at Tahlequah, in the Eastern District of Oklahoma.

5. Plaintiff brings this lawsuit pursuant to its inherent power and authority as a sovereign Indian nation, and in accordance with the Act

of Congress, approved December 23, 1982, 96 Stat. 1944, and the jurisdictional provisions of Section 2 of the Indian Claims Commission Act of August 13, 1946, 60 Stat. 1049 (25 U.S.C. 70a et seq.).

6. Defendant in this action is the United States of America operating through its various governmental and administrative agencies, such as the United States Army Corps of Engineers, the Department of the Interior, and the Southwest Power Administration.

7. Pursuant to the Treaty of New Echota, executed December 29, 1835, 7 Stat. 478 (2 Kapp. 439), the Cherokee Nation agreed to relinquish its ancestral lands in the east and to remove to lands west of the Mississippi River. The treaty in pertinent part stated:

> ". . . ."
>
> "Article 2. Whereas by the treaty of May 6th, 1828 and the supplementary treaty thereto of Feb. 14th, 1833 with the Cherokees west of the Mississippi the United States guaranteed and secured to be conveyed by patent, to the Cherokee nation of Indians the following tract of country 'Beginning at a point on the old western territorial line of Arkansas Territory being twenty-five miles north from the point where the territorial line crosses Arkansas river, thence running from said north point south on the said territorial line where the said territorial line crosses Verdigris river; thence down said Verdigris river to the Arkansas river; thence down said Arkansas to a point where a stone is placed opposite the east or lower bank of Grand river at its junction with the Arkansas; thence running south forty-four degrees west one mile; thence in a straight line to a point four miles northerly, from the mouth of the north fork of the Canadian; thence along the said four mile line to the Canadian; thence down the Canadian to the Arkansas; thence down the Arkansas to that point on the Arkansas where the eastern Choctaw boundary strikes said river and running thence with the western line of Arkansas Territory as now defined, to the southwest corner of Missouri; thence along the western Missouri line to the land assigned the Senecas; thence on the south line of the Senecas to Grand river; thence up said Grand river as far as the south line of the Osage reservation, extended if necessary; thence up and between said south Osage

line extended west if necessary, and a line drawn due west from the point of beginning to a certain distance west, at which a line running north and south from said Osage line to said due west line will make seven millions of acres within the whole described boundaries. In addition to the seven millions of acres of land thus provided for and bounded, the United States further guaranty to the Cherokee nation a perpetual outlet west, and a free and unmolested use of all the country west of the western boundary of said seven millions of acres, as far west as the sovereignty of the United States and their right of soil extend:

"Provided however That if the saline or salt plain on the western prairie shall fall within said limits prescribed for said outlet, the right is reserved to the United States to permit other tribes of red men to get salt on said plain in common with the Cherokees; And letters patent shall be issued by the United States as soon as practicable for the land hereby guaranteed."

" . . . "

"Article 3. The United States also agree that the lands above ceded by the treaty of Feb. 14, 1833, including the outlet, and those ceded by this treaty, shall all be included in one patent executed to the Cherokee nation of Indians by the President of the United States according to the provisions of the act of May 28, 1830.

" . . . . "

"Article 5. The United States hereby covenant and agree that the lands ceded to the Cherokee nation in the foregoing article shall, in no future time without their consent, be included within the territorial limits or jurisdiction of any State or Territory. But they shall secure to the Cherokee nation the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country belonging to their people or such persons as have connected themselves with them; provided always that they shall not be inconsistent with the constitution of the United States and such acts of Congress as have been or may be passed regulating trade and intercourse with the Indians; and also, that they shall not be considered as extending to such citizens and army of the United States as may travel or reside in the Indian country by permission according to the laws and regulations established by the Government of the same."

8. The Treaty of 1835 contained limited and specific easements and reservations with regard to gathering of salt on the Cherokee land, the rights to land assigned to the Quapaws, and, lastly, the right of the United States to establish military roads and posts, and to maintain the post at Fort Gibson.

9. On December 31, 1838 the promised patent was duly issued by the United States and recorded in the General Land Office conveying to the Cherokee Nation the above-described lands, as set forth in the Treaty of 1835. Said lands, thus described by metes and bounds, conveyed to the Cherokee Nation said 13,594,135.14 acres in what was then known as Indian Territory, now a part of the State of Oklahoma. Included within the metes and bounds description was the navigable portion of the Arkansas River. Said patent provided, with respect to the lands granted therein, that said Cherokee Nation was "to have and hold the same together with all rights, privileges and appurtenances thereunto belonging to said Cherokee Nation forever. . . ."

10. For more than fifty years the Cherokee Nation occupied the patented lands and as the fee simple owner exercised full dominion and control over such lands, including the navigable portion of said Arkansas River. Plaintiff at no time since 1835 divested itself of title to the bed and banks of said Arkansas River within the metes and bounds description of said patent.

11. By letter dated March 28, 1908, the Secretary of the Interior erroneously determined that the Cherokee Nation was not entitled to royalties from the excavation of sand and gravel because title to the bed of the Arkansas River within the Cherokee Nation passed to the State of Oklahoma upon its admission to the Union on an equal footing with the other states.

12. Defendant's Army Corps of Engineers, pursuant to the Flood Control Act of 1944, 58 Stat. 883, 890, and the River and Harbor Act of July 24, 1946, 60 Stat. 634, 636, constructed a series of locks and dams on that portion of the Arkansas River owned in fee simple by the Cherokee Nation, without its consent, and without the payment of just compensation therefor, in violation of the Fifth Amendment to the Constitution of the United States.

13. In 1970, the United States Supreme Court, in Choctaw Nation et al. v. Oklahoma, 397 U. S. 620, declared that the Cherokee Nation was the present owner of the fee simple title to the bed and banks of the Arkansas River within the territorial domain of the Cherokee Nation, and that the Cherokee Nation was entitled to an accounting for mineral royalties erroneously acquired by the State of Oklahoma.

14. In constructing the dams and locks on that portion of the Arkansas River flowing through the Cherokee National domain, and in altering the channel thereof, defendant has destroyed, or caused to be lost, vast deposits of sand and gravel constituting the valuable property of plaintiff, without payment to plaintiff therefor, and for which plaintiff herein demands just compensation.

15. At all times mentioned herein there has existed between plaintiff and defendant a fiduciary relationship, the defendant being the trustee and the plaintiff being its dependent Indian ward; that under such relationship the defendant has the right to preserve, manage and control the property and affairs of plaintiff for its benefit, but cannot destroy or dissipate said trust property, or use it for its own purposes, without providing just compensation to plaintiff therefor; that defendant, in violation of its duty as trustee herein has failed to exercise the highest

fiduciary standards in destroying the property rights of plaintiff in that portion of the Arkansas River within the national domain of plaintiff; and its dealings with plaintiff's riverbed property is in plain violation of fair and honorable dealings.

16. Defendant's United States Army Corps of Engineers has located locks and dams on plaintiff's Arkansas riverbed property, without plaintiff's consent and without providing just compensation therefor; and such structures have constituted a continuing trespass, and continue presently to constitute a continuing trespass on said property of plaintiff; and such actions of defendant continue to deprive plaintiff of the benefits to be derived from its fee simple title to said property.

COUNT II

17. Plaintiff incorporates by reference herein paragraphs 1 through 7 of Count I.

18. Pursuant to the Flood Control Act of 1944, 58 Stat. 883, 890, and The River and Harbors Act of 1946, 60 Stat. 634, 636, defendant, through action of its United States Army Corps of Engineers, commencing in 1957, constructed a series of locks and dams on the Arkansas River designated as the Arkansas River Navigation System (the McClellan-Kerr Navigation Project) on lands owned in fee simple by the Cherokee Nation:

The Webbers Falls Lock and Dam, No. 16, located about five miles northwest of the Town of Webbers Falls, Muskogee County, Oklahoma;

The Robert S. Kerr Lock and Dam, No. 15, located at Short Mountain, about eight miles southerly from the Town of Sallisaw, Sequoyah County, Oklahoma; and

The W. D. Mayo Lock and Dam, No. 14, located about nine miles southwesterly of Fort Smith, Arkansas, in Sequoyah County, Oklahoma.

19. Said locks and dams described above are located in whole or in part on lands granted by the United States to the Cherokee Nation in the 1838 patent, and are still owned by plaintiff, Cherokee Nation of Oklahoma.

20. Defendant constructed said dams and locks without the permission or consent of plaintiff Indian nation. Said locks and dams, located as they are, on plaintiff's property constitute a taking without just compensation in violation of the Fifth Amendment of the Constitution of the United States; and also constitute a breach of the fiduciary duty owed by defendant to plaintiff, its dependent Indian ward. Defendant's actions in permitting the destruction and dissipation of plaintiff's property violate the basic principles of fair and honorable dealing between plaintiff and defendant.

21. Plaintiff has been deprived of the use of its property by defendant's wrongful action in constructing said locks and dams, including, but not limited to, the private development of hydroelectrical energy.

22. The locks and dams constructed by defendant generate hydroelectric power which is marketed by the defendant's Southwest Power Administration to cooperatives and municipalities in the area. Plaintiff Indian nation has not been compensated for the loss and deprivation of this valuable property right in its said lands.

WHEREFORE, plaintiff prays:

1. That plaintiff be awarded just compensation from defendant for the fair market value of the Cherokee Nation's lands thus intruded upon by defendant, and taken by the United States Army Corps of Engineers in the construction of the locks and dams, Nos. 14-16, in violation of the Fifth Amendment to the Constitution of the United States;

2. That plaintiff be awarded just compensation from defendant for the fair market value of the Cherokee Nation's lands thus intruded upon by defendant, and taken by the United States Army Corps of Engineers in the construction of locks and dams Nos. 14-16, in violation of the principles of fair and honorable dealings between defendant and plaintiff, its dependent Indian ward;

3. That plaintiff be awarded just compensation for the past and future loss of the sand and gravel and coal deposits as a consequence of defendant's action in constructing said locks and dams and altering the channel of said Arkansas River; said assets thus lost to plaintiff and taken by defendant without the payment of just compensation therefor, in violation of the Fifth Amendment to the Constitution of the United States;

4. That plaintiff be awarded just compensation for the past and future loss of the sand and gravel deposits as a consequence of defendant's action in constructing said locks and dams and altering the channel of said Arkansas River; said assets thus being lost to plaintiff and taken by defendant without the payment of just compensation therefor, in violation of the principles of fair and honorable dealings between defendant and plaintiff, its dependent Indian ward;

5. That plaintiff be awarded just compensation for the fair market value of the damsites thus taken by defendant, and for the electrical energy generated at said sites, which property has been taken by defendant in violation of the Fifth Amendment to the Constitution of the United States; and

6. That plaintiff be awarded just compensation for the fair market value of the bed and banks of the Arkansas River, which defendant has taken from plaintiff in violation of the Fifth Amendment to the

Constitution of the United States; and/or in violation of its duties as trustee of plaintiff, and contrary to the most exacting fiduciary standards, and in violation of the principles of fair and honorable dealings between defendant and plaintiff, its dependent Indian ward.

Respectfully submitted,

ANDREW WILCOXEN
P. O. Box 357
Muskogee, OK 74402-0357
(Telephone: 918-683-6696)
Attorney for Plaintiff, Cherokee Nation of Oklahoma

OF COUNSEL:

PAUL M. NIEBELL
910 Seventeenth Street N. W.
Suite 419
Washington, DC 20036
(Telephone: 202-659-1516)

MICHAEL S. YAROSCHUK
P. O. Box 9
Montpelier, VT 05602
(Telephone: 802-229-0062)

REPRODUCED AT THE NATIONAL ARCHIVES

F-E-10

94 JAN 31 PM 3:23

DEPARTMENT OF JUSTICE GENERAL LITIGATION SECTION

# In the United States Court of Federal Claims

No. 218-89 L and No. 630-89 L
(consolidated)

(FILED: January 28, 1994)

* * * * * * * * * * * * * * * * * * * * * * * * * * *

**THE CHEROKEE NATION OF OKLAHOMA,**

**AND**

**THE CHOCTAW NATION OF OKLAHOMA AND THE CHICKASAW NATION,**

*Plaintiffs,*

**v.**

**THE UNITED STATES,**

*Defendant.*

* * * * * * * * * * * * * * * * * * * * * * * * * * *

FILED
JAN 28 1994
U.S. COURT OF FEDERAL CLAIMS

***Joe R. Reeder***, Washington, D.C., and ***Bob Rabon***, Hugo, Oklahoma, for plaintiffs.

***Thornton Withers Field*** and ***James M. Upton***, Washington, D.C., for defendant.

DEPARTMENT OF JUSTICE
3
LANDS
RECORD

## ORDER

***TIDWELL***, **Judge:**

This case is before the court on defendant's motion for summary judgment. For the reasons set forth below, the court denies defendant's motion.

**Ex. 3**
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

## FACTS

On September 27, 1830, defendant granted the Choctaw Nation a vast area of western territory that today encompasses the southern third of the State of Oklahoma, in exchange for Choctaw land in Mississippi. Treaty of Dancing Rabbit Creek, Sept. 27, 1830, 7 Stat. 333-334. On December 29, 1835, defendant and the Cherokee Nation entered into a treaty under which the Cherokee Nation gave up all its aboriginal land interests east of the Mississippi River in exchange for substantial territory in the northeastern part of the present State of Oklahoma. Treaty of New Echota, Dec. 29, 1835, 7 Stat. 478-480. In 1837, defendant granted the Chickasaw Nation an undivided one-fourth interest in the remainder of Choctaw land. Treaty of January 17, 1837, 11 Stat. 573-574.

In 1906, Congress enacted legislation declaring that plaintiffs' tribal lands were "held in trust by the United States for the use and benefit of the Indians." Act of April 26, 1906, ch. 1876, § 27, 34 Stat. 137, 148 (1906). After Oklahoma received statehood in 1907, the United States Secretary of the Interior incorrectly informed both the Governor of Oklahoma and the Cherokees that the State of Oklahoma held legal title to the Arkansas riverbed within the Indian lands. The United States Supreme Court later ruled that plaintiffs owned fee simple title to the Arkansas riverbed pursuant to the Treaties of Dancing Rabbit Creek and New Echota. *Choctaw Nation v. Oklahoma*, 397 U.S. 620 (1970) (*Choctaw I*). Following *Choctaw I*, the State of Oklahoma turned over to the Bureau of Indian Affairs (BIA) and to the three Tribes the sand-and-gravel, and oil-and-gas leases, which the State had entered into with various parties, and which were on tribal riverbed land.

Since 1907, the location of the Arkansas River has not remained fixed; between now and that time it has meandered extensively, in some instances as much as two miles. Part of the movement was caused by the McClellan-Kerr Arkansas River Navigation System, authorized by Congress to improve navigation, and to provide hydroelectric power and other beneficial uses, which extensively changed the riverbed in the 1950's and 1960's. As a result, neither the Tribes nor the BIA know precisely what land is owned by the Tribes. Beginning in 1973, the Tribes sought to sell their riverbed interests to the United States. In order to determine what the Tribes owned for purposes of the proposed sale, W. R. Holoway and Associates (Holoway), under contract to BIA, conducted a river movement study in 1973-74, based upon an amalgam of information derived from prior aerial photos and affidavits of elders familiar with the river. Instead of surveying the boundaries of tribal land on the ground, Holoway superimposed computer-generated boundaries on aerial maps. Since 1974, the BIA relied on the Holoway boundaries for the issuance of tribal sand-and-gravel, and oil-and-gas leases.

REPRODUCED AT THE NATIONAL ARCHIVES

Pursuant to the Choctaw-Chickasaw-Cherokee Boundary Dispute Act, the Tribes obtained special legislation to sue each other in order to determine their respective ownerships of the Arkansas riverbed. Choctaw-Chickasaw-Cherokee Boundary Dispute Act, Pub. L. 93-195 (1973). The district court determined each Tribe's interest in the riverbed as of November 16, 1907, the date Oklahoma achieved statehood. *Choctaw Nation v. Cherokee Nation*, 393 F. Supp. 224 (E.D. Okla. 1975). However, the district court failed to address which specific tracts of land were owned by the Tribes, and whether the tribal boundaries would move with subsequent river meanders or remain stationary. Following the district court determination of boundaries, the Tribes entered into a revenue sharing agreement on April 29, 1976, under which all royalties, interest, and income from the lease of riverbed land were to be distributed amongst themselves; they amended the oil and gas revenue distribution sixteen years later. Lacking Congressional and Executive Branch support, the Tribal initiative to sell all riverbed assets to the United States ceased in 1979.

In 1988-89, the BIA received congressional funding to obtain an official river movement study and survey of the Arkansas River by the Bureau of Land Management (BLM). The BLM surveys and studies are much more thorough and detailed than the Holoway study, and most importantly, are based on ground surveys. Control points are placed several miles from the river to insure accuracy. To date, the survey of thirty linear miles of the ninety-six mile river segment on which the Tribes lay claim is substantially complete.

