IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, | * | |
| Plaintiff, | * | Case No. 89-218(L) |
| and | * | Chief Judge Edward H. Damich |
| PATTON BOGGS LLP, | * | |
| Intervenor-Plaintiff | * | |
| v. | * | |
| THE UNITED STATES OF AMERICA, Defendant. | * | |

* * * * * * * * * * * * *

**CHEROKEE NATION'S APPENDIX OF EXHIBITS IN RESPONSE TO PATTON BOGGS CROSS MOTION FOR SUMMARY JUDGMENT**

**EXHIBITS 7 - 22 OF 38**

Arthur Lazarus, Jr.
Sonosky, Chambers, Sachse, Endreson & PerryLLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240, (202) 682-0249 (fax)
alazarus@sonosky.com

Special Counsel for Plaintiff Cherokee Nation

Of Counsel:
Lloyd Benton Miller
Donald J. Simon
Anne D. Noto
Sonosky, Chambers, Sachse, Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240, (202) 682-0249 (fax)
lloyd@sonosky.net; dsimon@sonosky.com; anoto@sonosky.com

ATTORNEY'S CONTRACT

THIS AGREEMENT, made and entered into this ____ day of ________, 1988, by and between Wilma P. Mankiller, Principal Chief of the Cherokee Nation of Oklahoma, acting for and on behalf of said Cherokee Nation ("Party of the First Part"), and James G. Wilcoxen of Muskogee, Oklahoma, and Paul M. Niebell, Washington, D.C. ("Parties of the Second Part").

WITNESSETH: That the Party of the First Part, on behalf of the said Cherokee Nation of Oklahoma, under authority of a Resolution of the Council of said Cherokee Nation, adopted at Tahlequah, Oklahoma on the 13th day of August, 1988, a copy of which is hereto attached and made a part hereof, hereby contracts with, retains and employs the Parties of the Second Part as attorneys in matters hereinafter mentioned, subject to the approval of the Commissioner of Indian Affairs and to the future retention of Patton, Boggs and Blow, Washington, D.C. as co-counsel in matters hereinafter mentioned.

It shall be the duty of said attorneys to advise and to represent the said Cherokee Nation in connection with properly prosecuting to final conclusion any and all claims which said Cherokee Nation may have against the United States, which it may be authorized to present by Act of Congress in the United States courts, or any other court or tribunal.

Said attorneys shall advise the said Cherokee Nation in any matters relating to said claims, and to represent it or them before the United States Court of Appeals for the Tenth Circuit and the Supreme Court of the United States, and before any other courts or tribunals, or any officers having any duty to perform in connection with the investigation, consideration or final settlement relative to any or all suits so authorized to be filed and prosecuted for and on behalf of said Cherokee Nation.



**Ex. 7**
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

Said attorneys, in the performance of the duties required of them under this Contract, shall be subject to the supervision and direction of the Commissioner of Indian Affairs, and the said Cherokee Nation, and shall not make any compromise, settlement or other adjustment of the matters in controversy unless with the approval of the Commissioner of Indian Affairs and the Principal Chief of the said Cherokee Nation.

It is agreed that the said attorneys, subject to the approval of the Commissioner of Indian Affairs, may associate with them in said work hereunder other attorneys of their own choice and selection; provided, that neither the United States nor the Cherokee Nation of Oklahoma, Party of the First Part, is to be at any expense by reason of the employment of any such associate attorneys, all expenses thereof to be paid by the Parties of the Second Part, out of any compensation which they may receive for services to be rendered hereunder.

It is agreed that the compensation of the Parties of the Second Part, for the services rendered under the terms of this Contract, is to be wholly contingent upon a recovery for said Cherokee Nation. The Parties of the Second Part shall receive such compensation as the Commissioner of Indian Affairs may find equitably to be due as may be determined by a court or tribunal, for services theretofore rendered under this Contract, but in no event shall the aggregate fee exceed ten percent (10%) of any and all sums recovered or procured through the efforts of the said attorneys, in whole or in part for the said Cherokee Nation.

The attorneys, Parties of the Second Part, shall also be allowed and disbursed from the amount of any judgment received such actual expenses incurred by them, except such amounts as may be authorized by resolution of the Council

of said Cherokee Nation, approved by the Commissioner [illegible] be expended out of tribal funds to reimburse said attorneys [illegible] expenses during the progress of the litigation.

It is agreed that the effective date of this Contract [illegible] August 11, 1988, the date of expiration of the prior Attorneys' Contract in order to cover the services of the Parties of the Second Part in prosecuting any and all claims herein mentioned, and that the terms of this Contract shall continue for a period of two (2) years from said effective date or to August 11, 1990, and that this Contract may be extended for periods of five (5) years, each from the date of its expiration, at the option and written request of said Parties of the Second Part, with the approval of the Principal Chief of the Cherokee Nation of Oklahoma and the Commissioner of Indian Affairs.

It is agreed also that no assignment of the obligations of this Contract, in whole or in part, shall be made without the consent of the Commissioner of Indian Affairs.

It is further agreed that no assignment or encumbrance of any interest of said attorneys in the compensation agreed to be paid by this Contract shall be made without the approval of the Commissioner of Indian Affairs. Any assignment of the obligations of this Contract, and/or any assignmnet or encumbrance of any interest in the compensation agreed to be paid, made in violation of the provisions of this paragraph, shall operate to terminate this Contract, and in such event no attorney having any interest in the Contract or in the fee provided for therein shall be entitled to any compensation whatever for any service rendered to the date of the termination of the Contract.

It is agreed that in the event of the death of either one or more of the

Parties of the Second Part the estate of the deceased attorney, or the estates of the deceased attorneys as the case may be, shall be allowed compensation in such sum as the Commissioner of Indian Affairs may find equitable to be due for the services theretofore rendered under the Contract, or as may be determined by a court or tribunal equitably to be due for the services theretofore rendered under this Contract.

It is agreed that the death of one of the Parties of the Second Part, leaving the others surviving, shall not terminate the Contract, but the death of all of the Parties of the Second Part shall terminate this Contract, unless they leave surviving associate counsel holding an interest in the Contract under an assignment duly approved by the Commissioner of Indian Affairs, in which event such associate counsel shall be entitled to proceed in all claims pending before the United States Court of Appeals for the Tenth Circuit, United States Supreme Court, or in any other court or tribunal, until their final determination under the terms and conditions of the Contract, and to prosecute such proceedings in compliance with the terms and provisions of this Contract.

This Contract may be terminated by the Commissioner of Indian Affairs with the consent of the Council of the Cherokee Nation of Oklahoma for cause deemed by the Commissioner of Indian Affairs to be reasonable and satisfactory upon sixty (60) days notice to the parties in interest, and if the Contract shall be so terminated, the Parties of the Second Part shall be credited with such interest should any sum or sums be recovered by a judgment of a court or tribunal as the court or tribunal may determine to be equitable in the fee found due upon the final determination of the said suit and the controverted matters therein included.

IN WITNESS WHEREOF, we have hereunto set our hands and seals this 8th day of September, 1988.

Principal Chief of the Cherokee Nation of Oklahoma

Party of the First Part

James G. Wilcoxen

Paul M. Niebell

Parties of the Second Part

Approved pursuant to authority delegated by the Commissioner of Indian Affairs in 10 BIAM 3.

1-23-89
Date

Area Director
Muskogee Area Office

# ATTORNEYS' CONTRACT

THIS AGREEMENT (the "Contract") is made and entered into this 17th day of April, 1989, by and between The Cherokee Nation of Indians of the State of Oklahoma ("Cherokee Nation") and Patton, Boggs & Blow, Washington, D.C. (the "Attorneys").

WITNESSETH: That the Cherokee Nation or Tribe of Indians in Oklahoma, under authority of a Resolution of the Council of said Cherokee Nation, adopted at Tahlequah, Oklahoma on the 20th day of May, 1989, copies of which are hereto attached and made a part hereof, hereby contracts with, retains and employs Patton, Boggs & Blow as attorneys in matters hereinafter mentioned, subject to all required approvals. (All references hereinafter to "required approvals" shall be construed to include the Cherokee Nation Tribal Council and the Bureau of Indian Affairs, if required by regulation or statute.)

It shall be the duty of said Attorneys to advise and to represent the Cherokee Nation in connection with claims which said Cherokee Nation may have under any treaty, Act of Congress, other laws, or regulations for damages or equitable relief arising from the violation of the duties of the United States to protect the tribal lands and to manage the tribal resources of said Cherokee Nation. The terms and conditions of this Contract do not authorize said Attorneys to provide any representation in Cherokee Nation v. United States, Case No. 88-112, now pending before the United States Court of Appeals for the Tenth Circuit, nor does the representation authorized by this Contract in any way interfere with said pending litigation.

**Ex. 8**
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

Said Attorneys shall advise and represent the Cherokee Nation in the aforementioned matters before the United States Claims Court, federal district courts, Courts of Appeal, and the Supreme Court, and before any other courts or tribunals, or any officers having any duty to perform in connection with the investigation, consideration or final settlement of such matters.

The said Attorneys will pursue as their top priority, either through the litigation processes or complementary legislative efforts, a resolution by way of settlement to recompense the Cherokee Nation for its long-outstanding entitlement since 1970 to the full benefits of its rights in its tribal lands held in trust by the United States, which rights to this date have not been honored in any respect.

Said Attorneys, in performing their duties under this Contract, are subject to the supervision and direction of the Cherokee Nation, and shall not make any compromise, settlement or other adjustment of the matters in controversy without advance approval of the Principal Chief of the Cherokee Nation.

It is agreed that said Attorneys shall prosecute actions for an injunction and/or damages, which are directly interrelated with pending legislative efforts, and shall be compensated an amount not to exceed $5,000 per month for fees for the period January 1989 through June 1990, and for actual out-of-pocket costs expended in direct prosecution of said litigation, including, but not limited to, deposition transcripts, travel and subsistence expenses.

It is agreed that said Attorneys may associate with them in the aforementioned matters other attorneys of their own choice and selection; provided, that said Cherokee Nation agrees in advance to pay the expense that said Attorneys incur by reason of the employment of any such associate attorneys.

The Cherokee Nation and the Attorneys acknowledge that said Attorneys will provide considerably more legal services and incur more in fees than the amount herein provided for monthly compensation. Accordingly, it is agreed that, upon agreed monetary or other quantifiable recovery for the Cherokee Nation, through the litigation or legislative process, said Attorneys shall receive from the Cherokee Nation additional compensation of ten percent (10%) of the amount recovered less the amounts previously paid by said Cherokee Nation for attorney fees pursuant to this Contract for litigation; provided, that approvals required by law, if any, are obtained.

This Contract shall be effective for eighteen (18) months (January 1, 1989 to July 1, 1990), and may be extended for periods of two (2) years, each from the date of its expiration, at the option and written request of the Attorneys, with all approvals required by law. It is expressly understood that said Attorneys shall have no contractual obligation to continue representation of the Cherokee Nation after expiration or termination of this Contract, and the Cherokee Nation shall cooperate in said Attorneys' actions to terminate such representation, including consent to withdrawal from pending court actions.

This Contract may be terminated by the Cherokee Nation with the consent of the Tribal Council of the Cherokee Nation for cause deemed by the Bureau of Indian Affairs to be reasonable and satisfactory upon sixty (60) days notice to the parties in interest. If the Contract is so terminated, and any monetary or other quantifiable sum is recovered by judgment or settlement of a suit or related controverted matters for which Patton, Boggs & Blow has represented the Cherokee Nation, said Attorneys shall receive an equitable portion of such recovery, pro rated consistent with the terms hereof regarding additional compensation.

IN WITNESS WHEREOF, we have hereunto set our hands and seals this 13th day of November, 1989.

Wilma P. Mankiller
Principal Chief on behalf of
Cherokee Nation of Indians
of the State of Oklahoma

Joe R. Reeder, on behalf of
PATTON, BOGGS & BLOW
Washington, D.C.

Approved pursuant to authority delegated by the Commissioner of Indian Affairs in 10 BIAM 3.

NOV 13 1989
Date

Merritt Youngdeer
Area Director
Muskogee Area Office

9-24-91

PATTON, BOGGS & BLOW
2550 M STREET, N.W.
WASHINGTON, D.C. 20037
(202) 457-6000

TRT TELEX: 197780
TELECOPIER: 457-6315

WRITER'S DIRECT DIAL

(202) 457-6094

September 18, 1991

The Honorable Wilma P. Mankiller
Principal Chief
Cherokee Nation of Oklahoma
P.O. Box 948
Tahlequah, OK 74465

Re: Budget for FY 1991-1992

Dear Chief Mankiller: Wilma

Pursuant to our discussions about plans and strategy for legislative and other projects for the Cherokee Nation in the upcoming year, this letter confirms a monthly budget of $8,333.33 to cover already expanded representation of the Nation in non-litigation matters.

As you know, we have taken on a number of new legislative initiatives over time, some of which were unanticipated. In addition to our continuing efforts to secure funding for the Arkansas Riverbed Authority and riverbed surveys, we have prepared testimony and lobbied for increased Indian Health Service funding for Cherokee health facilities and services and for continued EARN funding. Other examples of new projects include our tireless efforts to secure favorable legislative language to confirm the Cherokee Nation of Oklahoma as the sole recipient of federal program grant and contract funds and of lands to be held in trust in Cherokee territory. We also have done some limited lobbying on the tribe's behalf for increased funds for Indian Housing and for the Administration for Native Americans, and are currently pursuing funding for Cherokee waste water treatment facilities construction. Also at your request I have been involved in coalition efforts to improve the bilingual outreach provisions of the Voting Rights Act.

As was the case last year, there may well be legislative and administrative opportunities/challenges we will need to address as they arise this year. The foregoing budget contemplates coverage of these contingencies, and has been discussed with Tommy Thompson. Per Tommy's instructions, I also

Ex. 9
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

will prepare and submit a separate budget for pursuit of the Cherokee Nation's economic development proposal in Garland, Texas, assuming the project is feasible based on our due diligence review you have requested.

Assuming the above non-litigation budget is satisfactory, please sign below, and we will be set for fiscal year 1991-1992.

Warm regards,

Kate

Katharine R. Boyce

KRB/vsa

AGREED:

Wilma P. Mankiller
Principal Chief
Cherokee Nation of Oklahoma

**CHEROKEE NATION**
P.O. Box 948
Tahlequah, OK 74465-0948
918-456-0671

Joe Byrd
ᏦᏫ ᏥᏍᏆ
Principal Chief

James "Garland" Eagle
ᏥᎻ ᎠᏬᎯᎵ
Deputy Principal Chief

October 30, 1995

Kate Boyce
PATTON BOGGS, L.L.P.
2550 M Street N.W.
Washington, D.C. 20037

Dear Ms. Boyce:

As you know, Cherokee Nation has recently changed Administrations. I made the commitment during the election to closely scrutinize all accounts and contracts. I have acted upon that promise.

Currently, we are reviewing our legislative needs and weighing those against our budgetary constraints. After consulting with members of the Administration and staff, I have decided that, at this time, Cherokee Nation no longer requires the services of Patton Boggs.

I would personally like to thank you for your years of service to Cherokee Nation. You recently guided our staff through the Budget Reconciliation and we are grateful for your insight. As a former Council Member, I am also aware of the role you played in obtaining funding for Sequoyah and of your involvement with the Arkansas River Bed. Our tribal members have certainly benefited from your expertise.

Please do not hesitate to contact Cherokee Nation if we can be of assistance. Again, thank you for your hard work.

Sincerely,

Joe Byrd
Principal Chief

JB/tg

**Ex. 10**
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

**CHEROKEE NATION**
P.O. Box 948
Tahlequah, OK 74465-0948
(918) 456-0671

Joe Byrd
ᏦᎾ ᏂᏯᏆ
Principal Chief

James "Garland" Eagle
ᏂᏘ ᎠᏟᏠᏢ
Deputy Principal Chief

April 23, 1996

C. Allen Foster
Katharine R. Boyce
Patton Boggs
2550 M Street, N.W.
Washington, D.C. 20037-1350

RE: <u>Cherokee Nation v. United States</u>

Dear Mr. Foster and Ms. Boyce:

Chief Byrd has referred your letter of January 19 and your letter of April 18 to me. The Cherokee Nation is not prepared at this time to issue a direct response to Ms. Boyce's January 19 suggestion that if the Cherokee Nation doesn't agree with your firm's interpretation of the fee provisions in the contract, your firm will require a statement of termination for cause by the Council before withdrawal from the case. You may wish to know that the Council was informed of the termination of the Nation's relationship with Patton Boggs during our budget process earlier this year, and no objections were voiced. If you desire affirmative public action, we can certainly seek it.

I am thus reiterating Chief Byrd's earlier position that the services of Patton Boggs are no longer required, and any representation of the Cherokee Nation by your firm in the Riverbed case since his October 1995 notification of termination of your firm's representation is not authorized by the Cherokee Nation, absent any future express direction by the Council to the contrary. Please send the motion for the Cherokee Nation's consent to your withdrawal from the case immediately. We will be back in touch with you regarding our acquisition of the litigation files, and will work out any disputes regarding fees at a later time.

Sincerely,

L. Susan Work

cc: Jim Wilcoxen, General Counsel

**Ex. 11**
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218
(Fed. Cl.)

*Wilcoxen & Wilcoxen*

*Attorneys at Law*
*112 North Fifth Street*
*P.O. Box 357*
*Muskogee, Oklahoma 74402-0357*
*E-Mail: Wilcoxenlaw@Azalea.net*

*Andrew Wilcoxen (1918-1985)*
*James G. Wilcoxen*
*Andrew C. (Drew) Wilcoxen*

*Area Code 918*
*Telephone 683-6696*
*Fax 682-8605*

# Memorandum

To: Julian Fite, General Counsel of the Cherokee Nation

From: James G. Wilcoxen

Date: November 5, 2002

This submission is made in response to your request of October 1, 2002. I will endeavor to submit a more complete response as time allows. I begin with a history which sets the stage for my involvement as well as that of associated counsel under my contract. Paul Niebell was one of the original riverbed attorneys who was also co-counsel until his death.

History:

In 1966 Oklahoma agreed to waive its sovereign immunity and allow itself to be sued for a judicial determination of who owned the Arkansas riverbed. In that year the Cherokee Nation sued the state in Federal Court in Muskogee for an accounting of all income it had received from oil and gas and sand and gravel development along 96 miles of the Arkansas riverbed within the Cherokee Nation. The Choctaws and Chickasaws intervened with like claims. The state answered waiving its immunity and asking the Court to quiet the title in the state pursuant to the equal footing doctrine.

Following adverse decisions in both the District Court and the Court of Appeals, the United States Supreme Court reversed holding that the Cherokee, Choctaw and Chickasaw Nations were the joint owners of the riverbed and that the United States had ceded tribal titles to their respective domains in present Oklahoma to the tribes by the treaties of the early nineteenth century and later confirmed by patents which included the subject riverbed.

During the seventies and early eighties, the Cherokee Nation made many attempts to settle all or part of its damage claims with the United States. At each turn the tribe was



Ex. 12
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

assured that settlement was imminent, but for various reasons the federal government failed to adopt a settlement policy that was acceptable to both the Congress and the Administrations. On December 23, 1982, after many years of study and frustration, President Reagan signed into law an act which allowed the Cherokee, Choctaw and Chickasaw nations to bring suit against the United States for all damages related to the construction of the navigation way. On May 23, 1983, the Cherokee Nation filed its complaint in the United States District Court in Muskogee alleging that construction of the McClellan-Kerr Navigation System created a loss of its tribal assets in the Arkansas riverbed. The tribe maintained that those assets were held in trust by the United States for the benefit of the tribe and that the same constituted an unlawful taking of the assets by the United States under the Fifth Amendment. The tribe also maintained in a separate section of the complaint that the United States had breached its duty to deal fairly and honorably with the tribe.

