IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, | * | |
| Plaintiff, | * | Case No. 89-218(L) |
| and | * | Chief Judge Edward H. Damich |
| PATTON BOGGS LLP, | * | |
| Intervenor-Plaintiff | * | |
| v. | * | |
| THE UNITED STATES OF AMERICA, Defendant. | * | |

* * * * * * * * * * * * * *

**CHEROKEE NATION'S RESPONSE TO PATTON BOGGS' PROPOSED FINDINGS OF UNCONTROVERTED FACT IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT FOR $1,247,501.80**

Pursuant to RCFC 56(h)(2), the Cherokee Nation hereby responds to Patton Boggs' Proposed Findings of Uncontroverted Fact in Support of its Cross-Motion for Summary Judgment. Because Patton Boggs' proposed findings omit findings on matters relevant to its Cross-Motion for Summary Judgment, the Nation also submits a separate statement, as provided by RCFC 56(h)(2), of the Cherokee Nation's Proposed Findings of Uncontroverted Facts on Matters Relevant To But Not Covered By Patton Boggs's Proposed Findings and Patton Boggs' Cross-Motion for Summary Judgment.

PB Proposed Finding 1. Patton Boggs entered into an attorney fee contract with the Cherokee Nation with respect to this litigation. Ex. 2 at A-39 (the "Contract").

Cherokee Nation response. The proposed finding is disputed to the extent that it omits material facts that are relevant to the disposition of Patton Boggs' Motion for Summary Judgment. The proposed finding fails to state, *inter alia,* that Patton Boggs' contract was made with the Cherokee Nation on April 17, 1989 and was terminated in 1995. *See* Patton Boggs Complaint in Intervention at ¶ 15; s*ee also* CN Ex. 10.[1]

PB Proposed Finding 2. The Contract provided for, *inter alia*, monthly compensation and "compensation of ten percent (10%) of the amount recovered less the amounts previously paid by said Cherokee Nation for attorney fees pursuant to this Contract for litigation; provided, that approvals required by law, if any, are obtained." *Id.* at 2, 3.

Cherokee Nation response. The proposed finding is disputed to the extent that it omits material facts that are relevant to the disposition of Patton Boggs' Motion for Summary Judgment, namely the proposed finding fails to state that Patton Boggs' contract was terminated on October 30, 1995. See Patton Boggs Complaint in Intervention at ¶ 15; *see also* CN Ex 10.

PB Proposed Finding 3. Patton Boggs was paid a total of $403,959 in monthly payments under the Contract. Ex. 4 at A-47 (October 6, 2003 letter from the Cherokee Nation's General Counsel, Julian Fite).

[1] "CN Ex. ___" refers to the exhibits that the Cherokee Nation submits with the Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment.

Cherokee Nation response. The proposed finding is disputed as Patton Boggs was paid some amount in excess of $403,959 for services provided under the Arkansas Riverbed attorneys contract. The Cherokee Nation in fact paid Patton Boggs a total sum of $1,053,908.48 for services provided under this and a separate lobbying contract between the Cherokee Nation and Patton Boggs. While some services provided under the separate lobbying contract were unrelated to the Arkansas Riverbed, others were related to the Riverbed Claim and some portion of the fees paid under the separate lobbying contract might properly be attributable to services provided under the Arkansas Riverbed contract under which Patton Boggs makes its claim here. *See* PB Ex. 4 at A-47 (October 6, 2003 letter from the Cherokee Nation's General Counsel, Julian Fite); *see also* CN Ex. 9 (Letter agreement dated September 18, 1991, between Patton Boggs and the Cherokee Nation regarding payment for other services); CN Ex. 15 (Cherokee Nation spreadsheet of fees paid to Patton Boggs); CN Ex. 22 at 5 (letter from outside legal counsel to the Nation).

PB Proposed Finding 4. The Settlement Act provided for $20 million in appropriations for the Cherokee Nation and its attorneys, making $2 million available to pay the Cherokee Nation's attorneys. Docket No. 125, December 19, 2005 Opinion & Order at 3 ("Since the Cherokee Nation will receive a total of $20 million in appropriations under the Settlement Act, $2 million is available for payment of attorney's fees.").

Cherokee Nation response. The proposed finding is disputed as it mischaracterizes the terms of the Settlement Act. The Settlement Act provided for $20 million in appropriations for the Cherokee Nation, and authorized the use of "*not to exceed* 10% of that Indian Nation's allocation

of funds" to pay attorneys fees. 25 U.S.C. § 1779e(b) (emphasis added.) Thus, the Act imposed a ceiling—not a floor—on the amount of attorneys' fees that could be paid.

PB Proposed Finding 5. To date, Congress has appropriated three of the four annual installments authorized by the Settlement Act, rendering a total of $14,485,018.00 to be allocated to the Cherokee Nation and its attorneys, through FY 2006. Docket No. 137, Joint Status Report; Attachment to Docket No. 138, Declaration of Douglas A. Lords ("Lords Decl.").

Cherokee Nation response. The proposed finding is disputed in part. The $14,485,018.00 in funds appropriated to date belong to the Cherokee Nation -- not its attorneys.

PB Proposed Finding 6. Of the sums already appropriated, $1,448,501.80 has been allocated to the attorney escrow fund. Docket No. 137, Joint Status Report; Lords Decl. ¶ 7.

Cherokee Nation response. Not disputed.

PB Proposed Finding 7. The Settlement Act provides for an additional $5,000,000.00 to be appropriated in FY 2007 for the Cherokee Nation and its attorneys. 25 U.S.C. §§ 1779c(c)(4),(d)(1). Of that amount, the Settlement Act makes up to $500,000.00 available to pay to the Cherokee Nation's attorneys their statutory attorneys' fees. *Id.* § 1779e(b).

Cherokee Nation response. The proposed finding is disputed in part. The additional $5,000,000.00 to be appropriated under the Settlement Act in FY 2007 belongs to the Cherokee

Nation – not its attorneys. Moreover, the Act does not provide any specific amount of "statutory attorneys' fees."

PB Proposed Finding 8. On February 18, 2005, the Cherokee Nation provided to the Secretary its own Resolutions that purportedly "authorized and approved" certain payments to its lawyers other than Patton Boggs, as follows:

| | |
|---|---|
| Wilcoxen & Wilcoxen | $550,000.00 |
| Estate of Mr. Niebell | $100,000.00 |
| Hall Estill | $280,524.57 |

Ex. 6 at A-53 to A-54.

