| |
|---|
| **CN's Proposed Finding Fact 49.**<br><br>49. To address those questions, the Cherokee Nation undertook an examination of the claims being made by those attorneys. *See* CN Ex. 12, CN Ex. 13. |
| **PB's Response 49.**<br>**Not disputed for purposes of this motion.** |
| **CN's Proposed Finding Fact 50.**<br><br>50. At the direction of the Nation, both James Wilcoxen and Patton Boggs submitted reports setting out the justifications for their fee claims. CN Ex. 12 (Memorandum dated November 5, 2002 from James Wilcoxen to Cherokee Nation General Counsel, Julian Fite); CN Ex. 13 (Memorandum dated November 7, 2002 from Patton Boggs to Cherokee Nation Principal Chief and General Counsel Julian Fite). |
| **PB's Response 50.**<br>**Not disputed for purposes of this motion.** |
| **CN's Proposed Finding Fact 51.**<br><br>51. James Wilcoxen, the widow of Paul Niebell, and the Hall Estill firm (which had been associated as counsel under the Wilcoxen-Niebell contract), thereafter supplemented their initial submission with additional information and billing records. *See* CN Ex 14, letter of May 2, 2003 from James Wilcoxen to Julian Fite; *see also* CN Ex. 16 at A-110-A115, Memorandum dated October 6, 2003, from Julian Fite.[2] |
| **PB's Response 51.**<br>**Not disputed for purposes of this motion.** |

[2] To protect attorney client privilege, the Cherokee Nation maintains attorney billing records as confidential and, accordingly, those records are not submitted with this Statement.

**CN's Proposed Finding Fact 52.**

52. The submissions made by the attorneys, as well as Tribal records, were reviewed by the Nation's general counsel, Julian Fite, who prepared a memorandum, dated October 6, 2003, setting out his preliminary views on allocation of fees under the Settlement Act. CN Ex. 16. That memorandum was provided to the Principal Chief of the Cherokee Nation, and by letter dated October 24, 2003 to James Wilcoxen, Joe Reeder (formerly a partner with Patton Boggs, but at that time outside counsel to Patton Boggs), Katherine Boyce at Patton Boggs, and Margaret Swimmer at Hall Estill. *Id.* at A-108 - A-109.

**PB's Response 52.**
**Not disputed for purposes of this motion.**

**CN's Proposed Finding Fact 53.**

53. Mr. Fite's analysis considered the attorneys fee claims in light of the decades-long effort to secure compensation for damages to the Nation's interests in the Arkansas riverbed. He stated that:

> Except for the original litigation confirming the title to this property [the 1970 Supreme Court decision on the Arkansas riverbed], *none of the several lawsuits and appeals ever resulted in favorable disposition of any issues.* However, the long term and continued litigation efforts helped to keep these issues alive so that the eventual legislative solution could be reached.
>
> Likewise, the long and many efforts to reach a legislative settlement of these matters went down many dead end roads until they reached fruition last year.

CN Ex. 16 at A-113 - A-114 (emphasis added).

**PB's Response 53.**
**Not disputed for purposes of this motion.**

| |
|---|
| **CN's Proposed Finding Fact 54.**<br><br>54. Mr. Fite also explained that: "on these many efforts, the Cherokee Nation has expended well over $3 million to outside attorneys. In addition, the time of staff attorneys and administrative personnel on these matters would run into the hundreds of thousands or possibly over $1 million." CN Ex. 16 at A-114. In that context, Mr. Fite considered the pending fee claims being made by each outside counsel. |
| **PB's Response 54.**<br>**Not disputed for purposes of this motion.** |
| **CN's Proposed Finding Fact 55.**<br><br>55. Mr. Fite stated that the first identified written contract with James Wilcoxen and Paul Niebell was in 1988, for services in prosecuting claims which the Cherokee Nation may have against the United States in any court or other tribunal, that it provided for the payment of fees not to exceed 10% of the recovery, and that each of the attorneys had submitted records regarding their time and expenses in providing services. CN Ex. 16. |
| **PB's Response 55.**<br>**Not disputed for purposes of this motion.** |
| **CN's Proposed Finding Fact 56.**<br><br>56. As to James Wilcoxen, Mr. Fite noted that he provided services to the Nation since 1985, CN Ex. 16 at A-110, and had submitted a statement of his time on the matters from 1985 to 2003 (showing 1750 hours from 1985-1987, and 2219 hours from 1988 to 2003, for a total of $595,350 at $150 per hour), plus $2638.83 in expenses. He noted that Mr. Wilcoxen estimated his time from 1985 to 1992, thereafter had contemporaneous time records, and had not been paid for any of the work done on these matters. CN Ex. 16 at A-112. |
| **PB's Response 56.**<br>**Not disputed for purposes of this motion.** |
| **CN's Proposed Finding Fact 57.**<br><br>57. Mr. Fite recommended *not* paying Wilcoxen for time spent before the first executed contract was made in 1988. CN Ex. 16 at A-114. |
| **PB's Response 57.**<br>**Not disputed for purposes of this motion.** |

