Finally, the Government states: "the legislative history does not anywhere suggest that the Secretary must, as a court would do, adjudicate between the fee claims of the various competing law firms." US Reply at 5. Again, Patton Boggs agrees. The legislative history certainly does not vest authority in the Cherokee Nation, and does not specify that even the Secretary can make a binding determination of how to apply the limitation on fees imposed by 25 U.S.C. § 1779e(b). Further, the lack of an adjudication process between competing firms does not justify giving Patton Boggs' statutorily-mandated attorney's fee to the Cherokee Nation. Rather, the Tucker Act empowers this Court to adjudicate the Secretary's failure to pay Patton Boggs and the Settlement Act empowers the Court to do so through the entry of the Consent Decree. Most importantly, this Motion hardly involves adjudication among firms – it seeks only those statutory fees which undisputably belong to Patton Boggs.

Because Section 1779e's legislative history is unequivocal and dispositive, there is no need to look to any judicial presumption. *See AD Global Fund*, 67 Fed. Cl. at 672.

### C. Even If Both The Settlement Act And Its Legislative History Were Ambiguous, Neither The Indian Canon Of Construction Nor *Chevron* Deference Would Apply To This Case.

#### 1. Why *Chevron* Deference Does Not Apply.

Even assuming *arguendo* that any potential ambiguity is not resolved by Section 1779e's legislative history, the Secretary's interpretation here is not owed *Chevron* deference because *Chevron* deference is warranted "only when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law." *Gonzales v. Oregon*, 126 S.Ct. 904, 914-15 (2006) (quotation omitted); *see also Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990) ("A precondition to deference under *Chevron* is a congressional delegation of administrative authority."). "*Chevron*

deference…is not accorded merely because the statute is ambiguous and an administrative official is involved." *Gonzales*, 126 S.Ct. at 916. Instead, deference to an agency's statutory interpretation under *Chevron* applies only where an agency administers a statute. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). Section 1779e is not the type of statute for which *Chevron* deference might even be applicable because Congress did not grant the Secretary authority to "administer" it.[16]

**(a) <u>The Secretary Was Never Empowered To "Administer" The Settlement Act's Attorney Fee Provision; She Was Instructed To Pay In Accordance With It.</u>**

The Secretary is due no deference when "merely authorized [by statute] to process and pay" claims. *Wagner Seed Co., Inc. v. Bush*, 946 F.2d 918, 921 (D.C. Cir. 1991). It is the agency's "considerable experience and expertise" which garners its rules and interpretations substantial deference. *Gonzales v. Oregon*, 126 S. Ct. at 915. Section 1779e contains no provision calling for the Secretary to apply such expertise when carrying out what the Secretary herself has called a "purely ministerial" duty of payment. No part of Section 1779e even purports to establish a regulatory scheme requiring or warranting administration, but is, instead, simply an affirmative obligation imposed by Congress upon the Secretary to "pay to the Indian Nations' attorneys those fees provided

[16] Indeed, the Settlement Act itself draws a distinction between the Tribal trusts funds created in 25 U.S.C. § 1779d and the attorneys fees to be paid under 25 U.S.C. § 1779e. The Secretary has an ongoing role over the Tribal trust funds. *Id.* § 1779d. This administration of Indian Trust Funds is within the scope of the Department of the Interior's unique experience (if not notoriety). Under the Payment Provision, however, the Secretary's only role is that the Secretary "shall pay." Further, the payment of attorney's fees comes first, before there is even money allocated to the trust funds that the Secretary will administer. *See id.* at § 1779c(d). Once payment is made, the Secretary has no further duty under the Payment Provision.

for in the individual tribal attorney fee contracts as approved by the respective Indian Nations." 25 U.S.C. § 1779e(a). Thus, the Secretary's interpretation the statute is not susceptible to *Chevron* deference. *Gonzales v. Oregon*, 126 S. Ct. at 916-7 (declining to afford the Attorney General *Chevron* deference where the statute in question "gives the Attorney general limited powers to be executed in specific ways.").

