# In the United States Court of Federal Claims

Consolidated Case No. 89-218 L

(Filed: August 24, 2006)

******************************************

| | | |
|---|---|---|
| **THE CHEROKEE NATION OF OKLAHOMA,** Plaintiff, **PATTON BOGGS, LLP,** Intervenor-Plaintiff, v. **THE UNITED STATES,** Defendant. | * | Case No. 89-218 L<br>Motion to Dismiss; 25 U.S.C. § 1779e; Attorneys' Fees; Money-Mandating Statute; Law of the Case; Motion for Summary Judgment; Statutory Interpretation; Rule of the Last Antecedent; Indian Canon of Construction |

******************************************

******************************************

| | | |
|---|---|---|
| **THE CHOCTAW NATION OF OKLAHOMA AND THE CHICKASAW NATION,** Plaintiffs, v. **THE UNITED STATES,** Defendant. | * | Case No. 89-630 L |

******************************************

---

**OPINION**

---

*Arthur Lazarus, Jr.*, Sonosky, Chambers, Sachse, Endreson & Perry, LLP, Washington, D.C., Special Counsel for Plaintiff.

*James M. Upton*, Trial Attorney, U.S. Department of Justice, Environment and Natural Resources Division, Washington, D.C., with whom was *Sue Ellen Woolridge*, Assistant Attorney General, Environment and Natural Resources Division.

*David S. Panzer*, Greenberg Traurig LLP, Washington, D.C., counsel of record for Applicant-Intervenor, with whom was *David P. Callet*.

**DAMICH,** Chief Judge.

## I. Introduction

This matter is before the court on Defendant's Motion to Dismiss, pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC") or, in the Alternative, for Summary Judgment, pursuant to RCFC 56, filed February 28, 2006; Plaintiff Cherokee Nation's ("the Cherokee Nation") Motion to Dismiss Complaint-in-Intervention of Patton Boggs, LLP ("PB" or "Patton Boggs"), pursuant to RCFC 12(b)(1) and (6), filed on February 17, 2006; and Intervenor-Plaintiff Patton Boggs' Cross-Motion for Summary Judgment pursuant to RCFC 56, filed March 20, 2006. Patton Boggs filed its Complaint in Intervention on January 11, 2006. At issue is whether the Secretary of the Interior ("Secretary") fully paid Patton Boggs, the Cherokee Nation's former counsel, the amount of attorneys' fees it was owed for its services. The Court is grateful for the able and insightful briefing from all counsel. Oral argument is deemed unnecessary. For the reasons discussed herein, the Court **DENIES** Defendant's motion to dismiss and **GRANTS** its motion for summary judgment. Cherokee Nation's motion is hereby **GRANTED**.[1] Intervenor-Plaintiff Patton Boggs' Cross-Motion for Summary Judgment is **DENIED**.

---

[1]Because the Court has considered Cherokee Nation's arguments in conjunction with undisputed factual evidence placed on the record by Defendant, the Court converts Cherokee Nation's motion to dismiss to a motion for summary judgment.

## II. Background

______A. Settlement of Plaintiff Cherokee's Cause of Action Against the Government

In 1989, Plaintiffs filed suit in this court seeking damages for the government's use and mismanagement of tribal trust resources along the Arkansas River. The case was reassigned to this judge on January 27, 1999. Shortly thereafter, the parties requested that the court stay the case pending settlement negotiations. Settlement negotiations were fruitful and resulted in the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act of 2002 ("Settlement Act"). *See* Pub. L. No. 107-331, tit. VI, 116 Stat. 2845 (codified at 25 U.S.C. §§ 1779a-1779g (Supp. III 2003). The Settlement Act conferred certain benefits on the Plaintiffs, and in return for those benefits, section 1779c(a) required them to "enter into a consent decree with the United States that waives, releases, and dismisses all the claims they have asserted or could have asserted in their cases . . ." before the court. 25 U.S.C. § 1779c(a). This section further required the parties to "lodge" the consent decree with the court and then "move for [its] entry . . . at such time as all appropriations by Congress . . . have been made and deposited into the appropriate tribal trust fund account. . . ." *Id.* Finally, section 1779c(a) provides that "[u]pon entry of the consent decree," the Plaintiffs' claims against the government "shall be deemed extinguished." *Id.*

On January 8, 2003, the parties' lodged the consent decree with the court. The parties' representatives signed and dated the consent decree. It has not, as of yet, been signed by this court nor have the parties moved for its entry.

The Settlement Act contains a specific provision regarding the payment of attorneys' fees. Section 1779e(a) provides that:

> At the time the funds are paid to the Indian Nations, from funds authorized to be appropriated [by the Act], the Secretary [of the Interior] shall pay to the Indian Nations' attorneys those fees provided for in the individual tribal attorney fee contracts as approved by the respective Indian Nations.

*Id.* § 1779e(a).

This provision, however, is limited by section 1779e(b), which provides that "the total fees payable to attorneys under such contracts with an Indian Nation shall not exceed 10 percent of that Indian Nation's allocation of funds appropriated under . . . ." the Act. *Id.* § 1779e(b). As envisioned by the Settlement Act, Congress has appropriated each fiscal year, from the date of passage of the Act, partial appropriations, such that by sometime in 2007, the nearly $20 million will have been appropriated. Assuming that FY 2007 appropriations fully fund the last tranche of authorized funds under the Settlement Act, the Cherokee Nation will receive a total of $19,485,018 in appropriations under the Settlement Act, $1,948,501.80 is potentially available for the payment of attorneys' fees.