In 1989, the three Tribes filed suit here seeking compensation for alleged complex natural resource mismanagement actions. The Tribes alleged that the United States breached its treaty duty to identify the Arkansas Riverbed lands and evict alleged trespassers from the lands so that the natural resources of the lands could be managed for the Tribes' benefit. Initially, defendant filed a Motion to Dismiss in *Cherokee* and a Summary Judgment Motion in *Choctaw*, each time asserting that plaintiffs' claims failed to establish defendant's monetary liability and that the claims were time barred under 28 U.S.C. § 2501 (1988), because they accrued more than six years prior to the filing of suit.

On October 5, 1990, the court partially dismissed Cherokee's complaint. Specifically, the court determined that Cherokee failed to state a claim for: 1) failure to evict casual trespassers from Cherokee's lands in general, and failure to survey those lands; 2) failure to remove trespassers from plaintiff's farm and range lands and to issue farming and grazing leases; and 3) failure to manage plaintiff's timber lands. *Cherokee Nation of Oklahoma v. United States*, 21 Cl. Ct. 565, 575-79 (1990). In addition, the court ruled that all Cherokee claims found to have accrued prior to April 21, 1983 were time

REPRODUCED AT THE NATIONAL ARCHIVES

barred. *Id.* at 572. The court went on to note that if plaintiffs could show that defendant owed a continuing duty, and a breach thereof, then plaintiffs could recover for a continuing claim, but only for the statutory period. *Id.* However, the court declined to rule on defendant's § 2501 motion or the applicability of the continuing claims doctrine until Cherokee had the opportunity to present additional facts that would allow the court to decide when plaintiffs' claims first accrued. *Id.* The court left intact those claims alleging failure to remove trespassers from, and issue leases on, Cherokee's mineral lands, claims for unauthorized government use of Cherokee land, and claims for unauthorized use of land for rights-of-way. *Id.* at 576-582.[1]

On October 29, 1990, the court granted defendant's motion for a more definite statement and ordered the Cherokee plaintiff to identify its claims with specificity.[2] The court ordered plaintiff to:

> 1) Specify exactly which lands, by legal description or some other generally accepted method for land identification, are the subject of the alleged breaches of trust;
>
> 2) Specify for each parcel identified in paragraph one above, the alleged trespassing party (or parties) who has caused the alleged injury;
>
> 3) Identify with specificity which leases and lands are involved in the numerous allegations of mismanagement and the leases under which defendant allegedly failed to collect payments due;
>
> 4) Identify with particularity when the claims first accrued (*e.g.*, which trespassers, if any, began their trespass activities after April 21, 1983, and the effective date of topping leases at issue); and
>
> 5) Delete from the complaint those issues disposed of in the court's October 5, 1990 Order.

In spite on the court's October 5 and October 29, 1990 Orders, Cherokee plaintiff repeated allegations in its first amended complaint that the

---

[1]In its Order of June 3, 1991, the court informed the parties that its decision in *Cherokee Nation of Oklahoma v. United States*, 21 Cl. Ct. 565 (1990), would be *stare decisis* as to similar issues in the *Choctaw* case. As a result, the Choctaw Nation amended its complaint to allege the identical counts remaining in *Cherokee* after the court's October 5, 1990 Order.

[2]The court previously issued the same order to the *Choctaw* plaintiffs on April 2, 1990.

REPRODUCED AT THE NATIONAL ARCHIVES

court clearly dismissed. Therefore, on May 8, 1991, the court granted defendant's motion in limine and limited plaintiffs' claims to those lands and causes of action which it identified with specificity in its amended complaint. *Cherokee Nation of Oklahoma v. United States*, 23 Cl. Ct. 117, 119 (1991). The court also ordered Cherokee to file a second amended complaint in consonance with its Order of May 8, 1991.

Because Cherokee's second amended complaint complied with the court's order only in part, the court, on January 9, 1992, dismissed Cherokee's claim for unauthorized use of rights-of-ways for failure to plead the cause of action with the requisite degree of particularity, and once again ordered Cherokee to amend its complaint. *Cherokee Nation of Oklahoma v. United States*, 24 Cl. Ct. 695, 698 (1992). On March 5, 1992, the court struck claims from Cherokee's third amended complaint that referred to land other than the Arkansas Riverbed, and ordered Cherokee to file another amended complaint. *Cherokee Nation of Oklahoma v. United States*, 25 Cl. Ct. 361, 363 (1992). Choctaw plaintiffs filed a similarly noncomplying amended complaint to which defendant moved to strike and dismiss. In its Order of March 9, 1992, the court limited Choctaw plaintiffs to lands and causes of action alleged with particularity and ordered Choctaw to file a second amended complaint. *Choctaw Nation of Oklahoma v. United States*, 25 Cl. Ct. 363, 366 (1992).

Cherokee filed its Fourth Amended Complaint and Choctaw and Chickasaw their Second; defendant again objected. The Fourth and Second Amended Complaints, which were essentially identical, raised the following three claims:

> Count 1) Breach of duty to manage lands for natural gas and oil exploration and production;
> Count 2) Breach of duty to manage lands for solid minerals exploration and production;
> Count 3) Breach of duty to protect tribal lands from unauthorized government use.

In addition, Choctaw plaintiffs raised a Fourth Count for failure to issue rights-of-way.

On July 23, 1992, the court denied defendant's Second Motion to Dismiss in *Cherokee*, holding that the Arkansas riverbed was held in trust by the United States for the Cherokee Nation, and that the continuing claims doctrine potentially applied. *Cherokee Nation of Oklahoma v. United States*, 26 Cl. Ct. 798 (1992).

REPRODUCED AT THE NATIONAL ARCHIVES

In order to move the cases forward and provide context to any future discovery, defendant filed a motion for summary judgment on June 25, 1993. For the sole purpose of the motion for summary judgment, the court consolidated the *Cherokee* case with *Choctaw Nation of Oklahoma and the Chickasaw Nation v. United States*, No. 630-89L.

## DISCUSSION

Pursuant to RCFC 56(c), summary judgment is appropriate upon a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c) (1992); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). In evaluating a motion for summary judgment, the evidence must be viewed, and inferences drawn, in a light most favorable to the non-moving party. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed. Cir. 1985); *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1146 (Fed. Cir. 1983). A genuine issue of material fact is one that would change the outcome of the case. *Anderson*, 477 U.S. at 247-48; *Chevron U.S.A., et al. v. United States*, 17 Cl. Ct. 537, 540 (1989), *rev'd on other grounds*, 923 F.2d 830 (Fed. Cir. 1991). In order to show that a material fact is genuinely at issue, the non-movant must do more than present "some" evidence on the disputed issue. *Anderson*, 477 U.S. at 248-50. The non-movant must furnish evidence sufficient for the court to return a verdict in favor of that party. *Id.* at 249-50. The Tribes must do more than raise some doubt as to the existence of a fact; they must present some credible evidence sufficient to require trial on the merits. *See Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed. Cir. 1988). On the other hand, the moving party need not show "the absence of a genuine issue concerning any material fact," but may point out to the court the absence of credible evidence to support the Tribe's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

### *Genuine Issue of Material Fact*

Title to the Arkansas Riverbed is the foundation of plaintiffs' claims. The United States Supreme Court determined that under the New Echota and other treaties, the Tribes are fee simple owners of the riverbed underlying the Arkansas River. *Choctaw Nation v. Oklahoma*, 397 U.S. 620 (1970). However, the Supreme Court did not determine what specific land constituted the riverbed, nor whether subsequent river meanders would affect the Tribes' land. Because the Arkansas River has shifted since the time of the treaties, and the land so granted was defined in reference to the river, the BLM

REPRODUCED AT THE NATIONAL ARCHIVES

surveys are necessary to determine the boundaries of land given to the Tribes and held in trust for them by the United States government. Therefore, before plaintiffs can proceed with their breach of fiduciary duty claims, plaintiffs must establish legal title to specific land at issue.

Under Counts One, Two, and Four of plaintiffs' complaint, plaintiffs alleged that defendant breached its duty to manage tribal mineral and land resources. In addition to plaintiffs assertions that specific leases were mismanaged, plaintiffs also contended in their complaint that defendant breached its treaty duty by not protecting tribal land from trespassers and illegal drainage, thereby depriving the Tribes of entitled royalties from their land.[3] In support of their claims, plaintiffs presented the new BLM survey which allegedly showed land that was not managed by defendant as tribal land. Defendant argued that only land and leases allegedly managed by defendant are at issue, and not alleged tribal land defendant allegedly failed to manage.

Similarly, under Count Three, plaintiffs maintained that tribal land was used by the government without authorization by the Tribes. Defendant asserted ownership of the subject lands by condemnation and purchase prior to 1977 for construction of the McClellan-Kerr Arkansas River Navigation System, authorized by the Rivers and Harbors Act of July 24, 1946, Pub. L. 79-525, 60 Stat. 634 (1946). The Tribes did not dispute that defendant's condemnation and purchase of subject land was a matter of public record, nor that defendant claimed title to the subject land. However, the Tribes disputed whether the United States *properly* condemned and purchased the riverbed tracts from third parties. The Tribes asserted that, according to the recently completed BLM survey, significant portions of the tracts acquired by the United States, by purchase and condemnation, are in fact dry, tribal Arkansas riverbed lands.

Clearly, defendant and plaintiffs dispute what land constitutes the tracts of Arkansas riverbed land in question. The BLM survey presented by the Tribes is sufficient evidence establishing that the ownership of riverbed land is a material fact genuinely at issue. Contrary to defendant's assertions, title to the riverbed land must be resolved before the court can determine which, if any, land owned by the Tribes was mismanaged, not managed or subject to

[3]The court acknowledges the disorder surrounding the issues of this case, noting that despite repeated orders by this court to identify their claims with specificity, plaintiffs' complaints continue to be fraught with convoluted statements of their claims. Much of the delay in resolving this case was caused by plaintiffs' attorneys' lack of skill in drafting the complaint. Plaintiffs have never come forward with a clear and concise statement of their claims.

REPRODUCED AT THE NATIONAL ARCHIVES

unauthorized use by defendant. Accordingly, because there is a genuine issue of material fact, summary judgment is inappropriate in this case, and defendant's motion is denied.

*Quiet Title*

Because the threshold issue of what land constitutes the Arkansas riverbed is in controversy, this court lacks the necessary facts to decide the secondary issue of breach of fiduciary duty by defendant. The court cannot decide the underlying issue of whether defendant breached its duty to manage resources on tribal lands without knowing which specific lands were tribally owned. Relying on the dubious Holoway study and the partially completed BLM survey, the court has jurisdiction to quiet title between the Tribes and defendant on the portion of the riverbed that has been surveyed by BLM, and then decide the breach of duty to manage issue as to the land quieted. *See Gila Gin Co. v. United States*, 231 Ct. Cl. 1001, 1002-1003 (1982), holding that the court may make a determination of title to real property, so long as the determination is incident to a claim over which the court has independent jurisdiction. However, such action at this time would result in inefficient piecemeal quiet title actions.

In order to effectively and efficiently quiet their title and determine precisely where the Arkansas riverbed lies, the Tribes must include in their quiet title action all individuals owning land where the Arkansas River currently lies and where it lay prior to meandering. However, such an action is not possible in this court because it lacks jurisdiction to adjudicate claims between individuals. *Grundy v. United States*, 2 Cl. Ct. 596, 598 (1983). Therefore, in the interest of justice and judicial economy, title to the Arkansas riverbed must be quieted in district court, which has such jurisdiction, between the Tribes, the government, and any other interested individuals before this court can proceed with the instant action.[4] To avoid a premature decision by the court on the issue of defendant's breach of duty to manage, and relitigation of the action once title to the riverbed is quieted between all affected parties, common sense dictates that this court should suspend

[4]According to 28 U.S.C. § 2409a(a) (1988), the Quiet Title Act does not apply to trust or restricted Indian lands, indicating that the United States has not chosen to waive sovereign immunity for land which it holds in trust for Indians. However, pursuant to 43 U.S.C. § 666 (1988 & Supp. IV 1992), the United States may be joined in an action to adjudicate the rights of all claimants to a river; here the Arkansas River riverbed, but any such joinder would have to be in a case before a United States district court.

REPRODUCED AT THE NATIONAL ARCHIVES

plaintiffs' case until such time as plaintiffs have quieted title to the Arkansas riverbed. The court notes for the record that counsel for defendant has informed the court that it is preparing to file the quiet title action in the United States District Court for the Eastern District of Oklahoma.

## CONCLUSION

Accordingly, the cases are suspended pending quiet title determinations. All pending motions in this court are also suspended until specific legal title to the Arkansas riverbed is resolved.

**IT IS SO ORDERED.**

M. R. Tidwell

MOODY R. TIDWELL
Judge

FILED
FEB 17 1995
U.S. COURT OF FEDERAL CLAIMS

REPRODUCED AT THE NATIONAL ARCHIVES

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, | § | |
| Plaintiff, | § | |
| v. | § | No. 218-89L |
| THE UNITED STATES OF AMERICA, | § | Honorable Moody R. Tidwell |
| Defendant. | § | |

NOTICE OF APPEAL

Notice is hereby given that The Cherokee Nation of Oklahoma, plaintiff in the above-named case, hereby appeals to the United States Court of Appeals for the Federal Circuit, pursuant to 28 U.S.C. § 1291 and § 1295, from the following orders and portions thereof entered in this action:

1. That portion of the Order filed January 28, 1994, suspending this action pending quiet title determinations and suspending all pending motions until specific legal title to the Arkansas riverbed is resolved;[1/]

2. That portion of the Order filed October 11, 1990, barring certain claims by plaintiff pursuant to 25 U.S.C. § 2501.

1/ As noted later in this Notice of Appeal, the January 28, 1994 Order is appealable as a final decision under 28 U.S.C. §§ 1291 and 1295 because that Order stayed this action for, at least, a prolonged or uncertain period of time and effectively terminated any further litigation before the Court of Federal Claims. This appeal is timely brought under Rule 4 of the Federal Rules of Appellate Procedure, by virtue of the suspension of this case in the January 28, 1994 Order and the Court's further Orders (dated February 15, 1994 and December 21, 1994) staying all proceedings, including all contemplated proceedings with respect to the Court's January 28, 1994 Order, which secondary suspension expired on February 16, 1995.

3. That portion of the Order filed October 11, 1990, granting defendant's motion to dismiss for failure to state a claim with respect to plaintiff's claims for: (1) failure to evict casual trespassers from plaintiff's lands in general and failure to survey those lands; (2) failure to remove trespassers from plaintiff's farm and range lands and failure to issue farming and grazing leases; and (3) failure to manage plaintiff's timber lands;

4. That portion of the Order filed October 11, 1990, granting defendant's motion to dismiss on the basis of 28 U.S.C. § 1500 with regard to any claims which subsequently are shown to have arisen out of the construction of the Arkansas River Navigation System;

5. That portion of the Order filed October 11, 1990, granting defendant's motion to dismiss on the basis of *res judicata* for claims arising on land subject to defendant's navigable servitude;

6. That portion of the Order filed October 11, 1990, holding that the "continuing wrong" or "continuing claim" doctrine is not applicable to plaintiff's claims;

7. The Order entered October 29, 1990, granting defendant's motion for more definite statement and directing plaintiff to file an amended complaint;

8. The Order filed May 8, 1991, granting defendant's motion *in limine*, striking portions of the plaintiff's first amended complaint limiting plaintiff to those lands and causes of action which it identified with particularity in its amended complaint and which were not dismissed in the Court's October 11, 1990 Order, and ordering plaintiff to file a second amended complaint;

9. The Order filed August 21, 1991, denying plaintiff's motion for entry of final judgment under RUSCC 54(b);

REPRODUCED AT THE NATIONAL ARCHIVES

10. That portion of the Order filed January 9, 1992, granting defendant's motion to strike in part, limiting plaintiff's causes of action, and directing plaintiff to file a third amended complaint;

11. That portion of the Order filed March 5, 1992, granting defendant's motion to strike in part; deeming stricken from the Verified Third Amended Complaint any references to claims of trespass on lands in or adjacent to the Canadian, Grand and Verdigris Riverbeds, and Big Lake; and directing plaintiff to file a fourth amended complaint;

12. The Order filed May 19, 1992, denying plaintiff's request for voluntary withdrawal of the judge assigned this action;

13. The Order filed July 20, 1992, denying plaintiff's request for reconsideration of its request for voluntary withdrawal of the presiding judge;

The January 28, 1994 Order suspending this action is appealable as a final decision under 28 U.S.C. § 1291, in that the Order stayed this action for, at least, a prolonged or uncertain period of time; effectively terminated any further litigation before the Court of Federal Claims; and is otherwise appealable by virtue of the United States Supreme Court's decisions in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), *Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.*, 460 U.S. 1 (1982), and other authority which will be discussed in detail in plaintiff/appellant's Brief to be filed in this appeal.

REPRODUCED AT THE NATIONAL ARCHIVES

Respectfully submitted,

C. Allen Foster / by G. Kendrick Macdowell

C. Allen Foster
D.C. Bar No. 411662
PATTON BOGGS, L.L.P.
2550 M Street, N.W.
Washington, D.C. 20037
(202) 457-6000
Counsel of Record for Plaintiff
THE CHEROKEE NATION OF OKLAHOMA

OF COUNSEL:
G. Kendrick Macdowell
D.C. Bar No. 436375
William C. Foster
Katharine Boyce
PATTON BOGGS, L.L.P.