The district court framed two (2) issues:

(1) Whether the United States navigational servitude in the Arkansas River prevented it from liability for an alleged Fifth Amendment taking of tribal land; and

(2) Whether the exercise of the servitude constituted a breach of its duty to deal fairly and honorably with the tribe.

The District Court ruled favorably on the first issue and reserved ruling on the second issue. The United States appealed the Court's ruling on the first issue to the Tenth Circuit.. The Circuit affirmed the District Court holding that the Cherokee Nation did have a compensable property interest in the bed of the river even in the face of the servitude.

In 1985 following the Tenth Circuit's ruling, the United States filed a petition for writ of certiorari with the supreme Court. The Supreme Court granted certiorari and following briefing and argument held that whatever property interests the Cherokee Nation held in the Arkansas riverbed the same were subject to the United States power over navigation. This holding was consistent with previous servitude decisions. However, it was the first instance in which the Untied States' power under the servitude came into conflict with its trust obligations to an Indian tribe under the commerce clause of the Constitution. Never before had an Indian tribe whose assets were held in trust by the United States been denied compensation when the trustee used the same for its own purposes.

Following the Supreme Court's ruling in 1987, the case was sent back to the District Court in Muskogee for a decision on the second issue. The District Court after considering the position of the Cherokee Nation ruled against the tribe in the face of the Supreme Court's recent decision. That decision was appealed again to the Tenth Circuit. In 1991, the Court ruled that the Cherokee Nation could not show that the United States violated its duty to deal fairly and honorably with the tribe for the reason that the Supreme Court had removed any doubt that the tribe's property interests were subject to the navigational servitude. Thereafter, the tribe again sought review in the United States Supreme Court which was denied.

My involvement:

I first appeared in this matter in the spring of 1985. At that time, a claim pursuant to the 1982 special legislation was pending in the Eastern District of Oklahoma for all losses and damages attributable to the government's use and occupation of the Arkansas riverbed. I became counsel of record for the Cherokee Nation while the action was pending. In the summer of 1985, the district court ruled in favor of the Cherokee Nation on its claim that the actions of the United States constituted a 5th Amendment taking under the Indian Claims Commission Act of 1946. The United States appealed to the 10th Circuit Court of Appeals where the judgment in favor of the Cherokee Nation was affirmed. Throughout this process, there were various trips to Washington in an attempt to settle the matter pending appeal. Notwithstanding, the Justice Department elected to take the case to the Supreme Court. We responded first with a brief in opposition to the United States' petition for certiorari. In 1985 *cert* was granted. Paul Niebell and myself prepared and filed a brief on behalf of the Cherokee Nation in response to the brief submitted to the United States. The matter was ultimately heard on oral argument before the Supreme Court. The Court rendered its decision in the spring of 1987 reversing the 10th Circuit and remanding the matter to the Eastern District for further consideration on other claims arising under the Indian Claims Commission Act. Again, after briefing, the district court found against the Cherokee Nation because of the conclusive nature of the Supreme Court's decision on the 5th Amendment taking issue. Notwithstanding, considerable effort was made in 1989 to further research and appeal the remaining issues to the 10th Circuit, with oral argument and a petition for rehearing *en banc*. From this point forward, associated counsel provided substantial assistance in pursuit of the balance of the litigation. After the 10th Circuit affirmed the district court's denial of our claims, considerable effort was expended it the preparation of a petition for certiorari, which was ultimately denied.

No other Tribe had been denied compensation by the federal government for the taking of tribal lands for use in river improvement projects. The Arkansas riverbed situation was unique because at the time of the development of the river by the Corps of

Engineers, the federal government did not know that the riverbed was owned by the Cherokee, Choctaw and Chickasaw Nations. We therefore prepared legislation over a period of several months to cure this situation. Working closely with associated counsel, Choctaw and Chickasaw Nation representatives, the Department of the Interior and the Oklahoma delegation, particularly Congressman Synar, we were able to have introduced H.R. 4209 on February 7, 1992. The legislation would have required the Secretary of the Treasury to pay to the Choctaw, Chickasaw, and Cherokee Nations such sums as would be determined in valuation proceedings brought in the federal court for damages resulting from the use and occupation by the United States of that portion of the bed and banks of the Arkansas River owned by each such tribe pursuant to treaties with the United States as confirmed by the Supreme Court in Choctaw Nation v. Oklahoma. After considerable effort the bill was passed by the House of Representatives and was nearly cleared for passage by the Senate, but congress adjourned and the bill died. However, that legislative effort was not in vain, it laid a strong foundation for subsequent legislative efforts. Since that period of time, there has been an almost continuous attempt to negotiate a settlement with the United States. Over the last ten years, there have been extended negotiations with federal officials and elected representatives in Oklahoma and Washington, D.C. , and our efforts finally began to bear fruit. In the last three years the United States engaged seriously with the Tribes to negotiate for a settlement substantially in excess of the $8 to $10 million range that the Clinton administration had insisted on. (See letter of David Hayes attached). The Administration has finally recognized that if a settlement is not reached with the federal government, then the United States is going to have to file hundreds actions against thousands of non-Indian citizens of Oklahoma to quiet title to approximately 7,700 acres of what is now characterized as "dry bed lands." If it fails to do so, the United States risks facing breach of trust claims by the Cherokee, Choctaw, and Chickasaw Nations. Once the tribes began to embrace the concept of relinquishing their claim of title to these disputed lands, the United States began to seriously negotiate the various categories of damages which were raised in the tribes' original appraisals and claims presented in court. Incidentally, it was always Ross Swimmer's belief that these issues could be resolved for an amount in the neighborhood of $40 million and that no amount substantially less would be desirable to the tribes and no amount substantially more would be paid by the government. History has borne out that reality as can be seen from the pending legislation H.R. 3534.

Since the Cherokee election of 1999, there has been a renewed effort to settle with the government. For the last three years, I have been counsel of record in the Claims Court action, which has been held in abeyance pending the outcome of settlement negotiations. Prior to my taking over that case, the Court severely cut back the causes of action that it would entertain; and the remaining three causes of action are the subject of a dismissal motion by the United States.

Recent settlement negotiations were conducted by a local team consisting of Minerals Management Officer, BIA, Charlie Robertson, Interior Department Field Solicitor Alan Woodcock, Chickasaw and Choctaw Nations attorney Bob Rabon, Cherokee Nation attorney David Mullon, Arkansas Riverbed Authority Director, Troy

Potette, and myself. The United States began at $8 to $10 million. However, after scores of meetings, and much consultation with experts, Bill Smith and DeLon Flinchum, we finally got the government up to about $29 million for all damage categories except sand and gravel. While we were able to get the government to concede that the Corp of Engineers' records for sand and gravel movement and/or use did not disagree with our analysis, the Justice Department did not want to pay for sand and gravel per se because of the navigational servitude. We could show however that based on reasonable market value per ton and the Corps' own data, that $22 million in past and future sand and gravel was or would be moved and/or used by the government. The ultimate response was to split the difference and add $11 million to the already negotiated amount of $29 million resulting in the $40 million we knew we had to have to settle.

<u>Attorney fees</u>:

We are compiling attorney fee records for all contract and associated counsel. I will submit those as soon as we can.

Sincerely,

WILCOXEN & WILCOXEN

James G. Wilcoxen

JGW:bs

To: Principal Chief Chad Smith
Cherokee General Counsel Julian Fite

November 7, 2002

From: Patton Boggs

Re: Patton Boggs' Contractual Attorney Fees Due for Arkansas Riverbed Litigation Representation

This responds to Cherokee Nation General Counsel Julian Fite's October 17, 2002 memorandum relating to the Arkansas Riverbed and Civil Action 218-89L. First, on behalf of all of the many lawyers involved over the past nearly fourteen (14) years, Mr. Fite's recount of the Cherokee Nation's recognition of and appreciation for Patton Boggs' efforts over the years was most gratifying. In the face of substantial uncompensated time involved and low probability of success, we also appreciate very much the Tribe's stated commitment to be generous in compensating Patton Boggs. The narrative below generally track Mr. Fite's numbered issues relating to Patton Boggs' claim for $1,596,041.00 pursuant to its April 17, 1989 Attorneys' Contract executed by the Cherokee Nation, approved by the Bureau of Indian Affairs (BIA), Department of the Interior, on November 13, 1989. Exhibit 1. Although not pertinent to any aspect of the discussion below, this contract was renewed on several occasions subsequent to 1989.

A and E --Narrative of Legal Services Provided by Patton Boggs

Brief Synopsis of Initial "Legislative Representation"

In July, 1988, Cherokee Nation retained Patton Boggs to consider a number of different legislative approaches to resolve the Arkansas Riverbed matter (the "Legislative Representation"). Then Principal Chief Wilma Mankiller requested research and recommendations on new approaches, including legislation, that might secure compensation for Riverbed-related damages. Within the budget for this retention, Patton Boggs began by lobbying for and securing $400,000 in the Interior Appropriations Act for FY 1989, and like amounts annually thereafter for a total of



Ex. 13
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

3642312v6

nearly $3 million, for the Bureau of Land Management ("BLM") to conduct extensive cadastral surveys to ascertain the legal boundaries of the Arkansas Riverbed lands determined by the Supreme Court to belong to the Cherokee, Choctaw and Chickasaw Nations in Choctaw Nation v. Oklahoma, 396 U.S. 620 (1970). As part of and in addition to that funding, Patton Boggs subsequently secured appropriations for operation of the Arkansas Riverbed Authority and to help it pay for an economic valuation analysis (discussed below under "Legislative Settlement Efforts 1993-1994"), and for abstracting and legal services to prepare title opinions[1] so that the Department of Justice could commence of trespass and quiet title litigation. Without this funding for surveying and the title work overseen by the Riverbed Authority, neither the Cherokee Nation nor the other Tribes would have been in a position to press for the 600-800 trespass suits as leverage in working towards a legislative settlement.

As another strategy to spotlight the Riverbed problems, Patton Boggs sparked the interest of the Senate Indian Affairs Committee's Special Investigations Panel in holding an oversight hearing exclusively focused on the Arkansas Riverbed. On behalf the Arkansas Riverbed Authority and the three Tribes, Chief Mankiller presented the legal background of the Riverbed trust lands and highlighted BIA's failure to conduct cadastral surveys to identify the corpus of the trust to be protected, and the failure of both BIA and Justice to protect the Riverbed trust lands from trespass and pillage. Of particular interest to the Senate Investigations Panel was the oil consultant, whose testimony supported the Cherokees' claim that a number of trespassers were out right stealing oil resources from Riverbed trust lands, either because they had no BIA leases and were trespassing or

[1] With funds appropriated pursuant to Patton Boggs' lobbying efforts, the Arkansas Riverbed Authority hired Jim Wilcoxen and Bob Rabon to issue title opinions on the abstracted trust property determined, by the BLM cadastral surveying, to belong to their respective tribal clients. As noted previously, the BLM conducted the surveys expeditiously only because Patton Boggs lobbied successfully for $400,000 in BLM appropriations annually, for many years, to get the surveying accomplished.

slant drilling from adjacent non-tribal land, or because they claimed to have leases which really were on "top" of BIA leases. In either case, the BIA was doing little or nothing to halt the theft, recoup the Tribes' losses, or otherwise enforce BIA leases on tribal trust lands.

As part of the foregoing efforts, Patton Boggs began examining thousands of leases for oil and gas, sand and gravel, and some agricultural use. Through this tedious and exhaustive examination, the enormity of BIA misfeasance, nonfeasance and even malfeasance struck Patton Boggs attorneys as promising grounds for Cherokee claims for breach of trust for mismanagement along the lines of the Mitchell II claims cases that had prevailed in the Federal Claims and Supreme Court. Patton Boggs presented Chief Mankiller with the "mismanagement" theory as a legal basis for relief. The Chief welcomed this theory, particularly in light of the fact that the prospects for Paul Niebell's and Jim Wilcoxen's "takings" and "fair and honorable dealings" claims litigation then appeared doubtful. Patton Boggs proceeded to propose two litigations: 1) a mandamus action seeking an injunction directing the Secretary of the Interior to conduct surveys, which would help identify the Riverbed trust lands so that trespass suits could be filed and the Cherokee Nation could make future use of those lands; and 2) a breach of trust action against the United States for mismanaging the Arkansas Riverbed trust assets.

"Litigation Representation"

In March, 1989, Chief Mankiller chose to prosecute only the mismanagement suit in the Court of Federal Claims and discussed executing a separate contract with Patton Boggs for "Litigation Representation." Prior to drafting the new contract, however, Patton Boggs attorneys and Chief Mankiller specifically discussed whether the proposed mismanagement claim could parallel and not compete with the "fair and honorable dealings" litigation in which Paul Niebell and Jim Wilcoxen were representing Cherokee Nation before the Tenth Circuit Court of Appeals. At

the Chief's request, Patton Boggs reviewed the Niebell-Wilcoxen Attorney Contract, Exhibit 2,[2] before it was executed in 1988, That contract authorized Niebell and Wilcoxen to pursue such claims "as may be prosecuted under an Act of Congress."[3] It also expressly referenced the anticipated Patton Boggs Litigation Representation contract and made the Niebell-Wilcoxen contract "subject thereto." On April 20, 1989, Patton Boggs executed its Litigation Representation Contract with Cherokee Nation, subsequently approved by the BIA. As partial compensation for attorneys fees for the Litigation Representation from January 1, 1989 forward, the contract provided a monthly budget of only $5,000. Recognizing that this current monthly budget was very limited, the contract also provided additional compensation specified as a minimum, unqualified payment of 10% of any recovery, less attorney fees previously paid under the contract, as discussed below in "D – Position on Contract Terms."

---

[2] Patton Boggs letters dated April 11, 1989 to Chief Mankiller and Wilcoxen demonstrate that, from the outset, Patton Boggs had to overcome Jim Wilcoxen's strong resistance to the filing of the mismanagement suit. Had Patton Boggs not overcome that resistance, the relief now coming to the Cherokee Nation would never have occurred.

[3] The only two claims which Paul Niebell and Jim Wilcoxen initiated under their Attorney Contract(s), the "takings" and "fair and honorable dealings" claims, were those which Congress had specifically authorized by statute in 1982, Public Law 97-385. See Exhibit 3. By waiving the statute of limitations on Indian Claims, the Act allowed Cherokee Nation to sue for damages for the value of Arkansas Riverbed assets lost during construction of the McClellan-Kerr Navigation System. Although the "takings" claim prevailed in the lower court, ultimately the Supreme Court held that the Federal Government's exercise of the navigational servitude preempted the Cherokees' claim for damages. The subsequent "fair and honorable dealings" claim already had been denied in the lower court on virtually identical grounds and was pending appeal in the Tenth Circuit when Chief Mankiller met with and retained Patton Boggs to take a fresh look at the Arkansas Riverbed matter and recommend new and different options. After accepting Patton Boggs' recommendation to file the claim for breach of trust for mismanagement, Chief Mankiller executed the Litigation Representation Contract which specified that Patton Boggs could proceed by way of litigation, but stated clearly that "the terms and conditions of this Contract do not authorize said Attorneys to provide any representation in Cherokee Nation v. United States, Case No. 88-112 [the "fair and honorable dealings" claim], now pending before the United States Court of Appeals for the Tenth Circuit, nor does the representation authorized by this Contract in any way interfere with said pending litigation." Indeed, Patton Boggs stayed out of that litigation, with one exception. In 1992, Jim Wilcoxen began working with Hall Estill attorneys, Ross Swimmer and Joe Membrino, as co-counsel in Washington, DC to lobby for an amendment to the 1982 jurisdictional statute that, in effect, would have enabled the Tenth Circuit to recognize the then pending "fair and honorable dealings" claim, "notwithstanding" the Federal Government's navigational servitude that would otherwise bar Cherokee Nation's recovery. While Patton Boggs assisted Hall Estill in that legislative effort, they did so under a separate Legislative Representation contract which Patton Boggs had earlier executed with Cherokee Nation. After the Senate Judiciary Committee blocked that legislation, based on a perceived adverse precedent it could set by waiving the Federal Government's navigational servitude, the "fair and honorable dealings" claim failed.

On April 21, 1989, Patton Boggs filed the mismanagement claim in the Federal Claims Court, which became styled "Case No. 218-89L." Exhibit 4. Unfortunately, the case was assigned to Judge Moody Tidwell, a judge who was hopelessly biased as a former Interior solicitor.[4] The litigation proceeded at a glacial pace, as Judge Tidwell hospitably entertained the Government's filing on at least five occasions time-consuming and dilatory motions (to dismiss and to require repeated amendment of the Cherokee complaint with a "more definite statement" of the claims) before a responsive pleading was finally filed. At one point, Judge Tidwell threatened to hold Joe Reeder and Allen Foster in contempt of court because they refused to eliminate key claims (which he had dismissed) from the Complaint when it was amended. (As a matter of procedural law, to omit these claims would have abandoned them.) Subsequently, despite the provisions of the Federal Rule of Civil Procedure that pleadings only have to give fair notice of a party's claims, Judge Tidwell forced Patton Boggs to specify in the amended complaint proof of every example of alleged mismanagement. Hearings on the case often were excruciating sessions in which the presiding Judge, in open court, berated Patton Boggs attorneys because of their persistence in pressing Cherokee Nation's claims.

During the course of this protracted litigation, the BIA decided to put heavy pressure on the Cherokee, Choctaw and Chickasaw Nations by withholding, rather than continuing to distribute to the Tribes, all of the proceeds from the Riverbed, pending outcome of the Government's promised, but yet-to-be-filed, trespass claims. This capricious and mean-spirited maneuver obviously was wholly unanticipated when the parties' Litigation Representation contract was executed. Nevertheless, Patton Boggs undertook to file an appeal to the Interior Board of Indian Appeals. Patton Boggs also used the appeal to make the point that all lands identified in the Holway Study

[4] At one point in the litigation, Judge Tidwell even invited the Cherokee Nation to file a recusal motion, only to deny the motion subsequently once it was filed.

should be considered tribal lands until titles were restored judicially or at least until the Justice Department accepted the validity of BLM surveys by authorizing the filing of lawsuits to quiet title. After a frustrating year of circuitous "settlement" negotiations with BLA solicitors, Patton Boggs succeeded in forcing the release of withheld funds to Cherokee Nation[5] and to the other Tribes. Exhibit 5.

In June 1993, the Justice Department filed a motion for summary judgment against all of Cherokee Nation's claims which had not previously been dismissed by Judge Tidwell. Although the Judge denied the motion in January 1994, he also suspended the proceedings pending the completion of any trespass suits the Justice Department might ever file. Knowing that Justice had no intention of filing trespass suits whose outcome would establish conclusively the Government's liability for mismanagement, Patton Boggs recommended filing a motion to stay the Federal Claims Court litigation in order to pursue negotiation of a legislative settlement.

Legislative Settlement Efforts in 1993-1994

For the second half of 1993 through most of 1994, Patton Boggs worked closely with Chief Mankiller and particularly with in-house Cherokee Nation counsel David Mullon to develop draft settlement legislation. With the help of several senior staff of the late Congressman Mike Synar, a discussion draft bill was prepared. Patton Boggs then engaged in numerous settlement negotiations with Interior and Justice Department officials, and worked with the Oklahoma Senators and House Resources and Senate Indian Affairs Committees on the introduction of the legislation. Exhibit 7.