Cherokee Nation response. The proposed finding is disputed to the extent that it characterizes the Cherokee Nation's Resolutions as "purportedly" authorizing and approving payments to attorneys. The Resolutions speak for themselves and properly authorize and approve payments to the attorneys, consistent with the 2002 Settlement Act, 25 U.S.C.§ 1779e(a), and Cherokee Nation law, *see* CN Ex. 21, as well as the requirements of the terminated contract under which Patton Boggs makes its claim. That contract makes the payment of any fee to Patton Boggs subject to the approvals required by applicable law, including tribal law, and tribal law requires any attorney fee payments to be approved by the Cherokee Nation Council. *See* PB Ex. 2 at 3.

PB Proposed Finding 9. None of those attorneys listed above in paragraph 8 dispute the amounts they were paid. Ex. 5 at A-51 (March 31, 2005 letter from Mr. Wilcoxen, and the Hall Estill firm, to the Cherokee Nation, stating "having accepted the Nation's fee determination, we have

no dispute with the Nation . . . . "). Nor do they seek additional payment under the Settlement Act. *Id.*

Cherokee Nation response. Neibell and Hall Estill did dispute the initial recommendations regarding the amount of fees to be paid to each of them, *see* CN Exs. 17, 19, but have subsequently indicated their acceptance of the Nation's decision. Payments to the attorneys have been made pursuant to the Settlement Act.

PB Proposed Finding 10. On March 30, 2005, the Cherokee Nation provided the Secretary with a Resolution "approving" payment of $151,000 to Patton Boggs, Ex. 6 at A-53-A-54 (October 13, 2005 letter from Assistant Secretary James Cason).

Cherokee Nation response. Not disputed, except that the term approving should not be in quotes.

PB Proposed Finding 11. On October 13, 2005, the Secretary decided to disburse a total of $1,081,524.57 from the attorney escrow account, exactly as directed to do by the Cherokee Nation. Exhibit 6 at A-54 (Mr. Cason's October 13, 2005 letter).

Cherokee Nation response. Disputed to the extent that the proposed finding fails to fully describe the basis for the Secretary's October 13, 2005 decision, which included a determination that the Settlement Act required payment of the attorneys fees in amounts as approved by the settling Nations. PB Ex. 6 at A-54 (Mr. Cason's October 13, 2005 letter).

PB Proposed Finding 12. On October 17 and 18, 2005, the Secretary made those disbursements from the attorney escrow account. Docket No. 137, Joint Status Report; Lords Decl. at ¶¶ 8-9.

Cherokee Nation response. Not disputed.

PB Proposed Finding 13. No further disbursements have been made from the attorney escrow account, and its current balance was $366,977.23 immediately after disbursement of attorneys' fees. *Id.*

Cherokee Nation response. Not disputed.

PB Proposed Finding 14. The Cherokee Nation did not enter into an attorney fee contract with the Hall Estill law firm relating to any aspect of the Settlement Act. Ex 4 at A-44 (Mr. Fite's letter explains that "Wilcoxen associated the Hall, Estill law firm and they have presented billings.").

Cherokee Nation response. Disputed to the extent that the proposed finding omits material relevant facts, namely that while the Cherokee Nation did not enter into an attorney contract directly with the Hall Estill law firm, the Hall Estill firm provided services to the Cherokee Nation as associate counsel under the contract between the Cherokee Nation and Mssrs Wilcoxen and Niebell, which contract expressly authorized the use of associate counsel. PB Ex 4 at A-44; see also PB Ex. 1 at 2.

PB Proposed Finding 15. Instead, Hall Estill was "associated" by Mr. Wilcoxen, under the Wilcoxen-Niebell Contract. *Id.*

Cherokee Nation response. Disputed only to the extent that the proposed finding, as written, incorrectly suggests some impropriety in Hall Estill serving as associate counsel. The use of associate counsel was proper and was expressly authorized by the Wilcoxen-Niebell Contract. *See* PB Ex. 1 at 2.

PB Proposed Finding 16. The Wilcoxen-Niebell Contract, required "all expenses [of associated counsel, like Hall Estill] to be paid by [Mr. Wilcoxen and Mr. Niebell], out of any compensation which they may receive for services to be rendered hereunder." Ex. 1 at A-35.

Cherokee Nation response. Disputed to the extent that the proposed finding when read with Patton Boggs' related proposed findings 15 and 17 suggests some impropriety in having the Secretary make payment of $280,524.57 directly to the Hall Estill firm rather than include that amount in a payment made to Mr. Wilcoxen who would then, in turn, remit the funds to Hall Estill. Although the time spent by Hall Estill could have been considered and paid as part of Mr. Wilcoxen's claim for compensation, the Nation decided to review and act on that firm's request for compensation separately, as did the Secretary. Since there is no dispute that Hall Estill was associate counsel under the Wilcoxen-Niebell contract and provided services to the Cherokee Nation under that contract, there was nothing unlawful or improper about the form in which the payment was made.

PB Proposed Finding 17. Despite the lack of any contract with the Cherokee Nation, and despite Mr. Wilcoxen's obligation to pay the expenses of the Hall Estill firm he associated, the Cherokee Nation directed the Secretary to make payment of $280,524.57 to the Hall Estill firm. Ex. 6 at A-54.

Cherokee Nation response. As with Patton Boggs' Proposed Findings 15 and 16, the Cherokee Nation disputes this proposed finding to the extent that it suggests some impropriety in having the Secretary make payment of $280,524.57 directly to the Hall Estill firm rather than include the same amount in the payment made to Mr. Wilcoxen who would then, in turn, remit the funds to Hall Estill. Although the time spent by Hall Estill could have been considered and paid as part of Mr. Wilcoxen's claim for compensation, the Nation decided to review and act on the Hall Estill request for compensation separately, as did the Secretary. Since there is no dispute that Hall Estill was associate counsel under the Wilcoxen-Niebell contract and provided services to the Cherokee Nation under that contract, there was nothing unlawful or improper about the form in which the payment was made.