| |
|---|
| **CN's Proposed Finding Fact 58.**<br><br>58. For the period 1988 through 2003, Mr. Fite noted that Wilcoxen and the attorneys working with him "are the only ones with payments deferred to this final resolution," and "that Wilcoxen was involved from the beginning until final resolution." Mr. Fite recommended a payment of $400,000, with a "performance premium of $150,000 for long term unpaid service and results, for a total of $550,000." CN Ex. 16 at A-114. |
| **PB's Response 58.**<br>**Not disputed for purposes of this motion.** |
| **CN's Proposed Finding Fact 59.**<br><br>59. As to Paul Niebell, Mr. Fite reviewed the time records submitted by his widow, which showed 482 hours from 1980-1984, 1101 hours from 1985-1988 and 1127 hours from 1988 to 1994. Mr. Fite recommended a payment of $100,000 to Mr. Niebell's estate. CN Ex. 16 at A-110, A-112, A-114. |
| **PB's Response 59.**<br>**Not disputed for purposes of this motion.** |
| **CN's Proposed Finding Fact 60.**<br><br>60. As to the Hall Estill firm, Mr. Fite found that the firm worked on these matters for the Nation under the terms of the Wilcoxen/Niebell contract. CN Ex. 16 at A-110, A-112. |
| **PB's Response 60.**<br>**Not disputed for purposes of this motion. Of course, the fact that Mr. Fite made conclusions does not make such conclusions binding on the Court.** |
| **CN's Proposed Finding Fact 61.**<br><br>61. Mr. Fite reviewed that firm's billings, found its records to be detailed and contemporaneous and recommended payment in the amounts shown ($264,938.22 for the period 1989-1994, and $15,586.35 for the period 2002-2003), with a performance bonus of $100,000. CN Ex. 16 A-112 - A-113, A-115. |
| **PB's Response 61.**<br>**Not disputed for purposes of this motion. Again, while Patton Boggs does not dispute the fact that Mr. Fite made certain findings, the fact that he made findings establishes nothing material to this case.** |

**CN's Proposed Finding Fact 62.**

62. Mr. Fite examined the terms of the contract between the Nation and Patton Boggs. He also noted that the firm had a second contract with the Nation, for lobbying services, "much of which had to do with Arkansas Riverbed matters." CN Ex. 16 at A-113.

**PB's Response 62.**

**Not disputed for purposes of this motion. Mr. Fite's musings on the scope of Patton Boggs' second contract is not even relevant to whether, in fact, Patton Boggs' second contract had anything to do with the Arkansas Riverbed or this case.**

**CN's Proposed Finding Fact 63.**

63. Mr. Fite stated that Patton Boggs had been paid $403,959 under the litigation contract from 1989 through 1997, and that "in a letter dated August 11, 1995, Kate Boyce, a Patton Boggs partner, indicated that Patton Boggs had accumulated $126,000 in unbilled fees for Riverbed legal work." CN Ex. 16. at A-113; *see also* Ex. 9 (Letter agreement between the Cherokee Nation and Patton Boggs for other services).