Further, the Court may not infer an agency's authority to administer a statute. Where, as here, the statute does not explicitly delegate to an agency authority to administer a statute, the Court simply does not owe it any deference. *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 154 (1991). In such circumstances, it is "inappropriate" to rely upon agency interpretations of statutes in order to resolve ambiguities. *Adams Fruit Co.*, 494 U.S. at 650.[17]

Instead, authority to administer the statute that is not delegated to an agency remains with the court. The agency is then a party to the suit like any other. *See Wagner Seed,* 946 F.2d at 927 (Williams, J., dissenting) (according no deference to the EPA's interpretation of CERCLA, stating, "we do not review an EPA order, but simply entertain a suit between EPA and a private firm"), *cited favorably in Dico v. Diamond*, 35 F.3d 348, 352 n.4 (8th Cir. 1994) (examining the EPA's interpretation of CERCLA *de novo* in the course of litigation).

---

[17] *See Wagner Seed Co., Inc. v. Bush*, 946 F.2d 918, 927-8 (D.C. Cir. 1991) (distinguishing between CERCLA, which charged the Environmental Protection Agency with the administration of a "complex regulatory scheme" and therefore permitted courts to accord deference to the EPA's interpretations, and the Federal Tort Claims Act (FTCA) in which an agency's decision to deny a claim was accorded no deference because the FTCA "merely authorized [agencies] to process and pay tort claims").

**(b) <u>Even If The Secretary Had Been Empowered To "Administer" The Settlement Act's Attorney Fee Provision, Her Interpretation Should Not Be Accorded Deference Because She Never Promulgated Rules Or Regulations.</u>**

Even assuming that the Secretary were empowered to "administer" the Settlement Act's attorney-fee payment provision, the Secretary's failure to establish regulations, administrative practice, or promulgate any rulings pertaining to Section 1779e supports a finding that *Chevron* deference is inappropriate here. The Secretary has neither made "rules carrying the force of law" nor advanced an "interpretation claiming deference [that] was promulgated in the exercise of that authority" to establish rules pursuant to Section 1779e. *Gonzales*, 126 S.Ct. at 915 (quotation omitted).

**(c) <u>Moreover, The Secretary's Litigation Stance Is Not Due *Chevron* Deference.</u>**

Absent an agency rule, courts "refrain from deciding whether deference is due" because the agency's position "concerns merely … interpretation of the case law, not … interpretation of the controlling statute." *Director, Office of Workers' Compensation Programs, Department of Labor v. General Dynamics Corp.*, 980 F.2d 74, 78 (1st Cir. 1992) (quotation omitted). Here, the Secretary disclaimed any administration of the statute; yet, in litigation, the Department of Justice alleges that her interpretation is due *Chevron* deference, and the only basis to support her interpretation (because there are no rules or regulations) is her litigation counsel's reading of case law and rules of construction. *See Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 212-13 (1988) ("We have never applied the deference principle of those cases to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice. … Congress has delegated to the administrative official and not to [agency's] counsel the responsibility for elaborating and enforcing statutory commands.") (citation and

quotation omitted).

### 2. Why The Indian Canon Of Construction Does Not Apply To Disputes Between The Government And Non-Indians.

The Indian canon of construction is "rooted in the unique trust relationship between the United States and the Indians." *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985), and resolves ambiguities in favor of the Indians' interpretation, not in favor of a government agency's interpretation. Neither the Cherokee Nation, nor the Government, has cited any case in which this canon has been applied by the government against a third party, and we are aware of none. *See generally*, Peter S. Heinecke, Chevron *and the Canon Favoring Indians*, 60 U. CHI. L. REV. 1015 (1993).

## II. "QUANTUM MERUIT" ANALYSIS IS IRRELEVANT TO PATTON BOGGS' MONEY-MANDATING TUCKER ACT CLAIM AGAINST THE GOVERNMENT.

The Cherokee Nation and the Government contend that Patton Boggs is limited to a "quantum meruit" fee because the Contract was terminated.[18] The Oppositions

---

[18] Absent a termination "for cause," the amount "provided for" in Patton Boggs' Contract is a ten-percent contingency. *Compare* A-41 (ten-percent contingency) *with* A-42 ("an equitable portion" in the event of a "for cause" termination). Neither the Cherokee Nation, nor the Government, has ever contended that Patton Boggs was terminated for cause. *See* Docket No. 154-1, The Cherokee Nation's Response to Patton Boggs' Proposed Findings of Uncontroverted Fact at Fact 2 (no reference to termination for cause); *see generally* Docket No. 152, the Government's Statement Of Genuine Issues Of Material Fact In Dispute (same).