Pursuant to four tribal resolutions, the Cherokee Nation directed the Secretary to make the following payments of attorneys' fees:

| **Tribal Resolution:** | **Payee:** | **Amount of Fees:** |
|---|---|---|
| No. 29-05 | Patton Boggs | $151,000.00 |
| No. 20-05 | Wilcoxen & Wilcoxen | $550,000.00 |
| No .18-05 | Hall Estill | $280,524.57 |
| No. 19-05 | Estate of Paul Niebell | $100,000.00 |

Compl., Ex. 3 at 2.

On October 13, 2005, the Associate Deputy Secretary, James Cason wrote a letter to Chief Chad Smith of the Cherokee Nation informing him, and the Cherokee Nation attorneys, including PB, that he "determined that the Secretary is required to pay only those fees approved by the tribal resolutions after the Settlement Act became effective . . . ." Compl., Ex. 3 at 2. In the same letter, Mr. Cason indicated that the attorney's fees would be dispersed according to the Cherokee Nation's resolution "within two weeks." *Id.* Mr. Cason also stated that, "[u]pon payments of these attorney fees, the balance remaining in the Cherokee attorney escrow account will be disbursed to the Nation and the account will be closed." *Id.* On October 17-18, 2005, the Secretary disbursed the attorney's fees in the amounts determined by the Cherokee Nation. Attachment to Def..'s Mot. at Attach., Declaration of Douglas A. Lords, ¶¶ 8-9.

In response, on October 19, 2005, PB filed three motions including a Motion to Intervene, a Motion for a Temporary Restraining Order, and a Motion for Attorney's Fees. PB sought to prevent the Secretary from disbursing the balance of the attorney fee escrow account to the Cherokee Nation until the court determined whether PB was entitled to additional attorneys' fees.

On December 19, 2005, the Court granted PB's Motion to Intervene and determined that the Court has jurisdiction over PB's claim against the Government for attorneys' fees under section 1779e(a) of the Settlement Act, as it mandated the payment of monies to attorneys. "A plain reading of [the Settlement Act's payment provision] unequivocally demonstrates that the statute mandates that the Secretary pay the attorneys their fees." *The Cherokee Nation of Okla. v. United States*, 69 Fed. Cl. 148, 159 (2005).[2]

[2]At oral argument on December 13, 2005, PB withdrew its claim for equitable remedies, which was the focus of its motions for attorney's fees and temporary restraining order, Tr. at 49, and instead sought to pursue a claim for monetary damages against Defendant.

In its cross-motion for summary judgment, PB argues that its retainer agreement provides that it is entitled to receive 10 percent of the "amount recovered" "through the litigation or legislative process," (which, pursuant to the Settlement Act, is, $1,948,501.80). PB's Cross-mot. at 4. As PB asserts that it had only been paid $403,959, and as the Cherokee Nation determined that PB was owed only $151,000 more, PB claims that it is still owed $1,393,542.80. *Id.* PB acknowledges that the Settlement Act between the Defendant and the Cherokee Nation places a statutory cap of 10 percent on "the total fees payable to attorneys." *Id.*.; 25 U.S.C. § 1779e(b). Nevertheless, PB asserts that some of the other attorneys whose fees the Cherokee Nation approved are not entitled to payment under the Settlement Act. Specifically, it maintains that monies paid out of the attorney fee escrow account to the Hall Estill Law firm in the amount of $280,524.57 and the estate of Paul Niebell, Esq. in the amount of $100,000 were improperly paid and properly belong to PB. *Id.* at 21. Accordingly, PB is seeking a money judgment in the amount of $1,247,501.80. *Id.* This amount includes the following components:

| | |
|---|---|
| Balance of the Attorney Fee Escrow Fund: | $366,977.23 |
| Future Expected Allocation To the Attorney Fee Escrow Fund | $500.000.00 |
| Monies Paid Out of the Attorney Fee Escrow Fund to Hall Estill Firm | $280,524.57 |
| Monies Paid Out of the Attorney Fee Escrow Fund to Paul Niebell, Esq. | $100,000.00 |
| **Total Patton Boggs Fee Claim** | **$1,247,501.80**[3] |

*Id.*

## III. Standard of Review

### ______A. Motion to Dismiss

"[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *accord Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2 (1977); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988).

The Tucker Act establishes the jurisdiction of this court. "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department." 28 U.S.C. § 1491. By judicial interpretation, however, the

---

[3]PB's complaint in intervention requests that the Court award it a judgment of $1,445,041. Compl. ¶ 23. The Court assumes that PB has reduced its award to the amount contained in its cross-motion for summary judgment.

Constitutional provision, the Act of Congress or the regulation must mandate the payment of money. *United States v. Testan*, 424 U.S. 392, 401-02 (1976). The Court of Claims has ruled that a provision of law is "money-mandating" if "the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007, 178 Ct. Cl. 599 (Ct. Cl. 1967).

B. Motion for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is considered material if it is one that might affect the outcome of the suit. *Id*. at 248. An issue of material fact is genuine if the evidence is such that a reasonable jury or trier of fact could return a verdict in favor of the non-moving party. *Id*. Furthermore, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [its] favor."[4] *Id*. at 255.

## IV. The Court Will Not Revisit Previously-Argued Money-Mandating Arguments Under the Law of the Case Doctrine

As stated above, the Court held in its December 19, 2005 Opinion that it has jurisdiction over PB's claim against the Government for monetary damages because the Settlement Act expressly provides that the Secretary "shall pay" the attorneys. 25 U.S.C. § 1779e(a). In their motions to dismiss, the Cherokee Nation and Defendant seek to revisit this determination.