Dated: February 17, 1995

REPRODUCED AT THE NATIONAL ARCHIVES

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing NOTICE OF APPEAL was served by mailing a copy thereof, first-class mail, postage prepaid, addressed as follows:

Thornton Withers Field
U.S. Department of Justice
Environment and Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, DC 20044-0663

Emmett M. Rice
Assistant Regional Solicitor
U.S. Department of the Interior
Page Belcher Federal Building
333 West Fourth Street, Room 3800
Tulsa, OK 74103

Bob Rabon, Esquire
Kile, Rabon and Wolf
114 North Second Street
P.O. Drawer 726
Hugo, OK 74743

This 17th day of February, 1995.

G. Kendrick Macdowell

GB-18028

NOTE: Pursuant to Fed. Cir. R. 47.6, this order is not citable as precedent. It is a public record.

# United States Court of Appeals for the Federal Circuit

95-5055

THE CHEROKEE NATION OF OKLAHOMA,

Plaintiff-Appellant,

v.

THE UNITED STATES,

Defendant-Appellee.

---

95-5056

THE CHOCTAW NATION OF OKLAHOMA
and THE CHICKASAW NATION,

Plaintiffs-Appellants,

v.

THE UNITED STATES,

Defendant-Appellee.

ON MOTION

Before RICH, Circuit Judge.

**Ex. 5**
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

O R D E R

The parties have responded to this court's order directing the Cherokee Nation of Oklahoma (Cherokee Nation) and the Choctaw Nation of Oklahoma et al. (Choctaw Nation) to show cause why their appeals should not be dismissed as premature. The Cherokee Nation and the Choctaw Nation (collectively, the Nations) move to strike portions of the United States' response. The United States

opposes. The Choctaw Nation moves for leave to file an overlong response to the court's order. The Choctaw Nation states that the United States does not oppose. The Nations move for an extension of time to file their briefs.

The Nations sued the United States in the Court of Federal Claims seeking compensation for the alleged mismanagement of tribal mineral lands (i.e., the Arkansas riverbed) by the United States.[1] On January 28, 1994, the court suspended the cases pending quiet title determinations and suspended all pending motions until specific legal title to the Arkansas riverbed could be resolved. The Nations and the United States agree that the resolution of the numerous prospective quiet title cases, which will include "all individuals owning land where the Arkansas River currently lies and where it lay prior to meandering," may not occur for a number of years. The Nations argue that the January 28, 1994 order is thus appealable as a final decision under 28 U.S.C. §§ 1291 and 1295 because the order stayed their actions for a prolonged, uncertain period of time and effectively terminated any further litigation before the Court of Federal Claims. See, e.g., Kahn v. General Motors Corp., 889 F.2d 1078 (Fed. Cir. 1989) (potentially lengthy and indefinite stay pending resolution of separate district court action was final and appealable). Further, the Choctaw Nation states that the lands that have allegedly been mismanaged have been

[1] In 1970, the United States Supreme Court ruled that the Cherokee, Choctaw and Chickasaw tribes owned fee simple title to the Arkansas riverbed and that the United States held the riverbed lands in trust for the benefit of the tribes. Choctaw Nation v. Oklahoma, 397 U.S. 620 (1970).

sufficiently identified so that the lower court may proceed with a determination of damages.

The United States contends that the January 28, 1994 order is not a final, appealable order because the stay "only shifts part of the decision-making to another forum" and that the Nations' ownership of specific tracts of land must be established before the United States may be held liable for mismanagement. The United States also argues that the Nations' notices of appeal were not timely filed because they were not filed within 60 days of the January 28, 1994 order. See 28 U.S.C. § 2522; Fed. R. App. P. 4(a)(1). Finally, the United States asserts that the Nations may not appeal from the other orders cited in the notices of appeal, as those orders were interlocutory in nature.

We first address the United States' argument that the January 28, 1994 order is not a final, appealable order under 28 U.S.C. §§ 1291 and 1295. In Gould v. Control Laser Corp., 705 F.2d 1340 (Fed. Cir. 1983), cert. denied, 464 U.S. 935 (1983), this court noted that stay orders are not ordinarily regarded as final orders that may be reviewed on appeal. However, we recognized an exception where the appellant is "effectively out of court" as a result of the stay:

> A stay may be an appealable "final" decision, and thus within the jurisdiction of an appellate court, when it effectively puts the parties out of the district court, either permanently because it terminates the action as a practical matter, or, as some courts have held, for a protracted or indefinite period.

Gould, 705 F.2d at 1341 (citations omitted). In Gould, we declined to hold that the lower court had abused its discretion because the

stay of proceedings, pending the conclusion of a reexamination by the Patent and Trademark Office, was not for a protracted or indefinite period of sufficient length to render its issuance a final decision. Id.

In the present appeal, all parties agree that the stay will effectively postpone litigation for an indeterminate period of at least several years. The parties have not informed the court that any Arkansas riverbed quiet title actions have been filed by the United States or the Nations. The Choctaw Nation estimates that suits must be filed against several thousand alleged trespassers and that the completion of these actions may last more than twenty years. The Cherokee Nation states that the "many hundreds of cases" will not be concluded for decades. The United States also acknowledges that it may take a number of years to complete the quiet title actions. Accordingly, it appears that the stay issued by the Court of Federal Claims will suspend the Nations' actions for such a protracted and indefinite period that the stay is a final and appealable order under the "effectively out of court" standard. See Kahn v. General Motors Corp., infra; compare McKnight v. Blanchard, 667 F.2d 477 (5th Cir. 1982) (reviewing stay of proceedings for seven years or longer); Hines v. D'Artois, 531 F.2d 726, 730 (5th Cir. 1976) (when a stay order places an action in an "extended state of suspended animation," the stay must be viewed as final and appealable).

We now turn to the issue of the timeliness of the notices of appeal.[2] On February 10, 1994, the parties filed in the Court of Federal Claims a joint motion for a stay that stated, in pertinent part:

> On January 28, 1994, this Court entered an Order denying defendant's motion for summary judgment and staying further proceedings in this Court pending actions brought to quiet title to the Arkansas riverbed. The Court acknowledged those actions would take many years to complete. Pending the resolution of those actions, the plaintiffs would have no relief. As a result, both the plaintiffs and the defendant would seek reconsideration and modification of the Court's Order, again requiring further litigation and expense by all parties and the use of valuable and scarce judicial resources.

On February 15, 1994, the Court of Federal Claims stayed all further motions and proceedings until the adjournment of Congress, in order to facilitate settlement negotiations with congressional representatives. The congressional stay was subsequently extended until February 16, 1995. Thereafter, the stay of proceedings continued on the basis of the January 28, 1994 order, and it was at this time that the Nations were placed "effectively out of court." The Nations could not have filed a notice of appeal before this date because the stay order did not achieve its status as a final and appealable order until the possibility of settlement was nullified and it was certain that litigation would be effectively postponed for a protracted and indefinite period of time. Thus,

---

[2] The Nations move to strike portions of the United States' response concerning whether the notices of appeal were timely and whether the Nations may appeal from any orders other than the January 28, 1994 order. Because those portions of the United States' response also address the jurisdiction of this court, the motions to strike are denied.

the filing of the notices of appeal on February 17, 1995, one day after the reinstatement of the January 28, 1994 order, was timely.

Finally, we consider the United States' position that the Nations may not appeal from any orders other than the January 28, 1994 order. The United States argues that the orders specified in the Nations' notices of appeal are nonappealable, interlocutory orders. The Choctaw Nation contends that this court may review such orders under the doctrine of pendent appellate jurisdiction because they are "inextricably related" to the January 28, 1994 order.

The doctrine of pendent appellate jurisdiction allows an appellate court to review interlocutory orders that ordinarily would not be independently appealable when those orders are reviewed in connection with a final and appealable order. Intermedics Infusaid, Inc. v. Regents of Univ. of Minn., 804 F.2d 129, 134 (Fed. Cir. 1986).

> [T]he major factor in determining whether to exercise this jurisdiction is the extent that review of the appealable order will involve consideration of factors relevant to the otherwise nonappealable order.

Id. at 134 (citing General Motors Corp. v. New York, 501 F.2d 639, 648 (2d Cir. 1974)). We conclude that the interlocutory orders cited in the Nations' notices of appeal are not reviewable by this court. These orders are neither factually interrelated to nor interdependent with the January 28, 1994 stay order. See Intermedics, 804 F.2d at 134; see also United States ex rel. Valders Stone & Marble, Inc. v. C-Way Constr. Co., 909 F.2d 259, 262 (7th Cir. 1990) (pendent appellate jurisdiction is proper only

when orders are inextricably entwined and there are compelling reasons for immediate review). Thus, the Nations may only seek review of the January 28, 1994 order on appeal.

Accordingly,

IT IS ORDERED THAT:

(1) The stay of the briefing schedule is lifted.

(2) The Nations' motion to strike portions of the United States' response is denied.

(3) The Choctaw Nation's motion for leave to file an overlong response is granted.

(4) The Nations' motion for an extension of time is moot.

(5) The Nations' briefs are due within 30 days of the date of filing of this order.

APR 12 1996

Date

Giles S. Rich

Giles S. Rich
Circuit Judge

cc: C. Allen Foster, Esq.
Bob Rabon, Esq.
John T. Stahr, Esq.

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

APR 12 1996

FRANCIS X. GINDHART
CLERK

s10

# H.R. 103, H.R. 3476 and H.R. 3534

# LEGISLATIVE HEARING

BEFORE THE

## COMMITTEE ON RESOURCES
## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTH CONGRESS

SECOND SESSION

April 17, 2002

**Serial No. 107-105**

Printed for the use of the Committee on Resources

Available via the World Wide Web: http://www.access.gpo.gov/congress/house
or
Committee address: http://resourcescommittee.house.gov

U.S. GOVERNMENT PRINTING OFFICE

78-759 PS WASHINGTON : 2002

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250 Mail: Stop SSOP, Washington, DC 20402–0001

**Ex. 6**
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

COMMITTEE ON RESOURCES

JAMES V. HANSEN, Utah, *Chairman*
NICK J. RAHALL II, West Virginia, *Ranking Democrat Member*

Don Young, Alaska,
*Vice Chairman*
W.J. "Billy" Tauzin, Louisiana
Jim Saxton, New Jersey
Elton Gallegly, California
John J. Duncan, Jr., Tennessee
Joel Hefley, Colorado
Wayne T. Gilchrest, Maryland
Ken Calvert, California
Scott McInnis, Colorado
Richard W. Pombo, California
Barbara Cubin, Wyoming
George Radanovich, California
Walter B. Jones, Jr., North Carolina
Mac Thornberry, Texas
Chris Cannon, Utah
John E. Peterson, Pennsylvania
Bob Schaffer, Colorado
Jim Gibbons, Nevada
Mark E. Souder, Indiana
Greg Walden, Oregon
Michael K. Simpson, Idaho
Thomas G. Tancredo, Colorado
J.D. Hayworth, Arizona
C.L. "Butch" Otter, Idaho
Tom Osborne, Nebraska
Jeff Flake, Arizona
Dennis R. Rehberg, Montana

George Miller, California
Edward J. Markey, Massachusetts
Dale E. Kildee, Michigan
Peter A. DeFazio, Oregon
Eni F.H. Faleomavaega, American Samoa
Neil Abercrombie, Hawaii
Solomon P. Ortiz, Texas
Frank Pallone, Jr., New Jersey
Calvin M. Dooley, California
Robert A. Underwood, Guam
Adam Smith, Washington
Donna M. Christensen, Virgin Islands
Ron Kind, Wisconsin
Jay Inslee, Washington
Grace F. Napolitano, California
Tom Udall, New Mexico
Mark Udall, Colorado
Rush D. Holt, New Jersey
James P. McGovern, Massachusetts
Anibal Acevedo-Vila, Puerto Rico
Hilda L. Solis, California
Brad Carson, Oklahoma
Betty McCollum, Minnesota

Tim Stewart, *Chief of Staff*
Lisa Pittman, *Chief Counsel/Deputy Chief of Staff*
Steven T. Petersen, *Deputy Chief Counsel*
Michael S. Twinchek, *Chief Clerk*
James H. Zoia, *Democrat Staff Director*
Jeffrey P. Petrich, *Democrat Chief Counsel*

# CONTENTS


| | Page |
|---|---|
| Hearing held on April 17, 2002 | 1 |
| Statement of Members: | |
| Carson, Hon. Brad, a Representative in Congress from the State of Oklahoma | 91 |
| Prepared statement on H.R. 3534 | 92 |
| Hansen, Hon. James V., a Representative in Congress from the State of Utah | 1 |
| Prepared statement on H.R. 103, H.R. 3476, and H.R. 3534 | 2 |
| Hayworth, Hon. J.D., a Representative in Congress from the State of Arizona | 6 |
| Prepared statement on H.R. 103 | 6 |
| Issa, Hon. Darrell, a Representative in Congress from the State of California | 3 |
| Prepared statement on H.R. 3476 | 5 |
| Kildee, Hon. Dale, a Representative in Congress from the State of Michigan | 3 |
| Prepared statement on H.R. 103 | 57 |
| Prepared statement on H.R. 3476 | 3 |
| Prepared statement on H.R. 3534 | 96 |
| Pallone, Hon. Frank, Jr., a Representative in Congress from the State of New Jersey, Prepared statement on H.R. 3476 | 100 |
| Rahall, Hon. Nick J. II, a Representative in Congress from the State of West Virginia | 9 |
| Prepared statement on H.R. 103, H.R. 3476, and H.R. 3534 | 9 |
| Watkins, Hon. Wes, a Representative in Congress from the State of Oklahoma | 94 |
| Prepared statement on H.R. 3534 | 95 |
| Statement of Witnesses: | |
| Anoatubby, Bill, Governor, The Chickasaw Nation | 79 |
| Prepared statement on H.R. 3534 | 80 |
| Avery, Jim, Senior Vice President, San Diego Gas & Electric | 38 |
| Prepared statement on H.R. 3476 | 39 |
| Brulte, Hon. Jim, State Senator, The State of California | 7 |
| Prepared statement on H.R. 3476 | 8 |
| Garcia, Joe A., Tribal Councilman, San Juan Pueblo Indians | 57 |
| Prepared statement on H.R. 103 | 59 |
| George, Keller, President, United South and Eastern Tribes, Inc. | 65 |
| Prepared statement on H.R. 103 | 68 |
| Macarro, Mark, Chairman, Pechanga Band of Luiseno Mission Indians | 33 |
| Prepared statement on H.R. 3476 | 35 |
| Marquez, Deron, Chairman, San Manuel Band of Mission Indians | 60 |
| Prepared statement on H.R. 103 | 63 |
| Pyle, Gregory, Chief, Choctaw Nation of Oklahoma | 81 |
| Prepared statement on H.R. 3534 | 82 |
| Smith, Chad, Principal Chief, The Cherokee Nation | 85 |
| Prepared statement on H.R. 3534 | 87 |
| Smith, Wayne, Deputy Assistant Secretary—Indian Affairs, Bureau of Indian Affairs, U.S. Department of the Interior | 11 |
| Prepared statement on H.R. 103 | 28 |
| Prepared statement on H.R. 3476 | 12 |
| Prepared statement on H.R. 3534 | 31 |

# LEGISLATIVE HEARING ON H.R. 3476, TO PROTECT CERTAIN LANDS HELD IN FEE BY THE PECHANGA BAND OF LUISENO MISSION INDIANS FROM CONDEMNATION UNTIL A FINAL DECISION IS MADE BY THE SECRETARY OF THE INTERIOR REGARDING A PENDING FEE TO TRUST APPLICATION FOR THAT LAND, AND FOR OTHER PURPOSES; H.R. 103, TO AMEND THE INDIAN GAMING REGULATORY ACT TO PROTECT INDIAN TRIBES FROM COERCED LABOR AGREEMENTS; AND H.R. 3534, TO PROVIDE FOR THE SETTLEMENT OF CERTAIN LAND CLAIMS OF THE CHEROKEE, CHOCTAW, AND CHICKASAW NATIONS TO THE ARKANSAS RIVERBED IN OKLAHOMA.

**Wednesday, April 17, 2002**
**U.S. House of Representatives**
**Committee on Resources**
**Washington, DC**

The Committee met, pursuant to call, at 10 a.m., in room 1334, Longworth House Office Building, Hon. James V. Hansen (Chairman of the Committee) presiding.

## STATEMENT OF THE HON. JAMES V. HANSEN, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF UTAH

The CHAIRMAN. The Committee will come to order. Good morning. It is good to see you all here. I notice there is a group of folks standing. We are not going to use this bottom tier here today. If you want to come up and take it, if you can stand the embarrassment of sitting up there, we would love to have you come up and take it.

[Laughter.]

The CHAIRMAN. We normally like to use 1324 for our hearings. That is the room on the other end, but there is some work being done on it right now, so we all are stuck in this little room.

Mr. HAYWORTH. Actually, it is a part of a cultural exchange with our friends from Switzerland, neutrality.

[Laughter.]

Mr. HAYWORTH. Other questions or comments at this point on H.R. 103 for Mr. Smith?

If not, then, friend, it is time to turn to H.R. 3534. I know Mr. Carson has more than a casual interest in this.