---

[5] This release also benefited the heirs to the 1980 Andrew Wilcoxen Attorney Contract settlement reached after the victory in Choctaw Nation v. Oklahoma, 396 U.S. 620(1970). Despite the lack of any monetary recovery in that case (or in the subsequent statutorily authorized "takings" and "fair and honorable dealings" cases), Cherokee Nation agreed to reward its victorious attorneys anyway by satisfying the 10% contingency in their contract with a settlement of $3.5 million to be paid from one-half of the revenues derived from Riverbed assets each year until fully paid, or for 25 years, whichever occurred first. Exhibit 6. In hindsight, the pegged value of $35 million for damages to its Riverbed assets (a valuation set sometime before the 1980 attorney fee settlement) is considerably higher than the $20 million actually to be recovered by Cherokee Nation after enactment of H.R. 3534, some 22 years later.

Patton Boggs also prepared an extensive economic valuation to quantify damages for mismanagement of all the Tribe's resources. (A summary chart is attached as Exhibit 8.) Before the bill's introduction, however, Interior Secretary Bruce Babbitt and Congressman Synar had a dispute over an unrelated matter and, suddenly, Interior lost interest in settlement talks. After the Oklahoma Senators declined to insert a damage figure without Interior's concurrence, effectively killing the legislative effort, Patton Boggs presented Chief Mankiller with a memorandum on "Options for Arkansas Riverbed Claims Resolution" dated October 21, 1994. Exhibit 9. One option was to reactivate the Claims Court litigation, and press the Government to bring the trespass/quiet title actions. Another was to renew the legislative settlement efforts in the new Congress. Chief Mankiller opted to reactivate the litigation in December 1994. Exhibit 10.

Patton Boggs then conceived of the strategy that turned the corner in the mismanagement litigation and ultimately resulted in the instant settlement. Rather that simply appear in court for a status conference and, there, try to convince Judge Tidwell to cease his suspension of the litigation until the trespass suits were concluded, Patton Boggs presented an enormous (4 inch thick) status report on the entire case. The very next day, on February 17, 1995, Patton Boggs proceeded to the Federal Circuit Court of Appeals to file a Notice of Interlocutory Appeal of Judge Tidwell's stay as tantamount to a final judgment under the "death knell" theory.[6] While there was some risk that the Federal Circuit might reject the appeal as premature, there also was hope for a more positive, and comprehensive ruling at a faster pace.[7] Indeed, on March 16, 1995 the Federal Circuit issued an

[6] Ordinarily, a party cannot appeal from a Trial Judge's order until he enters a final judgment. In some cases, however, interim orders constitute the "death knell" for the case and, as a result, are considered essentially to be final judgments from which appeal can be taken. The Cherokee Nation's appeal, and parallel Choctaw/Chickasaw appeal, included all of the tribal claims—even those which Judge Tidwell had dismissed in earlier skirmishes before he suspended the proceedings altogether.

[7] Patton Boggs' aggressive move intrigued Jim Wilcoxen, who requested informative materials about the lawsuit. Patton Boggs responded promptly. Exhibit 11.

order directing Cherokee Nation to show cause within ten days why its appeal should not be dismissed as premature, and requiring the government to respond seven days thereafter.

The Circuit Court's quick response apparently spooked the Department of Justice. Its attorneys tried, unsuccessfully, to persuade Patton Boggs to drop the appeal and "jointly" ask Judge Tidwell to lift its stay as an effort "in both our interests." Exhibit 12. On March 27, 1995, Patton Boggs filed Cherokee Nation's response. Exhibit 13. A month later the briefing schedule was suspended, at the parties' request, until the Court decided whether it had jurisdiction over the appeal. Unfortunately, it then took almost a year for the Court to act. On or about April 12, 1996, the Court decided to hear the Cherokee Nation's appeal and called for briefs in support of the appeal within 30 days. Exhibit 14.

By that time, however, Chief Joe Byrd had succeeded Chief Mankiller and was proceeding to replace nearly all of her key staff and counsel. During this time period, Patton Boggs was informed that its legislative services on various non-Riverbed matters were no longer required. Chief Byrd, however, had not made a definitive decision on how to proceed on the Arkansas Riverbed litigation. Therefore, by letter dated April 18, 1996, Patton Boggs wrote to Chief Byrd informing him of the Federal Circuit's decision to hear Cherokee Nation's appeal and of the need to file a brief in 30 days. Exhibit 15. Patton Boggs also prepared for Chief Byrd a comprehensive memorandum, which outlined in some detail what would need to be briefed, entitled "Status of Cherokee Nation's Mismanagement Claim Against the U.S." dated April 30, 1996. Exhibit 16. Presumably responding in Chief Byrd's absence,[8] the then Cherokee General Counsel, Susan Work, sent a letter dated April 23, 1996, directing that Patton Boggs withdraw as counsel of record in the mismanagement

[8] In follow-up calls to the Tribe, Patton Boggs was informed that the Chief was out of the country on a trip to India.

litigation and send all the files to Cherokee Nation. Exhibit 17.[9] Shortly after Patton Boggs was informed that the case would be transferred to the law firm of Chief Bird's brother-in-law, it was Jim Wilcoxen who sent a letter dated May 1, 1996 advising that the administration of the Cherokee Nation had requested that he enter his appearance in the Federal Circuit proceeding. Exhibit 19. The Wilcoxen letter directed Patton Boggs to send the complete litigation file to his office and "not to cause any briefs to be prepared or filed" in the case. Enclosed were a motion for Patton Boggs to withdraw as counsel of record, and a motion to give Wilcoxen an additional 60 days to prepare the brief awaited by the Federal Circuit.

Had Patton Boggs not been improperly and unjustifiably terminated, which occurred for no reason other than the change in leadership of the Cherokee Nation, that brief would have been filed in no more than 30 days on May 18, 1996. Instead, the only promising suit for Riverbed-related damages ever filed on Cherokee Nation's behalf was buffeted among attorneys who had enormous learning curves to overcome – not just Jim Wilcoxen, but also Washington-based James Hamilton of Swidler & Berlin, who apparently was retained as lead counsel in the Federal Circuit proceedings. No doubt Cherokee Nation paid substantially for these transitions, both in terms of lost time and money.

B and C -- Narrative of Time Expended and Payments Made Under Patton Boggs Contract

Although the time expended exceeded this amount by many fold, the terms of its Litigation Representation Contract permitted Patton Boggs to bill Cherokee Nation a maximum of $5,000 per

[9] This action was in breach of Patton Boggs Litigation Contract which, by its terms, could not be terminated by Cherokee Nation without a determination of the Tribal Council and "cause" deemed by the BIA to be reasonable and satisfactory after 60 days notice to the parties in interest. There obviously was no "cause" and certainly no "cause" deemed reasonable by anyone with authority to do so under the contract. In fact, in earlier letters from Chief Byrd, as in Susan Work's letter, Patton Boggs consistently received praise for its work. See, e.g., Exhibit 18.

month for litigation-related work beginning in January 1989. Throughout the over seven (7) years that they served as litigation counsel, Patton Boggs attorneys worked thousands of hours on the mismanagement litigation. Beginning in 1994, Patton Boggs attorneys also spent significant time, energy and resources towards a legislative settlement effort. After preparing and filing the appeal in the Federal Circuit in February 1995, the litigation activity level diminished somewhat while Patton Boggs awaited a ruling from the Circuit Court. For this period as just described, Patton Boggs attorneys, law clerks and paralegals recorded well over 6,400 hours on Cherokee litigation-related work. Each of the partner-level attorneys who worked intensely on the case (Joe Reeder, Bill Foster, Allen Foster and Kate Boyce) did so at substantially reduced billing rates (50% or less of their normal rates). They rarely recorded all of the time they spent prosecuting the litigation, or lobbying for settlement legislation in 1993-1994. Consequently, the 6,388 hours of time that was formally recorded on the mismanagement litigation and legislation represent only a fraction of the actual efforts expended by Patton Boggs over the years on behalf of the Cherokee Nation. In all there were over twenty lawyers and paralegals who worked on behalf of the Cherokee Nation on the Arkansas Riverbed litigation and legislation efforts.

As noted above, and discussed in more detail below, the Litigation Representation Contract provided for the Cherokee Nation to pay Patton Boggs a cap of $5,000 for attorneys fees. Under this Contract, the $5,000 in monthly fees, once paid, could be aggregated and backed out of the "additional compensation" of 10% of any future monetary recovery. The maximum amount that Patton Boggs could have charged for legal fees was $440,000 during the 88 months beginning January 1, 1989 through the end of April 1996, when Patton Boggs was officially asked to withdraw as counsel of record in the mismanagement litigation. Instead, Patton Boggs contained costs to the maximum extent possible. Furthermore, Patton Boggs substantially reduced its activity while the Federal Circuit was considering Cherokee Nation's appeal of the Court of Claims Stay. After Chief

Byrd's October 1995 letter indicating that the Tribe might pursue its Riverbed claims in a different fashion, by a different team of attorneys, Patton Boggs engaged only in activity necessary to remain ready to jump immediately into preparation of any filing required by the Federal Circuit. Therefore, the total amount Patton Boggs billed and collected for legal fees under the Litigation Representation contract was $403,959.[10]

While virtually all of the legal theories, briefs and day-to-day strategy for the Cherokee, the Choctaw and Chickasaw Nations pursued from the very outset of this dispute stemmed from the inspiration (and much of the perspiration) of Patton Boggs attorneys, Patton Boggs is entitled only to ten percent (10%) of the non-Choctaw/Chickasaw portion of the $40,000,000 legislated settlement of Civil Action to 218-89L, which Patton Boggs filed in 1989. This totals $2,000,000, less $403,959 paid by Cherokee Nation for attorney fees under the Litigation Representation Contract. Therefore, the total claim of Patton Boggs is $1,596,041.00.

D -- Position on Contract Terms/Abrupt Notice of Termination on April 23, 1996

Pursuant to its Litigation Representation Contract, Patton Boggs' duty was to represent the Cherokee Nation --

> in connection with claims which said Cherokee Nation may have under any treaty, Act of Congress, other laws, or regulations for damages or equitable relief arising from the violation of the duties of the United States to protect the tribal lands and to manage the tribal resources of said Cherokee Nation. Exhibit 1, at 1.

Patton Boggs' specific assignment was --

> to pursue either through the litigation processes or complementary legislative efforts, a resolution by way of settlement to recompense the Cherokee Nation . . . Id. at 2.

---

[10] This figure is based on reconstructed billing files because Patton Boggs changed automated billing systems in 1990. As a result, the firm's computer records cannot produce a running tally from January 1989 through April 1996 of professional hours worked, legal fees billed, and legal fees paid.

The Cherokee Nation agreed to pay Patton Boggs, as current monthly compensation --

> an amount not to exceed $5,000 per month for fees . . . and for actual out-of-pocket costs expended in direct prosecution of said litigation . . . Id.

In providing for the 10% payment, Cherokee Nation acknowledged that Patton Boggs would provide "considerably more legal services and incur more in fees" than the current monthly compensation authorized. To account for this, the Contract further specified as follows:

> Accordingly, it is agreed that, upon agreed monetary or other quantifiable recovery for the Cherokee Nation, through the litigation or legislative process, said Attorneys shall receive from the Cherokee Nation additional compensation of ten percent (10%) of the amount recovered less the amounts previously paid by said Cherokee Nation for attorney fees pursuant to this Contract for litigation; . . . Id. at 3.[11]

Never, under <u>any</u> circumstances, would Patton Boggs have undertaken the mismanagement litigation as a contingency matter and put in over seven years of work for a contingency amount <u>less</u> than 10%, which is lower than any other percentage contingency to which the firm has ever agreed. The Litigation Representation Contract makes it abundantly clear that the prospects of decades of successful attorney work without adequate compensation was never intended by Patton Boggs or Cherokee Nation.

Nor would Patton Boggs ever have undertaken this complex and protracted representation without express contractual protection against a whimsical discharge after years and thousands of hours of hard work. It is for this precise reason that the Contract expressly provided for a

---

[11] While not applicable in this case, even if Patton Boggs had been terminated "for cause" (which it was not), the contract specifically provided for additional attorneys fees in the event of ultimate payment to the Cherokee Nation:

> This Contract may be terminated by the Cherokee Nation with the consent of the Tribal Council of the Cherokee Nation for cause deemed by the Bureau of Indian Affairs to be reasonable and satisfactory upon sixty (60) days notice to the parties in interest. If the Contract is so terminated, and any monetary or other quantifiable sum is recovered by judgment or settlement of a suit or related controverted matters for which Patton Boggs has represented the Cherokee Nation, said Attorneys shall receive an equitable portion of such recovery, pro rated consistent with the terms hereof regarding additional compensation" Id.

minimum, unqualified payment of 10%, less attorney fees previously paid under the litigation contract, unless Patton Boggs were discharged for "cause." When efforts were mounted in 1996 to effect a "political" switch in counsel, Patton Boggs made every effort to remain counsel of record and thereby avoid any unnecessary delay and expense in the Cherokees' prosecution of what was finally becoming a successful Federal Circuit appeal of Judge Tidwell's outrageous stay. While this obviously can never be proven now, had Patton Boggs' services not been terminated solely for political reasons, the current settlement may well have more appropriately compensated Cherokee Nation.[12]

F and G -- Total Claim and Proportional Value of Patton Boggs "Effort" to Anticipated Recovery

Assuming as we do that the terms of the parties' contract is to be honored upon payment to the Cherokee Nation, Patton Boggs is entitled under its 10% contingency Litigation Representation Contract to be paid $1,596,041.00.[13] It is beyond dispute that Patton Boggs developed the theory under which Case No. 218-89L was successfully prosecuted, i.e., BIA mismanagement, and that ultimately this lawsuit has been the only viable grounds for (and, therefore, specifically referenced by civil action number in) the current legislative relief, H.R. 3534. And, as the docket sheet and pleadings amply demonstrate, the overwhelming amount of work in pursuing a just resolution of this case was provided by the many Patton Boggs attorneys who worked on it over the years.

---

[12] Similarly, we can never know whether different attorneys could have prosecuted the "takings" and "fair and honorable dealings" claims more successfully.

[13] It is unequivocally clear from the 1988 predecessor contract of Jim Wilcoxen, that Patton Boggs is entitled to a minimum of 10% payment for any "litigation or legislative" resolution. The Wilcoxen 1988 contract expressly references the anticipated Patton Boggs' contract, and is made "subject thereto."

While it is unclear why no one to date called upon Patton Boggs to assist with the final legislative solution,[14] the Cherokee Nation's one-half share of the $40,000,000 is itself a significant compromise of the amount to which Cherokee Nation is properly entitled. See, e.g., Exhibit 8. As is also clear, from the pleadings filed throughout the many years Patton Boggs served as the Cherokees' counsel in this litigation, virtually all pleadings filed by Choctaw and Chickasaw counsel, Bob Rabon, track (often verbatim) in their entirety the pleadings which Patton Boggs researched, drafted, finalized, and filed on Cherokee Nation's behalf. Mr. Rabon, who was completely cooperative with Patton Boggs and provided excellent representation to the other two Tribes, will fully corroborate this fact. Indeed, Mr. Rabon relied upon Patton Boggs throughout the years to serve without compensation as local counsel for the Chicksaw and Choctaw Nations in their "me too" suits in the Court of Federal Claims.

Most recently, Patton Boggs has made every practicable effort, without success, to engage in dialogue with the only other outside attorney of whom it is aware to have had any involvement or possible interest in the case, Jim Wilcoxen.[15] As of the date of this memorandum, Mr. Wilcoxen's response to these efforts has been a refusal to engage in any discussion. Reportedly, this same stubborn refusal has been conveyed to officials of the Cherokee Nation, despite their strongly expressed request that Mr. Wilcoxen help the Cherokee Nation reach an amicable and comprehensive resolution. Under these circumstances, Patton Boggs' claim is eminently just, extremely modest, and should now be honored.

[14] If the reason was the hope that Patton Boggs might not surface to claim its contractual attorneys fees, the fact is, such contractual right is in no manner contingent upon any whimsical (or even legitimate) reasons that may exist for excluding them from that representation. Unless discharged for "cause," which did not occur, Patton Boggs' contractual 10% contingency rights are inviolate.

[15] See Exhibit 20.

Were it not for the mismanagement lawsuit, conceived of solely by Patton Boggs and prosecuted exclusively by many different Patton Boggs attorneys until wrested away by other lawyers, perhaps with ulterior motives, there would be no recovery of any damages for Cherokee Nation, legislatively or otherwise (nor for the Choctaw and Chickasaw Nations, for that matter). As a result, both as a matter of plain and unequivocal contract entitlement and as a matter of fairness and equity, Patton Boggs should be paid its entitlement of $1,596,041.00.

## CONCLUSION

Over the course of representing the Cherokee Nation in a protracted litigation that is now being resolved legislatively, the many attorneys of Patton Boggs who fought for this client developed and demonstrated a passion that only heightened with each adversity and roadblock confronted along the way. While Patton Boggs had the contractual right to terminate this representation when prospects of success became remote, they never quit. To the day that Patton Boggs was directed to facilitate transfer of the case to other counsel (April 23, 1996), Patton Boggs and its attorneys, at great personal sacrifice, on multiple fronts delivered fierce and tireless efforts on behalf of the Cherokee Nation to precipitate relief. While the 6,388 hours of formally recorded attorneys' work reflect only part of that effort, Patton Boggs' dedication to the Cherokee Nation's cause over the years could not be more self-evident. As Mr. Fite correctly notes, these efforts were made with full knowledge that the odds of success were low. Under these circumstances, Patton Boggs would hope for strong and unqualified support from the Cherokee Nation for just compensation under the parties' contract and the renewals executed over the years.

# Exhibits to Cherokee Nation Memorandum

In Front Pocket

1. General Counsel Julian Fite's October 17, 2002 Memorandum
2. Patton Boggs' Memorandum in Response


| Exhibit # | Description | Page Reference |
|---|---|---|
| 1. | Patton Boggs' Attorneys Contract ("Litigation Representation") | 1, 11 |
| 2. | 1988 Niebell-Wilcoxen Attorney Contract | 4 |
| 3. | 1982 Jurisdictional Act (and ICC Act sections referenced therein) | 5 |
| 4. | Patton Boggs' 1989 Complaint alleging mismanagement | 4 |
| 5. | IBIA decision reversing BIA's escrow decision | 6 |
| 6. | 1980 Andrew Wilcoxen Contract Settlement | 6, 13 |
| 7. | Draft Settlement Legislation (1994) | 6 |
| 8. | Patton Boggs' Chart of Economic Valuation of Riverbed Damages | 7, 14 |
| 9. | Patton Boggs' Memorandum on Options for Arkansas Riverbed Claims Resolution | 7 |
| 10. | Chief Mankiller's Letter of October 27, 1994 on Options | 7 |
| 11. | Patton Boggs' Letter of March 1, 1995 to Jim Wilcoxen on Riverbed Mismanagement Claim | 7 |
| 12. | Letters between Justice and Patton Boggs attorneys on the appeal | 8 |
| 13. | Patton Boggs' Brief on Federal Circuit jurisdiction to hear appeal (March 27, 1995) | 8 |
| 14. | Federal Circuit Court Order of April 12, 1996 | 8 |
| 15. | Patton Boggs' Letter to Chief Byrd on filing brief on merits of Cherokee Nation's appeal | 8 |
| 16. | Patton Boggs' Memorandum on status of mismanagement Claim | 8 |
| 17. | Cherokee Counsel Susan Work's letter on Patton Boggs' termination | 9 |
| 18. | Chief Byrd's Letters praising Patton Boggs' representation | 9 |
| 19. | Wilcoxen's letter on his substitution as counsel of record in mismanagement litigation | 9 |
| 20. | Letter to Wilcoxen on attorney fee settlement | 14 |

*Wilcoxen & Wilcoxen*

*Attorneys at Law*
*112 North Fifth Street*
*P.O. Box 357*
*Muskogee, Oklahoma 74402-0357*
*E-Mail: Wilcoxenlaw@Azalea.net*

*Andrew Wilcoxen (1918-1985)*
*James G. Wilcoxen*
*Andrew C. (Drew) Wilcoxen*

*Area Code 918*
*Telephone 683-6696*
*Fax 682-8605*

May 2, 2003

Mr. Julian Fite
Cherokee Nation
P.O. Box 948
Tahlequah, OK 74465

In re: Arkansas Riverbed
(Contingency Fee Contract)

Dear Julian:

The enactment of Public law 107- 331 concluded a decades-long effort to obtain justice from the United States for the usurpation of Cherokee Nation lands and resources in the bed of the Arkansas River. Pursuant to the referenced contingency fee contract, my firm and the attorneys with whom I associated (Hall Estill Hardwick Gable Golden and Nelson, P.C. and Paul M. Niebell), represented the Nation's interest in the courts, the Congress and in negotiations with the Executive agencies of the federal government. During the period of service under the contract and its subsequent renewals, approximately 18 years, we represented the Tribe without compensation, understanding that any payment to us would be contingent on a successful resolution of the Nation's claims.