PB Proposed Finding 18. Under the Wilcoxen-Niebell Contract, Mr. Niebell's fee was "wholly contingent" on a recovery by the Cherokee Nation. Exhibit 1 at A-35.

Cherokee Nation response. Not disputed.

PB Proposed Finding 19. Mr. Niebell and Mr. Wilcoxen brought only two actions on behalf of the Cherokee Nation under the Wilcoxen-Niebell Contract, both of which were finally dismissed

with prejudice many years before the Settlement Act was enacted, resulting in no recovery. *See United States v. Cherokee Nation,* 480 U.S. 700 (1987) (disposing of "takings" claim); *Cherokee Nation v. United States,* 937 F.2d 1539 (10th Cir.) (disposing of "fair and honorable dealings" claims), *reh'g denied,* 948 F.2d 635 (10th Cir. 1991).

Cherokee Nation response. The proposed finding is disputed to the extent that it concludes that the claims raised in the litigation brought by Mr. Niebell and Mr. Wilcoxen "resulted in no recovery." While it is undisputed that the litigation itself was dismissed, the 2002 Settlement Act includes compensation for the claims raised in that litigation – namely the losses to the Cherokee Nation resulting from the construction and operation of the McClellan-Kerr Arkansas Riverbed Navigation Project, *see* 25 U.S.C.§ 1778c(a), which claims were found not to be a part of the lawsuit filed by Patton Boggs in this Court. *See Cherokee Nation of Okla. v. United States*, 21 Cl. Ct. 565, 580-81 & n..11 (1990). The proposed finding is also disputed to the extent that it describes Mr. Wilcoxen's work as limited to the claims brought in the U.S. District Court for the Eastern District of Oklahoma (and adjudicated through the Tenth Circuit and Supreme Court). While Mr. Wilcoxen was not attorney of record at the time the instant case was filed, the record before this Court makes clear that he served as counsel of record to the Cherokee Nation in this action after Patton Boggs' contract was terminated and through enactment of the 2002 Settlement Act.

PB Proposed Finding 20. Mr. Niebell died in 1994. Ex. 4 at A-46.

Cherokee Nation response. Not disputed.

<u>PB Proposed Finding 21.</u> Mr. Niebell never worked on this litigation brought and prosecuted by Patton Boggs. *Id.* (Cherokee Nation's description of Mr. Niebell's work on this matter); *see also* Ex. 3 at A-43 (October 30, 1995 termination letter from the Cherokee Nation to Patton Boggs – thus, as of 1994 (when Mr. Niebell died), Patton Boggs was still lead counsel in this case).

<u>Cherokee Nation response</u>. The proposed finding is disputed to the extent that it omits material facts that are relevant to the disposition of Patton Boggs' Motion for Summary Judgment. The proposed finding fails to state that the 2002 Settlement Act was the culmination of a 30-year effort to secure compensation to the Cherokee Nation, and provided compensation to the Nation for damages sustained by the Cherokee Nation that included damages sought in the litigation on which Mr. Niebell represented the Nation (those arising from the Kerr-McClallen Arkansas Riverbed Navigation Project), 25 U.S.C. § 1779c(a)), and which the Court in this case said were not part of the claims in this case. *See Cherokee Nation of Oklahoma v. United States*, 21 Cl.Ct. 565, 580-81 & n. 11 (1990).

May 12, 2006

Respectfully submitted,

*/s/ Arthur Lazarus, Jr.*

Arthur Lazarus, Jr.
Sonosky, Chambers, Sachse, Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240, (202) 682-0249 (fax)
<u>alazarus@sonosky.com</u>

Special Counsel for Plaintiff Cherokee Nation

Of Counsel:

Lloyd Benton Miller
Donald J. Simon
Anne D. Noto
Sonosky, Chambers, Sachse, Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240, (202) 682-0249 (fax)
lloyd@sonosky.net; dsimon@sonosky.com
anoto@sonosky.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE CHEROKEE NATION OF OKLAHOMA, | * | |
| Plaintiff, | * | Case No. 89-218(L) |
| and | * | Chief Judge Edward H. Damich |
| PATTON BOGGS LLP, | * | |
| Intervenor-Plaintiff | * | |
| v. | * | |
| THE UNITED STATES OF AMERICA, Defendant. | * | |

* * * * * * * * * * * * *

**CHEROKEE NATION'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS ON MATTERS RELEVANT TO BUT NOT COVERED BY PATTON BOGGS' PROPOSED FINDINGS AND PATTON BOGGS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to RCFC 56(h)(2), the Cherokee Nation submits the Nation's Proposed Findings of Uncontroverted Facts on matters that are relevant and material to the issues raised in Patton Boggs' Cross-Motion for Summary Judgment but which were not addressed by Patton Boggs in its Proposed Findings.

## I. History of the litigation

### A. Origin of the claims.

1. In December 1966, the Cherokee Nation, later joined by the Choctaw and Chickasaw Nations, filed suit against the State of Oklahoma, challenging Oklahoma's title to the Arkansas riverbed. *Choctaw Nation v. Okla.*, 397 U.S. 620, 621 (1970).

2. In 1970, the Supreme Court held that the Cherokee Nation, along with the Choctaw and Chickasaw Nations, retained title to the riverbed. *Choctaw Nation v. Okla.*, 397 U.S. 620 (1970).

3. Following the Supreme Court's 1970 ruling, the Cherokee Nation sought compensation from the United States for the damages that the Nation sustained as a result of the Government's failure to recognize and protect the Nation's title to the land, including the value of land and mineral resources used by the United States in the construction and operation of the McClellan-Kerr Arkansas Riverbed Navigation Project, which was authorized by Congress in 1941 and built between 1957 and 1971. *See Cherokee Nation of Okla. v. United States*, 782 F.2d 871, 873 n. 2 (10th Cir. 1986) (recitation of history), rev'd on other grounds, *United States v. Cherokee Nation of Okla.*, 480 U.S. 700 (1987); *see also* CN Ex. 12[1] (Memorandum dated November 5, 2003 from James Wilcoxen to Julian Fite).

4. Efforts made to obtain legislation to compensate the Nation in the late 1970s and early 1980s were not successful. *See United States v. Cherokee Nation of Okla.*, 480 U.S. 700, 701-02 (1987); *see also Cherokee Nation of Okla. v. United States*, 782 F.2d 871, 873 n.2 (10th Cir. 1986).