**PB's Response 63.**

**Not disputed for purposes of this motion. But, Mr. Fite's statements recorded in the CN Ex. 16/Patton Boggs Exhibit 4 prove no more than Mr. Fite made such statements.**

**CN's Proposed Finding Fact 64.**

64. Mr. Fite also stated that under the two contracts, the Nation had paid Patton Boggs a total of $1,053,908.48. *Id.* at A-113; *see also* Ex. 15.

**PB's Response 64.**

**Not disputed for purposes of this motion. Of course, what Patton Boggs was paid under another contract is entirely irrelevant to what the Settlement Act required the Secretary to pay to Patton Boggs.**

**CN's Proposed Finding Fact 65.**

65. Based on this information, Mr. Fite recommended that Patton Boggs be paid the additional $126,000 that it claimed was due, plus a performance premium of $25,000 for the firm's supplemental assistance in the passage of the Settlement Act in 2002. CN Ex. 16 at A-115.

**PB's Response 65.**

**Not disputed for purposes of this motion. CN Ex. 16 says what it says, but that does**

**not support the inference the Cherokee Nation makes as to why Mr. Fite actually recommended payment to Patton Boggs of $151,000. Of course, Mr. Fite's motivation is irrelevant, as is the entire process through which the Cherokee Nation purported to approve payments to Patton Boggs. It matters not how many persons participated in the decision to "approve" payments to Patton Boggs, because the Cherokee Nation had no right to make such an after-the-fact approval.**

**CN's Proposed Finding Fact 66.**

66. Mr. Fite also pointed out that following the termination of the Patton Boggs' contract, the Nation retained the services of Swidler Berlin to represent it in the claims case, that the firm's services were terminated in 1999 and that the Nation had paid the firm $202,120 in connection with services provided in the case. He stated that the firm was making no claim for additional payment and he recommended none. CN Ex. 16 at A-111, A-113, A-115.

**PB's Response 66.**
**Not disputed for purposes of this motion. It does not matter what Swidler Berlin did or did not do, because it is not entitled to be paid under the Settlement Act.**

**CN's Proposed Finding Fact 67.**

67. Mr. Fite invited the interested attorneys to comment on the recommendations contained in his memorandum. CN Ex. 16 at A-108 - A-109 (October 24, 2003 letter).

**PB's Response 67.**
**Not disputed for purposes of this motion.**

**CN's Proposed Finding Fact 68.**

68. By letter dated November 8, 2003, the widow of Paul Niebell objected to Mr. Fite's proposal to pay her husband's estate only $100,000, stating that the payment would amount to only $37 per hour for his time. She asked that he reconsider the matter, as her husband regularly charged his time at $100 per hour. CN Ex. 17.

**PB's Response 68.**
**Not disputed for purposes of this motion. Mr. Niebell died without working on the only matter that brought about a Cherokee Nation recovery. Thus, under his wholly contingent contract, he was entitled to nothing. It makes no difference whether his Estate sought more, because he had no colorable claim to anything.**

**CN's Proposed Finding Fact 69.**

69. By letter dated December 5, 2003, Hall Estill commented on Mr. Fite's recommendation, further described its services and requested additional compensation for time that had not been billed and for the delay in receiving payment. CN Ex. 19.

**PB's Response 69.**
**Not disputed for purposes of this motion. This fact is irrelevant because (a) Hall Estill had no right to be paid directly by the Cherokee Nation and (b) it later withdrew any claim for additional payments.**

**CN's Proposed Finding Fact 70.**

70. Patton Boggs responded to Mr. Fite's invitation by telephone calls in early November, and a letter dated November 14, 2003. CN Ex. 18.

**PB's Response 70.**
**Not disputed for purposes of this motion.**

**CN's Proposed Finding Fact 71.**

71. In his letter dated November 14, 2003, Patton Boggs' counsel Mr. Reeder stated that the firm's claim was "based squarely on the Litigation Contract," questioned the Nation's decision to terminate that contract, and described the services that the firm had provided to the Nation prior to the contract termination. CN Ex. 18 at 2-3.