Therefore, termination of Patton Boggs' Contract without cause did not disqualify Patton Boggs from receiving the funds that it was due under the Settlement Act. *See White Mountain Apache Tribe of Arizona v. United States*, 30 Fed. Cl. 8, 13, 23 (1993) ("attorneys who were not involved in the litigation resulting in the final award and whose last contract with the plaintiff Tribe ended 10 years before the final award was made" were, nonetheless, awarded a fee by the Court), *aff'd*, 31 F.3d 1176 (Fed. Cir. 1994); *W. Shoshone Identifiable Group v. United States*, 652 F.2d 41 (1981) (counsel awarded full 10% contingency fee even though he was fired before judgment was entered); *Sioux Nation of Indians v. United States*, 650 F.2d 244 (Ct. Cl. 1981) (**special counsel in this case**, Mr. Lazarus, was awarded a full 10% fee on an award exceeding $100 million, even though one of his contracts with one of the tribes he represented had expired).

contentions are without merit because Patton Boggs is pursuing a money-mandating Tucker Act claim against the United States, not a contract claim against the Cherokee Nation. 12/19/05 Opinion at 15.[19] The issue is not whether the Cherokee Nation would prevail on some contractual defense to a breach of contract claim brought in another forum.[20] The issue is only what amount the Secretary was instructed to pay, and that

---

Even if Patton Boggs had been terminated for cause, because its Contract "provided for" an "equitable" portion of its ten-percent contingency, (A-42, Contract at 4), Patton Boggs would still be entitled to the full amount of its summary judgment – which does not contest monies paid to Mr. Wilcoxen. Assuming, for purposes of this Motion, the truth of every fact proffered by the Cherokee Nation, but for Patton Boggs' "heroic efforts," (CN Opp at 1), none of the Indian Nations would have recovered anything. There is no dispute that, this case, brought by Patton Boggs, was the only case pending at the time of the Settlement Act asserting the Indian Nations' claims which were resolved by the Settlement Act. There is no dispute that the only other attorney with an approved contract that ever worked on this case was Mr. Wilcoxen. Mr. Wilcoxen's rather limited work in this litigation is readily apparent from the Court's docket sheet, and there is no dispute Mr. Wilcoxen is entitled to ***no more than*** the $550,000 he already has received for that work. *See* A-51, March 31, 2005 letter. And, there is no dispute that Patton Boggs more than earned its statutory fee, for the reasons set forth in the November 3, 2005 Declaration of Katharine R. Boyce, Esq., (Docket No. 117, Exhibit 15), which are not disputed by any of the so-styled "relevant" facts the Cherokee Nations puts forth. Thus, this Court could, on the undisputed record, award Patton Boggs its statutory fee based an "equitable portion" of its ten-percent contingency, and it would be entirely "equitable" that Patton Boggs receive the balance of available fees. But no such exercise is called for in this case.

[19] The Cherokee Nation's continued treatment of Patton Boggs' Tucker Act claim against the Government as a contract claim against the Cherokee Nation brings to mind the popular saying, "What is it about 'No' that you don't understand?" Indeed, this Court's ruling that it has jurisdiction over Patton Boggs' claim impliedly rejected the Oppositions' "quantum meruit" argument. *Compare* 12/19/05 Opinion at 15 ("The court finds it has jurisdiction over PB's claim against the government for money damages.") *with Guardsman Elevator Co. v. U.S.*, 50 Fed. Cl. 577, 584 (2001) ("The Court of Federal Claims' Tucker Act jurisdiction does not extend to claims brought solely on the theory of *quantum meruit* because the Tucker Act does not reach claims based on contracts implied in law, as opposed to those implied in fact.") (italics in original, citations omitted).