A. Cherokee Nations' Arguments

The Cherokee Nation makes several arguments urging the Court to revisit its determination that it has jurisdiction to hear PB's claim for money damages pursuant to the Settlement Act. First, it argues that, while the Court correctly determined that the Secretary has a duty to pay attorneys' fees, it nevertheless claims that the Court incorrectly determined that the monies paid by the Secretary were "still Government money." The Cherokee Nation argues that the monies used to pay Government fees are not Federal money, but only tribal trust funds. Tribal trust funds, it insists, are not Government money, and the Tucker Act does not provide jurisdiction over claims that the Secretary failed to comply with a statute that mandates the payment of an Indian tribes' trust funds to a third party.

Second, the Cherokee Nation also argues that, apart from the Tucker Act, the Court has no jurisdiction under the Settlement Act to adjudicate an award of attorneys' fees to PB. The Cherokee Nation contrasts the Settlement Act with the specific provision contained in the Indian Claims Commission Act ("ICCA"), 25 U.S.C. § 70n, which provided the-then Indian Claims

---

[4]In this case, the facts relied upon by the Court that were submitted outside the pleadings are virtually undisputed.

Commission to set attorneys' fees. In contrast to the power expressly conferred by the ICCA, the Settlement Act is silent as to the Court's role in the payment of attorneys' fees.[5]

Third, the Cherokee Nation argues that PB's cause of action is a private dispute over which this Court has no jurisdiction. *United States v. Sherwood*, 312 U.S. 584, 588 (1941), which the Cherokee Nation cites, held that the Court of Claims could not adjudicate the claim of a judgment creditor of another party because such adjudication would require the Court to adjudicate the validity of the state court order vesting the judgment creditor with the capacity to make the claim, thereby adjudicating a dispute between private parties. It maintains that to determine whether the Secretary must pay PB its attorneys' fee claim, the Court must first resolve a dispute between PB and the Cherokee Nation as to the terms of their private contracts.

B. Defendant's Arguments

In its Motion to Dismiss, Defendant argues that because PB first made the argument that the Settlement Act was money-mandating in its November 28, 2005 reply brief in support of its motion to intervene (at 8-11), Defendant should be provided the opportunity to submit a written response to PB's money-mandating argument here. Defendant argues that the Settlement Act does not mandate the payment of money to PB, because any statutory obligation by the Government to pay attorneys' fees is that of a trustee to act on behalf of the trust beneficiaries. As attorneys are not trust beneficiaries – unlike Plaintiff Cherokee – any obligation by the Government to pay attorneys' fees under the Settlement Act runs to the Cherokee Nation and not PB.

C. PB's Arguments In Response

1. Response to the Cherokee Nation's Motion to Dismiss

PB argues that, while the Court is not precluded from reconsidering its December 19, 2005 Opinion, nonetheless, the law of the case doctrine is designed to "protect[] the settled expectation of the parties." *Wolfchild v. United States*, 68 Fed. Cl. 779, 785 (2005) (citations,

---

[5]The Cherokee Nation contrasts the Settlement Act with the Hoopa-Yurok Settlement Act ("HYSA"), Pub. L. No. 100-580, 102 Stat. 2924 (1988), (codified at 25 U.S.C. §§ 1300i-1300i-11 (2000). The U.S. Court of Appeals for the District of Columbia Circuit ruled that a law firm could not pursue a claim against the Secretary for unpaid attorneys' fees under the APA because HYSA explicitly provided that "any claim" challenging the distribution of money and property under HYSA "shall be brought" in the Claims Court. *Heller, Ehrman, White & MacAuliffe v. Babbitt*, 992 F.2d 360, 363 (D.C. Cir. 1993). The Cherokee Nation argues that this case presents the exact reverse of the *Heller, Ehrman* case, demonstrating that the absence in the Settlement Act of a jurisdictional grant to the Court to hear challenges to attorney fee payments from a settlement fund precludes the Court to hear PB's claim.

internal quotations and other markings omitted). Prior decisions generally are not revisited unless there is "the discovery of new and different material evidence that was not presented in the prior action, or an intervening change of controlling legal authority, or when the prior decision is clearly incorrect and its preservation would work a manifest injustice." *Id.*

First, PB points out that the Cherokee Nation argued that the Settlement Act was not money-mandating in its opposition to PB's Motion to Intervene. *See* Pl. Cherokee's November 17, 2005 Opp. Mot. to Inter. at 23-26. In addition, Plaintiff Cherokee specifically argued at the December 13, 2005 oral argument that the Settlement Act was not money-mandating because the monies sought by PB come from tribal trust fund accounts rather than the U.S. Treasury judgment fund. See. Dec. 13, 2005 Tr. at 27:17-29:1. Plaintiff Cherokee's arguments were specifically considered by the Court in its December 19, 2005 Opinion and rejected**.** *The Cherokee Nation of Okla*., 69 Fed. Cl. at 159.

Second, PB states that Plaintiff Cherokee's arguments that (a) the Settlement Act, apart from the Tucker Act, conveys no jurisdiction to the Court to award fees to PB, and (b) that PB's cause of action is a dispute between private parties over which this Court has no jurisdiction, were previously raised in and copied verbatim from its opposition to PB's Motion to Intervene. *See* PB's Opp. To Cherokee Nation's Mot. To Dismiss at Exh. 1. Furthermore, PB states that Plaintiff Cherokee's argument that the Settlement Act does not grant jurisdiction to this Court is irrelevant since this Court has held that the Tucker Act provides this Court with jurisdiction to hear PB's claim. Finally, PB argues that the predecessor to this Court has ruled that competing attorney fee claims are not a private dispute. *Sissteton & Wahpeton Bands or Tribes v. United States*, 191 Ct. Cl. 459, 470-71 (1970).