Mr. SMITH. Hopefully on my third strike.

This bill has a long and rather sordid legal history. I will skip over that. It is in my testimony, but the chiefs of the tribes that will come after me are much more knowledgeable than I am about that history. I will let them speak to that.

What I would like to speak to is the status of the current negotiations to try to settle this case, and the Department has appointed a team to attempt to negotiate a settlement of the Court of Federal Claims cases that are currently pending. The team is composed of representatives of the BIA, the Solicitor's Office, and the Bureau of Land Management.

Representatives of the team have met on numerous occasions with the attorneys of the Cherokee, Choctaw, and Chickasaw Nations to reach agreement on the support of the Department of Interior for the bill. Such discussions have centered on the valuation of elements of damages claimed by the nations.

The parties are working toward an agreement as to the amount that can be recommended to Congress for settlement of the claim. While agreement has not been reached, the parties are making substantial progress on the agreement. At this time it appears there exists substantial disagreement on only one element of damages. That element is the subject of ongoing meetings between the Federal negotiating team and the nations' attorneys. I would like to emphasize here that I believe we are very close to an agreement.

The Court of Federal Claims is also interested in the settlement of the pending claims, and has held a series of status conferences to ensure that settlement discussions are proceeding. The next status conference is scheduled for June 19th. We believe the Congress should not proceed in ratifying a settlement until the parties have reached agreement on all issues.

We believe that continued discussion by the parties may result in a negotiated settlement between the Department and the Nations. The settlement should achieve two goals: one, resolve the financial elements; and, two, resolve the quiet title issues.

In addition, the Federal negotiation team has discussed amending certain parts of the bill. The team will be working with the Committee to clarify the description of lands disclaimed, the transfer of real property interest, particularly in the areas where the navigation system was channelized across fee lands acquired by the U.S. Army Corps of Engineers, and certain other matters, including express waiver of certain future claims.

This concludes my prepared statement. I would be happy to answer questions.

[The prepared statement of Mr. Smith follows:]

**Statement of Wayne Smith, Deputy Assistant Secretary—Indian Affairs, U.S. Department of the Interior, on H.R. 3534**

Good morning, Mr. Chairman and Members of the Committee. I am pleased to appear before you today concerning the Department's views on H.R. 3534, the "Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act". Since the subject of this legislation is pending litigation, I can only provide you with a background and status of the issue.

*BACKGROUND*

This case originated in the mid–1960's when the Cherokee, Choctaw and Chickasaw Nations (Nations) filed suit against the State of Oklahoma for a declaratory judgment regarding ownership of the Arkansas Riverbed. The case culminated in a decision by the United States Supreme Court holding that ownership of the Arkansas Riverbed remained in the Nations. See Choctaw Nation v. Oklahoma, 397 U.S. 620 (1970). The Supreme Court did not attempt to designate the particular tracts owned by the United States in trust for the Nations.

Thereafter, the United States District Court for the Eastern District of Oklahoma, held that the State of Oklahoma had no further interest in the Arkansas Riverbed. Again, there was no ruling as to the ownership of the particular tracts of land. The Court transferred the ownership of certain oil and gas leases executed by the State of Oklahoma to the Bureau of Indian Affairs (BIA) for the benefit of the Nations. See Cherokee and Chickasaw v. Oklahoma, No. 6219–Civil (Judgment filed Jan. 21, 1977) and The Choctaw and Chickasaw Nations v. the Cherokee Nation, No. 73–332–Civil (Judgment filed April 15, 1975).

The Nations then sued the United States arguing that the construction of the Kerr–McClelland Navigation System was a taking by the United States of the Tribe's ownership of the riverbed. This case ultimately went to the United States Supreme Court. The Court held that the Nations' interest was subject to the navigation servitude retained by the United States. See United States v. Cherokee Nation of Oklahoma, 480 U.S. 700 (1987). The Court stated that the United States has the power to deepen the water or erect structures which it may believe to aid navigation.

What is not directly resolved by the 1987 case is the ownership of specific tracts of dry lands owned by the Nations after avulsive changes in the river's course, as discussed by the Supreme Court in the first decision. After the 1970 decision, the United States obtained a study done by Holway and Associates, a private company located in Oklahoma City, Oklahoma. This study outlined the dry land areas that were considered to be owned by the Nations. As a result of the Holway study, the United States began leasing the minerals located in those areas. The BIA determined that there might be problems with the Holway study, and a second study was done by the Bureau of Land Management(BLM). This study, like the Holway study, examined the entire length of the riverbed.

In 1989, the Nations filed two lawsuits against the United States in the Court of Federal Claims. See Cherokee Nation of Oklahoma v. United States ; No. 218–89–L (Ct.Fed.Cl.) and Choctaw and Chickasaw Nations v. United States, No. 630–89–L (Ct. Fed. Cl.), seeking damages from the United States for the failure to restore the Nations possession of the tracts claimed. The cases have been pending since that time.

Quiet title lawsuits have been filed regarding certain tracts of land along the Arkansas River. The Cherokee Nation quieted title to one tract of land, in Cherokee Nation of Oklahoma v. Mathis, Case No. 87–193–C (E.D. Okla. Judgment filed Nov. 27, 1989). This judgment quiets title in a single tract of land containing 124.942 acres in Section 9, Township 10 North, Range 24 East, of Sequoyah County, Oklahoma.

The United States initiated a quiet title lawsuit covering the claim areas in two sections of the Riverbed. See United States v. Pates Farms, et al., Case No. CIV–97–685–B. This lawsuit sought to quiet title to tracts in Sections 31 and 32, Township 11 North, Range 27 East, Sequoyah County, Oklahoma. The case was dismissed by the Court on technical grounds and has not been refiled because of the pending settlement efforts.

*CURRENT STATUS*

The Department has appointed a team to attempt to negotiate a settlement of the Court of Federal Claims cases. The team is composed of representatives of the BIA, the Solicitor's Office and BLM. Representatives of the team have met on numerous occasions with the attorneys for the Cherokee, Choctaw and Chickasaw nations to reach agreement on the support of the Department of the Interior for the bill. Such discussions have centered on the valuation of elements of damages claimed by the

Nations. The parties are working towards an agreement as to the amounts that can be recommended to Congress for settlement of the claim. While agreement has not been reached, the parties are making substantial progress on the agreement. At this time, it appears that there exists substantial disagreement as to only one element of damages. That element is the subject of ongoing meetings between the Federal negotiation team and the Nation's attorneys.

The Court of Federal Claims is also interested in the settlement of the pending claims and has held a series of status conferences to insure that settlement discussions are proceeding. The next status conference is scheduled for June 19. We believe the Congress should not proceed in ratifying a settlement until the parties have reached agreement on all issues.

*COMMENTS ON H.R. 3534*

We believe that continued discussion by the parties may result in a negotiated settlement between the Department and the Nations. The settlement should achieve two goals: (1) resolve financial elements, and (2) resolve quiet title issues. In addition, the Federal negotiation team has discussed amending certain parts of the bill. The team will be working with the Committee to clarify the description of lands disclaimed, the transfer of real property interests, particularly in areas where the Navigation System was channelized across fee lands acquired by the U.S. Army Corps of Engineers and certain other matters, including an express waiver of certain future claims.

This concludes my prepared statement. I regret that I cannot speak more specifically on the proposed legislation due to the litigation of the matter. We look forward to working with the Committee on the settlement legislation once an agreement has been reached by all parties involved.

---

Mr. HAYWORTH. Thank you, Mr. Smith.

The Committee is aware that the United Keetoowah Band of Cherokee has concerns about whether this bill will adequately protect its interest. To what extent has the United Keetoowah Band been involved in the development of the settlement agreement?

Mr. SMITH. I am not really aware of that. I can't answer that.

Mr. HAYWORTH. Could you check on that?

Mr. SMITH. I can check and get back to you, I think. Sure.

Mr. HAYWORTH. We would appreciate that. Can the administration account for or summarize the values placed on the various elements of H.R. 3534 and how these values arrive at a total of over $41 million?

Mr. SMITH. We have a chart I would be happy to submit to you, rather than read it on the record, if you want me to, and give you the amounts that the different positions—the amounts that were agreed to. I would be happy to submit that to you. The only thing that is outstanding, Mr. Chairman, is the sand and gravel cost, and that is the one that is still under negotiation. All the rest of them have been agreed to.

Mr. HAYWORTH. Mr. Smith, if the United States is unable to reach a settlement with the three nations on the issues in H.R. 3534, what would be the administration's course of action?

Mr. SMITH. To continue litigation, but I don't believe that is what is going to happen. The litigation could go on probably 10, 15, 20 more years, and that is just not tenable for either party. Like I testified to, I believe that both the government as well as the nations are very close to settlement, and I think you will hear from the nations that that is indeed the case.

Mr. HAYWORTH. Thank you, sir.

I turn to the Ranking Member. Any questions or comments?

Mr. RAHALL. No, thank you.

Mr. HAYWORTH. Any questions or comments? The Gentleman from Oklahoma, Mr. Carson.

Mr. CARSON. No real questions for Mr. Smith, other than to thank you for being here today and thank you for the ongoing negotiations, and I think you have answered a couple of questions I had to Mr. Hayworth, and I look forward to talking about the issue more here in a few minutes, as well. Thank you.

Mr. HAYWORTH. I thank the Gentleman from Oklahoma, who was born in Winslow, Arizona. We always appreciate that, the Sixth District of Arizona. For purposes of full disclosure, Mr. Rahall, we had to point that out.

The Gentleman from Michigan.

Mr. KILDEE. I will probably wait until Governor Anoatubby and Chief Smith and Chief Pyle will be testifying, and have some statements and questions at that time.

Mr. SMITH. Thank you. They are far more knowledgeable than I.

Mr. KILDEE. Thank you.

Mr. HAYWORTH. Thank you. Any other questions or comments for Wayne?

If not, then, Mr. Smith, we thank you, and we appreciate your offer to stick around or have capable folks who work with you to hang around, lend an ear and an opinion as the day continues along.

Mr. SMITH. Thank you, Mr. Chairman. I will get someone more capable than I to stick around. Thank you.

Mr. HAYWORTH. Thanks very much. Now, panel three. we will call on Mark Macarro, the Chairman of the Pechanga Band of Luiseno Mission Indians, and also James P. Avery, the Senior Vice President of San Diego Gas & Electric. Gentlemen, if you would join us front and center, we would appreciate it.

Again, gentlemen, we welcome you, and we reaffirm from the Chair that your entire statements will be included in the record of today's proceedings, and we would appreciate a summarization of those statements. Chairman Macarro, when you are prepared to commence, we welcome you and we look forward to your testimony. Thank you, sir.

## STATEMENT OF MARK MACARRO, CHAIRMAN, PECHANGA BAND OF LUISENO MISSION INDIANS

Mr. MACARRO. [Greetings in native language.] My name is Mark Macarro. I am the Tribal Chairman for the Pechanga Band of Luiseno Mission Indians, and I simply said greeting in our Luiseno language. Hello, and it is good to be with all of you here today. Thank you for being here, and hi to all my friends and relations from here, and fellow Indians.

Mr. Chairman, I want to thank also Congressman Darrell Issa for introducing this bill, and Congresswoman Bono and Congressman Calvert for cosponsoring this bill on behalf of our people. With all my heart, I ask for your full support of H.R. 3476. Simply, H.R. 3476 would temporarily protect unique and sacred lands called the Great Oak Ranch. While we want the Great Oak protected forever, H.R. 3476 just keeps these special lands from utility line condemnation until a final decision is made by the U.S. Secretary of Interior on our pending fee to trust application.

Last May we culminated a 20-year effort to purchase the 697 acres now known as the Great Oak Ranch, to join together the two existing portions of our reservation. Our people have worked long and hard over many years to reacquire these ancestral lands, so we filed an application with Interior through the BIA to have the Great Oak Ranch placed into trust as part of our existing reservation.

For the people of Pechanga, returning ancestral lands to our reservation is a duty that transcends easy expression by me here today. For example, in 1875 our last aboriginal village for our people, we were the subject of an eviction through a Federal decree of ejectment. It was a forced eviction that took place in the Temecula Valley. And for 7 years, until the establishment of our reservation in 1882 by executive order, we had no lands.

So the rugged, undeveloped landscape of the Great Oak Ranch is rich with spiritual, cultural, and archaeological resources. These lands are where the Pechanga people came into being, and these lands are where the Pechanga people will always be.

These lands are likewise important to the entire Temecula community and valley, and home to many irreplaceable resources, both cultural and natural. These ranch lands include the former home of Erle Stanley Gardner, author of the famed Perry Mason novels.

And the centerpiece of these lands is its namesake, the Great Oak. Dated by UCLA at more than 1,500 years, it is heralded as the oldest known coastal live oak, Quercus agrifola. It stands majestically at more than 96 feet in height with a massive trunk nearly 20 feet in circumference. Each branch, larger than most live oak trunks, rises to touch the sky and then bends down to touch the earth, creating a natural, serene, cathedralesque sanctuary. It was underneath these great branches that Pechanga members held sacred ceremonies eons ago, and now at the dawn of a new century the Pechanga people are once again gathering under the Great Oak canopy.

Just days ago we were notified by the BIA Pacific Regional Office of their intent to take the Great Oak Ranch into trust for the Pechanga people, acknowledging the following, and I quote:

"The sole purpose of the acquisition is the preservation and protection of Luiseno people's natural and cultural resources. The Pechanga Band is committed to protecting and preserving the invaluable and irreplaceable cultural resources of the Pechanga and Luiseno people. The cultural resources located within the Great Oak Ranch provide the Pechanga Band with unique opportunities to protect and preserve such resources on property owned by the Band itself."

These words from the Federal Government validate the emotion in our hearts about the Great Oak Ranch, and that it should come home to its native family.

It is our understanding, however, that this decision by the BIA will be appealed by Sempra Energy so that they can run a massive power line within feet of the Great Oak Ranch itself. And while Interior's Notice of Intent specifically states, I quote, "Sempra Energy's proposed route across the Great Oak Ranch is only one of several possible routes for a new 500,000-volt power line," Sempra has relentlessly pressed for this route. They have indicated to the

So we have been in that situation, too, because we do offer jobs above the pay scales that you can get in the general community or other jobs in the State. We have been able to retain our employees, and we have a very satisfactory level. That is why we haven't had any attempts of unions to organize up to now, but it is mandated by law, and that is what we are saying.

But if we had that same authority or same ability such as grocery stores that are in the news lately, that they can tell their employees, "These are the benefits you are going to get," and offset what the unions are telling them that is all we are saying.

I am not against the union and I am not necessarily for unions. I have never belonged to a union because the majority of my time of being around was in the military and then working for my nation. So we are not opposed to unions, but there should be a level playing field on how the process is. That is all we are saying, and we appreciate this, because the debate has started and I think we have to take a closer look at this, because some States, as I said, are using this one law to bypass another law, and we are very concerned about that.

Mr. HAYWORTH. The Gentleman from Hawaii, Mr. Abercrombie.

Mr. ABERCROMBIE. Well, I couldn't help but observe, Mr. Chairman, that even though Mr. Miller couldn't eat in his mother's restaurant, he apparently was able to find some other venues. He doesn't look too undernourished to me.

[Laughter.]

Mr. HAYWORTH. Rising to the defense of my colleague on the minority side—

Mr. ABERCROMBIE. Well, Mr. Chairman, I might observe you are not exactly the one that should be rising to—

[Laughter.]

Mr. HAYWORTH. I was going to point out, Mr. Abercrombie, that though you are blessed with the figure of Adonis, you also perhaps have some—

Mr. MILLER. I think we ought to stop this whole conversation.

Mr. HAYWORTH. But we are not going to go there any longer. We all appreciate the chance to understand that there is a preponderance of physical evidence that we certainly enjoy the finer points of gourmet eating.

Mr. MILLER. Mr. Abercrombie has been known as a scratch knife and fork man for a lot of years.

Mr. ABERCROMBIE. Mr. Chairman, I will admit that I did bulk up for winter, but I have seen the light.

Mr. HAYWORTH. Well, that is good to know, and we look forward to other nutritional guidelines in the days ahead, perhaps not through an act of Congress but informal advice for all of us.

We also welcome to the dais the Gentleman from Idaho, and he is happy to be here. And I would ask, as I thank our witnesses for being here with this panel, we will continue to have the debate and we appreciate you coming in and being with us today. Thank you for your time and your testimony.

As we welcome up panel five, I would also ask unanimous consent that the Gentleman from Oklahoma, Mr. Watkins, be able to join us here for the testimony. Objection?

Hearing none, so ordered.

Mr. HAYWORTH. And we welcome Congressman Watkins even as we welcome Governor Bill Anoatubby of the Chickasaw Nation, Principal Chief Chad Smith of the Cherokee Nation, and Gregory Pyle, the Chief of the Choctaw Nation of Oklahoma, as they come to testify on H.R. 3534, to provide for the settlement of certain land claims of the Cherokee, Choctaw, and Chickasaw Nations to the Arkansas River bed in Oklahoma. Thank you gentlemen for coming. Governor Anoatubby, welcome. Appreciate your coming, Bill, and look forward to your testimony.