At your request I have compiled contemporary and reconstructed records to identify the time spent by those acting under my contract. The time and amounts identified do not reflect the risk associated with our contingency fee contract or the time value of money. I have not yet received records for Paul M. Niebell, although I anticipate receiving those in the near future and will forward them to you as soon as they are available.

To reconstruct my time records for the years 1985 through 1991, I have reviewed the records of proceedings in the Eastern District of Oklahoma, and the Tenth Circuit

Court of Appeals and the United States Supreme Court. For these years, the time stated is not based on contemporary time records, but is reconstructed from available records, memory and comparison to similar work.

For 1992, I supplemented the partial record I had maintained by referring to the contemporary records kept by Hall Estill for its work under the contingency fee contract. The Hall Estill records include numerous entries referring to me and describe considerable work performed by me for which I had not kept independent, contemporaneous records. Therefore, the additional aggregate times reflected were derived by reviewing those records and checking them against mine. Only those entries for Joe Membrino were considered even though I periodically worked with other members of the firm. Any time travel or inapplicable entries were eliminated from my claims.

Finally, for the years 1993 through the present, only contemporaneous records were used to identify time.

If you have any questions, please do not hesitate to contract the undersigned.

Sincerely,

WILCOXEN & WILCOXEN

James G. Wilcoxen

JGW:bs

Enclosure

Total Paid
Patton Bogg Blow
Patton Boggs

| NAME | Inv. # | Disb/Oblig # | Bus. Date | Ck # | Amount | FY 89 | FY 90 | FY 91 | FY 92 | FY 93 | FY 94 | FY 95 | FY 96 | FY 97 | FY98 | FY99 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patton Boggs & Blow | D28540 | D028540 | 11/9/1988 | 122302 | $35,000.00 | $35,000.00 | | | | | | | | | | |
| Patton Boggs & Blow | 37395 | D037395 | 5/11/1989 | 131062 | $15,000.00 | $15,000.00 | | | | | | | | | | |
| Patton Boggs & Blow | 37396 | D037396 | 5/11/1989 | 131062 | $15,000.00 | $15,000.00 | | | | | | | | | | |
| Patton Boggs & Blow | Legal | D038588 | 6/7/1989 | 132577 | $21,987.97 | $21,987.97 | | | | | | | | | | |
| Patton Boggs & Blow | 1 5 6 89 | D42309 | 8/30/1989 | 136911 | $28,001.45 | $28,001.45 | | | | | | | | | | |
| Patton Boggs & Blow | DV50384A | D50384A | 2/14/1990 | 145724 | $27,700.00 | | $27,700.00 | | | | | | | | | |
| Patton Boggs & Blow | DV50384B | D50384B | 2/14/1990 | 145724 | $5,833.33 | | $5,833.33 | | | | | | | | | |
| Patton Boggs & Blow | DV50384C | D50384C | 2/14/1990 | 145724 | $5,833.33 | | $5,833.33 | | | | | | | | | |
| Patton Boggs & Blow | DV50384D | D50384D | 2/14/1990 | 145724 | $5,833.33 | | $5,833.33 | | | | | | | | | |
| Patton Boggs & Blow | DV50384E | D50384F | 2/14/1990 | 145724 | $5,833.33 | | $5,833.33 | | | | | | | | | |
| Patton Boggs & Blow | A60110DV | D60110A | 9/13/1990 | 157024 | $2,372.50 | | $2,372.50 | | | | | | | | | |
| Patton Boggs & Blow | B60110DV | D60110B | 9/13/1990 | 157024 | $5,627.50 | | $5,627.50 | | | | | | | | | |
| Patton Boggs & Blow | C60110DV | D60110C | 9/13/1990 | 157024 | $2,372.50 | | $2,372.50 | | | | | | | | | |
| Patton Boggs & Blow | D60110DV | D60110D | 9/13/1990 | 157024 | $5,627.50 | | $5,627.50 | | | | | | | | | |
| Patton Boggs & Blow | E60110DV | D60110E | 9/13/1990 | 157024 | $5,627.50 | | $5,627.50 | | | | | | | | | |
| Patton Boggs & Blow | F60110DV | D60110F | 9/13/1990 | 157024 | $2,372.50 | | $2,372.50 | | | | | | | | | |
| Patton Boggs & Blow | G60110DV | D60110G | 9/13/1990 | 157024 | $5,627.50 | | $5,627.50 | | | | | | | | | |
| Patton Boggs & Blow | H60110DV | D60110H | 9/13/1990 | 157024 | $2,372.50 | | $2,372.50 | | | | | | | | | |
| Patton Boggs & Blow | I60110DV | D60110I | 9/13/1990 | 157024 | $54,368.43 | | $54,368.43 | | | | | | | | | |
| Patton Boggs & Blow | 62063A | D62063A | 10/31/1990 | 159731 | $3,531.57 | | | $3,531.57 | | | | | | | | |
| Patton Boggs & Blow | 62063B | D62063B | 10/31/1990 | 159734 | $5,414.78 | | | $5,414.78 | | | | | | | | |
| Patton Boggs & Blow | 62063C | D62063C | 10/31/1990 | 159734 | $5,414.78 | | | $5,414.78 | | | | | | | | |
| Patton Boggs & Blow | 62063D | D62063D | 10/31/1990 | 159734 | $5,414.81 | | | $5,414.81 | | | | | | | | |
| Patton Boggs & Blow | 62063E | D62063E | 10/31/1990 | 159734 | $5,414.78 | | | $5,414.78 | | | | | | | | |
| Patton Boggs & Blow | SP64016A | D64016A | 12/12/1990 | 161902 | $2,184.56 | | | $2,184.56 | | | | | | | | |
| Patton Boggs & Blow | SP64016B | D64016B | 12/12/1990 | 161902 | $2,184.57 | | | $2,184.57 | | | | | | | | |
| Patton Boggs & Blow | SP64016C | D64016C | 12/12/1990 | 161902 | $2,184.57 | | | $2,184.57 | | | | | | | | |
| Patton Boggs & Blow | SP64016D | D64016D | 12/12/1990 | 161902 | $2,184.57 | | | $2,184.57 | | | | | | | | |
| Patton Boggs & Blow | SP64016E | D64016E | 12/12/1990 | 161902 | $2,184.57 | | | $2,184.57 | | | | | | | | |
| Patton Boggs & Blow | NV65871A | D65871A | 1/23/1991 | 164287 | $4,628.98 | | | $4,628.98 | | | | | | | | |
| Patton Boggs & Blow | NV65871B | D65871B | 1/23/1991 | 164287 | $4,628.98 | | | $4,628.98 | | | | | | | | |
| Patton Boggs & Blow | NV65871C | D65871C | 1/23/1991 | 164287 | $4,628.98 | | | $4,628.98 | | | | | | | | |
| Patton Boggs & Blow | NV65871D | D65871D | 1/23/1991 | 164287 | $4,628.98 | | | $4,628.98 | | | | | | | | |
| Patton Boggs & Blow | NV65871E | D65871E | 1/23/1991 | 164287 | $4,628.99 | | | $4,628.99 | | | | | | | | |
| Patton Boggs & Blow | 12AG8024 | D68024A | 3/13/1991 | 167201 | $2,805.54 | | | $2,805.54 | | | | | | | | |
| Patton Boggs & Blow | 12B68024 | D68024B | 3/13/1991 | 167201 | $2,805.54 | | | $2,805.54 | | | | | | | | |
| Patton Boggs & Blow | 12C68024 | D68024C | 3/13/1991 | 167201 | $2,805.54 | | | $2,805.54 | | | | | | | | |
| Patton Boggs & Blow | 12D68024 | D68024D | 3/13/1991 | 167201 | $2,805.54 | | | $2,805.54 | | | | | | | | |
| Patton Boggs & Blow | 12E68024 | D68024E | 3/13/1991 | 167201 | $2,805.54 | | | $2,805.54 | | | | | | | | |
| Patton Boggs & Blow | 70174A | D70174A | 4/17/1991 | 169332 | $2,804.03 | | | $2,804.03 | | | | | | | | |
| Patton Boggs & Blow | 70174B | D70174B | 4/17/1991 | 169332 | $2,804.01 | | | $2,804.01 | | | | | | | | |
| Patton Boggs & Blow | 70174C | D70174C | 4/17/1991 | 169332 | $2,804.01 | | | $2,804.01 | | | | | | | | |
| Patton Boggs & Blow | 70174D | D70174D | 4/17/1991 | 169332 | $2,804.01 | | | $2,804.01 | | | | | | | | |
| Patton Boggs & Blow | 70174E | D70174E | 4/17/1991 | 169332 | $2,804.01 | | | $2,804.01 | | | | | | | | |
| Patton Boggs & Blow | FEB | D71036 | 5/8/1991 | 170598 | $2,310.06 | | | $2,310.06 | | | | | | | | |
| Patton Boggs & Blow | FEBA | D71036A | 5/8/1991 | 170598 | $2,310.06 | | | $2,310.06 | | | | | | | | |
| Patton Boggs & Blow | FEBB | D71036B | 5/8/1991 | 170598 | $2,310.08 | | | $2,310.08 | | | | | | | | |
| Patton Boggs & Blow | FEBC | D71036C | 5/8/1991 | 170598 | $2,310.06 | | | $2,310.06 | | | | | | | | |
| Patton Boggs & Blow | FEBD | D71036D | 5/8/1991 | 170598 | $2,310.06 | | | $2,310.06 | | | | | | | | |
| Patton Boggs & Blow | MAR PAY | D71723A | 5/16/1991 | 171074 | $2,406.36 | | | $2,406.36 | | | | | | | | |
| Patton Boggs & Blow | MAR PAY | D71723D | 5/16/1991 | 171074 | $2,406.36 | | | $2,406.36 | | | | | | | | |
| Patton Boggs & Blow | MARCHPAY | D71723 | 5/16/1991 | 171074 | $2,406.36 | | | $2,406.36 | | | | | | | | |
| Patton Boggs & Blow | PAYMAR | D71723B | 5/16/1991 | 171074 | $2,406.36 | | | $2,406.36 | | | | | | | | |
| Patton Boggs & Blow | PAYMARCH | D71723C | 5/16/1991 | 171074 | $2,406.36 | | | $2,406.36 | | | | | | | | |
| Patton Boggs & Blow | 7590MLLE | D75903 | 7/24/1991 | 173656 | $24,802.13 | | | $24,802.13 | | | | | | | | |
| Patton Boggs & Blow | 80873 B | D80873B | 10/31/1991 | 181971 | $2,259.82 | | | | $2,259.82 | | | | | | | |
| Patton Boggs & Blow | 80873 C | D80873C | 10/31/1991 | 181971 | $2,259.82 | | | | [illegible] | | | | | | | |
| Patton Boggs & Blow | 80873 D | D80873D | 10/31/1991 | 181971 | $2,259.82 | | | | [illegible] | | | | | | | |
| Patton P[illegible]s & Blow | 80873A | D80873A | 10/31/1991 | 181971 | $2,259.82 | | | | [illegible] | | | | | | | |
| Patton [illegible] & Blow | 8087ML N | D80873 | 10/31/1991 | 181971 | $2,259.80 | | | | [illegible] | | | | | | | |

ARK RIVER LEGAL FEES SEPT 1990

Page 1 of 4

**Ex. 15**
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

Total Paid
Patton Bogg Blow
Patton Boggs

| NAME | Inv. # | Disb/Oblig # | Bus. Date | Ck # | Amount | FY 89 | FY 90 | FY 91 | FY 92 | FY 93 | FY 94 | FY 95 | FY 96 | FY 97 | FY98 | FY99 | F |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patton Boggs & Blow | 80937AUG | D80937 | 10/31/1991 | 181971 | $4,316.30 | | | | $4,316.30 | | | | | | | | |
| Patton Boggs & Blow | 80937J-A | D80937 | 10/31/1991 | 181971 | $4,316.30 | | | | $4,316.30 | | | | | | | | |
| Patton Boggs & Blow | 80937JLY | D80937 | 10/31/1991 | 181971 | $4,316.30 | | | | $4,316.30 | | | | | | | | |
| Patton Boggs & Blow | AUG80937 | D80937 | 10/31/1991 | 181971 | $4,316.30 | | | | $4,316.30 | | | | | | | | |
| Patton Boggs & Blow | JLY80937 | D80937 | 10/31/1991 | 181971 | $4,316.30 | | | | $4,316.30 | | | | | | | | |
| Patton Boggs & Blow | A-SEPT | D81939 | 11/20/1991 | 183255 | $2,135.47 | | | | $2,135.47 | | | | | | | | |
| Patton Boggs & Blow | B-SEPT | D81939 | 11/20/1991 | 183255 | $2,135.47 | | | | $2,135.47 | | | | | | | | |
| Patton Boggs & Blow | C-SEPT | D81939 | 11/20/1991 | 183255 | $2,135.47 | | | | $2,135.47 | | | | | | | | |
| Patton Boggs & Blow | D-SEPT | D81939 | 11/20/1991 | 183255 | $2,135.48 | | | | $2,135.48 | | | | | | | | |
| Patton Boggs & Blow | SEPT | D81939 | 11/20/1991 | 183255 | $2,135.47 | | | | $2,135.47 | | | | | | | | |
| Patton Boggs & Blow | 876300-D | D87630 | 3/4/1992 | 189792 | $8,917.70 | | | | $8,917.70 | | | | | | | | |
| Patton Boggs & Blow | 87630A | D87630A | 3/4/1992 | 189792 | $8,917.71 | | | | $8,917.71 | | | | | | | | |
| Patton Boggs & Blow | 87630B | D87630B | 3/4/1992 | 189792 | $8,917.71 | | | | $8,917.71 | | | | | | | | |
| Patton Boggs & Blow | 87630C | D87630C | 3/4/1992 | 189792 | $8,917.71 | | | | $8,917.71 | | | | | | | | |
| Patton Boggs & Blow | 87630D | D87630D | 3/4/1992 | 189792 | $8,917.71 | | | | $8,917.71 | | | | | | | | |
| Patton Boggs & Blow | OCT88088 | D88088 | 3/11/1992 | 190346 | $15,127.83 | | | | $15,127.83 | | | | | | | | |
| Patton Boggs & Blow | 12272FEE | D12272 | 6/10/1992 | 196559 | $43,476.04 | | | | $43,476.04 | | | | | | | | |
| Patton Boggs & Blow | #3365100 | D23008 | 7/1/1992 | 197766 | $13,829.66 | | | | $13,829.66 | | | | | | | | |
| Patton Boggs & Blow | APR-JULY | D42247 | 12/16/1992 | 208806 | $5,719.49 | | | | | $5,719.49 | | | | | | | |
| Patton Boggs & Blow | 45370SEP | D45370 | 2/10/1993 | 212250 | $14,328.75 | | | | | $14,328.75 | | | | | | | |
| Patton Boggs & Blow | OCT45371 | D45371 | 2/10/1993 | 212250 | $14,891.06 | | | | | $14,891.06 | | | | | | | |
| Patton Boggs & Blow | 45965NOV | D45965 | 2/24/1993 | 213221 | $14,932.44 | | | | | $14,932.44 | | | | | | | |
| Patton Boggs & Blow | 484690DEC | D48469 | 3/31/1993 | 215851 | $16,455.18 | | | | | $16,455.18 | | | | | | | |
| Patton Boggs & Blow | JAN-FEB | D55769 | 8/4/1993 | 225037 | $28,875.46 | | | | | $28,875.46 | | | | | | | |
| Patton Boggs & Blow | MAR55770 | D55770 | 8/4/1993 | 225037 | $14,390.64 | | | | | $14,390.64 | | | | | | | |
| Patton Boggs & Blow | APR56735 | D56735 | 8/18/1993 | 226089 | $15,149.57 | | | | | $15,149.57 | | | | | | | |
| Patton Boggs & Blow | 57297MAY | D57297A | 8/25/1993 | 226586 | $14,820.68 | | | | | $14,820.68 | | | | | | | |
| Patton Boggs & Blow | MAY57297 | D57297 | 8/25/1993 | 226586 | $1,475.83 | | | | | $1,475.83 | | | | | | | |
| Patton Boggs, LLP | 60702JUL | D60702 | 10/20/1993 | 230969 | $11,260.01 | | | | | | $11,260.01 | | | | | | |
| Patton Boggs, LLP | 60703JUN | D60703 | 10/20/1993 | 230969 | $5,482.50 | | | | | | $5,482.50 | | | | | | |
| Patton Boggs, LLP | JUL60702 | D60702A | 10/20/1993 | 230969 | $3,246.50 | | | | | | $3,246.50 | | | | | | |
| Patton Boggs, LLP | JUN60703 | D60703A | 10/20/1993 | 230969 | $11,306.41 | | | | | | $11,306.41 | | | | | | |
| Patton Boggs, LLP | 71292A-S | D71292A | 3/16/1994 | 242586 | $14,818.15 | | | | | | $14,818.15 | | | | | | |
| Patton Boggs, LLP | 71293OCT | D71293 | 3/16/1994 | 242586 | $2,688.37 | | | | | | $2,688.37 | | | | | | |
| Patton Boggs, LLP | A-S71292 | D71292A | 3/16/1994 | 242586 | $19,449.91 | | | | | | $19,449.91 | | | | | | |
| Patton Boggs, LLP | OCT71293 | D71293A | 3/16/1994 | 242586 | $11,938.75 | | | | | | $11,938.75 | | | | | | |
| Patton Boggs, LLP | 74170DEC | D74170 | 4/26/1994 | 245638 | $16,140.02 | | | | | | $16,140.02 | | | | | | |
| Patton Boggs, LLP | 74685FEB | D74685 | 4/26/1994 | 245638 | $8,050.19 | | | | | | $8,050.19 | | | | | | |
| Patton Boggs, LLP | 74686JAN | D74686 | 4/26/1994 | 245638 | $7,413.48 | | | | | | $7,413.48 | | | | | | |
| Patton Boggs, LLP | 74687NOV | D74687 | 4/26/1994 | 245638 | $6,201.25 | | | | | | $6,201.25 | | | | | | |
| Patton Boggs, LLP | FEB74685 | D74685A | 4/26/1994 | 245638 | $7,798.06 | | | | | | $7,798.06 | | | | | | |
| Patton Boggs, LLP | JAN74686 | D74686A | 4/26/1994 | 245638 | $7,866.25 | | | | | | $7,866.25 | | | | | | |
| Patton Boggs, LLP | NOV74687 | D84687A | 4/26/1994 | 245638 | $8,459.05 | | | | | | $8,459.05 | | | | | | |
| Patton Boggs, LLP | APR84990 | D84990 | 9/15/1994 | 258061 | $2,305.05 | | | | | | $2,305.05 | | | | | | |
| Patton Boggs, LLP | APR84993 | D84993 | 9/15/1994 | 258061 | $5,149.92 | | | | | | $5,149.92 | | | | | | |
| Patton Boggs, LLP | JUL84996 | D84996 | 9/15/1994 | 258061 | $5,960.75 | | | | | | $5,960.75 | | | | | | |
| Patton Boggs, LLP | JUL84997 | D84997 | 9/15/1994 | 258061 | $1,785.66 | | | | | | $1,785.66 | | | | | | |
| Patton Boggs, LLP | MAR85245 | D85245 | 9/15/1994 | 258061 | $5,380.42 | | | | | | $5,380.42 | | | | | | |
| Patton Boggs, LLP | MAY84994 | D84994 | 9/15/1994 | 258061 | $2,398.99 | | | | | | $2,398.99 | | | | | | |
| Patton Boggs, LLP | MAY84995 | D84995 | 9/15/1994 | 258061 | $4,855.15 | | | | | | $4,855.15 | | | | | | |
| Patton Boggs, LLP | MAY84998 | D84998 | 9/15/1994 | 258061 | $5,148.29 | | | | | | $5,148.29 | | | | | | |
| Patton Boggs, LLP | 94179 | D94179 | 1/12/1995 | 268331 | $7,208.00 | | | | | | | $7,208.00 | | | | | |
| Patton Boggs, LLP | 94179-SEP | D94179A | 1/12/1995 | 268331 | $3,712.83 | | | | | | | $3,712.83 | | | | | |
| Patton Boggs, LLP | 96461OCT | D96461A | 2/8/1995 | 271163 | $8,554.54 | | | | | | | $8,554.54 | | | | | |
| Patton Boggs, LLP | JUN96434 | D96434 | 2/8/1995 | 271163 | $13,302.30 | | | | | | | $13,302.30 | | | | | |
| Patton Boggs, LLP | OCT96461 | D96461 | 2/8/1995 | 271163 | $2,754.22 | | | | | | | $2,754.22 | | | | | |
| Patton Boggs, LLP | 99962AUG | D99962A | 3/15/1995 | 274580 | $5,524.49 | | | | | | | $5,524.49 | | | | | |
| Patton Boggs, LLP | AUG99962 | D99962 | 3/15/1995 | 274580 | $5,226.76 | | | | | | | $5,226.76 | | | | | |
| Patton Boggs, LLP | 02666NOV | D102666A | 4/20/1995 | 277723 | $2,494.02 | | | | | | | $2,494.02 | | | | | |
| Patton Boggs, LLP | NOV02666 | D102666 | 4/20/1995 | 277723 | $9,106.10 | | | | | | | $9,106.10 | | | | | |
| Patton B[illegible], LLP | 03522DEC | D103522A | 4/27/1995 | 278506 | $2,296.36 | | | | | | | $2,296.36 | | | | | |
| Pattor [illegible] LLP | DEC03522 | D103522 | 4/27/1995 | 278506 | $7,102.69 | | | | | | | $7,102.69 | | | | | |