5. In 1982, Congress enacted a special jurisdictional statute which waived statutes of limitation and allowed the Nation to file suit against the United States for any claims that

[1] "CN Ex.__" refers to the exhibits that the Cherokee Nation submits with the Nation's Opposition to Patton Boggs' Cross-Motion for Summary Judgment.

the Nation might have "...arising from construction of the Arkansas River Navigation System, including, but not limited to, the value of sand, gravel, coal, and other resources taken..." Act of December 23, 1982, Pub. L 97-385, 96 Stat. 1944.

B. The Oklahoma litigation.

6. On May 23, 1983, pursuant to the special jurisdictional act, the Nation, represented by attorneys Paul Niebell and Andrew Wilcoxen, filed a claim in the United States District Court for the Eastern District of Oklahoma seeking compensation from the United States under the Fifth Amendment for the damages caused by its construction and operation of the McClellan-Kerr Arkansas Riverbed Navigational System. CN Ex. 2 Complaint in *Cherokee Nation of Okla. v. United States*, No. 83-306C (E.D. Okla); CN Ex. 1 Docket Entries for No. 83-306C (E.D. Okla).

7. Although the Cherokee Nation prevailed in the District Court and the Court of Appeals for the Tenth Circuit, the Supreme Court reversed, holding that the United States' navigational servitude barred the Nation's claims for compensation based on the Fifth Amendment. *United States v. Cherokee Nation of Okla.*, 480 U.S. 700 (1987).

8. On remand, the Cherokee Nation sought compensation based on the "fair and honorable dealings" clause of the Indian Claims Commission Act of 1946, ch. 959, § 2, 60 Stat. 1049, 1050 (formerly codified as amended at 25 U.S.C. § 70a), which had been made applicable to the Nation's claims by the 1982 special jurisdictional act. The

District Court rejected those claims, and the Court of Appeals for the Tenth Circuit affirmed. *Cherokee Nation of Okla. v. United States*, 937 F.2d 1539 (10th Cir.), *reh'g denied,* 948 F.2d 635 (10th Cir 1991).

9. The Cherokee Nation petitioned for certiorari, but on May 18, 1992, the Supreme Court issued an order declining to review the Tenth Circuit's decision. *Cherokee Nation of Okla. v. United States*, 504 U.S. 910 (1992).

10. The litigation efforts in the District Court for the Eastern District of Oklahoma, the Court of Appeals for the Tenth Circuit and the Supreme Court were undertaken by attorneys Paul Niebell, Andrew Wilcoxen, and, beginning in 1985, James Wilcoxen, with the subsequent assistance (beginning in 1989) of associate counsel, Hall Estill. CN Ex. 12 (Wilcoxen Memorandum of November 5, 2003 to Julian Fite); *see also* CN Ex. 1 (Docket Entries for No. 83-306C (E.D. Okla.)); CN Ex. 14; CN Ex. 19.

11. The services provided by these attorneys were performed under a contract dated September 8, 1988 entered into by James Wilcoxen and Paul Niebell with the Cherokee Nation. That contract retained these attorneys on a contingent basis and they received no payment before the payments made under the 2002 Cherokee, Choctaw and Chickasaw Settlement Act. CN Ex. 7; CN Ex. 16. The Wilcoxen/Niebell Contract authorized the association of other counsel, and Hall Estill was so associated. CN Ex. 7. *See also* CN Exs. 12, 14, 19.

12. Beginning in July 1991, the Cherokee Nation, with assistance of its legal counsel, explored possible legislation to resolve its damages claims. CN Exs. 12 at 3, 14, 19.

13. On February 7, 1992, Congressman Mike Synar introduced H.R. 4209, a bill to amend the 1982 special jurisdictional act to allow compensation to be awarded notwithstanding the Government's rights under its navigational servitude. 138 Cong. Rec. H396-04, 397 (daily ed. Feb. 7, 1992).

14. H.R. 4209 was favorably reported by the House Committee on the Judiciary on August 3, 1992, H. Rept. 102-773, passed the House on August 4, 1992, and was referred to the Senate. 138 Cong. Rec. H7321-01, 7323-7324 (daily ed. Aug. 4, 1992).

15. A parallel bill, S. 2750, had been introduced in the Senate on May 20, 1992, 138 Cong Rec. S7029-01, 7037-7038 (daily ed. May 20, 1992), but did not pass.

C. The Claims Court litigation

16. On April 17, 1989, the Cherokee Nation retained Patton Boggs to bring claims "for damages or equitable relief arising from the violation of the duties of the United States to protect the tribal lands and to manage the tribal resources of the Cherokee Nation." CN Ex 8 (Patton Boggs Contract at 1). Patton Boggs would "prosecute actions for an injunction and/or damages, which are directly interrelated with pending legislative efforts," but would not represent the Nation in the pending Tenth Circuit litigation. *Id.*

17. The Nation's contract with Patton Boggs further stated that in consideration for the services provided, Patton Boggs would be paid "not to exceed $5000 per month for fees . . . and for actual out of pocket expenses," and, in the event of an "agreed monetary or other quantifiable recovery for the Cherokee Nation . . . additional compensation of ten percent (10%) of the amount recovered less the amounts previously paid by said Cherokee Nation . . . provided that approvals required by law, if any, are obtained." CN Ex. 8 at 2, 3.

18. On April 21, 1989, Patton Boggs filed the complaint in this still pending case for damages against the United States. *See* Docket entries for No. 218-89 (Fed.Cl.).

19. By a decision entered on October 5, 1990, the Claims Court dismissed, for failure to state a claim, the Nation's claims for: failure to evict casual (non-mineral) trespassers from the Nation's lands; failure to survey those lands; failure to remove trespassers from the Nation's farm and range lands; failure to issue farming and grazing leases for the Nation's lands; and failure to manage the Nation's timber lands. *Cherokee Nation of Okla. v. United States*, 21 Cl. Ct. 565, 574-76, 577-79 (1990).

20. The Court, in its October 5, 1990 decision, also found that the case did not encompass claims related "to the construction of the [Arkansas River] Navigation System." *Cherokee Nation*, 21 Cl. Ct. at 580-81 & n. 11.