**PB's Response 71.**
**Not disputed for purposes of this motion.**

**CN's Proposed Finding Fact 72.**

72. In the November 14, 2003 letter, Patton Boggs also took the position that the lawsuit it filed in the Claims Court was "the only basis, and, indeed, the statutorily stated basis, for the resulting legislative settlement." CN Ex. 18 at 2.

**PB's Response 72.**
**Not disputed for purposes of this motion.**

| |
|---|
| **CN's Proposed Finding Fact 73.**<br><br>73. In response to a request by the Nation for more specific information about the number of hours that Patton Boggs stated it had billed on this matter, its counsel submitted a letter dated December 17, 2003 in which he explained:<br><br>> the difficulty in reconstructing time worked but never fully recorded because our Attorney Contract neither required or contemplated that we would charge by the hour and submit and maintain precise, detailed data in that manner. Further complicating this arduous task, as explained in our November 2002 submission, Patton Boggs installed a new computerized billing system in December 1990. While we do not have all the time that was devoted to this cause, we have attempted to recapture from the billing system the total professional hours devoted to the Arkansas Riverbed litigation matters.<br><br>CN Ex. 20. |
| **PB's Response 73.**<br>**Not disputed for purposes of this motion. Of course, Patton Boggs' bills were irrelevant because it was entitled to be paid a ten-percent contingency fee *from the Secretary*.** |
| **CN's Proposed Finding Fact 74.**<br><br>74. Patton Boggs submitted to the Nation a one-page chart which reported a total of 6,528 hours of time by 53 individuals, CN Ex. 20. The chart does not differentiate among partners, associate attorneys, paralegals or law clerks, or describe the substance of the work done. |
| **PB's Response 74.**<br>**Not disputed for purposes of this motion.** |
| **CN's Proposed Finding Fact 75.**<br><br>75. On February 23, 2004, to implement the statutory restrictions on the use of the $20 million payment to the Nation under the Settlement Act, the Council of the Cherokee Nation adopted an Act, as a matter of tribal law, to govern its use of those funds. Cherokee Nation Legislative Act 5-04, the Arkansas Riverbed Trust Fund Management Act of 2004. CN Ex. 21. |
| **PB's Response 75.**<br>**Not disputed for purposes of this motion. Indeed, this fact further proves that there was no such "approval" extant at the time the Settlement Act was passed.** |

**CN's Proposed Finding Fact 76.**

76. The Cherokee Nation Arkansas Riverbed Trust Fund Management Act of 2004 requires, *inter alia,* the approval of the Chief and the Council with regard to the payment of attorneys' fees. CN Ex. 21 at § 5.

**PB's Response 76.**
**Not disputed for purposes of this motion. Indeed, this fact further proves that there was no such "approval" extant at the time the Settlement Act was passed.**

**CN's Proposed Finding Fact 77.**

77. In 2004, Mr. Fite retained outside legal counsel to provide an independent analysis of his preliminary recommendations on the attorney fee claims. *See* CN Ex. 22.

**PB's Response 77.**
**Not disputed for purposes of this motion.**

**CN's Proposed Finding Fact 78.**

78. By letter dated July 9, 2004, outside counsel concurred in large part with the recommendations made by Mr. Fite, but raised some additional questions for his consideration. CN Ex. 22.

**PB's Response 78.**
**Not disputed for purposes of this motion.**

**CN's Proposed Finding Fact 79.**

79. Among the questions raised by outside counsel was the extent to which Patton Boggs was obligated under its "litigation" contract with the Nation also to provide legislative and lobbying services related to the Arkansas Riverbed, but for which the firm was separately paid under its other, "lobbying," contract with the Nation. CN Ex. 22 at 5.