[20] For that reason, *Scates v. Principi*, 282 F.3d 1362 (Fed. Cir. 2002) – a contract case – is not instructive.

statutory amount is the "fee[] provided for in the" approved Contract.[21]

## III. SUBSEQUENT (2004) LEGISLATION REQUIRING CHEROKEE NATION APPROVAL OF ATTORNEYS FEES UNDERSCORES THAT NO SUCH APPROVALS WERE INCORPORATED INTO THE SETTLEMENT ACT.

The Cherokee Nation argues that the Contract is limited to fees "approved" by the Cherokee Nation, including tribal approvals. CN Opp at 30. Yet, Patton Boggs' fee was only subject to approvals "if any" were required. A-41, Contract at 3. The Cherokee Nation's after-the-fact legislation, arrogating to itself a right ***in 2004*** to approve Patton Boggs' statutory fee, could not more plainly demonstrate the fact that no such approvals were required by the Settlement Act ***in 2002***.[22]

---

[21] In support of its "quantum meruit" analysis, the Cherokee Nation, for the first time, argues that the Cherokee Nation's recovery under the Settlement Act was the result of individual, allegedly-quantifiable components, one being damages suffered due to the Government's construction of the McClellan-Kerr Navigation Project (the "Project"). CN Opp 11-12. Neither the Settlement Act, nor Patton Boggs' Contract, break down the Cherokee Nation's recovery in the manner the Cherokee Nation now urges. The Settlement Act mandates payment of fees as provided for in the individual tribal attorney fee contracts, and Patton Boggs' Contract is for ten-percent of the Cherokee Nation's recovery whether by litigation or legislative resolution. The scope of Patton Boggs' Contract was to assert all claims except those being advanced in two specific cases prosecuted by Mr. Wilcoxen and Mr. Niebell – both subsequently dismissed without ***any*** recovery. Thus, the Project either was excluded from the scope of Patton Boggs' Contract but worth ***zero*** as part of those claims dismissed with prejudice, or it was within the scope of Patton Boggs' Contract, which culminated in the one and only recovery for the Cherokee Nation. Further, even assuming that the Project did provide a separate, quantifiable recovery for the Cherokee Nation to which Patton Boggs is not entitled to its ten-percent share, the Cherokee Nation has failed to introduce any evidence as to what that value might be (and it did not move under RCFC 56(f) to seek additional time to obtain such necessary discovery). *See* CN Opp at 12 n. 27 (speculating about alleged evidence, without invoking RCFC 56(f)).

[22] This Cherokee Nation Act applies to "Trust funds" "derived from the Settlement Act." CN Opp, Exhibit 21, Legislative Act 5-04 § 4. But, the fees set aside to pay the attorneys are ***not*** Cherokee Nation funds. The Settlement Act directs "Indian Nations' attorneys" to be paid first, ***before any*** "remaining funds" are to be paid into the Indian Nations' Trust funds. 25 U.S.C. §§ 1779c(d), 1779e(b).

## IV. THE GOVERNMENT, BY IMPROPERLY PAYING OTHERS, CANNOT ESCAPE ITS OBLIGATION TO PAY PATTON BOGGS.

Finally, the Government argues that the Court must enforce the fee cap in 25 U.S.C. § 1779e(b) (the "Fee Cap") and, therefore, Patton Boggs' claim must fail. In particular, the Government objects to Patton Boggs' exclusion from the Fee Cap the $100,000 improperly paid to the Estate of Paul Niebell (whose work resulted in ***zero*** recovery) and the $280,524.57 paid to the Hall Estill law firm (which had no contract with the Cherokee Nation, but was merely "associate counsel" to Mr. Wilcoxen). US Opp at 6-7.[23]