2. PB's Response to Defendant's Motion to Dismiss

PB argues that Defendant has not provided any arguments to the Court to reverse itself other than those which the Court has rejected. It rejects Defendant's argument that the Secretary owes no duty to PB because it was not a party to the settlement agreement between Plaintiff Cherokee and the Defendant on the grounds that its Tucker Act claim is predicated upon the Settlement Act's mandating payment of attorney's fees. PB also asserts that, while the Secretary may have a trust relationship with the Cherokee Nation, the Secretary nonetheless owes an obligation to PB pursuant to the Settlement Act to pay its claim, which is 10 percent of the amounts recovered by the Cherokee Nation under the Settlement Act.

D. Analysis

The Court agrees with PB that the "law of the case" doctrine applies to the Court's prior determination that it has jurisdiction to hear PB's claim under the Tucker Act and that the Settlement Act "mandat[es] that the Secretary pay attorneys government funds. . . ." *The Cherokee Nation of Okla*., 69 Fed. Cl. at 159. As explained above, the "settled expectations of the parties," the Court will not revisit previously decided issues unless there is "the discovery of

new and different material evidence that was not presented in the prior action, or an intervening change of controlling legal authority, or when the prior decision is clearly incorrect and its preservation would work a manifest injustice." *Wolfchild*, 68 Fed. Cl. at 785. The Cherokee Nation and Defendant have not made such a showing. Although both parties claim that they were deprived of the effective opportunity to argue the money-mandating issue before the Court, the money-mandating issue was nonetheless fully explored at oral argument. Moreover, every single argument pertaining to the money-mandating issue proffered by both Cherokee Nation and Defendant was previously raised by the parties in either oral argument or in the briefings regarding PB's motion to intervene.

Defendant's argument that the Secretary's money-mandating duty runs to the tribes and not PB was argued at the December 13, 2005 oral argument. Tr. at 30 ("They [Congress] are not trying to protect the attorneys here. They duty here relates to protecting the tribes, and the secretary - already distribution of monies from the settlement fees escrow account in accordance with what the Cherokee Nation decided should happen. So simply put, from our perspective, it's not a money-mandating situation."). Nevertheless, the Court did not accept this argument and ruled that Congress mandated the payment of funds to attorneys, not just the Tribes. *The Cherokee Nation of Okla*., 69 Fed. Cl. at 159.

Similarly, the Cherokee Nations's arguments that the Settlement Act is not money-mandating have either been previously raised or are irrelevant. First, Plaintiff Cherokee presented its argument that the Settlement Act was not money-mandating because the Secretary pays attorneys' fees with tribal trust funds and not a money judgment from the U.S. Treasury. See Tr. at 27:17 - 29:1. This argument was explicitly rejected by the Court. *The Cherokee Nation of Okla*., 69 Fed. Cl. at 159 ("The Court is not persuaded by the Cherokee Nation's argument that section 1779e is not money-mandating because it does not authorize payment out of the general judgment fund, but rather from a fund set aside for the Cherokee Nation's payment of attorney's fees."). The Cherokee Nation's argument that PB's cause of action is a private contractual dispute that is not cognizable in this Court was also previously argued verbatim in its opposition to PB's motion to intervene. In response to this argument, the Court's December 19, 2005 Opinion explained that "there is no requirement that the statute expressly provide that the court has the power to adjudicate the dispute. To the contrary, the power or authority to adjudicate the dispute arises from the money-mandating nature of the statute." *Id.* at 158. The Cherokee Nation has not provided the Court with any new information that would justify another review by the Court nor has it shown that the Court's prior holding is manifestly wrong or would work an injustice.

The Cherokee Nation also asserts that the money authorized by the Settlement Act for payment of attorneys fees are tribal trust funds at the moment of appropriation, thereby rendering the appropriation not a Government obligation to pay attorneys fees. This argument misses the mark. Even if, for the sake of argument, funds appropriated by Congress become tribal trust funds by virtue of their appropriation, that does not in any way derogate from the Government's obligation under statute to pay the fees of attorneys for the respective Indian nations. Again, the

Court reiterates that "whether the money comes from the attorney fee escrow account or the judgment fund, it is still U.S. Government money." *The Cherokee Nation of Okla*., 69 Fed. Cl. at 159.

The parties have provided no basis for revisiting the money-mandating status of the Settlement Act. Accordingly, the Court reiterates that it has jurisdiction to hear PB's claims.

## V. Defendant Properly Performed Its Duty By Determining that the Settlement Act Mandated It To Pay Attorneys' Fees In Accordance with the Cherokee Nation's Instructions.

The parties are in dispute as to whether the Secretary properly interpreted section 1779e(a) of the Settlement Act, (codified at 25 U.S.C. § 1779e(a)). As stated above, and reproduced below, section 1779e(a) provides:

> At the time the funds are paid to the Indian Nations, from funds authorized to be appropriated pursuant to section 1779c of this title, the Secretary shall pay to the Indian Nations' attorney those *fees* provided for in the individual tribal attorney fee *contracts* as approved by the respective Indian Nations.

(Emphasis added). The issue *sub judice* is whether the clause, "as approved by the respective Indian Nations," modifies the noun "fees" or "contracts." The Cherokee Nation and Defendant argue that the "as approved" clause modifies "fees." while PB argues that it modifies "contracts."