**STATEMENT OF BILL ANOATUBBY, GOVERNOR, CHICKASAW NATION**

Mr. ANOATUBBY. Good morning, Mr. Chairman and members of the Committee. Thank you very much for including us in this hearing, and to say we are privileged to be here to speak to the gist of an issue that is certainly of great importance to us and to the other two tribes here. You have my written testimony, Mr. Chairman, and we certainly know that is part of the record so we will keep the comments brief this morning, or excuse me, this afternoon.

This is an issue that has been on our table for many, many years. In fact, as a result of the Supreme Court ruling in 1970, these three tribes have been restored ownership of the bed and banks of the Arkansas River, and you will hear more of the details regarding that ownership and history of that ownership and the legal history from the other two witnesses.

Let me just simply express a few thoughts here. For 32 years, actually for 95 years, the three tribes were denied access, denied the fact that they owned this property. Then after the Supreme Court ruling, we have actually been denied access. It is time for us to bring this to a settlement.

At this point we are further ahead and closer to settlement than perhaps we have been in many years.

We are thankful that this Congress is taking up this legislation. We are thankful for the authors, for Mr. Carson and his effort to bring this bill forward, and we are also thankful at this point for the Bureau of Indian Affairs; some people may wonder how you could hear those words uttered from the lips of a tribal chairperson and a Governor, but we are thankful that they have come to the table and appointed a negotiation team to deal with this. We are so very close now in coming to agreement.

This legislation that you have before you is beneficial not only to the Indian tribes in question but also to many citizens of the State of Oklahoma, especially those who are residing in property, on property, or utilizing property that is in question here. So this is not just a good thing for the tribes but it also is good for Oklahoma to settle this issue.

I listened to Mr. Smith's testimony, and I think that if you listened carefully you see that it shows some encouragement and that there are some decisions that we are getting close to making. But one thing that he indicated that I respectfully request that this Committee please do not take into account and listen wholeheartedly, we do not need to delay this legislation in any way.

In fact, this bill has brought us closer and closer to reaching a settlement or calculating a number that we can agree to. Also the court case, the judge is awaiting how this legislation should proceed. So I would ask humbly that this august body continue to consider this legislation and to move it forward. We have been trying to resolve this issue for over 30 years, and if it weren't for this legislation and the court case, it is highly likely we would not be where we are today and as near to a settlement as we are.

So I am here to support the legislation. I am here to ask your consideration and your support for it, and I ask you please, move it forward. Thank you.

[The prepared statement of Mr. Anoatubby follows:]

**Statement of The Honorable Bill Anoatubby, Governor, Chickasaw Nation**

Mr. Chairman and members of the Committee:

I am Bill Anoatubby, Governor of the Chickasaw Nation. It is a pleasure for me to appear before this committee and I appreciate your inviting me to do so. As you will be hearing (or have already heard) from the other tribal leaders, I will keep my remarks brief.

This committee is presented with the opportunity to begin to right an injustice on behalf of the United States that has endured for almost a century. We are here before you after an almost 40-year struggle in dozens of courts, including the U.S. Supreme Court; however, it has been made abundantly clear to all who have visited this situation that it can only be resolved by Congress. We seek your help.

Please allow me to briefly outline the history of this matter that brings us to where we are today. In the early 19th century, these three tribes entered into treaties with the United States Government to give up millions of acres of land in the east and to remove westward to allow for growth and expansion of the country's frontiers. In exchange, we were conveyed lands in what is now Eastern Oklahoma. For the remainder of the century, the tribes had complete governance over their respective territories and domains; however, subsequent actions by Congress, particularly the allotment process under the Dawes Act, reduced their domains to a little more than 100,000 acres. Those lands include the bed of the Arkansas River from its confluence with the Canadian River eastward to the Arkansas–Oklahoma state line, approximately 65 miles.

It has been determined through various court decisions and agreements that from Muskogee, Oklahoma to the confluence of the Canadian, Cherokee Nation owns the entire riverbed. From the Canadian confluence down to the Arkansas State Line, the Cherokee Nation owns the north half of the riverbed and the Choctaw and Chickasaw nations own the south half. Due to meanderings of the river over the past century, the wet bed and dry lands of the bed comprise over 25,000 acres of land, the title to which is held by the United States in Trust for the three tribes.

The tribes' problems began when Oklahoma became a state in 1907. Relying on an erroneous opinion in 1908 by the solicitor, the U.S. Department of the Interior incorrectly assumed that Oklahoma became the owner of the riverbed. In 1946, the government began construction of the Kerr–McClellen Navigation System on the river. Because of the misplaced belief that the state of Oklahoma owned the riverbed, the tribes were neither consulted nor compensated for the taking of thousands of acres and extensive damage to their property.

In 1970, the U.S. Supreme Court ruled that the title to the riverbed was in the tribes when Oklahoma became a state and, therefore, it could not have passed to the state under the Equal–Footing Doctrine. Thus, the tribes continued to own the riverbed as they did in 1907 and 1946, and as they do today.

For 60 years prior to 1970, the Bureau of Indian Affairs did not exercise its trust responsibility to protect and exploit these tribal lands. As a result, adjacent landowners began to occupy the portions of riverbed that were dry land and continue to be in possession today depriving the tribes of the use of their dry surface lands. Mineral interests either went undeveloped or were exploited by others claiming to own them. Millions of tons of sand and gravel were mined from the riverbed and used to construct the structures required in the navigation system without compensation to the tribes. The tribes have lost tens of millions of dollars for which they would have otherwise been compensated but for the mistaken belief by the government that they were not the rightful owners.

In 1989, the tribes brought suit in the Claims Court seeking damages for the failure of their Trustee to properly manage this property. That litigation is still pending but would be dismissed if this settlement is approved.

For 20 years after the 1970 decision, the boundaries of the tribal lands went undetermined. Finally, in 1990, the Bureau of Land Management began and has completed a cadastral survey of the riverbed lands. However, due to the fact that the boundaries were created by river meanderings, the title to the lands remained in question until the survey was completed about 1995. During this 25-year period, it was difficult to properly and completely exploit the oil and gas interests due to the title situation. Thus, income was not received that would otherwise have been paid to the tribes, contributing to the tens of millions of dollars already lost.

The tribes have spent countless hours over the past 30 years and hundreds of thousands of dollars calculating their losses, meeting with various government officials and litigating in the courts. Our experts and advisors have meticulously studied the records and made estimates and appraisals to determine those losses and evaluating our riverbed property. You have or will have that information before you.

As I said earlier, the government and the tribes can only extricate themselves from the quagmire they find themselves and achieve justice with your help. The legislation you are considering will benefit everyone concerned. The tribes will finally be compensated for the long-standing damages they have endured because of the circumstances that bring us here. The litigation in the U.S. Court of Claims will end. The tribes will disclaim their interest to the thousands of acres of land occupied by others who thought they were the rightful owners. For this, the tribes would also be fairly and justly compensated. The government will be relieved of its Trust responsibility to remove the thousands of third-party occupants which could take up to 20 years to litigate at a cost of tens of millions of dollars. But, just as importantly, with the passage and implementation of this legislation, this tragic saga would finally come to an end.

Thank you very much for having me here today. I respectfully ask you to approve H.R. 3534.

---

Mr. HAYWORTH. Thank you, Governor, and now we will hear from Chief Smith. Welcome.

Mr. SMITH. Mr. Chairman, with regard, Chief Pyle goes next.

Mr. HAYWORTH. OK, then, we will turn to Chief Pyle and we will await Chief Smith after a while.

## STATEMENT OF GREGORY E. PYLE, CHIEF, CHOCTAW NATION OF OKLAHOMA

Mr. PYLE. Thank you, Mr. Chairman, and members of the Committee. My name is Greg Pyle. I am Chief of the Choctaw Nation of Oklahoma. Today I had submitted 10 pages of written. I will condense it down to one page, if it pleases everyone, for time constraints.

I am here today to support passage of a long-awaited resolution, the tribal claims relating to the Arkansas River bed in eastern Oklahoma. That would be H.R. 3534, introduced and supported by Congressmen Carson, Watkins, Kildee, and Largent. The Choctaw, Cherokee, and Chickasaw Nations come before you today to present a proposal of settlement of disputes regarding Arkansas River bed. We prefer a settlement rather than litigation to displace thousands of occupants along the river.

Prior to the 1800's, the three tribes lived in the southeastern region of the United States. The lands occupied by the tribal people made tempting targets for European neighbors moving in during the late 1700's and early 1800's. Aggressive efforts were made to force the tribal people to move off their lands, and in 1831 the Choctaws were the first of three tribes to travel the Trail of Tears to what is now Oklahoma.

As part of the resettlement process, the tribes signed treaties giving up lands in the homelands and taking ownership of lands and waters in the new territories. The terms of the treaties were dictated by the United States, and included transfer in fee simple of all title and rights to the riverbed of the Arkansas River.

Over the course of the years, the riverbed has shifted, creating over 7,500 acres of dry land. Farmers moved onto the property and are farming it today without legal authority. Also, sand, gravel, coal and gas resources associated with the river were extracted and sold by non-Indians, without any consideration or compensation to the tribes. This creates a problem with tribal ownership being asserted.

In the 1940's the Kerr-McClellan Dams and power generation system was developed and built on the Arkansas River. Without any regard to tribal rights, millions of tons of sand and gravel and stretches of useable land associated with the river were taken by the Federal Government. To this day, there has been no compensation to the tribes for this taking. This is possibly the only instance where tribal trust property supposedly under Federal protection was taken by the Federal Government without any consideration or compensation.

In 1970 the Supreme Court held that the three tribes owned all rights to the Arkansas River and its resources. In 1989, action was filed in Federal court for damages for mismanagement of tribal trust properties.

We do not want the disruption of personal lives and fortunes which would be caused if the United States had to file between 600 and 800 cases to clear the tribal title and displace current possessors of the 7,500 acres of land on the river and that the tribes are reclaiming. Once the first acts are filed, title to property along the river could be clouded for decades.

We proposed to the congressional committee that compensation be paid from the Federal Government rather than penalize the individuals using the property along the riverbed. The tribes proposed legislation beginning at over $100 million, and now proposed at $41 million, in compensation of loss of tribal resources, and it buys 7,500 acres of land, minerals, as well as makes provision for the government to take steps to clear the title of land for the current occupants. The bill also contains a one-time payment of about $8 million for the continued production of electricity by power heads located on the river.

Simply speaking, the tribes are willing to give up all their rights, past and present and future, in the 7,500 acres of land created by this wandering Arkansas River, in return for these payments. Thank you.

[The prepared statement of Mr. Pyle follows:]

**Statement of The Honorable Gregory Pyle, Chief, Choctaw Nation of Oklahoma**

Mr. Chairman, Members of the Committee, ladies and gentlemen.

My name is Greg Pyle and I am the Chief of the Choctaw Nation of Oklahoma. I am here today to support the passage of a long-awaited resolution to the tribal claims relating to the Arkansas Riverbed of Eastern Oklahoma, H.R. 3534, introduced and supported by Congressmen Carson, Watkins, Kildee and Largent. I say long awaited, since claims involving the River itself and the resources and lands associated with it have been before the Courts, the Tribal Councils and the Con-

gress continuously over the past 35 years. We are asking today for legislative support which would lay to rest all these issues, and which would benefit the United States, the Tribes and all the citizens of Oklahoma. We are asking for your support today as a matter of equity and as a matter of fulfilling the government to government and trust relationships between our tribes and our Country.

*Background*

Prior to the 1800s, the Choctaw and the Cherokee and Chickasaw Nations lived, and had lived from time immemorial, in the Southeastern region of the United States. We were good friends to the colonists, supporters of the fledgling Nation and had been very successful in accommodating our agrarian lifestyle to that of our new, European neighbors. Unfortunately, our lands made tempting targets, and soon, various factions were lobbying to take over the lands of the Choctaws. For a period we resisted, but, with the other tribes of the Southeast, we were forced to give up our lands. Our Tribes were forcibly removed to what was then the newly purchased territory of Oklahoma, the so-called Indian territory. This removal, known as the Trail of Tears, took place in stages in the 1830s. As part of this policy and resettlement, our Tribes signed treaties giving us title to lands and waters in the new territories. These treaties, the terms of which were dictated by the United States, included transfer, in fee simple, of all title and rights to the riverbed of the Arkansas River.

The ownership by the Tribes of the River, its bed and its resources, was renewed by the Federal government by the Act of April 30, 1906 (34 Stat. 137), which held that all the rights of the tribes were reserved to them, but were to be held in trust by the United States. Unfortunately, when the State of Oklahoma was admitted to the Union, a Solicitor in the Department of the Interior gave an erroneous opinion on the River's ownership. In response to a State request for clarification, the Solicitor gave an opinion stating that the River was now the property of the State. Strange as it seems at this time, no one challenged this opinion (as a matter of fact, it is questionable at this time as to how many people knew of it). Based on this opinion, the State treated the river as part of its property, and dealt with the United States and other parties as if it owned the River. The Tribes complained a number of times that their rights in the River were being ignored, but the United States, which under law had the responsibility to protect the interests of the Tribes, refused to take any action.

During the 50 years following the creation of the State of Oklahoma and the erroneous opinion, two major changes in the River occurred. First, the riverbed of the Arkansas River shifted. Over time, the course of the River moved in a meandering fashion. Through the process of accretion and avulsion, former riverbed became dry land. More than 7,500 acres of land was created in this fashion. Though by law, this land became part of the tribal property, no Federal agency took this into consideration. I don't know what it is like in your States, but in Oklahoma, if land, which is good for farming or pasturage, is left vacant, the neighboring farmers have a tendency to move in. That is what happened. Over the past 80 years, non–Indian farmers have moved onto the property and are farming it or using it, without any legal authority. At the same time, under the authority from the State, sand and gravel and coal and gas resources associated with the River were extracted and sold by non–Indians, without any consideration or compensation to the Tribes. This causes a problem, now that the tribal ownership has been reasserted.

Second, in the 1940's, as part of the Federal move to control floods and watercourses, the giant Kerr–McClellan Dams and power generation system was developed and built. Without any regard to tribal rights (which at the time existed but were not recognized) millions of tons of tribal sand and gravel and stretches of useable land associated with the River, were taken by the Federal Government. To this day, there has been no compensation to the Tribes for this taking. This constitutes the only instance, of which we are aware, where tribal trust property, supposedly under Federal protection, was taken by the Federal government without any consideration or compensation.

In 1965, the Tribes finally gained permission to sue the State of Oklahoma for clarification of the title to the Arkansas River. In 1970, the United States Supreme Court, 396 U.S. 620 (1970), held that the three Tribes, together, owned all rights to the Arkansas River and its resources.

*Current suit against the government*

For the last three decades, the Tribes have sought redress for the wrongs associated with past mismanagement by the Interior Department of the River. These include:

- Failure of our trustee to protect Indian interests to the 7,500 acres of new property;
- Failure of our trustee to protect Indian interests to minerals, including sand and gravel and coal and gas.
- Failure to compensate the Tribes for the taking of resources involved with the Kerr–McClellan Dam system, takings which were done by the Federal government itself;
- Failure to make plans for the utilization of these properties for the benefit of the Tribes in the future.

Sporadic negotiations with the United States have been unsuccessful, despite an Interior opinion in the 1970s that if the United States had known when the water projects were built that the tribes owned the river, compensation would have been paid. While negotiations have had their ups and downs over the years, experience has taught us that no one will protect our interests, if we do not do it. For that reason, an action was filed in Federal Court in 1989 for damages for mismanagement of tribal trust properties. Delay after delay has happened, and we are still in Court with the Department of the Interior over these charges.

In the meantime, another factor has developed. The United States now realizes that as the trustee for the Tribes, it is the responsibility of the government to sue the current occupants of the land to quiet title and gain possession for the Tribes of the 7,500 acres in new property. These lawsuits would involve at least 600 litigants (that we have identified). One such action, which was filed by the United States, was dismissed without prejudice of renewal, for procedural grounds. However, the precedent for such suits has been established.

If these actions go forward, total chaos regarding property rights and values along the Arkansas River will occur. Unless a settlement can be reached, the United States will have to file between 600-800 cases involving thousands of litigants and occupants, to clear the tribal title and displace current possessors. Once the first actions are filed, title to property along the river will be clouded for decades. The Tribes do not want this end to the tale, but know they must come to Congress to protect their rights. Mr. Chairman, let me state on behalf of the Choctaw Nation that we hope there will never be a need for these lawsuits. We do not want the disruption of personal lives and fortunes which these suits will cause, and we know that the political costs of such actions will be great. At the same time, the status quo, where the rights of the Tribes have not been protected, is unacceptable.

*The proposal*

Due to the delay in the lawsuits and the cost involved in pursuing them, along with our desire to resolve these issues in such a way that does not disrupt the lives of any Indian or non–Indian, we have joined with our fellow Tribes, the Cherokee and the Chickasaw, to put forward a legislative proposal to resolve, once and for all and in a comprehensive fashion, all issues regarding the Arkansas River. In its entirety, the proposal is:

- Agree to pay the Tribes a sum of approximately $41M for compensation of loss of tribal resources for the last 9 decades of BIA mismanagement. It also buys 7,500 acres of land and the sand and gravel, coal and gas, and any other minerals, from the Tribes and makes provision for the government to take steps to clear the title of this land for the current occupants. Also, the bill contains a one time payment of about $8 M for the value of land used for the continued production of electricity by powerheads located in the River.
- The three Tribes agree to give up all rights to the 7,500 acres of land transferred, and to settle all claims against the U.S. for damages from past mismanagement. No interest on the past claims is sought.
- Funds would be deposited in tribal shares in accounts which the Tribes could use for various social, educational, health and other programs, including the purchase of very specifically designated property to replace part of the 7,500 acres transferred.