Total Paid
Patton Bogg Blow
Patton Boggs

| NAME | Inv. # | Disb/Oblig # | Bus. Date | Ck # | Amount | FY 89 | FY 90 | FY 91 | FY 92 | FY 93 | FY 94 | FY 95 | FY 96 | FY 97 | FY98 | FY99 | FY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patton Boggs, LLP | 05961JAN | D105961 | 5/25/1995 | 281455 | $6,090.53 | | | | | | | $6,090.53 | | | | | |
| Patton Boggs, LLP | JAN05961 | D105961A | 5/25/1995 | 281455 | $5,218.39 | | | | | | | $5,218.39 | | | | | |
| Patton Boggs, LLP | 07550FEB | D107550A | 6/15/1995 | 282273 | $7,656.08 | | | | | | | $7,656.08 | | | | | |
| Patton Boggs, LLP | FEB07550 | D107550 | 6/15/1995 | 282273 | $7,296.59 | | | | | | | $7,296.59 | | | | | |
| Patton Boggs, LLP | 15076MAR | D115076A | 9/6/1995 | 291972 | $9,121.13 | | | | | | | $9,121.13 | | | | | |
| Patton Boggs, LLP | 15077APR | D115077A | 9/6/1995 | 291972 | $9,226.71 | | | | | | | $9,226.71 | | | | | |
| Patton Boggs, LLP | 15078MAY | D115078A | 9/6/1995 | 291972 | $9,080.95 | | | | | | | $9,080.95 | | | | | |
| Patton Boggs, LLP | APR15077 | D115077 | 9/6/1995 | 291972 | $6,359.14 | | | | | | | $6,359.14 | | | | | |
| Patton Boggs, LLP | MAR15076 | D115076 | 9/6/1995 | 291972 | $5,959.80 | | | | | | | $5,959.80 | | | | | |
| Patton Boggs, LLP | MAY15078 | D115078 | 9/6/1995 | 291972 | $2,785.71 | | | | | | | $2,785.71 | | | | | |
| Patton Boggs, LLP | 20408JUN | D120408A | 10/26/1995 | 296993 | $1,100.95 | | | | | | | | $1,100.95 | | | | |
| Patton Boggs, LLP | JUN20408 | D120408 | 10/26/1995 | 296993 | $8,630.95 | | | | | | | | $8,630.95 | | | | |
| Patton Boggs, LLP | 22926AUG | D122926 | 11/8/1995 | 298210 | $8,787.50 | | | | | | | | $8,787.50 | | | | |
| Patton Boggs, LLP | AUG22926 | D122926A | 11/8/1995 | 298210 | $2,608.31 | | | | | | | | $2,608.31 | | | | |
| Patton Boggs, LLP | 22926AUG | D122926 | 12/13/1995 | 301307 | $8,179.21 | | | | | | | | $8,179.21 | | | | |
| Patton Boggs, LLP | AUG22926 | D122926A | 12/13/1995 | 301307 | $4,600.81 | | | | | | | | $4,600.81 | | | | |
| Patton Boggs, LLP | 25258OCT | D125258 | 1/25/1996 | 304552 | $3,610.18 | | | | | | | | $3,610.18 | | | | |
| Patton Boggs, LLP | OCT25258 | D125258A | 1/25/1996 | 304552 | $509.13 | | | | | | | | $509.13 | | | | |
| Patton Boggs, LLP | 41370JUY | D141370 | 8/23/1996 | 322356 | $7,000.00 | | | | | | | | $7,000.00 | | | | |
| Patton Boggs, LLP | 003565 | 24321 | 3/31/1997 | 333738 | $1,000.00 | | | | | | | | | $1,000.00 | | | |
| Patton Boggs, LLP | MAY - PMT | 35854 | 3/31/1997 | 338549 | $1,000.00 | | | | | | | | | $1,000.00 | | | |
| Patton Boggs, LLP | APRIL - PMT | 35853 | 3/31/1997 | 338549 | $1,000.00 | | | | | | | | | $1,000.00 | | | |
| Patton Boggs, LLP | 003565 JUNE | 43198 | 7/31/1997 | 341781 | $1,000.00 | | | | | | | | | $1,000.00 | | | |
| Patton Boggs, LLP | JUNE 97 PMT | 46700 | 7/31/1997 | 343425 | $1,000.00 | | | | | | | | | $1,000.00 | | | |
| Patton Boggs, LLP | AUG 97 PMT | 57635 | 9/30/1997 | 347804 | $1,000.00 | | | | | | | | | $1,000.00 | | | |
| Patton Boggs, LLP | JULY 97 PMT | 60668 | 9/30/1997 | 349014 | $1,000.00 | | | | | | | | | $1,000.00 | | | |
| Patton Boggs, LLP | SEP 97 PMT | 67030 | 9/30/1997 | 351890 | $1,000.00 | | | | | | | | | $1,000.00 | | | |
| | | | | | | | | | | | | | | | | | |
| Patton Boggs Total | | | | | $1,053,908.48 | $114,989.42 | $137,401.75 | $135,690.49 | $160,580.01 | $141,039.10 | $175,103.13 | $136,077.54 | $45,027.04 | $8,000.00 | $0.00 | $0.00 | |



ARK RIVER LEGAL FEES SEP 14 2005 Page # 3 of 3

SEAL OF THE CHEROKEE NATION
SEPT. 6, 1839

# CHEROKEE NATION

P.O. Box 948
Tahlequah, OK 74465-0948
918-456-0671

Chad "Corntassel" Smith
ᎣᏥᏩᏍᎩ
Principal Chief

Joe Grayson, Jr.
ᏦᏏᏓᏍᏗ ᏦᏍᎪᏍᏗ
Deputy Principal Chief

October 24, 2003

Jim Wilcoxen
Wilcoxen & Wilcoxen
P.O. Box 357
Muskogee, OK 74402-0357
918.682.8605 fax

Joe R. Reeder
Greenberg Traurig
800 Connecticut Avenue, Ste. 500
Washington, DC 20006
202.261.0125 fax

Margaret Swimmer
Hall, Estill, Hardwick, Gable,
Golden & Nelson
320 South Boston Avenue, Suite 400
Tulsa, OK 74103-3708
918.594.0505 fax

Katharine R. Boyce
Patton Boggs LLP
2550 M Street, NW
Washington, DC 20037
202.457.6315 fax

Re: Recommendations Concerning Arkansas Riverbed Attorney Fees

Dear Ladies and Gentlemen:

This letter is to accompany my latest draft of recommendations to Principal Chief Chad Smith concerning Arkansas Riverbed Settlement attorney fees. This letter is being faxed and mailed, along with the recommendations, to Jim Wilcoxen, Hall Estill, Joe Reeder and Kate Boyce.

I have discussed this matter only with Chief Smith, and each of you are seeing my views and evaluation for the first time. This, as you know, involves volumes of materials and records from an extended period of time. I have spent a great deal of time reviewing the material as well as the positions stated by Wilcoxen and Reeder. I have tried to be fair, both to the attorneys and the Cherokee Nation.

At this time, I suggest you review my recommendations and commence to point out all of my mistakes and faulty evaluations. I'm sure that my infallibility is subject to challenge.



**Ex. 16**
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

I would appreciate your written comments or responses within a couple of weeks. I will be glad to discuss any matter by phone, but I also need written comments for careful evaluation.

Sincerely,

Julian K. Fite
General Counsel

JKF:lr

# CHEROKEE NATION

P.O. Box 948
Tahlequah, OK 74465-0948
918-456-0671

Chad "Corntassel" Smith
ᎤᎰᏀᎫ
Principal Chief

Joe Grayson, Jr.
ᎫᏞᎤᏍ ᎫᎶᏂᏍ
Deputy Principal Chief

**To:** Principal Chief Chad Smith
Jim Wilcoxen, Wilcoxen and Wilcoxen
Joe Reeder, Patton Boggs
**From:** Julian K. Fite, General Counsel
**Date:** October 6, 2003
**Subject:** Attorney Fees for Work on Arkansas Riverbed Issues

**I.** **Overview: There are several claims or potential claims for attorney fees in regard to legislation passed in the latter part of 2002, settling the claims of the Cherokee Nation pertaining to the Arkansas River:**

**A. ORIGINAL FEE SETTLEMENT:**

**1. The Cherokee Nation and the attorneys who had represented the Nation in the original suit quieting title to the riverbed in the Cherokee, Choctaw and Chickasaw Nations, <u>Choctaw Nation</u> v. <u>Oklahoma</u> (U.S. Supreme Court 1970) made a fee settlement in 1980 providing for up to $3.5 million to be paid at the rate of ½ the annual revenue for 25 years. $ 1,527,701.00 remains payable. The contract expires by its terms in 2005. Due to potential ambiguities, a claim might be made that this balance would be payable from Arkansas Riverbed settlement funds.**

**B. WILCOXEN/NIEBELL CONTRACT:**

**In 1988, Cherokee Nation entered a contract with Jim Wilcoxen and Paul Niebell to pursue litigation (essentially a takings or condemnation claim) and, or, settlement of the various claims of the Cherokee Nation. Fees were to be determined by the Commissioner of Indian Affairs on an equitable basis as determined by a court with a limitation of 10%.**

**Under this contract, possibly a prior contract, and extensions of the 1988 contract, Jim Wilcoxen has rendered services from 1985 to the present. Mr. Niebell is deceased but his widow has submitted a claim for the period he worked on these matters. Also under this contract, Wilcoxen associated the Hall, Estill law firm and they have presented billings.**

**C. PATTON BOGGS CONTRACT:**

**In 1989, Cherokee Nation entered a contract with the Patton Boggs law firm for pursuit of a separate lawsuit against the U.S. for mismanagement of the resources of Cherokee Nation regarding the Arkansas Riverbed. This contract provided for monthly fees of up to $5,000 and 10% of any recovery (less monthly fees already paid). This contract was terminated in April 1997, during the Byrd administration.**

**D. SWIDLER BERLIN LAW FIRM:**

**During the Byrd administration of Cherokee Nation, the contract of Patton Boggs was terminated and the firm of Swidler Berlin was retained to pursue the claims. Swidler Berlin services were terminated in 1999.**

**E. CHEROKEE NATION STAFF ATTORNEYS AND PERSONNEL**

**During the long years of trying to resolve Cherokee Nation claims, staff attorneys and other personnel have contributed to this effort. David A. Mullon Jr. was directly involved during the Mankiller administration and again during the final three years under Principal Chief Smith. Arkansas Riverbed Commission Director Troy Wayne Poteete played a major role in the negotiations. Key administrative personnel of Cherokee Nation and the Cherokee Nation's Washington, D.C. staff were key players in Congressional efforts that resulted in the settlement legislation.**

**F. FEE LIMITATIONS AND OTHER ISSUES**

**The legislation makes specific provisions for attorney fees as follow:**

***SEC. 607.ATTORNEY FEES***

***(B) PAYMENT - At the time the funds are paid to the Indian Nations, from funds authorized to be appropriated pursuant to section 605(c), the Secretary shall pay to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations.***

***(b) LIMITATIONS - Notwithstanding subsection (a), the total fees payable to attorneys under such contracts with an Indian Nation shall not exceed 10 percent of that Indian Nation's allocation of funds appropriated under section 605(c).***

**The Cherokee Nation portion of settlement payments will total $20 million payable at $5 million per year for 4 years. These payments are conditioned on yearly appropriations from Congress. Thus there would be up to $2 million available for attorney fees payable at $500,000 per year for 4 years (if funded).**

In addition, the United Keetoowah Band has filed an action claiming an interest in the Arkansas Riverbed and demanding these funds. The legislation reserves up to 10% of the funds payable to satisfy any such claims. Should UKB be successful, $2 million could be taken from the Cherokee payments which would reduce available funds for attorney fees to $1.8 million.

## II. ANALYSIS OF CLAIMS:

Each of the claims, or potential claims, should be examined in its individual context:

### A. ORIGINAL FEE SETTLEMENT:

This fee agreement has been administered by BIA and has paid out around $2 million to date, leaving a balance due of approximately $1.5 million. The contract states that it is payable "solely from monies realized by the Nation from the sale of resources, or from earnings or income arising from the ownership of assets in the River; actual balance is $1,577,701.00

This settlement would probably not be construed as sale or as earnings or income from the resource. Since the legislation is restrictive in regard to what these funds can be used for, and sets a 10% limit on attorney fees overall, I would consider this potential claim likely to be denied if asserted.

### B. WILCOXEN/NIEBELL CONTRACT:

This contract bridges the entire litigation/settlement saga of over 30 years. Mr. Niebell was one of the original six attorneys who entered into the 1980 fee settlement above. The father of Jim Wilcoxen was also one of those six. Mr. Niebell died and his involvement ended in 1994 (his claim is asserted by his widow). Jim Wilcoxen apparently started working on these issues in 1985, although we have no record of a written contract until 1988.

Wilcoxen has submitted billings for 1985 to present. I have divided these into 1985-87 (1750 hours at $150 per hour = $262,500), and 1988 to present (2219 hours at $150 per hour - $332,850 plus expenses of $2638.83 for a total of $335,488.83). It should be noted that Wilcoxen has estimated time from 1985 up to a portion of 1992. Since then, the claim is based on contemporaneous records.

Mr. Niebell's widow has assembled records and submitted claims for 1980-1984 (482 hours); 1985-1988 (1101 hours); and 1988-1994 (1127 hours). There is no hourly rate requested in the documents submitted.

The Hall, Estill firm, operating under Wilcoxen's contract has submitted billings for 1989-94 ($264,938.22), and for additional work in

2002-2003 ($15,586.35). These records appear to be detailed and contemporaneous.

In regard to these claims, I have requested Cherokee Nation records regarding payments to these attorneys and the matters and cases involved for 1980 to present (to the extent such records are available).

C. PATTON, BOGGS CONTRACT:

Under this contract, Patton Boggs was paid $403,959 from 1989 through the termination of the contract in 1997. In addition, the firm was paid additional sums under a companion lobbying contract, much of which had to do with Arkansas Riverbed matters. In a letter dated August 11, 1995, Kate Boyce, Patton Boggs partner, indicated that Patton Boggs had accumulated $126,000 in unbilled fees for Riverbed legal work. The total amount paid this firm during the contracts was $1,053,908.48.

Patton Boggs has raised an issue that their contract was improperly terminated in 1997 during the Byrd administration; however, no apparent complaint was made at the time.

The Patton Boggs contract states that, in the event of the contract being terminated, "said attorneys shall receive an equitable portion of such recovery, prorated consistent with the terms hereof regarding additional compensation."

It should also be noted that Joe Reeder, formerly with Patton Boggs, and Kate Boyce provided valuable assistance in the passage of the 2002 legislation, at the request of Wilma Mankiller and with the consent of Principal Chief Smith.

D. SWIDLER BERLIN LAW FIRM:

This after the fact contract was entered into in 1997 and terminated in 1999. It included legal work on Arkansas River matters. Under this contract, the firm was paid $632,699.39, $202,120 of which was billing for Riverbed projects. When the contract was terminated, the Tribal Council voted specifically not to pay an outstanding balance, part of which was billing for Riverbed projects. This was due to the debt being incurred without budget authority.

III. GENERAL COMMENT:

The many and long efforts to claim the Arkansas Riverbed and the eventual legislative resolution of remaining issues has involved a long succession of Principal Chiefs, Tribal Councils, administrators, law firms and BIA and Interior Department personnel.

Except for the original litigation confirming the title to this property, none of the several lawsuits and appeals ever resulted in favorable disposition of any issues. However, the long term and continued litigation efforts helped to keep these issues alive so that the eventual legislative solution could be reached.

Likewise, the long and many efforts to reach a legislative settlement of these matters went down many dead end roads until they reached fruition last year.

On these many efforts, the Cherokee Nation has expended well over $3 million to outside attorneys. In addition, the time of staff attorneys and administrative personnel on these matters would run into hundreds of thousands, or possibly over $1 million.