21. The Court's October 5, 1990 decision held that the Nation's complaint did contain allegations stating claims for losses resulting from trespass on and mismanagement of the Nation's mineral resources in the Arkansas riverbed, but that such claims would be barred by the statute of limitations, except for those accruing within six years of the filing of the suit (April 21, 1983) or which fall within the continuing claim doctrine. *Cherokee Nation*, 21 Cl. Ct. at 570-72.

22. The Claims Court, in its October 5 decision, also deferred consideration of the Nation's claim for an accounting of the income generated by its trust land and resources, stating that the Court's jurisdiction to order an accounting depended on first finding liability in the United States. *Cherokee Nation*, 21 Cl. Ct. at 582.

23. The Claims Court issued additional decisions in 1991 and 1992, after Patton Boggs, on behalf of the Nation, filed amended complaints at the Court's direction, to restate the claims with greater specificity. The United States challenged the adequacy of the amended complaints and the Claims Court issued several decisions, accepting some claims, and striking others. *Cherokee Nation of Okla. v. United States*, 23 Cl. Ct. 117 (1991); 24 Cl. Ct. 695 (1992); 25 Cl. Ct. 361 (1992).

24. On August 21, 1991, the Court denied a motion filed by Patton Boggs for entry of a partial final judgment on the dismissed claims for purposes of an immediate appeal. *Cherokee Nation of Okla. v. United States,* 23 Cl. Ct. 735 (1991).

25. On May 19, 1992 and July 20, 1992, the Court rejected motions requesting that the Judge recuse himself from the case. *Cherokee Nation of Okla. v. United States,* 26 Cl. Ct. 215 (1992); 26 Cl. Ct. 794 (1992).

26. On January 28, 1994, the Court issued an unpublished order in which it declined to rule on a motion for summary judgment that had been filed by the United States, and instead indefinitely stayed all proceedings in the case until quiet title actions could be litigated against the third parties who were alleged to be trespassing on the Nation's riverbed lands. Ex. 3.

27. On February 15, 1994, in response to the parties' joint motion, the Claims Court stayed implementation of its January 28 order, for a period of one year, so the parties could pursue a possible legislative settlement of the case. *See* CN Ex. 5, *Cherokee Nation of Okla. v. United States*, No. 95-5056 Slip. Op. at 5 (Fed. Cir. April 12, 1996).

28. For the next year, the parties pursued legislative settlement of the case. *See* CN Ex. 13 (Patton Boggs Memorandum to Principal Chief Smith and General Counsel Julian Fite dated November 7, 2003 at 6-7).

29. When the legislative efforts failed and the Court's February 1994 stay expired, the Nation, represented by Patton Boggs, filed an appeal on February 17, 1995, seeking review of the adverse decisions of this Court. *See* CN Ex. 4.

30. On March 16, 1995, the Court of Appeals issued an order to show cause why the appeal should not be dismissed as premature, *see* CN Ex. 5, and Patton Boggs responded on behalf of the Nation. *Id.*

31. On October 30, 1995, the Principal Chief of the Cherokee Nation sent a letter to Patton Boggs terminating its contracts. CN Ex. 10; *See also* Patton Boggs Complaint in Intervention at ¶ 15 (stating that Patton Boggs' contract was terminated, although identifying date of termination as "April 30, 1995.")

32. On April 12, 1996, the Court of Appeals for the Federal Circuit issued an order accepting appellate jurisdiction over the lower court order imposing an indefinite stay, but declining jurisdiction on all other matters, and set a briefing schedule. CN Ex. 5, *Cherokee Nation of Okla. v. United States*, No. 95-5056 Slip. Op. (Fed. Cir. April 12, 1996).

33. By letter dated April 23, 1996, the Nation confirmed that Patton Boggs' services for both legislative and litigation matters had been terminated, and requested that the firm transfer its files to the Nation. CN Ex. 11.

34. The Cherokee Nation retained other law firms to handle the appeal before the Federal Circuit. *See* Opening and Reply Briefs of the Cherokee Nation in *Cherokee Nation of Okla. v. United States*, No. 95-5055 (Fed. Cir), reprinted at 1995 WL 17043907 (1995) and 1997 WL 33545042 (1997).

35. The appeal was successful, and the Federal Circuit reversed the order imposing an indefinite stay. *Cherokee Nation of Okla. v. United States*, 124 F.3d 1413 (Fed. Cir. 1997).

36. On remand, the Nation was represented in this Court by James Wilcoxen. *See* Docket entries for 89-219; *see also* CN Exs. 12, 14.

37. The litigation before the Court of Federal Claims was stayed while the Cherokee Nation, represented by James Wilcoxen and counsel associated with him, the Hall Estill firm, along with Cherokee Nation officials and staff, focused its efforts on legislation to seek a global resolution of all issues arising from the Arkansas Riverbed. CN Exs. 12, 14, 16.

D. <u>The 2002 Settlement Act.</u>

38. On December 19, 2001, a bill to settle the Arkansas Riverbed matters, H.R. 3534, was introduced in the House. 147 Cong. Rec. H10908-03, 10909 (daily ed. Dec. 19, 2001).

39. On April 17, 2002 a hearing was held on H.R. 3534 before the House Committee on Resources. CN Ex. 6.

40. Before the House Committee on Resources, Cherokee Nation Principal Chief Chad Smith described the matters covered by the Settlement Act, stating:

> [T]his legislation is the culmination of many years of work by the succession of tribal administrations to resolve the complex controversies surrounding the Nations' ownership of the bed and banks of the Arkansas River in Oklahoma. Our earliest efforts to reach a settlement for lost riverbed resources began in the late 1970s. . .
>
> The current bill, H.R. 3534, would settle the three Nations' damage claims against the United States now pending in the Court of Federal Claims, and it would give them, in a single lump sum, the past and future fair rental value of the lands being used for the two powerheads that were constructed on tribal lands on the bed of the Arkansas. The bill would also compensate the Nations for the lands being occupied by adjacent landowners and other potential claimants in the lower segments of the River. In exchange for the appropriated sums, the three Nations would dismiss their lawsuits against the Government and disclaim any right, title or interest in the 7,750 acres of lands being occupied by non-tribal interests. Those disclaimers will serve to eliminate the cloud of tribal claims in the title to lands being occupied by these people and relieve the Government of the very expensive burden of having to bring ejectment litigation against a very large number of Oklahoma citizens. . .