**PB's Response 79.**
**Not disputed for purposes of this motion. Mere speculation by the Cherokee Nation's outside counsel is not a material fact.**

| |
|---|
| **CN's Proposed Finding Fact 80.**<br><br>80. Outside counsel also questioned the basis for Patton Boggs' assertion that the firm had over 6000 hours time in the matter. CN Ex. 22 at 7. |
| **PB's Response 80.**<br>**Not disputed for purposes of this motion. Mere speculation by the Cherokee Nation's outside counsel is not a material fact.** |
| **CN's Proposed Finding Fact 81.**<br><br>81. Outside counsel concurred in Mr. Fite's view that "any determination of the amount of this 'equitable contingency fee' should take into account the primary fact that recovery under the Act arose from the efforts and contributions of several attorneys and law firms (including employees of the Nation) in addition to Patton Boggs." CN Ex. 22 at 7. |
| **PB's Response 81.**<br>**Not disputed for purposes of this motion. Legal conclusions by the Cherokee Nation's outside counsel are not binding on the Court and, in this case, have no bearing on the case because no one contends that Patton Boggs was terminated for cause.** |
| **CN's Proposed Finding Fact 82.**<br><br>82. Mr. Fite's recommendations were provided to the Principal Chief who, in turn, formally submitted the matter to the Council of the Cherokee Nation. *See* CN Ex. 23 (Rules Committee Meeting Minutes for September 16, 2004 at A-143). |
| **PB's Response 82.**<br>**Not disputed for purposes of this motion. It is simply not relevant how many times the Cherokee Nation considered a matter over which it had no authority, or what procedures it followed in "approving" Patton Boggs' fee which the Secretary was mandated to pay.** |

| |
|---|
| **CN's Proposed Finding Fact 83.**<br><br>83. In accord with Nation law and practice, the Council referred the matter to the legislative Rules Committee, which is a standing Committee comprised, at that time, of all 15 members of the Council. *See* CN Ex. 23 (Rules Committee Meeting Minutes for September 16, 2004 at A-141, A-143). |
| **PB's Response 83.**<br>**Not disputed for purposes of this motion. It is simply not relevant how many times the Cherokee Nation considered a matter over which it had no authority, or what procedures it followed in "approving" Patton Boggs' fee which the Secretary was mandated to pay.** |
| **CN's Proposed Finding Fact 84.**<br><br>84. The Cherokee Nation Rules Committee considered the issue of attorneys fees at six Committee meetings, held on September 16, 2004, October 20, 2004, November 18, 2004, December 16, 2004, January 17, 2005, and February 17, 2005. CN Ex. 23 at A-143 - A-145; Ex. 24 at A-147 - A-153; Ex. 25 at A-158; Ex. 27 at A-169 - A170; Ex. 28 at A-175 - A-180; Ex. 30 at A-195 - A-196. |
| **PB's Response 84.**<br>**Not disputed for purposes of this motion. It is simply not relevant how many times the Cherokee Nation considered a matter over which it had no authority, or what procedures it followed in "approving" Patton Boggs' fee which the Secretary was mandated to pay.** |
| **CN's Proposed Finding Fact 85.**<br><br>85. The underlying records relating to the attorney fee claims were made available for review by Council members. *See* CN Ex. 25 (Rules Committee Meeting Minutes for November 18, 2004 at A-158). |
| **PB's Response 85.**<br>**Not disputed for purposes of this motion. It is simply not relevant how many times the Cherokee Nation considered a matter over which it had no authority, or what procedures it followed in "approving" Patton Boggs' fee which the Secretary was mandated to pay.** |