The Government is wrong because the Fee Cap applies only to monies properly paid under the Settlement Act. The Government does not even argue that it was proper for the Secretary to pay the Estate of Mr. Niebell or the Hall Estill law firm. *Id.* at 3, 6-7. The Government neither contests the undisputed fact that Mr. Niebell's contract entitled him to ***zero*** attorneys fees because his work "[n]ever resulted in favorable disposition of any issue," nor that the Hall Estill firm was merely associated under the Wilcoxen-Niebell Contract. *See* Docket No. 152, Defendant's Statement of Genuine Issues of Material Facts In Dispute ¶¶ 1, 2. Those payments made in contravention of the Settlement Act (*i.e.*, the $380,524.57 paid to the Estate of Mr. Niebell and the Hall Estill firm) do not count against the Fee Cap, allowing Patton Boggs to be fully paid from Settlement Act funds.[24]

---

[23] Thus, even if correct, and the $2 million set aside for attorneys with approved contracts can be reduced by the Government having made statutorily unauthorized payments, Patton Boggs still would be entitled to summary judgment for $866,977.23. *See* PB Memo at 16.

[24] It actually benefits the Government (and makes far more sense) to conclude that the Settlement Act limited payments to attorneys with approved contracts to ten-percent of the Indian Nations' recovery. By excluding these improper payments (directed by the

The Fee Cap limits the amount the Secretary must pay in compliance with the Settlement Act, not her liability for ignoring the Settlement Act's money-mandating Payment Provision. In the end, the Government is liable because the Secretary failed to comply with the money-mandating provision of the Settlement Act.[25]

## CONCLUSION

Despite the ream of facts the Cherokee Nation denominates as "relevant," there are no ***material*** facts in dispute. The Cherokee Nation and the Government have effectively admitted every material fact set forth by Patton Boggs, thereby entitling Patton Boggs to judgment as a matter law. Ultimately, because the Settlement Act is money-mandating, requiring the Secretary to pay Patton Boggs, the only question is "how much is due?" Should the Secretary pay the amounts provided for in approved contracts as the Settlement Act provides, or pay the fees subsequently dictated by the Cherokee Nation, as the Cherokee Nation's self-benefiting, after-the-fact, statute provides? If there were ever any doubt (which there is not), then, as the Cherokee Nation has now conceded (CN Opp at 37), the Court first should look to the legislative history *before* applying any judicial presumptions. The legislative history is unequivocal that the Settlement Act does not involve any *post-hoc* Indian Nation approval. The sum owed under Patton Boggs' Contract is ten-percent of the Cherokee Nation's recovery, less the amounts Patton Boggs

---

Cherokee Nation) from the Fee Cap, the entirety of Patton Boggs' summary judgment can be paid without using the Judgment Fund. But, while it should matter to the Government, it does not matter to Patton Boggs whether it is paid from Settlement Act funds or the from the Judgment Fund.

[25] "By mandating that the Secretary pay attorneys government funds, Congress provided the attorneys with a cause of action if the Secretary failed to do so." 12/19/05 Opinion at 14; *see also id.* at 15 ("In the event that the court holds the government liable to PB for attorney's fees, and if there is no money left in the attorney fee escrow account, the award *may* be payable from the judgment fund.") (italics in original).

was already paid. A-41, Contract at 3.

In this Motion, Patton Boggs seeks only those sums to which no one else has a legitimate claim, as set forth below:

| | |
|---|---|
| Balance Of The Attorney Fee Escrow Fund | $366,977.23 |
| Future Expected Allocation To The Attorney Fee Escrow Fund | $500,000.00 |
| Monies Improperly Paid Out Of The Attorney Fee Escrow Fund To The Hall Estill Law Firm – Which Had No Contract With The Cherokee Nation | $280,524.57 |
| Monies Improperly Paid Out Of The Attorney Fee Escrow Fund To The Estate Of Paul Niebell – A Fee "Wholly Contingent" On A Recovery He Did Not Achieve | $100,000.00 |
| **Total: Patton Boggs' Claim For Summary Judgment** | **$1,247,501.80** |

Respectfully submitted,

David P. Callet (DC Bar No. 181990)
David S. Panzer (DC Bar No. 470677)
GREENBERG TRAURIG LLP
800 Connecticut Ave, NW, Suite 500
Washington, DC 20006
202-331-3100
202-331-3101 (fax)
calletd@gtlaw.com
panzerd@gtlaw.com

May 26, 2006