### A. Defendant's Arguments

The Secretary interpreted its duties under section 1779e(a) as being "required to pay only those fees approved by tribal resolutions after the Settlement Act became effective and ... the Settlement Act requires the Secretary to perform a purely ministerial act in carrying out the instructions of the Cherokee Nation. . . ." Letter of James Cason to Chad Smith, Principal Chief of the Cherokee Nation of Oklahoma, at 2, Attach. Def.'s Mot to Dismiss. First, Defendant argues that the Secretary's construction of the attorneys' fees provision is entitled to deference under *Chevron, U.S.A. Inc. v. Natural Resources Defense Council*, *Inc*., 467 U.S. 837, 844 (1984) on the grounds that the Department of the Interior has strong expertise in construing Indian legislation.

Second, Defendant also argues that each side's interpretation of section 1779e renders certain portions of section 1779e(a) superfluous, and that where a genuine ambiguity exists in an Indian statute, a basic canon of construction requires that the ambiguity be resolved in favor of the Indians. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). This Indian canon of construction is also sometimes known as the *Blackfeet* presumption. Citing the "cardinal principle of statutory construction... that a statute ought, upon the whole, be construed that, if it can be prevented, no clause, sentence, or word, shall be superfluous, void, or insignificant,'"

*TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001), (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)), Defendant argues that both Defendant's and PB's interpretation each render certain words "superfluous," thereby resulting in an ambiguity.

As explained by Defendant, it interprets the phrase in section 1779e(a), "as approved by the respective Indian Nations," as modifying the word "fees." That interpretation renders the phrase "provided for in the individual tribal attorney fee contract" superfluous. PB, on the other hand, interprets "as approved by the respective Indian Nations" as modifying the word "contracts." However, this phrase renders the words "as approved by the respective Indian Nations" superfluous because no "individual tribal attorney fee contracts" can be valid or binding without approval by the tribe and the Secretary of Interior. Accordingly, so it argues, in order to adhere to the Indian canon of construction for Indian legislation, the Government must adopt the construction of section 1779e(a) which resolves the ambiguity in favor of the Cherokee Nation. Only the Government's construction renders the decision as to which attorneys are to be paid (and how much each attorney is to be paid) to the Cherokee Nation.

Defendant argues that the Secretary carried out its interpretation of section 1779e(a). The October 13, 2005 letter of the Associate Deputy Secretary states that he intended to pay attorneys' fees in accordance with the four Cherokee Nation tribal resolutions referenced. Accordingly, the Office of the Special Trustee made the payment of attorneys' fees in accordance with the October 13, 2005 Letter.

B. Cherokee Nation's Arguments

The Cherokee Nation, in its motion to dismiss, argues that the Secretary correctly construed the Settlement Act as a matter of law. First, the Cherokee Nation notes that PB's contract with Cherokee provides that PB's contingent fee is subject to the condition "that approvals required by law, if any, are obtained." Compl. Ex. 1 at 3. The contract defines "required approvals as including approvals by the Cherokee Nation Tribal Council and the Bureau of Indian Affairs, if required by regulation or statute." *Id.* at 1. Therefore, the Cherokee Nation argues that by the express terms of the contract, PB's contingent fee is subject to any approvals of the Cherokee Nation Tribal Council required by law. The Cherokee Nation argues that the Secretary reached the same conclusion, stating "I have determined that the Secretary is required to pay only those fees approved by tribal resolution after the Settlement Act became effective." Compl., Exh. 3 at 2.

The Cherokee Nation also argues that PB incorrectly interprets the phrase "as approved by the respective Indian Nations" as modifying the word "contracts" in section 1779e(a) because "approval" of a valid contract is itself a tautology since a valid contract must have already received the approval of the Cherokee Nation in the first place in order for there to be a contract at all. Such an interpretation would create a surplusage in the statute, contrary to the principle of statutory construction which mandates that meaning should be given to every word in the statute. The Cherokee Nation insists that "as approved by the respective Indian Nations" must modify the

word "fees" – as interpreted by the Secretary. This construction, according to the Cherokee Nation, is entitled to *Chevron* deference. *See also Udall v. Tallman*, 380 U.S. 1, 16 (1965).

The Cherokee Nation also argues that the Secretary's construction of section 1779e(a) is consistent with the Government's trust responsibility to protect the interests of Indian tribes rather than to protect parties contracting with the tribes. To this end, it cites *In re Sanborn*, 148 U.S. 222, 227 (1893) which holds that certain statutes which require the approval of contracts between a tribe and its attorneys are "intended to protect the Indians from improvident and unconscionable contracts [and] by no means create a legal obligation on the part of the United States to see that the Indians perform their part of such contracts. Similarly, it maintains that the Settlement Act was enacted to protect the rights and interest of the settling tribes, but not to create any rights or remedies for non-Indian contractors. By deferring to tribal determinations as to the appropriate amount to be paid to the Cherokee Nation's attorneys, the Secretary's construction, it maintains, is fully consistent with the Secretary's responsibility to manage tribal funds for the benefit of the tribe. *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942) (cited for the proposition that when managing tribal funds, the government's conduct should "be judged by the most exacting fiduciary standards.").

C. PB's Arguments

PB argues that the phrase "as approved by the respective Indian Nations," found in section 1779e(a), modifies the word "contracts" and not the word "fees." First, it argues that if every word in section 1779e(a) is to be given meaning, the "as approved" clause cannot refer to "fees" because it would make insignificant the phrase "provided for in the individual tribal attorney contracts." It also argues that, grammatically, if Congress intended the phrase "as approved" to refer to "fees" instead of "contracts", then the clause "provided for in the individual tribal attorney fee contracts" would have been set off by commas at the beginning and conclusion of the phrase. In other words, the applicable portion of the sentence would read: "the Secretary shall pay to the Indian Nations' attorneys those fees, provided for in the individual tribal attorney fee contracts, as approved by the respective Indian Nations." PB also argues that the "doctrine of the last antecedent" dictates that the "as approved" phrase modifies "contracts." The doctrine of the last antecedent provides that "qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to and including others more remote." *Elliot Coal Mining Co. v. Dir., Office of Workers' Comp. Programs*, 17 F.3d 616, 629 (3rd Cir. 1994) (citations and internal quotation marks omitted).