That's essentially it. Seems simple enough, and it is, though the attorneys take 4 pages to say it in statutory language. The Tribes, in exchange for one payment, give up all rights, past, present and future, in the 7,500 acres of land created by the Arkansas River, and claims for damages arising for past mismanagement, and any rights to resources taken from the property in the future.

We have a representative of the Administration here to testify today, but it has been plain for some time that the Department of the Interior has supported the concept of such a political solution without caveat. Let's be plain in this statement, this goes way beyond a simple lawsuit. This is a problem crying for a political solution. This is the only taking of tribal property for a Federal use, without compensation, on record, and it continues to this day. The fact that this was all based on

one Solicitor's misunderstanding of the law is irrelevant. This is where we are. The people in Interior, and in my opinion, many in Justice, are aware of this fact and want there to be an end to these problems.

Our problem in resolving this with the Departments seems to be a matter of money, and to be more specific, a matter of budget. For decades, the Federal government has offered to settle for a $10 M token payment. IN ALL OF THAT TIME, NO RATIONALE FOR THIS AMOUNT HAS BEEN PRODUCED. We have been told this is the cost the Federal government would spend to sue for possession of the property. We have been told this is what the "nuisance value" of dealing with the Tribes is going to be. We have been told that this is the amount, because that's all there is.

To be blunt, Mr. Chairman, we are caught in a budget squeeze. The Department of the Interior is concerned that any settlement reached will ultimately have to be accommodated within their budget allocation. Likewise, the Department of Justice is concerned that the claim will come out of its judgment fund. We know times are hard with budget constraints, but we are tired of being the pawns in a Departmental budget chess match.

In contrast, the Tribes, with Federal support, have conducted several studies to show that the value of the land and the resources the Tribes have lost, or which will be lost, is much higher. Originally, we started this process over 15 years ago asking for over $100 M. dollars. Through a process of "negotiating with ourselves", we have now arrived at a figure for which we are willing to settle our issues for $49M. This includes a one time payment to cover the loss of revenue caused by the production of electricity in the future. Frankly, Mr. Chairman, we have come to the end of our patience. If the Tribes are not able to settle for a reasonable figure for these claims, we have to consider proceeding with our Court actions, including those for restitution of control over the 7,500 acres of land.

If a statutory settlement can be reached, millions of dollars in attorney and litigation expense on the part of the government, the Tribe, and the current constituent possessors of the property can be saved. Finally, let me add for the benefit of my representatives, it is a fact that any settlement figure paid to the Tribes will stay in Oklahoma. It will provide the Tribes with sorely needed capital for economic development, and such tribal services as health care and education. It will benefit the entire State.

Mr. Chairman, I want to thank you for asking me to testify on this measure so crucial to my tribe, and I want to ask you to fully support H.R. 3534.

---

Mr. HAYWORTH. And we thank you very much, Chief Pyle. And now we hear from Chief Smith.

**STATEMENT OF CHAD SMITH, PRINCIPAL CHIEF, CHEROKEE NATION**

Mr. SMITH. Let me begin by thanking you, Chairman, and other members of the Committee for this opportunity to testify today in support of this bill, H.R. 3534. I would also like to thank the members of the Oklahoma congressional delegation who sponsored the bill, Representatives Brad Carson, Wes Watkins, Steve Largent, as well as Representative Kildee of the Committee, who has always been a friend of the Cherokees and other Indian tribes in the United States.

My name is Chad Smith, and I am the Principal Chief of the Cherokee Nation, the second largest tribe in the United States. The Cherokee Nation is located in northeastern Oklahoma, and we share a common boundary along the Arkansas River from basically Muskogee down to Fort Smith. The river is not only our common boundary, but it is also a wonderful and valuable resource that the three nations share.

I just want to point out to you, for reference, what we are talking about. This is a map. If you would look, Muskogee, Oklahoma is here. Tulsa is probably up here. And Fort Smith is here. We own this riverbed from Muskogee down to Fort Smith.

The river has moved, through natural and manmade causes, in the last 100 years, and really what we are talking about is damages to the whole river, but also lands that are now dry lands which are located in the lower portions of the river, and you can hardly see, but these are 7,700 acres that is indicated in brown here. It is those lands that are in dispute. We believe we own them. There are folks who have farmed those. As part of this bill, we would give up our claim to that title and let it be vested in those occupants.

What I wanted to share with you in these few moments is really the dignity of the title of the Cherokee Nation and the other two tribes. In 1830 the Indian Removal Act was passed, which was unique because Congress allowed the President to exchange lands in the southeast for our five tribes with those in the Indian Territory. And what was so unique about it, it was an exchange of land from government to government. In fact, in the following treaty with the Cherokees in 1885, the Treaty of New Echota, which led to the infamous Trail of Tears, the Cherokee Nation ceded its interest in the southeast and the United States ceded its interest to the Cherokee Nation in Indian Territory.

At statehood, when the lands were allotted, it was a mistake that the State acquired these lands, but in 1970 the U.S. Supreme Court quieted title to this riverbed to our three tribes. Since 1966 we have been litigating this matter. Let me share with you why we believe compensation is in order.

Because of the adherence to this erroneous legal opinion referred to by the Department of Interior, BIA did nothing between statehood and 1970 to protect these riverbed interests. In the process, after World War II there was a mammoth economic project, the McClellan-Kerr navigation system, in which the U.S. Government dredged the river, changed the river, and did not compensate the tribes for the use of that riverbed or the damage to it. In fact, two power heads now exist, producing power for the last 50 years.

If it was known then that the title vested in our three tribes, I believe the government would have compensated us for it. In fact, in the last decade Congress enacted a second settlement for damages to the Standing Rock Sioux and three affiliated tribes arising from the construction of the Garrison and Oahe Dams. Also, in 1994 the United States negotiated a legislative settlement with the Colville Tribe for the use of its land for power and reservoir sites, boasting to be the largest claims settlement ever negotiated, $53 million plus an annual payment of $15 million in perpetuity.

This is a bill that is good for Oklahoma. There is 300 landowners and we anticipate there are 7,000 interests in the 7,500 acres that would have to be litigated. The Department of Justice anticipates it would take 20 years and at least $10 million to litigate. So what we propose in this bill is to resolve that. We give up title to those lands. We receive damages for the construction of the navigation way and other damages to that riverbed, and it is something that is good for not only our three tribes but for the State of Oklahoma and all of our constituents.

Thank you, sir.

[The prepared statement of Mr. Smith follows:]

**Statement of The Honorable Chad Smith, Principal Chief, Cherokee Nation, on H.R. 3534**

Mr. Chairman and members of the Committee:

Let me begin by thanking you, Chairman Hansen and the other members of the Committee, for the opportunity to testify today in support of this bill, H.R. 3534. I would also like to thank the members of the Oklahoma congressional delegation who sponsored the bill, Representatives Brad Carson, Wes Watkins and Steve Largent, as well as Representative Dale Kildee of the Committee, who has always been a friend of the Cherokees and other Indian tribes in the United States.

My name is Chad Smith, and I am the Principal Chief of the Cherokee Nation, the second largest Federally-recognized Indian tribe in the United States. Cherokee Nation is located in northeastern Oklahoma, and we share a common boundary along the Arkansas River, from the point of confluence of the Canadian River to the Arkansas state line, with two other great Indian nations, the Choctaw and Chickasaw Nations. The River is not only our common boundary, but it is also a wonderful and valuable resource that the three Nations share.

As the members of this Committee no doubt know, the Cherokee, Choctaw and Chickasaw Nations have not always been in Oklahoma, and I am sure that you know that how we came to be in Oklahoma is by no means a happy story. Although culturally and linguistically the Cherokee people are very different from the Choctaw and Chickasaw people, the members of our three Nations, along with our neighbors the Creeks and Seminoles, were all forcibly uprooted from our aboriginal homelands in what is now the southeast United States about 140 years ago and marched over the Trail of Tears to lands west of the Mississippi in the Indian Territory. The story of how that came to be, how the Government of the United States swept us up from our homelands east of the Mississippi River and deposited us in a completely unfamiliar country is the sad part of our histories that the three Nations share along with our brothers the Creeks and Seminoles. It is also the story of how we came to own the bed and banks of the Arkansas River within the State of Oklahoma.

It should come as no surprise that the events of Indian removal were an integral part of the legal history of tribal ownership of the bed and banks of the Arkansas River in Oklahoma, because the Indian removal was accomplished only in part through force; it was facilitated by treaties of territorial cession—cessions by the Indian Nations and cessions by the United States. I will attempt to give the Committee an overview of that legal history and then explain why this is a good bill, one that Congress should pass into law.

The Cherokee Nation executed treaties both with Britain and, after Independence, with the United States. Our first treaty with the U.S. was the Treaty of Hopewell, on November 28, 1785, which purported to set out the boundaries of the Cherokee Nation. A mere 36 days later, also at Hopewell, the Choctaw Nation executed its own treaty with the United States, one similar to that of the Cherokees. In these treaties and a few others that soon followed, the Cherokees and Choctaws were placed under the protection of the United States; their rights to the exclusive use and occupancy of lands not cede were "solemnly" assured by the United States [1] and assured of our right to pursue our own ways and govern ourselves under our own system of laws.

Despite solemn guarantees of protection by the United States expressed in treaty, waves land-hungry non–Indian settlers began invading the Cherokee Nation, occupying and "improving" lands owned by the Nation and used communally by its citizens for centuries. Less than 20 years after the signing of the Hopewell treaties, the United States Government first conceived of a new Indian policy'the first of a long series of Federal policies that would have devastating effects on Indian people everywhere'that would eventually come to be known as "Indian removal," whereby it was determined that the best way to protect Indians from the consequences of the invasions of white settlers would be to move them en masse to the remote country west of the Mississippi River that had just been acquired in the Louisiana Purchase. [2]

In 1817 and 1820, respectively, the Cherokee Nation and the Choctaw Nation executed treaties with the United States agreeing to cede portions of their lands east of the Mississippi River in exchange for large tracts of land in the Arkansas Territory. Although some Cherokees, who came to be known as "Old Settlers," did move soon thereafter to the Arkansas Territory, before the Government could follow through with removal it discovered that it had miscalculated the rate of westward

[1] See Treaty of Holston, July 2, 1791, 7 Stat. 39, 40.
[2] See the Act of March 26, 1804, 2 Stat. 289.

expansion, for the lands in Arkansas the U.S. had promised to the Indian Nations had already been occupied by non–Indian settlers. The two Nations were then forced to relinquish their lands in the Arkansas Territory and to accept instead lands farther west in the "Indian Territory." This time, the United States assured them, their lands would, "under the most solemn guarantee of the United States, be, and remain, theirs forever." [3]

The failure of the Arkansas removal program did little to inspire confidence among Cherokees and Choctaws that the Federal Government had the political will to protect them from non–Indian settlement in the promised lands of the Indian Territory. Those who had not already moved to the Arkansas Territory became more determined than ever to remain in their aboriginal homelands in the east. At the same time, however, pressure was building in the states of Georgia and Mississippi for Congress to rid them of their Indians, and laws were passed in the state legislatures purporting to extend state jurisdiction into the Indian Country. Then, in 1830, Congress passed the Indian Removal Act. [4]

Although the Cherokees successfully challenged the validity of the state laws asserting jurisdiction over Cherokee territory in now famous court cases that are part of foundation of modern Federal Indian law, [5] the Indian Nations received no support whatsoever from the Andrew Jackson administration as political pressure for Indian removal continued to grow.

Eventually the Indian Nations decided that removal was inevitable, that they should make the best deal they could with the United States while there was still time to do so. The Choctaw Nation signed the Treaty of Dancing Rabbit Creek [6], another removal treaty, on September 27, 1830; in it they agreed to move to new lands west of the Arkansas Territory. Similarly, on December 29, 1835, the Cherokees ended their resistance to removal by executing the Treaty of New Echota [7], and those Cherokees who had not moved earlier to the Arkansas Territory "agreed" to move to lands in the Indian Territory ceded to them by the United States. [8] Later, by treaty with the United States, the Chickasaw Nation was granted a 1/4 interest in the lands of the Choctaws west of the Mississippi in the Indian Territory. [9]

In their removal treaties, the Indian Nations were to be given their lands in the Indian Territory by way of patents executed by the President of the United States granting title to the property in fee simple. The Indians were assured that they would be free to govern themselves and never again be moved, and that their domains would never be embraced within the limits of any state or territory. [10]

The years following the Trail of Tears were a time of great turmoil in the Cherokee Nation, when internecine fighting among Cherokee factions erupted over the actions of the so-called "Treaty Party," who were alleged to have acted illegally in ceding tribal land in the removal process. Some members of the Treaty Party, including Elias Boudinot, were executed for what they did. This turmoil, though it happened long ago, reflects the strength of attachment of Cherokee people to their tribal lands and explains their strong bias against relinquishing title to those lands except when absolutely necessary.

Although peace was eventually restored in the Cherokee Nation in the mid–1840s, in part through the efforts of the Government, [11] it was not a long-lasting peace. The Civil War brought political and economic destruction and chaos to the Indian Territory. The membership of the Cherokee Nation, not unlike that of the other four Nations, was divided between the Union and the Confederacy, but for their unfortunate choices in taking sides in the War the Indian Nations were rewarded with yet another generous round of punitive treaties. [12] Despite the many onerous provisions

[3] See treaties of January 20, 1825, 7 Stat. 234, and May 6, 1828, 7 Stat. 311.

[4] 4 Stat. 411.

[5] Cherokee Nation v. Georgia, 5 Pet. 1, 8 L.Ed. 25 (1831); Worcester v. Georgia, 6 Pet. 515, 8 L.Ed. 483 (1832).

[6] 7 Stat. 333.

[7] 7 Stat. 478.

[8] A small number managed to avoid removal and remain near their homelands. Their descendants are members of the Eastern Band of Cherokee Indians.

[9] See treaty of January 17, 1837, 11 Stat. 573, and treaty of June 22, 1855, 11 Stat. 611.

[10] See Article 5 of the Treaty of New Echota, 7 Stat. 478, 481.

[11] See treaty of August 6, 1846, 9 Stat. 871, declaring amnesty for crimes committed within Cherokee Nation during the factional struggles and making special monetary provisions for the Old Settlers. Article 1 of this treaty also affirms that the Cherokee Nation's new lands in the Indian Territory "shall be secured to the whole Cherokee people for their common use and benefit."

[12] See treaties of March 21, 1866, 14 Stat. 755 (Seminole Nation), April 28, 1866, 14 Stat. 769 (Choctaw and Chickasaw Nations), June 14, 1866, 14 Stat. 785 (Creek Nation), and July 19,1866, 14 Stat. 799 (Cherokee Nation).

in these treaties, however, they did expressly reaffirm all not inconsistent obligations of prior treaties.[13]

Other provisions in the 1866 treaties with the five Nations contemplated the creation of an Indian state from the Indian Territory, to be governed by an inter-tribal council consisting of representatives of the Indian Nations[14]. This idea would never become a reality: once again, political pressure began building to do away with the tribal governments in the Indian Territory. Congress eventually succumbed to this pressure and, in 1893, created the Commission to the Five Civilized Tribes.[15] The purpose of the Commission was to negotiate allotment agreements with the five Nations and thereby pave the way to the dissolution of the tribal governments. It is important to note here that the reason allotment agreements were necessary was that the United States did not hold title to the lands of the Cherokee, Choctaw, Chickasaw, Creek and Seminole Nations'their tribal lands had been ceded to them by patents of the United States'so that the U.S. was not in a position to convey title to allotted lands. This legal fact would eventually play an important role in how the Cherokees, Choctaws and Chickasaws came to own the bed of the Arkansas River.

The Indian Nations resisted allotment as long as possible. They continuously rebuffed the Commission in its efforts to negotiate allotment. Then Congress passed the Curtis Act of 1898[16], legislation that in effect put an ultimatum to the Indian Nations—allot your lands by agreement or they will be allotted by force of law. Within four years passage of the Curtis Act, all five Indian Nations had executed allotment agreements, and their tribal lands were soon allotted in severalty.

In 1906, Congress passed a law[17] that was intended to begin the process of winding up the affairs and existence of the five Nations. Although the 1906 Act clearly contemplated the eventual dissolution of the governments of the five Indian Nations, neither it nor any other act of Congress ever accomplished that end[18]. Section 27 of the 1906 Act did, however, expressly provide that any tribal lands remaining after allotment would be held thereafter in trust for the Indians another important legal fact in the history of our Nations' ownership of the bed of the Arkansas River.

At the time of allotment through statehood in 1907, the Department of Interior assumed that the United States owned the bed and banks (to the highwater mark) of the Arkansas River, with the consequence that the bed of the River was never allotted. Until 1970, in fact the Department and the Federal Government persisted in the belief and an erroneous legal opinion that title to the riverbed went to the State of Oklahoma upon statehood under the "Equal Footing Doctrine," whereby title to the beds of a navigable stream is passed to the state whose borders encompass it upon admission of that state into the Union[19].