Of the various lawyers and law firms who have been employed by the Cherokee Nation, most have received substantial payments. The necessity now is that Cherokee Nation must determine amounts to be approved for payment under various contracts, bearing in mind the legislative limitation on total amount.

## IV. TENTATIVE RECOMMENDATION FOR APPROVAL OF ATTORNEY FEES:

### A. ORIGINAL ATTORNEY FEE SETTLEMENT:

The amount still owed is actually for different work than the matters resolved by this legislation, and I would recommend that any lump sum payment come from funds other than the Riverbed Settlement Funds.

### B. WILCOXEN/NIEBELL CONTRACT:

Without any available contract or fee agreement, and without records to determine the status of payment for work done prior to the 1988 contract, I would not recommend full payment based on this work.

As to Wilcoxen's stated hours up until contemporaneous records begin in 1992, the claim appears a bit ambitious, though I would not doubt the honest effort to reconstruct matters from over ten years ago. I also take into account the fact that Wilcoxen and the attorneys working with him are the only ones with payments deferred to this final resolution. My recommendations also reflect the fact that Wilcoxen was involved from the beginning until final resolution.

With the foregoing, I would recommend payment to Jim Wilcoxen in the amount of $400,000, plus a performance premium for long term unpaid service and results of $150,000, for a total of $550,000.

I would further recommend a payment to the estate of Paul Niebell in the amount of $100,000.

I would further recommend payment to the Hall, Estill law firm on their two invoices of $264,938.22, and $15,586.35, for a total of $280,524.57, plus a performance premium of $100,000.00 regarding critical executive and legislative issues.

C. PATTON, BOGGS CONTRACT:

The Patton, Boggs firm was paid for the bulk of their work from 1989-1997. After that time, they were no longer involved in litigation or legislative efforts until late in 2002, discussed above.

As such I would recommend payment for the uncompensated time accrued on the Arkansas Riverbed contract in the amount of $126,000, plus a performance premium for the final assistance in the legislation in the amount of $25,000 for a total of $151,000.

D. SWIDLER, BERLIN LAW FIRM:

This firm has made no claim, and, under the facts of their involvement I would not recommend any payment.

E. CONCLUSION:

My recommendation would be, as set forth above, that the Cherokee Nation approve those amounts for payment from the Arkansas Riverbed settlement. The total payments would be $1,206,524.57.

7825 Mary Cassatt Drive
Potomac, MD 20854-3228

November 8, 2003

Mr. Julian K. Fite
General Counsel
Cherokee Nation
P. O. Box 948
Tahlequah, OK 74465-0948

Dear Mr. Fite:

Mr. James G. Wilcoxen was kind enough to send me the initial determination made by you RE: Recommendations Concerning Arkansas Riverbed Attorney Fees.

You state in the 3rd paragraph of your letter to "review my recommendations and commence to point out all of my mistakes and faulty evaluations."

This I have done and submit the following to you:

Mr. Wilcoxen contacted me in reference to the work my late husband, Paul Niebell, did for the Arkansas Riverbed Case. He sent you the 57 pages I mailed him in answer to his request. I did not put any hours down to include Paul's three trips to Oklahoma since I was not sure how to calculate them nor show any expenses.

There was no mention of any hourly rate requested for this work. In reviewing Paul's prior work on Indian claims I find that his records indicate that his rate was $100 an hour minimum.

On page 8 of your letter dated October 24, 2003 it is recommended that a payment of $100,000 be given to Paul Niebell's estate which would amount to $37.00 an hour! I certainly feel that the $100,000 is to be considered a "token" payment to his estate. No expert lawyer handling Indian claims would work for $37.00 an hour.

In view of the above I would greatly appreciate it if you would reconsider the evaluation given to Paul Niebell's estate for his work of over 2700 hours in this matter.

Thanking you in advance, I am,

Sincerely yours,

Eleanor B. Niebell

Eleanor B. Niebell
(Mrs. Paul M., Sr.)

**Ex. 17**
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

GREENBERG
ATTORNEYS AT LAW
TRAURIG

202-331 3125
Reedcrj@gtlaw.com

November 14, 2003

**BY EMAIL, FAX AND FEDERAL EXPRESS**

Julian K. Fite, Esq., General Counsel
Cherokee Nation
17675 South Muskogee
Tellequah Oklahoma 74464

Re: Cherokee Nation

Dear Mr. Fite:

This letter supplements our telephone conversations on Tuesday, November 4, 2003 and again yesterday, and your letter of October 24, 2003 and memorandum concerning Arkansas Riverbed attorneys' fees. We accept your assurances that your memo included only draft recommendations, and that you are open to revising those recommendations based on our correction of mistakes and faulty evaluations, which we address below.

**Undisputed Facts Pertaining to Patton Boggs' Claim**

Over one year ago on November 8, 2002, we transmitted to you a detailed memorandum and 20 exhibits demonstrating unequivocally the entitlement of Patton Boggs to the agreed compensation prescribed by its Attorneys' Contract (the "Litigation Contract") (Original Exhibit 1)[1], authorized by Cherokee Tribal Council Resolution No. 31-89 (Exhibit 21)[1].

The Bureau of Indian Affairs formally approved the contract, assigning Number TAC-012-89, after receiving responses to its questions from Cherokee Nation by letter dated September 22, 1989 resulting in discounted fees and a limitation of payments to Patton Boggs to $5,000 per month, and a specified additional "compensation equal to 10% of any recovery less that amount previously paid by Cherokee Nation." (Original Exhibit 3) This letter also addressed the termination for cause provision, explaining that the Contract "gives the right of contract termination to the Cherokee Nation with tribal council consent, and not to the Secretary ..." (except to the extent that the Contract empowered the BIA to determine reasonableness in the event of a "for cause determination"). To our knowledge, no Tribal Council Resolution has ever existed that authorized the termination of the Litigation Contract "for cause." In any event, Patton Boggs' was never notified of any such finding, and is confident that all responsible parties involved at the time will confirm that no such cause ever existed.

[1] "Original Exhibits" refer by number to the November 8, 2002 Exhibits 1-20. There are two (2) new Exhibits (No's 21& 22) attached to this Supplemental Memorandum, as marked.

A - 117

Ex. 18
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

Pursuant to the Litigation Contract, Patton Boggs attorneys conceived, filed, and litigated for over seven years Civil Action No. 218-89L, Cherokee Nation's claim for breach of trust for mismanagement of the Tribe's Arkansas Riverbed assets – a claim, or cause of action, no other law firm has ever alleged and prosecuted on behalf of the Cherokee Nation. Nor did the Choctaw or Chickasaw Nations ever think to prosecute claims for "mismanagement" until their "me too" pleadings, filed after Patton Boggs asserted this claim on behalf of the Cherokee Nation. Unquestionably, this action is the only basis and, indeed, the statutorily stated basis, for the resulting legislative settlement, as specified in sections 602(2), (12) and (16) and 605(a) of the Cherokee, Choctaw and Chickasaw Nations Claims Settlement Act (hereinafter "Settlement Act").

The Cherokee Nation has never challenged the accuracy of any facts set forth in our November 8, 2002 submission. Neither your October 24, 2003 transmitted memorandum nor any of your statements on the phone in any way questions any of the facts presented or exhibits provided to support the claim of the Patton Boggs law firm that resulted in the $40 million legislated settlement. In fact, during your November 4, 2003 conversation with Allen Foster and me, you acknowledged that nothing in our November 8, 2002 submission was determined to be incorrect. Your October 2003 memorandum also acknowledges that, in addition to the Patton Boggs lawsuit, our recent personal work was instrumental in achieving the 2002 legislative result itself.

**Settlement Act Provisions**

The obligation of Cherokee Nation to pay attorneys fees stems from Section 607 of the Settlement Act directing the Secretary to "pay to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations." As you note in your memo, the Settlement Act imposes certain limitations, but you omitted two key limitations. First, Section 607(a) directs the Secretary to pay the attorneys before the balance of the appropriated funds are deposited in the trust fund account provided for Cherokee Nation under Section 606. Second, at the time the trust fund account is established to hold Cherokee Nation's allocation, Section 608(b)(2) directs creation of a special holding account into which ten percent (10%) of those allocated funds to be set aside for distribution if another Tribe prevails in a claim brought under Section 608(b). Therefore, the Settlement Act provisions do not permit Cherokee Nation to reduce or withhold any funds provided for payments to which the attorneys are entitled under their approved contracts based on the possible future success of such a claim (e.g., by the United Keetoowah Band). Accordingly, the balance of this letter discusses attorney fee entitlements to amounts totaling $2,000,000.

**The Governing Agreement: Patton Boggs Litigation Contract**

Our November 8, 2002 submission fully addresses Patton Boggs attorneys' entitlement to "compensation of ten percent (10%) [$2,000,000] of the amount recovered [$20,000,000] less the amounts previously paid [$406,939] by said Cherokee Nation for attorneys' fees pursuant to this contract for litigation." Patton Boggs attorneys' claim of $1,596,041 is based squarely on

that Litigation Contract, which, by its terms (all fully and formally approved by Cherokee Nation and the Federal Government, in writing), expressly makes all of the other attorney fee contracts (i.e., the Wilcoxen/Niebell contract, as discussed on pages 6-7 below) subject to and subordinate to the Patton Boggs Litigation Contract.

Your October 2003 memorandum gingerly raises the issue of the Litigation Contract's improper termination in 1997, and incorrectly states that no apparent complaint was made at the time. In fact, however, Patton Boggs strenuously objected to the political maneuverings by both in-house and outside counsel to orchestrate the termination of the Litigation Contract totally without cause. Exhibit 16 to our November 2002 submission, Patton Boggs' letter of April 18, 1996, states: "If you insist on changing counsel at this critical juncture, we will, of course, cooperate fully in the transition, but we feel it is only fair to point out that we will hold the Nation fully responsible for any loss we suffer thereby."

In order to prevent an unjust abuse of Patton Boggs, once it proceeded in good faith to pursue the Cherokee Nation's mismanagement claims, all of the parties' contracts were cancelable only "for cause." See Original Exhibits 1, 2 and 16. Patton Boggs' representation obviously was never terminated "for cause" and neither you nor the Cherokee Nation has ever contended otherwise. Only if the termination had been "for cause" would Patton Boggs' otherwise unqualified right to 10% of the $20,000,000 recovery (less fees paid) be limited to "an equitable portion." See last sentence of Original Exhibit 1. The Cherokee Nation's then General Counsel, Susan Work, acknowledged that Patton Boggs was not dismissed "for cause" (see Original Exhibit 17), dismissively relegating resolution of Patton Boggs' fees to "a later time." That time has come, the Litigation Contract terms apply the same 10% (less fees paid) compensation formula for contract termination without cause, and Patton Boggs' full claim should be honored.

We find it shocking that, without questioning or in any way even addressing any of the law and facts presented in our November 8, 2002 submission supporting Patton Boggs' claim for $1,596,041, your memo interjects wholly irrelevant, and frankly erroneous, statements. With no factual support (because there isn't any), your memo states that "much" of the additional sums paid to Patton Boggs under a companion lobbying contract had to do with Arkansas Riverbed matters.[2] You then alluded to a Patton Boggs letter dated August 11, 1995 that discussed the outstanding amount in legal fees owed by Cherokee Nation for a whole variety of services and picked out of that document a passing reference to "more than $126,000 in 'unbilled' fees" on Arkansas Riverbed-related work. At least you recommend $25,000 for work done in connection with final lobbying to secure enactment of the Settlement Act, but you seem to have concluded that, in complete disregard of the parties' approved contract, the total of $151,000 should be the entire of Patton Boggs' entitlement.

[2] Of Patton Boggs' ten different subject matter sub files for Cherokee Nation, only three contained billings related to Arkansas Riverbed matters. By far the largest billings fell into the general legislative and six other sub files.

It is unconscionable to hold against Patton Boggs the fact that it received payment for legislative work that the firm was entitled to bill under a totally separate and unrelated lobbying contract. In fact, that work netted Cherokee Nation over $13 million for construction and staffing of two tribal health clinics, sewage treatment facility construction, and high school construction and renovations, in addition to nearly $3 million secured in appropriations for cadastral surveying of Arkansas Riverbed boundaries and operation of the Arkansas Riverbed authority. See Exhibit 22. Because Patton Boggs did not consider this almost $16 million that Patton Boggs achieved for the Cherokee Nation as having anything to do with the Arkansas Riverbed contract, Patton Boggs has not claimed entitlement to 10% of this amount. If, as your memo suggest, the Cherokee Nation concludes otherwise by counting in the very modest fees corresponding to that $16 million, then Patton Boggs would be entitled to an additional $1.6 million, less those corresponding fees, or a total now due and owing of about $2.6 million instead of $1.6 million.

Also misplaced is the attempt to make relevant any outstanding "unbilled" legal fees for litigation and legislative work related to the mismanagement claim. We did not previously address this issue because the Litigation Contract disregards such a calculation by prescribing merely compensation of 10% of the amount of the Arkansas Riverbed mismanagement claim settlement achieved, less fees paid. Nor could Patton Boggs' August 11, 1995 memorandum fairly be viewed as a claim for unbilled fees under the Litigation Contract. Rather, the memo discussed the legal fees billable under the two separate fee agreements for the sole purpose of expediting payment of several months of outstanding invoices. [3] Had the purpose of that 1995 memo been to reconstruct all of the thousands of hours expended (both recorded and unrecorded) at normal rates (not the substantially reduced rates labored under for seven years), the unbilled fees figure would be both accurate and dramatically larger. Since Patton Boggs penalizes partners for unbilled fees carried over in subsequent years, its attorneys were willing to file the mismanagement lawsuit only after the 10% contingency (less fees paid) compensation terms were agreed to by Cherokee Nation, memorialized in the Litigation Contract, authorized by the Tribal Council, and approved by the Bureau of Indian Affairs. The Cherokee Nation's Principal Chief at the time, who personally negotiated this contract, knows and can confirm this.

As a final point, while we appreciate your recommendation to pay a performance premium of $25,000 for securing passage of the 2002 Settlement Act, not even pretending to honor the unequivocal terms of the Litigation Contract approved by the Cherokee Nation, its Tribal Council, and the BIA is unconscionable.

---

[3] In fact, wholly independent of the Arkansas Riverbed claim, Patton Boggs still is owed $18, 457 for which it pursued collections in 1997-1999 and through you by letter of June 13, 2000 until you advised Kate Boyce by phone that you would not present the outstanding amount for payment because the Tribal Council was not interested in paying more attorneys' fees in the wake of the Tribe's dispute with Swidler Berlin over the inordinate attorney fees charged by that firm. It bears repeating that Cherokee Nation would never have had to hire Swidler Berlin, and incur those extraordinary (and needless) fees for Arkansas Riverbed litigation representation, if your predecessor, former General Counsel Susan Work under Chief Joe Byrd's administration, had not directed Patton Boggs to withdraw as litigation counsel without cause.

**Wilcoxen Litigation Contract**

Moving to the only other attorney contract that could conceivably be at issue in this matter, the 1988 Wilcoxen/Niebell contract, its own terms fail to support your recommended payments to Jim Wilcoxen. First, his contract relates only to litigation pursuing claims specifically authorized by a 1982 statute that waived the statute of limitations as to claims for a "taking" and breach of the duty of "fair and honorable dealings." The prosecution of both of these claims failed. Totally. And no one will contend otherwise. Nor, could anyone contend that either the "takings" or the "fair and honorable dealings" claims have anything whatever to do with the mismanagement claim prosecuted by Patton Boggs and settled by Congress in 2002.

Second, while the Wilcoxen/Niebell contract permitted the association of "other attorneys of their own choice and selection ...," it also clearly specified "that neither the United States nor the Cherokee Nation of Oklahoma ... is to be at any expense by reason of the employment of such associate attorneys, all expenses thereof to be paid by [Wilcoxen and Niebell], out of any compensation which they may receive for services to be rendered hereunder." Indeed, both in your October 2003 memo and in our November 4 telephone conversation, you acknowledged that the Hall Estill firm was a Wilcoxen subcontractor. Therefore, any compensation to the Hall Estill firm for Arkansas Riverbed-related services, by the terms of Wilcoxwn's own contract, must come from compensation to Wilcoxen under his 1988 attorney contract, and not from Cherokee Nation and certainly not from Patton Boggs.

Once you receive and review the records you have requested on previous payments to Jim Wilcoxen for matters handled by him from 1980 to the present, we are confident you will confirm the absence of any factual basis for your memo's statement that Wilcoxen and the attorneys working with him "were the only ones with payments deferred to this final resolution." Apart from the fact that Patton Boggs had significant payments deferred, Jim Wilcoxen has indeed received payment for Cherokee legal work related to the Arkansas Riverbed, including title and other legal matters (for which payment was made from funds appropriated pursuant to successful lobbying by Patton Boggs attorneys), as well as payments as a beneficiary of the original 1980 Contract Fee Settlement Agreement of $3.5 million (based on a projection of ultimate federal compensation to Cherokee Nation of $35 million).

**Conclusion**

In sum, Cherokee Nation's contract obligation to Patton Boggs attorneys could not be more clear and unequivocal. We would hope for the Cherokee Nation and its members to be genuine in their desire to deal fairly and honorably with the firm that conceived of the winning theory (mismanagement) and whose substantial prosecution of the Cherokee claim set the stage for settlement and payment of federal compensation for Arkansas Riverbed-related losses. The fact is that any objective third party can and would easily confirm the merits of Patton Boggs' contractual entitlement at this time. Your letter, offering Patton Boggs about nine cents on each

dollar it is owed, is unconscionable. When contrasted to a proposal to compensate Wilcoxen 115% for each dollar you say he claims, along with an inexplicable performance bonus for a total of about 164% on each dollar, any pretense at objectivity is gone. When coupled with a proposal to pay the newly surfaced Hall Estill firm 100% on each dollar it now claims under a newly revealed subcontract with Wilcoxen, the total lack of objectivity becomes conclusive.

For reasons reiterated above, Patton Boggs' contract rights are clear and unequivocal, as any impartial party can and would quickly confirm. In the spirit of compromise, and based upon the misrepresentation last November that a decision was imminent, and that Patton Boggs' submission was needed on an expedited basis, we made a substantial submission on November 8, 2002. At this time, we ask to meet with Principal Chief Chad Smith. While we genuinely regret what other firms may have done to the Cherokee Nation, throughout all of the years that it represented this great Tribe, never once did Patton Boggs give less than 100%. Nor did Patton Boggs ever fail to deliver. Given all the injustices that Cherokee Nation has endured throughout its proud heritage, to fail now to treat this devotion, and this track record with dignity, respect, and genuine gratitude, is unfortunate. Patton Boggs will obviously not accept the unconscionable result proposed in your October 24th letter. And it would wish not to be forced to fight to have the simple terms of its contract honored.

We hope, Chief Smith will grant Patton Boggs the dignity it earned the hard way, uncompensated for 14 years, capped by delivery of success in 2002. Patton Boggs deserves, now, to be paid what it has contractually earned, and to be thanked for what it has done for the Cherokee Nation.