CN Ex. 6, at 90.

41. The United States, represented by Deputy Assistant Secretary for Indian Affairs Wayne Smith, explained at the House hearing that the amount of the settlement was based on reaching agreement on specific categories of losses, set out in a chart which he offered to the Committee. CN Ex. 6 at 32.

42. Deputy Assistant Secretary Smith further explained at the House hearing that agreement had been reached on all issues but one, and that negotiations to resolve the remaining issue were continuing. CN Ex. 6 at 32.

43. Oklahoma Congressman Brad Carson, the principal House sponsor of the bill, also described the matters for which compensation was being paid:

> Enactment of this legislation, H.R. 3534, will bring about clear, tangible benefits. First it will eliminate the need for the Department of Justice to bring hundreds of defendants into court due to their occupancy of parts of the 7,750 acres of drybed lands. Second, the settlement will pay the three tribes for the actual present value of the loss of past and future assets they would have had if not for the construction of the McClelland-Kerr navigation system. Third, positive movement of the legislation will result in the dismissal of the mismanagement case against the Bureau of Indian Affairs. And, finally, the settlement will provide the tribes with resources that will, in turn, be used to further economic development in the region, benefiting Indian and non-Indian members of these communities alike. . .

CN Ex. 6, at 92- 93.

44. H.R. 3534 was reported out of the House Committee on September 4, 2002, H. Rept. 107-632, and passed the House on October 1, 2002. 148 Cong. Rec. D1013-01, 1015 (digest, Oct. 1, 2002).

45. On November 14, 2002, the House considered S. 2017, and amended it to include, as Title VI, the text of H.R. 3534, the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act. S. 2017 passed the House as amended. 148 Cong. Rec. H8912-03, 8913-8919, 8923 (daily ed. Nov. 14, 2002).

46. On November 20, 2002 the Senate passed S. 2017 as amended by the House, and including the Cherokee, Choctaw and Chickasaw Nations Claims Settlement Act. 148 Cong. Rec. S11773-01, 11783 (daily ed. Nov. 20, 2002).

47. On December 13, 2002 the President signed S. 2017, and the Cherokee, Choctaw and Chickasaw Nations Claims Settlement Act became law. Pub L. 107-331, Title VI, 116 Stat. 2845, codified at 25 U.S.C. §§ 1779-1779g.

## II. <u>Cherokee Nation consideration of the attorney fees claims</u>

48. In late 2002, the various attorneys who had represented the Nation over the years began to raise questions regarding payment of their fees. *See* CN Exs. 12 and 13.

49. To address those questions, the Cherokee Nation undertook an examination of the claims being made by those attorneys. *See* CN Ex. 12, CN Ex. 13.

50. At the direction of the Nation, both James Wilcoxen and Patton Boggs submitted reports setting out the justifications for their fee claims. CN Ex. 12 (Memorandum dated November 5, 2002 from James Wilcoxen to Cherokee Nation General Counsel, Julian Fite); CN Ex. 13 (Memorandum dated November 7, 2002 from Patton Boggs to Cherokee Nation Principal Chief and General Counsel Julian Fite).

51. James Wilcoxen, the widow of Paul Niebell, and the Hall Estill firm (which had been associated as counsel under the Wilcoxen-Niebell contract), thereafter supplemented their initial submission with additional information and billing records. *See* CN Ex 14, letter of May 2, 2003 from James Wilcoxen to Julian Fite; *see also* CN Ex. 16 at A-110-A115, Memorandum dated October 6, 2003, from Julian Fite.[2]

52. The submissions made by the attorneys, as well as Tribal records, were reviewed by the Nation's general counsel, Julian Fite, who prepared a memorandum, dated October 6, 2003, setting out his preliminary views on allocation of fees under the Settlement Act. CN Ex. 16. That memorandum was provided to the Principal Chief of the Cherokee Nation, and by letter dated October 24, 2003 to James Wilcoxen, Joe Reeder (formerly a partner with Patton Boggs, but at that time outside counsel to Patton Boggs), Katherine Boyce at Patton Boggs, and Margaret Swimmer at Hall Estill. *Id.* at A-108 – A-109.

53. Mr. Fite's analysis considered the attorneys fee claims in light of the decades-long effort to secure compensation for damages to the Nation's interests in the Arkansas riverbed. He stated that:

> Except for the original litigation confirming the title to this property [the 1970 Supreme Court decision on the Arkansas riverbed], *none of the several lawsuits and appeals ever resulted in favorable disposition of any issues*. However, the long term and continued litigation efforts helped to keep these issues alive so that the eventual legislative solution could be reached.

[2] To protect attorney client privilege, the Cherokee Nation maintains attorney billing records as confidential and, accordingly, those records are not submitted with this Statement.

> Likewise, the long and many efforts to reach a legislative settlement of these matters went down many dead end roads until they reached fruition last year.

CN Ex. 16 at A-113 – A-114 (emphasis added).

54. Mr. Fite also explained that: "on these many efforts, the Cherokee Nation has expended well over $3 million to outside attorneys. In addition, the time of staff attorneys and administrative personnel on these matters would run into the hundreds of thousands or possibly over $1 million." CN Ex. 16 at A-114. In that context, Mr. Fite considered the pending fee claims being made by each outside counsel.

55. Mr. Fite stated that the first identified written contract with James Wilcoxen and Paul Niebell was in 1988, for services in prosecuting claims which the Cherokee Nation may have against the United States in any court or other tribunal, that it provided for the payment of fees not to exceed 10% of the recovery, and that each of the attorneys had submitted records regarding their time and expenses in providing services. CN Ex. 16.

56. As to James Wilcoxen, Mr. Fite noted that he provided services to the Nation since 1985, CN Ex. 16 at A-110, and had submitted a statement of his time on the matters from 1985 to 2003 (showing 1750 hours from 1985-1987, and 2219 hours from 1988 to 2003, for a total of $595,350 at $150 per hour), plus $2638.83 in expenses. He noted that Mr. Wilcoxen estimated his time from 1985 to 1992, thereafter had contemporaneous

time records, and had not been paid for any of the work done on these matters. CN Ex. 16 at A-112.

57. Mr. Fite recommended *not* paying Wilcoxen for time spent before the first executed contract was made in 1988. CN Ex. 16 at A-114.