| |
|---|
| **CN's Proposed Finding Fact 86.**<br><br>86. At each Committee meeting when the attorney fee issue was substantively discussed, the interested attorneys were provided with the opportunity to present their position in support of their claims for fees. *See* CN Ex. 23 at A-143 - A-145; Ex. 24 at A-147 - A-153; Ex. 27 at A-167, A-169 - A-170; Ex. 28 at A-175 - A-180; Ex. 30 at A-192, A-195 - A-196 (Rules Committee Meeting Minutes for September 16, October 20, December 16, January 17, and February 17). |
| **PB's Response 86.**<br>**Not disputed for purposes of this motion. It is simply not relevant how many times the Cherokee Nation considered a matter over which it had no authority, or what procedures it followed in "approving" Patton Boggs' fee which the Secretary was mandated to pay.** |
| **CN's Proposed Finding Fact 87.**<br><br>87. Patton Boggs appeared at five of the six meetings, through either partners of the firm or local counsel, presented its position to the Committee and responded to questions. *See* CN Ex. 23 at A-143 - A-145; Ex. 24 at A-147 - A-153; Ex. 27 at A-167, A-169 - A-170; Ex. 28 at A-175 - A-180; Ex. 30 at A-192, A-195 - A-196 (Rules Committee Meeting Minutes for September 16, October 20, December 16, January 17, and February 17). |
| **PB's Response 87.**<br>**Not disputed for purposes of this motion. It is simply not relevant how many times the Cherokee Nation considered a matter over which it had no authority, or what procedures it followed in "approving" Patton Boggs' fee which the Secretary was mandated to pay.** |
| **CN's Proposed Finding Fact 88.**<br><br>88. Committee members had the benefit of recommendations from not only the Nation's General Counsel and outside legal counsel, but also the Nation's legislative counsel. CN Ex. 26. |
| **PB's Response 88.**<br>**Not disputed for purposes of this motion. It is simply not relevant how many times the Cherokee Nation considered a matter over which it had no authority, or what procedures it followed in "approving" Patton Boggs' fee which the Secretary was mandated to pay.** |

| |
|---|
| **CN's Proposed Finding Fact 89.**<br><br>89. After hearing presentations, the Council members debated the issue during the Rules Committee meetings. *See* CN Ex. 23 at A-143 - A-145; Ex. 24 at A-147 - A-153; Ex. 27 at A-167, A-169 - A-170; Ex. 28 at A-175 - A-180; Ex. 30 at A-192, A-195 - A-196. |
| **PB's Response 89.**<br>**Not disputed for purposes of this motion. It is simply not relevant how many times the Cherokee Nation considered a matter over which it had no authority, or what procedures it followed in "approving" Patton Boggs' fee which the Secretary was mandated to pay.** |
| **CN's Proposed Finding Fact 90.**<br><br>90. During those meetings, members of the Council expressed their desire to deal fairly with the attorneys who had represented the Nation throughout these proceedings and to honor the Nation's obligations. Council members discussed the work done by each of the attorneys, the extent to which each had, or had not, been paid, and the results achieved. *See* CN Ex. 27 at A-169 - A-170; Ex. 28 at A-175 - A-180. |
| **PB's Response 90.**<br>**Not disputed for purposes of this motion. It is simply not relevant how many times the Cherokee Nation considered a matter over which it had no authority, or what procedures it followed in "approving" Patton Boggs' fee which the Secretary was mandated to pay.** |
| **CN's Proposed Finding Fact 91.**<br><br>91. During the Rules Committee meeting on January 17, 2005 a motion to pay Patton Boggs the sum of $151,000 failed, following a 5-5 vote. CN Ex. 28 at A-177. |
| **PB's Response 91.**<br>**Not disputed for purposes of this motion. It is simply not relevant how many times the Cherokee Nation considered a matter over which it had no authority, or what procedures it followed in "approving" Patton Boggs' fee which the Secretary was mandated to pay.** |

**CN's Proposed Finding Fact 92.**

92. Following that vote, the Rules Committee approved fee payments for attorneys Wilcoxen and Niebell in the amounts recommended by Mr. Fite, and approved a fee payment to Hall Estill, but without the $100,000 bonus that Mr. Fite had recommended. CN Ex. 28 at A-177 - A-178.

**PB's Response 92.**
**Not disputed for purposes of this motion. It is simply not relevant how many times the Cherokee Nation considered a matter over which it had no authority, or what procedures it followed in "approving" attorney's fees which the Secretary was mandated to pay. Moreover, the fact that the Cherokee Nation did not "approve" a $100,000 bonus to Hall Estill does not change the fact that it approved almost three times that in fees despite the fact that Mr. Wilcoxen was solely liable for such fees.**

**CN's Proposed Finding Fact 93.**

93. The Committee then resumed discussion of the fee payment for Patton Boggs. A motion was made to pay Patton Boggs $900,000. The motion was subject to further debate, including argument from Patton Boggs' counsel, but the motion failed by a vote of 4-8. CN Ex. 28 at A-178 - A-180.