Because the statute is unambiguous, PB argues that the Court owes no *Chevron* deference to the Secretary's interpretation of the Settlement Act because the Secretary has not advanced a permissible construction of the statute. *See Chevron USA., Inc.*, 467 U.S. at 843 ("the question for the court is whether the agency's answer is based on a permissible construction of the statute."). Moreover, PB also asserts that the Indian canon of construction does not apply when there is no ambiguity in the statutes. "The canon of construction regarding the resolution of ambiguities in favor of the Indians, however, does not permit reliance on ambiguities that do not exist, nor does it permit disregard of the clearly expressed intent of Congress. *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986) (footnote omitted).

Even if there is an ambiguity in the statute, so PB argues, the legislative history resolves any ambiguity in favor of PB's interpretation. PB points to the committee report of the House Committee on Resources on the operation of section 1779e, which states "This section authorizes the Secretary to pay the Nations' attorneys those sums owed them under the respective contracts, but imposes a cap of ten percent of the Nation's allocation of funds appropriated under [section 1779c]." H.R. Rep No. 107-632 at A-29. Because the legislative history states nothing as to any "approval" of attorneys' fees by the Indian Nations, so PB argues, the statute means that the "as approved" clause modifies "contracts" rather than "fees." Because the legislative history is clear, there can be no statutory presumption in favor of the Cherokee Nation. *See, e.g. Chickasaw Nation v. United States,* 534 U.S. 84, 91-93 (2001). Moreover, PB argues that this case is a dispute between the Government and a third party, and that the Indian canon of construction does not apply to such disputes.

D. Analysis

Although the Court determined that the Settlement Act is a money-mandating statute and requiring the payment of attorneys' fees, it left open the issue of whether the Secretary correctly construed the Settlement Act in paying only those fees "approved by the respective Indian Nations." To resolve that issue, the Court must interpret section 1779e(a). Statutory interpretation begins with the plain meaning of the language of the statute. "The starting point in any case involving construction of a statute is the language itself." *St. Paul Fire & Marine Insurance Co. v. Barry*, 438 U.S. 531, 5471 (1978). *See also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, ___ U.S. 546 ___, 125 S.Ct. 2611, 2626, 162 L.Ed.2d 502 (2005) ("As we have repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material."). The analytical framework by which the Court will interpret the statute is as follows:

> In determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of "a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." Of course, there is no errorless test for identifying or recognizing "plain" or "unambiguous" language. Also, authoritative administrative constructions should be given the deference to which they are entitled, absurd results are to be avoided and internal inconsistencies in the statute must be dealt with.

*Tex. State Comm'n for the Blind v. United States*, 796 F.2d 400, 406 (Fed. Cir. 1986) (internal citations omitted). When the language of the statute is not clear, canons of construction may be used to determine the plain meaning of the statute, if possible. Such canons of construction are not binding on the Court. Rather, they are interpretative aids and "guides that 'need not be conclusive.'" *Chickasaw Nation*, 534 U.S. at 94 (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001)). If "the language is clear and fits the case, the plain meaning of the statute generally will be regarded as conclusive." *Norfolk Dredging Co. v. United States*. 375 F.3d 1106, 1110 (Fed. Cir. 2004).

However, the Court might not be able to determine the plain meaning of a statute because the language may be ambiguous. "Ambiguity in a statute. . . normally means two or more alternative readings, all having some claim to respect and none leading to absurd results." *Hart v. United States,* 218 Ct. Cl. 212, 219 (1978). Statutory language is also considered to be ambiguous if it is "capable of being understood by reasonably well-informed persons in either of two or more senses." *Wash. State Dept. Of Servs. for the Blind v. United States*, 58 Fed. Cl. 781, 792 (2003) (citing 2A Norman J. Singer, *Statutes and Statutory Construction* § 45:02 (6th ed.2000) at 14). In such cases, the Court may "resort to legislative history and other extrinsic aids." *Id.* Finally, "if the legislative history is equivocal and does [not] constitute a reliable indicator of the intentions of Congress, any remaining ambiguities should be resolved by resort to any applicable presumption." *AD Global Fund, LLC v. United States* 67 Fed. Cl. 657, 672 (2005).

Turning to section 1779e(a), it is not immediately apparent whether the phrase "as approved by the respective Indian Nations" modifies the noun "fees" or the noun "contracts." Therefore, the Court applies the cardinal principle of statutory construction that "a statute ought, upon the whole, be so construed that, if it can be prevented, no clause, sentence, or word, shall be superfluous, void, or insignificant." *Duncan*, 533 U.S. at 174. When this canon of construction is applied, it becomes clear that the phrase "as approved by the respective Indian Nations" cannot modify either "fees" or "contracts" without creating a surplusage. If the "as approved" phrase modifies the word "contracts," then it is purely redundant insofar as any valid contract entered into by the Indian Nation is "approved." The phrase adds absolutely nothing to the statute if Plaintiff's interpretation is correct. A "cardinal rule of statutory interpretation [is] that no provision should be construed as entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778 (1988). While PB argues that the "as approved" clause means that any attorney with an approved contract gets whatever the contract provided for, that phrase could easily be inconsistent with the ten percent statutory cap on attorneys' fees provided for in section 1779e(b). Similarly, Defendant's construction of the "as approved" clause as modifying "fees" also renders the phrase "provided for in the individual tribal attorney fee contracts" superfluous or insignificant.