The Cherokee, Choctaw and Chickasaw Nations disagreed with the Government's position. Instead, these Nations contended that when the United States ceded lands to them pursuant to their respective removal treaties and the Federal land patents executed by the President, the United States granted all of its interest in the bed and banks of the Arkansas River, along with the other lands described in those treaties and patents, to the three Indian Nations, so that at the time of Oklahoma statehood the U.S. was possessed of no title to transfer to Oklahoma under the Equal Footing Doctrine. The Indian Nations followed this with an argument that by operation of section 27 of the 1906 Act, these unallotted riverbed lands went to the United States in trust for the Indian Nations.

In 1966, the Cherokee Nation took these very arguments to the United States District Court for the Eastern District of Oklahoma in a lawsuit naming the state of Oklahoma and various oil and gas companies with riverbed leases from the state. Subsequently, the Choctaw and Chickasaw Nations intervened in the action. The Indian Nations lost at the trial court and again on appeal to the Tenth Circuit[20]. The Supreme Court accepted review of the case on certiorari and reversed[21]. The Court reviewed the three Nations' various treaties with the United States, the land patents executed by the President, and the historical and legal context in which those treaties and patents were made, and held that (1) when the United States ceded

[13] See article 31 of the Cherokee's 1866 treaty, 14 Stat.799, 806.
[14] See article 12 of the Cherokee's 1866 treaty, 14 Stat. 799, 802.
[15] See the Act of March of March 3, 1893, 27 Stat. 645.
[16] Act of June 28, 1898, 30 Stat. 495.
[17] Act of April 26, 1906, 34 Stat. 148.
[18] For an excellent legal analysis of how the governments of the five Nations continued to survive after and despite the 1906 Act, see Harjo v. Kleppe, 420 F. Supp. 1110 (D.D.C. 1976), aff'd. sub nom., Harjo v. Andrus, 581 F.2d 949 (D.C. App. 1978).
[19] See memorandum of Duard R. Barnes, Acting Associate Solicitor, Division of Indian Affairs, Department of Interior, to Legislative Counsel dated August 12, 1976.
[20] 402 F.2d 739 (10th Cir. 1968).
[21] Choctaw Nation v. Oklahoma, 397 U.S. 620 (1970).

lands to the three Indian Nations in the Indian Territory, it intended to cede the bed and banks of even the navigable segment of the Arkansas River, from Three Forks near present day Muskogee down to the Arkansas territorial line, and (2), by operation of the 1906 Act, the bed and banks of the River went to the United States in trust for the Indian Nations.

Because of its adherence to the erroneous legal opinion referred to above, the Department of Interior did nothing between the time of statehood and 1970 to protect the three Indian Nations' interests in riverbed resources. When Congress authorized the construction of the McClellan–Kerr Navigation System along the Arkansas River after the Second World War, no provision was made for compensating the three Nations for the use of their resources in constructing the dams, revetments and levies within the system. Nor did the Department take steps to prevent depletion of the Nations' oil and gas reserves under the river, or to prevent landowners from occupying thousands of acres of the riverbed that became dry or "fast" as the result of natural or man-made changes in the course of the River. Today, in the lower reaches of the Arkansas River near the Oklahoma–Arkansas state line, there are approximately 7,750 "dry" acres of riverbed lands that belong to the Nations but are occupied and used by adjacent landowners without consent of, or compensation to, the three Nations.

In 1989, the three Nations filed suit against the United States in the United States Court of Federal Claims,[22] after receiving special permission from the Congress to do so, seeking compensation from the Government for the taking of tribal resources along the riverbed and for it breach of trust to protect the Nations' beneficial interests in the riverbed. Those lawsuits are still pending today. In 1997, the United States brought a quiet title action against many dozens of landowners occupying tribal lands along a small segment of the River[23]'representing only a small percentage of the total number of persons who might be occupying or claiming an interest in the Nations' riverbed lands but the lawsuit was dismissed without prejudice on technical grounds. Thus, the task of removing persons occupying tribal lands along the Arkansas has not even begun.

Mr. Chairman and members of the Committee, this legislation is the culmination of many years of work by a succession of tribal administrations to resolve the complex controversies surrounding the Nations' ownership of the bed and banks of the Arkansas River in Oklahoma. Our earliest efforts to reach a settlement for lost riverbed resources began in the late 1970s. My predecessors in office, Principal Chiefs Ross Swimmer and Wilma Mankiller, worked diligently with the tribal leaders of Choctaw and Chickasaw Nations to bring closure to these controversies, not only through litigation but also through negotiation with Interior and Justice, but always, for one reason or another, settlement has proven to be an elusive thing.

The current bill, H.R. 3534, would settle the three Nations' damage claims against the United States now pending in the Court or Federal Claims, and it would give them, in a single lump sum, the past and future fair rental value of the lands being used for the two powerheads that were constructed on tribal lands on the bed of the Arkansas. The bill would also compensate the Nations for the lands being occupied by adjacent landowners and other potential claimants in the lower segments of the River. In exchange for the appropriated sums, the three Nations would dismiss their lawsuits against the Government and disclaim any right, title or interest in the 7,750 of lands being occupied by non-tribal interests. Those disclaimers will serve to eliminate the cloud of tribal claims in the title to lands being occupied by these people and relieve the Government of the very expensive burden of having to bring ejectment litigation against a very large number of Oklahoma citizens.

Mr. Chairman and members of the Committee, this is a good bill and I urge that you give it your unqualified support. I also thank you for taking the time in the Committee's busy schedule to set this matter for hearing and for providing me the opportunity to testify on behalf of a bill that will be of great benefit not only to the people who are my constituents, the Cherokee people, but to many non–Indian citizens of Oklahoma as well.

---

Mr. HAYWORTH. And we thank you very much, Chief, and the Chair would note that we are joined by two Oklahomans here on the dais. Our friend Mr. Carson is the principal sponsor. We will

[22] Case Nos. 218–89L and 630–89L.

[23] United States of America v. Pates Farms, Inc., et al., Case No. Civ.97–685–B, United States District Court for the Eastern District of Oklahoma.

hear from him first, and then recognize our good friend and special guest. Wes Watkins. Mr. Carson?

**STATEMENT OF THE HON. BRAD CARSON, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF OKLAHOMA**

Mr. CARSON. Thank you, Mr. Hayworth, and I would like to thank Chairman Hansen and Ranking Member Rahall for scheduling this hearing today, and thank you, Governor Anoatubby, Chief Smith, and Chief Pyle, for your patience in sitting through the other hearings as well. You know this is a laborious, sometimes tedious process. I know you have been through it before, and we are grateful to have you here today.

All three of you have ably outlined the history of this particular dispute, but let me just for the record say a bit more about that and why a settlement of this issue is so needed today. Disputes involving the Cherokee, Choctaw, and Chickasaw lands along the riverbed, as has been pointed out, have been ongoing since 1907, the year of statehood in Oklahoma, and in order to achieve justice and compensate these three tribes for the land and resources that have been wrongfully taken from them, misused and left dormant, a settlement today must occur. Everyone agrees on that, both the administration as well as tribal leaders and most of us here in Congress.

As Chief Smith was also outlining, and also abetted by Chief Pyle's testimony and Governor Anoatubby's testimony, the tribes of course were relocated to Oklahoma in the 1830's.

They were to occupy land ceded to them in the new Indian Territory on which the Arkansas River now runs.

But in 1970, as Chief Smith pointed out, an erroneous legal opinion by the U.S. Government, because of that the Arkansas River bed was conveyed to the new State of Oklahoma. All navigable rivers of the United States were deemed property of the State under the Equal Footing Doctrine.

However, the treaties of the three tribes came long before the Equal Footing Doctrine, and in 1970 in the landmark Supreme Court case of Choctaw Nation v. Oklahoma, the U.S. Supreme Court ruled in favor of the tribes and determined that the tribes indeed were the rightful owners of the riverbed, and not the State of Oklahoma.

Despite the tribes' ownership of those lands, between 1907 and 1970 the BIA acted on the assumption that Oklahoma owned the riverbed, and therefore took no action to protect tribal resources such as oil and gas production, sand and gravel, grazing, and croplands.

Since the Supreme Court decision of now 32 years ago, there has been little disagreement that a settlement should be reached. However, there have existed substantial differences in thought regarding the settlement amount that should be awarded to the tribes.

In 1974 Congress appropriated $1.2 million to the BIA to conduct an appraisal of the entire riverbed, and to survey the riverbed from the Arkansas line to the Three Forks area north of Muskogee, Oklahoma. The value of the riverbed and related assets were determined to be $177 million. Senator Henry Bellman, the Senator

from Oklahoma at that time, introduced legislation to authorize the United States to pay the tribes for the value of the riverbed. However, this legislation was not passed, and now, 30 years later, the tribes still await settlement of this issue.

Enactment of this legislation will bring about clear and tangible benefits. First, it will eliminate the need for the Department of Justice to bring hundreds of defendants into court due to their occupancy of parts of the nearly 8,000 acres of dry bed lands that the chiefs and Governor Anoatubby were talking about. Second, the settlement will pay the three tribes for the actual present value of the loss of past and future assets they would have had if not for the construction of the McClellan-Kerr navigation system.

Third, positive movement of the legislation will result in the dismissal of the mismanagement case against the BIA. And, finally, the settlement will provide the tribes with resources that will in turn be used to further economic development in the region, benefitting Indian and non-Indian members of the communities alike.

I hope that everyone on this Committee can support the legislation. I would like to thank Chairman Hansen and Ranking Member Rahall and you, Mr. Hayworth, for your past support. And if I could ask the panelists here to discuss something that Mr. Smith from the BIA testified to, you hear earlier this morning, let me talk to you about the ongoing status of the settlement negotiations. Can you tell us how those are coming along, what the hurdles are going to be, and the potential resolution of the sand and gravel matter that he was saying still remains a roadblock?

**Statement of The Honorable Brad Carson, a Representative in Congress from the State of Oklahoma, on H.R. 3534**

Chairman Hansen and Ranking Member Rahall, I would first like to express my sincere appreciation to you both for scheduling this hearing on H.R. 3534, the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, and for inviting the leaders of the three Indian nations here today to testify. They certainly understand this issue better than anyone and can speak most eloquently about the need for this legislation. I would also like to take this opportunity to thank Congressman Wes Watkins, Steve Largent, and Dale Kildee for their strong support and co-sponsorship of this legislation.

Disputes involving the Cherokee, Choctaw and Chickasaw lands along the Arkansas River have been ongoing since 1907. In order to achieve justice and compensate these three tribes for the lands and resources that have been wrongfully taken from them, misused, and left dormant, a settlement must occur.

In order to understand the need for this legislation, I believe you must first turn to the history of these tribal lands. As you well know, in the 1830s, the Cherokee, Choctaw, Chickasaw, Creek and Seminole Nations were forcibly removed to the Indian Territory of Oklahoma to occupy lands ceded to them by the United States, through which the Arkansas River runs. In 1907, due to an erroneous legal opinion, the Arkansas riverbed was conveyed to the new State of Oklahoma. All navigable rivers of the United States were deemed property of the State under the Equal Footing Doctrine. However, the treaties of the three tribes came long before the Equal Footing Doctrine. And, in 1970, in Choctaw Nation vs. Oklahoma, the U.S. Supreme Court ruled in favor of the tribes and determined that the tribes, indeed, were the rightful owners of the riverbed and not the state of Oklahoma.

Nevertheless, from 1907 through 1970, the Bureau of Indian Affairs acted on the assumption that Oklahoma owned the riverbed and, therefore, took no action to protect tribal resources such as oil and gas production, sand and gravel, grazing and croplands. The Government itself constructed hydroelectric powerheads and other improvements in the channel of the river on tribal lands, using sand and gravel belonging to the three Indian Nations. Due to the Bureau's inaction, individuals with property near the Arkansas River also began to occupy the three Indian Nations'

"dry-bed" lands—amounting to approximately 7,750 acres of land that was under water at the time of statehood but that is now dry due to changes in the course of the river.

Since the Supreme Court decision of 1970, there has been little disagreement that a settlement should be reached. However, there have existed substantial differences in thought regarding the settlement amount that should be awarded the tribes. In 1974, Congress appropriated $1.2 million to the BIA to conduct an appraisal of the entire riverbed and to survey the riverbed from the Arkansas line to the three forks area north of Muskogee. The value of the riverbed and related assets was determined to be $177 million. Senator Henry Bellmon, at that time, introduced legislation to authorize the United States to pay the tribes for the value of the riverbed. However, this legislation was not passed, and, almost thirty years later, the tribes are still awaiting settlement of this issue.

Recent discussions between Federal, state and tribal entities involved in this dispute have been extremely productive making the 107th Congress a most appropriate time for settlement.

Enactment of this legislation, H.R. 3534, will bring about clear, tangible benefits. First, it will eliminate the need for the Department of Justice to bring hundreds of defendants into court due to their occupancy of parts of the 7,750 acres of drybed lands. Second, the settlement will pay the three tribes for the actual present value of the loss of past and future assets they would have had if not for the construction of the McClelland–Kerr navigation system. Third, positive movement of the legislation will result in the dismissal of the mismanagement case against the Bureau of Indian Affairs. And, finally, the settlement will provide the tribes with resources that will, in turn, be used to further economic development in the region, benefitting Indian and non–Indian members of these communities alike.

I ask my colleagues on the Committee to support this important legislation. Thank you Mr. Chairman.

---

Mr. SMITH. We have looked at different assets under actually the disputed lands. The value of the land has been agreed to. The value of the oil and gas has been agreed to. The value of methane gas has been agreed to. The last thing that we haven't come to an agreement on, and we are making great progress, is the value of sand and gravel.

I can tell the Committee that in 1989 we came—our strategy then was to piecemeal the damages out, and in 1989 we had an agreement with the Bureau of Indian Affairs for the Cherokee portion, which we don't have, to agree for compensation of $8.5 million for our portion of the sand and gravel. I believe that gives us a benchmark. I think we can get to a settlement in the near future, especially with the encouragement of Congress and this Committee.

Mr. CARSON. You also in your testimony referenced the fact that there are numerous lawsuits involving title to some of the dry bed lands. Is there any estimate from the tribes about the expense and duration of litigation if settlement is not reached through Congress or working with the administration?

Mr. SMITH. In 1989 the Department of Justice anticipated it would be the year 2009 before they could bring all the quiet title suits. In the first filing, which was dismissed based on technicalities, there were over 100 named defendants in one particular tract. We anticipate 300 to 400 named defendants and probably as many as 7,000 interests, individual interests in these lands, including mortgage companies, insurance companies, oil and gas companies, the farmers themselves. We have had widespread support all up and down the Arkansas River by these other parties wanting to settle this issue.

Mr. CARSON. I see my time has expired. Mr. Chairman, I would ask for leave to enter my full statement into the record.

Mr. HAYWORTH. I am certainly happy to allow that to take place, Mr. Carson. The Chair would only take exception to your comment that somehow this hearing was tedious today, but that is OK.

Perhaps you will find support from our other special guest, Mr. Watkins of Oklahoma. Welcome, and you are recognized.

## STATEMENT OF THE HON. WES WATKINS, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF OKLAHOMA

Mr. WATKINS. Thank you, Mr. Chairman, and I appreciate Mr. Rahall's being here. And Dale, it is always good having you here. I know you have always been quite popular in the Durant area, Chief Pyle.

This is I think a landmark piece of legislation, no pun intended by "landmark" because it is riverbed legislation, but it has been a long time. Speaking of tedious, it has been a lot longer. It is not very long sitting out here, right, because over these many years there has been a long delay.

And let me say this to the Committee. This has been of interest to me along with a lot of other activities because I think, as a co-sponsor, let me say this is also a bipartisan piece of legislation, my colleague from Oklahoma being a Democrat and part of the minority side in the Congress at this time. I have joined him. We have joined together, my being a Republican on the majority side, in helping to show the kind of support that we want and hopefully can gain from this Committee in moving forward.

I would like to say to Mr. Chairman, when I left the Ways and Means Committee and he sits, Chairman Hayworth sits right next to me on Ways and Means Committee and we discuss a lot of Native American activities and legislation, they were still going strong when I left there. I don't know if they are still are. I am going to go back.

But H.R. 3534 is, like I say, a long time in coming, and it will settle I think a situation that needs to have been done a long time ago. You have heard the history of it, but Mr. Chairman, really the BIA recognized or reported, they reported for about 60 years that this belonged to Oklahoma, the State of Oklahoma. But a lawsuit in 1970, the U.S. Supreme Court stated this river bed and all belonged to the Choctaws and the Chickasaws and the Cherokees. That was brought about from a lawsuit in 1966, if I recall correctly.

And so it has been over 30 years since the Supreme Court has ruled, and they have made a lot of effort, spent a lot of time over these years. In 1989 there was further activity, a filing of lawsuits, and hopefully this legislation will prevent an expansion of this. I think Chief Smith hit on the head. When you look at it from a practical standpoint and a reasonable standpoint, working out a settlement is much better than could involve as many as up to 7,000 interests that are involved in the potential of the lawsuits, including hundreds of landowners along that river.