Sincerely,

Joe R. Reeder
C. Allen Foster
Counsel to Patton Boggs LLP

JR/elm

Enclosures [Index of Exhibits; and Exhibits 22 & 23]

cc: Honorable Chad Smith
Principal Chief, Cherokee Nation



GREENBERG TRAURIG, LLP
800 CONNECTICUT AVENUE, N.W. SUITE 500 WASHINGTON, D.C. 20006
202-331-3100 FAX 202-331-3101 www.gtlaw.com
MIAMI NEW YORK WASHINGTON, D.C. ATLANTA PHILADELPHIA TYSONS CORNER CHICAGO BOSTON PHOENIX WILMINGTON LOS ANGELES DENVER
FORT LAUDERDALE BOCA RATON WEST PALM BEACH ORLANDO TALLAHASSEE

HALL
ESTILL
ATTORNEYS AT LAW

Margaret A. Swimmer
Direct Dial: (918) 594-0426
Facsimile: (918) 594-0505
mswimmer@hallestill.com

December 5, 2003

**VIA OVERNIGHT DELIVERY**

Julian Fite, Esq.
General Counsel
Cherokee Nation
17675 South Muskogee Avenue
Tahlequah, OK 74464

Re: Recommendations Concerning Arkansas Riverbed Attorney Fees

Dear Julian:

Thank you for taking the time to discuss with us by telephone the draft recommendations to Principal Chief Chad Smith for allocation of attorney fees for the Arkansas Riverbed settlement which you had shared with us by letter of October 6, 2003. At the conclusion of the conference, you requested we make a written submission of our comments on the proposed allocation. Accordingly, we respectfully submit this letter to request that you reconsider and increase the recommended allocation to Hall Estill for two reasons.

First, the allocation does not reflect the years of work that Ross Swimmer, during his tenure at Hall Estill and as a private consultant to the Nation, and other attorneys at Hall Estill devoted to advancing the Arkansas Riverbed settlement. Second, the allocation to Hall Estill is based on the hours for which billing records were submitted, but that allocation does not recognize that Hall Estill represented the Cherokee Nation under a contingent fee contract. For 14 years Hall Estill bore the cost of attorney time and out-of-pocket expenses.

When Ross Swimmer joined Hall Estill, he arranged for the firm to be associated under Wilcoxen & Wilcoxen's contingent fee contract covering the Arkansas Riverbed claims. Under that contract, Ross and others at Hall Estill worked on litigation and legislation, as well as with the first Bush and Clinton administrations to resolve the riverbed claim. In the 102nd Congress, during the first Bush administration, Ross led the legislative effort for enactment of a special jurisdictional act to resolve the riverbed claim: H.R. 4209 and S. 2750 "To amend the Act entitled 'an Act conferring jurisdiction on certain courts of the United States to hear and render judgment in connection with certain claims of the Cherokee Nation of Oklahoma'". Although that legislation was not enacted, it focused the attention of Congress and the Executive Branch on the riverbed and laid a foundation for later success in the 107th Congress. Subsequently, the Nation accepted Ross' recommendation that the Nation build on the record it had developed to

A - 123

Ex. 19
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

justify a settlement. Hall Estill and Jim Wilcoxen supported that recommendation and continued to pursue the settlement.

Because Hall Estill represented the Cherokee Nation under the terms of a contingent fee contract, Ross did not maintain detailed records of all his work on behalf of the riverbed settlement. The hours displayed in the Hall Estill records submitted through Wilcoxen & Wilcoxen represent only a fraction of the time Ross Swimmer devoted to the settlement. You will see in those records several mentions of meetings and other activities in which Ross participated, but for which he did not record his time. For his critical role in advancing the settlement, we request that you adjust your recommended allocation to include $100,000.00 as compensation for this work and for Ross Swimmer's/Hall Estill's contribution to the success of the settlement.

Second, as noted in your October 6 memorandum, Hall Estill operated under Wilcoxen & Wilcoxen's contingent fee contract for the period 1989 until 2003. That contract provided for a payment of up to ten percent of the financial recovery as attorney fees.

You observed that Hall Estill's billing records submitted for the work during that time appeared to be detailed and contemporaneous. In fact, those records are contemporaneous and were compiled and maintained pursuant to Hall Estill's time management system. Those records reflect all of Joseph Membrino's and Margaret Swimmer's time on the Cherokee Nation's behalf at billing rates then in effect. They do not, as discussed above, reflect all of Ross Swimmer's time. Nor do they reflect the fact that compensation for the value of the time devoted to the settlement effort would be paid only in the event that we were successful in securing a settlement. Hall Estill, under its contract, accepted that risk and delayed payment because of its expectation of a contingent fee award. In lieu of the contingent fee provision in the Wilcoxen & Wilcoxen contract, we invite you to consider increasing the allocation to Hall Estill by an amount representing 6% interest from 1995 to 2003. This rate is one-third of Hall Estill's standard interest charge to clients that carry balances for long periods of time. We propose that the 6% rate be applied from a point in time beginning one year after accrual of the bulk of the hourly time submitted, *i.e.* 1995, and that its application be limited to the $280,524.57, not the additional compensation requested above for Ross Swimmer/Hall Estill's contribution to the success of the settlement. The proposed interest amount, *i.e.* $83,209.71, represents only a portion of the increased present value of services provided.

In summary we respectfully request an adjustment in the recommended payment as follows:

| | | |
|---|---|---|
| | $280,524.57 | |
| | 83,209.71 | (Interest on $280,524.57 for 9 years at 6%.) |
| | 100,000.00 | (Additional compensation) |
| Total | $463,734.28 | |

Thank you for your consideration of this request. If you have any questions we can discuss them with you at your convenience.

Sincerely,

Margaret A. Swimmer

Joseph R. Membrino

cc: James G. Wilcoxen

402335.1:999914:00014

GREENBERG
ATTORNEYS AT LAW
TRAURIG

Joe Reeder
202-331-3125
Reederj@gtlaw.com

December 17, 2003

**VIA FAX AND FEDERAL EXPRESS**

Principal Chief Chad Smith
Cherokee Nation
657 South Muskogee
Tahlequah, Oklahoma, 74464

Re: Just Compensation under Patton Boggs Litigation Contract

Dear Chief Smith:

This letter responds to your request to the two of us during your December 1, 2003 conference call concerning the Patton Boggs law firm claim for compensation pursuant to its Attorney Contract, executed by then Principal Chief Wilma Mankiller, and duly approved by Tribal Council Resolution and the Bureau of Indian Affairs.

As we have explained in depth, and fully documented in our two earlier submissions to the Cherokee Nation, the Patton Boggs Attorney Contract: (1) is the only attorney the Cherokee Nation consummated for the stated purpose of pursuing, through litigation and legislative settlement, claims for breach of trust for mismanagement of Cherokee Nation's Arkansas Riverbed trust assets (Civil Action No. 218-89L); (2) makes all other attorney contracts related to Arkansas Riverbed trust assets "subject to" the Patton Boggs contract; (3) requires payment to Patton Boggs attorneys of an amount equal to ten percent (10%) of Cherokee Nation's recovery less attorney fees previously paid under the contract, unless the contract is terminated with Tribal Council approval for cause deemed reasonable by the BIA; and (4) there was never any termination for cause.

We understand from speaking with you and Julian Fite, that both of you have read both our 2002 submission and our 2003 submission, and the 22 Exhibits thereto. We also understand from each of you that, having reviewed these two submissions responsive to requests from Cherokee Nation, neither of you dispute any of the facts in our submissions, principally summarized in the four enumerated statements in the preceding paragraph. Furthermore, you both appreciate the fact that, because the contract terms do not require calculation of hours worked to arrive at the contractual compensation owed, Patton Boggs' claim is based on deducting fees previously paid from the $2,000,000 attorneys fee owed by virtue of the Settlement Act, and the parties contract.

During our December 1 conference call, you asked that we endeavor to reconstruct and submit to you the actual hours devoted to all aspects of the mismanagement litigation and settlement efforts. We are confident you can appreciate the difficulty of reconstructing time worked but never fully recorded because our Attorney Contract neither required nor contemplated that we would



**Ex. 20**
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

charge by the hour and submit and maintain precise, detailed data in that manner. Further complicating this arduous task, as explained in our November 2002 submission, Patton Boggs installed a new computerized billing system in December 1990. While we do not have all the time that was devoted to this cause, we have attempted to recapture from the billing system the total professional hours devoted to Arkansas Riverbed litigation matters. The attached chart reflects, by year, a breakdown totaling 6,528.80 hours recorded by a total of 64 individuals. You will note from the chart that there are many months during which the lead partners -- Joe Reeder, Allen Foster, and Kate Boyce -- often recorded little or no time (while other professionals were entering time) because we relied on the Tribe's contractual commitment to pay pursuant to the contract's prescribed compensation formula. Had we billed every hour we ever worked, amassing millions in uncollected fees, the firm's compensation system would be penalizing the three of us even more harshly than it already did while we have waited for fourteen (14) years to receive our hard-earned, rightful compensation. We are sure the actual total hours exceeded by well over 500 hours in excess of the 6,528.80 hours documented on the attached chart. At regular hourly rates this obviously would have resulted in billings exceeding the amount we have claimed as our entitlement under the contract.

We are confident that, as a reform candidate elected to lead the Cherokee Nation and set it on the right course again, you take very seriously the importance of reputation for the integrity and dependability in professional relationships such as the relationships formally embodied in the Cherokee Nation's approved contract with Patton Boggs. Based upon our contract and all that Patton Boggs has done for the Cherokee Nation over the past 15 years[1], we ask that Cherokee Nation honor both the spirit and the terms of our agreement. We hope that your review of this third submission on behalf of Patton Boggs will help lead you to conclude that we should resolve our differences amicably. If that effort fails, we understand that while you are unwilling to engage in neutral binding arbitration, you are open to non-binding ADR, as a means of achieving a just resolution. For that we thank you.

Respectfully submitted,

Joe R. Reeder C. Allen Foster

Enclosure

cc: Katharine R. Boyce, Esq.

[1] Our previous submissions have catalogued the over $16 million in appropriations Patton Boggs achieved as the Cherokee Nation's solo lobbyists in Washington. Part of this appropriations lobbying secured formerly permanent statutory language that made Cherokee Nation the exclusive recipient of Interior funds for use for Indian programs within its 14-county jurisdictional service area and gave the Tribe the right to concur on any trust land acquisition for any other tribe within the 14-county service area. This was a very significant achievement that, unfortunately, was lost after Patton Boggs ceased representing Cherokee Nation during the Byrd Administration.

**Cherokee Nation - 3565**

| Riverbed Hours | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | Total Hours |
|---|---|---|---|---|---|---|---|---|---|
| Tuttle | | | 3.00 | 25.00 | 14.50 | | | | 42.50 |
| AA Rothrock | | | | | | 58.00 | 2.75 | | 60.75 |
| A White | | | | | | | 141.50 | | 141.50 |
| BB Harshman | | | | | | | 21.25 | | 21.25 |
| BA Hoppert | | | | | 289.25 | | | | 289.25 |
| B Rockwell | | | 0.50 | | | | | | 0.50 |
| B Xu | | | | 1.75 | 56.75 | 0.50 | | | 59.00 |
| CA Foster | | 21.75 | 15.50 | 13.25 | 3.50 | 20.00 | 50.25 | 5.50 | 129.75 |
| CA Sole | | | | | 1.25 | | | | 1.25 |
| C Lathan | | | | | | | 3.00 | | 3.00 |
| C Massa | | | | 3.50 | | | | | 3.50 |
| DF McGahn | | | | | | | | 25.00 | 25.00 |
| DH Pearlman | 0.25 | | | 0.75 | | | | | 1.00 |
| DJ Allison | | | | 27.75 | | | | | 27.75 |
| DMM | 2.75 | | | | | | | | 2.75 |
| DP Miletich | | 0.76 | | | | | | | 0.76 |
| DS Christy | 16.00 | | | | | | | | 16.00 |
| EMG | | | | | 1.50 | | | | 1.50 |
| E Pearl | | | 29.50 | 381.25 | 217.75 | 17.75 | | | 646.25 |
| ES Polikov | | 180.75 | 570.50 | 683.00 | 432.50 | | | | 1866.75 |
| GK MacDowell | 3.25 | | | | 39.75 | 54.50 | 230.00 | 4.00 | 331.50 |
| J Hanson | | 5.00 | | | | | | | 5.00 |
| JM McDade | 3.00 | | | | | | | | 3.00 |
| JN Halpern | 410.75 | | | | | | | | 410.75 |
| J Poltronieri | 27.25 | | | | | | | | 27.25 |
| R Reeder | 32.00 | 23.25 | 14.50 | 182.50 | 90.75 | | | | 343.00 |
| JW Bagley | | | | | 1.00 | | | | 1.00 |
| JW Logan | | | | | | 7.00 | 13.50 | | 20.50 |
| KL Kelley | 239.75 | 1.50 | | | | | | | 241.25 |
| KR Boyce | 106.75 | 123.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 21.00 | 650.75 |
| L Low | | | 2.75 | | | | | | 2.75 |
| LM Batey | | | 2.50 | | | | | | 2.50 |
| L Tucker | | | | 1.00 | 49.00 | | | | 50.00 |
| M Carowitz | 172.25 | | | | | | | | 172.25 |
| M Carlson | | | | 7.75 | 2.00 | | | | 9.75 |
| MJ Ray | | | | | | | | 4.25 | 4.25 |
| MJ Schaengold | | | | 2.00 | | | | | 2.00 |
| MK Green | | | | | 1.50 | | | | 1.50 |
| MK Osbeck | | | | 1.00 | | | | | 1.00 |
| PE Brugge | | 42.25 | | | | | | | 42.25 |
| P Long | | | | | 2.75 | | | | 2.75 |
| RA Matthews | | | | | | | 14.00 | | 14.00 |
| R Hecht | 1.00 | 24.75 | | | | | | | 25.75 |
| RM Stolbach | 4.00 | | | | | | | | 4.00 |
| RM Trotter | | | | | | | 2.25 | | 2.25 |
| RN Hunter | | 1.00 | | | | | | | 1.00 |
| SC Foster | | | | 0.50 | | | | | 0.50 |
| TA Weisler | | | | | | 0.75 | 5.00 | | 5.75 |
| TL Simpson | | | | | | 10.00 | | | 10.00 |
| TB Mills | | | | | | 2.75 | | | 2.75 |
| TP O'Donnell | | | 38.50 | | | | | | 38.50 |
| V Cimini | | | 2.75 | | | | | | 2.75 |
| WC Foster | 263.80 | 16.00 | 23.00 | 19 | 122.50 | 267.75 | 45.50 | | 757.55 |
| | | | | | | | | | |
| Totals | 1281.8 | 440.00 | 783.00 | 1430.00 | 1406.25 | 519.00 | 609.00 | 59.75 | 6528.80 |

# An Act

Legislative Act 5-04

ACT RELATING TO
ESTABLISHING POLICY AND PROCEDURES FOR THE MANAGEMENT AND USE OF CHEROKEE NATION TRUST FUNDS AND TRUST ASSETS

**BE IT ENACTED BY THE CHEROKEE NATION:**

**Section 1. Title and Codification**

This act shall be known as the "**Arkansas Riverbed Trust Fund Management Act of 2004**," and codified as ____________ (Title) __________ (Section) ____________ of the Cherokee Nation Code Annotated.

**Section 2. Purpose**

The purpose of this Act is to establish the policies and procedures for managing Cherokee Nation trust funds and trust assets pursuant to terms and the authority granted under P.L. 107-632, Section 6, "Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, hereafter referred to as the "Settlement Act". This legislation will govern the use and expenditure of trust funds awarded to the Cherokee Nation pursuant to the federal legislation. The funds awarded shall remain in trust for investment on behalf of the Cherokee Nation until such time as appropriated by the Council of the Cherokee Nation and withdrawn from the federal trust account for the settlement.

**Section 3. Legislative History**

The Settlement Act specifically set aside trust funds to be appropriated by Congress for Trust Land Acquisitions and provides for "Required Trust Land Acquisitions" with minimal procedural requirements provided, that the required trust acquisitions are in an area of the lands nearby the Arkansas Riverbed Area in Muskogee, McIntosh and Sequoyah Counties, as described in the "Settlement Act".

**Section 4. Definitions**

For purposes of this Title:

Trust funds: The term "trust funds" means,

(a) all monies, interest in the principal from the investment or proceeds derived from the Settlement act referenced above

**Section 5. Use and Expenditure of Trust Funds**

After the payment of attorney fees, which shall be approved by the Principal Chief and the Council of the Cherokee Nation, and not exceed 10% according to the Settlement Act, the balance of funds shall be used for the following purposes:

(1) The first priority for the use of the settlement trust funds shall be given to the area referred to in Section 3 of the legislative history to compensate for loss of any lands associated with the Settlement Act.

(2) The second priority for the use of settlement trust funds shall be given to other trust land acquisitions based on land management and tenure plans of the Cherokee Nation.

(3) The remaining balance of the funds shall be reserved to restore the tribal land base based on the future needs of the Nation unless this act is amended.

**Section 6. Provisions as cumulative**

The provisions of this act shall be cumulative to existing law.

**Ex. 21**
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

**Section 7. Severability**

The provisions of this act are severable and if any part of provision hereof shall be held void the decision of the court so holding shall not affect or impair any of the remaining parts or provisions of this act.

**Section 8. Emergency declared**

It being immediately necessary for the welfare of the Cherokee Nation, the Council hereby declares that an emergency exists, by reason whereof this act shall take effect and be in full force after its passage and approval.