58. For the period 1988 through 2003, Mr. Fite noted that Wilcoxen and the attorneys working with him "are the only ones with payments deferred to this final resolution," and "that Wilcoxen was involved from the beginning until final resolution." Mr. Fite recommended a payment of $400,000, with a "performance premium of $150,000 for long term unpaid service and results, for a total of $550,000." CN Ex. 16 at A-114.

59. As to Paul Niebell, Mr. Fite reviewed the time records submitted by his widow, which showed 482 hours from 1980-1984, 1101 hours from 1985-1988 and 1127 hours from 1988 to 1994. Mr. Fite recommended a payment of $100,000 to Mr. Niebell's estate. CN Ex. 16 at A-110, A-112, A-114.

60. As to the Hall Estill firm, Mr. Fite found that the firm worked on these matters for the Nation under the terms of the Wilcoxen/Niebell contract. CN Ex. 16 at A-110, A-112.

61. Mr. Fite reviewed that firm's billings, found its records to be detailed and contemporaneous and recommended payment in the amounts shown ($264,938.22 for the

period 1989-1994, and $15,586.35 for the period 2002-2003), with a performance bonus of $100,000. CN Ex. 16 A-112 - A-113, A-115.

62. Mr. Fite examined the terms of the contract between the Nation and Patton Boggs. He also noted that the firm had a second contract with the Nation, for lobbying services, "much of which had to do with Arkansas Riverbed matters." CN Ex. 16 at A-113.

63. Mr. Fite stated that Patton Boggs had been paid $403,959 under the litigation contract from 1989 through 1997, and that "in a letter dated August 11, 1995, Kate Boyce, a Patton Boggs partner, indicated that Patton Boggs had accumulated $126,000 in unbilled fees for Riverbed legal work." CN Ex. 16. at A-113; *see also* Ex. 9 (Letter agreement between the Cherokee Nation and Patton Boggs for other services).

64. Mr. Fite also stated that under the two contracts, the Nation had paid Patton Boggs a total of $1,053,908.48. *Id.* at A-113; *see also* Ex. 15.

65. Based on this information, Mr. Fite recommended that Patton Boggs be paid the additional $126,000 that it claimed was due, plus a performance premium of $25,000 for the firm's supplemental assistance in the passage of the Settlement Act in 2002. CN Ex. 16 at A-115.

66. Mr. Fite also pointed out that following the termination of the Patton Boggs' contract, the Nation retained the services of Swidler Berlin to represent it in the claims

case, that the firm's services were terminated in 1999 and that the Nation had paid the firm $202,120 in connection with services provided in the case. He stated that the firm was making no claim for additional payment and he recommended none. CN Ex. 16 at A-111, A-113, A-115.

67. Mr. Fite invited the interested attorneys to comment on the recommendations contained in his memorandum. CN Ex. 16 at A-108 – A-109 (October 24, 2003 letter).

68. By letter dated November 8, 2003, the widow of Paul Niebell objected to Mr. Fite's proposal to pay her husband's estate only $100,000, stating that the payment would amount to only $37 per hour for his time. She asked that he reconsider the matter, as her husband regularly charged his time at $100 per hour. CN Ex. 17.

69. By letter dated December 5, 2003, Hall Estill commented on Mr. Fite's recommendation, further described its services and requested additional compensation for time that had not been billed and for the delay in receiving payment. CN Ex. 19.

70. Patton Boggs responded to Mr. Fite's invitation by telephone calls in early November, and a letter dated November 14, 2003. CN Ex. 18.

71. In his letter dated November 14, 2003, Patton Boggs' counsel Mr. Reeder stated that the firm's claim was "based squarely on the Litigation Contract," questioned the

Nation's decision to terminate that contract, and described the services that the firm had provided to the Nation prior to the contract termination. CN Ex. 18 at 2-3.

72. In the November 14, 2003 letter, Patton Boggs also took the position that the lawsuit it filed in the Claims Court was "the only basis, and, indeed, the statutorily stated basis, for the resulting legislative settlement." CN Ex. 18 at 2.

73. In response to a request by the Nation for more specific information about the number of hours that Patton Boggs stated it had billed on this matter, its counsel submitted a letter dated December 17, 2003 in which he explained:

> the difficulty in reconstructing time worked but never fully recorded because our Attorney Contract neither required or contemplated that we would charge by the hour and submit and maintain precise, detailed data in that manner. Further complicating this arduous task, as explained in our November 2002 submission, Patton Boggs installed a new computerized billing system in December 1990. While we do not have all the time that was devoted to this cause, we have attempted to recapture from the billing system the total professional hours devoted to the Arkansas Riverbed litigation matters.

CN Ex. 20.

74. Patton Boggs submitted to the Nation a one-page chart which reported a total of 6,528 hours of time by 53 individuals, CN Ex. 20. The chart does not differentiate among partners, associate attorneys, paralegals or law clerks, or describe the substance of the work done.

75. On February 23, 2004, to implement the statutory restrictions on the use of the $20 million payment to the Nation under the Settlement Act, the Council of the Cherokee Nation adopted an Act, as a matter of tribal law, to govern its use of those funds. Cherokee Nation Legislative Act 5-04, the Arkansas Riverbed Trust Fund Management Act of 2004. CN Ex. 21.

76. The Cherokee Nation Arkansas Riverbed Trust Fund Management Act of 2004 requires, *inter alia*, the approval of the Chief and the Council with regard to the payment of attorneys' fees. CN Ex. 21 at § 5.

77. In 2004, Mr. Fite retained outside legal counsel to provide an independent analysis of his preliminary recommendations on the attorney fee claims. *See* CN Ex. 22.

78. By letter dated July 9, 2004, outside counsel concurred in large part with the recommendations made by Mr. Fite, but raised some additional questions for his consideration. CN Ex. 22.

79. Among the questions raised by outside counsel was the extent to which Patton Boggs was obligated under its "litigation" contract with the Nation also to provide legislative and lobbying services related to the Arkansas Riverbed, but for which the firm was separately paid under its other, "lobbying," contract with the Nation. CN Ex. 22 at 5.

80. Outside counsel also questioned the basis for Patton Boggs' assertion that the firm had over 6000 hours time in the matter. CN Ex. 22 at 7.