**PB's Response 93.**
**Not disputed for purposes of this motion. It is simply not relevant how many times the Cherokee Nation considered a matter over which it had no authority, or what procedures it followed in "approving" Patton Boggs' fee which the Secretary was mandated to pay.**

**CN's Proposed Finding Fact 94.**

94. On February 14, 2005, the full Tribal Council approved the Committee recommendations regarding fees for Wilcoxen (by a vote of 13 to 1), for Niebell and for Hall Estill (by votes of 11 to 3 each), CN. Ex. 29 at A-188 - A-189, and enacted: Resolution No. 18-05 (for payment of $280,524.57 to Hall Estill) (CN Ex. 32); Resolution No. 19-05 (for payment of $100,000 to the estate of Paul Niebell) (CN Ex. 33); and Resolution No. 20-05 (for payment of $550,000 to James Wilcoxen) (CN Ex. 34).

**PB's Response 94.**
**Not disputed for purposes of this motion. It is simply not relevant how many times the Cherokee Nation considered a matter over which it had no authority, or what procedures it followed in "approving" attorney's fees which the Secretary was mandated to pay.**

| |
|---|
| **CN's Proposed Finding Fact 95.**<br><br>95. On February 17, 2005, the Rules Committee resumed consideration of the Patton Boggs fees, and adopted (by a vote of 8-7) a resolution approving Mr. Fite's recommendation that the firm be paid $151,000. CN Ex. 30 at A-195 - A-196. |
| **PB's Response 95.**<br>**Not disputed for purposes of this motion. It is simply not relevant how many times the Cherokee Nation considered a matter over which it had no authority, or what procedures it followed in "approving" Patton Boggs' fee which the Secretary was mandated to pay.** |
| **CN's Proposed Finding Fact 96.**<br><br>96. The Rules Committee's action and Mr. Fite's recommendation on Patton Boggs' fees were then considered by the full Council during its regular session on March 14, 2005. CN Ex. 31 at A-209 - A-212. |
| **PB's Response 96.**<br>**Not disputed for purposes of this motion. It is simply not relevant how many times the Cherokee Nation considered a matter over which it had no authority, or what procedures it followed in "approving" Patton Boggs' fee which the Secretary was mandated to pay.** |
| **CN's Proposed Finding Fact 97.**<br><br>97. Following debate on the issue, the Council (by a vote of 8-5) enacted Resolution No. 29-05 (CN Ex. 35), approving the Rules Committee recommendation to pay Patton Boggs $151,000. CN Ex. 31 at A-209 - A-212. |
| **PB's Response 97.**<br>**Not disputed for purposes of this motion. It is simply not relevant how many times the Cherokee Nation considered a matter over which it had no authority, or what procedures it followed in "approving" Patton Boggs' fee which the Secretary was mandated to pay.** |

| |
|---|
| **CN's Proposed Finding Fact 98.**<br><br>98. Taking into account payments already made (exclusive of additional payments made under the lobbying contract), the Council's decision brought the total paid to Patton Boggs under its litigation contract to at least $554,959. *See* CN Ex. 35 and CN Ex. 16. |
| **PB's Response 98.**<br>**Not disputed for purposes of this motion.** |
| **CN's Proposed Finding Fact 99.**<br><br>99. By letters dated February 18, 2005 and March 30, 2005, the Principal Chief forwarded the Council resolutions to the Bureau of Indian Affairs for processing and payment from the Nation's share of the funds appropriated under the Settlement Act. CN Exs. 36, 37. |
| **PB's Response 99.**<br>**Not disputed for purposes of this motion. Of course, the fact that the Principal Chief took certain actions does not establish the Cherokee Nation's legal right to take those actions.** |

Respectfully submitted,

David P. Callet (DC Bar No. 181990)
David S. Panzer (DC Bar No. 470677)
GREENBERG TRAURIG LLP
800 Connecticut Ave, NW, Suite 500
Washington, DC 20006
202-331-3100
202-331-3101 (fax)
calletd@gtlaw.com
panzerd@gtlaw.com

May 26, 2006