PB argues that the "rule of the last antecedent" demands that the "as approved" clause must modify the word "contracts" insofar as the word "contract" is the last antecedent of the "as approved" phrase. The "rule of the last antecedent" is a canon of construction which means that a limiting phrase should ordinarily be read as modifying only the noun or phrase that immediately precedes it. *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 342-43 (2005). The Court, however, does not believe that the rule of the last antecedent applies in this case. First, typically, the rule applies to statutes where there are two or more antecedents, followed by a qualifier in which it is unclear whether the qualifier applies only to the last item in the series or to all of the items. In this case, however, the issue is a choice between two possible antecedents in the alternative. But, even if the rule is potentially applicable in this scenario, the Court believes that it ought not to be applied here. The rule itself "is not inflexible and uniformly binding." 2A Norman J. Singer, *Statutes and Statutory Construction* § 47:33 (6th ed.2000) at 372. The use of the last antecedent rule in this case does not make the "as approved" phrase any less superfluous than it is absent the application of the rule. Application of this rule,

therefore, would not resolve the interpretative problem. PB's further argument in favor of its construction based on the lack of commas setting off "provided for in the individual tribal attorney fee contracts" from the rest of the sentence, likewise fails because it, too, does not resolve the interpretative problem for either its or Defendant's construction. "[A] purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454-55 (1993).

Since the plain meaning of the statute cannot be discerned by means of the standard canons of construction, the Court turns to the relevant legislative history of the Settlement Act to discern Congressional intent with respect to the "as approved" clause.[6] PB points to a Committee Report of the House of Representative's Committee on Resources which states that section 1779e "authorizes the Secretary to pay the Nations' attorneys those sums owed them under their respective contracts, but imposes a cap of ten percent of the Nation's allocation of funds appropriate under [section 1779c]. H.R. Rep. No. 107-632, at 8. However, the legislative history itself neither gives any indication that Congress intended for the Secretary to pay attorneys whatever they claim to be their fees, no matter whether the Indians have approved the fee claim, nor provides any guidance as to the process by which the Secretary determines "those sums owed them." The one sentence simply states the common-sense notion that the Secretary is to pay attorneys fees subject to the payment cap. The legislative history is simply unhelpful in interpreting the statute. Thus, if the legislative history is "equivocal and does [not] constitute a reliable indicator of the intentions of Congress, any remaining ambiguities should be resolved by resort to any applicable presumption." *AD Global Fund*, *LLC*, 67 Fed. Cl. at 672. Because the statute is ambiguous, the Court now turns to the canon of interpreting ambiguous statutes in favor of Indian tribes.

As stated above, it is a well-established canon of interpretation for Indian legislation that ambiguities are construed to the benefit of Indian tribes. *Blackfeet Tribe of Indians*, 471 U.S. at 766 (statutes are "to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit"). Applying this Indian canon of interpretation to the ambiguous section 1779e(a), the "as approved" clause must modify "fees" because only this construction enhances the Cherokee Nation's sovereignty by giving it the decision as to which attorneys are to be paid and how much they are to be paid. In contrast, if the "as approved" clause modified

---

[6]It is not clear from the decisional history of this circuit whether the Court must look to legislative history prior to applying any presumption that would resolve an ambiguous statute. *See AD Global Fund, LLC*, 67 Fed. Cl. at 672. ("Although the court recognizes that other courts have employed presumptions as part of the plain-meaning analysis, the court deems that it is appropriate to use such a presumption after consulting the legislative history."). In the case of the so-called *Blackfeet* presumption in favor of the Indian tribes, analyzed *infra,* which is predicated upon Congressional intent in Indian legislation to benefit Indian tribe, there is a strong argument that resorting to legislative history prior to application of *Blackfeet* presumption is unnecessarily duplicative. The Court need not, however, resolve that issue here because, as explained below, the legislative history sheds no light on the ambiguity whatsoever.

"contracts," the statute would not respect the sovereignty of the Cherokee Nation to determine how it intended to pay the fees of its counsel.

PB, however, states that this Indian canon of construction cannot be used to contravene other interpretative guides or to create an ambiguity where none exists. *Red Lake Band v. United States*. 17 Cl. Ct. 362, 381 (1989) ("This rule [construing statutes to benefit Indians] does not permit a construction that contradicts express statutory language or legislative history, however.") While it is true that the Indian canon of construction cannot be used to contradict an unambiguous statute, the Court has found that the "as approved" clause is ambiguous. The presumption in favor of the Indians is appropriately used to resolve ambiguities. *Chickasaw*, 534 U.S. at 93-94; *Pueblo of Santa Ana v. United States*, 214 F.3d 1338, 1342 (Fed Cir. 2000).

Next, PB argues that, because the Indian canon of construction is "rooted in the unique trust relationship between the United States and the Indians," *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985), the canon should not be applied by the Government to the detriment of a third party with whom the Government does not have a trust relationship. However, this argument is flawed because from the point of view of the Indian canon, it is immaterial whether an ambiguous statute is construed in a manner favorable or unfavorable towards a third party. It is also not the case that the Indian canon must be construed to the detriment of the Government. It is enough that the ambiguity occurs in a statute which Congress intended to benefit an Indian tribe.