So I don't think it is—I think all of us who watched these settlements over the years realize that that would be a whole lot more. This is 7,500 acres of land. It looks like to me we all know the hydro power situation there, the water value that continues to flow

there, and that is going to continue throughout our lifetime and throughout many hundreds of years. And this is basically, without question, settled, the ownership of that has been settled. We just got to get now settling the value and settling the compensation for this.

So I appreciate you, Mr. Chairman, and I appreciate my colleague from Oklahoma, Mr. Carson, and his leadership on this Committee and all of your interests in this legislation, and I ask that for a positive vote, Neil, if I could, later on when markup takes place and we move this legislation forward, and I can assure you will be trying to do what I can from the majority side to move this legislation.

Thank you, Mr. Chairman.

**Statement of The Honorable Wes Watkins, a Representative in Congress from the State of Oklahoma, on H.R. 3534**

Mr. Chairman, Mr. Rahall, and Members of the Committee, I thank you for conducting this hearing today and join as a co-sponsor on the Legislation offered by Mr. Carson of Oklahoma. Today you will hear about a bill that would have a significant impact on the members of the Cherokee, Choctaw, and Chickasaw Indian tribes of Oklahoma. The Cherokee, Choctaw and Chickasaw Nations Claims Settlement Act is a piece of legislation I fully support, and hope will be passed by the House of Representatives this year. H.R. 3534 would bring closure to both current and forthcoming lawsuits between the United States, and the Chickasaw, Choctaw, Cherokee tribes, and hundreds of individuals in Oklahoma.

The Bureau of Indian Affairs for more than 60 years, reported that the State of Oklahoma owned the Arkansas Riverbed. However, in 1970 the Supreme Court of the United States ruled in Choctaw Nation v. Oklahoma that the tribes mentioned above owned the Arkansas Riverbed. After many attempts to settle with the Government in1989, the Cherokee, Chickasaw, and Choctaw Nations filed lawsuits against the United States seeking damages for the use and mismanagement of these tribal trust resources. These lawsuits are still pending in Federal court, and without this legislation future lawsuits will be filed.

The Arkansas Riverbed encompasses over 7,500 acres of the Indian Nations' Drybed Lands have been occupied by a large number of adjacent landowners in Oklahoma. Without a settlement, further litigation against thousands of landowners would be likely. The potential of these lawsuits and the time and increased expense to not only the government and tribes, but also to private citizens is in my opinion a valid and strong reason to settle the Arkansas Riverbed. It is in the best interest of not only the tribes, but also the United States to pass this legislation.

This legislation would bring a quick settlement to a claim the tribes have had against the United States for over 30 years. It would end pending lawsuits between the tribes and the United States. Most of all settling with the tribes would avoid thousands of future lawsuits brought by the United States against individuals who currently own the Drybed lands.

---

Mr. HAYWORTH. Thank you very much.

The Gentleman from Michigan, any questions?

Mr. KILDEE. Thank you, Mr. Chairman. I am very happy to be one of the cosponsors of this bill, glad to see my three friends here. I would try to speak, if I could, in Choctaw and Chickasaw, but I have a Potawatomi accent in that, but I will say in Cherokee, "O-see-o," and I am glad that you are here, Chairman Smith, and also "Owado," thank you very much for being here. Kim Chee behind me, she teaches me my Cherokee, so I probably have a Flint, Michigan accent in that, also.

But I think you have been very, very patient in this action, more than patient, and you are certainly being more than reasonable in the figure, and I think that we should act very expeditiously on this to make sure that you are given some compensation so you can

take care of the needs of your tribe. Justice is extremely important, and I think justice delayed is justice denied. It has been delayed for a long, long time. That is why I would hope that we would very, very good have a markup.

And it is very good when we—I think Indian issues have risen above partisanship. When J.D. Hayworth and I established the Native American Caucus, we decided at that point to make it a bipartisan caucus because these things are of a bipartisan nature, and J.D. and I have worked very closely together. Wes and I came to Congress together, we won't say how many years ago, but we arrived in Congress together. And Brad Carson has been, of course, a citizen of the Cherokee Nation and certainly added a great deal to this Committee and to the Congress.

So I just thank you for your testimony. I don't really have any questions. I think you have a very, very strong case here and I will do everything I can to support it.

Thank you, Mr. Chairman.

**Statement of The Honorable Dale E. Kildee, a Representative in Congress from the State of Michigan, on H.R. 3534**

Mr. Chairman, I am in strong support of H.R. 3534, a bill that would settle certain claims of the Cherokee, Choctaw, and Chickasaw Nations to the Arkansas riverbed in Oklahoma. I want to thank Congressman Carson for his leadership in trying to resolve this legal dispute, which has been without resolution for more than three decades. I am proud to be an original cosponsor of this legislation.

Since the Supreme Court first ruled in 1970 that the three tribes retain title to the Arkansas riverbed, the tribes have been seeking damages in Federal court for the mismanagement and uncompensated use of the Arkansas riverbed lands and resources.

I want to commend the three tribal nations, the Cherokee, Choctaw, and Chickasaw Nations for working together to reach an agreement among their respective nations about settlement terms. I know firsthand by working with the Michigan tribes on the Michigan Indian Claims Settlement Act how difficult it can be to get sovereign nations to come together and agree to settlement terms.

This bill would:

1. Extinguish the claims of the three tribes against the United States related to the Arkansas riverbed;
2. Puts an end to the threat of trespassing suits by the Department of Justice against hundreds of private landowners that occupy the drybed land;
3. Authorizes an appropriation of nearly $50 million for full settlement of claims against the U.S.; AND
4. Reserves the tribes' interest in the riverbed except for the disclaimed drybed lands.

Mr. Chairman, it is my hope that we will honor the agreement of these sovereign nations and urge the Department of Interior and the Department of Justice to finalize negotiations soon so that we can finally put an end to this legal dispute by passing a settlement bill.

I look forward to hearing the testimony today. Thank you

---

Mr. HAYWORTH. Thank you, Mr. Kildee.

The Gentleman from Hawaii?

Mr. ABERCROMBIE. Thanks very much, Mr. Chairman.

Gentlemen, I want to make sure that I understand. I want to be supportive of this legislation. I want to make sure I have it down right, because I heard a couple of different figures.

Is the intention of the legislation, in your understanding, to provide a continuing income, or is this a final settlement and some kind of—in other words, continuing income if there is money being made or income being derived from the selling of hydroelectric

power and so on. Does that provide a continuing income to the tribes?

Mr. PYLE. If I may, no, it is a one-time settlement.

Mr. ABERCROMBIE. OK, and land disputes is the same thing?

Mr. PYLE. Although we could change on that electric if you would like us to.

Mr. ABERCROMBIE. No, no. I am just interested. So title then goes to the State. Is that right? Or it is no longer in dispute?

Mr. SMITH. The disputed lands, the 7,700 acres, title would vest with the present land occupants, individual land occupants.

Mr. ABERCROMBIE. Yes, I understand that, but I am talking about the riverbed now.

Mr. SMITH. No, the Cherokee and the Chickasaw and the Choctaw Nations retain title to the wet bed, to the wet bed.

Mr. ABERCROMBIE. But not the energy that is derived from the water that is flowing over it?

Mr. SMITH. That is correct. Congress has decided that with their navigational easement they are entitled to put that dam there, and it will stay there without compensation.

Mr. ABERCROMBIE. The reason I am asking is not to try to recreate a dispute or to urge any kind of renegotiation, but rather that in reading over this, I mean, this has been years and years and years this has been going on. I just want to make sure that if we pass thing, we don't end up missing something in the process, that then becomes a further grounds for dispute.

You said the sand and the gravel hadn't been quite resolved. Does this take care of that, or is that going to continue to hold this up, if we do pass it, from being implemented?

Mr. SMITH. We anticipate a settlement on the sand and gravel.

Mr. ABERCROMBIE. Well, would this appropriation—it is $49 million, right, approximately?

Mr. SMITH. Yes

Mr. ABERCROMBIE. Would that handle that?

Mr. SMITH. It would.

Mr. ABERCROMBIE. And so you are anticipating, this $49 million anticipates a settlement that would be within the range of what your negotiations are now?

Mr. SMITH. Yes.

Mr. ABERCROMBIE. And the last thing is, will that cover all your attorneys fees?

Mr. SMITH. Yes.

Mr. ABERCROMBIE. Because this has gone on for 30 years or whatever it is. Is that intended to cover—does that cover the fees for this particular negotiation, or are you on the hook for whatever you have done in the past, or has that already been paid?

Mr. SMITH. We are on the hook, and this settlement will take care of it.

Mr. ABERCROMBIE. The only suggestion I would make in this, Mr. Chairman, is that—and I would be supportive. You know, I don't want to mess with your figures or try and change anything around. This would have to be something we would have to decide, but I would just like to be absolutely clear as to what is required of the tribes in terms of taking care of attorneys fees, so that everything is cleared, that all decks are cleared, and that perhaps we might

think about adding more money to this rather than less to pay for those fees, so that the $49 million all goes to the tribes.

Mr. CARSON. If you would yield, Mr. Abercrombie—

Mr. ABERCROMBIE. Sure, I will.

Mr. CARSON. —we will certainly accommodate you on that, and I will talk to you personally and get your staff information, and we will try to make sure you are satisfied with what the bill says about attorneys fees and that it addresses all your concerns.

Mr. ABERCROMBIE. Yes. I would add them in. I mean, it is easy for me to say, but—

Mr. WATKINS. If I might mention to the Gentleman, too, I think Mr. Carson is correct. That is one thing. Surely all this is going to take care of that, and that is one big thing we are trying to—we don't want to continue a lot of lawsuits or allow them to continue on all these other interests. That is the one thing for settling this thing.

If we can settle this, we will get out of all these maybe thousands of lawsuits it could be—

Mr. ABERCROMBIE. Oh, no, I agree absolutely. It is just in Section 5 here it says "At the time the funds are paid to the Indian nations, the funds derived to be appropriated, the Secretary shall pay the Indian nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian nations."

I read that to say that the Secretary—that we could have the Secretary pay it out of funds that we establish to pay it. It doesn't say, as I read this, that it has to come out of the Indian nations' end of this settlement figure. That is all. Do you see what I am driving at?

Mr. WATKINS. I think there is an allowable percent in the bill for attorney fees.

Mr. ABERCROMBIE. Ten percent, I think.

Mr. WATKINS. That is pretty hefty.

Mr. ABERCROMBIE. That is what I meant.

Mr. WATKINS. That is a lot.

Mr. ABERCROMBIE. It takes a lot, so that—

Mr. WATKINS. That is going to be negotiated with the tribal leaders and their attorneys.

Mr. ABERCROMBIE. Well, I wouldn't mind making this, if it is 10 percent, that means about $5 million, right?

Mr. CARSON. $41 million total in the settlement, so about $4.1 million.

Mr. ABERCROMBIE. OK, $4.1 million. Well, why don't we just add $4.1 million to this settlement and let them pay the fees out of it? You know, I am serious about it.

Mr. CARSON. I am sure we could find a lot of agreement from our panelists to do that. I think it is anticipated that the $41 million encompasses the $4.1, or $4 or $5 million in attorneys fees, already.

Mr. ABERCROMBIE. Oh, OK, that is included.

Mr. CARSON. But we will work with you on that, and perhaps the panelists can—

Mr. ABERCROMBIE. But this is years and years, decades. It is not fair to cut the compensation any more than it has to be. Or did you

take, does the $41 million take into account the fees, so that the settlement is what you thought it should be?

Mr. SMITH. The $41 million actually is the value of our compensation, so we are taking out of the compensation our attorney fees, so we really—

Mr. ABERCROMBIE. I will conclude with this, Mr. Chairman. I am just saying to you that it is not their fault, and I don't see why the hell that the attorneys fees—in a lot of court cases, when you lose a case, and this is not losing exactly but it should be—you know, the judge can order you to pay the attorneys fees for the winning side. And the fact that this settlement in effect recognizes, that is what I am trying to say, that the claims of the tribes were legitimate, it seems to me the United States should pay those attorneys fees. That is my only point.

Mr. HAYWORTH. I thank the Gentleman—

Mr. ABERCROMBIE. I appreciate it. I don't want to screw up the legislation or hold it up, but I am just telling you I believe that it is not the tribes' responsibility to pay these attorneys fees, because in effect this settlement is admitting that the United States owed this money, and therefore the attorneys fees should be paid by the United States. That is all.

Mr. HAYWORTH. I thank the Gentleman from Hawaii for his point of view, and recognize the Gentleman from Oklahoma.

Mr. WATKINS. I would like to close. You know, Mr. Carson here has Cherokee ancestry and all that, and he is going to make sure, I think, things are fair. I grew up with the Choctaws down in the southern part of Oklahoma, and many of them I have worked with all my life, and lived with them literally, and Governor Anoatubby and I shared a home town together in the Chickasaw Nation for over 20-some-odd years, and I think they know that we have tried to work to have a fair settlement and one that—the main thing right now I think is, if they can get that, they can pay attorneys and get that over with, and they can have economic growth and development moving in a way that can be very positive for those tribes, for those members of those tribes.

Mr. HAYWORTH. Thank you, Mr. Watkins.

Mr. Carson, any closing comments?

Mr. CARSON. I would just ask that the record be kept open for 2 weeks on all three bills to supplement the record. And I was remiss in not thanking Mr. Watkins in my comments for his leadership and activity on this matter.

Mr. HAYWORTH. The Gentleman from Michigan?

Mr. KILDEE. Mr. Chairman, I have a statement for the record also.

Mr. HAYWORTH. Without objection, all statements will be there in their entirety, as will the statements of our witnesses. Again, gentlemen, we thank you very much, as we thank all the different panelists on the three different pieces of legislation that we considered today in this hearing, and this hearing stands adjourned.

[Whereupon, at 1 p.m., the Committee was adjourned.]

[A statement submitted for the record by Mr. Pallone follows:]

**Statement of The Honorable Frank Pallone, Jr., a Representative in Congress from the State of New Jersey, on H.R. 3476**

I commend you, Mr. Chairman, for holding this hearing on American Indian and Alaska Native (AI/AN) legislation. Such hearing opportunities serve as valuable forums to further research and understand the social, economic, legal and political complexity of AI/AN realities, before related legislation is brought to the House of Representatives for voting purposes. As Congressional history demonstrates, the decisions we make as Representatives can either positively or negatively impact these people, and their nations (i.e., tribes, bands, villages and communities).

For example, between 1887 and 1934, the U.S. Government took over 90 million acres of land from American Indians without compensation. More recently, between 1945 and 1968, Congress decided that Federal recognition and assistance to more than 100 tribes should be terminated. This termination policy created economic disaster for many American Indians, and their nations, resulting in millions of acres of valuable natural resource land being lost through tax forfeiture sales. This is a primary reason why AI/AN families have the highest poverty level of any group in the country, at a rate of 31% on some Indian reservations.

By holding hearings on the impact of legislation related to American Indians and Alaska Natives, Congress moved to rectify its prior decisions by passing self-determination and self-governance policies. As a result of such polices, AI/AN nations and villages have greater control over their lands and resources, and have made great strides toward reversing the economic blight that resulted from previous Federal policies, and have revived their unique cultures and nations. Congress must withstand pressure from those individuals and groups that call for back tracking to old AI/AN policies, such as termination and reduction of AI/AN sovereign rights. We must acknowledge and learn from our mistakes, and not repeat them in the future because AI/AN nations and villages are relying upon our commitments.

As is becoming more widely known, the United States Constitution recognizes that American Indian Nations are sovereign governments. Hundreds of treaties, the Supreme Court, the President and the Congress have repeatedly affirmed that Indian Nations retain their inherent powers of self-government. In addition, the United States Government is committed to a trustee relationship with the Indian Nations. This trust relationship requires the Federal Government to exercise the highest degree of care with tribal and Indian lands and resources.

I have thoroughly reviewed H.R. 3476, a bill to protect 697-acres of land, known as The Great Oak Ranch, held in fee by the Pechanga Band of Luiseno Mission Indians from condemnation until a final decision is made by the Secretary of the Interior regarding a pending fee to trust application for that land. I have also listened to those views that are in opposition to the passage of this legislation. I believe that there exists some misunderstanding between these two opposing sides. I am here today to clear the record.

This property is part of the ancestral homelands of the Pechanga and contains many historical, cultural and archaeological resources and sites that are significant to the Band. In addition, it is home to the largest known naturally growing California live oak tree, estimated to be more than 800 years old. And despite statements made to the contrary, there are no plans for an Indian casino to be built on this land.

H.R. 3476 simply maintains the status quo until the Federal process for taking land into trust has run its course and the application is evaluated on its merits. Furthermore, it prevents a change in the status of the land until Interior makes a FINAL determination on taking the land into trust. There is no guarantee Interior will take this land into trust; however, I do believe that this process should be allowed to run its course unabated. This legislation does not take a position on the land to trust application, infringe on states' rights, nor prevent opposing groups from appealing Interior's decision. It does, however, allow adequate time for the Department of Interior to make a final determination on taking this land into trust.

Therefore, I support passage of H.R. 3476 and would urge my colleagues to do the same.

○