Enacted by the Council of the Cherokee Nation on the 17TH day of FEBRUARY, 2004

Joe Grayson, Jr., President
Council of the Cherokee Nation

**ATTEST:**

Bill John Baker, Secretary
Council of the Cherokee Nation

Approved and signed by the Principal Chief this 23 day of February, 2004

Chad Smith, Principal Chief
Cherokee Nation

**ATTEST:**

Callie Catcher, Secretary/Treasurer
Cherokee Nation

**YEAS AND NAYS AS RECORDED:**

| | | | |
|---|---|---|---|
| Audra Smoke-Connor | YEA | Melvina Shotpouch | YEA |
| Bill John Baker | YEA | Meredith A. Frailey | YEA |
| Joe Crittenden | YEA | John F. Keener | YEA |
| Jackie Bob Martin | YEA | Cara Cowan | YEA |
| Phyllis Yargee | YEA | Buel Anglen | YEA |
| David W. Thornton, Sr. | YEA | William G. Johnson | YEA |
| Don Garvin | YEA | Charles "Chuck" Hoskin | YEA |
| Linda Hughes-O'Leary | YEA | | |

**RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LEWIS**
A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS AT LAW
FRISCO BUILDING
502 WEST SIXTH STREET
TULSA, OKLAHOMA 74119-1010
(918) 587-3161
Fax (918) 587-9708

GREGORY W. ALBERTY
JACK R. ANDERSON
N J. ASSINK
EVEN BARKER
ALD M. BINGHAM
JAM A. BOWLES
RICHARD B. BOYLE*
KELLY L. BRATCHER
H. JAMES BRIGGS
PETER W. BROLICK
SCOTT W. BYRD
DAVID C. CAMERON
MICHELLE M. CARTER◇
PHYLLIS J. COFFMAN*
COLBY L. COOK
MATTHEW P. CROUCH*
DEBORAH R. DAWSON
TINA LOUISE DIAZ*
FRANCISCO LUIS DONGO*
GLENNA S. DORRIS
JANET S. DUMONT
IRA L. EDWARDS, JR.
GEORGE M. EMERSON
ROYCE B. FENTON*
JAMES L. FOLTMER*
RICHARD A. GANN
RICHARD T. GARREN
D. SHARON GENTRY
STEPHEN E. HALE
MELVIN C. HALL
SHARON E. HAMM*
ERIK S. HOUGHTON
ROBERT E. HOWARD
STEVEN JANISZEWSKI*
KIEMONN L. JONES
DAVID J. KATALINAS*
SARAH G. KIENY*
SCOTT P. KIRTLEY
DAVID M. KNOLL*
KRISTOPHER E. KOEPSEL
TERRY D. KORDELSKI
JOSEPH P. LENNART
MICHELLE L. LESTER
C. S. LEWIS, III
MARY JEAN LITTLE
ADRIANA LOPEZ KLIPPERT
LORI T. LOVOI-NIEVES
JOHN D. LUTON
SHANNON M. MCMURRAY
JANET G. MALLOW
JOHN ROSS MALOY
RICHARD M. MILDREN
GLENDA V. MIMS
QUSAIR MOHAMEDBHAI*
J. LYON MOREHEAD
JANICE LOGAN MORROW
ROBERT A. NANCE
CATHERINE NAPIER
GARY L. NEAL
MARK L. NELMS◇◇
JAMES C. ORBISON
BHAVIN V. PATEL*
GISELE K. PERRYMAN
CHARLES L. PETERS*
SON V. PHAM*
JAMES R. POLAN
RICHARD P. POORMON
TIMOTHY S. POSEY
DAVID L. PRICE*
VICTORIA L. RACKLEY
FRED RAHAL, JR.
LISA R. RIGGS
M. DAVID RIGGS
STEPHEN B. RILEY
RANDALL A. RINQUEST*
MARY J. ROUNDS
GRETCHEN M. SCHILLING
MARK W. SCHILLING
WILLIAM C. SEARCY
H. GENE SEIGEL
DAVID A. SIMMENTAL*
ROBERT P. SKEITH
KENNETH M. SMITH
BETTY J. SONMARS*
MATO STANDING HIGH*
BEVERLY A. STEWART
MELISSA H. SULLIVENT*
MICHELLE M. TANNER*
DANA L. TARTAR*
STEPHANIE L. THEBAN
DAVID H. THOMAS*
HARLEY W. THOMAS
GORDON S. THOMPSON*
REX W. THOMPSON
STEPHANIE P. TOLLEFSEN
BETTY TSAMIS*
MICHAEL C. TURPEN
PHILIP J. VADEBONCOEUR*
LINDA VAN ARKEL-GREUBEL
DIANNE VAN VOORHEES*
KAREN A. WALKER*
KAREN CARDEN WALSH
GARY L. WATTS
SHARON K. WEAVER
DOUGLAS A. WILSON
JERRY L. WITT
GARY W. WOOD
JENNIFER L. ZUYUS

Of Counsel
Benjamin P. Abney
E. Bryan Henson

Licensed in:
Arizona
◇ Arkansas and Oklahoma
California and Oklahoma
* Colorado
Colorado and Louisiana
Colorado and Oklahoma
+ District of Columbia
Illinois
Maryland and Oklahoma
Nebraska
New Mexico and Oklahoma
◇◇ Missouri and Oklahoma
South Carolina and Oklahoma
Texas
Texas and Oklahoma
Wyoming

July 9, 2004

Julian Fite, Esq.
General Counsel
Cherokee Nation of Oklahoma
P.O. Box 948
Tahlequah, OK 74465

**ATTORNEY-CLIENT COMMUNICATION**

RE: Claims of Various Attorneys

Dear Julian:

Thank you for the opportunity to review the contracts and other material relating to various claims asserted against the Nation by individual attorneys and law firms. I will address the attorney-client contracts in chronological order, although (as you know) in certain instances there appears to be overlap or duplication which does not lend itself to a strict chronological analysis:

1. **The 1980 Agreement:** This written contract, executed on June 1, 1980, obligates the Nation to make certain payments to six (6) individual attorneys or to their respective estates if deceased. We see no factual or legal basis for any of these attorneys (or their estates) to assert a claim or encumbrance against the money which has been and will be paid to the Nation under the terms of the December 13, 2002 Act ("the Act"). The money paid to the Nation under the Act is not "monies realized by the Nation from the sale of resources, or from earnings or income arising from ownership of assets in the River." In addition, I see no factual or legal basis for any argument that passage of the Act or payment of the money authorized by the Act constitutes "a sale of any or all of the assets in the River," as mentioned on page 2 paragraph 7 of the 1980 Agreement. Most

**Ex. 22**
to Cherokee Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment
*Cherokee Nation v. United States*, No. 89-218 (Fed. Cl.)

important, however, even if the Act had acknowledged or effected such a sale, paragraph 7 of the 1980 Agreement is not a "trigger mechanism" for accelerated payment of the balance owed to the attorneys. Paragraph 7 is for the protection of the Nation, not for the protection of the attorneys, and is nothing more or less than a promise by the attorneys that none of them will claim any additional amount over and above the $3.5 million, regardless of whether River assets of the Nation are sold and irrespective of the sale price. Neither paragraph 7 nor any other provision of the 1980 Agreement establishes any right to receive compensation other than the amount specifically provided in paragraph 3. Paragraph 7 merely restates that no additional compensation will be provided by the Nation to the contracting attorneys, regardless of subsequent events, including without limitation the sale of assets in the River.

2. **The 1988 Wilcoxen/Niebell Contract:** This written contract was signed by the parties on September 8, 1988, and signed by the BIA representative on January 23, 1989. The contract expressly provides that neither James Wilcoxen nor Paul Niebell will be compensated for services performed pursuant to the contract unless and until the Nation obtains a monetary recovery: "It is agreed that the compensation of the Parties of the Second Part, for the services rendered under the terms of this Contract, is to be <u>wholly</u> contingent upon a recovery for said Cherokee Nation." Page 2 [emphasis added].

The amount of the contingency fee to be paid to James Wilcoxen and Paul Niebell upon recovery is expressly limited in two ways: their aggregate fee must be "equitable" and must not exceed ten percent (10%) of all sums recovered or procured "in whole or in part" through the efforts of the attorneys. Page 2. The determination of how much money constitutes an "equitable" fee for the attorneys is a matter for determination by a third party, but it remains unclear whether the third party is the Commissioner of Indian Affairs, a judge, or a jury: "The Parties of the Second Part shall receive such compensation <u>as the Commissioner of Indian Affairs may find equitably to be due as may be determined by a court or tribunal</u>, for services theretofore rendered under this Contract . . . " Page 2 [emphasis added].

If the Commissioner has the final say in determining the amount of compensation due to the attorneys under this contract, logically there would be no need to add the phrase "as may be determined by a court or tribunal." On the other hand, if the amount of compensation due is simply a question of fact to be resolved by a judge or jury in court, logically there would be no need to impose a requirement that the Commissioner find the fee "equitable." The finding of the Commissioner and the determination by a court are not stated in the alternative, and, instead, are simply run together in one phrase of the same sentence, leaving a significant question as to whose determination of an "equitable" amount is dispositive.

Beginning on page 3 of the contract, the parties agree that if either of the attorneys dies, the estate of the deceased attorney "shall be allowed compensation in such sum as the Commissioner of Indian Affairs may find equitable *[sic]* to be due for the services theretofore rendered under the Contract, <u>or</u> as may be determined by a court or tribunal equitably to be due for the services theretofore rendered under this Contract." Pages 3-4 [emphasis added]. Although the quoted language establishes that the Commissioner's finding and the juridical determination are alternatives, rather than complimentary processes, the contract does not provide a mandatory mechanism by which to choose between them. The contract, for example, does not address the situation where the attorneys opt to have the Commissioner determine an equitable fee but the Nation opts to have a court make the determination.

In any event, the contract clearly calls for the attorneys to receive an equitable fee for the services which they (and attorneys engaged by them) render pursuant to the contract. The question then arises: What services are authorized and required by the contract? Apparently, James Wilcoxen and the estate of Paul Niebell are asserting claims for services rendered to the Nation <u>prior to</u> September of 1988 (when this contract was executed by the parties). The contract itself makes no mention of prior services rendered by either attorney, nor does it mention any formula for calculating compensation with respect to prior services.

None of the material which I have reviewed, except the 1980 Agreement, establishes the right of any attorney or law firm to recover for services

rendered to the Nation prior to September of 1988. Of course, the "equitable" contingency fee provided in the 1988 contract would arguably compensate Wilcoxen and Niebell for services which had been rendered prior to September of 1988 to the extent (at a minimum) that their prior services contributed to a recovery by the Nation.

In summary, it is my opinion that the 1988 Wilcoxen/Niebell Contract obligates the Nation to pay James Wilcoxen and the estate of Paul Niebell a total fee which (a) is "equitable," (b) does not exceed 10% of the amount recovered by the Nation under the Act, and (c) does not cause the total amount paid by the Secretary to exceed the limit imposed by Congress in Section 607 of the Act. My conclusion is tempered by the fact that the Nation may be able to argue successfully that its contractual obligations to all attorneys and law firms in connection with Arkansas River issues have been pre-empted by Section 607 of the Act and, therefore, that the Nation itself does not owe any such attorney fees, and, instead, the fees are owed exclusively by the United States.

3. **The 1989 Patton Boggs Contract:** I refer to this particular agreement as "the 1989 Patton Boggs Contract," although "final" (as opposed to "conditional") approval of this contract was not granted by the BIA until November 13, 1989, and notwithstanding that subsequent "extensions" purportedly exist. This contract (or its "extension") was terminated or repudiated by Chief Byrd on a date which I have not been able to determine from the material provided, although it appears that the termination or repudiation occurred prior to the stated date for expiration of the "extension." There is no evidence in the material which I reviewed that indicates termination was approved by the Cherokee Council or the BIA. Nothing in the material reflects any finding that there existed "reasonable and sufficient cause" or any other valid justification for termination of the contract. Of course, the original contract and its "extensions" each provide a specified date of expiration if no "termination" occurs sooner. So it could be argued that the Byrd attempt to terminate the contract was without cause and thus of no effect, but for the contract to be extended again, it was incumbent upon Patton Boggs to initiate action to extend it which they apparently did not do. Patton Boggs, therefore, allowed the contract to expire without further extension. "Expiration" of a contract by its own terms generally means that all rights

and obligations of the contracting parties are extinguished on the date of expiration, unless the language of the contract clearly expresses an intent that certain provisions survive the expiration. The 1989 Patton Boggs Contract, as well as the 1988 Wilcoxen/Niebell Contract, is silent with respect to whether any right or obligation established by the contract survives its expiration.

The scope of the contractual consideration to be provided by Patton Boggs is defined broadly: Page 1 of the 1989 Patton Boggs Contract obligates Patton Boggs "to advise and to represent" the Nation in connection with claims "arising from the violation of the duties of the United States to protect the tribal lands and to manage the tribal resources of said Cherokee Nation." [emphasis added]. This contractual duty "to advise and to represent" is not limited to the filing and prosecution of litigation.

Page 2 of the contract obligates Patton Boggs to "advise and represent the Cherokee Nation in the aforementioned matters before [various courts and tribunals]," and the next paragraph provides that Patton Boggs "will pursue as their top priority whether through the litigation processes or complimentary legislative efforts, a resolution by way of settlement. . . ." [emphasis added]. In my opinion, the 1989 Patton Boggs Contract establishes the duty of Patton Boggs to provide both litigation services and lobbying/legislative services in return for the compensation specified in the contract. My view of the services promised by Patton Boggs is bolstered by the provision on page 3 that Patton Boggs will become entitled to receive a contingency fee if and when the Nation obtains a recovery "through the litigation or legislative process . . .." [emphasis added].

Copies of correspondence which you provided to me indicate that subsequent to 1989, the Nation and Patton Boggs entered into a separate contract, apparently providing that Patton Boggs would be paid $100,000 per year for lobbying. A considerable sum of money evidently has been paid by the Nation pursuant to this separate contract, but it remains uncertain as to what extent the lobbying services purportedly rendered under the separate contract are in fact lobbying services that are required under the 1989 Patton Boggs Contract. I do not have a copy of what Patton Boggs refers to as "the lobbying contract," and Patton Boggs

continues to refer to the 1989 Patton Boggs Contract as "the litigation contract" (notwithstanding the fact that the 1989 contract encompasses and requires legislative/lobbying services).

Regardless of whether Chief Byrd's termination of the 1989 Patton Boggs Contract (or its extension) was valid, it appears undisputed that the 1989 contract, including its valid extensions (if any), expired prior to December 13, 2002, the effective date of the Act. I have considered what effect this expiration has on the claim currently asserted by Patton Boggs. The 1989 Patton Boggs Contract is silent as to what compensation, if any, Patton Boggs would be entitled to receive if the Nation obtains a recovery on a date following expiration of the contract: "It is agreed that, upon agreed monetary or other quantifiable recovery for the Cherokee Nation, through the litigation or legislative process, said Attorneys shall receive from the Cherokee Nation additional compensation . . . ." Page 3. The contract, however, does clearly provide that expiration extinguishes any obligation of Patton Boggs to continue providing legal services: "It is expressly understood that said Attorneys shall have no contractual obligation to continue representation of the Cherokee Nation after <u>expiration</u> or termination of this Contract . . . ." Page 3 [emphasis added].

Thus, the 1989 Patton Boggs Contract says that upon its expiration, Patton Boggs is no longer required to perform any services required by the contract, but it does not say whether the Nation's obligation to pay a contingency fee survives *expiration*. On page 4 of the 1989 Patton Boggs Contract, it is provided that upon *termination* of the contract, Patton Boggs would be entitled to be paid "an equitable portion of such recovery, pro rated consistent with the terms hereof regarding additional compensation."

Notwithstanding the statement in the 1988 Wilcoxen/Niebell contract that it is "subject to . . . the future retention of [Patton Boggs] as co-counsel . . . ," I believe that the most reasonable construction of the attorney-fee provisions of the 1989 Patton Boggs Contract is as follows: Patton Boggs is entitled to receive an "equitable" contingency fee in an amount less than the difference between (a) ten percent (10%) of the Nation's recovery under the Act and (b) the total amount paid by the Nation to Patton Boggs for services in connection with any claim "arising

from the violation of the duties of the United States to protect the tribal lands and to manage the tribal resources of [the] Cherokee Nation," including all payments for such services billed under the so-called "lobbying contract" between the Nation and Patton Boggs. I believe that the most Patton Boggs could reasonably claim under any reasonable construction of their contract would be the full difference between the ten percent (10%) for attorney fees provided by the Act less the amount they previously were paid by the Nation. Their claim to a "full amount" does not seem well founded to me because, in addition to the contractual ambiguities for which they certainly have some responsibility, there are also unanswered questions about the nature and extent of the services they did perform and the amounts paid for those services. The litigation they were involved in on behalf of the Nation consisted almost entirely, if not entirely, of drafting pleadings, research and brief writing. Apparently not one deposition was taken in the case. I know of no way to verify the 6,000-plus hours of work they now claim to have spent on the litigation, and we have the same question about those claimed hours that Chief Smith apparently has. The total amount of claimed time doesn't seem reasonable to us.

Any determination of the amount of this "equitable contingency fee" should take into account the primary fact that recovery under the Act arose from the efforts and contributions of several attorneys and law firms (including employees of the Nation) in addition to Patton Boggs. Such a determination would not simply consist of starting with the ten percent (10%) amount and then subtracting the total already paid to Patton Boggs. The determination of this contingency fee should start with no formula or presumption, other than an acknowledgement that Patton Boggs made contributions to the overall effort to achieve the settlement which resulted in recovery under the Act.

The agency or court which adjudicates the amount of the Patton Boggs contingency fee should consider only services rendered under the original 1989 Patton Boggs Contract or under a valid extension thereof. Even after the 2000 amendment of the statute which required BIA approval of certain attorney-fee contracts (formerly 25 USC § 81), no contract or extension would have been valid unless it was authorized and approved in accordance with the requirements of the Cherokee Constitution and other

laws of the Nation. There is no obligation on the part of the Nation to pay for services rendered gratuitously or in violation of tribal law, regardless of whether the consent of a governmental agency was required by federal law. Any determination of an "equitable" fee for Patton Boggs which includes time, services, or expenses provided or incurred outside of a valid contract or extension would not comport with tribal law and would encourage the assertion of claims against the Nation under alleged "oral" contracts, promissory estoppel, unjust enrichment, and other theories that seek to justify recovery on grounds other than breach of a valid, written tribal contract. Whoever adjudicates the amount of the fee due to Patton Boggs must honor the laws of the Nation, including the Cherokee Constitution, in deciding how much is "equitable."

As you can see, Julian, our analysis of these issues is quite close to your own. In addition to reviewing your analysis, you also specifically asked us to review your recommendations, so I would like to comment directly on your recommendations. I will cover them in the same order and under the same headings you gave them:

A. **Original Attorney Fee Settlement:** We are in complete agreement with your position.

B. **Wilcoxen/Niebell Contract:** It has been very hard for us to understand and appreciate the quality and extent of the work done under this contract. You are in a much better position obviously to evaluate the performance, so it would be hard for us to take issue with you regarding your recommendation. We could not quarrel with your recommended payment to Hall Estill, since it would be based upon work done and supported by contemporaneous time records. Considering the uncertainty of being paid at all and the substantial delay in being paid, Hall Estill would seem to be entitled to the amount you recommend. Your recommendation of $100,000.00 for Paul Niebell's Estate seems fair to us, but, again, we have no real appreciation of his contribution to the cause. I personally have a small question mark in my mind about your recommended performance premium for Jim Wilcoxen. Enhancing the base payment you recommend might be difficult to support in the face of the Patton Boggs argument regarding his contract being "subject to" theirs. Here again, though, you have a much better feel, I am sure, for the value of Wilcoxen's work to the Nation.

C. **Patton Boggs Contract:** Our thinking is very close to yours regarding Patton Boggs. Although the records are incomplete and sketchy, it does seem to us that they were paid for much of the work they were doing from 1989 to at least 1997. It is hard for us to believe they would do much work over such a long period of time without billing for it, since they were expected to bill for their services during that period of time under the two contracts. We are also not persuaded by the Patton Boggs arguments which essentially call for specific performance of two contracts which contain a number of ambiguities and are inconsistent with each other. Their best argument would be for equitable relief, or for a *quantum meruit* approach to calculating a reasonable fee, and that would be under the theory that they were brought back into the lobbying effort by tribal officials after they had allowed their employment contract with the Nation to expire. We don't know how you calculated the uncompensated time accrued on the Arkansas River Bed Contract, but we cannot argue with your proposal to pay, on this basis, $126,000.00 to Patton Boggs. Your performance premium recommendation might be a bit small because it seems that there is a general consensus among those involved that they played an important role in passage of the 2002 Act. Perhaps a $100,000.00 performance premium for Wilcoxen and a $100,000.00 performance premium for Patton Boggs would come closer to recognizing the contribution of each. Would it be possible for you to interview those most closely involved in the lobbying effort which resulted in the 2002 Act in order to better gauge the relative contributions of Wilcoxen and Patton Boggs?

D. **Swidler Berlin Law Firm:** We agree completely with your recommendation.

Julian, we have found it difficult to put all of our thoughts into this letter to you. I have employed some very bright legal interns in our firm to assist on this and have relied heavily upon Don Bingham and Tim Posey of our firm as well. Don, Tim and I would welcome an opportunity to sit down with you and share with you the many thoughts we have about this very complicated matter which did not find their way into this memorandum. Although I have not added up our time as yet, I do not think we have come close to exhausting the $10,000.00 cap you put on our fees. If you think it

would be helpful, we would be glad to come to Tahlequah to spend an hour or two with you going over all of this. That would also provide us an opportunity to answer any questions you might have about our comments. Thanks again for involving us in this. We look forward to hearing from you.

Sincerely,

M. David Riggs
For the Firm

MDR:pjl