81. Outside counsel concurred in Mr. Fite's view that "any determination of the amount of this 'equitable contingency fee' should take into account the primary fact that recovery under the Act arose from the efforts and contributions of several attorneys and law firms (including employees of the Nation) in addition to Patton Boggs." CN Ex. 22 at 7.

82. Mr. Fite's recommendations were provided to the Principal Chief who, in turn, formally submitted the matter to the Council of the Cherokee Nation. *See* CN Ex. 23 (Rules Committee Meeting Minutes for September 16, 2004 at A-143).

83. In accord with Nation law and practice, the Council referred the matter to the legislative Rules Committee, which is a standing Committee comprised, at that time, of all 15 members of the Council. *See* CN Ex. 23 (Rules Committee Meeting Minutes for September 16, 2004 at A-141, A-143).

84. The Cherokee Nation Rules Committee considered the issue of attorneys fees at six Committee meetings, held on September 16, 2004, October 20, 2004, November 18, 2004, December 16, 2004, January 17, 2005, and February 17, 2005. CN Ex. 23 at A-143 – A-145; Ex. 24 at A-147 – A-153; Ex. 25 at A-158; Ex. 27 at A-169 – A170; Ex. 28 at A-175 – A-180; Ex. 30 at A-195 – A-196.

85. The underlying records relating to the attorney fee claims were made available for review by Council members. *See* CN Ex. 25 (Rules Committee Meeting Minutes for November 18, 2004 at A-158).

86. At each Committee meeting when the attorney fee issue was substantively discussed, the interested attorneys were provided with the opportunity to present their position in support of their claims for fees. *See* CN Ex. 23 at A-143 – A-145; Ex. 24 at A-147 – A-153; Ex. 27 at A-167, A-169 – A-170; Ex. 28 at A-175 – A-180; Ex. 30 at A-192, A-195 – A-196 (Rules Committee Meeting Minutes for September 16, October 20, December 16, January 17, and February 17).

87. Patton Boggs appeared at five of the six meetings, through either partners of the firm or local counsel, presented its position to the Committee and responded to questions. *See* CN Ex. 23 at A-143 – A-145; Ex. 24 at A-147 – A-153; Ex. 27 at A-167, A-169 – A-170; Ex. 28 at A-175 – A-180; Ex. 30 at A-192, A-195 – A-196 (Rules Committee Meeting Minutes for September 16, October 20, December 16, January 17, and February 17).

88. Committee members had the benefit of recommendations from not only the Nation's General Counsel and outside legal counsel, but also the Nation's legislative counsel. CN Ex. 26.

89. After hearing presentations, the Council members debated the issue during the Rules Committee meetings. *See* CN Ex. 23 at A-143 – A-145; Ex. 24 at A-147 – A-153; Ex. 27 at A-167, A-169 – A-170; Ex. 28 at A-175 – A-180; Ex. 30 at A-192, A-195 – A-196.

90. During those meetings, members of the Council expressed their desire to deal fairly with the attorneys who had represented the Nation throughout these proceedings and to honor the Nation's obligations. Council members discussed the work done by each of the attorneys, the extent to which each had, or had not, been paid, and the results achieved. *See* CN Ex. 27 at A-169 – A-170; Ex. 28 at A-175 – A-180.

91. During the Rules Committee meeting on January 17, 2005 a motion to pay Patton Boggs the sum of $151,000 failed, following a 5-5 vote. CN Ex. 28 at A-177.

92. Following that vote, the Rules Committee approved fee payments for attorneys Wilcoxen and Niebell in the amounts recommended by Mr. Fite, and approved a fee payment to Hall Estill, but without the $100,000 bonus that Mr. Fite had recommended. CN Ex. 28 at A-177 - A-178.

93. The Committee then resumed discussion of the fee payment for Patton Boggs. A motion was made to pay Patton Boggs $900,000. The motion was subject to further debate, including argument from Patton Boggs' counsel, but the motion failed by a vote of 4-8. CN Ex. 28 at A-178 – A-180.

94. On February 14, 2005, the full Tribal Council approved the Committee recommendations regarding fees for Wilcoxen (by a vote of 13 to 1), for Niebell and for Hall Estill (by votes of 11 to 3 each), CN. Ex. 29 at A-188 – A-189, and enacted: Resolution No. 18-05 (for payment of $280,524.57 to Hall Estill) (CN Ex. 32); Resolution No. 19-05 (for payment of $100,000 to the estate of Paul Niebell) (CN Ex. 33); and Resolution No. 20-05 (for payment of $550,000 to James Wilcoxen) (CN Ex. 34).

95. On February 17, 2005, the Rules Committee resumed consideration of the Patton Boggs fees, and adopted (by a vote of 8-7) a resolution approving Mr. Fite's recommendation that the firm be paid $151,000. CN Ex. 30 at A-195 – A-196.

96. The Rules Committee's action and Mr. Fite's recommendation on Patton Boggs' fees were then considered by the full Council during its regular session on March 14, 2005. CN Ex. 31 at A-209 – A-212.

97. Following debate on the issue, the Council (by a vote of 8-5) enacted Resolution No. 29-05 (CN Ex. 35), approving the Rules Committee recommendation to pay Patton Boggs $151,000. CN Ex. 31 at A-209 – A-212.

98. Taking into account payments already made (exclusive of additional payments made under the lobbying contract), the Council's decision brought the total paid to Patton Boggs under its litigation contract to at least $554,959. *See* CN Ex. 35 and CN Ex. 16.

99. By letters dated February 18, 2005 and March 30, 2005, the Principal Chief forwarded the Council resolutions to the Bureau of Indian Affairs for processing and payment from the Nation's share of the funds appropriated under the Settlement Act. CN Exs. 36, 37.

May 12, 2006

Respectfully submitted,

*/s/ Arthur Lazarus, Jr.*

Arthur Lazarus, Jr.
Sonosky, Chambers, Sachse, Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240, (202) 682-0249 (fax)
alazarus@sonosky.com

Special Counsel for Plaintiff Cherokee Nation

Of Counsel:

Lloyd Benton Miller
Donald J. Simon
Anne D. Noto
Sonosky, Chambers, Sachse, Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240, (202) 682-0249 (fax)
lloyd@sonosky.net; dsimon@sonosky.com
anoto@sonosky.com