> The *Blackfeet* presumption simply requires that, when there is doubt as to the proper interpretation of an ambiguous provision in a federal statute enacted for the benefit of an Indian tribe, "the doubt [will] benefit the Tribe, for '[ambiguities in federal law have been construed generously in order to comport with... traditional notions of sovereignty and with the federal policy of encouraging tribal independence.'"

*Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 729 (9th Cir. 2003) (internal citations omitted).

*Artichoke Joe's* itself is an example of a case where the Indian canon of construction was applied to the detriment of a third party. The plaintiffs were non-Indian private parties that sued the Secretary of Interior and various California state officials because they were prohibited from conducting certain gaming activities, while Indian tribes within California were permitted to do so. *Artichoke Joe's Cal. Grand Casino*, 353 F.3d at 714. At issue were the plaintiffs' and the Secretary's rival interpretations of a provision of the Indian Gaming Regulatory Act ("IGRA"). *Id.* at 714-18. The Ninth Circuit found that both proposed interpretations were plausible and deemed the disputed statute ambiguous. *Id.* at 722, 724. It then determined that the statute was enacted for the benefit of the Indians and that the *Blackfeet* presumption applied. *Id.* At 728. The Ninth Circuit then noted two possible exceptions to the *Blackfeet* presumption: *Chevron* deference to agency construction of a statute, and the canon of construction requiring the court to avoid constitutionally doubtful constructions of a statute. *Id.* at 730. Here, the Ninth Circuit noted that some circuits held that *Chevron* deference could "overcome the [*Blackfeet*]

presumption." *Id.* However, the Ninth Circuit assumed without deciding that the Secretary's determination was entitled to *Chevron* deference and noted that both the *Chevron* deference and the *Blackfeet* presumption pointed to the same interpretation, that is, an interpretation of the IGRA that permitted the Indian tribes to continue its gaming activities.[7] The second exception was not relevant to the case. Accordingly, the court applied the Indian canon of construction in favor of the Indians, despite the fact the Indian tribes were not parties to the case, and that the use of the presumption was detrimental to the interest of the non-Indian parties. *Id.*

Similarly here, PB's complaint is predicated upon the Secretary's determination, which was designed to honor the sovereignty of the Cherokee Nation's management of its relationship with its attorneys. "I have determined that the Secretary is required to pay only those fees approved by tribal resolutions after the Settlement Act became effective and that the Settlement Act requires the Secretary to execute a purely ministerial act in carrying out the instructions of the Cherokee Nation as expressed in the post settlement resolutions of the Council. . . . . The Department respects the sovereignty of the Cherokee Nation and its right to manage its relationship with third party counsel." Compl. Exh. 3 at 2. The fact that the Secretary's finding is to the detriment of third-party counsel is irrelevant. Since the Secretary's interpretation of the ambiguous section 1779e(a) and payment of attorneys' fees in accordance with tribal resolutions gives full effect to the Cherokee Nation's sovereignty, its interpretation must prevail.[8]

---

[7] In the present case *sub judice*, both the Cherokee Nation and Defendant have alleged that the Secretary's interpretation of section 1779e(a) is entitled to *Chevron* deference. However, the Court is not convinced that her interpretation is owed deference under *Chevron* because *Chevron* deference is warranted "only when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law." *Gonzales v. Oregon*, __ US __, 126 S.Ct. 904, 914-915 (2006) (quotations omitted). There is no evidence that Congress delegated any authority to the Secretary to make any rules whatsoever in carrying out the Settlement Act, nor has the Secretary issued any such rules or undertaken any adjudicatory role in carrying out the duties imposed on it by the statute. While the Secretary certainly has vast expertise in interpreting Indian statutes generally, the Secretary interprets its role in paying attorneys' fees is a "purely ministerial act." Compl., Exh. 3 at 2. One court has held that the Secretary is due no deference when "merely authorized [by statute] to process and pay" claims. *Wagner Seed Co., Inc. v. Bush*, 946 F.2d 918, 921 (D.C. Cir. 1991). However, it is theoretically possible that the Secretary's determination is owed a lower level of deference; e.g., *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944), which held that an agency "with specialized experience and broader investigations and information" available based upon the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." As in *Artichoke Joe's*, however, both the Indian canon of construction and the Secretary's interpretation of the ambiguous statute point to the same result. Therefore, the Court need not determine whether the Secretary's interpretation of section 1779e(a) is owed no deference or a lower level of deference.

[8]The Cherokee Nation argues that PB's fee claim suffers from a host of defects that preclude PB from stating a claim in this Court. However, because the Court finds that the

## VI. CONCLUSION

Because the Secretary correctly construed the Settlement Act as requiring the payment of attorney's fees "as approved by the respective Indian Nations," and paid Cherokee Nation's attorneys in accordance with the tribe's instructions, the Court finds that PB is not entitled to damages in this forum. Accordingly, the Court **DENIES** Defendant's motion to dismiss and **GRANTS** its motion for summary judgment. Cherokee Nation's motion is hereby **GRANTED**. Intervenor-Plaintiff-Patton Boggs' Cross-Motion for Summary Judgment is **DENIED**.

Pursuant to RCFC 54(b), inasmuch as there appears to be no just reason for delay, the Clerk of the Court is hereby directed to enter judgment in favor of Plaintiff Cherokee Nation and Defendant with respect to Intervenor-Plaintiff Patton Boggs' claims and to dismiss Intervenor-Plaintiff Patton Boggs' complaint, with prejudice. No costs.

**IT IS SO ORDERED.**

s/ Edward J. Damich
EDWARD J. DAMICH
Chief Judge

Secretary properly interpreted section 1779e(a), there is no need to consider the Cherokee Nation's additional arguments.